Julian André (SBN 251120)
jandre@mwe.com
**McDERMOTT WILL & EMERY LLP**
2049 Century Park East, Suite 3200
Los Angeles, California 90067-3206
Telephone:  +1 310 277 4110
Facsimile:   +1 310 277 4730

Joseph B. Evans (*pro hac vice* application pending)
Todd Harrison (*pro hac vice* application pending)
jbevans@mwe.com
tdharrison@mwe.com
**McDERMOTT WILL & EMERY LLP**
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone:  +1 212 547 5400
Facsimile:   +1 212 547 5444

Counsel for Plaintiff

TAYLOR THOMSON

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Taylor Thomson, | CASE NO. |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | 1. **Fraud** |
| | 2. **Civil Conspiracy to Commit Fraud** |
| Persistence Technologies (BVI) Pte Ltd. Tushar Aggarwal and Ashley Richardson, | 3. **Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder - 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5** |
| Defendants. | 4. **Selling Unregistered Securities – Cal. Corp. Code § 25503** |
| | 5. **Misrepresentation or Omission of Material Fact in the Sale of Securities – Cal. Corp. Code §25501** |
| | 6. **False Advertising - Cal. Bus. & Prof. Code §17500 BPC** |
| | **JURY TRIAL DEMANDED** |

McDermott Will & Emery LLP
Attorneys At Law
New York

Plaintiff Taylor Thomson ("Ms. Thomson" or the "Plaintiff"), file this complaint against defendants Persistence Technologies (BVI) Pte Ltd. ("Persistence"), Tushar Aggarwal ("Aggarwal") and Ashley Richardson ("Richardson" and, collectively with Persistence and Aggarwal, "Defendants").

## PRELIMINARY STATEMENT

1.     In 2021, Defendant Aggarwal learned that Defendant Richardson had gained the trust of Ms. Thomson, an affluent individual who had recently become interested in investing in crypto.  In a calculated effort to convince Ms. Thomson to provide capital, Aggarwal and Persistence delivered false promises of returns and market adoption to Ms. Thomson through Richardson.  Relying on those false promises, Ms. Thomson invested a total of $46,082,634 to purchase Persistence's cryptocurrency, XPRT.  Aggarwal and Persistence structured Ms. Thomson's investment into 11 different wallets in order to artificially inflate the value of XPRT by making it look like numerous large and influential investors, rather than a single investor, had placed significant amounts of capital into XPRT.  Aggarwal and Persistence paid Richardson a secret kickback of $783,702 in XPRT for working with them to induce Ms. Thomson to invest in Persistence.  However, once the Defendants' efforts to improperly inflate the value of XPRT failed, XPRT dropped more than 90% in value, causing losses to Ms. Thomson of at least $43,565,429.

2.     This lawsuit seeks to recover a portion of those losses associated with open market purchases made by Ms. Thomson totaling $24,731,599.

3.     XPRT is an unregistered security.  Ms. Thomson and other investors invested fiat and crypto to purchase XPRT, expecting to profit from the efforts of Aggarwal and the rest of the Persistence team.  Aggarwal repeatedly touted the work being done by the "project team" in his varied efforts to obtain more XPRT investors. XPRT was being marketed directly to investors in the United States through social media, websites, speaking engagements, and at least one secretly paid agent of Persistence, Richardson.

McDermott Will & Emery LLP
Attorneys At Law
New York

- 2 -
COMPLAINT

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
NEW YORK

4.      The Defendants' efforts to obtain XPRT investors were directed through Richardson, a California resident who executed the scheme in Los Angeles, California.  The calls, text messages, and emails promoting XPRT to Ms. Thomson occurred while Richardson was located in California.  During many of these conversations, Ms. Thomson was also located in California.  While Ms. Thomson was physically present outside of the U.S. when the purchases pursuant to the Token Sale Agreement ("Agreement") were executed, Persistence knew that the sales and marketing efforts were occurring while Richardson, and on some occasions Ms. Thomson, were located in California.

5.      Among other things, Persistence made false, misleading, and unattainable promises about the potential to earn rewards, at one point advertising on its Twitter account an impossible Annual Percentage Yield ("APY") of 1,948%.

6.      Accordingly, Defendants Ashley Richardson, Tushar Aggarwal, and Persistence Technologies (BVI) Pte Ltd. engaged in fraud and the unregistered sale of securities, causing Ms. Thomson to lose tens of millions of dollars worth of cryptocurrency.

## THE PARTIES

7.      Plaintiff Ms. Thomson is a Canadian citizen who currently resides in England.

8.      Defendant Persistence is a company incorporated in the British Virgin Islands and located in Singapore.

9.       Defendant Tushar Aggarwal is the founder and Chief Executive Officer of Persistence currently and at all times relevant to this action.

10.      Defendant Richardson is an individual who resided in Los Angeles, California, at all times material to this action, and who currently resides in and is a citizen of the State of California.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts causes of action arising under the laws of the United States.

12.     The Court has supplemental subject matter jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a) because they are so related to the Plaintiff's federal law claims as to form the same case and controversy.

13.     The Court has personal jurisdiction over Defendants because Richardson is subject to personal jurisdiction as a resident of the state of California, because the underlying events giving rise to these causes of action occurred in this judicial district, and Persistence is subject to specific jurisdiction in California and specifically in the Central District of California, as alleged herein, as it worked directly with Richardson with respect to the transactions that led to Plaintiff's damages and offered its securities to California residents.

14.     Defendants also caused false representations to be made to Ms. Thomson through Defendant Richardson while Defendant Richardson was physically located in California.

15.     Defendants Aggarwal and Persistence also agreed to pay, and subsequently did pay, a secret kickback to Richardson in California in exchange for Richardson's assistance in luring Ms. Thomson to invest in Persistence while Richardson was physically located in California.

16.     Additionally, because the facts alleged in this Complaint arise from a single transaction or occurrence, the Court also has pendent personal jurisdiction over all Defendants and because Section 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa) authorizes nationwide personal jurisdiction and service of process.

17.     Venue in this judicial district is proper under Section 20 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b)(2), or in the alternative, § 1391(b)(3).

18.     Venue in this judicial district is also proper because the underlying events occurred in this judicial district.

19.     Venue in this judicial district is also proper because Defendants caused false statements to be made to Ms. Thomson through Richardson while Richardson was present in this district.

20.     Venue in this judicial district is also proper because Defendants Aggarwal and Persistence agreed to pay, and subsequently did pay, a secret kickback to Richardson while Richardson was present in this district.

## BACKGROUND ON CRYPTOCURRENCY

21.     The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "virtual currencies," "digital assets," "coins," and "tokens." Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay.  Most customers purchase cryptocurrency speculating that the price of that particular cryptocurrency will increase.  Some cryptocurrencies are also used to buy goods and services.  Bitcoin (BTC) and Ethereum (ETH) are currently the most popular cryptocurrencies, but there are thousands of other cryptocurrencies.

22.     All cryptocurrencies exist on a "blockchain."  A blockchain is an open-sourced string of code, which is the underlying technology that facilitates the creation of and subsequent transaction in a particular cryptocurrency.  All transactions are recorded on the blockchain and are publicly available.  When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions, called "blocks."  Those "blocks" are publicly available and reflect all of the cryptocurrency transactions that occurred on the blockchain at a particular point in time.  Those "blocks" are all reflected on the blockchain and are ordered by date in a "chain," which is why it is called a "block"-"chain."

23.     There are a number of different blockchains.  The first and most popular blockchain was the Bitcoin blockchain.  Another well-known blockchain is the Ethereum blockchain, which launched the popular cryptocurrency ETH.    The

McDermott Will & Emery LLP
Attorneys At Law
New York

COMPLAINT

Ethereum blockchain made it relatively easy to create new cryptocurrencies that would also reside on the Ethereum blockchain. Those cryptocurrencies created on the Ethereum blockchain are referred to as "ERC-20" compliant tokens. There are thousands of cryptocurrencies other than BTC and ETH, which are commonly referred to as "altcoins." Most of those altcoins are "ERC-20" compliant tokens.

24.    XPRT is considered an "altcoin".

25.    Smart contracts are open-sourced code that exist on the blockchain and dictate to the market participants exactly how a particular transaction will be executed. They are "self-executing", meaning that each participant to a smart contract does not have to agree in the future to make a payment or transfer cryptocurrency. Once the "rules" of the smart contract are satisfied, the smart contract automatically executes the transaction. Most smart contracts are designed so they can never be changed. However, the designer of the smart contract can retain the ability to "withdraw" the smart contract, which effectively cancels it.

26.    Users generally hold cryptocurrency tokens in digital wallets. On the Ethereum blockchain, tokens, wallets, and smart contract are all identifiable by unique public keys. These public keys are 40-digit alphanumeric strings, such as "0x36994486c6e97c170065899d8659a28d7371c800." Anyone can use the platform Etherscan to see the complete public history of transactions associated with any of these public keys, including any time tokens are traded, or any time a smart contract is used.

