1   Julian André (SBN 251120)
    jandre@mwe.com
2   **McDERMOTT WILL & EMERY LLP**
    2049 Century Park East, Suite 3200
3   Los Angeles, California 90067-3206
    Telephone:  +1 310 277 4110
4   Facsimile:   +1 310 277 4730

5   Joseph B. Evans
    Todd Harrison
6   jbevans@mwe.com
    tdharrison@mwe.com
7   **McDERMOTT WILL & EMERY LLP**
    One Vanderbilt Avenue
8   New York, New York 10017-3852
    Telephone:  +1 212 547 5400
9   Facsimile:   +1 212 547 5444

10  Counsel for Plaintiff

11  TAYLOR THOMSON

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
NEW YORK

12          **UNITED STATES DISTRICT COURT**

13         **CENTRAL DISTRICT OF CALIFORNIA**

14              **WESTERN DIVISION**

15

16  Taylor Thomson,                          CASE NO.  2:23−cv−04669−MEMF−MAR

17              Plaintiff,

18       v.                                  **FIRST AMENDED COMPLAINT**

19  Persistence Technologies (BVI) Pte Ltd.
    Tushar Aggarwal, and Ashley Richardson,
20                                           **JURY TRIAL DEMANDED**
                Defendants.
21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT      CASE NO.  2:23−cv−04669−MEMF−MAR

## PRELIMINARY STATEMENT

1.      The Defendants fraudulently induced Ms. Thomson to invest in their crypto offering, concealing a secret kickback and advertising outsized rewards that would never be realized.  The Defendants used false promises of outsized annual percentage yield ("APY") and annual percentage rates ("APR") to convince Ms. Thomson to invest $46,082,634 in Persistence Technologies (BVI) Pte Ltd. ("Persistence")'s cryptocurrency XPRT that was primarily used to earn profits from yield earning opportunities (the "Persistence Offering").  Persistence and Aggarwal paid Ashley Richardson a secret kickback in XPRT for her role in securing Ms. Thomson's investment in the Persistence Offering.  Eventually, the market exposed Defendants' false statements, the value of XPRT plunged, and Ms. Thomson lost nearly the entirety of her investment.  Ms. Thomson seeks to recover no less than $24,731,599 in this proceeding.[1]

2.      In 2021, Defendant Tushar Aggarwal learned that Defendant Richardson had gained the trust of Ms. Thomson, an affluent individual who had recently become interested in investing in crypto.  With Richardson's assistance, Aggarwal and Persistence falsely promised that if Ms. Thomson purchased Persistence's cryptocurrency, XPRT, Ms. Thomson would realize a large return on her investment, quoting returns of up to 6,000% APY, and drive market adoption of the newly minted cryptocurrency.  Relying on those false promises, Ms. Thomson purchased $46,082,634 worth of XPRT.  Aggarwal and Persistence structured Ms. Thomson's investment into 10 different digital wallets to make it appear to the market that numerous large investors had purchased XPRT.  In actuality, each of those digital wallets held only Ms. Thomson's XPRT.  Aggarwal and Persistence paid Richardson

---

[1] Ms. Thomson initiated a proceeding in a SIAC arbitration in Singapore.  In the SIAC arbitration Ms. Thomson seeks damages in connection with the investment in the Persistence Offering of 4,000,000 XPRT made pursuant to the contract between Ms. Thomson and Persistence.  This action seeks damages in connection with the additional investments in the Persistence Offering of 4,624,431 XPRT that Ms. Thomson made subsequent to the purchases under the contract.

McDermott Will & Emery LLP
Attorneys At Law
New York

a secret kickback of $783,702 in XPRT for working with them to induce Ms. Thomson to invest in Persistence.  Richardson hid this kickback from Ms. Thomson and in written correspondence explicitly denied receiving any kickbacks or commissions.

3.    While the Defendants' efforts to improperly inflate the value of XPRT initially was successful, it predictably failed and XPRT cratered in value.  In the approximately 24 months since Ms. Thomson's initial investment in August 2021, XPRT dropped more than 90% in value, causing losses of at least $43,565,429.

4.    This lawsuit seeks to recover a portion of those losses associated with open market purchases made by Ms. Thomson totaling $24,731,599.  The losses associated with purchases made pursuant to the Token Sale Agreement (the "Agreement") are being litigated in an arbitration proceeding in Singapore.

5.    Persistence marketed XPRT as an asset to be purchased in connection with the Persistence Offering for the primary purpose of earning yield in various liquidity pools and staking opportunities controlled by Persistence.  Ms. Thomson used fiat and crypto to invest in the Persistence Offering, expecting to profit from the efforts of Aggarwal and the rest of the Persistence team.  Aggarwal repeatedly touted the work being done by the "project team" to Ms. Thomson and in his efforts to obtain more investors in the Persistence Offering.  The Persistence Offering was being marketed directly to investors in the United States through social media, websites, speaking engagements, and at least one secretly paid agent of Persistence, Richardson.

6.    The Defendants' efforts to obtain investors in the Persistence Offering were directed through Richardson, a California resident who executed the scheme in Los Angeles, California.  The calls, text messages, and emails promoting the Persistence Offering to Ms. Thomson occurred while Richardson was located in California.  During many of these conversations, Ms. Thomson was also located in California.  While Ms. Thomson was physically present outside of the U.S. when

FIRST AMENDED COMPLAINT        CASE NO. 2:23-cv-04669-MEMF-MAR

certain purchases pursuant to the Agreement were executed, Persistence knew that the sales and marketing efforts were occurring while Richardson and Ms. Thomson were in California.

7.    Persistence solicited Ms. Thomson by touting the profitability of the Persistence Offering, including the increase in the value of XPRT and the lucrative opportunities to use XPRT to stake and otherwise earn "yield" and "rewards." Many of Persistence's promises in connection with the Persistence Offering of exorbitant "APYs," "APRs," and "rewards" were false.

8.    After conducting an investigation into claims made by Persistence and Richardson, Plaintiffs have identified a number of false or misleading statements made the Defendants. The declaration of investigation and compliance professional Bradley Dizik of Guidepost Solutions LLC ("Guidepost Solutions") has been attached to this amended complaint (the "Dizik Decl.").[2]

9.    For example, Persistence touted on Twitter on April 8, 2022, that the current APR for a PSTAKE/OSMO pool was 336%.[3]

10.    The April 8, 2022 tweet was demonstrably false. "Identifiable data from five days prior to this tweet shows that the APR was 62%. The same data shows that two days following this tweet, the APR was 74%. These APR percentages are many multiples lower than the promised 336% on April 8, 2022. We have not identified any basis for a 336% APR on April 8, 2022."[4]

11.    Ms. Thomson was convinced by Richardson, Aggarwal, and Persistence's false or misleading statements that the Persistence Offering was a viable investment with an extraordinarily profitable yield earning component. In actuality, XPRT is an altcoin with very little backing that ultimately lost over 90% of

McDermott Will & Emery LLP
Attorneys At Law
New York

---

[2] The Dizik Decl. is incorporated by reference as if fully restated herein.
[3] @pStakeFinance, Twitter (April 8, 2022, 1:48 PM), https://x.com/pstakefinance/status/1512487541311963137?s=46&t=OjdUXeKuQl4U-sBKKQDK5A.
[4] Dizik Decl. ¶ 24(n).

FIRST AMENDED COMPLAINT        CASE NO. 2:23–cv–04669–MEMF–MAR

its value causing Ms. Thomson to lose tens of millions of dollars' worth of cryptocurrency.

12. Accordingly, Defendants Ashley Richardson, Tushar Aggarwal, and Persistence Technologies (BVI) Pte Ltd. engaged in fraud and the unregistered sale of securities in connection with the Persistence Offering.

## THE PARTIES

13. Plaintiff Ms. Thomson is a Canadian citizen who currently resides in England.

14. Defendant Persistence is a company incorporated in the British Virgin Islands and located in Singapore.

15. Defendant Tushar Aggarwal is the founder and Chief Executive Officer of Persistence currently and at all times relevant to this action.

16. Defendant Richardson is an individual who resided in Los Angeles, California, at all times material to this action, and who currently resides in and is a citizen of the State of California.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts causes of action arising under the laws of the United States.

18. The Court has supplemental subject matter jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a) because they are so related to the Plaintiff's federal law claims as to form the same case and controversy.

19. The Court has personal jurisdiction over Defendants because Richardson is subject to personal jurisdiction as a resident of the state of California, because the underlying events giving rise to these causes of action occurred in this judicial district, and Persistence is subject to specific jurisdiction in California and the Central District of California by directing its solicitation of investors in the Persistence Offering through Richardson in California.

McDermott Will & Emery LLP
Attorneys At Law
New York

20.     Defendants also caused false representations to be made to Ms. Thomson through Defendant Richardson while Defendant Richardson was physically located in California.

21.     Defendants Aggarwal and Persistence also paid a secret kickback to Richardson while she was physically located in California.

22.     Additionally, because the facts alleged in this Complaint arise from a single transaction or occurrence, the Court also has pendent personal jurisdiction over all Defendants and because Section 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa) authorizes nationwide personal jurisdiction and service of process.

23.     Venue in this judicial district is proper under Section 20 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b)(2), or in the alternative, § 1391(b)(3).

24.     Venue in this judicial district is also proper because the underlying events occurred in this judicial district.

25.     Venue in this judicial district is also proper because Defendants caused false statements to be made to Ms. Thomson through Richardson while Richardson was present in this district.

26.     Venue in this judicial district is also proper because Defendants Aggarwal and Persistence agreed to pay, and subsequently did pay, a secret kickback to Richardson while Richardson was present in this district.

## BACKGROUND ON CRYPTOCURRENCY

27.     The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "virtual currencies," "digital assets," "coins," and "tokens."  Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay.  Bitcoin (BTC) and Ethereum (ETH) are currently the most popular cryptocurrencies, but there are thousands of other cryptocurrencies.

FIRST AMENDED COMPLAINT          CASE NO. 2:23−cv−04669−MEMF−MAR

McDermott Will & Emery LLP
Attorneys At Law
New York

28.     All cryptocurrencies exist on a "blockchain."  A blockchain is an open-sourced string of code, which is the underlying technology that facilitates the creation of and subsequent transaction in a particular cryptocurrency.  All transactions are recorded on the blockchain and most are publicly available.  When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions, called "blocks."  In many cases, those "blocks" are publicly available and reflect all of the cryptocurrency transactions that occurred on the blockchain at a particular point in time.  Those "blocks" are all reflected on the blockchain and are ordered by date in a "chain," which is why it is called a "block"-"chain."

29.     There are a number of different blockchains.  The first and most popular blockchain was the Bitcoin blockchain.  Another well-known blockchain is the Ethereum blockchain, which launched the popular cryptocurrency ETH.  The Ethereum blockchain made it relatively easy to create new cryptocurrencies that would also reside on the Ethereum blockchain.  Those cryptocurrencies created on the Ethereum blockchain are referred to as "ERC-20" compliant tokens.  There are thousands of cryptocurrencies other than BTC and ETH, which are commonly referred to as "altcoins."  XPRT is considered an "altcoin".

30.     Smart contracts are open-sourced code that exist on the blockchain and dictate to the market participants exactly how a particular transaction will be executed.  They are "self-executing", meaning that each participant to a smart contract does not have to agree in the future to make a payment or transfer cryptocurrency.  Once the "rules" of the smart contract are satisfied, the smart contract automatically executes the transaction.  Most smart contracts are designed so they can never be changed.  However, the designer of the smart contract can retain the ability to "withdraw" the smart contract, which effectively cancels it.

