UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| Taylor Thomson, <br><br>        Plaintiff, <br><br> v. <br><br> Persistence Technologies (BVI) Pte Ltd., Tushar Aggarwal and Ashley Richardson, <br><br>        Defendants. | CASE NO. 2:23-cv-04669-MEMF-MAR <br><br> **DECLARATION OF BRADLEY DIZIK IN SUPPORT OF PLAINTIFF'S FIRST AMENDED COMPLAINT** <br><br> Judge: Hon. Maame Ewusi-Mensah Frimpong <br> Complaint Filed: June 13, 2023 |

I, Bradley Dizik, pursuant to 28 U.S.C. § 1746, declare as follows:

**A.     BACKGROUND**

1.     I am an investigation and compliance professional with over a decade of experience leading and supervising investigations, many that include tracing and recovering assets on the blockchain.  A copy of my resume is attached as **Exhibit A**.

2.     I am the Executive Vice President of Emerging Issues + Technology and a Practice Group Leader at Guidepost Solutions LLC ("Guidepost Solutions," "Guidepost," "we"), a national leader in blockchain and cryptocurrency investigations, intelligence, compliance, and cyber and physical security.  In that role, I work with law enforcement officials, law firms, investors, blockchain and cryptocurrency companies and their executives and officers around the world to lead and supervise blockchain forensic investigations.  I conduct investigations and advise clients on emerging issues and technology involving intellectual property, social media, cryptocurrency, NFTs, blockchain forensic tracing, artificial intelligence, data governance and protection, data forensics, privacy, and cybersecurity.  I am frequently asked to conduct sensitive, complex, and cross-border investigations, advise on the development and evaluation of

- 1 -

ethics, compliance, cybersecurity, and privacy programs, and forensically trace and recover cryptocurrency.

3.  I am a lawyer admitted to practice in New York and the District of Columbia. I graduated *cum laude* with a Juris Doctor degree from Michigan State University College of Law.

4.  I received a Master of Laws, Dean's List, in Securities and Financial Regulation from Georgetown University Law Center.

5.  I received a Bachelor of Arts in Political Theory and Constitutional Democracy with a Specialization in Political Economy from James Madison College at Michigan State University.

### B. INVESTIGATION

6.  In June 2022, Guidepost Solutions was retained by McDermott, Will & Emery LLP on behalf of Plaintiff Taylor Thomson ("Ms. Thomson") to investigate, trace, and recover significant quantities of missing cryptocurrency.

7.  One particular investment Guidepost Solutions analyzed was Ms. Thomson's sizable investment in a cryptocurrency called XPRT, which was issued by Persistence Technologies (BVI) Pte Ltd. ("Persistence") and its project team, including Tushar Aggarwal ("Aggarwal"), the CEO and founder of Persistence. Ms. Thomson executed one agreement with Persistence called a Token Sale Agreement (the "Agreement") in which she purchased 4,000,000 XPRT. Ms. Thomson also subsequently purchased 3,999,995 XPRT directly from Persistence, outside of the Agreement. Ms. Thomson purchased all 7,999,995 XPRT directly from Aggarwal and Persistence. There was an additional 97,931 XPRT purchased from secondary decentralized marketplaces or liquidity pools by swapping Ms. Thomson's assets for

- 2 -

DECLARATION OF BRADLEY DIZIK
IN SUPPORT OF PLAINTIFF'S FIRST
AMENDED COMPLAINT

CASE NO. 2:23-CV-04669-MEMF-MAR

XPRT from October 23, 2021 through November 4, 2021.[1]  In total, Ms. Thomson invested $45,287,612 buying XPRT.

8. We used many different sources to investigate these claims. These sources include, but are not limited to:

a. Information recovered from Ashley Richardson ("Richardson"), including a spreadsheet labeled "XPRT Transaction - Persistence OTC Deal - Wallets Transfer Allocation";

b. Publicly available blockchain explorers, such as Mintscan.io;

c. Proprietary blockchain explorers, such as Chainalysis;

d. A self-hosted XPRT node;

e. The Persistence tokenomics whitepaper;[2]

f. Publicly available pricing, volume, and market cap data, available on websites such as https://coinmarketcap.com/;

g. Osmosis Proposals related to incentive adjustments and reward percentages at various points in time;

h. Osmosis Documentation;[3]

i. Persistence Documentation;[4]

j. The Persistence Validators website;[5]

k. Proton mail email accounts;

l. Publicly available XPRT source code review; and

---

[1] These additional XPRT were purchased on the ledger referred to as "M12" in address # osmo19rum09y6rz25stuzu9pu3vkq0j26nzxkzxawpc.

