JULIAN L. ANDRÉ (251120)
JAndre@mwe.com
**MCDERMOTT WILL & SCHULTE LLP**
2049 Century Park East
Suite 3200
Los Angeles, CA 90067-3206
Telephone:     +1 310 277 4110
Facsimile:     +1 310 277 4730

JOSEPH B. EVANS (appearing *pro hac vice*)
jbevans@mwe.com
TODD HARRISON (appearing *pro hac vice*)
tdharrison@mwe.com
**MCDERMOTT WILL & SCHULTE LLP**
One Vanderbilt Ave
New York, NY 10017
Telephone: (212) 547-5767
Facsimile: (212) 547-5444

Attorneys for Plaintiff
TAYLOR THOMSON

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Taylor Thomson<br><br>                    Plaintiff,<br><br>          v.<br><br>Persistence Technologies BVI Pte Ltd., Tushar Aggarwal, Ashley Richardson,<br>                    Defendants. | Case No. 2:23-cv-04669-MEMF-MAR<br>**PLAINTIFF TAYLOR THOMSON'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>The Honorable Maame Ewusi-Mensah Frimpong, United States District Judge<br><br>Date:  February 5, 2026<br>Time: 10:00 a.m.<br>Courtroom: 8B |

# <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

I.      Introduction ................................................................................................1

II.     Defendant's Procedural "Strike" Argument Fails And Does Not Defeat Summary Judgment ..................................................................................................4

III.    Defendant Does Not Raise A Triable Issue of Fact On IIED ......................6

        A.      Defendant cannot establish any outrageous conduct intended to cause emotional distress ............................................................................6
        B.      No severe distress tied to actionable conduct .............................10

IV.     Defendant Does Not Raise A Triable Issue of Fact On Defamation ...........12

        A.      There is no admissible evidence of an unprivileged "publication" of a specific defamatory statement ...............................................12
        B.      There is no falsity, and Defendant conflates her denials with evidence ....................17
        C.      Defendant Cannot Establish Causation or Damages as Her Claimed Harm Is Speculative and Untethered to Any Statement by Plaintiff .......................................20
        D.      Defamation requires evidence, not inference stacked on inference ...........................22

V.      Defendant Cannot Establish Entitlement to Punitive Damages ................23

VI.     Conclusion ..............................................................................................24

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).........................................................................................12

*Arboireau v. Adidas Salomon AG*,
  No. CV-01-105-ST, 2002 WL 31466564 (D. Or. June 14, 2002) ...........................5

*Cervantez v. J.C. Penney Co.*,
  24 Cal. 3d 579 (1979) .......................................................................................9

*Christensen v. Superior Court*,
  54 Cal. 3d 868 (1991) ......................................................................................10

*Cochran v. Cochran*,
  65 Cal. App. 4th 488 (1998) ...............................................................................7

*Coleman v. Gulf Insurance Group*,
  41 Cal.3d 782 (1986) .......................................................................................23

*Erlich v. Etner*,
  224 Cal. App. 2d 69 (1964) ...............................................................................20

*Gilbert v. Sykes*,
  147 Cal. App. 4th 13 (2007) ..............................................................................12

*Hughes v. Pair*,
  46 Cal. 4th 1035 (2009) .................................................................................6, 10

*Kahn v. Bower*,
  232 Cal. App. 3d 1599 (1991) ...........................................................................12

*Kashian v. Harriman*,
  98 Cal. App. 4th 892, 120 Cal. Rptr. 2d 576 (2002).............................................14

*Kruse v. Bank of America*,
  202 Cal.App.3d 44 (1988) ..................................................................................9

*Looney v. Superior Court*,
  16 Cal. App. 4th 521 (1999) ..............................................................................24

*McGarry v. Univ. of San Diego*,
  154 Cal. App. 4th 97 (2007) ..............................................................................16

*Potter v. Firestone Tire & Rubber Co.*,
  6 Cal. 4th 965 (1993) ...............................................................................6, 7, 10

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

- i -

*Seelig v. Infinity Broad. Corp.*,
   97 Cal. App. 4th 798 (2002) ................................................................12

*Smith v. Maldonado*,
   72 Cal. App. 4th 637 (1999) ................................................................12

*Vogel v. Felice*,
   127 Cal. App. 4th 1006 (2005) ............................................................12

**Statutes**

California Civil Code §47(b) ..................................................................9

California Civil Code §47(c) ................................................................14

**Other Authorities**

Local Rule 7-3...................................................................................1, 4, 5

Federal Rule of Civil Procedure 56 ...............................................3, 4, 20

Federal Rule of Civil Procedure 56(d)...................................................5

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
(No. 2:23-cv-04669-MEMF-MAR)

## I.  **INTRODUCTION**

Defendant's Opposition[1] fails to identify any triable issues of fact on her claims for defamation, intentional infliction of emotional distress ("IIED"), or punitive damages. Rather, the Opposition largely relies on bald rhetoric without reference to evidence that would actually support Defendant's argument.  The Opposition also asks the Court to deny summary judgment based on (i) procedural complaints about Local Rule 7-3 and discovery scheduling; (ii) conclusory assertions that Plaintiff's actions were outrageous, wholly unsupported by any evidence and in any event concerning actions which plainly do not rise to that level as a matter of law; and (iii) similarly conclusory assertions that Plaintiff essentially "must have" made unspecified defamatory statements resulting in some vague and completely unevidenced loss that, in any event, is completely disconnected from any acts by Plaintiff.  For these reasons and those that follow, Plaintiff's motion should for summary judgment should be granted.

*First*, Defendant is simply incorrect that Plaintiff's motion should be denied because of an alleged failure to comply with this Court's rules. Plaintiff has consistently attempted to work cooperatively with Defendant in order to streamline the issues before this Court, including by sending Defendant a draft of Plaintiff's motion for summary judgment two weeks before Defendant's response was due, in accordance with the Court's rules. Defendant, on the other hand, blatantly disregarded this Court's process, disregarded relevant deadlines, and filed her own opposition that does not comply with this Court's rules—consistent with her conduct since the initiation of this lawsuit. In any event, as previously pointed out, Defendant's own arguments prove that meeting and conferring with Defendant would have been futile—and Defendant does not claim otherwise.

*Second*, Defendant utterly fails to demonstrate that anything that Plaintiff did was "outrageous," let alone sufficiently outrageous to constitute intentional infliction of emotional distress—a claim that Defendant advances solely in an attempt to gain leverage in a litigation that

---

[1] On December 10, 2025, Defendant emailed the undersigned her Opposition, stating "please find attached items filed with the court today." As of the filing of this Reply, the Opposition and supporting papers had not yet been filed on the docket. Nevertheless, Plaintiff is filing her Reply as soon as she was able, and in any event within seven days, out of an abundance of caution.

McDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

1  should have ended long ago.[2] The wholly innocuous requests on which Defendant's IIED claim is

2  predicated occurred over a decade-long period in the context of a close friendship the Defendant

3  herself describes as "loving" (App'x Ex. 1, Tr. 202:23); the admittedly polite requests made of her

4  were ones she was eager to voluntarily help with, and the harm of which she complains (which is

5  wholly unevidenced) can be attributed to a host of other causes, including the death of her

6  stepmother, COVID-induced isolation, the breakdown of her relationship with her partner, and the

7  loss of work she experienced due to the downturn in the film and TV industry. The only "outrageous"

8  conduct is that of Defendant, who caused Plaintiff to suffer approximately $80 million in damages,

9  took covert and unauthorized kickbacks of hundreds of thousands of dollars, and then, instead of

10  taking responsibility for her gross financial and personal misconduct, sued her former friend for the

11  privilege of losing her so much money, and has made repeated threats to make salacious (and untrue)

12  statements to the media if Plaintiff did not pay her millions of dollars.[3]

13        The specific allegations of IIED fail as a matter of law. As Plaintiff's opening brief makes

14  clear, the material facts are undisputed. Richardson voluntarily assisted Thomson by managing her

15  cryptocurrency investments, in part because she was unemployed at the time and saw an opportunity

16  for herself to make money and develop a new career. Under Defendant's management, Plaintiff's

17  cryptocurrency portfolio suffered catastrophic losses—approximately $80 million— including

18  because Defendant continued to trade Plaintiff's assets after her authority had been revoked, and

19  because Defendant entered into numerous highly risky unauthorized trades. Defendant admitted under

20  oath that she continued trading long after March 25, 2022, long after Defendant's authority had been

21  revoked and management had been transferred to Plaintiff's financial manager and while falsely

22  telling her own counsel that all assets had been returned.

23

24  [2] Having settled with the other parties, Plaintiff seeks the end of this litigation and would dismiss her claims against Defendant if Defendant's claims were dismissed, voluntarily or otherwise, despite losing a vast sum of money as a result

25  of Defendant's misconduct.
    [3] Defendant has repeatedly threatened to make salacious (and untrue) statements to the media unless Plaintiff paid

26  Defendant millions of dollars. Defendant has since admitted under oath that she knew Defendant and her family do not like press attention (App'x Ex. 1, Tr. 235:3-9), and generally admitted that the inference she was trying to portray to the

27  media was not supported by facts (App'x Ex. 1, Tr. 236:2-16; 237:11-15). After those extortionate demands were rejected, Defendant gave an extended interview to the Wall Street Journal in which she made those same salacious (and untrue)

28  inferences about Plaintiff's sexuality. (App'x Ex. 1, Tr. 213:4-6.)

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
(No. 2:23-cv-04669-MEMF-MAR)

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

In any event, with respect to IIED, there was no conduct that can be considered "offensive." There was no employment relationship between Plaintiff and Defendant, no written agreement, and absolutely no obligation on the part of the Defendant. Defendant was not pressured or forced to do anything; she testified that she acted of her own free will. (App'x Ex. 1, Tr. 112:22 ("I wasn't paid. I wasn't an employee"), 157:4-9 ("Q: […] You weren't her employee. She wasn't paying you. A. That's what I'm going to tell you. Q. And you have free will, right? A. She was my friend."); 179:22-24 ("A. […] I gave my time to helping Taylor. Q. But that was your own freewill, voluntary decision, correct? A. Thousand percent.") App'x Ex. 2, Tr. 192:6.)  Under these facts, there can be no IIED.

*Third*, Plaintiff has failed to meet her burden with respect to defamation. Plaintiff cannot identify any specific defamatory statements or when such statements were made. With a single exception, Plaintiff has not even spoken to anyone she even contends a defamatory statement was made to—and so by her own admission has no idea *if* any statement was made at all. Nor has Plaintiff identified any evidence to support her unsupported rhetoric about the amorphous damages she alleges that she suffered. Indeed, she has repeatedly refused to produce any such evidence. Plaintiff's vague claim that she lost social relationships is belied by Plaintiff's own (inadmissible) evidence. And Plaintiff has no evidence whatsoever to support her claim that she lost work due to any allegedly defamatory statement. Plaintiff acknowledges that employment opportunities dried up *years* earlier, and she has asserted no evidence *at all* that would link any alleged (unevidenced) defamatory statement to that (unevidenced) harm. Without any damages, there can be no defamation.[4]  Nor can there be defamation when the statements are true, as they are here.

Rule 56 exists to prevent meritless claims from consuming judicial resources and coercing settlements through expense and delay. That is precisely the purpose of Plaintiff's motion here.

---

[4] Defendant's suggestion that she suffered damages because she was "maligned publicly in the press" does not demonstrate defamation.  To the extent Defendant was "maligned," it was because Plaintiff was forced to seek protection from the legal system as a result of Defendant's abhorrent conduct in sending voluminous threatening text messages. Indeed, Plaintiff filed for an order of protection after Defendant sent what she herself describes as "extremely volatile" text messages that Defendant admits were "intensely disturbing" (App'x Ex. 1, Tr. 238:1; 197:17-18; 198:25-199:5 ("Q. So you're saying -- your testimony is it's Ms. Thomson's fault for filing an order of protection after she got those harassing text messages? A. That it's -- the media was interested, yes, I am."); Thomson Depo Tr. 168:17).

1   Defendant's Counterclaims are entirely devoid of merit and were filed in an attempt to gain improper

2   leverage against Plaintiff in the pursuit of improper demands for millions of dollars, including a

3   media campaign to publish salacious (and untrue) stories. Defendant's claims for IIED and

4   defamation should be dismissed with prejudice.

5     Stepping back, Defendant's claim purports to rest on conduct going back more than fifteen

6   years, yet by her own account the earliest alleged harm appears in 2021—an effective abandonment

7   of claims made in respect of any earlier conduct. If there were truly 11 years of intentional infliction

8   of emotional distress before 2021, and there were defamatory statements causing grave reputational

9   harm in early 2022 (as Defendant now claims to be the case) there is no explanation for waiting until

10  2023—only after being sued—to raise it. The timing, content, and persistent inability to evidence

11  even the most basic aspects of her claim make clear this is a reactive, opportunistic claim assembled

12  after the fact, not a genuine account of actual, long-standing harm, of which Defendant never once

13  complained until Plaintiff filed this lawsuit.

14  **II. DEFENDANT'S PROCEDURAL "STRIKE" ARGUMENT FAILS AND DOES NOT**

15     **DEFEAT SUMMARY JUDGMENT**

16    Defendant argues that Plaintiff's Motion should be stricken or denied for alleged

17  noncompliance with Local Rule 7-3, the Court's Standing Order, and purported "structural

18  prejudice." These arguments do not justify striking a Rule 56 motion or avoiding merits review.

19  Reduced to their essence, Defendant's procedural objections rest on two claims: (1) that Plaintiff

20  failed to adequately meet and confer, and (2) that Defendant somehow lacked access to one of the two

21  deposition transcripts (even though she attaches a copy of that transcript to her Response). Both

22  clearly fail on this record.

23    Plaintiff did not "skip" the meet-and-confer process. To the contrary, throughout the case—

24  across discovery disputes, scheduling issues, deposition logistics, and matters leading up to summary

25  judgment—Plaintiff repeatedly attempted to meet and confer with Defendant. [Dkt. 144-1 ¶ 2.] Those

26  efforts were uniformly unsuccessful. [*Id.*] This is not a case where further discussion might have

27  clarified issues; it is a case where repeated attempts affirmatively demonstrated futility. Indeed,

28  Defendant herself has repeatedly refused to follow the Court's rules, including in the filing of her

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

Opposition here. Plaintiff's counsel sent Defendant its Motion and invited her to fill out her sections on the timeline required by the Court (November 20, 2025). Defendant wholly ignored Plaintiff's email, did not request any meet and confer, and simply disregarded this Court's rules. [*Id.* ¶¶ 2-4.]

