1  Ashley Richardson

2  25399 Markham Ln,

3  Corral De Tierra, CA 93908

4  (310) 490-2476 |

5  ashrichardson@mac.com

6

7  IN PRO PER

8  UNITED STATES DISTRICT COURT

   CENTRAL DISTRICT OF CALIFORNIA

9

10

11  TAYLOR THOMSON,                          Case No.: 2:23-cv-04669-MEMF-MAR

12          Plaintiff and Counterclaim

13  Defendant                                DEFENDANT/COUNTERCLAIMANT

14  vs.                                      ASHLEY RICHARDSON'S OPPOSITION

15  ASHLEY RICHARDSON,                       TO PLAINTIFF'S MOTION FOR PARTIAL

16          Defendant and Counterclaim       SUMMARY JUDGEMENT

17  Plaintiff

18

19

20  **I. INTRODUCTION**

21

22          Plaintiff's Motion for Summary Judgment ("MSJ") should not survive the first

23  page. Procedurally, it was filed in clear violation of Local Rule 7-3 and Judge Frimpong's Civil

24  Standing Order after a year-long pattern of discovery obstruction and timing games that boxed a

25  self-represented defendant out of the summary judgment process. Substantively, it ignores sworn

26  testimony, misstates the record, and asks this Court to resolve sharply disputed issues of fact

27  about what Taylor Thomson ("Thomson") said, what actually happened in the cryptocurrency

28

DEFENDANT/COUNTERCLAIMANT ASHLEY RICHARDSON'S OPPOSITION TO PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGEMENT -                                            1

FILED
CLERK, U.S. DISTRICT COURT
12/10/2025
CENTRAL DISTRICT OF CALIFORNIA
BY _____ GSA _____ DEPUTY
DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

portfolio, and what that conduct did to Ashley Richardson's ("Richardson") life, reputation, and mental health.

On the merits, this is not a case where there is "no evidence." A reasonable jury could conclude that:

1. Thomson published defamatory statements to multiple third parties—including, at minimum, Shiro Gutzie, director Catherine Hardwicke, Thomson's daughter Madeline, and other members of the parties' small COVID-era social circle—accusing Richardson of having taken a "secret commission," a "hidden kickback almost a million dollars," having "stolen" from Thomson, and having committed "fraud" with respect to Thomson's cryptocurrency holdings;

2. Those statements were false or grossly misleading, because even Thomson admits she does not know whether Richardson ever received any money or benefit at all from the alleged "finder's fee," and that her "hidden commission" narrative is based on her own "speculation" and interpretation—not on evidence that Richardson pocketed secret profits;

3. Those accusations and communications destroyed Richardson's social and professional network, particularly in the tightly interwoven pandemic years, leading to the abrupt loss of key relationships and reputational standing in the entertainment, tech, and crypto communities; and

4. Thomson's overall pattern of conduct—pressuring an untrained, medically vulnerable friend into managing a nine-figure, hyper-volatile crypto portfolio, relentlessly demanding high-risk trades, then scapegoating her with accusations of fraud, theft, and secret kickbacks and socially isolating her when the market crashed—was extreme and outrageous, and caused the profound, enduring emotional and physical harm Richardson and Michele Fleury describe.

On this record, summary judgment is improper for at least two independent reasons:

1. Procedurally, the Motion must be stricken or denied for failure to comply with Local Rule 7-3 and the Standing Order, combined with a year of calculated obstruction around

DEFENDANT/COUNTERCLAIMANT ASHLEY RICHARDSON'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGEMENT -                                                                                    2

Thomson's deposition that deprived Richardson of any fair chance to file her own dispositive motion or to meaningfully oppose Plaintiff's.

2. Substantively, there are genuine disputes of material fact on every element of defamation, IIED, and punitive damages. The Court cannot resolve those credibility and factual disputes on summary judgment.

3. The Motion should be struck or, at minimum, denied in its entirety.

## II. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT MUST BE STRICKEN OR DENIED FOR PLAINTIFF'S BLATANT VIOLATION OF LOCAL RULE 7-3 AND THE COURT'S CIVIL STANDING ORDER

Plaintiff's MSJ was filed in direct, irrefutable violation of Judge Frimpong's Standing Order and Local Rule 7-3. The failure to comply was not a technical oversight. It was the predictable culmination of a year-long pattern of procedural gamesmanship, strategic delay, and prejudicial timing that has repeatedly exploited the resource imbalance between a billionaire plaintiff represented by a large firm and a pro se defendant.