27.    In recent years, the term "decentralized finance" or "DeFi" has become popular. This term has been widely applied to traditional lending, yield earning, and banking services that are not being performed by a centralized bank or financial institution. Instead, these services are being provided solely by "decentralized" organizations and governed by self-executing smart contracts. In reality, many products that claim to be "DeFi" and completely "decentralized" are actually being

McDermott Will & Emery LLP
Attorneys At Law
New York

controlled by a group of natural person insiders who are making decisions, marketing the product, running the websites, and generally control nearly everything related to the so-called "DeFi" project.

28.    Persistence is one such self-described "DeFi" project.

29.    In reality, Persistence, like many other "DeFi" projects is actually controlled by a core team of decisionmakers, as further described herein.

30.    An important element of many DeFi protocols is "staking."  Staking is, on a basic level, lending tokens to a protocol in exchange for the promise of a return. "Stakers" can place their cryptocurrency into the protocol and in exchange the users gain interest on their investment, called "yield."

31.    As described in more detail below, Persistence offered a yield-earning liquid staking opportunity which it calls pSTAKE.

## BACKGROUND ON PERSISTENCE

32.    Persistence launched its native staking cryptocurrency (XPRT) in April 2021.

33.    Persistence has, at all relevant times, been controlled by Aggarwal as well as a small team of promoters including "core" team members Jeroen Develter, Mikhil Pandey, and Puneet Mahajan.

34.    Aggarwal is the founder and CEO of Persistence.[1]

35.    The ongoing operation, management, and future success of the XPRT network are under the control of Aggarwal and the core team.

36.     This control includes, but is not limited to, the ability to update the XPRT network's software, manage the XPRT economy, stimulate demand for XPRT,

---

[1] Tushar Aggarwal, *Staking will eat proof-of-work for breakfast — Here's why* (Aug. 18, 2021), https://cointelegraph.com/news/staking-will-eat-blockchain-for-breakfast-here-s-why; *FAQs*, Persistence, https://persistence.one/faq; Tushar Aggarwal, CEO of Persistence, BeInCrypto, https://beincrypto.com/author/tushar-aggarwal/; Tushar Aggarwal, Crunchbase, https://www.crunchbase.com/person/tushar-aggarwal-3997; *1739: Forbes Asia 30 under 30 Crypto CEO on Staking, DeFi and Blockchain Interoperability* (Oct. 10, 2021), https://techblogwriter.co.uk/persistence/.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
NEW YORK

and enter into partnerships or collaborations with other enterprises to enhance the utility and value of XPRT.

37.    For example, Persistence authored an article on February 10, 2022 in which Persistence asserted that "[i]n 2021, the Persistence team focused on the Core-1 mainnet launch and key block explorer/wallet/exchange integrations required to scale the ecosystem.  In 2022 and beyond, the main focus for the team will be to drive significant economic activity on the Persistence Core-1 chain."[2]

38.    The potential for XPRT to appreciate in value, thereby delivering a profit to its holders, depends largely on the effectiveness of Aggarwal and Persistence's collective efforts in these areas.

39.    XPRT is available and has been sold in the United States.

40.     XPRT is also freely available for purchase by United States persons through certain cryptocurrency exchanges, including KuCoin and Gate.io.

41.    Indeed, Persistence had a section of their website dedicated to advising customers on how to purchase XPRT, complete with links to various exchanges.

42.    The website states "Get Involved In the Persistence Ecosystem. Powered by XPRT" and elsewhere provided a host of links to exchanges and directs customers to "[a]cquire XPRT[.]"[3]

43.    This website was available throughout the United States, including in California.

44.    After being contacted recently by Plaintiff prior to the filing of this action, Defendants removed the offer to "[a]cquire XPRT" as well as the links to exchanges on which to purchase XPRT, however, these links appeared on the Persistence website and were functional at least as of April 27, 2023.

---

[2] Persistence Team, *The Vision for Persistence*, Persistence Blog (Feb. 10, 2022), https://blog.persistence.one/2022/02/10/the-vision-for-persistence/.
[3] Persistence, https://persistence.one/; Persistence, *XPRT*, https://persistence.one/xprt (this section of the website provides users with links to popular exchanges on which they can purchase XPRT. The exchanges include Huobi Global, KuCoin, and Gate.io.).

45.    The main Persistence website and the links prominently displayed thereon, remain accessible in California as of June 12, 2023.

46.    Persistence's website prominently states as follows: "Get Involved In the Persistence Ecosystem. Powered by XPRT" and elsewhere provided a host of links to exchanges and directs customers to "[a]cquire XPRT[.]"[4]

47.    As part of its strategy to promote the purchase and use of XPRT, the Defendants Persistence and Aggarwal orchestrated extensive marketing campaigns, produced promotional materials, and made numerous public statements.

48.    Through these channels, which include Twitter, the Persistence website and blog, YouTube, podcasts, Telegram, internet articles, ask me anything sessions (commonly referred to as "AMAs") and live conferences, the Defendant represented and implied that XPRT was not only a functional asset within its digital ecosystem, but also an investment that would appreciate greatly in value, including statements that at various times stated Persistence would have APYs of 1,948%, 245%, and 164%.

49.    These false and misleading communications created an expectation of profit among potential buyers, including Ms. Thomson, thereby encouraging and stimulating the purchase of XPRT.

50.    The economic value of XPRT is directly connected to the overall performance of Persistence.

51.    XPRT holders relying on Persistence's public statements reasonably believed that the value of XPRT was tied to the success of Persistence and its "core" team of promoters.

---

[4] Persistence, https://persistence.one/; Persistence, *XPRT*, https://persistence.one/xprt (this section of the website provides users with links to popular exchanges on which they can purchase XPRT. The exchanges include Huobi Global, KuCoin, and Gate.io).

McDermott Will & Emery LLP
Attorneys At Law
New York

52.     In various marketing and promotional materials, Persistence repeatedly claimed that XPRT would incur "value accrual" from the Persistence ecosystem's financial activity.

53.     Persistence claims on its website that "Persistence is an app chain for Liquid Staking powering an ecosystem of DeFi applications focused on unlocking the liquidity of staked assets" and that "$XPRT is the native staking cryptocurrency of the Persistence Core-1 chain."

54.     Persistence also offered a number of other products designed to allow XPRT holders to earn profit from their investment.

55.     For instance, in Persistence's October 2021 newsletter, Persistence highlighted "the launch of XPRT perpetual futures on AscendEX, with XPRT metrics across the board rising steadily."

56.     Most notably, Persistence offers "liquid staking" to facilitate its users' profit.

57.     In June 2021, Persistence launched pSTAKE, a "liquid staking solution" the company described as "a turning point in Persistence's history."[5]

58.     The company hosted a "Staking Gala" that closed on July 9, 2021.[6] Persistence claimed that XPRT would incur "value accrual" from the financial activity of Persistence.[7]

59.     Traditionally, to stake assets a user would lock their cryptocurrency with a protocol which would then pay them rewards for as long as the cryptocurrency was locked.

---

[5]  Persistence Blog, *Community Newsletter #10* (Aug. 22, 2021), https://blog.persistence.one/2021/08/22/community-newsletter-10-july-2021/.

[6]  Persistence (@PersistenceOne), Twitter (Jul. 8, 2021, 11:46 AM), https://twitter.com/pStakeFinance/status/1413177591025053702.

[7]  *See* Persistence, *XPRT: The Heart of Persistence Ecosystem*, https://persistence.one/xprt.

McDermott Will & Emery LLP
Attorneys At Law
New York

60.   "Liquid staking," in contrast, is a system by which Persistence pays users staking rewards, but also issues them a derivative asset called a "liquid token," which according to Persistence "can be used in DeFi for trading, liquidity provisioning, lending, or borrowing."

61.   On its website, Persistence describes the benefits of liquid staking available to XPRT holders as "unlocking the liquidity of otherwise locked staked assets, maximizing its capital efficiency, and providing greater flexibility and potentially higher returns compared to traditional staking methods."

62.   Aggarwal, Persistence, and Richardson falsely promised Ms. Thomson that this liquid staking would allow her to earn extreme returns on her investment in Persistence.

63.   Persistence's promotional materials also claimed that individuals could earn XPRT holders an APY as ridiculously high as 1,948% for providing liquidity on certain liquidity pools on "@osmosiszone".[8]

64.   On July 7, 2022, XPRT advertised up to an incredible 245% APR for "providing liquidity to pools on @osmosiszone[.]"[9]

65.   It continued to make these claims through at least July 2022.[10]

66.   Persistence and Aggarwal secretly paid Richardson a kickback of approximately $783,702 in XPRT to act on their behalf, and to pass on their false and misleading promises of high returns in order to recruit Ms. Thomson as an investor.