FIRST AMENDED COMPLAINT     CASE NO. 2:23−cv−04669−MEMF-MAR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
NEW YORK

31.    Users generally hold cryptocurrency tokens in digital wallets.  On the Ethereum blockchain, for example, tokens, wallets, and smart contracts are all identifiable by unique public keys.  These public keys are 40-digit alphanumeric strings.  Anyone can use the platform Etherscan to see the complete public history of transactions associated with any of these public keys, including any time tokens are traded, or any time a smart contract is used.

32.    In recent years, the term "decentralized finance" or "DeFi" has become popular.  This term has been widely applied to traditional lending, yield earning, and banking services that are not being performed by a centralized bank or financial institution.  Instead, these services are being provided solely by "decentralized" organizations and governed by self-executing smart contracts.

33.    Persistence is one such self-described "DeFi" project.

34.    In reality, Persistence is actually controlled by a core team of decisionmakers, including Aggarwal.

35.    An important element of many DeFi protocols is "staking."  Those who "stake" transfer cryptocurrency to a smart contract which is often referred to as a "protocol" usually for a specified period of time and the user is rewarded with interest, which is often referred to as "yield."

36.    As described in more detail below, Persistence offered a yield-earning staking opportunity which it calls pSTAKE.  pSTAKE funders include the notorious Three Arrows Capital, Alameda Research, and Do Kwon.[5]

## BACKGROUND ON PERSISTENCE

37.    Persistence launched the Persistence Offering and the native staking cryptocurrency (XPRT) in April 2021.

---

[5] Zhiyuan Sun, *Liquid staking protocol pSTAKE raises $10M from notable cryptocurrency venture capital firms and angel investors*, COINTELEGRAPH (Nov. 16, 2021), https://cointelegraph.com/news/liquid-staking-protocol-pstake-raises-10m-from-notable-cryptocurrency-venture-capital-firms-and-angel-investors.

- 8 -

FIRST AMENDED COMPLAINT          CASE NO. 2:23−cv−04669−MEMF−MAR

McDermott Will & Emery LLP
Attorneys At Law
New York

38.     The economic value of the Persistence Offering is directly connected to the overall performance of Persistence.[6]

39.     Persistence has, at all relevant times, been controlled by Aggarwal as well as a small team of promoters including "core" team members Jeroen Develter, Mikhil Pandey, and Puneet Mahajan.

40.     Aggarwal is the founder and CEO of Persistence.[7]

41.     The ongoing operation, management, and future success of the Persistence Offering are under the control of Aggarwal and the core team.

42.      This control includes, but is not limited to, the ability to update the XPRT network's software, manage the XPRT economy, stimulate demand for XPRT, and enter into partnerships or collaborations with other enterprises to enhance the utility and value of XPRT.

43.     For example, Persistence authored an article on February 10, 2022 in which Persistence asserted that "[i]n 2021, the Persistence team focused on the Core-1 mainnet launch and key block explorer/wallet/exchange integrations required to scale the ecosystem.  In 2022 and beyond, the main focus for the team will be to drive significant economic activity on the Persistence Core-1 chain."[8]

---

[6] On March 25, 2021, in its published tokenomics, Persistence explicitly says "the economic activity driven both within and outside the ecosystem will drive value for XPRT" and proceeds to list specific ways that value is driven to XPRT through 4 different mechanisms, all of which Persistence has a role in creating. Persistence Team, *XPRT Tokenomics: Powering the Persistence Ecosystem*, PERSISTENCE (Mar. 25, 2021), https://blog.persistence.one/2021/03/25/xprt-tokenomics-and-utility-powering-the-persistence-ecosystem/.

[7] Tushar Aggarwal, *Staking will eat proof-of-work for breakfast — Here's why* (Aug. 18, 2021), https://cointelegraph.com/news/staking-will-eat-blockchain-for-breakfast-here-s-why; *FAQs*, PERSISTENCE, https://persistence.one/faq; Tushar Aggarwal, CEO of Persistence, BEINCRYPTO, https://beincrypto.com/author/tushar-aggarwal/; Tushar Aggarwal, CRUNCHBASE, https://www.crunchbase.com/person/tushar-aggarwal-3997; *1739: Forbes Asia 30 under 30 Crypto CEO on Staking, DeFi and Blockchain Interoperability* (Oct. 10, 2021), https://techblogwriter.co.uk/persistence/.

[8] Persistence Team, *The Vision for Persistence*, Persistence Blog (Feb. 10, 2022), https://blog.persistence.one/2022/02/10/the-vision-for-persistence/.

FIRST AMENDED COMPLAINT          CASE NO. 2:23−cv−04669−MEMF−MAR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
NEW YORK

44.    The potential for the Persistence Offering to appreciate in value, thereby delivering a profit to its holders, depends largely on the effectiveness of Aggarwal and Persistence's collective efforts in these areas.

45.    The Persistence Offering is available and has been sold in the United States.

46.    The Persistence Offering, is also freely available for purchase by United States persons through certain cryptocurrency exchanges, including KuCoin and Gate.io.

47.    Indeed, Persistence had a section of their website dedicated to advising customers on how to purchase XPRT, complete with links to various exchanges.

48.    The website states "Get Involved In the Persistence Ecosystem. Powered by XPRT" and elsewhere provided a host of links to exchanges and directs customers to "[a]cquire XPRT."[9]

49.    This website was available and accessible throughout the United States, including in California.

50.    After being contacted recently by Plaintiff prior to the filing of this action, Defendants removed the offer to "[a]cquire XPRT" as well as the links to exchanges on which to purchase XPRT.  Those links appeared on the Persistence website and were functional at least as of April 27, 2023.

51.    Persistence's main website and the links prominently displayed thereon, were accessible in California as of June 12, 2023.

52.    Subsequently, some links on the Persistence's main website have been geofenced, or excluded from availability in California as of September 22, 2023.

---

[9] Persistence, https://persistence.one/; Persistence, *XPRT*, https://persistence.one/xprt (this section of the website provides users with links to popular exchanges on which they can purchase XPRT. The exchanges include Huobi Global, KuCoin, and Gate.io.).

FIRST AMENDED COMPLAINT          CASE NO. 2:23−cv−04669−MEMF−MAR

McDermott Will & Emery LLP
Attorneys At Law
New York

53.    Persistence's website prominently states as follows: "Get Involved In the Persistence Ecosystem. Powered by XPRT" and elsewhere provided a host of links to exchanges and directs customers to "[a]cquire XPRT."[10]

54.    As part of its strategy to promote the Persistence Offering, the Defendants Persistence and Aggarwal orchestrated extensive marketing campaigns, produced promotional materials, and made numerous public statements.

55.    Through these channels, which include Twitter, the Persistence website and blog, YouTube, podcasts, Telegram, internet articles, ask me anything sessions (commonly referred to as "AMAs") and live conferences, the Defendant represented and implied that XPRT was not only a functional asset within its digital ecosystem, but also an investment that would appreciate greatly in value.

56.    For example, on April 8, 2022, @pstakefinance, a social media account operated by Persistence, tweeted that the current APR for a PSTAKE/OSMO pool was 336%.[11]

57.    The April 8, 2022 tweet was demonstrably false.  "Identifiable data from five days prior to this tweet shows that the APR was 62%.  The same data shows that two days following this tweet, the APR was 74%.  These APR percentages are many multiples lower than the promised 336% on April 8, 2022.  We have not identified any basis for a 336% APR on April 8, 2022."[12]  As such, it is virtually impossible that the APR was 336% on April 8, 2022.

58.    On April 9, 2022, @pstakefinance tweeted "The PSTAKE/OSMO pool on @osmosiszone is providing ~320% APR, currently the highest incentives out of all pools on Osmosis.  Provide liquidity and bond your tokens for 14 days to receive

---

[10] Persistence, https://persistence.one/; Persistence, *XPRT*, https://persistence.one/xprt (this section of the website provides users with links to popular exchanges on which they can purchase XPRT. The exchanges include Huobi Global, KuCoin, and Gate.io.).
[11] @pStakeFinance, TWITTER (April 8, 2022, 1:48 PM), https://x.com/pstakefinance/status/1512487541311963137?s=46&t=OjdUXeKuQl4U-sBKKQDK5A.
[12] Dizik Decl. ¶ 24(n).

FIRST AMENDED COMPLAINT          CASE NO. 2:23−cv−04669−MEMF−MAR

McDermott Will & Emery LLP
Attorneys At Law
New York

LP rewards. Total Rewards: 150,000 $PSTAKE Provide liquidity:
https://app.osmosis.zone/pool/648." [13]

59.    "Identifiable data from six days prior to this tweet shows APR was 62%.
The same data shows that two days following this tweet, the APR was 74%.  As such,
it is unlikely that the APR was approximately 320% on April 9, 2022.  We are unable
to identify any basis for promising a 320% APR on April 9, 2022." [14]  Accordingly,
this statement was false, or at least intentionally misleading, at the time it was made.

60.    These false and misleading communications created an expectation of
profit among potential investors in the Persistence Offering.

61.    The economic value of the Persistence Offering is directly connected to
the overall performance of Persistence.

62.    Investors in the Persistence Offering relying on Persistence's public
statements reasonably believed that the value of the Persistence Offering was tied to
the success of Persistence and its "core" team of promoters.

63.    In various marketing and promotional materials, Persistence repeatedly
claimed that XPRT would incur "value accrual" from the Persistence ecosystem's
financial activity.

64.    Persistence claims on its website that "Persistence is an app chain for
Liquid Staking powering an ecosystem of DeFi applications focused on unlocking
the liquidity of staked assets" and that "$XPRT is the native staking cryptocurrency
of the Persistence Core-1 chain."

65.    Persistence also offered a number of other products designed to allow
XPRT holders to earn profit from their investment.

---

[13] @pStakeFinance, TWITTER (April 9, 2022, 12:34 AM),
https://x.com/pstakefinance/status/1512650070037983232?s=46&t=OjdUXeKuQl4U-
sBKKQDK5A.
[14] Dizik Decl. ¶ 24(o).

FIRST AMENDED COMPLAINT          CASE NO. 2:23−cv−04669−MEMF−MAR

McDermott Will & Emery LLP
ATTORNEYS AT LAW
NEW YORK

66.     For instance, in Persistence's October 2021 newsletter, Persistence highlighted "the launch of XPRT perpetual futures on AscendEX, with XPRT metrics across the board rising steadily."

67.     Persistence offers "liquid staking" to facilitate its users' profit.

68.     In June 2021, Persistence launched pSTAKE, a "liquid staking solution" the company described as "a turning point in Persistence's history."[15]

69.     The company hosted a "Staking Gala" that closed on July 9, 2021.[16] Persistence claimed that XPRT would incur "value accrual" from the financial activity of Persistence.[17]

70.     Traditionally, to stake assets a user would lock their cryptocurrency with a protocol which would then pay them rewards for as long as the cryptocurrency was locked.

71.     "Liquid staking," in contrast, is a system by which Persistence pays users staking rewards, but also issues them a derivative asset called a "liquid token," which, according to Persistence, "can be used in DeFi for trading, liquidity provisioning, lending, or borrowing."[18]

72.     On its website, Persistence describes the benefits of liquid staking available to XPRT holders as "unlocking the liquidity of otherwise locked staked assets, maximizing its capital efficiency, and providing greater flexibility and potentially higher returns compared to traditional staking methods."[19]

---

[15]   Persistence Blog, *Community Newsletter #10* (Aug. 22, 2021), https://blog.persistence.one/2021/08/22/community-newsletter-10-july-2021/.

[16]   Persistence (@PersistenceOne), Twitter (Jul. 8, 2021, 11:46 AM), https://twitter.com/pStakeFinance/status/1413177591025053702.