[2] Persistence Team, *XPRT Tokenomics: Powering the Persistence Ecosystem*, PERSISTENCE (Mar. 25, 2021), https://blog.persistence.one/2021/03/25/xprt-tokenomics-and-utility-powering-the-persistence-ecosystem/.

[3] Osmosis, https://docs.osmosis.zone/overview. "Documentation" is an industry term for the instruction manual for a software program. Documentation is usually written to explain a software program to individuals that deploy, develop, and use the program.

[4] *Persistence Docs*, https://docs.persistence.one/.

[5] Persistence Validators, MINTSCAN, https://www.mintscan.io/persistence/validators.

- 3 -

DECLARATION OF BRADLEY DIZIK
IN SUPPORT OF PLAINTIFF'S FIRST
AMENDED COMPLAINT

CASE NO. 2:23-CV-04669-MEMF-MAR

  m. Blockchain transactions including a forensic review of approximately a dozen physical hardware wallets and nearly a half-dozen cryptocurrency exchange accounts.

9. Richardson pitched Ms. Thomson to invest in certain cryptocurrency projects and to directly purchase cryptocurrency. Richardson executed certain transactions for Richardson and at one time had physical possession of hardware devices used to store cryptocurrency, called "Ledgers."[6] Richardson set up those Ledgers which held Thomson's cryptocurrency and had in her possession all related account information, seed phrases, pins, passwords, and proton email accounts until July of 2022 when Richardson turned over this information to Guidepost Solutions.

10. Guidepost Solutions identified many digital addresses holding a cryptocurrency called XPRT. Guidepost learned that the digital addresses holding XPRT were accessible from the Ledgers that were under Richardson's control. 7,999,995 XPRT was deposited into ten digital addresses accessible from ten separate Ledgers, as shown in the table below.

| Address | Ledger Name | XPRT |
|---|---|---|
| persistence1k3nszkadlnm7225p2rtn9awkeq5f6sem6k60k9 | A07 | 480,000 |
| persistence1u8ycj4r8shhyat98j7pfphk6j2q3ucstugqpp4 | E18 | 799,999 |
| persistence19e9ndx8dpzpfswwmzajdneta6gs0hgqptzdpal | F72 | 1,002,519 |
| persistence1gx4v8yx904xm56lcsa8xj80cnv8xygq20a3c6a | L02 | 620,000 |
| persistence1e2vlhguqsmdzl0st700mjrcsdkcun6a5e5rz65 | L10 | 477,000 |
| persistence1eehmj7cksk0347v4twx2a6yhvc9uar5q8l07r5 | M07 | 777,000 |
| persistence1q57q0704syut9dt2thk54szd6c4krt37g20jyt | M12 | 737,999 |
| persistence1ldryf2rr4hj0er77xxtkc0e2mcud3q5zm3twas | P12 | 719,999 |
| persistence1mflryjl4fzwen5gpkvpzavmuu3haaga4wvdyzv | R78 | 1,497,479 |
| persistence12k0nwpyv7lkfhfuk24cln2gt7sffjdluh73lv0 | T02 | 888,000 |
| **TOTAL** | | **7,999,995** |

---

[6] Ledger is the brand name that produces these cryptocurrency storage devices. Richardson used two different models, the Ledger Nano X, and Ledger Nano S.

- 4 -

DECLARATION OF BRADLEY DIZIK
IN SUPPORT OF PLAINTIFF'S FIRST  CASE NO. 2:23-CV-04669-MEMF-MAR
AMENDED COMPLAINT

11. Richardson subsequently placed some XPRT to an eleventh physical ledger, referred to as T59 (digital address persistence1f0cu2w9zjy65n9wpqrd6jxh2eatt8r5uae9kwh).

12. In or around August 2021, when Ms. Thomson made an initial purchase of XPRT, Ms. Thomson was told by Richardson to transfer Ms. Thomson's assets to eight separate digital addresses. This practice continued in October 2021 when Richardson directed the investments of XPRT to two additional digital addresses. Additional purchases in October 2021 were directed to three of the original digital addresses that held the least amount of XPRT.