Plaintiff therefore submitted her Motion without the Defendant's portions on November 26, 2025 (i.e., 20 days after it had been sent to Defendant and almost a week after Defendant's deadline under the standing order had lapsed). (*Id.* ¶3-4.) On December 10, 2025, 20 days after the deadline for her Opposition had expired and 14 days after Plaintiff filed her Motion, Defendant unilaterally filed her Opposition with the Court without any attempt to confer with counsel, and only thereafter sent Plaintiff a copy of her Opposition. That Opposition, filed after the deadline, wholly failed to comply with the Standing Orders, the result of which is that the Plaintiff has been forced to file this Reply in a similarly non-conforming format in an effort properly to engage with Defendant's Opposition—no doubt a source of frustration to the Court, and one that could readily have been avoided had Defendant followed the Court's rules and done as she was required to do a month ago.

Further and in any event, the substance of Defendant's Opposition confirms that any additional meet and confer would have been futile. Defendant disagrees vehemently with all of Plaintiff's arguments and does not contend that an additional conference would have resulted in withdrawal of claims, stipulations, narrowing of issues, or any change in position. Instead, she attempts to invoke Local Rule 7-3 purely as a procedural weapon, even though that rule does not require counsel to engage in ritualistic or performative conferences where one party has made clear— by words and conduct—that constructive participation will not occur. S*ee, e.g.*, *Arboireau v. Adidas Salomon AG*, No. CV-01-105-ST, 2002 WL 31466564, at *1 (D. Or. June 14, 2002) (addressing a similar rule in Oregon and noting that "this court recognizes that in this case, conferral would have been futile. . . [b]ecause this court does not require futile acts, plaintiffs' motion is not denied for failing to confer"). Her procedural complaint appears designed to distract this Court from the plain fact that Defendant has no evidence to support her claims.

Defendant's assertion of "structural prejudice" fares no better. That claim is based on timing and transcript availability and is, at most, a request for relief under Rule 56(d). Rule 56(d) requires a declaration identifying specific facts sought, why they exist, why they are essential, and diligence in

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

discovery; generalized grievances about fairness and scheduling are insufficient. Defendant makes _none_ of these showings. In any event, Defendant's claim makes no sense, as Defendant had just as much access to any transcript as Plaintiff, and more time in which to digest the transcript than Plaintiff before her brief was due. Defendant's argument is a transparent attempt to cover for the fact that she has simply ignored the Court's rules and timelines, even when Plaintiff told her what they were.

## III.    DEFENDANT DOES NOT RAISE A TRIABLE ISSUE OF FACT ON IIED

Defendant's IIED claim and her Opposition attempt to reframe the ordinary interactions in a relationship between friends as "outrageous" conduct simply by repeatedly pointing out that the Plaintiff is wealthy. That reframing utterly fails. Even if the Court were to accept Defendant's narrative _completely_, that narrative does not come close to supporting the elements of IIED: (1) extreme and outrageous conduct, (2) intent to cause, or reckless disregard of the probability of causing, emotional distress, (3) severe emotional distress, and (4) actual and proximate causation. _Hughes v. Pair_, 46 Cal. 4th 1035, 1050 (2009); _Potter v. Firestone Tire & Rubber Co._, 6 Cal. 4th 965, 1001 (1993). Plaintiff has failed to demonstrate that a single one of these elements has been met here.

### A.    Defendant cannot establish any outrageous conduct intended to cause emotional distress

Rather than pointing to any discrete episode of extreme or outrageous conduct, Defendant strings together a scattershot collection of completely ordinary interpersonal interactions spanning more than a decade and retrospectively seeks to characterize them as sufficiently "outrageous" to constitute IIED, even though Defendant admits that Plaintiff was "wonderful", "sweet" and "loving." (App'x Ex. 1, Tr. 202:21-23.)

#### 1.    No Extreme and Outrageous Conduct

Plaintiff has utterly failed to demonstrate that any conduct by Plaintiff is "extreme and outrageous." Conduct is "extreme and outrageous" only if it exceeds all bounds tolerated in a civilized society; mere insults, indignities, threats, annoyances, petty oppressions, other trivialities, or offensive speech are insufficient as a matter of law. _Hughes v. Pair_, 46 Cal. 4th 1035, 1050-51

- 6 -

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

1  (2009); *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1001 (1993); *Cochran v. Cochran*, 65

2  Cal. App. 4th 488, 494 (1998).

3    Here, Defendant contends that Plaintiff's conduct was "extreme and outrageous" because (i)

4  Plaintiff made occasional requests for assistance and inconsequential favors intermittently over a

5  period exceeding ten years, and (ii) Defendant felt pressure due to her voluntary management of tens

6  of millions of dollars of Plaintiff's cryptocurrency. Neither of these contentions comes anywhere

7  close to constituting IIED.

8    The evidence makes clear that Defendant cannot point to any instance—much less a pattern—

9  in which she was *compelled* to comply with Plaintiff's requests. She, rightly, does not allege threats,

10  any type of coercion, or any abuse that deprived her of free choice. Nor does she allege any physical

11  intimidation ever occurred; indeed, she confirms that Plaintiff has *never* made threats of violence

12  against her (App'x Ex. 1, Tr. 11-13). Defendant admits that she was not under any employment

13  obligations with regard to Plaintiff, nor that she relied on Plaintiff economically. There simply was no

14  IIED whatsoever.

15    Defendant admits she was free to decline any request for help, and she repeatedly agreed that

16  any assistance she provided to Plaintiff was entirely voluntary. (App'x Ex. 1, Tr. 232:5-9 ("Q. . . . you

17  did it willingly, right? It was of your own volition? A. You could say that about everything I did for

18  Taylor"); 203:14-17 ("A . . . . And I always [helped] . . . Q. Of your own volition, correct?

19  A. Absolutely, yeah."); 179:21-24 ("A . . . . I gave my time to helping Taylor. Q. But that was your

20  own freewill, voluntary decision, correct? A. Thousand percent"); 224:7-225:3 ("A. She asked me to

21  go and see what the state of the house was in because it was going to be shown, and she was

22  concerned about . . . A. So I called her, and then I sent her text message pictures. And she was like,

23  "Can you help?" And of course, I, like, you know, snapped into action . . . . And, you know, it was -

24  again, happy to do it."); 278:1-4 ("Q . . . you were voluntarily managing Taylor Thomson's

25  cryptocurrency, correct? No one forced you to do it, right? A. Yes"); 230:24-231:2. Defendant

26  begrudgingly admitted she could have said "no" to any request. (App'x Ex. 1, Tr. 233:9-22 (" Q . . .

27  .again, you had the ability to say no, right? Freewill, of your own volition, you could have said no if

28  you really thought it was extreme . . . . A. Technically speaking, the answer is always going to be a

- 7 -

1   technical yes.")) Indeed, in one of the examples on which Defendant relies as "evidence" of the

2   "extreme demands" made of her—Plaintiff's daughter asking if Defendant could pick Plaintiff up in

3   her car—involves the Defendant *saying she was unable to help.*[5] That Defendant's assistance was

4   willing and voluntary was also a leitmotif in Defendant's own questions to Plaintiff during *Plaintiff's*

5   deposition. There, Defendant noted "there is one sort of constant that . . . through this, that -- that we

6   [Defendant and Ms. Fleury] showed up and *we were happy to do it*," and "I think [we] could agree

7   that throughout our friendship, when you've asked me to do things for you, I showed up and *I was*

8   *happy to -- to help*." (App'x Ex. 2, Tr. 322:15-21.)

9          Defendant readily concedes that any assistance she provided was *not* because she felt any

10   compulsion instilled by Plaintiff.  Rather, even in conjunction with the cryptocurrency management

11   Defendant admits she helped Plaintiff because Defendant saw an opportunity to gain experience that

12   had a long-term upside for her (App'x Ex. 1, Tr. 173:16-18 ("I was happy to do it because I was -- I

13   legitimately thought there would be a longer-term upside from both the experience I was gaining.")).