**Judge Frimpong's Standing Order is clear:** "Counsel for the parties shall meet and confer pursuant to Local Rule 7-3… The parties must discuss in real time all issues to be raised in the motion, as well as the law and evidence relevant to those issues… The Court may strike or outright deny a motion… if counsel fails to meet and confer in good faith. Moreover, if the briefing reveals that the parties have not sufficiently conferred… the motion shall be stricken."

This requirement applies to "any motion," including Rule 56 motions. Nothing in the Standing Order exempts summary judgment. Plaintiff simply ignored it.

**No Real-Time Meet-and-Confer Occurred Regarding This MSJ**

Local Rule 7-3 and the Standing Order required Plaintiff to:

a. contact Defendant before filing,

DEFENDANT/COUNTERCLAIMANT ASHLEY RICHARDSON'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGEMENT - 3

b.  engage in a real-time discussion (phone or Zoom),

c.  "discuss thoroughly" the issues, law, and evidence, and

d.  do so early enough to meaningfully affect the motion.

Plaintiff's counsel did none of these things.

The only pre-filing "communication" regarding this MSJ was an email sent at approximately 11:31 p.m. on November 6, 2025, attaching a fully drafted MSJ brief and stating: "Please find attached our portions of our Motion for Summary Judgment. Please return your portions within 14 days." (Richardson Decl. ¶¶ 2–3 & Ex. ___.)

That email: proposed no call; identified no issues for discussion; raised no legal authorities or evidence for debate; did not mention Local Rule 7-3; and did not attempt any "potential resolution."

There was no telephone conference. No Zoom. No substantive discussion at all. There was only unilateral, midnight service of a finished dispositive brief.

Calling that "compliance" with Local Rule 7-3 and the Standing Order empties those requirements of all meaning. Under the express language of the Standing Order, this alone is grounds to strike or deny the Motion.

**Plaintiff's "Futility" Excuse Is Refuted by the Record**

Plaintiff attempts to excuse its failure by asserting that further attempts to meet and confer would have been "futile" because Defendant supposedly "eschews" the process. Local Rule 7-3 contains no futility exception, and courts in this District routinely reject post-hoc futility justifications when parties simply skip the required conference.

Even if futility were a valid theory, it is squarely contradicted by the record in this case. As detailed in Richardson's declaration and prior filings:

1.  July 29–31, 2025: Richardson wrote "pursuant to our obligation to meet and confer" about Plaintiff's deficient document responses, identified specific categories of withheld materials, and requested Plaintiff's "earliest available for a meet and confer, no later than EOD Wednesday July 30th." Plaintiff did not schedule a conference; instead, counsel

responded with accusations that Richardson had "no evidence" and was "wholly ignor[ing] your discovery obligations." (Richardson Decl. ¶ 6 & Ex. __.)

2. Early May 2025: Plaintiff's counsel offered a narrow window on May 7 to meet and confer. Richardson immediately confirmed she was available at 3:00 p.m. Eastern and asked counsel to "confirm today's meet and confer at 3pm EST, and the best method to contact." (Richardson Decl. ¶ 7 & Ex. __.)

3. September 2025: When Plaintiff's counsel circulated a premature Local Rule 37 joint stipulation draft without having held any Local Rule 37-1 conference, Richardson responded by quoting the rule, explaining why the draft did not start her seven-day clock, and saying she "remain[ed] available and willing to meet and confer in good faith" while proposing alternative dates and times. (Richardson Decl. ¶ 8 & Ex. __.)

These are not the actions of someone who "eschews" meet-and-confers. They are the actions of a pro se litigant actively trying to comply, faced with a represented party that repeatedly weaponized timing and avoided direct engagement.

Plaintiff's "futility" narrative is not only unsupported; it is affirmatively refuted by the written record.

**Plaintiff's Counsel Had Seven Hours In-Person With Defendant and Still Did Not Attempt to Confer**

On October 28, 2025, Richardson sat for her own deposition in Plaintiff's San Francisco offices for over seven hours. At least four members of Plaintiff's legal team were physically present. (Richardson Decl. ¶ 4.)

During that day:

a. counsel spoke casually with Richardson about her drive from Carmel,

b. discussed where she lived, and

c. conversed in hallways, elevators, and on breaks.

At no point did anyone:

a. mention a contemplated Motion for Summary Judgment,

b. raise any Rule 56 issues,

c.  suggest topics for discussion, or

d.  attempt to schedule a Local Rule 7-3 conference.

For counsel to spend a full day with a self-represented litigant in their own offices—days before a dispositive motion—and say nothing about a forthcoming MSJ, while later claiming futility, is powerful evidence of intentional non-compliance, not good-faith effort.