67.   Aggarwal, Persistence, and Richardson all concealed the secret kickback from Ms. Thomson.

///

---

[8] Persistence (@PersistenceOne), Twitter (June 27, 2021, 12:18 PM), https://twitter.com/persistenceone/status/1409184300369473541?s=42&t=OjdUXeKuQl4U-sBKKQDK5A.

[9] Persistence (@PersistenceOne), Twitter (Jul. 7, 2022, 2:00 PM), https://twitter.com/PersistenceOne/status/1545105607488950272.

[10] *See* Persistence (@PersistenceOne), Twitter (Jul. 7, 2022, 2:00 PM), https://twitter.com/PersistenceOne/status/1545105607488950272.

McDermott Will & Emery LLP
Attorneys At Law
New York

## XPRT IS A SECURITY

68.    When determining whether digital assets are securities subject to the Securities Laws, the SEC and federal courts have applied the "investment contract" analysis first articulated by the U.S. Supreme Court in *SEC v. Howey*, 328 U.S. 293 (1946) (the "*Howey* test").

69.    The *Howey* test is a four-part test for determining when a particular arrangement constitutes an "investment contract," and, therefore, a security.  Under the Howey test, four elements must be met for an asset to be considered a security:

        a.    An investment of money;

        b.    In a common enterprise;

        c.    With an expectation of profits; and

        d.    Derived from the efforts of others.

70.    XPRT meets all four prongs of this test.

71.    The SEC has repeatedly taken the position that, when cryptocurrencies are purchased and sold for fiat and other cryptocurrencies, the "investment of money" prong is satisfied.  Given that Ms. Thomson exchanged value for XPRT, the "investment of money" prong is satisfied for XPRT.

72.    Certain U.S. courts have held that a "common enterprise" exists where there is both "horizontal" and "vertical" commonality.  *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) (discussing horizontal commonality as "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits" and two variants of vertical commonality, which focus on "the relationship between the promoter and the body of investors"); *see, e.g.*, *SEC v. Kik*, 492 F. Supp. 3d 169, 179 (S.D.N.Y. 2019) (citing *Balestra v. ATBCoin LLC*, 380 F. Supp. 3d 340, 354 (S.D.N.Y. 2019)); *Mautner v. Alvin H. Glick Irrevocable Grantor Tr.*, No. 19-cv-2742, 2019 WL 6311520, at *7

McDermott Will & Emery LLP
Attorneys At Law
New York

(S.D.N.Y. Nov. 25, 2019).  The SEC generally considers cryptocurrency to satisfy "commonality."

73.    With respect to XPRT, Persistence has created "commonality" which satisfies the second prong of the Howey test because each of the investors' fortunes are tied to the fortunes of other XPRT investors.  The common goal of all XPRT investors is to use XPRT to make a profit. The profitability of XPRT is entirely dependent on the development and marketing of the OHM ecosystem by Persistence. *See Kik Interactive Inc.*, 492 F. Supp. 3d at 176-85.  For all these reasons, XPRT satisfies the common enterprise prong.

74.    The "Persistence One Official Announcements" Telegram account has made numerous statements that support the common enterprise prong.

   a.    On May 3, 2021, on Telegram, Persistence quoted the following statement from Aggarwal in a recent podcast: "It's still super, super early days for us... but what we have done is built strong foundations, and now we're spinning up multiple products to essentially drive value for end users and for XPRT holders."  See a screenshot of the post below:



In the recent interview with Jason Choi of Blockcrunch and The Spartan Group, who is also one of our esteemed advisors, Tushar gives some great insights into his journey with Persistence, provides some hints as to the team's broader strategy and gives an overview of the Persistence product ecosystem.

🚀 With the launch of our pStake liquid staking product quickly approaching, this is definitely not an interview to miss for all cryptonauts!

*"It's still super, super early days for us... but what we have done is built strong foundations, and now we're spinning up multiple products to essentially drive value for end users and for XPRT holders."*

🌐 Listen to the podcast: apple.co/3gRKFkg

🔊 Spread the word:
https://twitter.com/PersistenceOne/status/138915052069 5214088

Persistence.one | Twitter | Telegram | Medium | YouTube
t.me/PersistenceOne/395          2.4K 👁 May 3, 2021 at 05:34

COMPLAINT

McDermott Will & Emery LLP
Attorneys At Law
New York

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

b.    On May 28, 2021, on Telegram, Persistence stated: "We're continuously working hard to build out our product ecosystem to provide new opportunities for both institutional and crypto-native users, continuing with the launch of pSTAKE in June." A screenshot of the post is below:



c.    On July 2, 2021, Persistence, via its Telegram account stated, in part: "We have been working hard to create a truly game-changing liquid staking product for the PoS community. It's a pleasure to see so much interest and engagement from everyone." A screenshot of the post is below:

75.    On February 10, 2022, in a blog post, the Persistence Team wrote that their focus in 2021 was the "Core-1 mainnet launch and key block explorer/wallet/exchange integrations required to scale the ecosystem."[11]

76.    On February 10, 2022, in a blog post, the Persistence Team also stated that, "[i]n 2022 and beyond, the main focus for the team will be to drive significant economic activity on the Persistence Core-1 chain."[12]

77.    To determine whether there is an "expectation of profits," the SEC applies an "economic reality" test.  *See Telegram*, 448 F. Supp. 3d at 365 ("In the analysis of purported investment contracts, form should be disregarded for substance and the emphasis should be on economic reality.") (internal quotation omitted); *Kik*, 492 F. Supp. 3d at 179-180.  This asks how the cryptocurrency is actually used.  The advertising of Persistence repeatedly focuses on the availability of profit to investors, and so this prong is also satisfied.

78.    Numerous public statements by Persistence state specifically that purchasers of XPRT can expect exorbitant "APYs."  Persistence repeatedly used a rocket ship symbol to underscore these statements.  A rocket ship symbol is commonly understood in the cryptocurrency industry to communicate to buyers and potential buyers that the value of the security being sold will increase exponentially, "to the moon."

79.    For example, on May 4, 2021, on Telegram, Persistence stated: "[o]ur primary aim is to ensure the continual advancement of the network for the long-term

---

[11] Persistence Team, *The Vision for Persistence*, Persistence Blog (Feb. 10, 2022), https://blog.persistence.one/2022/02/10/the-vision-for-persistence/.

[12] *Id.*

COMPLAINT

McDermott Will & Emery LLP
Attorneys At Law
New York

success of Persistence and our community, and we're thrilled to see this coming to
fruition!"  A screenshot of this post is below:



80.    Additionally, the SEC has said that it is informative when "[a] digital asset
is transferable or traded on or through a secondary market or platform."  XPRT is
traded on a number of secondary markets, including Gate.io and KuCoin.

81.    For these reasons, XPRT clearly satisfies the reasonable expectation of profit prong.

82.    Finally, the "derived solely from the efforts of others" prong is closely related to the "common enterprise" prong. *Telegram*, 448 F. Supp. 3d at 375 (noting that the relevant inquiry asks "whether the reasonable expectation of profits [were] derived from the entrepreneurial or managerial efforts of others") (internal quotation omitted). Whether this prong is met depends, in large part, on the involvement of third parties in off- and on-chain governance.

83.    Persistence's website makes abundantly clear that Aggarwal and the core team control the protocol,[13] so the "efforts of others" prong is easily satisfied with respect to XPRT.

a.    Persistence, via Telegram, stated on May 12, 2021 that it was "working around the clock to usher in the new decentralized paradigm[.]" Persistence marketed its launch of a "pStake [sic] liquid staking app[.]" A screenshot of this post is below:

🤝 We'd like to thank Bitcoinist for their insightful article. We're working around the clock to usher in the new decentralized paradigm and it's great to see the space taking notice.

🚀 The next major milestone on our journey is the launch of our pStake liquid staking app, coming in June!

b.    On May 25, 2021 Persistence repeated a quote from a validator which stated that "'Persistence is one of the hardest working and

---

[13] *See, e.g.*, Persistence, *FAQs*, https://persistence.one/faq (stating in response to the question "[w]ho are the core team members of Persistence" as follows "The Persistence team currently comprises ~30 members. The Core team members of Persistence are - Tushar Aggarwal: Founder & CEO Jeroen Develter: Ecosystem lead Mikhil Pandey: pSTAKE lead Puneet Mahajan: Tech lead".).

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
NEW YORK

most innovative teams that championed various streams including NFTs, liquid staking, and token distribution models in the Cosmos ecosystem.' - Chorus One[.]"  A screenshot of this post is below:



84.    Because all four prongs of the *Howey* test are satisfied, XPRT is a security.

85.    Despite this, at no time has Persistence registered XPRT as a security with the SEC, or duly qualified XPRT with California Department of Business Oversight.