[17]   *See* Persistence, *XPRT: The Heart of Persistence Ecosystem*, https://persistence.one/xprt.

[18]   Persistence, *What is liquid Staking?*, FAQs, https://persistence.one/faq.
[19]   *Id.*

FIRST AMENDED COMPLAINT          CASE NO. 2:23−cv−04669−MEMF−MAR

McDermott Will & Emery LLP
Attorneys At Law
New York

73.     Aggarwal, Persistence, and Richardson falsely promised Ms. Thomson that this liquid staking would allow her to earn extreme returns on her investment in the Persistence Offering.

74.     Persistence and Aggarwal secretly paid Richardson a kickback of approximately $783,702 in XPRT to act on their behalf, and to pass on their false and misleading promises of high returns in order to recruit Ms. Thomson as an investor.

75.     Aggarwal, Persistence, and Richardson all concealed the secret kickback from Ms. Thomson.

**PERSISTENCE SOLD UNREGISTERED INVESTMENT CONTRACTS**

76.     When determining whether cryptocurrency-related offerings are securities subject to the Securities Laws, the Securities and Exchange Commission ("SEC") and federal courts have applied the "investment contract" analysis first articulated by the U.S. Supreme Court in *SEC v. Howey*, 328 U.S. 293 (1946) (the "*Howey* test").

77.     The *Howey* test is a four-part test for determining when a particular arrangement constitutes an "investment contract," and therefore, a security.  Under the *Howey* test, four elements must be met for an asset to be considered a security:

        a.     An investment of money;

        b.     In a common enterprise;

        c.     With an expectation of profits; that is

        d.     Solely derived from the efforts of others.

78.     The Persistence Offering meets all four prongs of this test.

79.     The SEC has repeatedly taken the position that, when cryptocurrencies are purchased and sold for fiat and other cryptocurrencies, the "investment of money" prong is satisfied.  Given that Ms. Thomson exchanged value to invest in the Persistence Offering, the "investment of money" prong is satisfied.

80.     U.S. courts have held that a "common enterprise" exists where there is both "horizontal" and "vertical" commonality.  *See Revak v. SEC Realty Corp.*, 18

McDermott Will & Emery LLP
Attorneys At Law
New York

F.3d 81, 87 (2d Cir. 1994) (discussing horizontal commonality as "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits" and two variants of vertical commonality, which focus on "the relationship between the promoter and the body of investors"); *see, e.g.*, *SEC v. Kik*, 492 F. Supp. 3d 169, 179 (S.D.N.Y. 2019) (citing *Balestra v. ATBCoin LLC*, 380 F. Supp. 3d 340, 354 (S.D.N.Y. 2019)); *Mautner v. Alvin H. Glick Irrevocable Grantor Tr.*, No. 19-cv-2742, 2019 WL 6311520, at *7 (S.D.N.Y. Nov. 25, 2019).

81.    With respect to the Persistence Offering, Persistence has created "commonality" which satisfies the second prong of the *Howey* test because each of the investors' fortunes are tied to the fortunes of other investors in the Persistence Offering.  The profitability of the Persistence Offering is entirely dependent on the development and marketing of the Persistence ecosystem by Persistence.  *See Kik Interactive Inc.*, 492 F. Supp. 3d at 176-85.  For all these reasons, the Persistence Offering satisfies the common enterprise prong.

82.    The "Persistence One Official Announcements" Telegram account has made numerous statements that support the common enterprise prong.

FIRST AMENDED COMPLAINT          CASE NO. 2:23−cv−04669−MEMF−MAR

a.  On May 3, 2021, on Telegram, Persistence quoted the following statement from Aggarwal in a recent podcast:

> pSTAKE has surpassed 3K followers on Twitter amid mounting anticipation for the Staking Gala and mainnet launch! ❤️
>
> 🔥 We have been working hard to create a truly game-changing liquid staking product for the PoS community. It's a pleasure to see so much interest and engagement from everyone.
>
> 🏔️ As they say, *"Success is a journey, not a destination."* Our team is happy to forge this path with all of you!
>
> 🚀 There is still so much more in store, so be sure to follow pSTAKE if you're not already. Next stop is our Staking Gala, beginning today, followed closely by the mainnet launch!
>
> 🛌 While other teams sleep during this volatile market, we continue to press forward with vigor.
>
> 🙌 Thank you again!
>
> 🗣️ Spread the word:
> https://twitter.com/pStakeFinance/status/1410934248475930630
>
> Persistence.one | Twitter | Telegram | Medium | YouTube
> t.me/PersistenceOne/509          1.1K 👁 Jul 2, 2021 at 08:15

b.  On May 28, 2021, on Telegram, Persistence stated:

> 🚀 We're continuously working hard to build out our product ecosystem to provide new opportunities for both institutional and crypto-native users, continuing with the launch of pSTAKE in June.

c.  On July 2, 2021, Persistence, via its Telegram account stated, in part: "We have been working hard to create a truly game-changing liquid staking product for the PoS community. It's a pleasure to see so much interest and engagement from everyone."

McDermott Will & Emery LLP
Attorneys At Law
New York

FIRST AMENDED COMPLAINT          CASE NO. 2:23–cv–04669–MEMF–MAR



83.    On February 10, 2022, in a blog post, the Persistence Team wrote that their focus in 2021 was the "Core-1 mainnet launch and key block explorer/wallet/exchange integrations required to scale the ecosystem."[20]

84.    On February 10, 2022, in a blog post, the Persistence Team also stated that, "[i]n 2022 and beyond, the main focus for the team will be to drive significant economic activity on the Persistence Core-1 chain."[21]

85.    To determine whether there is an "expectation of profits," the SEC applies an "economic reality" test. *See SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 353, 365 ("In the analysis of purported investment contracts, form should be disregarded for substance and the emphasis should be on economic reality.") (internal quotation omitted); *Kik*, 492 F. Supp. 3d at 179-180.  Persistence repeatedly touts the

[20] Persistence Team, *The Vision for Persistence*, Persistence Blog (Feb. 10, 2022), https://blog.persistence.one/2022/02/10/the-vision-for-persistence/.

[21] *Id.*

- 17 -

FIRST AMENDED COMPLAINT          CASE NO. 2:23−cv−04669−MEMF-MAR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
NEW YORK

profitability of the Persistence Offering especially with respect to promised "APRs" and "APYs" derived from its "liquid staking" program.

86.     Numerous public statements by Persistence state specifically that purchasers of XPRT can expect exorbitant "APRs" and "APYs."  Persistence repeatedly used a rocket ship symbol to underscore these statements.  A rocket ship symbol is commonly understood in the cryptocurrency industry to communicate to buyers and potential buyers that the value of the security being sold will increase exponentially, "to the moon."

87.     For example, on May 4, 2021, on Telegram, Persistence stated: "[o]ur primary aim is to ensure the continual advancement of the network for the long-term success of Persistence and our community, and we're thrilled to see this coming to fruition!"  A screenshot of this post is below:

FIRST AMENDED COMPLAINT        CASE NO. 2:23−cv−04669−MEMF−MAR



88.    Additionally, the SEC has said that it is informative when "[a] digital asset is transferable or traded on or through a secondary market or platform."[22] XPRT is traded on a number of secondary markets, including Gate.io and KuCoin.

89.    Recent precedent also reaffirms that notion that "[t]he inquiry is an objective one focusing on the promises and offers made to investors." *SEC v. Ripple Labs, Inc.*, 2023 U.S. Dist. LEXIS 120486, at *29 (S.D.N.Y. July 13, 2023) (citing *Telegram*, 448 F. Supp. 3d at 371; *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir.

---

[22] U.S. Securities and Exchange Commission, *Framework for "Investment Contract" Analysis of Digital Assets* (Mar. 8, 2023), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets#_edn1.

FIRST AMENDED COMPLAINT          CASE NO. 2:23−cv−04669−MEMF−MAR

McDermott Will & Emery LLP
Attorneys At Law
New York

2009)).  Persistence specifically promised its investors that they could expect profits from investments in the Persistence Offering.

90.    For these reasons, the Persistence Offering clearly satisfies the reasonable expectation of profit prong.

91.    Finally, the "derived solely from the efforts of others" prong is closely related to the "common enterprise" prong.  *Telegram*, 448 F. Supp. 3d at 375 (noting that the relevant inquiry asks "whether the reasonable expectation of profits [were] derived from the entrepreneurial or managerial efforts of others") (internal quotation omitted).  Whether this prong is met depends, in large part, on the involvement of third parties in off- and on-chain governance.

92.    Persistence's website makes abundantly clear that Aggarwal and the core team control the protocol,[23] so the "efforts of others" prong is easily satisfied with respect to the Persistence Offering.

    a.    On March 25, 2021, in its published tokenomics, Persistence explicitly states "the economic activity driven both within and outside the ecosystem will drive value for XPRT" and proceeds to list specific ways that value is driven to XPRT through 4 different mechanisms, all of which Persistence has a role in creating.[24]

---

[23] *See, e.g.*, Persistence, *FAQs*, https://persistence.one/faq (stating in response to the question "[w]ho are the core team members of Persistence" as follows "The Persistence team currently comprises ~30 members. The Core team members of Persistence are - Tushar Aggarwal: Founder & CEO Jeroen Develter: Ecosystem lead
Mikhil Pandey: pSTAKE lead Puneet Mahajan: Tech lead".).
[24] Persistence Team, *XPRT Tokenomics: Powering the Persistence Ecosystem*, PERSISTENCE (Mar. 25, 2021), https://blog.persistence.one/2021/03/25/xprt-tokenomics-and-utility-powering-the-persistence-ecosystem/.

FIRST AMENDED COMPLAINT          CASE NO. 2:23−cv−04669−MEMF-MAR

McDermott Will & Emery LLP
Attorneys At Law
New York

b.  Persistence, via Telegram, stated the following on May 12, 2021: below:

> 🤝 We'd like to thank Bitcoinist for their insightful article. We're working around the clock to usher in the new decentralized paradigm and it's great to see the space taking notice.
>
> 🚀 The next major milestone on our journey is the launch of our pStake liquid staking app, coming in June!

c.  On May 25, 2021 Persistence repeated a quote from a validator which states the following:

> "Persistence is one of the hardest working and most innovative teams that championed various streams including NFTs, liquid staking, and token distribution models in the Cosmos ecosystem." - Chorus One
>
> 📈 We're honored to have Chorus One securing the mainnet and supporting our journey, and we look forward to a long and fruitful relationship!
>
> 🌐 Chorus One announcement: https://buff.ly/34g4tWW
>
> 🗣: Spread the word: https://twitter.com/PersistenceOne/status/1397168144037318656
>
> Persistence.one | Twitter | Telegram | Medium | YouTube
> t.me/PersistenceOne/432          2.4K 👁  May 25, 2021 at 08:33

93.   Because all four prongs of the *Howey* test are satisfied, the Persistence Offering is a security.

94.   Persistence did not register the Persistence Offering as a security with the SEC or the California Department of Business Oversight.

## AGGARWAL, PERSISTENCE AND RICHARDSON INDUCE MS. THOMSON TO INVEST WITH FALSE PROMISES

95.   Sometime in 2021, Richardson became aware that Ms. Thomson had amassed significant holdings in Ethereum and Bitcoin.

96.   Richardson met and formed a close relationship with Persistence and its founder, Tushar Aggarwal.  Aggarwal and Richardson agreed that Aggarwal or

FIRST AMENDED COMPLAINT        CASE NO. 2:23-cv-04669-MEMF-MAR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
NEW YORK

Persistence would pay Richardson a kickback if she convinced investors to invest in the Persistence Offering.  Richardson told Aggarwal about her relationship with Ms. Thomson, including that Ms. Thomson had amassed a large portfolio of cryptocurrency.