13. In mid-July 2022, Aggarwal provided Ms. Thomson with a file titled "XPRT Transaction - Persistence OTC Deal - Wallets Transfer Allocation." This file contained an overview which showed digital addresses labeled "investor" containing XPRT. This spreadsheet also contained four payments designated as "commissions" Aggarwal and Persistence made to Richardson in between August and October of 2021.

14. Following a series of calls and emails, in late July 2022, Richardson and her counsel confirmed that an additional Persistence Address, beginning with #1nxvw (the "#1nxvw Address") belonged to her, not Ms. Thomson, and that the XPRT was deposited in the #1nxvw Address by Aggarwal and Persistence for her efforts to direct Ms. Thomson's investment capital to Persistence and XPRT.

15. In total, Persistence paid Richardson a previously undisclosed payment of 97,166 XPRT.[7] Persistence paid Richardson over four different transactions

---

[7] *See* Mintscan Transaction Details:

1. August 25, 2021 Transaction:
    - https://www.mintscan.io/persistence/txs/CF632D7033A5E7982957769B943C45474F3B99B1E4732F317120BC37AA92C292;
2. September 6, 2021 Transaction:

- 5 -
DECLARATION OF BRADLEY DIZIK
IN SUPPORT OF PLAINTIFF'S FIRST
AMENDED COMPLAINT

CASE NO. 2:23-CV-04669-MEMF-MAR

between August and October 2021.[8] All four of those transaction hashes showed XPRT cryptocurrency being transferred to the #1nxvw Address. The undisclosed payment was worth approximately $783,702 based on the price of XPRT at the time of the transactions.[9]

16. In late July 2022, Guidepost Solutions took control of Ms. Thomson's physical ledger wallets, account information including seed phrases, pins, passwords, and proton email accounts used to setup exchange accounts, and cryptocurrency from Richardson in Los Angeles County, California. Neither the undisclosed payment nor the #1nxvw Address were at any time turned over to Ms. Thomson by Richardson.

17. Along with transaction records, we have also reviewed statements made by Persistence, Tushar Aggarwal, and Richardson.

18. Guidepost reviewed a series of public and private statements set forth below concerning Persistence "staking rewards."

19. Staking is a method by which holders of a particular cryptocurrency can "stake" their cryptocurrency into a smart contract and earn a yield. For some staking protocols, participants must be actively involved in technically operating a "validator node," which generally has the ability to vote to approve or reject particular blocks of transactions on a blockchain. Staking is one highly popular way that holders of particular cryptocurrencies earn a yield.

---

- https://www.mintscan.io/persistence/txs/21A6BB7F9C585B3864178F1C598D5C7CCD78853D7B55161689EF542AE9FD1F1B;

3. October 4, 2021 Transaction:
   - https://www.mintscan.io/persistence/txs/95E3C37378CAA357339196E2F9A96B2A58ECD8BC81CDBC6406BB90CA9A15556A;

4. October 18, 2021 Transaction:
   - https://www.mintscan.io/persistence/txs/3A551ACC6AFBB9DD7CFDCFDCC483686C83392637C584E9DB77D945AFB102530A.

[8] *Id.*
[9] *Id.*

- 6 -

DECLARATION OF BRADLEY DIZIK
IN SUPPORT OF PLAINTIFF'S FIRST
AMENDED COMPLAINT

CASE NO. 2:23-CV-04669-MEMF-MAR

20. Persistence promised staking rewards that far exceed market rates. For this reason, we analyzed Persistence's promised staking rewards and compared those to the staking rewards actually paid to Ms. Thomson. We uncovered that she received far less than the promised yield.

21. This is not just important because Ms. Thomson did not receive the promised staking rewards. Staking rewards are a key value proposition for certain cryptocurrencies, including XPRT. Misleading statements concerning the promised staking rewards could artificially inflate the price of a particular cryptocurrency as investors will be drawn to buy a particular cryptocurrency with the expectation that they will receive the promised staking rewards. This was the case with Ms. Thomson and her purchases of XPRT. It appears that misleading promises concerning XPRT staking rewards led Ms. Thomson to purchase XPRT.