14   Further, Defendant saw her assistance as a way to partially recompense Plaintiff for the many

15   expensive international vacations that Plaintiff invited Defendant and her partner on, and paid for

16   them to join (App'x Ex. 1, Tr. 232:12-19 ("A . . . . you flag these great vacations as 'Oh, my God.

17   How lucky was I.' By the way, absolutely. Going on a super yacht in the Amalfi Coast is a freaking

18   dream come true for anybody."); App'x Ex. 4 ("You have given me so much, and I have tried to do

19   my small part to reciprocate in ways I can, I hoped this would be one of them, I still do" ()).

20          Further, the alleged "demands" that Defendant claims constitute IIED are said to have

21   occurred over a period of more than 10 years, during which time Defendant admits that Plaintiff was

22   "by and large . . . wonderful and sweet and loving."[6] (App'x Ex. 1, Tr. 202:21-23.) That is significant

23   in two respects: (*i*) over a period of a decade, *the best* Defendant can do is point to a small handful of

_____

[5] "Q. But you did have the ability to say no. And, in fact, you did for the hypberbaric driving thing. You said no . . . . A. I had to work. Q . . . . okay. So you said no? A. I said no to yacht trips because I had to work. A . . . . I really did have a job." It also bears note that Defendant entirely mischaracterizes this in her Responses to Interrogatories as "*Plaintiff* demanded that I cancel a scheduled production meeting — an important work commitment — and risk COVID exposure by driving her to a hyperbaric chamber appointment". (Richardson Rogs. 26:14-16.)

[6] The "by and large" qualification is because Defendant can recall a *single* instance—in 2012—in which Plaintiff allegedly yelled at her because Defendant chose what Defendant herself describes as a "not-nice . . . campy" hotel. (App'x Ex. 1, Tr. 202:7-8.)

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
(No. 2:23-cv-04669-MEMF-MAR)

McDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

1    sporadic, isolated, entirely routine requests for help on minor matters; and (*ii*) Defendant has

2    produced no evidence *at all* that over that period she ever raised any issue with, or in any way

3    objected to, any of the few routine requests that were made of her. That conspicuous lack of

4    contemporaneous evidence is entirely consistent with the position, drawn out in her deposition

5    testimony, that she was happy to help, and serves only to underscore the retaliatory nature of her

6    claim, asserted only in an attempt to gain a wholly undeserved financial windfall in this litigation.

7          The other "demands" that Defendant claims are so "outrageous" clearly do not rise to the level

8    of IIED.  These examples include: (a) occasionally "sourcing (and paying for) groceries" and on a

9    few occasions engaging in menu planning for Plaintiff, for which Defendant has produced no

10   evidence; (b) "review[ing] and provid[ing] detailed feedback on business plans, pitch decks, and

11   marketing strategies" (App'x Ex. 6, 24:12-25:4); (c) a request to quickly tidy a closet ("Would you

12   mind dropping into the Malibu house this weekend and tidying up my closet…" (App'x Ex. 5)),

13   which Defendant herself expanded ("Happy to do a quick walk through…") and then enthusiastically

14   undertook ("I'm fully staging the entire house 😂"). Defendant later thanked Plaintiff for the

15   "excuse" to step away from her computer ("Thanks for giving me an excuse to take my head out of

16   my laptop and my garden for a moment." (App'x Ex. 5, App'x Ex. 3)); or (d) managing Plaintiff's

17   cryptocurrency, which Defendant testified "happened organically" (App'x Ex. 1, Tr. 182:3) and that

18   she did voluntarily, accepting the risk that it might not yield any benefit for her, but believing that it

19   would (App'x Ex. 1, Tr. 182:3-14). Defendant's own testimony reduces her claim to an ordinary

20   dispute: she agreed to help manage crypto assets (and tidy the house, pick up groceries, etc.), the

21   market collapsed, Plaintiff accused her of wrongdoing, and Plaintiff pursued legal remedies (App'x

22   Ex. 1, Tr. 278:7-8).

23         On any measure, such conduct falls well short of being "so extreme as to exceed all bounds of

24   that usually tolerated in a civilized community" (*Cervantez v. J.C. Penney Co.,* 24 Cal. 3d 579, 593

25   (1979)), and to the extent the IIED claim rests on Plaintiff's litigation conduct, it is barred by

26   privilege and petitioning doctrines. Cal. Civ. Code §47(b); *Kruse v. Bank of America*, 202 Cal.App.3d

27   44, 67 (1988).

28

McDermott Will &Schulte LLP
Attorneys At Law
Los Angeles

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
(No. 2:23-cv-04669-MEMF-MAR)

## 2. No Intent

That conduct is "outrageous" is not alone sufficient to demonstrate IIED. Defendant must also show that Plaintiff engaged in that conduct *intending* to inflict severe emotional distress on Defendant. *Christensen v. Superior Court*, 54 Cal. 3d 868, 903 (1991); *Potter*, 6 Cal. 4th at 1001; *Hughes*, 46 Cal. 4th at 1051. Conspicuous by its absence is any evidence of such an intention. And it is clear why: there is none. To show intent, Defendant must show that any of the conduct identified above was intended to cause Defendant severe emotional distress. Defendant has failed to even assert that that there was any such intention here, which is fatal to her claim. Further, Defendant's own testimony undermines any intent on the part of Plaintiff, whom she variously describes as "kind", "loving", "wonderful", "sweet" and "generous" (App'x Ex. 1, Tr. 202:23; 257:21.)

## B. No severe distress tied to actionable conduct

Even if Defendant could somehow recharacterize ordinary favors or a role she voluntarily undertook as outrageous (she cannot) and show that Plaintiff's conduct was intended to cause Defendant harm (she cannot), her IIED claim independently fails because she cannot establish that she experienced severe distress as a result of any actionable conduct. Severe distress is distress "of such substantial quality or enduring quality that no reasonable person should be expected to endure it." *Hughes*, 46 Cal. 4th at 1051.

Here, Defendant (and Ms. Fleury) vaguely describe alleged emotional distress (without evidentiary support in the form of medical records, etc, which Defendant has repeatedly refused to produce) Defendant allegedly experienced. The Court need not even question the sincerity of those descriptions to conclude that Defendant's IIED claim still fails at summary judgment.

IIED requires proof that Plaintiff's extreme and outrageous conduct was a substantial factor in causing the severe emotional distress. Defendant offers no evidence (admissible or otherwise) satisfying that requirement.

Indeed, Defendant's own evidence is that there were *numerous* stressors at the time that caused her to allegedly suffer distress, which Defendant readily admits were not caused by Plaintiff (App'x Ex. 1, Tr. 214-10:13 "Q . . . . you had a lot of other stressors that were not caused by Ms. Thomson, correct? A . . . . yeah, that's fair"). These include:

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

(a)    the COVID pandemic (App'x Ex. 1, Tr. 176:10-77:9) and film- and television industry shutdowns (App'x Ex. 1, Tr. 171:2-3; 178:7-10);

(b)    the death of her stepmother and the fallout relating to the distribution of her father's family estate (App'x Ex. 1, Tr. 132:12-22);

(c)    the deterioration of her decade-long relationship with Ms. Fleury (App'x Ex. 1, Tr. 213:25-214:7); and

(d)    the collapse of the cryptocurrency market (App'x Ex. 1, Tr. 132:2; 132:20-22), into which Defendant encouraged "many people" to invest, all of whom she admits lost money (App'x Ex. 1, Tr. 97:24-25; 98:16-18), for which she felt personal responsibility (App'x Ex. 4 ("I helped, so many people who had no money to lose are now really struggling because I encouraged them to get into crypto, I wanted them to win too. And until that happens, it keeps me up at night"));

(e)    Defendant further admits that she and Ms. Fleury "lost everything" in the collapse and that it was "very hard" to watch the market decline, which she had viewed as a replacement career after her work as a film and television producer had already evaporated due to COVID (App'x Ex. 1, Tr. 98:1-13; 99:6-11; 170:24-171:5).