**Plaintiff's Year-Long Obstruction of Thomson's Deposition Created Structural, Irreparable Prejudice Around Summary Judgment**

The Local Rule 7-3 violation did not occur in a vacuum. It sits atop a year of calculated obstruction around Thomson's deposition that:

a.  pushed the key party-opponent deposition to the very end of the MSJ schedule,

b.  ensured that Richardson had no realistic opportunity to file her own MSJ, and

c.  deprived her of the transcript necessary to meaningfully oppose Plaintiff's Motion.

4.  As detailed in Richardson's prior motion to compel and declaration:

a.  Plaintiff resisted producing Thomson for deposition for roughly a year, forcing Richardson to seek court intervention. (Richardson Decl. ¶¶ 10–12 & Ex. ___.)

b.  Plaintiff cancelled earlier dates and then refused to offer new ones until compelled by Magistrate Judge Rocconi's order granting Richardson's motion to compel.

c.  Only then did Plaintiff finally offer a date—and the "earliest" date Plaintiff would agree to for its billionaire client was November 7, 2025.

That date set for Plaintiff's deposition was one day after Plaintiff emailed its completed MSJ draft at 11:31 p.m. on November 6,

a.  fell at the tail end of the Court's 63-day summary judgment sequence, and

b.  left no realistic time for a self-represented litigant to obtain the transcript, digest the testimony, and fold it into either her own MSJ or a fulsome opposition.

    c.  As of the filing of the MSJ, Richardson still had not received the certified transcript of Thomson's deposition and therefore could not fully cite Thomson's sworn testimony to rebut Plaintiff's "undisputed" narrative. (Richardson Decl. ¶¶ 10–14.)

The prejudice is twofold:

a.  Loss of dispositive opportunity. Under the Scheduling Order and Standing Order, filing an MSJ requires a reserved hearing date and compliance with the 63-14-7 schedule. By forcing Thomson's deposition into early November, Plaintiff ensured that Richardson could not build a factual record around Thomson's testimony in time to file her own dispositive motion.

b.  Inability to meaningfully oppose Plaintiff's MSJ. Plaintiff now asks the Court to grant summary judgment while the key party-opponent deposition remains effectively inaccessible to the pro se defendant whose rights it most affects.

c.

Rule 1's mandate for the "just, speedy, and inexpensive" determination of every action does not authorize a represented plaintiff to sandbag a self-represented opponent in precisely this way.

**In Light of the Clear Rule Violation and Prejudice, the Motion Should Be Struck or Denied**

Judge Frimpong's Standing Order authorizes this Court to:

a.  "strike or outright deny a motion" where counsel fails to meet and confer in good faith; and

b.  strike a motion where "the briefing reveals that the parties have not sufficiently conferred with respect to the issues and position(s) presented."

The record here shows:

a.  No real-time meet-and-confer for this MSJ;

b.  Only an 11:31 p.m. email attaching a finished brief and demanding that a pro se litigant "return your portions within 14 days";

c.  A documented pattern of Plaintiff resisting or weaponizing meet-and-confer efforts while Defendant repeatedly sought to confer; and

DEFENDANT/COUNTERCLAIMANT ASHLEY RICHARDSON'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGEMENT -       7

d.  A year of discovery obstruction culminating in a deposition date strategically chosen to deprive Defendant of both her own MSJ opportunity and the transcript needed to oppose Plaintiff's.

If Local Rule 7-3 and the Standing Order are to have any operative meaning, they must preclude exactly what Plaintiff has done here: ignore the mandatory process, manipulate the calendar, and then seek dispositive relief over the objections of a prejudiced pro se litigant.

Accordingly, the Court should strike or deny Plaintiff's Motion for Summary Judgment in its entirety on procedural grounds alone. In the alternative, if the Court declines to strike the Motion, it should still deny it on the merits for the reasons set forth below.

## III. LEGAL STANDARD

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome of the case under governing law, and a dispute is "genuine" if a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once that burden is met, the non-movant must set forth specific facts demonstrating a genuine dispute for trial. Id. at 324. In doing so, the Court must view the evidence in the light most favorable to the non-movant, draw all reasonable inferences in her favor, and may not weigh credibility or make factual findings. *Anderson*, 477 U.S. at 255.

Plaintiff's motion violates these basic principles by (1) treating disputed facts as "undisputed," (2) ignoring entire bodies of testimony (including Fleury's declaration and Richardson's interrogatory responses), and (3) inviting the Court to reject Richardson's account of what happened. That is improper at summary judgment.

## IV. FACTUAL BACKGROUND (MERITS FOCUSED)

### A. Thomson's escalating demands and the power imbalance

Richardson and Thomson were close friends for over a decade. For many of those years, Thomson was generous and kind. But as the cryptocurrency market took off, the dynamic changed dramatically.