## AGGARWAL, PERSISTENCE AND RICHARDSON INDUCE MS. THOMSON TO INVEST WITH FALSE PROMISES

86.    Sometime in 2021, Richardson became aware that Ms. Thomson had amassed significant holdings in Ethereum and Bitcoin.

87.    Richardson also knew that she had a partner, Aggarwal, who would pay her to divert Ms. Thomson's wealth into Persistence.

88.    Sometime before August 2021, Richardson met and formed a close relationship with Persistence and its founder, Tushar Aggarwal.

89.    Unbeknownst to Ms. Thomson, around this same time, Aggarwal, Persistence and Richardson concocted a plan to feed Ms. Thomson misinformation and false statements in order to induce her investment.

McDermott Will & Emery LLP
Attorneys At Law
New York

90.    In communications with Ms. Thomson, Richardson made sure to describe to Ms. Thomson her close relationship with Aggarwal and Persistence, but concealed the secret kickback that she was receiving from Persistence.

91.    For example, Richardson worked with Aggarwal on a business plan related to staking as reflected in the below text conversation from November 10, 2021.

**November 10, 2021 Text Conversation Between Richardson and Ms. Thomson**



92.    On September 6, 2021, Richardson stated that she participated in a "huge marketing meeting" and "business development meeting" with Aggarwal and the Persistence team.

93.    Richardson and Aggarwal's business relationship became deeply intertwined, and they spoke regularly, especially during the autumn of 2021.

94.    Richardson and Aggarwal spoke multiple times between September 2021 and January 2022.

95.    In texts to Ms. Thomson, Richardson stressed her close relationship with Persistence and Aggarwal, telling Ms. Thomson that she had engaged in all of the following actions:

a.    Attended business development meetings with Aggarwal.

COMPLAINT

b.  On September 6, 2021, Richardson had "a huge marketing meeting with persistence, and then a business development meeting with Tushar. Also have news about things happening[.]"

c.  Also on September 6, 2021, Richardson relayed to Ms. Thomson information from Persistence that "BIG companies wanting to buy out persistence tech," and noted that she "told them to hold.. it's a great sign they are sitting on something this valuable, but too valuable to sell… yet)."

d.  On September 10, 2021, Richardson related that she was "having a call soon with the biggest crypto influencer, and getting him to promote Persistence and get all Of [sic.] the other influencers on board."

**September 10, 2021 Text From Richardson to Ms. Thomson**

Side note: I'm having a call soon with the biggest crypto influencer, and getting him to promote Persistence and get all
Of the other influencers on board

It's SO much fun

e.  On September 29, 2021, she relayed to Ms. Thomson that Persistence was "launching an aggregated NFT network in November[.]"

f.  On November 10, 2021, Richardson stated that she "formed a C corp called TruStake Because I thought we could scale it up, since there is clearly a need This is in no way on you, I genuinely worked with Tushar who was desperate to create this for whales[.]"

96.  On November 10, 2021, Richardson stated that Aggarwal "was desperate to create" a staking service "for whales."

97.   A "whale" is a famous or wealthy investor whose investment can buoy the price of a cryptocurrency token.  Unbeknownst to Ms. Thomson, Aggarwal and Persistence needed "whales" in order to artificially drive up the value of XPRT and attract users to the Persistence ecosystem.  Aggarwal, Persistence, and Richardson intended to, and eventually did, inflate the apparent value of Persistence by putting Ms. Thomson's large-scale investment of $40 million into various wallets, all of which would be visible on the public blockchain, and would thus misleadingly suggest to other potential investors that Persistence had many more investors, and potentially many more large investors, than Persistence actually had.

98.   Richardson and Aggarwal saw Ms. Thomson as such a "whale."

99.   On November 10, 2021, Richardson emphasized that Persistence wanted to "open[] the door for other whales."

100.   Together, Aggarwal, Richardson, and Persistence set out to exploit Richardson's relationship with Ms. Thomson and targeted Ms. Thomson to induce her to invest her money in Persistence.

101.   Secretly, Aggarwal and Persistence promised to pay Richardson kickbacks in exchange for her efforts.

102.   Months later, after inducing Ms. Thomson to invest in Persistence through false and misleading statements, Persistence and Aggarwal paid those kickbacks to Richardson.

103.   Defendants purposefully concealed the kickbacks from Plaintiff.

104.   Indeed, on November 10, 2021, Richardson told Ms. Thomson that "to clarify any doubt" she was getting no compensation for the Persistence transactions.

### November 10, 2021 Email from Richardson to Ms. Thomson

on staked assets is 50% and it is not yet clear if they have insurance. For context: currently you are earning 2.7-3M a month solely in coming from your persistence interest/staking, and it is estimated this will likely go up considerably in the coming months earning between 30-150M a year in interest alone (a commission of 15-75M a year). In contrast (and to clarify any doubt) I am not taking any commissions or fees.

COMPLAINT

McDermott Will & Emery LLP
Attorneys At Law
New York

105.    Richardson said this to Ms. Thomson to disguise the closeness of her relationship with Persistence and Aggarwal, and to disguise the fact that she was being paid to induce Ms. Thomson to invest in Persistence.

106.    Persistence and Aggarwal structured the secret kickback to Richardson to ensure that the more XPRT Ms. Thomson bought, the more XPRT Richardson would get for herself.

107.    Throughout the duration of her inducement of Ms. Thomson, Richardson regularly met with Persistence and Aggarwal.

108.    These included, at the very least, meetings on June 24, 2021, September 7, 2021, and October 7, 2021.

109.    Shortly after these meetings, Richardson repeatedly fed Ms. Thomson falsehoods about Persistence and its potential for growth.

110.    These misstatements were communicated to Ms. Thomson on Aggarwal and Persistence's behalf.

111.    Richardson communicated these misstatements to Ms. Thomson while Richardson was located in California.

112.    For instance on August 18, 2021, Richardson sent Ms. Thomson a link to an article written by Aggarwal, which made exorbitant claims about staking.

113.    The article advertised XPRT staking, stating "we can see traffic levels on those networks increase exponentially over the coming months and years. More traffic means more fees which means more generous rewards for validators and stakers, making staking a no-brainer for generating passive income."[14]

114.    On the same day, Richardson texted Ms. Thomson to pitch Persistence, stating: "Irony is Bitcoin is at 44.5 and persistence is up to 7 today."

---

[14] Tushar Aggarwal, S*taking will eat proof-of-work for breakfast — Here's why* (Aug. 18, 2021), https://cointelegraph.com/news/staking-will-eat-blockchain-for-breakfast-here-s-why.

COMPLAINT

115.   On August 22, 2021, Richardson sent Ms. Thomson a draft email that she wanted Ms. Thomson to send to directors of the certain corporate entities and trusts related to Ms. Thomson extolling the virtues of the "DeFi space" and saying that she believes Persistence "will go much farther than Ethereum or Bitcoin in regards to upside potential."  The full email is below:

### August 22, 2021 Email from Richardson and Ms. Thomson

Dear Mich and Bob,

I am reaching out directly to you both as a first line on a matter that is time sensitive and not as straight forward as Lieh buying ETF's. As you know I have been deeply intrigued and invested in the crypto space, but recently have also begun to explore the larger long term opportunities with smaller up and coming projects that exist in the DeFi space, all having a strong emphasis on Proof of Stake. It is understood that (crypto aside) blockchain technologies will become widely adapted in the coming years and are already being utilized/explored by major financial institutions. I have an opportunity to invest in of these companies as a staked token holder with a generous discount and a tremendous upside of APY. Based on their strong fundamentals and strategic partnerships I believe they will go much farther than Ethereum or Bitcoin in regards to upside potential. I am including a very top-level overview of the space written by their CEO. https://cointelegraph.com/news/staking-will-eat-blockchain-for-breakfast-here-s-why

I understand crypto is a volatile space, but based on the underlying technologies and adaptation of DeFi the investment feels far more secure. I have negotiated a deal with them (directly) with a point entry point of $5usd which they will honor despite the fact that it has since risen to $9.Considering the investment is already up 95% upon entry, a far greater ROI than anything in our existing portfolio.

116.   Ms. Thomson relied on these statements, and others, by Persistence, Aggarwal, and Richardson in deciding to invest in Persistence.