97.    In communications with Ms. Thomson, Richardson described her close relationship with Aggarwal and Persistence.  Richarson concealed the secret kickback that she would receive from Persistence.

98.    For example, Richardson worked with Aggarwal on a business plan related to staking as reflected in the below text conversation between Ms. Thomson and Richardson on November 10, 2021:



99.    On September 6, 2021, Richardson stated to Ms. Thomson that she participated in a "huge marketing meeting" and "business development meeting" with Aggarwal and the Persistence team.

100.    On November 10, 2021, Richardson represented to a third party that she was "aligning with persistence."

101.    Richardson and Aggarwal's business relationship became deeply intertwined, and they spoke regularly, especially during the autumn of 2021.

102.    Richardson and Aggarwal spoke multiple times between September 2021 and January 2022.

FIRST AMENDED COMPLAINT          CASE NO. 2:23−cv−04669−MEMF−MAR

103.    In texts to Ms. Thomson, Richardson stressed her close relationship with Persistence and Aggarwal, telling Ms. Thomson that she had engaged in the following actions with Aggarwal and Persistence:

a.    Attended business development meetings with Aggarwal.

b.    On September 6, 2021, Richardson had "a huge marketing meeting with persistence, and then a business development meeting with Tushar. Also have news about things happening."

c.    Also on September 6, 2021, Richardson relayed to Ms. Thomson information from Persistence that "BIG companies wanting to buy out persistence tech," and noted that she "told them to hold.. it's a great sign they are sitting on something this valuable, but too valuable to sell… yet)."

d.    On September 10, 2021, Richardson related that she was "having a call soon with the biggest crypto influencer, and getting him to promote Persistence and get all Of [sic.] the other influencers on board."

> Side note: I'm having a call soon with the biggest crypto influencer, and getting him to promote Persistence and get all
> Of the other influencers on board
>
> It's SO much fun

e.    On September 29, 2021, she relayed to Ms. Thomson that Persistence was "launching an aggregated NFT network in November."

f.    On November 10, 2021, Richardson stated that she "formed a C corp called TruStake Because I thought we could scale it up, since there is clearly a need This is in no way on you, I genuinely worked with Tushar who was desperate to create this for whales."

McDermott Will & Emery LLP
Attorneys At Law
New York

104.   On November 10, 2021, Richardson stated that Aggarwal "was desperate to create" a staking service "for whales."  A "whale" is a wealthy investor. Richardson and Aggarwal saw Ms. Thomson as such a "whale."

105.   Aggarwal and Persistence needed "whales" in order to artificially drive up the value of XPRT and attract users to invest in the Persistence Offering. Aggarwal, Persistence, and Richardson intended to, and eventually did, inflate the apparent value of Persistence by directing Ms. Thomson's large purchases of XPRT into numerous different wallets.

106.   Persistence stated in August that the number of transactions and wallets created was "proof that our ecosystem of multi-chain #DeFi products is gaining traction."[25]

107.   On November 10, 2021, Richardson emphasized that Persistence wanted to "open[] the door for other whales."

108.   Together, Aggarwal, Richardson, and Persistence set out to exploit Richardson's relationship with Ms. Thomson and targeted Ms. Thomson to induce her to invest her money in Persistence.

109.   Secretly, Aggarwal and Persistence promised to pay Richardson kickbacks in exchange for her efforts.

110.   After inducing Ms. Thomson to invest in the Persistence Offering through false and misleading statements, Persistence and Aggarwal paid those kickbacks to Richardson.

111.   Defendants purposefully concealed the kickbacks from Plaintiff.

---

[25] Persistence (@PersistenceOne), TWITTER (Aug. 23, 2021, 12:22 PM), https://twitter.com/PersistenceOne/status/1429841596711772167.

FIRST AMENDED COMPLAINT          CASE NO. 2:23−cv−04669−MEMF−MAR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
NEW YORK

112.    Indeed, on November 10, 2021, Richardson told Ms. Thomson that "to clarify any doubt" she was getting no compensation for the Persistence transactions.

> on staked assets is 50% and it is not yet clear if they have insurance. For context: currently you are earning 2.7-3M a month solely in coming from your persistence interest/staking, and it is estimated this will likely go up considerably in the coming months earning between 30-150M a year in interest alone (a commission of 15-75M a year). In contrast (and to clarify any doubt) I am not taking any commissions or fees.

113.    Richardson said this to Ms. Thomson to disguise the closeness of her relationship with Persistence and Aggarwal, and to disguise the fact that she was being paid to induce Ms. Thomson to invest in Persistence.

114.    Persistence and Aggarwal structured the secret kickback to Richardson to ensure that the more XPRT Ms. Thomson bought, the more XPRT Richardson would get for herself.

115.    Throughout the duration of her inducement of Ms. Thomson, Richardson regularly met with Persistence and Aggarwal.

116.    These included, at the very least, meetings on June 24, 2021, September 7, 2021, and October 7, 2021.

117.    Shortly after these meetings, Richardson repeatedly fed Ms. Thomson falsehoods about Persistence and its potential for growth.

118.    These misstatements were communicated to Ms. Thomson on Aggarwal and Persistence's behalf.

119.    Richardson communicated these misstatements to Ms. Thomson while Richardson was located in California.

120.    For instance, on August 18, 2021, Richardson sent Ms. Thomson a link to an article written by Aggarwal, which made exorbitant claims about staking.

121.    The article advertised the Persistence Offering, stating "we can see traffic levels on those networks increase exponentially over the coming months and

McDermott Will & Emery LLP
Attorneys At Law
New York

years. More traffic means more fees which means more generous rewards for validators and stakers, making staking a no-brainer for generating passive income."[26]

122.   On the same day, Richardson texted Ms. Thomson to pitch the Persistence Offering, stating: "Irony is Bitcoin is at 44.5 and persistence is up to 7 today."

123.   On August 28, 2021, Richardson said, via text message to Ms. Thomson, "The alts are insane movers. Persistence is a long game, really feel 2-5 years it will be massive Will go up this year, buy the major moves will likely be 2022 But* I'm planning on staking and parking. And trying to find ways with short term gains on other alts. The lower the market cap the higher the potential. Which is why I picked veracity as well. Interesting tech, and it just went up 3x in two weeks. Has a long way to go. I invested 1k and now it's 10k, for perspective. So diversifying in that sector could really pay off, even if some lose."

124.   On August 22, 2021, Richardson sent Ms. Thomson a draft email that she wanted Ms. Thomson to send to directors of the certain corporate entities and trusts related to Ms. Thomson extolling the virtues of the "DeFi space" and saying that she believes the Persistence Offering "will go much farther than Ethereum or Bitcoin in regards to upside potential."  The full email is below:

---

[26] Tushar Aggarwal, *Staking will eat proof-of-work for breakfast — Here's why* (Aug. 18, 2021), https://cointelegraph.com/news/staking-will-eat-blockchain-for-breakfast-here-s-why.

FIRST AMENDED COMPLAINT         CASE NO. 2:23−cv−04669−MEMF−MAR

Dear Mich and Bob,

I am reaching out directly to you both as a first line on a matter that is time sensitive and not as straight forward as Lieh buying ETF's. As you know I have been deeply intrigued and invested in the crypto space, but recently have also begun to explore the larger long term opportunities with smaller up and coming projects that exist in the DeFi space, all having a strong emphasis on Proof of Stake. It is understood that (crypto aside) blockchain technologies will become widely adapted in the coming years and are already being utilized/explored by major financial institutions. I have an opportunity to invest in of these companies as a staked token holder with a generous discount and a tremendous upside of APY. Based on their strong fundamentals and strategic partnerships I believe they will go much farther than Ethereum or Bitcoin in regards to upside potential. I am including a very top-level overview of the space written by their CEO. https://cointelegraph.com/news/staking-will-eat-blockchain-for-breakfast-here-s-why

I understand crypto is a volatile space, but based on the underlying technologies and adaptation of DeFi the investment feels far more secure. I have negotiated a deal with them (directly) with a point entry point of $5usd which they will honor despite the fact that it has since risen to $9.Considering the investment is already up 95% upon entry, a far greater ROI than anything in our existing portfolio.

125.    Ms. Thomson relied on these statements, and others, by Persistence, Aggarwal, and Richardson in deciding to invest in the Persistence Offering.

126.    In an April 26, 2021 tweet, Persistence posted "If you're not staking $XPRT yet, you're missing out on huge rewards!"[27]

127.    Based on an analysis of Ms. Thomson's actual staking rewards on the Persistence blockchain, Ms. Thomson was generally earning less than 33% APR returns.[28]  Many of Persistence's claims about rewards are misleading.

128.    On April 8, 2022, @pstakefinance, a social media account operated by Persistence tweeted that the current APR for a PSTAKE/OSMO pool was 336%.[29]

129.    The April 8, 2022 tweet was demonstrably false.  "Identifiable data from five days prior to this tweet shows that the APR was 62%.  The same data shows that two days following this tweet, the APR was 74%.  These APR percentages are many multiples lower than the promised 336% on April 8, 2022.  We have not identified

---

[27] Persistence (@PersistenceOne), Twitter (Apr. 26, 2021, 8:46 AM), https://twitter.com/PersistenceOne/status/1386678153704267779.

[28] Dizik Decl. ¶ 22.

[29] @pStakeFinance, TWITTER (April 8, 2022, 1:48 PM), https://x.com/pstakefinance/status/1512487541311963137?s=46&t=OjdUXeKuQl4U-sBKKQDK5A.

FIRST AMENDED COMPLAINT        CASE NO. 2:23−cv−04669−MEMF-MAR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
NEW YORK

any basis for a 336% APR on April 8, 2022."[30]  As such, it is so unlikely as to be impossible that the APR was 336% on April 8, 2022.

130.   On April 9, 2022, @pstakefinance tweeted "The PSTAKE/OSMO pool on @osmosiszone is providing ~320% APR, currently the highest incentives out of all pools on Osmosis. Provide liquidity and bond your tokens for 14 days to receive LP rewards. Total Rewards: 150,000 $PSTAKE Provide liquidity: https://app.osmosis.zone/pool/648." [31]  "Identifiable data from six days prior to this tweet shows APR was 62%.  The same data shows that two days following this tweet, the APR was 74%.  As such, it is unlikely that the APR was approximately 320% on April 9, 2022.  We are unable to identify any basis for promising a 320% APR on April 9, 2022."[32]

131.   On April 26, 2021, Persistence tweeted: "The current APR for staking XPRT stands at a whopping 42%+. This is among the highest reward rates in the industry, and **the rewards will be no lower than 35% APR for the first two years**."[33]  This figure is contradicted by the sample of 29.6% APR that Guidepost Solutions calculated based on Ms. Thomson's returns.[34]

---

[30] Dizik Decl. ¶ 24(n).
[31] @pStakeFinance, TWITTER (April 9, 2022, 12:34 AM), https://x.com/pstakefinance/status/1512650070037983232?s=46&t=OjdUXeKuQl4U-sBKKQDK5A.
[32] Dizik Decl. ¶ 24(o).
[33] @PersistenceOne, TWITTER (April 26, 2021, 9:46 AM), https://twitter.com/PersistenceOne/status/1386678153704267779 (emphasis added).
[34] Dizik Decl. ¶ 24(a).