22. We selected a sample of staking transactions and found that Ms. Thomson's returns were generally lower than 33%. For example, 444,000 XPRT were delegated on September 8, 2021. On December 11, 2021, Ms. Thomson claimed and received rewards of 33,481 XPRT. We then annualized those returns, as shown below:

| Field | Value | Formula |
|---|---|---|
| Delegation Date | 9/8/2021 | A |
| Delegated Amount in XPRT | 444,000 | B |
| Last 2021 Rewards Date | 12/11/2021 | C |
| Total Rewards in XPRT | 33,481 | D |
| Days Staked | 93.00 | E = C - A |
| Annualized Staking Rewards | 131,404 | F = (D/E) * 365 |
| Calculated APR | 29.6% | G = F/B |

23. In total, Ms. Thomson received staking rewards of 2,058,870 XPRT between September 2021 through August 2022.

24. Persistence, Aggarwal, and Richardson made several statements that promise staking returns many multiples higher than what Ms. Thomson experienced. Those staking rewards do not appear supported by data. Some of those statements are as follows:

    a. On April 26, 2021, Persistence tweeted: "The current APR for staking XPRT stands at a whopping 42%+. This is among the highest reward rates in the industry, and the rewards will be no lower than 35% APR for the first two years."[10] This figure is contradicted by the sample of 29.6% APR that we calculated based on Ms. Thomson's returns.

    b. On August 28, 2021, Richardson texted Ms. Thomson that there was an "…upside of 269% annually for early adapters" for staking with XPRT. After reviewing Ms. Thomson's investment returns and publicly available data, we are unable to identify any basis for calculating a 269% return. Ms. Thomson's staking returns were significantly less than 269%.

    c. On August 28, 2021, Richardson told Ms. Thomson she could earn "200-600 % APY" with XPRT staking. After reviewing Ms. Thomson's investment returns and publicly available data, we are unable to identify any basis for calculating a 200-600% APY. Ms. Thomson's staking returns were significantly less than 200-600% APY.

    d. On October 7, 2021, Richardson said "Also want to walk you through a meeting I just had with persistence [sic.] about liquid staking – could be a huge upside for Atom, 15% a month APY

---

[10] Persistence (@PersistenceOne), TWITTER (Apr. 26, 2021, 9:46 AM), https://twitter.com/PersistenceOne/status/1386678153704267779.

which is about 180% a year." After reviewing Ms. Thomson's investment returns and publicly available blockchain data, we are unable to identify any basis for calculating these returns. Ms. Thomson's staking returns were significantly less than 180% a year.

  e. On November 10, 2021, Richardson confirmed, via text message to Ms. Thomson, that she was re-staking Ms. Thomson's assets daily. Our review of Ms. Thomson's assets and returns during this time period concluded that the XPRT were not being 'restaked' or redelegated daily. Accordingly, based on our review of Ms. Thomson's historical XPRT transactions, this statement was misleading at the time it was made.

  f. On November 10, 2021, Richardson told Ms. Thomson "currently you are earning 2.7-3M a month solely in coming from your persistence interest/staking, and it is estimated this will likely go up considerably in the coming months earning between 30-150M a year in interest alone (a commission of 15-75M a year)." We calculated significantly lower monthly earnings from September 2021 through June 2022.[11] We are unable to identify a basis for the claim of an increase in rewards.

  g. On November 10, 2021, Richardson told Ms. Thomson that "[Persistence] grandfathered you in as a key investor and are essentially giving you 65 Million in three weeks." After reviewing Ms. Thomson's investment returns, we are unable to verify this

---

[11] Each value identified by Richardson does not state whether it is in USD or CAD. All values calculated by Guidepost Solutions are in USD.

- 9 -

DECLARATION OF BRADLEY DIZIK
IN SUPPORT OF PLAINTIFF'S FIRST     CASE NO. 2:23-CV-04669-MEMF-MAR
AMENDED COMPLAINT

        statement. Under no calculation did Persistence "give" Ms. Thomson $65 million.

    h.    On November 10, 2021, Richardson told Ms. Thomson that "the upside [of Persistence] is massive"; "You are generating about 3M in interest per month," "If it doubles next month that is 6M a month!"; "I don't think you realize how much money is being made – it's bananas"; "I just want you to have a sense of what this is, because I think long term this is huge." We were unable to identify any indication that $3M or $6M in interest a month was being earned by Ms. Thomson.