Despite repeated demands from Plaintiff throughout the discovery period, Defendant still offers no medical (or any other) evidence demonstrating her alleged injuries, or linking her claimed clinical conditions to any actionable conduct by Plaintiff.

Put simply, overblown rhetoric about distress is not enough. Without any evidence tying severe emotional harm to any actual extreme, outrageous act by Plaintiff, Defendant cannot establish causation. She has not and cannot do that.

*        *        *

If Defendant's IIED theory were accepted, any long-term friendships involving routine requests for assistance would become tortious simply because the alleged aggrieved party later regrets saying "yes" to helping with routine tasks. That is all that Defendant can even *allege* here.

Defendant's claim must be seen for what it is: a self-serving retrospective attempt to aggregate years of ordinary interactions layered with speculation to convert Defendant's own choices

into "outrageous conduct" by Plaintiff and demand millions of dollars in compensation. Because Defendant cannot establish extreme and outrageous conduct, intent or recklessness, or causation of severe distress, Defendant's IIED claim should be dismissed.

**IV.    DEFENDANT DOES NOT RAISE A TRIABLE ISSUE OF FACT ON DEFAMATION**

**A.    There is no admissible evidence of an unprivileged "publication" of a specific defamatory statement**

For the Defendant's defamation claim to succeed, she must identify the exact statement(s) alleged to be defamatory. Vague characterizations, paraphrases, or general descriptions of what was "said" are insufficient. She must produce admissible evidence of the specific words used, if not plead them verbatim, who said them, and when. *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 31 (2007); *Seelig v. Infinity Broad. Corp.*, 97 Cal. App. 4th 798, 809 (2002); *Vogel v. Felice*, 127 Cal. App. 4th 1006, 1017 (2005); *Kahn v. Bower*, 232 Cal. App. 3d 1599, 1612 (1991). And she must adduce admissible evidence that the statement was actually communicated to a third party who understood it. *Smith v. Maldonado*, 72 Cal. App. 4th 637, 645 (1999). Hearsay or conclusory assertions do not create a triable issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

The Defendant's defamation claim fails. It began as a sweeping complaint that some group of people may have heard Plaintiff make some unidentified (but presumptively negative) statement at some unidentified point in time.  Despite discovery, Defendant's claim has not improved.

Defendant's Response to Interrogatories claim that "the factual basis for these counterclaims arises from numerous credible and consistent reports over an extended period from individuals across multiple sectors" and that she has "spoken with numerous individuals who either personally heard these statements or were present in conversations where they were made" (App'x Ex. 6, 1:26-27, 2:10-11). Defendant could have procured declarations from those "numerous individuals" explaining what they heard, or deposed them, or produced some tangible record of the "credible reports" she claims to have received. She has not, and the inference is clear: there is simply no evidence of any statement made by Plaintiff that would support Defendant's claim.

Furthermore, despite her initial claims of widespread publication, Defendant's deposition testimony narrows the universe dramatically. Despite claiming that there are "others" to whom

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

Plaintiff allegedly made defamatory statements, Defendant has identified none, and could not do so when asked under oath in her deposition. Pressed to clarify whether Defendant was deliberately withholding names of other individuals to whom allegedly defamatory statements were made on the basis of a fear that Plaintiff would retaliate against those individuals (a position Defendant had previously maintained), Defendant confirmed that was _not_ the case and that she was being as fulsome as possible in her answers (App'x Ex. 1, Tr. 76:11-79:19):

> Q . . . . I'm asking you if there are any other names that you are purposefully not telling us about based on your prior position in your papers that you are not going to reveal names because there's no protective order in place[ . . . ].
>
> THE WITNESS: I would say, no, that's not the reason.
>
> MR. HARRISON: Okay. Is there another reason that you are withholding information or not answering fully to the questions that you are being asked about defamatory statements and the evidence that you might have?
>
> THE WITNESS: I, at this point, believe that I have answered completely the question . . . . I've given names, and I've given a -- you know, a pretty broad sense of -- of elements I know.

Remarkably, in her second declaration, which was submitted with her Opposition here and which _followed_ her deposition, Defendant _again_ asserts the falsehood that she received various reports—direct and indirect—from unnamed others of the Plaintiff's allegedly defamatory statements. (App'x Ex. 7, ¶¶19-21, 44). These assertions are directly contradicted by the statements Defendant made repeatedly under oath in her deposition and should be rejected. In any event, she has provided absolutely no evidence at all beyond her own unsubstantiated and unevidenced recollection that would support them.

Defendant has now had more than two years in which to identify these "other people." She has not done so. That is because there are no other identifiable people to whom Defendant can even _allege_ that Plaintiff made allegedly defamatory statements, let alone evidence that any such statements _might_ have been made, let alone plead, let alone evidence those statements to the required degree of specificity.

That is the 'who'. The position as to 'what' was said is no better. It is neatly summarized in the following exchange during Defendant's deposition:

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
(No. 2:23-cv-04669-MEMF-MAR)

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

Q . . . . . what are the specific defamatory statements that you are alleging in this litigation Taylor Thomson made about you? . . . My question is not who are Taylor Thomson's list of friends that you think might have heard something bad.

A. I'm not sure that I understand what it is that you are asking for.

Q. I think you do. I think you are very clear about what I'm asking for because we have been asking for it for a year leading up to this deposition. But the question is pretty simple: What specific defamatory statements do you allege that Taylor Thomson made about you?

A. I would say objection.

(App'x Ex. 2, Tr. 52:6-23.)

At most, Defendant points to a single conversation Plaintiff had with a Shiro Gutzie—and then asks the Court to completely infer publication of some unspecified false statements at some unidentified time to a small handful of other individuals based solely on perceived changes in the status of Defendant's personal relationship with them.

In any case, the statement to Mr. Gutzie, even if it were untrue (which it is not, as explained below) is privileged. California Civil Code §47(c) codifies the common law privilege of common interest. The common law privilege protects "communications made in good faith on a subject in which the speaker and hearer shared an interest or duty." *Kashian v. Harriman*, 98 Cal. App. 4th 892, 914, 120 Cal. Rptr. 2d 576 (2002) (quoting *Brown v. Kelly Broad. Co.*, 48 Cal. 3d 711, 727 (1989)). Under Civil Code §47(c), a publication is privileged if it is "a communication, without malice, to a person interested therein, (1) by one who is also interested . . . .". In July 2022, Mr. Gutzie was assisting Plaintiff with the management of her cryptocurrency portfolio, including helping her to trace and recover the assets lost / taken by Defendant, and that is the context in which any statement to him was made.