Beginning in 2021, Thomson, a sophisticated investor and one of the wealthiest women in the world, pushed Richardson—who had no formal financial training and worked in creative and development roles—into the role of managing an extremely large, complex, and volatile cryptocurrency portfolio for Thomson. [Richardson Decl. ¶¶ __; Fleury Decl. ¶¶ __.]

1.  Thomson demanded that Richardson:

2.  Execute high-value trades, sometimes exceeding tens of millions of dollars in a single project;

3.  Act quickly on speculative alt-coins such as Persistence and OHM, where Thomson insisted on massive position sizes despite Richardson's repeated warnings about risk and liquidity; and

4.  Work at all hours to monitor prices, move assets, and "get it right," often keeping Richardson at her laptop up to 20 hours a day. [Richardson Decl. ¶¶ __; Fleury Decl. ¶¶ __.]

Michele Fleury, Richardson's partner of fourteen years, describes watching Richardson become increasingly consumed by Thomson's "constant requests, late-night messages, and urgent demands," and notes that Richardson became fearful that "if Taylor turned on her like she had with so many others, it would destroy her." [Fleury Decl. ¶ 21.]

### B. Thomson's pattern of scapegoating and defamatory accusations

Thomson had a documented history of "turning" on staff and friends when displeased: accusing them of theft, bad faith, or being "takers," firing them, and speaking poorly of them to others. [Fleury Decl. ¶¶ __ (re: Rand Rusher, Ron Murphy, Catherine Hardwicke, staff members, Yas, Dora, Raquel, etc.).] Richardson knew this pattern and understood that if anything went wrong with Thomson's crypto holdings, she would likely be blamed.

When the crypto market crashed in late 2021 and 2022, the fear became reality. Rather than taking responsibility for her own aggressive risk appetite and trading demands, Thomson began portraying Richardson as having "stolen" from her, "taken a secret kickback," and committed "fraud" with respect to the cryptocurrency. [Richardson Decl. ¶¶ __; Amended Counterclaim ¶¶ 3–5.]

Richardson testified that:

1. Director Catherine Hardwicke told her that Thomson had said Richardson had committed "fraud" or "theft" regarding Thomson's cryptocurrency;

2. Thomson's daughter Madeline told Richardson she was no longer speaking to her "because of what you did to my mother," and simultaneously cut off all contact;

3. Longtime mutual friend Ron Murphy, who had previously been in near-daily contact, abruptly stopped communicating, following a pattern Richardson had seen before when Thomson turned on him and others; and

4. Multiple individuals within their small pandemic-era social circle and professional network stopped interacting with Richardson without explanation, in a way that lined up exactly with Thomson's escalating accusations. [Richardson Decl. ¶¶ __; Fleury Decl. ¶¶ 16–18.]

5. This social and professional severance occurred in early 2022, long before Thomson filed this lawsuit in mid-2023, demonstrating that Thomson was spreading accusations

privately, outside of litigation, to people in the film, television, and overlapping social and business communities.

**C. The "finder's fee" and trading narrative are disputed**

Plaintiff's motion portrays the XPRT "finder's fee" as a secret, fraudulent kickback. Richardson disputes this characterization. She testifies that:

1. Any tokens allocated "to her" were part of an on-chain, project-level allocation she understood as either un-realized, non-liquid, or earmarked for charitable or project-based use;

2. She never converted those tokens to cash, never realized income from them, and never understood them to be a "kickback" at Thomson's expense; and

3. Thomson knew that philanthropic or project-related token allocations might exist and that nothing was concealed from her. [Richardson Decl. ¶¶ __.]

4.

5. Likewise, Plaintiff insists that post–March 25, 2022 trades were "unauthorized." Richardson, however, testifies that every action she took was either:

6. In direct response to Thomson's own instructions or the high-risk, aggressive strategy Thomson had previously demanded;

7. Part of managing, hedging, or unwinding existing positions in an extremely volatile market; and/or

8. Done in a good-faith effort to protect Thomson's portfolio in the absence of clear, timely, and coordinated handoff by Thomson's team. [Richardson Decl. ¶¶ __; Interrogatory Responses Nos. __.]

At minimum, there is a genuine dispute over what Richardson did, why she did it, what Thomson knew and approved, and whether any of this conduct could reasonably be characterized

as "fraud" or "theft." Those factual disputes are fatal to summary judgment on defamation and IIED.

**D. Catastrophic emotional and physical fallout**

The combined effect of Thomson's conduct—relentless trading pressure, market collapse, accusations of criminality, social shunning, and litigation—was devastating.