### STATEMENTS BY PERSISTENCE

117.   Persistence was spreading similar false and misleading statements publicly.

118.   For instance, in an April 13, 2021 blog post titled "Get Ready to Stake Your XPRT!" Persistence stated, in bold, that customers could "***stake their XPRT token rewards for 35+% APR*** even while they're locked."[15]

---

[15] Persistence Blog, *StakeDrop Rewards Distribution Mechanism Explained: Get Ready to Stake Your XPRT!* (Apr. 13, 2021),

McDermott Will & Emery LLP
Attorneys At Law
New York

119.   In an April 26, 2021 tweet, Persistence posted "If you're not staking $XPRT yet, you're missing out on huge rewards!"[16]

120.   On June 27, 2021 Persistence tweeted that "APYs [were] upto [sic.] 1,948%[.]"  A screenshot is below:



121.   On July 8, 2022, Mikhil Pandey, the project lead of Persistence Labs, while in the presence of Aggarwal in a virtual discussion posted on YouTube, discussed how one can obtain 60% yields through liquid staking on the Cosmos ecosystem available to pSTAKE customers.[17]

122.   Persistence released "community newsletters" on a monthly basis, which included numerous statements regarding the purported successes of the platform.  In August 2021 the newsletter included updates such as "We crossed an

https://blog.persistence.one/2021/04/13/stakedrop-rewards-distribution-mechanism-explained-get-ready-to-stake-your-xprt/.

[16] Persistence (@PersistenceOne), Twitter (Apr. 26, 2021, 8:46 AM), https://twitter.com/PersistenceOne/status/1386678153704267779.

[17] *Roadmap & Use Cases │ Snapshots: Diving into Liquid Staking*, YOUTUBE (July 8, 2022), https://www.youtube.com/watch?v=dRsf4BMs828.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
NEW YORK

incredible 200,000 transactions of XPRT with over 13,500 wallets created; our network is strong and the growth is phenomenal!" alongside a rocket ship symbol – a well-known emblem of profit-oriented cryptocurrency projects.

123.  In a community newsletter published on August 22, 2021, Persistence stated that its pSTAKE project had secured its spot "as the most efficient liquid staking product in the market."[18]

124.  Many of Richardson's communications with Ms. Thomson simply relayed false and misleading information from Defendants Persistence and Aggarwal.

125.  For instance, Richardson told Ms. Thomson, on behalf of Persistence, that "[Persistence] grandfathered you in as a key investor and are essentially giving you 65 Million in three weeks."

126.  These statements advanced discrete, false statements concerning the performance and likely returns from investing in XPRT.

127.  These discrete, false statements include:

a.  That Persistence would provide "APY that began at 6000% and "reduces weekly, until it lands somewhere around 100-200%"

b.  That Persistence "APYs [were] upto [sic.] 1,948%"

c.  That Persistence has an "…upside of 269% annually for early adapters[.]"

128.  None of these claims were true at the time they were made.  Far from making an exorbitant rate of return on her investment Ms. Thomson's initial investment decreased approximately 94.5% compared to the current value of her initial investment.

129.  Ms. Thomson relied on each of the above representations.

---

[18] Persistence Blog, *Community Newsletter #10 – July 2021* (Aug. 22, 2021), https://blog.persistence.one/2021/08/22/community-newsletter-10-july-2021/.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
NEW YORK

130.    If she had not been exposed to these numerous falsehoods promulgated by Aggarwal, Persistence, and Richardson, Ms. Thomson would never have made any investment in XPRT.

## AGGARWAL, PERSISTENCE, AND RICHARDSON'S FALSE STATEMENTS INDUCE MS. THOMSON TO INVEST

131.    After months of this targeted pressure campaign from Aggarwal, Persistence, and Richardson, Ms. Thomson acquiesced and agreed to purchase XPRT.

132.    Cryptocurrency companies in their early stages of development typically sell their new cryptocurrencies to buyers via contractual agreements.

133.    Despite the speculative risks of executing a cryptocurrency transaction of this kind, Richardson was dogged throughout August of 2021 in insisting that Ms. Thomson enter into the Agreement for XPRT.

134.    On August 18, 2021, Richardson even urged Ms. Thomson to send Persistence a "good faith amount" of Bitcoin or to sign a letter of intent for purchase of the cryptocurrency before Ms. Thomson was able to enter into a formal contract to purchase the cryptocurrency.

135.    On August 25, 2021, Ms. Thomson, at Richardson's direction, entered into the Agreement, which was memorialized in a written contract between Ms. Thomson and Persistence, and signed by Aggarwal.

136.    Since that day, all of the defendants' false and misleading statements have been proven to be either highly misleading or plainly false.

137.    The price of XPRT on the date of the first purchase had a high of approximately $8.16, due to the actions taken by the Defendants to falsely inflate the price.

138.    The market price of XPRT as of the writing of this Complaint is approximately $0.16.

McDermott Will & Emery LLP
Attorneys At Law
New York

139.   XPRT has decreased approximately 98% in value between the date of Ms. Thomson's first purchase of XPRT and the writing of this Complaint.

140.   Pursuant to Schedule 1 of the Agreement, Ms. Thomson agreed to purchase 4,000,000 XPRT in exchange for $20 million worth of cryptocurrency.

141.   When entering into the Agreement, Ms. Thomson relied on the false and misleading information which Aggarwal, Persistence, and Richardson provided.

142.   Together, Richardson and Persistence structured Ms. Thomson's XPRT purchases through multiple transactions over multiple days and sent the XPRT that Ms. Thomson purchased to multiple different wallets.

143.   Ms. Thomson did not have the expertise to recognize Defendants' scheme.

144.   Aggarwal, Persistence, and Richardson structured the transactions and storage in this manner in order to manipulate XPRT's price at Ms. Thomson's expense.

145.   Aggarwal, Persistence and Richardson insisted on structuring these transactions in this manner in order to make it appear that multiple individuals had made large purchases of XPRT and to falsely create the impression of broad interest in XPRT to the purchasing public.

146.   On August 24, 2021, Richardson directed the purchases through multiple wallets.

147.   In total, Persistence held Ms. Thomson's XPRT in approximately 11 separate ledgers in order to purposefully mislead the public, including actual and potential purchasers of XPRT.

148.   CoinMarketCap lists the anonymized wallet addresses of the top holders of any crypto asset, the number of cryptocurrencies held in each wallet, and the percent of the total supply that each wallet represents.

149.   Thus, due to Persistence and Richardson's improper and manipulative structuring of the transactions and their storage, the market believed it was seeing a

series of high-value investments in XPRT by numerous distinct investors.  In reality, a single investor, Ms. Thomson, had made a $46,082,634 investment.

150.   The scheme worked.  Buoyed by the misleading information Persistence put out to the buying public, XPRT's market cap grew by 30% in the days following Ms. Thomson's initial August 25, 2021 investment.[19]

151.   Persistence clearly placed great importance on the number of wallets, regularly provided misleading updates via social media regarding the number of wallet addresses on the Persistence platform.

152.   For example, on July 18, 2021, shortly before the execution of the Agreement, Persistence tweeted that it had "hit the huge milestone of over 12,000 total $XPRT wallet addresses[.]"[20]

153.   On November 23, 2021, after the Agreement, Persistence tweeted that its total wallet addresses exceeded 20,000.[21]

154.   Aggarwal, Persistence and Richardson used Ms. Thomson's investment in other ways to mislead the investing public.  For instance, Richardson proposed naming Ms. Thomson's staking node "Persistence Bull" because it would be seen as "a positive indicator whoever is holding it view there [sic] project in a positive light."

155.   Defendants chose the name to publicly suggest that someone holding a large amount of XPRT was generating returns.

---

[19]   CoinMarketCap, *Persistence Historical Data*, https://coinmarketcap.com/currencies/persistence/historical-data/; Richardson's own undisclosed XPRT trades, received as part of the kickback, benefitted from this market manipulation as well.

[20]   Persistence (@PersistenceOne), Twitter (July 18, 2021, 7:16 AM), https://twitter.com/persistenceone/status/1416718396847124484?s=46&t=OjdUXeKuQl4U-sBKKQDK5A.

[21]   Persistence (@PersistenceOne), Twitter (Nov. 23, 2021, 6:15 AM), https://twitter.com/persistenceone/status/1463103833480048642?s=46&t=OjdUXeKuQl4U-sBKKQDK5A.

COMPLAINT

McDermott Will & Emery LLP
Attorneys At Law
New York

156.  As 2021 came to a close, Aggarwal, Persistence and Richardson's pressure campaign continued, and they convinced Ms. Thomson to purchase even more XPRT.

157.  In multiple transactions between August 2021 and June 2022, Ms. Thomson purchased 8,624,431 XPRT worth $46,082,634.

158.  The first 4,000,000 XPRT were purchased under the Agreement, at an approximate value of $21,350,765.

159.  The remainder of the XPRT purchased directly from Persistence (purchased at a total value of $24,731,599) were not purchased pursuant to the Agreement.