FIRST AMENDED COMPLAINT        CASE NO. 2:23−cv−04669−MEMF−MAR

McDermott Will & Emery LLP
Attorneys At Law
New York

132.   On June 27, 2021 Persistence tweeted that "APYs [were] upto [sic.] 1,948%."  A screenshot is below:



133.   On July 8, 2022, Mikhil Pandey, the project lead of Persistence Labs, while in the presence of Aggarwal in a virtual discussion posted on YouTube, discussed how one can obtain 60% yields through liquid staking on the Cosmos ecosystem available to pSTAKE customers.[35]

134.   Persistence released "community newsletters" on a monthly basis, which included numerous statements regarding the purported successes of the platform.  In August 2021 the newsletter included updates such as "We crossed an incredible 200,000 transactions of XPRT with over 13,500 wallets created; our network is strong and the growth is phenomenal!" alongside a rocket ship symbol – a well-known emblem of profit-oriented cryptocurrency projects.

---

[35] *Roadmap & Use Cases │ Snapshots: Diving into Liquid Staking*, YouTube (July 8, 2022), https://www.youtube.com/watch?v=dRsf4BMs828.

FIRST AMENDED COMPLAINT        CASE NO. 2:23−cv−04669−MEMF−MAR

McDermott Will & Emery LLP
Attorneys At Law
New York

135.   In a community newsletter published on August 22, 2021, Persistence stated that its pSTAKE project had secured its spot "as the most efficient liquid staking product in the market."[36]

136.   Many of Richardson's communications with Ms. Thomson relayed false and misleading information from Defendants Persistence and Aggarwal.

137.   For instance, Richardson told Ms. Thomson, on behalf of Persistence, that "[Persistence] grandfathered you in as a key investor and are essentially giving you 65 Million in three weeks."  Despite these promises, Persistence never gave Ms. Thomson 65 million.

138.   Persistence and Richardson's discrete and false or misleading statements include:

    a.    Richardson's statement that "to clarify any doubt," that Richardson was "not taking any commissions or fees" with respect to Ms. Thomson's investment with Persistence.

    b.    The Agreement misleadingly states that the "Agreement constitutes the entire agreement between the Parties."  Persistence and Aggarwal hid the kickback to Richardson by not including it in the Agreement or any other document.

    c.    The Agreement also states that "each of the Parties acknowledges that it has entered into this Agreement in reliance upon the other Party's representations and warranties being true, accurate, complete, and non-misleading in all respects."

    d.    On April 26, 2021, Persistence tweeted: "The current APR for staking XPRT stands at a whopping 42%+. This is among the highest reward rates in the industry, and the rewards will be no

---

[36] Persistence Blog, *Community Newsletter #10 – July 2021* (Aug. 22, 2021), https://blog.persistence.one/2021/08/22/community-newsletter-10-july-2021/.

FIRST AMENDED COMPLAINT      CASE NO. 2:23−cv−04669−MEMF−MAR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
NEW YORK

lower than 35% APR for the first two years."[37]  This figure is contradicted by the sample of 29.6% APR that was calculated based on Ms. Thomson's returns.[38]

e.    On August 28, 2021, Richardson texted Ms. Thomson that there was an "…upside of 269% annually for early adapters" for staking with XPRT.  After reviewing Ms. Thomson's investment returns and publicly available data, Guidepost Solutions was unable to identify any basis for calculating a 269% return.  Ms. Thomson's staking returns were significantly less than 269%.[39]

f.    On August 28, 2021, Richardson told Ms. Thomson she could earn "200-600 % APY" with XPRT staking.  Guidepost Solutions opined that, "[a]fter reviewing Ms. Thomson's investment returns and publicly available data, we are unable to identify any basis for calculating a 200-600% APY.  Ms. Thomson's staking returns were significantly less than 200-600% APY."[40]

g.    On October 7, 2021, Richardson said "Also want to walk you through a meeting I just had with persistence [sic.] about liquid staking – could be a huge upside for Atom, 15% a month APY which is about 180% a year."  According to Guidepost Solutions, "[a]fter reviewing Ms. Thomson's investment returns and publicly available blockchain data, we are unable to identify any basis for calculating these returns.  Ms. Thomson's staking returns were significantly less than 180% a year."[41]

---

[37] Persistence (@PersistenceOne), TWITTER (Apr. 26, 2021, 9:46 AM), https://twitter.com/PersistenceOne/status/1386678153704267779.
[38] Dizik Decl. ¶ 24(a).
[39] Dizik Decl. ¶ 24(b).
[40] Dizik Decl. ¶ 24(c).
[41] Dizik Decl. ¶ 24(d).

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
NEW YORK

FIRST AMENDED COMPLAINT        CASE NO. 2:23−cv−04669−MEMF−MAR

h.  On November 10, 2021, Richardson confirmed, via text message to Ms. Thomson, that she was re-staking Ms. Thomson's assets daily.  Guidepost Solutions' review of Ms. Thomson's assets and returns during this time period concluded that the XPRT were not being 'restaked' or redelegated daily.[42]

i.  On November 10, 2021, Richardson told Ms. Thomson "currently you are earning 2.7-3M a month solely in coming from your persistence interest/staking, and it is estimated this will likely go up considerably in the coming months earning between 30-150M a year in interest alone (a commission of 15-75M a year)."  Guidepost Solutions "calculated significantly lower monthly earnings from September 2021 through June 2022"[43] and was "unable to identify a basis for the claim of an increase in rewards."[44]

j.  On November 10, 2021, Richardson told Ms. Thomson that "[Persistence] grandfathered you in as a key investor and are essentially giving you 65 Million in three weeks."  Guidepost Solutions reviewed "Ms. Thomson's investment returns," and was "unable to verify this statement."[45]  "Under no calculation did Persistence "give" Ms. Thomson $65 million."[46]

k.  On November 10, 2021, Richardson told Ms. Thomson that "the upside [of Persistence] is massive"; "You are generating about 3M in interest per month," "If it doubles next month that is 6M a month!";"I don't think you realize how much money is being

---

[42] Dizik Decl. ¶ 24(e).
[43] Each value identified by Richardson does not state whether it is in USD or CAD.  All values calculated by Guidepost Solutions are in USD.
[44] Dizik Decl. ¶ 24(f).
[45] Dizik Decl. ¶ 24(g).
[46] Dizik Decl. ¶ 24(g).

FIRST AMENDED COMPLAINT          CASE NO. 2:23−cv−04669−MEMF−MAR

McDermott Will & Emery LLP
Attorneys At Law
New York

made – it's bananas"; "I just want you to have a sense of what this is, because I think long term this is huge."  Guidepost Solutions was "unable to identify any indication that $3M or $6M in interest a month was being earned by Ms. Thomson."[47]

l.    On December 3, 2021 and December 8, 2021, Richardson said that there was a "fixed return" of at least 35% in addition to an APY that began at 6000% and "reduces weekly, until it lands somewhere around 100-200%" for platforms including Persistence.  Guidepost Solutions "reviewed APY figures for the relevant staking pairs and . . . found no support for a claim of 6,000% APY."[48]

m.    On December 13, 2021, Richardson told Ms. Thomson that she was "making 5.4 M a week on average, which seems insane and is going down over time… but I just verified it."  "Ms. Thomson was not earning anywhere near $5.4M per week on average.  In reality, Ms. Thomson's claimed staking rewards were valued at closer to approximately $6.8 million total over 12 months.  This is without taking into account the significant drop in value of XPRT and the inability to sell all of Ms. Thomson's XPRT due to a lack of interest in the market."[49]

n.    On January 6, 2022, Richardson told Ms. Thomson, "you are up on persistence and with the interest and the extra 10M you are getting for early liquidity, it makes up for it."  According to Guidepost Solutions, "Ms. Thomson did not receive an 'extra 10M.'"[50]

---

[47] Dizik Decl. ¶ 24(h).
[48] Dizik Decl. ¶ 24(i).
[49] Dizik Decl. ¶ 24(j).
[50] Dizik Decl. ¶ 24(k).

FIRST AMENDED COMPLAINT      CASE NO. 2:23–cv–04669–MEMF–MAR

o.  On January 12, 2022, Richardson told Ms. Thomson: "your Atom/Eth XPRT/Eth pairs have a fixed rate, but will be issued a large amount of yield for your early participation at the months end.  The amount is still unknown as it is due to your percentage of participation throughout, however the estimates I have laid out previously still stand (somewhere between 500k-15M EST) and will be issued the last week of this month."  "After reviewing Ms. Thomson's returns on investment, we did not identify any payment that was forthcoming at this time."[51]

p.  On January 14, 2022, Richardson told Ms. Thomson, "to clarify, you are still up! Don't forget the yield you are generating is greater than the price difference.  Also, you are going to get an addition 5-10M on rewards (on top of your staking APY) at the beginning of Feb just for having been an early liquidity provider."  According to Guidepost Solutions, "[a]fter reviewing Ms. Thomson's returns on investment, we did not identify any payment that was forthcoming in February 2022."[52]

q.  On April 8, 2022, @pstakefinance, a social media account operated by Persistence tweeted, in part: "Additional external rewards are live for PSTAKE/OSMO pool on @osmosiszone. Current APR: 336% Pool: https://app.osmosis.zone/pool/648."[53] "Identifiable data from five days prior to this tweet shows that the APR was 62%.  The same data shows that two days following this tweet, the APR was 74%.  These APR percentages are many

---

[51] Dizik Decl. ¶ 24(l).
[52] Dizik Decl. ¶ 24(m).
[53] @pStakeFinance, Twitter (April 8, 2022, 1:48 PM), https://x.com/pstakefinance/status/1512487541311963137?s=46&t=OjdUXeKuQl4U-sBKKQDK5A.

FIRST AMENDED COMPLAINT          CASE NO. 2:23−cv−04669−MEMF−MAR

McDermott Will & Emery LLP
Attorneys At Law
New York

multiples lower than the promised 336% on April 8, 2022.  We have not identified any basis for a 336% APR on April 8, 2022."[54]

r. On April 9, 2022, @pstakefinance, a social media account operated by Persistence tweeted, in part: "The PSTAKE/OSMO pool on @osmosiszone is providing ~320% APR, currently the highest incentives out of all pools on Osmosis.  Provide liquidity and bond your tokens for 14 days to receive LP rewards. Total Rewards: 150,000 $PSTAKE Provide liquidity: https://app.osmosis.zone/pool/648."[55]  "Identifiable data from six days prior to this tweet shows APR was 62%.  The same data shows that two days following this tweet, the APR was 74%.  As such, it is unlikely that the APR was approximately 320% on April 9, 2022.  We are unable to identify any basis for promising a 320% APR on April 9, 2022."[56]

139. Far from making an exorbitant rate of return on her investment Ms. Thomson's initial investment decreased approximately 94.5% compared to the current value of her initial investment.

140. Ms. Thomson relied on many of the above representations.

141. Ms. Thomson relied on representations from Persistence and Richardson to continue to invest her assets in liquidity pools.

142. Ms. Thomson would not have invested in the Persistence Offering if she was not told the above-referenced false statements.

---

[54] Dizik Decl. ¶ 24(n).
[55] @pStakeFinance, TWITTER (April 9, 2022, 12:34 AM), https://x.com/pstakefinance/status/1512650070037983232?s=46&t=OjdUXeKuQl4U-sBKKQDK5A.
[56] Dizik Decl. ¶ 24(o).

FIRST AMENDED COMPLAINT    CASE NO. 2:23-cv-04669-MEMF-MAR

McDermott Will & Emery LLP
Attorneys At Law
New York

## AGGARWAL, PERSISTENCE, AND RICHARDSON'S FALSE STATEMENTS INDUCE MS. THOMSON TO INVEST

143.    Due to this targeted pressure campaign from Aggarwal, Persistence, and Richardson, Ms. Thomson acquiesced and agreed to invest in the Persistence Offering.

144.    Despite the speculative risks of executing a cryptocurrency transaction of this kind, Richardson was dogged in insisting that Ms. Thomson enter into the Agreement for XPRT.