    i.    On December 3, 2021 and December 8, 2021, Richardson said that there was a "fixed return" of at least 35% in addition to an APY that began at 6000% and "reduces weekly, until it lands somewhere around 100-200%" for platforms including Persistence. We have reviewed APY figures for the relevant staking pairs and we have found no support for a claim of 6,000% APY.

    j.    On December 13, 2021, Richardson told Ms. Thomson that she was "making 5.4 M a week on average, which seems insane and is going down over time… but I just verified it." Ms. Thomson was not earning anywhere near $5.4M per week on average. In reality, Ms. Thomson's claimed staking rewards were valued at closer to approximately $6.8 million total over 12 months. This is without taking into account the significant drop in value of XPRT and the inability to sell all of Ms. Thomson's XPRT due to a lack of interest in the market.

    k.    On January 6, 2022, Richardson told Ms. Thomson, "you are up on persistence and with the interest and the extra 10M you are getting

- 10 -

DECLARATION OF BRADLEY DIZIK
IN SUPPORT OF PLAINTIFF'S FIRST
AMENDED COMPLAINT

CASE NO. 2:23-CV-04669-MEMF-MAR

for early liquidity, it makes up for it." Ms. Thomson did not receive an "extra 10M."

l.  On January 12, 2022, Richardson told Ms. Thomson: "your Atom/Eth XPRT/Eth pairs have a fixed rate, but will be issued a large amount of yield for your early participation at the months end. The amount is still unknown as it is due to your percentage of participation throughout, however the estimates I have laid out previously still stand (somewhere between 500k-15M EST) and will be issued the last week of this month." After reviewing Ms. Thomson's returns on investment, we did not identify any payment that was forthcoming at this time.

m.  On January 14, 2022, Richardson told Ms. Thomson, "to clarify, you are still up! Don't forget the yield you are generating is greater than the price difference. Also, you are going to get an addition 5-10M on rewards (on top of your staking APY) at the beginning of Feb just for having been an early liquidity provider." After reviewing Ms. Thomson's returns on investment, we did not identify any payment that was forthcoming in February 2022.

n.  On April 8, 2022, @pstakefinance, a social media account operated by Persistence tweeted, in part: "Additional external rewards are live for PSTAKE/OSMO pool on @osmosiszone. Current APR: 336% Pool: https://app.osmosis.zone/pool/648."[12] We identified a number of files reflecting historical APRs for this liquidity pool. These files were attached to proposals on the Osmosis blockchain.

---

[12] @pStakeFinance, TWITTER (April 8, 2022, 1:48 PM), https://x.com/pstakefinance/status/1512487541311963137?s=46&t=OjdUXeKuQl4U-sBKKQDK5A.

- 11 -

DECLARATION OF BRADLEY DIZIK
IN SUPPORT OF PLAINTIFF'S FIRST        CASE NO. 2:23-CV-04669-MEMF-MAR
AMENDED COMPLAINT

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
NEW YORK

        Identifiable data from five days prior to this tweet shows that the APR was 62%. The same data shows that two days following this tweet, the APR was 74%. These APR percentages are many multiples lower than the promised 336% on April 8, 2022. We have not identified any basis for a 336% APR on April 8, 2022.

o. On April 9, 2022, @pstakefinance, a social media account operated by Persistence tweeted, in part: "The PSTAKE/OSMO pool on @osmosiszone is providing ~320% APR, currently the highest incentives out of all pools on Osmosis. Provide liquidity and bond your tokens for 14 days to receive LP rewards. Total Rewards: 150,000 $PSTAKE Provide liquidity: https://app.osmosis.zone/pool/648."[13] We identified a number of files reflecting historical APRs for this liquidity pool. These files were attached to proposals on the Osmosis blockchain. Identifiable data from six days prior to this tweet shows APR was 62%. The same data shows that two days following this tweet, the APR was 74%. As such, it is unlikely that the APR was approximately 320% on April 9, 2022. We are unable to identify any basis for promising a 320% APR on April 9, 2022.

---

[13] @pStakeFinance, TWITTER (April 9, 2022, 12:34 AM), https://x.com/pstakefinance/status/1512650070037983232?s=46&t=OjdUXeKuQl4U-sBKKQDK5A.