In relation to Catherine Hardwicke, the Defendant has offered a shifting and incoherent narrative, supported only by her own inadmissible hearsay evidence. The sum total of Defendant's position is that Ms. Hardwicke at some point told her about a statement made by Plaintiff during a single telephone call—for an extended period prior to and since which Ms. Hardwicke had not communicated with Defendant. (App'x Ex. 1, Tr. 47:10; 48:16; 48:19–51:19.) Defendant cannot recall *any* salient details of her conversation with Ms. Hardwicke, including the date (other than that

- 14 -

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

1    it might have occurred in 2022, a position on which she reversed course after first stating that it was

2    *after* the litigation began in 2023), or even what was said. Indeed, Defendant admits that she cannot

3    "recall the specific statement" Plaintiff allegedly made (App'x Ex. 1, Tr. 47:3) and said that she

4    "object[s] to the question, because I couldn't tell you anything anybody told me over the phone that

5    long ago exactly" (App'x Ex. 1, Tr. 51:11-13). Of course, Defendant could have produced a

6    declaration from Ms. Hardwicke that would corroborate her own remarkably indistinct and

7    admittedly uncertain recollection, but she has not. As it stands, her allegations are based on nothing

8    more than inadmissible hearsay. No reasonable jury could find publication of a specific defamatory

9    statement on this record.

10        In relation to the other identified individuals (Madeleine Thomson, Ron Murphy, Rand

11   Rusher, and Kevin Fitzgerald). Defendant admits that she:

12        (a)    has not talked to Madeline about any defamatory statements, does not know of any

13   specific statements that were made to Madeleine, and simply denies even the most basic evidentiary

14   requirements of a defamation claim (App'x Ex. 1, Tr. 42:18-44:8 ("Q . . . . so we are clear, Madeleine

15   Thomson has never told you directly that Taylor Thomson made a defamatory statement about you to

16   Madeleine? A. I would say indirectly . . . A . . . . I know without a shadow of a doubt that defamatory

17   statements were made about me from Taylor Thomson to Madeleine Thomson . . . Q . . . . So if you

18   know without a shadow of a doubt, what were the statements? A . . . . I don't know the specific

19   statements. That's not how defamation is quantified.");

20        (b)    has not talked to Mr Murphy directly and does not have even _indirect_ knowledge of

21   any defamatory statements being made to him. (App'x Ex. 1, Tr. 41:1; 41:8-13 ("Have you talked to

22   Ron Murphy, and did he tell you about any allegedly defamatory statements that Taylor Thomson . . .

23   made about you? A. I have not talked to him directly, no. Q. So . . . Ron Murphy has never told you, I

24   take it, that Taylor Thomson made any defamatory statements to him about you. Is that correct?

25   A. Not directly. Q . . . . did he do it indirectly? A. No").);

26        (c)    Mr. Fitzgerald has never told her of any defamatory statements about Defendant that

27   Plaintiff made to him (App'x Ex. 1, Tr. 41:17-21 ("Q . . . Has Kevin Fitzgerald told you that Taylor

28   Thomson made defamatory statements about you to him? A. No."); and

- 15 -

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
(No. 2:23-cv-04669-MEMF-MAR)

(d)    she cannot recall if Mr. Rusher ever told her about any allegedly defamatory statement made to him, let alone what that statement actually was (App'x Ex. 1, Tr. 45:23-46:1.). No doubt if she had spoken with Mr. Rusher, Defendant would recall, at minimum, that she had done so. She cannot even do that.

In each case, Defendant's claim is, _at best_, based solely on an _inference_ that she invites the Court to draw on the basis that her relationship with the relevant individual soured sometime in late 2021 to early 2022 ("Ron Murphy was one of my closest friends. And there's no way that he would have cut off all contact if Taylor had not [defamed me]" (App'x Ex. 1, Tr. 41:1; 41:5-7); "[it's] clear that defamatory statements had been made [to Madeleine] based on the history of our relationship and the way that things took a turn." (App'x Ex. 1, Tr. 42:23-25).)

That falls far short of the standard of evidence required. The law is clear that mere speculation that others "must have heard" or "likely saw" the statement is insufficient. _McGarry v. Univ. of San Diego_, 154 Cal. App. 4th 97, 112 (2007). It's also a position overshadowed by Defendant's own evidence. For example:

(a)    In her deposition, she admitted that her "world had gotten very small during COVID. And Taylor was one of a small handful of people that [Defendant] saw and that [Defendant] interacted with" (App'x Ex. 1, Tr. 169:20-22.) "it was kind of Michele. And then my pod was, like, Taylor and Madeleine. And we weren't seeing a lot of other people." (App'x Ex. 1, Tr. 230:21-23.)

(b)    In her Responses to Interrogatories, Defendant said that in 2021 she "completely isolated [herself] from any contact with the outside world" and that by November 2021, Plaintiff "was the only person [Defendant] was interacting with." (App'x Ex. 6, 11:27-12:2.) (i.e., before _any_ defamatory statements are alleged to have been made (or _could_ have been made, given their alleged substance)).

The picture that emerges from the limited rhetorical evidence Defendant has produced (that is, her account of her own actions) is that over a period beginning in 2020 she essentially withdrew from her social circles only to emerge from the pandemic in late-2021 to find those relationships were not what they once were.

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

**B.    There is no falsity, and Defendant conflates her denials with evidence**

Even taking the Defendant's vague and entirely unsubstantiated allegations as to statements made to Ms. Hardwicke and Mr. Gutzie at face value, Defendant still cannot establish that either of the alleged statements is defamatory.

The only possibly admissible evidence of Plaintiff's communications with Ms. Hardwicke and Mr Gutzie comes from Plaintiff. Plaintiff testified that she told Ms. Hardwicke that Defendant had been managing Plaintiff's crypto, bought a coin, and for that received a commission (App'x Ex. 2, Tr. 223:8-12 ("I said was you were managing my crypto because I trusted you and -- and I bought a coin, which, unbeknownst to me, you had a secret commission, and hadn't seen you in a long time."), and that she told Mr Gutzie in July 2022 that Defendant had taken a hidden fee (App'x Ex. 2, Tr. 281:21-24 ("I basically texted him to say that you had taken a hidden fee, which is also, I assume, a secret kickback")).

Defendant cannot show falsity in either of those statements. Indeed, Defendant does not even deny those facts. To the contrary, she admits that she was directly paid a commission for facilitating Plaintiff's purchase of XPRT (App'x Ex. 1, Tr. 62:5-7 ("Q . . . . Aren't you the one that introduced Ms. Thomson to Persistence? A. Yes. Correct. Q. So wouldn't the finder's fee be paid to the person who introduced Ms. Thomson to Persistence? A. That is correct."). She also admits that the "commission" she received was paid to an address that she controlled, and which she did not disclose to Plaintiff (App'x Ex. 1, Tr. 90:14-91:19), an admission she fought tooth-and-nail to avoid making (App'x Ex. 1, Tr. 57:13-59:25; 65:5-68:25) despite it being apparent on the face of her own contemporaneous communications with Persistence (App'x Ex. 1, Tr. 59:6-8; 68:10-12; App'x Ex. 3, 18 (referring to "the amount of 4.94 being the purchase price ($5 going to the purchaser with the remaining $.06 as a finders fee to my [Defendant's] account . . . ).").

Further, Defendant acknowledged that she never disclosed the commission in writing to Plaintiff, in spite of their voluminous written communications, including on the topic of cryptocurrency (App'x Ex. 1, Tr. 182:15-18 ("I think we can agree that you never disclosed to Ms. Thomson in writing the finder's fee, correct? A. In writing, yes, that's correct"); 187:7-13 ("Q. . . . we

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
(No. 2:23-cv-04669-MEMF-MAR)

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

1  agree that you never told Ms. Thomson in writing anywhere about the finder's fee, correct? 11 A. I

2  don't remember ever putting it in writing. It's possible it happened, but I don't think it did."). Nor

3  was the commission recorded in any document between Plaintiff and Persistence because, as the

4  documentary record indisputably shows, Defendant actively sought to keep it out of those documents.