1. Richardson and Fleury both testify that, as a direct result of Thomson's actions, Richardson:

2. Developed severe, persistent panic attacks, insomnia, and debilitating depression;

3. Became suicidal, repeatedly expressing that her life was "over" and that no one would ever trust her again;

4. Suffered CPTSD, with symptoms including ongoing hypervigilance, dissociation, emotional dysregulation, intrusive thoughts, and inability to function normally; and

5. Experienced significant physical deterioration: hair loss, worsening of pre-existing conditions, systemic inflammation, ER visits, and long-term impairment of her capacity to work. [Richardson Decl. ¶¶ __; Fleury Decl. ¶¶ 21–23; Interrogatory Responses (damages) Nos. __.]

Fleury recounts that she watched Ashley go from "confident, creative, and professionally active" to someone "emotionally devastated, chronically overwhelmed, and financially ruined," in direct connection with Thomson's escalating demands, accusations, and lawsuit. [Fleury Decl. ¶ 21.]

This is not transient upset. It is the very definition of severe emotional distress.

**V. ARGUMENT**

**A. The defamation claim presents multiple triable issues of fact**

DEFENDANT/COUNTERCLAIMANT ASHLEY RICHARDSON'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGEMENT -                                                                                      12

Under California law, defamation requires: "(a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage." *Taus v. Loftus*, 40 Cal. 4th 683, 720 (2007).

Plaintiff's motion attacks each element on the assumption that there is "no evidence." The record proves otherwise.

**1. There is evidence Thomson published defamatory statements to third parties outside this litigation.** Plaintiff argues that Richardson cannot identify "any specific statement," "any witness," or "any document," and that the claim relies only on "speculation and rumor." That is simply false.

Thomson herself admits she told Shiro Guzie that Richardson had taken a "secret commission or hidden kickback" shortly after speaking to Tushar in July 2022. (Thomson Dep. 289:1–3, 11–14; 290:2–8.) That is direct evidence of publication to a specific, identified person in their overlapping social and professional circles.

In her own deposition, Thomson also admitted that she repeated the "secret kickback" accusation to director Catherine Hardwicke in a purely social, non-litigation setting. When asked whether she had discussed the allegations against Richardson with Ms. Hardwicke, Plaintiff testified that she saw Hardwicke in London and told her that Richardson had been "managing my crypto because I trusted you and I bought a coin, which, unbeknownst to me, you had a secret commission." (Thomson Depo. 223:8–12.) Plaintiff had just described those same allegations as including "a secret kickback that was not disclosed" and a "hidden fee," which she confirmed she had discussed with her daughter and with Ron Murphy as "everything in the complaint." (Thomson Depo. 221:18–25; 222:6–13.) Taken together, this testimony is an admission that Plaintiff published to at least three third parties—including Hardwicke, a prominent director in Richardson's industry—the core defamatory charge that Richardson secretly took a commission or "kickback" at Plaintiff's expense. That is direct, non-hearsay evidence of extrajudicial publication of the precise defamatory gist at issue.

DEFENDANT/COUNTERCLAIMANT ASHLEY RICHARDSON'S OPPOSITION TO PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGEMENT -                                                    13

In her declaration and interrogatory responses, Richardson testifies that prior to the filing of any lawsuit:

a. Catherine Hardwicke, a director and longstanding friend and collaborator, told Richardson that Thomson had said Richardson had committed fraud or theft in connection with Thomson's cryptocurrency. This is a concrete publication to a specific person in the film/TV industry. [Richardson Decl. ¶¶ __.]

b. Madeline Thomson (Plaintiff's daughter) told Richardson that she was no longer speaking to her "because of what you did to my mother." Given the timing—after the crypto crash and during Thomson's escalation against Richardson—a jury can reasonably infer that Madeline learned from Thomson that Richardson had wronged her financially, i.e., that she had stolen or committed fraud. [Richardson Decl. ¶¶ __.]

c. Ron Murphy, who had been a close mutual friend and part of Richardson's daily support system, abruptly cut off contact in the same window when Thomson was turning on Richardson, and after a long pattern in which Thomson had talked negatively about Ron's finances and status. [Richardson Decl. ¶¶ __; Fleury Decl. ¶¶ 16–18.]

Fleury's declaration corroborates that, once Thomson turned on Richardson, an entire small social circle evaporated, including Hardwicke, Ron, and others, and that this mirrored the pattern she had observed many times when Thomson decided someone had "wronged" her. [Fleury Decl. ¶¶ 16–18.]

This is more than enough to create a triable issue as to publication. Plaintiff may dispute how many statements were made, their exact wording, or whether additional witnesses exist, but that is a classic credibility issue for a jury.