160.  The following transactions were purchased pursuant to the Agreement:

| Date | Total Number of XPRT Purchased | Amount in BTC Paid in USD and Date | Subject to the Agreement? | Ms. Thomson's Location |
|------|-------------------------------|-----------------------------------|---------------------------|------------------------|
| 8/25/2021 | 3,000,000 | 15,711,929 on August 26, 2021 | Yes | Toronto |
| 9/6/2021 | 1,000,000 | 5,638,837 on September 6, 2021 | Yes | Toronto |

161.  The following transactions were purchased outside of the Agreement:

McDermott Will & Emery LLP
Attorneys At Law
New York

| Date | Total Number of XPRT Purchased | XPRT Market Price[22] Value in USD | Subject to the Agreement? | Ms. Thomson's Location |
|------|------|------|------|------|
| 10/4/2021 | 2,499,998 | $13,111,214 | No | London |
| 10/18/2021 | 1,499,997 | $9,996,588 | No | London |
| 10/23/2021 | 46,892 | $376,070 | No | London |
| 11/4/2021 | 51,039 | $452,975 | No | London and Toronto |
| 4/2/2022 | 6,666 | $ 23,597.64 | No | Toronto |
| 4/3/2022 | 91,147 | $ 327,219.13 | No | Toronto |
| 5/22/2022 | 59,039 | $ 98,890.95 | No | Los Angeles |
| 6/13/2022 | 43,160 | $ 48,122.83 | No | Toronto |
| 6/14/2022 | 139,145 | $ 130,865.02 | No | Toronto |
| 6/15/2022 | 187,349 | $ 166,056.52 | No | Toronto |

162.    Richardson executed transactions in Ms. Thomson's digital wallets while physically present in California.

163.    Ms. Thomson relied on Persistence and Richardson's misleading promises and false statements when she entered into the Agreement.

164.    However, Persistence and Richardson concealed numerous risks from Ms. Thomson associated with Ms. Thomson's purchase of XPRT.

165.    Unbeknownst to Ms. Thomson, Richardson and Persistence had an undisclosed compensation agreement whereby Persistence paid Richardson a financial kickback for bringing investors into the Persistence ecosystem.

---

[22] Market Price is average of High and Low on the day of sale from www.coinmarketcap.com.

COMPLAINT

166.   However, Richardson affirmatively and fraudulently represented to Ms. Thomson that she *did not* receive any financial compensation for brokering the Agreement.

167.   In an email on November 10, 2021, Richardson even told Ms. Thomson, "to clarify any doubt," that Richardson was "not taking any commissions or fees" with respect to Ms. Thomson's investment with Persistence.

168.   In reality, in exchange for bringing Ms. Thomson in as an investor, Persistence paid Richardson a kickback of 97,166 XPRT. [23]

169.   The kickback was paid to Richardson over four different transactions between August and October 2021. [24]

170.   The kickback was worth approximately $783,702 based on the price of XPRT at the times of the transactions. [25]

171.   The Defendants did not disclose this kickback arrangement to Ms. Thomson.  In fact, the Defendants purposefully concealed the kickbacks from Ms. Thomson.  The Agreement itself purposefully contained no reference to this kickback arrangement.

---

[23] *See* Mintscan Transaction Details:
1.  August 25, 2021 Transaction:
    - https://www.mintscan.io/persistence/txs/CF632D7033A5E7982957769B943C45474F3B99B1E4732F317120BC37AA92C292;
2.  September 6, 2021 Transaction:
    - https://www.mintscan.io/persistence/txs/21A6BB7F9C585B3864178F1C598D5C7CCD78853D7B55161689EF542AE9FD1F1B;
3.  October 4, 2021 Transaction:
    - https://www.mintscan.io/persistence/txs/95E3C37378CAA357339196E2F9A96B2A58ECD8BC81CDBC6406BB90CA9A15556A;
4.  October 18, 2021 Transaction:
    - https://www.mintscan.io/persistence/txs/3A551ACC6AFBB9DD7CFDCFDCC483686C83392637C584E9DB77D945AFB102530A.

[24] *Id.*
[25] *Id.*

172.   Section 7.4 of the Agreement specifically states that the "Agreement constitutes the entire agreement between the Parties[.]"

173.   The kickback also violates Section 2.5 of the Agreement, which states that "each of the Parties acknowledges that it has entered into this Agreement in reliance upon the other Party's representations and warranties being true, accurate, complete, and non-misleading in all respects."

174.   Ms. Thomson relied on Persistence's representations being true, accurate, complete, and non-misleading.

175.   However, Persistence's representations were untrue, inaccurate, and misleading because, among other things, they failed to disclose the existence of the secret kickbacks to Richardson.

176.   The $783,702 kickback was of significant value to Richardson and presented a serious undisclosed conflict of interest, at the very least.  Richardson's representation that she was not earning any compensation also was significant to Ms. Thomson and was an important consideration in her decision to authorize the investments in XPRT.

## AFTER THE INITIAL PURCHASE

177.   After the Agreement was executed, Richardson continued to fraudulently induce Ms. Thomson to continue investing in Persistence.  Richardson repeatedly assured Ms. Thomson that Ms. Thomson's investment in XPRT would considerably increase by mid-2022.

178.   Throughout this period, Ms. Thomson was convinced to repeatedly reinvest in Persistence by purchasing more XPRT tokens.

179.   After purchasing the 4,000,000 XPRT contemplated by the Agreement, Ms. Thomson made subsequent purchases of XPRT on October 4, October 18, October 23, November 4, in 2021 and on April 2, April 3, May 22, June 13, June 14, and June 15 of 2022.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
NEW YORK

180. During the period in which Ms. Thomson was making these purchases, Richardson continued to feed Ms. Thomson misleading statements from Persistence.

181. Richardson was present in California during this period.

182. On the same day that a purchase of XPRT was made, Richardson said "[y]our 20M instantly became 32.2 - but I expect even higher tomorrow."

183. On August 28, 2021, for example, Richardson, continuing to sell Ms. Thomson on Persistence, stated that there is "…upside of 269% annually for early adapters[.]"

184. There does not appear to be any basis for the figure of 269% annually.

185. On the same day, Richardson told Ms. Thomson that she "could have [her] own staking pool; which could be massive returns[.]"

186. On the same day, Richardson also said "[r]eward is in the form of persistence, I believe. And higher than regular staking. I'm getting the specifics next week on a call with him. Maybe we can do a zoom and you can join? Would love you to meet them[.]"

187. Aggarwal met with Ms. Thomson on or around January 21, 2022. He did not disclose the kickback at that time.

188. Later on in the day on August 28, 2021, Richardson told Ms. Thomson she could earn "200-600 % APY" with liquid staking.

189. Ms. Thomson relied on these misleading statements from Aggarwal, Persistence and Richardson when deciding whether she should continue investing in Persistence.

190. On October 7, 2021, Richardson stated to Ms. Thomson: "Also want to walk you through a meeting I just had with persistence [sic] about liquid staking – could be a huge upside for Atom, 15% a month APY which is about 180% a year. Have another meeting now but after if you have time let's hop on a call!"

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
NEW YORK

McDermott Will & Emery LLP
Attorneys At Law
New York

191.   On October 9, 2021, Richardson told Ms. Thomson that she believed Persistence "could be honestly huge" and that Richardson was "very[,] very bullish" on Persistence.

192.   On November 3, 2021, Richardson stated "even if persistence doesn't go up I think you are going to hit 500M before the end of the year At least 350" . . . "But I am sort of thinking it could go 500 or north of 500 . . . Honestly, that's not even a stretch if the bull holds[.]"  On November 8, 2021, 5 days from this date, the portfolio was around $278 million total, assuming the value of the NFTs were stable.  This is a far cry from $500 million.

193.   In a November 8, 2021 text message Richardson said that Ms. Thomson's "current profits for alt coins purchased from 9.21 to today (11.8.21) total $48,816,037, though I estimate they are likely 5-10M higher due to your profit participation being allocated from pStake [sic] in the coming weeks."

194.   In a November 8, 2021 email to Ms. Thomson, Richardson told Ms. Thomson that her holdings "could be considerably higher" by "mid-2022" and that Ms. Thomson "should plan accordingly."

195.   In a November 10, 2021 text, Richardson told Ms. Thomson "the upside [of Persistence] is massive"; "You are generating about 3M in interest per month," "If it doubles next month that is 6M a month!";"I don't think you realize how much money is being made – it's bananas"; "I just want you to have a sense of what this is, because I think long term this is huge."

196.   On November 10, 2021, Richardson told Ms. Thomson that Persistence was "essentially giving [her] 65 Million in three weeks For being there - they are so lovely That is on top of your assets!"

197.   Also in a November 10, 2021 email to Ms. Thomson, Richardson claimed that Ms. Thomson was "earning 2.7-3M a month solely in coming from [Ms. Thomson's] [P]ersistence interest/staking."    Richardson    further    provided    Ms.

Thomson an estimate that her investment in Persistence would "likely go up considerably in the coming months earning between 30-150m a year in interest alone."

198. On December 3, 2021, Richardson said that there was a "fixed return" of at least 35% in addition to an APY that began at 6000% and "reduces weekly, until it lands somewhere around 100-200%" for platforms including Persistence. We are unable to identify any basis for this 6000% figure.