145.    On August 18, 2021, Richardson urged Ms. Thomson to send Persistence a "good faith amount" of Bitcoin or to sign a letter of intent for purchase of the cryptocurrency before Ms. Thomson was able to enter into a formal contract to purchase the cryptocurrency.

146.    Richardson was required to be licensed as a broker-dealer and was not, at this time.

147.    Richardson also, for compensation, engaged in the business of advising Ms. Thomson, directly and through publications or writings as to the value and advisability of purchasing securities, purchasing securities when she advised Ms. Thomson to invest in the Persistence Offering.

148.    On August 25, 2021, Ms. Thomson, at Richardson's direction, invested in the Persistence Offering by entering into the Agreement.

149.    The Agreement was signed by Ms. Thomson and Aggarwal.

150.    The price of XPRT on the date of the first purchase had a high of approximately $8.16.

151.    The market price of XPRT as of the writing of the Complaint and this Amended Complaint is approximately $0.16.

152.    XPRT has decreased approximately 98% in value between the date of Ms. Thomson's first purchase of XPRT and the writing of this Complaint.

FIRST AMENDED COMPLAINT          CASE NO. 2:23–cv–04669–MEMF–MAR

McDermott Will & Emery LLP
Attorneys At Law
New York

153.   Pursuant to Schedule 1 of the Agreement, Ms. Thomson agreed to invest in the Persistence Offering by purchasing 4,000,000 XPRT in exchange for $20 million worth of cryptocurrency.

154.   When entering into the Agreement, Ms. Thomson relied on the false and misleading information which Aggarwal, Persistence, and Richardson provided.

155.   Together, Richardson and Persistence structured Ms. Thomson's investment in the Persistence Offering through multiple transactions and sent XPRT to multiple different wallets.

156.   Aggarwal, Persistence, and Richardson structured the transactions and storage in this manner in order to manipulate XPRT's price at Ms. Thomson's expense.

157.   Aggarwal, Persistence, and Richardson insisted on structuring these transactions in this manner in order to make it appear that multiple individuals had made large purchases of XPRT and to falsely create the impression of broad interest in XPRT to the purchasing public.

158.   In total, Persistence held Ms. Thomson's XPRT in 10 separate digital wallets[57] in order to purposefully mislead the public, including actual and potential purchasers of XPRT.

159.   The digital wallets holding XPRT are readily available on the "Rich List" on Mintscan.[58]  The "Rich List" identified the digital wallets holding the largest amounts of any particular cryptocurrency.[59]  The 10 digital wallets associated with Ms. Thomson were on the "Rich List."

160.   Thus, due to Persistence and Richardson's improper and manipulative structuring of the transactions and their storage, the market believed it was seeing a series of high-value investments in the Persistence Offering by numerous distinct

---

[57] Dizik Decl. ¶ 10.
[58] Mintscan, *Rich List*, https://www.mintscan.io/persistence/address.
[59] *Id.*

FIRST AMENDED COMPLAINT          CASE NO. 2:23−cv−04669−MEMF−MAR

McDermott Will & Emery LLP
Attorneys At Law
New York

investors.  In reality, a single investor, Ms. Thomson, had made approximately a $20,000,000 investment.

161.  The scheme initially worked.  Buoyed by the misleading information Persistence put out to the buying public, XPRT's market cap grew by 30% in the days following Ms. Thomson's initial August 25, 2021 investment.[60]

162.  Aggarwal, Persistence and Richardson used Ms. Thomson's investment in other ways to mislead the investing public.  For instance, Richardson proposed naming Ms. Thomson's staking node "Persistence Bull" because it would be seen as "a positive indicator whoever is holding it view there [sic] project in a positive light."

163.  Defendants chose the name to publicly suggest that someone holding a large amount of XPRT was generating returns.

164.  As 2021 came to a close, Aggarwal, Persistence, and Richardson's pressure campaign continued, and they convinced Ms. Thomson to purchase even more XPRT.

165.  In multiple transactions between August 2021 and June 2022, Ms. Thomson purchased 8,624,431 XPRT worth $46,082,634.

166.  The first 4,000,000 XPRT were purchased under the Agreement, at an approximate value of $21,350,765.

167.  The remainder of the XPRT purchased directly from Persistence (purchased at a total value of $24,731,599) were not purchased pursuant to the Agreement.

168.  The following transactions were purchased pursuant to the Agreement:

---

[60] CoinMarketCap, *Persistence Historical Data*, https://coinmarketcap.com/currencies/persistence/historical-data/; Richardson's own undisclosed XPRT trades, received as part of the kickback, benefitted from this market manipulation as well.

FIRST AMENDED COMPLAINT          CASE NO. 2:23−cv−04669−MEMF−MAR

| Date | Total Number of XPRT Purchased | Amount in BTC Paid in USD and Date |
|---|---|---|
| 8/25/2021 | 3,000,000 | 15,711,929 on August 26, 2021 |
| 9/6/2021 | 1,000,000 | 5,638,837 on September 6, 2021 |

169.  The following transactions were purchased outside of the Agreement:

| Date | Total Number of XPRT Purchased | XPRT Market Price[61] Value in USD | Ms. Thomson's Location |
|---|---|---|---|
| 10/4/2021 | 2,499,998 | $13,111,214 | London |
| 10/18/2021 | 1,499,997 | $9,996,588 | London |
| 10/23/2021 | 46,892 | $376,070 | London |
| 11/4/2021 | 51,039 | $452,975 | London and Toronto |
| 4/2/2022 | 6,666 | $ 23,597.64 | Toronto |
| 4/3/2022 | 91,147 | $ 327,219.13 | Toronto |
| 5/22/2022 | 59,039 | $ 98,890.95 | Los Angeles |
| 6/13/2022 | 43,160 | $ 48,122.83 | Toronto |
| 6/14/2022 | 139,145 | $ 130,865.02 | Toronto |
| 6/15/2022 | 187,349 | $ 166,056.52 | Toronto |

170.  Richardson executed transactions in Ms. Thomson's digital wallets while physically present in California.

---

[61] Market Price is average of High and Low on the day of sale from www.coinmarketcap.com.

McDermott Will & Emery LLP
Attorneys At Law
New York

171.   Ms. Thomson relied on Persistence and Richardson's misleading promises and false statements when she entered into the Agreement.

172.   However, Persistence and Richardson concealed numerous risks from Ms. Thomson associated with Ms. Thomson's purchase of XPRT.

173.   Richardson affirmatively and fraudulently represented to Ms. Thomson that she *did not* receive any financial compensation for brokering the Agreement.

174.   In an email on November 10, 2021, Richardson even told Ms. Thomson, "to clarify any doubt," that Richardson was "not taking any commissions or fees" with respect to Ms. Thomson's investment with Persistence.

175.   In reality, in exchange for bringing Ms. Thomson in as an investor, Persistence paid Richardson a kickback of 97,166 XPRT. [62]

176.   The kickback was paid to Richardson over four different transactions between August and October 2021.[63]

177.   The kickback was worth approximately $783,702 based on the price of XPRT at the times of the transactions.[64]

178.   The Defendants did not disclose this kickback arrangement to Ms. Thomson.  In fact, the Defendants purposefully concealed the kickbacks from Ms.

---

[62] Dizik Decl. ¶ 15; *see also* Mintscan Transaction Details:

1. August 25, 2021 Transaction:
   - https://www.mintscan.io/persistence/txs/CF632D7033A5E7982957769B943C45474
     F3B99B1E4732F317120BC37AA92C292;
2. September 6, 2021 Transaction:
   - https://www.mintscan.io/persistence/txs/21A6BB7F9C585B3864178F1C598D5C7
     CCD78853D7B55161689EF542AE9FD1F1B;
3. October 4, 2021 Transaction:
   - https://www.mintscan.io/persistence/txs/95E3C37378CAA357339196E2F9A96B2A
     58ECD8BC81CDBC6406BB90CA9A15556A;
4. October 18, 2021 Transaction:
   - https://www.mintscan.io/persistence/txs/3A551ACC6AFBB9DD7CFDCFDCC4836
     86C83392637C584E9DB77D945AFB102530A.

[63] Dizik Decl. ¶ 15.
[64] Dizik Decl. ¶ 15.

FIRST AMENDED COMPLAINT          CASE NO. 2:23−cv−04669−MEMF-MAR

Thomson.  The Agreement itself purposefully contained no reference to this
kickback arrangement.

179.   Section 7.4 of the Agreement specifically states that the "Agreement
constitutes the entire agreement between the Parties."

180.   The kickback also violates Section 2.5 of the Agreement, which states
that "each of the Parties acknowledges that it has entered into this Agreement in
reliance upon the other Party's representations and warranties being true, accurate,
complete, and non-misleading in all respects."

181.   Ms. Thomson relied on Persistence's representations being true,
accurate, complete, and non-misleading.

182.   However, Persistence's representations were untrue, inaccurate, and
misleading because, among other things, they failed to disclose the existence of the
secret kickbacks to Richardson.

183.   The $783,702 kickback was of significant value to Richardson and
presented a serious undisclosed conflict of interest.  Richardson's representation that
she was not earning any compensation also was significant to Ms. Thomson and was
an important consideration in her decision to authorize the investments into the
Persistence Offering.

### AFTER THE INITIAL PURCHASE

184.   After the Agreement was executed, Richardson continued to
fraudulently induce Ms. Thomson to continue investing in Persistence.  Richardson
repeatedly assured Ms. Thomson that Ms. Thomson's investment would considerably
increase by mid-2022.

185.   Throughout this period, Ms. Thomson was convinced to repeatedly
reinvest in Persistence by purchasing more XPRT tokens.

186.   After purchasing the 4,000,000 XPRT contemplated by the Agreement,
Ms. Thomson made subsequent purchases of XPRT on October 4, October 18,

FIRST AMENDED COMPLAINT          CASE NO. 2:23-cv-04669-MEMF-MAR

October 23, November 4, in 2021 and on April 2, April 3, May 22, June 13, June 14, and June 15 of 2022.

187.    During the period in which Ms. Thomson was making these purchases, Richardson continued to feed Ms. Thomson misleading statements from Persistence.

188.    Richardson was present in California during this period.

189.    On the same day that a purchase of XPRT was made, Richardson said "[y]our 20M instantly became 32.2 - but I expect even higher tomorrow."

190.    On August 28, 2021, for example, Richardson, continuing to sell Ms. Thomson on Persistence, stated that there is "…upside of 269% annually for early adapters."

191.    There does not appear to be any basis for the figure of 269% annually.

192.    On the same day, Richardson told Ms. Thomson that she "could have [her] own staking pool; which could be massive returns."

193.    On the same day, Richardson also said "[r]eward is in the form of persistence, I believe. And higher than regular staking. I'm getting the specifics next week on a call with him. Maybe we can do a zoom and you can join? Would love you to meet them."

194.    Aggarwal met with Ms. Thomson on or around January 21, 2022.  He did not disclose the kickback at that time.

195.    On August 28, 2021, Richardson told Ms. Thomson she could earn "200-600 % APY" with liquid staking.

196.    On October 7, 2021, Richardson stated to Ms. Thomson: "Also want to walk you through a meeting I just had with persistence [sic.] about liquid staking – could be a huge upside for Atom, 15% a month APY which is about 180% a year. Have another meeting now but after if you have time let's hop on a call!"

197.    On October 9, 2021, Richardson told Ms. Thomson that she believed Persistence "could be honestly huge" and that Richardson was "very[,] very bullish" on Persistence.

198.   In a November 8, 2021 email to Ms. Thomson, Richardson told Ms. Thomson that her holdings "could be considerably higher" by "mid-2022" and that Ms. Thomson "should plan accordingly."