- 12 -

DECLARATION OF BRADLEY DIZIK
IN SUPPORT OF PLAINTIFF'S FIRST
AMENDED COMPLAINT

CASE NO. 2:23-CV-04669-MEMF-MAR

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
NEW YORK

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 22, 2023.

Dated: September 22, 2023
Sparta, New Jersey

_____
BRADLEY DIZIK
SPARTA, NEW JERSEY

State of  NEW JERSEY , County of  SUSSEX

Subscribed and sworn to (or affirmed) before me on this  22nd  day of  SEPTEMBER , 20 23  by  BRADLEY L. DIZIK  proved to me on the basis of satisfactory evidence to be the person who appeared before me.

_____
Notary Signature

MARIANA B YAFAR
NOTARY PUBLIC
STATE OF NEW JERSEY
ID # 50099579
MY COMMISSION EXPIRES FEB. 26, 2024

# EXHIBIT A



**CONTACT**
+1 248.321.4905
bdizik@guidepostsolutions.com

**EDUCATION**
- Juris Doctor, *cum laude*, Michigan State University College of Law
- Master of Laws, Dean's List, Securities and Financial Regulation, Georgetown University Law Center
- Bachelor of Arts, Political Theory + Constitutional Democracy, James Madison College at Michigan State University
- Specialization, Political Economy, James Madison College at Michigan State University

**BAR ADMISSIONS**
- New York
- District of Columbia

**PROFESSIONAL AFFILIATIONS**
- Detroit Jewish Federation: Local Agency Planning Committee
- Jewish Federation of North America: National Young Leadership Cabinet

# BRADLEY DIZIK

Executive Vice President, Emerging Issues + Technology Practice Group Leader

Bradley Dizik is sought after as one of the nation's top crisis advisers, compliance experts, and investigators for cross-border, sensitive, and emerging issues. His reputation is credited to his creative strategies, unparalleled experience, and understanding of emerging technology in solving clients' most difficult challenges.

The *Detroit News* referred to Mr. Dizik as a "crusading knight [who] slayed [a client's] debt and vanquished a lawsuit." The *Detroit Free Press* wrote that Mr. Dizik's work led to a "remarkable turnaround" for a client that faced a complex crisis. His work "to reorganize the immense [Detroit] Masonic Temple" a "mythical concert hall" with "1,807 rooms" was profiled on the frontpage by French newspaper *Le Monde*.

Mr. Dizik is executive vice president and leads Guidepost's Emerging Issues + Technology practice group. Mr. Dizik who is a member of the Washington, D.C. and New York Bars is regularly called on to advise board directors and executive officers as strategic counsel for critical business and reputational decisions and in response to their most public and private crises. Clients frequently ask him to conduct sensitive, complex, and cross-border investigations, advise on the development and evaluation of ethics, compliance, cybersecurity, and privacy programs, and forensically trace and recover assets. He has also served as a court-appointed receiver and had key roles on U.S. Department of Justice monitorships.

Mr. Dizik's practice focuses on solving clients' most difficult challenges, whether as part of a criminal or regulatory inquiry, preventive effort to avoid one through compliance or cybersecurity program, in anticipation or pursuit of litigation, or as diligence or business intelligence. The following are highlights of his experience.

**Monitorships + Receivership**

Mr. Dizik has held leadership roles on the following U.S. Department of Justice Monitorships.

• General Motors arising out of its deferred prosecution agreement of charges related to making and selling cars with defective ignition switches where he led the team responsible for overseeing GM's preventive safety efforts.

• Point72 Capital Management (formerly, SAC Capital) to evaluate and report on its insider trading compliance practices and procedures for the U.S. Attorney's Office for the Southern District of New York.

• New York City Housing Authority (NYCHA) pursuant to an agreement reached among HUD, SDNY, NYCHA, and the City of New York to monitor the implementation



**BRADLEY DIZIK (CONTINUED)**

of efforts to achieve decent, safe, and sanitary living conditions for NYCHA's residents where he led the team responsible for overseeing NYCHA's efforts to address sanitation and pest control.