5  (App'x Ex. 1, Tr. 57:22-58:2 ("Q . . . . this finder's fee, this 1.1 percent, that wasn't in any of the

6  written contracts between Ms. Thomson and Persistence, was it? A. I -- I don't believe it was.";

7  App'x Ex. 3, 18 (Richardson to Aggarwal: "This part does not need to be spelled in the buyers

8  document.")). And Defendant did not disclose the commission to the attorneys that Defendant herself

9  had found to represent Plaintiff in connection with the purchase (App'x Ex. 1, Tr. 185:10-12

10  ("Q. You never told the attorneys at Dechert about the finder's fee you were getting, correct? A. Did

11  not, no")).

12      No doubt anticipating that fatal evidentiary gap on falsity, Defendant now gestures at a

13  different premise: that because the value of the cryptocurrency in which she received her secret

14  kickback subsequently crashed, she never *profited* or "cashed out" the commission she was paid

15  (Opp. 15:15) (as if an eventual lack of profit from the fraud simply erases the original fraud itself),

16  and therefore Plaintiff's description of a commission is false and/or "speculation." (Opp. 2:13.)

17  Whether Defendant converted the commission to fiat, held it, moved it, or later returned it does not

18  negate the truth of the statement that a commission was paid and was not disclosed. Defendant cannot

19  defeat truth by litigating semantics about later use of the funds of whether she ultimately benefitted

20  from them. That the crypto she received later lost some of its value does not demonstrate that she did

21  not receive an enormously valuable kickback *at the time*, and does not demonstrate falsity.

22      All told, Defendant's own admissions establish the truth of the statements she alleges Plaintiff

23  made: Defendant received compensation that was tied to the transaction and that Plaintiff was

24  unaware of that secret compensation. In short, there are no remaining issues of material fact that bear

25  on the truth or falsity of the alleged statements.

26      The Opposition "disputes the core accusations" for fraudulent conduct, contending that

27  "[e]very trade [Defendant] executed was either (i) at Thomson's explicit direction, or (ii) a good-faith

28  effort to manage the portfolio in line with Thomson's aggressive risk profile." (Opp. 15:11.)

McDermott Will &Schulte LLP
Attorneys At Law
Los Angeles

- 18 -

Defendant testified that:

(a)    On March 25, 2022, Defendant was expressly told that Plaintiff's investment manager, Lieh Wang, was taking over management of Plaintiff's assets, and she understood she no longer had authority to trade them (App'x Ex. 1, Tr. 116:21-25; 122:12-16 ("I don't think that I thought I still had free rein.")). By April 2022, Defendant knew she was required to return Plaintiff's assets, a fact she acknowledged in contemporaneous communications with Persistence (App'x Ex. 1, Tr. 119:11-14; 121:8-124:9).

(b)    Defendant delivered the physical wallets containing Plaintiff's crypto addresses in mid-April 2022 and had no further communication with Plaintiff thereafter (App'x Ex. 1, Tr. 117:16-19).

(c)    Despite instructions to return all assets, Defendant admitted that she continued trading Plaintiff's cryptocurrency in March, April, and later, including a significant number of trades after March 25, 2022 (App'x Ex. 1, Tr. 118:13-20; 119:7-10; 128:3-23).

(d)    Defendant undertook some of those trades because she "felt very badly for Persistence" and was concerned Plaintiff's assets would be liquidated by those now managing her assets, potentially harming Persistence (App'x Ex. 1, Tr. 125:4-9).

(e)    Defendant did not stop trading Plaintiff's assets until _at least_ late June 2022, and conducted "voluminous" undisclosed trades throughout May, June, and July 2022, which she described as an attempt to hedge losses in a falling market for which she was woefully ill-equipped (App'x Ex. 1, Tr. 131:18-21; 132:1-3; 132:23-133:6).

Based on Defendant's own admissions, she could not have believed (and did not, in fact, believe) that she had authority to trade Plaintiff's assets after being repeatedly instructed to return them and without any discussion with Plaintiff. That trading was unauthorized and fraudulent. Accordingly, even if Plaintiff had made the alleged statement (which Defendant cannot establish), no genuine dispute of material fact exists, as Defendant's admissions compel resolution of the issue in Plaintiff's favor.

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

**C.    Defendant Cannot Establish Causation or Damages as Her Claimed Harm Is Speculative and Untethered to Any Statement by Plaintiff**

For defamation *per quod*, Plaintiff must produce evidence of actual, quantifiable harm—such as lost employment, lost business, or specific reputational injury. General claims of emotional upset, embarrassment, or speculative reputational harm do not suffice. *Erlich v. Etner*, 224 Cal. App. 2d 69, 73 (1964).

Defendant baldly asserts that Plaintiff's alleged statements caused the loss of "six-figure opportunities," (Opp. 16:19; App'x Ex. 7, ¶45) the collapse of her professional network, and widespread reputational destruction across the entertainment, technology, and cryptocurrency communities. (Opp. 16:17-19.)

Those assertions fail at Rule 56 for two simple reasons: (i) Defendant offers absolutely no evidence (admissible or otherwise) of any specific lost opportunity, relationship, or income, and, furthermore, admitted under oath that she could not provide evidence of a single lost financial opportunity or other related financial loss; (ii) Defendant offers no evidence (admissible or otherwise) that would link any specific statement by Plaintiff to any such loss. Instead, she relies simply on her own generalized rhetoric.

Defendant fails at the threshold for the simple reason that, on her own evidence, she never had any viable earning potential that she could lose to begin with. Defendant testified that she completed no higher education, instead dropping out to move to India in around 2000 for several years, during which time she "made no income" performed volunteer work and did "a lot of meditating." (App'x Ex. 1, Tr. 12:15-13:9.)  Further, Defendant had not demonstrated six-figure earning potential, testifying that for several years, she worked in marketing, but "was not making much," later moving into sales at a series of now defunct companies, and "t[aking] a pay cut" to get her foot in the door. (App'x Ex. 1, Tr. 17:13-18:23).  Between March 2020 and late-2021, she became a film and television producer, but production in those industries had stopped, and "nothing was happening" during COVID (App'x Ex. 1, Tr. 171:2-3; 178:7-10). She became unemployed around March 2020 when her company closed during COVID (i.e., more than a year prior to voluntarily undertaking to manage Plaintiff's cryptocurrency) (App'x Ex. 1, Tr. 176:10-77:9.  Most tellingly, Defendant

acknowledged that she has not filed tax returns since at least 2020 (well before she started managing Plaintiff's cryptocurrency) as she "has not had income since then." (App'x Ex. 1, Tr. 24:7-10.) There is simply nothing in the record that would allow the Court to rule that Defendant suffered any damages whatsoever, let alone loss of the newly-alleged "six-figure opportunities."

Against that backdrop, Defendant attempted to "pivot" into cryptocurrency in 2021 as an effort to create new opportunities for herself (App'x Ex. 1, Tr. 171:4-5; 171:15-18 ("Q. . . . COVID had affected your industry, you weren't working, and you were looking to create other opportunities for yourself, correct? A. That's correct, yeah"). That "pivot" included managing Plaintiff's crypto, which she saw as an opportunity to upskill.[7] (App'x Ex. 1, Tr. 173:16-19 ("I legitimately thought there would be a longer-term upside from . . . the experience I was gaining.")). Although she claimed to have turned down other opportunities, she neither identified nor substantiated them, and later admitted she never received any offer of employment at all. ((App'x Ex. 1, Tr. 175:6-7) "Q. Did they make you an offer of employment? A. No".)

These admissions definitively establish that other factors wholly unrelated to Plaintiff (e.g., COVID) caused financial damage to Defendant; further, that Defendant's lack of income and professional momentum pre-dated and arose independently of any alleged statements by Plaintiff.