Plaintiff's reliance on the litigation privilege (Cal. Civ. Code § 47(b)) also fails at summary judgment because the key publications predate the lawsuit by over a year and occurred in purely social and professional contexts, not in pleadings, filings, or litigation communications. The severing of Richardson's relationships with Madeline, Ron, and others occurred in spring 2022, while Plaintiff's complaint was not filed until mid-2023. A reasonable jury could—and almost certainly would—conclude that these publications were extrajudicial, unprivileged statements, not shielded by § 47(b).

Whether particular statements fall within the privilege depends on context and purpose. On this record, the Court cannot conclude as a matter of law that every defamatory statement was made "to achieve the objects of the litigation" or in connection with judicial proceedings. That, again, is a jury question.

**2. A reasonable jury could find the statements false**

Plaintiff contends that any statement that Richardson stole, committed fraud, or took a secret kickback must be "true" as a matter of law. This is exactly the kind of disputed factual issue Rule 56 forbids courts from resolving at summary judgment.

Richardson directly disputes the core accusations:

a. She never "stole" from Thomson. Every trade she executed was either (a) at Thomson's explicit direction, or (b) a good-faith effort to manage the portfolio in line with Thomson's aggressive risk profile. [Richardson Decl. ¶¶ __.]

b. She never "conspired to defraud" Thomson. There is no evidence of any scheme, misrepresentation, or intent to deceive.

c. She never secretly profited at Thomson's expense. Any Persistence-related token allocation was not understood or used as personal compensation or clandestine profit. It was never realized as income, never converted to cash, and never "kicked back" from Thomson's purchase price. [Richardson Decl. ¶¶ __.]

Whether the XPRT allocation is properly called a "finder's fee," a "kickback," a "charitable allocation," or something else is a disputed fact. So is whether Richardson's post–March 25, 2022 trades were "unauthorized" or reasonably undertaken in the chaotic handoff of a highly volatile portfolio.

The truth or falsity of the accusation that Richardson "stole," "took a secret kickback," or "committed fraud" cannot be decided on this record as a matter of law. The motion should be denied for that reason alone.

**3. Accusations of fraud and theft are defamatory per se and inherently damaging**

DEFENDANT/COUNTERCLAIMANT ASHLEY RICHARDSON'S OPPOSITION TO PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGEMENT -                                    15

There is no serious dispute that accusing someone of "fraud" and "theft" in their profession is defamatory. Such accusations impute criminal conduct and professional dishonesty and are therefore defamatory per se. They have a natural tendency to injure and require no special showing beyond publication and falsity.

Here, the statements were made in precisely the communities—film, television, and tech/crypto—where Richardson's reputation and livelihood were rooted. To be labeled a "fraudster" and "thief" in those circles is career-ending. A jury could readily find the statements defamatory.

**4. Richardson has presented evidence of causation and damages**

Plaintiff argues that Richardson has "no evidence" linking any statement to any damage, and that her career was destroyed solely by COVID. The record, viewed in Richardson's favor, tells a different story.

Richardson testifies that:

a. Her small, pandemic-era social circle—which had become her primary community and professional network—collapsed abruptly after Thomson began accusing her of fraud and theft. These included long-standing ties with Thomson's daughter Madeline, mutual friend Ron Murphy, and director Catherine Hardwicke. [Richardson Decl. ¶¶ ___.]

b. Contacts in the entertainment and tech communities stopped responding, projects stalled or evaporated, and Richardson's reputation as trustworthy and reliable was destroyed.

c. Potential consulting and development opportunities in the six-figure range were lost or never materialized because people no longer trusted her. [Interrogatory Responses – Damages Nos. ___.]

Fleury independently observed this collapse: "once Taylor turned on Ashley all her closest friends followed suit," and Ashley's support system and social circle "evaporated." [Fleury Decl. ¶ 16–18.]

A jury may ultimately debate the exact dollar value of those losses, but at summary judgment, the record easily supports a finding that Thomson's statements were a substantial factor in causing both reputational and emotional harm.

At minimum, the defamation claim presents multiple triable issues of fact: who heard what, what they were told, whether it was true, whether the privilege applies, and how those statements affected Richardson's life and career. Summary judgment is improper.

**B. The IIED claim likewise presents classic jury questions**

Plaintiff argues there is "no evidence" of extreme and outrageous conduct, intent/recklessness, severe distress, or causation. As set forth below, each element is supported by ample evidence.

**1. A jury could find Thomson's conduct extreme and outrageous**

Conduct is "extreme and outrageous" when it is "so extreme as to exceed all bounds of that usually tolerated in a civilized community." It is not limited to insults or rude words; courts consider the totality of circumstances, including power imbalance, vulnerability of the victim, and pattern of behavior.

Here, a reasonable jury could find that Thomson's conduct was extreme and outrageous because she:

a.  Placed an untrained, medically vulnerable friend in sole charge of nearly $200 million in highly volatile cryptocurrency, without any formal role, training, risk controls, or institutional backing;

b.  Demanded high-risk, complex trades at all hours, chastising or belittling Richardson when she expressed concern or attempted to slow down;

c.  Knew from years of experience that when she turned on someone and accused them of theft, their reputation and livelihood were often destroyed;

d.  Responded to a market-wide crypto crash by framing it as Richardson's "fraud" and "theft," rather than as the foreseeable risk of the aggressive strategy Thomson herself insisted on;

e.  Spread those accusations into their overlapping social and professional circles, effectively isolating Richardson at the height of the pandemic, and

f.   Then used her immense resources to sue Richardson, forcing her to defend herself pro se in a complex federal action while coping with the emotional and physical fallout.

Against the backdrop of Thomson's documented pattern of accusing staff and friends of theft and betraying them when displeased, a jury could easily see this as an abuse of power and scapegoating, not a simple "friendship gone bad." Richardson contends that Thomson's pattern of abuse of "subordinates" will be admissible under Federal Rule of Evidence 404(b), as evidence of Thomson's motive and intent.

This far exceeds "mere insults, indignities, threats, annoyances, petty oppressions, or trivialities."

**2. A jury could infer intent or reckless disregard**

Intent or recklessness can rarely be proven by direct admission. It is shown by circumstances and patterns.

Here, Thomson:

a.   Knew that Richardson was untrained for institutional-level asset management, yet thrust her into that role.

b.   Knew from her own behavior and history how catastrophic her accusations of "fraud" and "theft" are to a person's reputation and life.

c.   Knew that Richardson depended heavily on this small social circle and on Thomson's goodwill, particularly during COVID.

d.   Nevertheless chose to respond to losses by labeling Richardson a thief, cutting off contact, and spreading that narrative to mutual friends and colleagues.

From this, a jury could readily infer that Thomson at least acted with reckless disregard of the probability of causing severe emotional distress, if not with actual intent.

**3. Richardson's emotional distress is severe and enduring, not trivial**

As detailed above, Richardson's emotional and physical injuries are profound:

a.   Persistent panic attacks, insomnia, depression, CPTSD;

DEFENDANT/COUNTERCLAIMANT ASHLEY RICHARDSON'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGEMENT -                                                          18

b.  Suicidal ideation and collapse of basic functioning;

c.  Major deterioration in physical health and ability to work.

Fleury's declaration independently confirms these injuries, describing a dramatic transformation from a confident, highly functional person into someone emotionally shattered and financially ruined. [Fleury Decl. ¶¶ 21–23.]

No reasonable jury would view this as trivial distress. It satisfies the "no reasonable person should be expected to endure" standard.

**4. Thomson's conduct was a substantial factor in causing that distress**

Plaintiff points to COVID, pre-existing conditions, and other stressors. Those may be part of the story, but they do not break the causal chain.

a.  The record supports a clear trajectory:

b.  Thomson's demands and the crypto role escalated.

c.  The market crashed.

d.  Thomson turned on Richardson, accused her of fraud and theft, and socially isolated her.

e.  Thomson then sued her, knowing she had no means to hire counsel.

f.  Richardson's mental and physical health collapsed.

That is more than sufficient to create a jury question on causation. Even if multiple forces contributed to Richardson's distress, Thomson's conduct can still be found a substantial factor—which is all the law requires.

**C. Punitive damages cannot be adjudicated away on this record**

Punitive damages require clear and convincing evidence of "malice," "oppression," or "fraud." Cal. Civ. Code § 3294(c)(1). Whether this standard is ultimately met is almost always a jury question, not something resolved at summary judgment where all inferences favor the non-movant.

Here, a reasonable jury could find:

1.  Thomson consciously decided to shift responsibility for her own investment choices and market risk onto Richardson;

2.  She knew those accusations were false or gravely misleading, given her own role in demanding trades and shaping the strategy;

3.  She weaponized her immense wealth and social influence to socially and professionally isolate Richardson; and

4.  She then used her superior resources to prosecute a lawsuit that compounded the emotional and financial devastation she had already caused.

That is precisely the kind of "despicable conduct" a jury could find meets § 3294. At this stage, Plaintiff's request to strike punitive damages as a matter of law must be denied.

## VI. CONCLUSION

For all the reasons above, this Court should not allow Plaintiff to use a procedurally defective, factually disputed motion to extinguish a pro se defendant's claims of reputational and emotional devastation.

Plaintiff's motion rests on a version of the facts that assumes away every contested issue and ignores the sworn testimony Plaintiff and Counterclaim Defendant Taylor Thomson, in addition to Defendant and Counterclaimant and Michele Fleury. When the record is viewed—as it must be—in the light most favorable to Richardson, there are multiple genuine disputes of material fact on the defamation and IIED counterclaims and on punitive damages.

A reasonable jury could find that: Thomson *did* make defamatory statements about Richardson's alleged "fraud," "theft," and "secret kickback" to multiple third parties outside of litigation;

A.  Those statements were false or grossly misleading;

B.  They caused catastrophic reputational and emotional harm to Richardson; and

C.  Thomson's conduct, given the extreme power imbalance and pattern of scapegoating, was outrageous and carried out with at least reckless disregard for the probability of severe distress.

DEFENDANT/COUNTERCLAIMANT ASHLEY RICHARDSON'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGEMENT -                                                                          20

WHEREFORE, Defendant and Counterclaimant Ashley Richardson respectfully prays that the Court:

1. Strike or outright deny Plaintiff's Motion for Summary Judgment in its entirety for failure to comply with Local Rule 7-3 and Judge Frimpong's Civil Standing Order, including Plaintiff's failure to conduct any real-time meet-and-confer and its year-long obstruction of Ms. Thomson's deposition;

2. In the alternative, if the Court does not strike the Motion on procedural grounds, deny Plaintiff's Motion on the merits because genuine disputes of material fact exist on every element of Richardson's counterclaims for defamation, intentional infliction of emotional distress, and punitive damages;

3. Award such other and further relief as the Court deems just and proper, including but not limited to any schedule adjustments necessary to allow Richardson a fair opportunity to obtain and use Ms. Thomson's deposition transcript and other discovery wrongfully delayed by Plaintiff.

Respectfully submitted,

Ashley Richardson

Dated December 10, 2025.

_____
Ashley Richardson

**TABLE OF CONTENTS**

I.     INTRODUCTION.................................................................... 1

II.    PLAINTIFF'S MOTION MUST BE STRICKEN OR DENIED FOR
       VIOLATION OF LOCAL RULE 7-3 AND THE COURT'S STANDING
       ORDER .............. 3
       A. No Real-Time Meet and Confer Occurred ........................ 3
       B. Plaintiff's Futility Argument Is Refuted by the Record............. 4
       C. Counsel Spent Seven Hours With Defendant and Still Did Not Confer.. 5
       D. Discovery Obstruction Created Structural, Irreparable Prejudice.......... 5
       E. The Motion Should Be Stricken or Denied on Procedural Grounds.......... 7

III. LEGAL STANDARD ................................................... 8

IV. FACTUAL BACKGROUND ............................................. 9
       A. Thomson's Escalating Demands and Power Imbalance................... 9
       B. Thomson's Pattern of Scapegoating and Defamatory Accusations......... 10
       C. The "Finder's Fee" and Trading Narrative Are Disputed .......... 11
       D. Catastrophic Emotional and Physical Fallout ..................... 12

V. ARGUMENT ........................................................... 13
       A. A Reasonable Jury Could Find Defamation ........................... 13
       1. Thomson Published Defamatory Statements to Multiple Third Parties...... 1
       2. A Jury Could Find the Statements False ................................ 15
       3. Accusations of Fraud/Theft Are Defamatory Per Se........................ 16
       4. Richardson Has Shown Causation and Damages............................ 16

       B. The IIED Claim Presents Classic Jury Questions........................... 17
       1. A Jury Could Find Thomson's Conduct Extreme and Outrageous ......... 1
       2. Intent or Recklessness Can Be Inferred From the Circumstances ........... 18

**3. Richardson's Emotional Distress Is Severe** ............................... **18**

**4. Thomson's Conduct Was a Substantial Factor in Causing Harm**......... **19**

**C. Punitive Damages Cannot Be Eliminated at Summary Judgme**............. **19**

**VI. CONCLUSION**.................................................................. **21**

—

**TABLE OF AUTHORITIES**

**Cases**

**Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)** ................................. **8, 13**

**Celotex Corp. v. Catrett, 477 U.S. 317 (1986)** ....................................... **8**

**Taus v. Loftus, 40 Cal. 4th 683 (2007**.................................................... **13**

**Statutes**

**Cal. Civ. Code § 47(b) (Litigation Privilege)** ......................................... **14**

**Cal. Civ. Code § 3294 (Punitive Damages Standard)** ............................... **19**

**Rules**

**Fed. R. Civ. P. 56** ......................................................................... **8**

**C.D. Cal. Local Rule 7-3**................................................................. **3, 7**

**Other Authorities**

**Judge Frimpong's Civil Standing Order** ................................................ **3, 7**

DEFENDANT/COUNTERCLAIMANT ASHLEY RICHARDSON'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGEMENT -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANT/COUNTERCLAIMANT ASHLEY RICHARDSON'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGEMENT -                    22