199. In December 2021, Richardson told Ms. Thomson that she was "making 5.4 M a week on average, which seems insane and is going down over time… but I just verified it."

200. As the market began to decline, Richardson continued to persuade Ms. Thomson that the value of her investment would increase.

201. On December 16, 2021, Richardson said "Super bullish on what persistence is building, and today I need to go through additional airdrops I think you may have received for new coins. The beauty of staking is that you often just getting loads of free new coins by way of airdrops."

202. On January 6, 2022, Richardson said that Persistence was holding its value despite a large unlock of XPRT. She said "I still believe that it has the most long term potential, and you are in profit."

203. On January 12, 2022, Richardson said "your Atom/Eth XPRT/Eth pairs have a fixed rate, but will be issued a large amount of yield for your early participation at the months end. The amount is still unknown as it is due to your percentage of participation throughout, however the estimates I have laid out previously still stand (somewhere between 500k-15M EST) and will be issued the last week of this month."

204. On January 14, 2022, Richardson said "to clarify, you are still up! Don't forget the yield you are generating is greater than the price difference. Also, you are going to get an addition 5-10M on rewards (on top of your staking APY) at the beginning of Feb just for having been an early liquidity provider ;)[.]"

205.   On the same day, Richardson said "unlock would have brought the price down even in a good market, so expect it to go up from here. Early early project with massive potential."

206.   A few days later, Richardson contradicted herself when she said that Ms. Thomson was "up on persistence and with the interest and the extra 10M you are getting for early liquidity, it makes up for it."

207.   In an email from January 20, 2022, Richardson predicted that Ms. Thomson would receive an estimated 10-30 million in XPRT, the vast majority of which was from pSTAKE cryptocurrencies.  Those cryptocurrencies ended up being worth approximately $2.34 million and were given on April 14, 2022.

208.   Upon information and belief, the aforementioned false and misleading statements were relayed to Ms. Thomson by Richardson from and on behalf of Aggarwal and Persistence, with whom Richardson continued to meet and correspond.

209.   Emails from Richardson to Ms. Thomson also show that Richardson was encouraging Ms. Thomson to keep funds set aside to make future investments in Persistence as opposed to investing the funds in other projects.

210.   Once the Defendants could no longer stretch the truth to make it appear as though Ms. Thomson was earning a return on her investment, they began to promise Ms. Thomson that she would earn such a return in the future.

211.   On February 16, 2021, at the beginning of what turned out to be a steady decline in the price of XPRT, Richardson said "The good news is that it does seems to be stabilizing and if the trend continues at this rate we you could be back to whole by March."

212.   In reality, Ms. Thomson was not back to whole by March, as the price of XPRT continued to decline.

213.   On October 12, 2021 Persistence tweeted the following "[y]ields on $XPRT": "$XPRT - $OSMO: 164% APY[,] $XPRT - $ATOM: 105% APY[;]" "$XPRT - $ROWAN: 350%+ APY[.]"[26]

214.   On July 8, 2022, Mikhil Pandey, the project lead of Persistence Labs, while in the presence of Aggarwal, discussed on a virtual video conference posted publicly on YouTube how one could obtain 60% yields through liquid staking on the Cosmos ecosystem available to pSTAKE customers.[27]

215.   Defendants Aggarwal, Persistence, and Richardson knew or should have known that the aforementioned statements were false or misleading at the time they made these statements.

216.   They made them anyway to extract all the value they could from their "whale", Ms. Thomson.

217.   Given their duplicity, Ms. Thomson continued to rely on the statements from Aggarwal, Persistence, and Richardson through 2022.

218.   But for the continued pressure and false statements promulgated by Aggarwal, Persistence, and Richardson, Ms. Thomson would not have made the numerous non-Agreement purchases of XPRT between October 2021 and June 2022.

219.   In fact, if she had been privy to the truth, Ms. Thomson would have been able to sell her assets before they lost over 90% of their value.

## THE DEFENDANTS' MISREPRESENTATIONS AND FALSE STATEMENTS ARE EXPOSED

220.   In 2022, the truth about Persistence and Richardson's false statements and misrepresentations began to be exposed.

---

[26] Persistence (@PersistenceOne), Twitter (Oct. 12, 2021, 2:14 PM), https://twitter.com/persistenceone/status/1447989063017910273?s=46&t=OjdUXeKuQl4U-sBKKQDK5A.

[27] *Roadmap & Use Cases │ Snapshots: Diving into Liquid Staking*, YOUTUBE (July 8, 2022), https://www.youtube.com/watch?v=dRsf4BMs828.

COMPLAINT

221. In or around January 2022, Ms. Thomson began reaching out to Richardson to seek an accounting. Richardson was not forthcoming. She evaded the questions regarding an accounting and made excuses as to why she couldn't provide the requested information.

222. During this time, Richardson continuously assured Ms. Thomson that she was earning money on her investment with Persistence and that she expected the investment to continue to appreciate in value.

223. Richardson was evasive in response to Ms. Thomson's requests for an accounting. This caused Ms. Thomson to become suspicious, and triggered the investigation that lead to the discovery of Richardson and Persistence's malfeasance.

224. Ms. Thomson retained Guidepost Solutions LLC ("Guidepost Solutions") to begin an investigation on or around June 2022.

225. On April 12, 2022, after months of Richardson failing to respond to requests to return the assets, Ms. Thomson confronted Richardson at her home in California and demanded the return of her assets. Richardson acquiesced and returned a portion of the ledgers and a few key phrases necessary to access Ms. Thomson's accounts.

226. After subsequent follow-up conversations, Ms. Thomson was able to recover possession of her assets from Richardson beginning in June and July of 2022 and throughout August of 2022.

227. During these conversations, however, Richardson finally admitted to Ms. Thomson that Persistence had provided a kickback to Richardson.

228. Given Richardson's previous insistence that no kickbacks were paid, and Persistence and Aggarwal's concealment of the kickback, this revelation raised major alarm bells.

229.   The kickback was paid to Richardson over four different transactions between August and October 2021 and was worth approximately $783,702, based on the price of XPRT at the times of the transactions.[28]

230.   Absent Aggarwal, Persistence, and Richardson's targeted misinformation campaign, Ms. Thomson would never have invested in Persistence.

231.   Between August 25, 2021 and June 15, 2022, Ms. Thomson invested assets worth $46,082,634 in Persistence.  Those investments are currently worth approximately $2,500,000.

232.   This complaint seeks damages from the cryptocurrency purchased outside of the Agreement.

233.   It was only because of the false claims of exorbitant returns fed to Ms. Thomson by Richardson, Aggarwal, and Persistence, that Ms. Thomson ever purchased XPRT.

234.   Since Ms. Thomson reached out to Defendants, Persistence has attempted to remove the digital footprint of their activities from the internet.  This includes deleting certain tweets advertising XPRT, removing the offer to sell XPRT from their website, and deleting their discord channel.

---

[28] *See* Mintscan Transaction Details:

5.  August 25, 2021 Transaction:
    - https://www.mintscan.io/persistence/txs/CF632D7033A5E7982957769B943C45474F3B99B1E4732F317120BC37AA92C292;
6.  September 6, 2021 Transaction:
    - https://www.mintscan.io/persistence/txs/21A6BB7F9C585B3864178F1C598D5C7CCD78853D7B55161689EF542AE9FD1F1B;
7.  October 4, 2021 Transaction:
    - https://www.mintscan.io/persistence/txs/95E3C37378CAA357339196E2F9A96B2A58ECD8BC81CDBC6406BB90CA9A15556A;
8.  October 18, 2021 Transaction:
    - https://www.mintscan.io/persistence/txs/3A551ACC6AFBB9DD7CFDCFDCC483686C83392637C584E9DB77D945AFB102530A.

McDermott Will & Emery LLP
Attorneys At Law
New York

235.  A screenshot of Persistence's website as of April 27, 2023 is below.  The section reading "[a]cquire XPRT" with links to exchanges and the advertisement of staking rewards no longer exist at the following address: https://persistence.one/xprt.



236.  Defendants also removed a tutorial for providing liquidity on osmosis from their website, as it was reflected below, as of April 27, 2023:

///

///

1      ///



## CLAIMS FOR RELIEF

## COUNT I

### Fraud

237.   The preceding paragraphs are incorporated herein as if fully restated.

238.   Defendants made false statements of material fact to Plaintiff, some of which are identified in the above allegations, which include, but are not limited to the following:

a.     Defendant Richardson stated that she was "not taking any commissions or fees" with respect to Ms. Thomson's investment with Persistence.  In truth, Richardson was paid by Aggarwal and Persistence to induce Ms. Thomson's investment in XPRT.

b.     Aggarwal and Persistence advertised that users could earn huge rewards of over 35% or up to 245% if staked with Persistence.

c.     Aggarwal and Persistence advertised, among other things, that owners of XPRT were earning an "Annual Percentage Yield ("APY") of 1,948%."

McDermott Will & Emery LLP
Attorneys At Law
New York

239.   Richardson also represented to Ms. Thomson that, among other things Ms. Thomson's investment in XPRT would provide "APY that began at 6000% and "reduces weekly, until it lands somewhere around 100-200%"

240.   At the time these representations were made, Defendants knew that they were false or recklessly disregarded the truth of whether statements were false or misleading.

241.   These misrepresentations were material.  Had Plaintiff known the truth, she never would have invested in XPRT or staked her assets with Persistence.

242.   Defendants made these statements intending to defraud Plaintiff and intending to induce Plaintiff's reliance therein.

243.   Plaintiff reasonably relied on the truth of these statements.

244.   As a direct and proximate result of this fraudulent conduct, Plaintiff suffered an economic loss of at least $24,731,599.

245.   Plaintiff is entitled to damages in an amount to be proven at trial.

## COUNT II

### Civil Conspiracy to Commit Fraud

246.   The preceding paragraphs are incorporated herein as if fully restated.

247.   Defendants Aggarwal, Persistence and Richardson agreed between themselves to commit acts of fraud for the purpose of persuading Plaintiff to purchase XPRT.

248.   Specifically, Defendants Aggarwal, Persistence, and Richardson conspired to hide the compensation paid to Richardson in return for convincing Plaintiff to purchase XPRT.

249.   Aggarwal and Persistence made advertisements, some of which are identified in the above allegations, which include, but are not limited to the following:

250.   Aggarwal and Persistence advertised that users could earn huge rewards of over 35% or up to 245% if staked with Persistence.  In truth, Persistence did not

McDermott Will & Emery LLP
Attorneys At Law
New York

maintain the XPRT network stability, investor base, or liquidity to consistently promise returns of 35% or greater to the investing public.

251. Aggarwal and Persistence advertised, among other things, that owners of XPRT were earning and "Annual Percentage Yield ("APY") of 1,948%."

252. Richardson also represented to Ms. Thomson that, among other things Ms. Thomson's investment in XPRT would provide "APY that began at 6000% and "reduces weekly, until it lands somewhere around 100-200%"

253. As part of the conspiracy, Defendants committed overt acts including making the specific representations described above to Ms. Thomson.

254. Defendants made these statements intending to defraud Plaintiff and intending to induce Plaintiff's reliance therein.

255. Defendants knew the statements were false or misleading or recklessly disregarded the truth of whether statements were false or misleading.

256. Plaintiff reasonably relied on the truth of these statements.

257. As a direct and proximate result of the encouragement by Richardson to continue investing in XPRT and the payment of a kickback by Persistence in furtherance of the conspiracy, Ms. Thomson suffered an economic loss of at least $24,731,599.

258. Plaintiff is entitled to damages in an amount to be proven at trial.

## COUNT III

**Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder - 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5**

259. The preceding paragraphs are incorporated herein as if fully restated.

260. Plaintiff Taylor Thomson purchased XPRT from Defendants Aggarwal, Persistence, and Richardson.

261. Defendant Richardson is a resident of California and was present in California at the time of the purchase.

McDermott Will & Emery LLP
Attorneys At Law
New York

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
NEW YORK

262.   During the relevant period, the Defendant sold securities to the Plaintiff, which were not registered with the Securities and Exchange Commission ("SEC") and were not exempt from registration, in violation of Section 5 of the Securities Act of 1933.

263.   Defendants knowingly made material misrepresentations and omissions in connection with the sale of XPRT, some of which are identified in the above allegations, which include, but are not limited to:

      d.   Defendants Aggarwal and Persistence made a material omission when they failed to notify Plaintiff about the agreed-upon kickback to Richardson.

      e.   Defendant Richardson made a material misrepresentation when she explicitly denied taking a commission in connection with her sale of XPRT to Plaintiff.

264.   Defendants made these misrepresentations with the intent to deceive Plaintiff, in order to convince her that Richardson was operating on her behalf and so induce her to purchase XPRT.

265.   Plaintiff relied on these misrepresentations in choosing to purchase XPRT.

266.   As a result of his purchase, Plaintiff suffered an economic loss of at least $24,731,599.

267.   Plaintiff Thomson's loss came as a factual and proximate result, of Defendants' material misstatements and omissions, as Plaintiff would not have purchased XPRT had Defendants not made such misstatements and omissions.

268.   Plaintiff is entitled to damages in an amount to be proven at trial. Plaintiff is also entitled to reasonable costs and attorneys' fees, as authorized by 15 USCS § 78i(f).

### **COUNT IV**

**Selling Unregistered Securities - Cal. Corp. Code § 25503**

269.   The preceding paragraphs are incorporated herein as if fully restated.

270.   Defendants Aggarwal, Persistence, and Richardson offered to sell XPRT, a security, within the state of California.

271.   Defendants Aggarwal, Persistence, and Richardson sold XPRT in issuer transactions.

272.   XPRT is not duly qualified with California Department of Business Oversight under Cal. Corp. Code. § 25110 at the time of the transactions.

273.   No exemption from qualification applied to the security or the transaction.

274.   Plaintiff purchased XPRT in reliance on Defendants' offer.

275.   As a direct and proximate result of Defendant's violation of Cal. Corp. Code § 25110 Cal. Plaintiff has suffered an economic of at least $24,731,599.

276.   Under Cal. Corp. Code. § 25503 Plaintiff is entitled to recovery and/or damages in an amount to be proven at trial.

## COUNT V

### Misrepresentation or Omission of Material Fact in the Sale of Securities - Cal. Corp. Code § 25501

277.   The preceding paragraphs are incorporated herein as if fully restated.

278.   Defendants Aggarwal, Persistence, and Richardson offered to sell XPRT, a security, within the state of California.

279.   Defendants Aggarwal, Persistence, and Richardson sold XPRT to Plaintiff.

280.   Defendants made untrue statements of material fact and/or omitted material facts in selling XPRT.

281.   Some of the omissions and misstatements are identified in the above allegations, which include, but are not limited to:

f.   Defendants Aggarwal and Persistence made a material omission when it failed to notify Plaintiff about the agreed-upon kickback to Richardson.

g.      Defendant Richardson made a material misrepresentation when she explicitly denied taking a commission in connection with her sale of XPRT to Plaintiff.

282.   The omissions and misstatements constitute a violation of Cal. Corp. Code § 25401.

283.   As a direct and proximate result of Defendant's violation of Cal. Corp. Code § 25401, Plaintiff has suffered an economic of at least $24,731,599.

284.   Under Cal. Code 25501 Plaintiff is entitled to recission and/or damages in an amount to be proven at trial.

## <u>COUNT VI</u>

### False Advertising - Cal. Bus. & Prof. Code § 17500 BPC

285.   The preceding paragraphs are incorporated herein as if fully restated.

286.   At all relevant times, Defendants Aggarwal, Persistence and Richardson made, disseminated, or caused to be made or disseminated, false and misleading statements intended to induce the public to enter into obligations pertaining to the purchase of XPRT.

287.   Specifically, Defendants have disseminated numerous false and misleading statements pertaining to XPRT APYs that were not achievable and were never achieved.

288.   Defendants made these false and misleading statements with the intent to sell XPRT and to induce members of the public, including Plaintiff, to purchase XPRT.

289.   Defendants' false and misleading statements were likely to deceive a reasonable consumer because consumers reasonably relied on the information provided by seemingly professional counterparties concerning the financial performance of their own product.

COMPLAINT

290.   As a direct and proximate result of Defendant's false and misleading statements, Plaintiff purchased XPRT and has suffered an economic loss of at least $24,731,599.

291.   Plaintiff is entitled damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

292.   For compensatory damages in an amount to be proven at trial, but no less than $24,731,599.

293.   For punitive damages.

294.   For rescission of purchases of XPRT.

295.   For such other relief as the Court deems to be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 13, 2023                    Respectfully submitted,

**MCDERMOTT WILL & EMERY LLP**

By:    */s/ Julian Andre*
_____
JULIAN ANDRE
2049 Century Park East, Suite 3200
Los Angeles, CA  90067-3206
Telephone: (310) 277-4110
Facsimile:  (310) 277-4730
Email: jandre@mwe.com

TODD HARRISON
JOSEPH B. EVANS
One Vanderbilt Avenue
New York, NY  10017-3852
Telephone:  +1 212 547 5400
Facsimile: +1 212 547 5444
Email: tdharrison@mwe.com

COMPLAINT

McDermott Will & Emery LLP
Attorneys At Law
New York

jbevans@mwe.com

*Counsel for Plaintiff Taylor Thomson*

McDermott Will & Emery LLP
Attorneys At Law
New York

COMPLAINT