199.   In a November 10, 2021 text, Richardson told Ms. Thomson "the upside [of Persistence] is massive"; "You are generating about 3M in interest per month," "If it doubles next month that is 6M a month!";"I don't think you realize how much money is being made – it's bananas"; "I just want you to have a sense of what this is, because I think long term this is huge."  There is no apparent basis for this statement.

200.   On November 10, 2021, Richardson told Ms. Thomson that Persistence was "essentially giving [her] 65 Million in three weeks For being there - they are so lovely That is on top of your assets!"  There is no apparent basis for this statement. Richardson falsely claimed that Ms. Thomson was earning "65 million" just "[f]or being there."

201.   On November 10, 2021, Richardson told Ms. Thomson that she was restaking her assets daily.  In reality, Richardson was not restaking Ms. Thomson's assets daily.

202.   Also in a November 10, 2021 email to Ms. Thomson, Richardson claimed that Ms. Thomson was "earning 2.7-3M a month solely in coming from [Ms. Thomson's] [P]ersistence interest/staking."  Richardson further provided Ms. Thomson an estimate that her investment in Persistence would "likely go up considerably in the coming months earning between 30-150m a year in interest alone."

203.   On December 3, 2021, Richardson said that there was a "fixed return" of at least 35% in addition to an APY that began at 6000% and "reduces weekly, until it lands somewhere around 100-200%" for platforms including Persistence.  We are unable to identify any basis for this 6000% figure.

McDermott Will & Emery LLP
Attorneys At Law
New York

FIRST AMENDED COMPLAINT          CASE NO. 2:23−cv−04669−MEMF−MAR

204.    In December 2021, Richardson told Ms. Thomson that she was "making 5.4 M a week on average, which seems insane and is going down over time… but I just verified it."

205.    As the market began to decline, Richardson continued to persuade Ms. Thomson that the value of her investment would increase.

206.    On December 16, 2021, Richardson said "Super bullish on what persistence is building, and today I need to go through additional airdrops I think you may have received for new coins. The beauty of staking is that you often just getting loads of free new coins by way of airdrops."

207.    On January 6, 2022, Richardson said that Persistence was holding its value despite a large unlock of XPRT.  She said "I still believe that it has the most long term potential, and you are in profit."

208.    On January 12, 2022, Richardson said "your Atom/Eth XPRT/Eth pairs have a fixed rate, but will be issued a large amount of yield for your early participation at the months end.  The amount is still unknown as it is due to your percentage of participation throughout, however the estimates I have laid out previously still stand (somewhere between 500k-15M EST) and will be issued the last week of this month."  There is no apparent basis for this statement.

209.    On January 14, 2022, Richardson said "to clarify, you are still up! Don't forget the yield you are generating is greater than the price difference. Also, you are going to get an addition 5-10M on rewards (on top of your staking APY) at the beginning of Feb just for having been an early liquidity provider ;)."  Ms. Thomson never received 5-10M in rewards in February 2022.

210.    On the same day, Richardson said "unlock would have brought the price down even in a good market, so expect it to go up from here. Early early project with massive potential."

McDermott Will & Emery LLP
Attorneys At Law
New York

211.   A few days later, Richardson contradicted herself when she said that Ms. Thomson was "up on persistence and with the interest and the extra 10M you are getting for early liquidity, it makes up for it."

212.   In an email from January 20, 2022, Richardson predicted that Ms. Thomson would receive an estimated "10-30M", the vast majority of which was from pSTAKE cryptocurrencies.  Those cryptocurrencies ended up being worth approximately $2.34 million and were given on April 14, 2022.

213.   Upon information and belief, Aggarwal and Persistence fed the above-referenced false statements to Richardson for the purpose of sharing them with Ms. Thomson.

214.   On February 16, 2022, at the beginning of what turned out to be a steady decline in the price of XPRT, Richardson said "[t]he good news is that it does seems [sic] to be stabilizing and if the trend continues at this rate we you could be back to whole by March."

215.   In reality, Ms. Thomson was not back to whole by March, as the price of XPRT continued to decline.

216.   On July 8, 2022, Mikhil Pandey, the project lead of Persistence discussed on a virtual video conference posted publicly on YouTube how one could obtain 60% yields through liquid staking on the Cosmos ecosystem available to pSTAKE customers.[65]

217.   Defendants Aggarwal, Persistence, and Richardson knew or should have known that the aforementioned statements were false or misleading at the time they made these statements.

218.   They made them anyway to extract all the value they could from their "whale," Ms. Thomson.

---

[65] *Roadmap & Use Cases │ Snapshots: Diving into Liquid Staking*, YOUTUBE (July 8, 2022), https://www.youtube.com/watch?v=dRsf4BMs828.

FIRST AMENDED COMPLAINT          CASE NO. 2:23−cv−04669−MEMF−MAR

219.   Given their duplicity, Ms. Thomson continued to rely on the statements from Aggarwal, Persistence, and Richardson through 2022.

220.   But for the continued pressure and false statements promulgated by Aggarwal, Persistence, and Richardson, Ms. Thomson would not have made the numerous non-Agreement purchases of XPRT between October 2021 and June 2022.

221.   In fact, if she had been privy to the truth, Ms. Thomson would have been able to sell her assets before they lost over 90% of their value.

<u>**THE DEFENDANTS' MISREPRESENTATIONS AND FALSE STATEMENTS ARE EXPOSED**</u>

222.   In 2022, the truth about Persistence and Richardson's false statements and misrepresentations began to be exposed.

223.   In or around January 2022, Ms. Thomson began reaching out to Richardson to seek an accounting.  Richardson was not forthcoming.  She evaded the questions regarding an accounting and made excuses as to why she couldn't provide the requested information.

224.   During this time, Richardson continuously assured Ms. Thomson that she was earning money on her investment with Persistence and that she expected the investment to continue to appreciate in value.

225.   Richardson was evasive in response to Ms. Thomson's requests for an accounting.  This caused Ms. Thomson to become suspicious and triggered the investigation that lead to the discovery of Richardson and Persistence's malfeasance.

226.   Ms. Thomson retained Guidepost Solutions to begin an investigation on or around June 2022.

227.   On April 12, 2022, after months of Richardson failing to respond to requests to return the assets, Ms. Thomson confronted Richardson at her home in California and demanded the return of her assets.  Richardson acquiesced and returned a portion of the ledgers and a few key phrases necessary to access Ms. Thomson's accounts.

- 46 -

228.   After subsequent follow-up conversations, Ms. Thomson was able to recover possession of her assets from Richardson beginning in June and July of 2022 and throughout August of 2022.

229.   In or around this time, Persistence finally admitted to Ms. Thomson that Persistence had provided a kickback to Richardson.

230.   Subsequently, Richardson admitted that she had received payment in connection with certain of Ms. Thomson's purchases of XPRT.

231.   Given Richardson's previous insistence that no kickbacks were paid, and Persistence and Aggarwal's concealment of the kickback, this revelation raised major alarm bells.

232.   The kickback was paid to Richardson over four different transactions between August and October 2021 and was worth approximately $783,702, based on the price of XPRT at the times of the transactions.[66]

233.   Absent Aggarwal, Persistence, and Richardson's targeted misinformation campaign, Ms. Thomson would never have invested in Persistence.

234.   Between August 25, 2021 and June 15, 2022, Ms. Thomson invested assets worth $46,082,634 in Persistence.  Those investments are currently worth approximately $2,500,000.

---

[66] Dizik Decl. ¶ 15; *see also* Mintscan Transaction Details:

   5.   August 25, 2021 Transaction:
      •   https://www.mintscan.io/persistence/txs/CF632D7033A5E7982957769B943C45474F3B99B1E4732F317120BC37AA92C292;
   6.   September 6, 2021 Transaction:
      •   https://www.mintscan.io/persistence/txs/21A6BB7F9C585B3864178F1C598D5C7CCD78853D7B55161689EF542AE9FD1F1B;
   7.   October 4, 2021 Transaction:
      •   https://www.mintscan.io/persistence/txs/95E3C37378CAA357339196E2F9A96B2A58ECD8BC81CDBC6406BB90CA9A15556A;
   8.   October 18, 2021 Transaction:
      •   https://www.mintscan.io/persistence/txs/3A551ACC6AFBB9DD7CFDCFDCC483686C83392637C584E9DB77D945AFB102530A.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
NEW YORK

235.   This complaint seeks damages from the cryptocurrency purchased outside of the Agreement.

236.   Ms. Thomson invested in the Persistence Offering because of the false claims of exorbitant returns.

237.   Since Ms. Thomson reached out to Defendants, Persistence has attempted to remove the digital footprint of their activities from the internet.  This includes deleting certain tweets advertising XPRT and removing the offer to sell XPRT from their website.

238.   A screenshot of Persistence's website as of April 27, 2023 is below.  The section reading "[a]cquire XPRT" with links to exchanges and the advertisement of staking rewards no longer exist at the following address: https://persistence.one/xprt.

FIRST AMENDED COMPLAINT          CASE NO. 2:23−cv−04669−MEMF-MAR

239.   A screenshot of the same Persistence website, https://persistence.one/xprt, as of September 22, 2023, is below.



240.   Defendants removed a tutorial for providing liquidity on osmosis from their website, as it was reflected below, as of April 27, 2023:



241.   A screenshot of the same Persistence website as of September 22, 2023, is shown below.

FIRST AMENDED COMPLAINT         CASE NO. 2:23−cv−04669−MEMF−MAR

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

McDermott Will & Emery LLP
Attorneys At Law
New York



## CLAIMS FOR RELIEF
### COUNT I
### Fraud
### (All Defendants)

242.    The preceding paragraphs are incorporated herein as if fully restated.

243.    Defendants made false statements of material fact to Plaintiff, which are identified in the above allegations, including, but not limited to the profitability of the Persistence Offering and that Richardson was not receiving a kickback.

244.    At the time these representations were made, Defendants knew that they were false or recklessly disregarded the truth of whether statements were false or misleading.

245.    These misrepresentations were material.  Had Plaintiff known the truth, she never would have invested in the Persistence Offering.

246.    Defendants made these statements intending to defraud Plaintiff and intending to induce Plaintiff's reliance therein.

FIRST AMENDED COMPLAINT          CASE NO. 2:23−cv−04669−MEMF−MAR

247.  Plaintiff reasonably relied on the truth of these statements.

248.  As a direct and proximate result of this fraudulent conduct, Plaintiff suffered an economic loss of at least $24,731,599 sought in this proceeding.

249.  Plaintiff is entitled to damages in an amount to be proven at trial.

**COUNT II**
**Civil Conspiracy to Commit Fraud**
**(All Defendants)**

250.  The preceding paragraphs are incorporated herein as if fully restated.

251.  Defendants Aggarwal, Persistence and Richardson agreed between themselves to commit acts of fraud for the purpose of persuading Plaintiff to invest in the Persistence Offering.

252.  Specifically, Defendants Aggarwal, Persistence, and Richardson conspired to hide the compensation paid to Richardson in return for convincing Plaintiff to invest in the Persistence Offering.

253.  Richardson, Aggarwal, and Persistence also issued misleading advertisements, which are identified in the above allegations, which include, but are not limited to, the profitability of the Persistence Offering and that Richardson was not receiving a kickback.

254.  As part of the conspiracy, Defendants committed overt acts including making the specific representations described above to Ms. Thomson.

255.  Defendants made these statements intending to defraud Plaintiff and intending to induce Plaintiff's reliance therein.

256.  Defendants knew the statements were false or misleading or recklessly disregarded the truth of whether statements were false or misleading.

257.  Plaintiff reasonably relied on the truth of these statements.

258.  As a direct and proximate result of the encouragement by Richardson to continue investing in the Persistence Offering and the payment of a kickback by Persistence in furtherance of the conspiracy, Ms. Thomson suffered an economic loss of at least $24,731,599 sought in this proceeding.

McDermott Will & Emery LLP
Attorneys At Law
New York

259.    Plaintiff is entitled to damages in an amount to be proven at trial.

## COUNT III
### Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder - 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5
### (All Defendants)

260.    The preceding paragraphs are incorporated herein as if fully restated.

261.    Plaintiff Taylor Thomson invested in the Persistence Offering.

262.    The Persistence Offering is an "investment contract."

263.    Defendant Richardson is a resident of California and was present in California at the time of the purchase.

264.    During the relevant period, the Defendants sold the Persistence Offering to the Plaintiff, which was not registered with the Securities and Exchange Commission ("SEC") and were not exempt from registration, in violation of Section 5 of the Securities Act of 1933.

265.    Defendants made false statements of material fact to Plaintiff, which are identified in the above allegations, including, but not limited to the profitability of the Persistence Offering and that Richardson was not receiving a kickback.

266.    Defendants made these misrepresentations with the intent to deceive Plaintiff, in order to convince her that Richardson was operating on her behalf and so induce her to invest in the Persistence Offering.

267.    Plaintiff relied on these misrepresentations in choosing to invest in the Persistence Offering.

268.    As a result of his purchase, Plaintiff suffered an economic loss of at least $24,731,599 sought in this proceeding.

269.    Plaintiff Thomson's loss came as a factual and proximate result of Defendants' material misstatements and omissions, as Plaintiff would not have invested in the Persistence Offering had Defendants not made such misstatements and omissions.

FIRST AMENDED COMPLAINT        CASE NO. 2:23−cv−04669−MEMF−MAR

270.  Plaintiff is entitled to damages in an amount to be proven at trial. Plaintiff is also entitled to reasonable costs and attorneys' fees, as authorized by 15 USCS § 78i(f).

### COUNT IV
### Selling Unregistered Securities - Cal. Corp. Code §§ 25503 and 25110
### (Persistence and Aggarwal)

271.  The preceding paragraphs are incorporated herein as if fully restated.

272.  Defendants Aggarwal, Persistence, and Richardson offered to sell the Persistence Offering within the state of California.

273.  Defendants Aggarwal, Persistence, and Richardson offered the Persistence Offering in issuer transactions.

274.  The Persistence Offering was an "investment contract."

275.  The Persistence Offering was not duly qualified with California Department of Business Oversight under Cal. Corp. Code. § 25110 at the time of the transactions.

276.  No exemption from qualification applied to the security or the transaction.

277.  Plaintiff invested in the Persistence Offering in reliance on Defendants' offer.

278.  As a direct and proximate result of Defendant's violation of Cal. Corp. Code § 25110 Cal. Plaintiff has suffered an economic of at least $24,731,59 sought in this proceeding.

279.  Under Cal. Corp. Code. § 25503 Plaintiff is entitled to recovery and/or damages in an amount to be proven at trial.

### COUNT V
### Misrepresentation or Omission of Material Fact in the Sale of Securities - Cal. Corp. Code §§ 25501 and 25401
### (All Defendants)

280.  The preceding paragraphs are incorporated herein as if fully restated.

FIRST AMENDED COMPLAINT         CASE NO. 2:23−cv−04669−MEMF−MAR

McDermott Will & Emery LLP
Attorneys At Law
New York

281.    Defendants Aggarwal, Persistence, and Richardson offered to sell the Persistence Offering within the state of California.

282.    Defendants Aggarwal, Persistence, and Richardson sold XPRT as part of the Persistence Offering to Plaintiff.

283.    Defendants made untrue statements of material fact and/or omitted material facts in selling the Persistence Offering.

284.    Defendants made false statements of material fact to Plaintiff, which are identified in the above allegations, including, but not limited to the profitability of the Persistence Offering and that Richardson was not receiving a kickback.

285.    The omissions and misstatements constitute a violation of Cal. Corp. Code § 25401.

286.    As a direct and proximate result of Defendant's violation of Cal. Corp. Code § 25401, Plaintiff has suffered an economic loss of at least $24,731,599 sought in this proceeding.

287.    Under Cal. Corp. Code § 25501 Plaintiff is entitled to recission and/or damages in an amount to be proven at trial.

### COUNT VI
### False Advertising - Cal. Bus. & Prof. Code § 17500 BPC
### (All Defendants)

288.    The preceding paragraphs are incorporated herein as if fully restated.

289.    At all relevant times, Defendants Aggarwal, Persistence and Richardson made, disseminated, or caused to be made or disseminated, materially false or misleading statements, which they knew or should have known to be false or misleading, intended to induce the public to enter into obligations pertaining to the investment into the Persistence Offering.

290.    Defendants made false statements of material fact to Plaintiff, which are identified in the above allegations, including, but not limited to the profitability of the Persistence Offering and that Richardson was not receiving a kickback.

McDermott Will & Emery LLP
Attorneys At Law
New York

291.    Defendants made these false and misleading statements with the intent to sell the Persistence Offering.

292.    Defendants' false and misleading statements were likely to deceive a reasonable consumer because consumers reasonably relied on the information provided by seemingly professional counterparties concerning the financial performance of their own product.

293.    As a direct and proximate result of Defendants' false and misleading statements, Plaintiff invested in the Persistence Offering and lost at least $24,731,599 sought in this proceeding.

294.    Plaintiff is entitled to damages in an amount to be proven at trial.

## COUNT VII
### Cal. Bus. & Prof. Code § 17200 et. seq.
### (All Defendants)

295.    The preceding paragraphs are incorporated herein as if fully restated.

296.    Cal. Bus. & Prof. Code §17200, et seq., prohibits, in relevant part, "any unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising."

297.    The conduct of Persistence, Aggarwal, and Richardson, including but not limited to disseminating deceptive and misleading advertising when it published figures about wallets and transactions and claimed that it was proof that its ecosystem was gaining traction, splitting Ms. Thomson's investment into 10 separate wallets, claiming returns on investment that were misleading, Defendant Richardson explicitly denied receiving a commission for selling Ms. Thomson XPRT, and disseminating deceptive and misleading advertising that violates Cal. Bus. & Prof. Code § 17200 et. seq.

298.    Defendants' representations are likely to deceive a reasonable consumer because consumers reasonably relied on the information provided by seemingly professional counterparties concerning the financial performance of their own product.

McDermott Will & Emery LLP
Attorneys At Law
New York

FIRST AMENDED COMPLAINT        CASE NO. 2:23−cv−04669−MEMF−MAR

299.   As a direct and proximate result of Defendants' false and misleading statements, Plaintiff invested in the Persistence Offering and lost at least $24,731,599 sought in this proceeding.

300.   Plaintiff is entitled to damages in an amount to be proven at trial.

301.   Defendant Persistence made the following false and misleading statements intended to induce the public to enter into obligations pertaining to the purchase of the Persistence Offering.

## COUNT VIII
### Aiding and Abetting Common Law Fraud
### (All Defendants)

302.   The preceding paragraphs are incorporated herein as if fully restated.

303.   Persistence and Aggarwal had actual knowledge of the underlying tort committed by Richardson, namely that Ms. Thomson was being misled regarding the returns she was receiving on her investment and the kickback being paid to Richardson.

304.   Persistence and Aggarwal provided substantial assistance or encouragement to Richardson in failing to tell Ms. Thomson about the kickback and making similar exorbitant claims regarding return on the investment.

305.   Persistence and Aggarwal reached a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act. As a direct and proximate result of Defendants' decision, Plaintiff invested in the Persistence Offering and has suffered an economic loss of at least $24,731,599 sought in this proceeding.

## COUNT IX
### Cal. Corp. Code § 25004
### (Against Richardson)

306.   The preceding paragraphs are incorporated herein as if fully restated.

307.   Cal Corp. Code § 25501.5 provides a private right of action for those who purchase securities from unlicensed broker-dealers.

308.    Defendant Richardson was engaged in the business of effecting transactions in securities in California state for the account of Ms. Thomson and for her own account as defined in Cal. Corp. Code § 25004(a).  Richardson induced the sale of securities in the state of California.

309.    Ms. Thomson purchased securities, namely, the Persistence Offering from Richardson, an unlicensed broker-dealer under Cal. Corp. Code § 25501.5.

310.    Richardson was required to be licensed as a broker-dealer and was not, at the time of the sale or purchase.  Richardson at no time applied for or secured from the Commissioner of Financial Protection and Innovation a certificate, then in effect, authorizing her to act as a broker-dealer.

311.    Ms. Thomson suffered financial damages due to Richardson's sale of the Persistence Offering, in an amount to be proven at trial, but no less than $24,731,599 sought in this proceeding.

312.    Persistence knowingly provided substantial assistance to Richardson in violation of Cal. Corp. Code § 25210 and thus is in violation of that provision as well pursuant to liability of persons inducing or assisting a violation pursuant to Cal. Corp. Code § 25403.

## COUNT X
## Cal. Corp. Code § 25009
## (Against Richardson)

313.    The preceding paragraphs are incorporated herein as if fully restated.

314.    Richardson, for compensation, engaged in the business of advising Ms. Thomson, directly and through publications or writings "as to the value of securities or as to the advisability of investing in, purchasing or selling securities . . ." when she regularly advised Ms. Thomson to invest in the Persistence Offering.  Cal. Corp. Code § 25009(a).

315.    Richardson received compensation from Persistence in the form of XPRT.

FIRST AMENDED COMPLAINT        CASE NO. 2:23−cv−04669−MEMF-MAR

316.    Richardson failed to obtain an investment adviser certificate as required by Cal. Corp. Code § 25230.

317.    Richardson at no time applied for or secured from the Commissioner of Financial Protection and Innovation a certificate, then in effect, authorizing her to act as an investment adviser.

318.    California Code of Civil Procedure § 1029.8 provides a private right of action for persons harmed by "[u]nlicensed persons who cause injury or damage . . . as a result of providing goods or performing services for which a license is required under . . . Section 25230 . . . ."

319.    Richardson caused Ms. Thomson to suffer financial damages, namely $24,731,599 sought in this proceeding, as a result of her advice regarding purchasing and continuing to invest in the Persistence Offering.

320.    Persistence knowingly provided substantial assistance to Richardson in violation of Cal. Corp. Code § 25230 and thus is in violation of that provision as well pursuant to liability of persons inducing or assisting a violation pursuant to Cal. Corp. Code § 25403.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

a.    For compensatory damages in an amount to be proven at trial, but no less than $24,731,599 sought in this proceeding.

b.    For punitive damages.

c.    For rescission of investments in the Persistence Offering.

d.    For such other relief as the Court deems to be just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
NEW YORK

1

2

3    Dated: September 23, 2023          Respectfully submitted,

4                                       **MCDERMOTT WILL & EMERY LLP**

5

6                                       By:    */s/ Julian Andre*
7                                              JULIAN ANDRE
                                               2049 Century Park East, Suite 3200
8                                              Los Angeles, CA  90067-3206
                                               Telephone: (310) 277-4110
9                                              Facsimile:  (310) 277-4730
                                               Email: jandre@mwe.com

10                                             TODD HARRISON
                                               JOSEPH B. EVANS
11                                             One Vanderbilt Avenue
                                               New York, NY  10017-3852
12                                             Telephone:  +1 212 547 5400
                                               Facsimile: +1 212 547 5444
13                                             Email: tdharrison@mwe.com
                                                      jbevans@mwe.com

14                                             *Counsel for Plaintiff Taylor Thomson*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT          CASE NO. 2:23−cv−04669−MEMF−MAR