- Court-appointed receiver in Battaglia v. Battaglia; Docket No. 190-82, District Court, Laramie County where he recovered approximately $40 million in assets, built a property management function from scratch to manage a dozen real property assets with dozens of tenants including a restaurant, body shops, NYC apartments, multi- and single-family homes and numerous exotic vehicles including 1972 Lamborghini Miura SV and 1991 Ferrari F40 which he liquidated for $2 million and approximately $1.2 million to fund the receivership estate's operations. Additionally, his investigative work led to the district court judge holding one of the parties in contempt, and ultimately issuing a criminal arrest warrant for that party's violations of the contempt order which led to a settlement among the parties.

### Crises + Government Investigations

- Currently overseeing the independent investigation and physical security review of the Oxford (Michigan) Community Schools' school shooting where four children were murdered, seven others shot, and numerous traumatized.

- Advised the Board of Regents for the University of Michigan on best (and next) practice strategies to implement recommended remediation in the aftermath of sexual misconduct findings against a former Provost.

- Played a key role in the investigation of the Southern Baptist Convention Executive Committee's response to sexual abuse where he led the development of remediation recommendations.

- Led internal investigation for company led by former professional athlete accused of fraud by an online sales platform, and former contractors and customers.

- Led the forensic investigation and economic damages analysis for a public company under investigation for alleged Stark Act and Anti-Kickback Statute violations by the U.S. Department of Justice.

- Led investigation for the Masonic Temple Association of Detroit of a former management company for fraud and misappropriation of funds that led to the client achieving summary judgment in favor of its claims and summary judgment and dismissal of all counterclaims against it including the eventual appointment of a Chapter 7 trustee that took control of the former management company's business and assets and helped return some of the misappropriated funds back to the Detroit Masonic Temple. In parallel, served as special adviser to the Detroit Masonic Temple's Board of Trustees where he led the renegotiation of the Detroit Masonic Temple's financial debt and oversaw its restructuring efforts leading to a complete financial and business recovery for the one-hundred-year-old structure in the background of the city of Detroit's historic bankruptcy.



BRADLEY DIZIK  (CONTINUED)

• Advised one of the U.S. military's largest suppliers of jet fuel to troops in Afghanistan in a U.S. Congressional investigation of alleged corruption in Central Asia and follow-on investigations by foreign authorities.

• Advised one of the world's largest financial institutions in a False Claims Act investigation in which the company was alleged to have misled the federal government about aspects of the business operations of a former life insurance subsidiary.

• Conducted investigation for an ultra-high net worth individual to determine open-source discovery exposure prior to client bringing defamation action.

**Cryptocurrency + Digital Assets + Social Media**

• Led and supervised the investigation, forensic tracing and accounting, mass identification of anonymous crypto wallets and social media accounts (98% success rate with over 60 anonymous adverse persons identified), and digital data capture and preservation for a prominent crypto company involved in litigation resulting in summary judgment in favor of the client's claims and summary judgement and dismissal of all adverse counterclaims brought by defendants.

• Led the investigation for the actor Seth Green of his stolen NFTs which led to the recovery of BAYC #8398 in Australia; working alongside the Los Angeles County Sheriff's Department recovered stolen BAYC #5778 for Cameron Moulene in Southeast Asia.

• Led and supervised the investigation, forensic tracing and accounting, social media monitoring, and anonymous crypto wallet identification of a group of individuals who serially schemed to defraud through the use of alternative crypto tokens, meme coins, and rug pulls, profiting millions of dollars through their illicit activities and use of intimidation tactics and threats.

• Led the investigation of three anonymous crypto wallet addresses that conducted transactional activity in a crypto token after a federal court issued a permanent injunction against transferring the token that led to the identification of all three anonymous persons behind each crypto wallet address.

• Led and supervised the investigation and forensic tracing for a prominent crypto company for the unknown crypto wallets and holdings of four adverse parties in a lawsuit, identifying all relevant wallets and crypto holdings of all parties.

• Led the investigation for a leading digital asset marketing company that suffered account takedowns after it was alleged to have violated two prominent social media company's terms of service including allegations of electronically compromising one platform's concierge service using bots. Our investigation proved that the allegations against the client were false and allowed counsel to enter confidential settlement negotiations to reactivate the client's suspended digital assets and reinstitute their social media presence.



**BRADLEY DIZIK  (CONTINUED)**

- Led the investigation of a cult like figure that is religiously followed by thousands of foreign dissidents in the US, Europe, and Asia whose cabal used a cryptocurrency token and cryptocurrency exchange to perpetuate a billion-dollar fraud and fund wide ranging conspiracies, disinformation, and disparagement campaigns on numerous social media platforms against perceived enemies. To support our investigation, we created a proprietary AI tool that was able to scrape, capture, and preserve over 6 data terabytes of videos, photos, and posts from social media platforms to serve as evidence against the cult like figure and their cabal and identify numerous formerly anonymous participants in the disinformation and disparagement campaign against our client. Our investigation supported ongoing litigation and led to a court holding the cult like figure in contempt for not complying with a court order shortly before the individual was arrested and charged by the U.S. Department of Justice for financial fraud related to their cryptocurrency activity.

- Advising celebrity on efforts to find and retake possession of digital assets that are inaccessible on their ledger wallet because of a derivation path error.

- Lead state-AML money transfer license due diligence for cryptocurrency company executive officers, board directors, and investors.

- Lead and supervise crypto forensic tracing efforts of stolen digital assets.

**Regulatory Issues + Frameworks**

- Led the development of ethics and compliance, information security, and privacy program for digital healthcare provider as part of readiness effort for HITRUST, SOC2, HIPAA/HITECH external audit. Effort included serving as client's internal auditor, HIPAA security rule risk assessment, development of business continuity and incident response plans, and a full suite of policies and procedures. Our team delivered certification in all relevant HITRUST domains and zero exception SOC2 and HIPAA/HITECH reports.

- Led the development of compliance and ethics program for de novo bank including BSA/AML controls, and a full suite of policies and procedures that help lead to the de novo bank to receiving state and federal regulatory approvals.

- Led the investigation of a publicly traded automotive supplier for Foreign Corrupt Practices Act, money laundering, and Iranian sanction violations in the United States, People's Republic of China, Brazil, United Kingdom, and Singapore.

- Oversaw development of Foreign Corrupt Practices Act, import/export, sanctions, and AML compliance program for a U.S. government contractor that supplied medical equipment to U.S. and foreign militaries and intelligence agencies.

- Led review and implementation of best execution procedures, Market Access Rule 15c3-5 and other compliance monitoring for adherence to best industry practices for one of the world's largest (AUM) investment management companies.



BRADLEY DIZIK  (CONTINUED)

- Advised one of the world's largest mineral resource companies on compliance with U.S. regulatory requirements including the Foreign Corrupt Practices Act, Federal Acquisition Regulation (FAR) when doing business with the U.S. Department of Defense Logistics Agency (DLA) and negotiations with foreign governments including related import and export control requirements.
- Lead HIPAA security rule risk assessments for digital healthcare companies.
- Lead Anti-Kickback Statute and Stark Act compliance fair market valuations.

Prior Legal Work

Prior to joining Guidepost, Mr. Dizik was an associate attorney in Weil, Gotshal & Manges LLP's white-collar investigations and financial institutions regulatory practices and co-manager of its Dodd-Frank Act financial regulatory reform working group where he represented clients before the U.S. Department of Justice, U.S. Securities & Exchange Commission, Commodities Futures Trading Commission, SIGTARP, and other government agencies. Prior to that, he served as a research consultant to the Committee on Capital Markets Regulation, a 501(c)(3) research organization dedicated to improving the regulation of US capital markets.

Mr. Dizik had brief stints in the SEC's Offices of International Affairs and Ethics Counsel, where he focused on the international enforcement of the federal securities laws, provided technical assistance to foreign regulators, and advised on the development of the Commission's insider trading compliance program.

Community Engagement

Mr. Dizik is a member of the Detroit Jewish Federation's Local Agency Planning Committee overseeing the Federation's nearly two dozen agencies and is a member of the Jewish Federation of North America's National Young Leadership Cabinet.

Mr. Dizik provides pro bono asset tracing for victims of cybercrime involving the theft of NFTs, cryptocurrency, and other forms of digital and crypto assets.

Education

Mr. Dizik is a recipient of Michigan State University's Distinguished Young Alumni Award from where he holds a J.D., cum laude and a B.A. in Political Theory and Constitutional Democracy with a specialization in Political Economy from its James Madison College. Additionally, he holds an LL.M. from Georgetown University Law Center which recognized him for "extraordinary academic performance" in International White-Collar Crime. He received the Federal Bar Association's Edward H. Rakow Scholarship Award for academic excellence in corporate and securities law.