Against that backdrop, Defendant was offered multiple opportunities to identify some—any—work that she *actually lost* as a result of a statement she alleges Plaintiff made. On every occasion she offered an, at best, evasive, and at worst, completely deficient, response.  For example, when asked whether statements allegedly made to Ron Murphy caused him not to work with her, Defendant responded that the issue was "far more complicated" (App'x Ex. 1, 191: 5-6); when asked to identify a specific missed opportunity with Mr. Murphy, she again referred vaguely to "profound reputational damage" within an "incredibly small" industry, naming various individuals (only two of whom she ever claimed to have a working relationship with) but identified no concrete opportunity (App'x Ex. 1, 191: 11-17).  Pressed further to identify even one specific opportunity she missed with any of those

---

[7] The fact that Plaintiff allowed Defendant an opportunity to develop a reputation in the cryptocurrency space at a time when Defendant had no other job opportunities, demonstrates that, far from damaging Defendant, Plaintiff offered Defendant a chance – one that Defendant took willingly, even eagerly.

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
(No. 2:23-cv-04669-MEMF-MAR)

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

people, Defendant vaguely asserted that she and Catherine Hardwicke had "a number of projects we were looking at" in development, without identifying them. (App'x Ex. 1, Tr. 191: 22-23).

In sum, Defendant has not identified or evidenced a single lost job, contract, investment, or engagement or any other financial loss attributable to any statement by Plaintiff. Her damages claim reduces to vague assertions of "a number of projects" with Catherine Hardwicke (which remain entirely unspecified) and an undefined, unnamed tangential project involving Ron Murphy—neither supported by any evidence. A defamation plaintiff cannot survive summary judgment by speculating that unnamed opportunities or unidentified listeners "must have" existed or reacted.

Defendant also claims undefined defamation damages based on a diminished social and professional circle, but her own testimony contradicts that assertion. She admitted that during COVID her "world had gotten very small" and Plaintiff was "one of a small handful of people" she interacted with at the time (App'x Ex. 1, Tr. 169:19-22), a consequence of the pandemic, not Plaintiff's conduct. In interrogatory responses, Defendant further stated that fear of others learning she held Plaintiff's assets caused her to "completely isolate[] myself from contact with the outside world," (App'x Ex. 6, 11: 26-27) confirming that any loss of relationships resulted from pandemic conditions and self-imposed isolation, not defamation.

More fundamentally, Defendant contends her alleged "network collapse" occurred between February and May 2022 (App'x Ex. 7, ¶66)—well before Plaintiff learned of the undisclosed kickback in July 2022 (Complaint ¶¶226-27). The harm she claims therefore predates the earliest possible time at which any defamatory statements of the type she alleges could have been made. Defendant also fails to identify a single person who severed ties because of something Plaintiff said, or to specify the content, timing, or context of any such statement. Changes in social dynamics do not establish defamation damages absent a causal link to an actionable statement. That is *a fortiori* the case where Defendant states she withdrew from essentially all social interaction *years* prior.

### D.  Defamation requires evidence, not inference stacked on inference

Defendant cannot survive summary judgment by asserting that (wholly unspecified) lucrative opportunities and reputational capital must have existed and must have been lost because of

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

Plaintiff's alleged statements. The law requires evidence tying a specific statement to a specific loss. Defendant has no such evidence.

Defendant also invokes defamation "per se." But that label does not relieve her of the burden to present admissible evidence of (*i*) a specific false statement of fact, (*ii*) published to an identified third party, (*iii*) outside any applicable privilege. Where, as here, she cannot prove the content, timing, or audience for most alleged publications—and cannot connect any alleged publication to any concrete loss—she cannot avoid summary judgment by reciting the phrase "per se."

At bottom, Defendant's damages theory rests on inference layered on inference: because her (undefined and unproven) "career" allegedly stalled and some relationships allegedly cooled, Plaintiff must have said something defamatory that caused it. No reasonable jury could award defamation damages on this record.

## V.    DEFENDANT CANNOT ESTABLISH ENTITLEMENT TO PUNITIVE DAMAGES

Defendant devotes a standalone section of her Opposition to punitive damages, arguing that a jury could find "malice, oppression, or fraud" based on alleged scapegoating, reputational harm, and Plaintiff's pursuit of legal remedies. That argument fails for multiple, independent reasons.

*First*, punitive damages are not an independent cause of action and cannot survive where the underlying tort claims fail. Indeed, California law is clear that punitive damages require proof of liability for an underlying tort, plus additional proof of culpable mental state. Where, as here, Defendant has not raised a triable issue on defamation or IIED, there is no predicate for punitive damages, and the claim must be dismissed as a matter of law. *Coleman v. Gulf Insurance Group,* 41 Cal.3d 782, 789 (1986).

*Second*, even if the Court were to assume arguendo that some underlying claim survived, Defendant still fails to meet the heightened evidentiary standard required for punitive damages. Under California law, punitive damages require clear and convincing evidence that the defendant acted with malice, oppression, or fraud. Conclusory allegations and narrative rhetoric are insufficient. Defendant offers no such evidence. She does not identify any admissible facts showing that Plaintiff acted with intent to injure Defendant, despicable conduct carried out with a wilful and conscious disregard of Defendant's rights; or fraudulent intent.

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

1    Instead, Defendant relies on post hoc characterizations—labelling Plaintiff's conduct as

2    "scapegoating" or "isolation"—without tying those labels to any supporting evidence meeting the

3    punitive damages standard. Disagreement over responsibility for financial losses, even sharp

4    disagreement, is not malice. Nor is asserting legal claims based on those losses.

5    *Third*, punitive damages are not appropriate just because there is wealth disparity between the

6    parties, or where one party feels upset by the mere filing of a litigation. Rather, to be granted punitive

7    damages, there must be clear and convincing proof of conduct that is itself malicious, oppressive, or

8    fraudulent. *Looney v. Superior Court*, 16 Cal. App. 4th 521 (1999) For the reasons set forth above,

9    Plaintiff has utterly failed to satisfy her burden here to demonstrate any "malicious, oppressive"

10   conduct. And the only "fraudulent" conduct here was that of Defendant, who claimed to be acting in

11   Plaintiff's best interests, but was actually helping destroy $80 million of value and taking a hidden

12   kickbacks for that privilege.

13   Because Defendant cannot establish an underlying tort and cannot produce clear and

14   convincing evidence of the requisite mental state, her claim for punitive damages fails as a matter of

15   law and should be dismissed.

16   **VI.    CONCLUSION**

17   For the foregoing reasons, Plaintiff respectfully requests that partial summary judgment be

18   granted in her favor.

19   Dated: December 17, 2025              **MCDERMOTT WILL & SCHULTE LLP**

20

21                                        By:    */s/ Julian L André*

22                                               JULIAN L. ANDRÉ
                                                 TODD HARRISON
23                                               JOSEPH B. EVANS

24                                               Attorneys for Plaintiff
                                                 TAYLOR THOMSON
25

26

27

28

MCDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 11-6.2

Pursuant to Local Rule 11-6.2, the undersigned, counsel of record for Plaintiff and Counterclaim Defendant Taylor Thomson, certifies that this brief is approximately 24 pages long, exclusive of title page, table of contents, table of authorities, signature block, and this Certificate of Compliance, which complies with Rule IX(D) of the Civil Standing Order of this Court.


Dated: December 17, 2025                    By:      */s/ Julian L André*

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
(No. 2:23-cv-04669-MEMF-MAR)

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles