FILED
CLERK, U.S. DISTRICT COURT
12/10/2025
CENTRAL DISTRICT OF CALIFORNIA
BY _____ GSA _____ DEPUTY
DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

1   Ashley Richardson, In Pro Per
    25399 Markham Ln
2   Corral De Tierra, Ca 93908
    (310) 490-2476
3   ashrichardson@mac.com

4   For Defendant/ Counter-Claimant
    ASHLEY RICHARDSON

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10  Taylor Thomson,                     Case No. 2:23-cv-04669-MEMF-MAR

11            Plaintiff,                **DEFENDANT/COUNTER-
                                        CLAIMANT'S STATEMENT OF
12      v.                              UNCONTROVERTED FACTS AND
                                        GENUINE DISPUTES**
13  Persistence Technologies BVI Pte Ltd.,
    Tushar Aggarwal, Ashley Richardson, The Honorable Maame Ewusi-Mensah
14                                      Frimpong
15            Defendants.
                                        Date: January 8, 2025
16
                                        Time: 10:00 a.m.
17
                                        Courtroom: 8B
18

19

20

21

22

23

24

25

26

27

28

Pursuant to Federal Rule of Civil Procedure 56, Central District Local Rule 56-2 and the Court's Order Re: Summary Judgment Motions, Defendant/Counter-Claimant hereby submits Appendix of Uncontroverted Facts and Genuine Disputes.

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| 1. Defendant Ashley Richardson ("Defendant") asserts that her defamation counterclaim is based on "numerous credible and consistent reports" from unnamed individuals allegedly across the film, television, cryptocurrency, and finance sectors. (Richardson Resp. to ROGs at 1-2.) | Undisputed | N/A | |
| 2. Defendant fails to identify a single person who directly heard Plaintiff Taylor Thomson ("Plaintiff") make any alleged defamatory statement. (Richardson Resp. to ROGs at 2.) | Disputed | Defendant's defamation claim is supported by specific testimony and corroborating evidence, not mere "information and belief." Richardson Decl.15–25 (statements from Hardwicke, Madeline, and others); Fleury Decl. 16–18 (observing Taylor turning on Ashley and the social circle cutting her off); Thomson Dep. 11/7/25 (admitting she told Catherine Hardwicke about an alleged "secret kickback"). | |

DEFENDANT/COUNTER-CLAIMANT'S STATEMENT OF UNCONTROVERTED FACTS
AND GENUINE DISPUTES
(No. 2:23-cv-04669-MEMF-MAR)

| | | |
|---|---|---|
| 3. Defendant provides no written statements, affidavits, or declarations from any purported witnesses supporting her defamation claim. (Richardson Resp. to ROGs at 1-3.) | Disputed | |
| 4. Defendant's description of these reports is entirely based on her own belief and information allegedly provided to her by third parties whose identities remain undisclosed. (Richardson Resp. to ROGs at 1-3.) | Disputed | Defendant has produced written communications and will submit declarations from witnesses with knowledge of Plaintiff's statements and their impact. Richardson Decl. 16–25 & Exs. Fleury Decl 16–18; Thomson Dep. 11/7/25 (re. discussions with Hardwicke about a "secret kickback"). |
| 5. Defendant identifies no direct evidence—such as emails, texts, recordings, or documents—showing that Plaintiff made any defamatory statements. (Richardson Resp. to ROGs at 1-3.) | Disputed | Defendant's claims are supported by sworn testimony and circumstantial evidence of publication and harm; direct recordings are not required to prove defamation. Richardson Decl. 17–25; Fleury Decl. 16–18; Thomson Dep. 11/7/25 (admitting she told Hardwicke about the alleged "secret kickback"); |
| 6. Defendant admitted that she only "has reason to believe" future discovery may produce supporting evidence. (Richardson Resp. to ROGs at 2.) | Disputed | While Defendant initially believes further discovery would reveal additional evidence, she now has specific testimony and deposition admissions |

- 2 -

DEFENDANT/COUNTERCLAIMANT'S STATEMENT OF UNCONTROVERTED FACTS AND GENUINE DISPUTES
(No. 2:23-cv-04669-MEMF-MAR)

| | | |
|---|---|---|
| | | supporting publication, falsity, and damages. Richardson Decl. 15–27; Thomson Dep. 11/7/25 (Hardwicke / "finder's fee" / "secret kickback"); Interrogatory Responses (First Set) Nos. 1–5 (identifying categories of recipients). |
| 7. Defendant claims her "professional and personal network" collapsed after alleged statements were made but provides no specific facts, witnesses, or documents linking the alleged statements to that collapse. (Richardson Resp. to ROGs at 1-3.) | Disputed | Defendant testifies in detail that her social and professional circle collapsed immediately after Plaintiff began accusing her of fraud and theft, and that trusted friends explicitly referenced "what you did to my mother." Richardson Decl. 18–27 (Madeline's text / "I'm not speaking to you because of what you did to my mother," Ron & others cutting off contact); Fleury Decl. 16–18 (observing Ashley's social circle "evaporate" after Taylor turned on her); Interrogatory Responses (Damages) Nos. 6–10. |
| 8. Defendant testified that Plaintiff made defamatory statements to Ron Murphy, Kevin Fitzgerald, Rand Rusher, and Catherine Hardwicke. (Richardson Depo. Tr. at 40:9-18, 46:6-18.) | Undisputed | N/A |
| 9. Defendant testified that Ron Murphy never directly | Disputed | Disputed. Defendant identifies specific individuals (including |

- 3 -

| | | | |
|---|---|---|---|
| told her that Plaintiff made any defamatory statement about her. (Richardson Depo. Tr. 40:22-41:1) | | Hardwicke and Madeline) and provides sworn testimony about what they said and how they reacted, which a jury can reasonably interpret as resulting from Plaintiff's accusations.Richardson Decl. 18–25; Fleury Decl. 16–18; Thomson Dep. 11/7/25 | |
| 10. Defendant testified that Kevin Fitzgerald never told her that Plaintiff made any defamatory statement about her. (Richardson Depo. Tr. 41:19-21.) | Disputed | Disputed. Defendant identifies specific individuals (including Hardwicke and Madeline) and provides sworn testimony about what they said and how they reacted, which a jury can reasonably interpret as resulting from Plaintiff's accusations.Richardson Decl. 18–25; | |
| 11. Defendant testified that Madeleine Thomson never directly told her that Plaintiff made any defamatory statement about Defendant. (Richardson Depo. Tr. 41:22-44:3.) | Disputed | Disputed. Defendant identifies specific individuals (including Hardwicke and Madeline) and provides sworn testimony about what they said and how they reacted, which a jury can reasonably interpret as resulting from Plaintiff's accusations.Richardson Decl. 18–25; | |
| 12. Defendant testified that she "cannot recall" if Rand Rusher told her that Plaintiff made any defamatory statement about Defendant. | Disputed | Disputed. Defendant identifies specific individuals (including Hardwicke and Madeline) and provides sworn testimony about what they | |

- 4 -

DEFENDANT/COUNTERCLAIMANT'S STATEMENT OF UNCONTROVERTED FACTS AND GENUINE DISPUTES
(No. 2:23-cv-04669-MEMF-MAR)

| | | | |
|---|---|---|---|
| (Richardson Depo. Tr. 45:23-46:1.) | | reacted, which a jury can reasonably interpret as resulting from Plaintiff's accusations.Richardson Decl. 18–25; | |
| 13. Defendant testified that she spoke with Catherine Hardwicke after this litigation started. (Richardson Depo. Tr. 47:5-12.) | Disputed | Disputed. Defendant identifies specific individuals (including Hardwicke and Madeline) and provides sworn testimony about what they said and how they reacted, which a jury can reasonably interpret as resulting from Plaintiff's accusations.Richardson Decl. 18–25; | |
| 14. Defendant testified that Catherine Hardwicke made a statement that Defendant "committed fraud and theft" but could not remember the specific statement. (Richardson Depo. Tr. 47:2-4.) | Disputed | Disputed. Defendant and Fleury both testify that Catherine Hardwicke conveyed that Plaintiff believed Defendant had committed "fraud" or "theft" with respect to Plaintiff's cryptocurrency, and Plaintiff admits she told Hardwicke that Defendant took an undisclosed "finder's fee" or "kickback." This creates a triable issue as to the nature and falsity of the statements. Richardson Decl. 20–21; Fleury Decl. 17; Thomson Dep. 11/7/25 (testimony re: conversations with Hardwicke about a "finder's fee" / "secret kickback"). | |
| 15. Defendant managed Plaintiff's cryptocurrency | Disputed in part. | Defendant did not "manage" Plaintiff's | |

- 5 -

| | | | |
|---|---|---|---|
| without compensation starting around September 2021. (Richardson Depo. Tr. 140:5-10; 170:10-13.) | | assets, nor was she ever asked, hired, trained, compensated, or formally authorized to manage anything. The term "managed" is Plaintiff's characterization, not Defendants. There was never a contract, never a discussion of any managerial role, and never any mutual understanding that I was acting as an asset manager, advisor, or fiduciary. There were increasing demands and expectations on behalf of the Plaintiff that organically evolved over time. | |
| 16. Defendant testified that Tushar Aggarwal ("Aggarwal") "was a senior representative at Persistence." (Richardson Depo. Tr. 55:17-22.) | Undisputed | N/A | |
| 17. Defendant received a "finder's fee" from Persistence Technologies BVI Pte Ltd. ("Persistence") for Plaintiff's purchases of XPRT. (Richardson Depo. Ex. 125 at 16.) | Disputed | Defendant does not dispute a portion of tokens were agreed upon to be set aside, but disputes that any such allocation was a secret "kickback" or "finders fee" was ever realized or received. | |
| 18. Defendant negotiated a purchase price of $4.94 per XPRT with Aggarwal, with $5 charged to Plaintiff and | Disputed | Defendant disputes that any such allocation was a secret "kickback". that she negotiated anything | |

| | | |
|---|---|---|
| "the remaining $.06 as a finders fee to [her] account." (Richardson Depo. Ex. 125 at 18; Richardson Depo. Tr. 274:2-12.) | | without Plaintiff's knowledge, that any accounts or wallets belonged to the "defendant" at any time. Richardson Decl. 28–38 (understanding of token allocation, no cash benefit, no intent to conceal); Interrogatory Responses (First Set) Nos. 6–9; Thomson Dep. 11/7/25 (acknowledging her own role in negotiating and approving the deal, and that she learned of the allocation before suit); Emails with Persistence / Aggarwal (showing project-level allocation and context). |
| 19. Aggarwal told Defendant that he would the XPRT finder's fee directly to her if she provided her Persistence wallet address. (Richardson Depo. Ex. 125 at 16.) | Disputed | Defendant disputes that any such allocation was a secret "kickback". that she negotiated anything without Plaintiff's knowledge, that any accounts or wallets belonged to the "defendant" at any time. Richardson Decl. 28–38 (understanding of token allocation, no cash benefit, no intent to conceal); Richardson Decl. 28–38 (understanding of token allocation, no cash benefit, no intent to conceal); Interrogatory Responses (First Set) Nos. 6–9; Thomson Dep. 11/7/25 (acknowledging her own role in negotiating and approving the deal, and that she learned of |

- 7 -

| | | | |
|---|---|---|---|
| | | the allocation before suit); Emails with Persistence / Aggarwal (showing project-level allocation and context). | |
| 20. Defendant provided her personal XPRT wallet address persistence1nxvw4rjuv7fpdj l5aa427sx88c84vy28u5akfe to Aggarwal for the finder's fee. (Richardson Depo. Ex. 125 at 40, 45; Richardson Depo. Tr. 90:22-91:4.) | Disputed | Defendant disputes that any accounts or wallets belonged to the "defendant" at any time. Richardson Decl. 28–38 (understanding of token allocation, no cash benefit, no intent to conceal); Richardson Decl. 28–38 (understanding of token allocation, no cash benefit, no intent to conceal); | |
| 21. On August 25, 2021, Plaintiff and Persistence entered into a Token Sale Agreement for Plaintiff's purchase of XPRT. (Token Sale Agreement at 1.) | Undisputed | N/A | |
| 22. Under the Token Sale Agreement, Plaintiff agreed to purchase 4,000,000 XPRT for a total price of $20,000,000, or $5 per XPRT (Token Sale Agreement at 15.) | Undisputed | N/A | |
| 23. The "finder's fee" was not disclosed in any written contract between Plaintiff and Persistence. (Richardson Depo. Tr. 57:22-58:1.) | Disputed | Defendant does not dispute a portion of tokens were agreed upon to be set aside, but disputes that any such allocation was ever concealed from plaintif or that the alleged secret "kickback" or "finders fee" was ever realized | |

DEFENDANT/COUNTERCLAIMANT'S STATEMENT OF UNCONTROVERTED FACTS AND GENUINE DISPUTES
(No. 2:23-cv-04669-MEMF-MAR)

| | | | |
|---|---|---|---|
| | | or received by Defendant. | |
| 24. Defendant's finder's fee was not disclosed to the attorneys, overseen by Defendant, that negotiated the Token Sale Agreement on behalf of Plaintiff with Persistence. (Richardson Depo. Tr. 183:14-185:5.) | Disputed | Defendant does not dispute a portion of tokens were agreed upon to be set aside, but disputes that any such allocation was ever concealed from plaintif or that the alleged secret "kickback" or "finders fee" was ever realized or received by Defendant. | |
| 25. Defendant told Persistence that the finder's fee did "not need to be spelled out in the buyers document, but just wanted to make sure that those amounts were agreed upon and clear . . . and able to be transacted in separate wallets." (Richardson Depo. Ex. 125 at 18.) | Disputed | Defendant does not dispute a portion of tokens were agreed upon to be set aside, but disputes that any such allocation was ever concealed from plaintif or that the alleged secret "kickback" or "finders fee" was ever realized or received by Defendant. | |
| 26. On August 26, 2021, Defendant caused Plaintiff to purchase 3 million XPRT for 326.09 Bitcoin from Persistence in 5 separate transactions. (Richardson Depo. Ex. 125 at 42-51.) | Disputed | Defendant did not "direct," "cause," or "instruct" Plaintiff to buy XPRT or any specific quantity. All purchase decisions— including the size, timing, and risk tolerance—were made solely by Plaintiff, a sophisticated investor with full autonomy over her own accounts. Defendant never recommended a dollar amount, never set a target position, and decision-making authority over how much Plaintiff should buy. *"At no time did I* | |

- 9 -

| | | |
|---|---|---|
| | | *recommend that Ms. Thomson buy any specific amount of XPRT or any other token. She alone chose the size and timing of every purchase."* (Richardson Decl. 30–36) |
| 27. Persistence sent Defendant 36,437.25 XPRT to wallet address persistence1nxvw4rjuv7fpdj l5aa5sx88c84vy28u5akfe. (Richardson Depo. Ex. 125 at 48.) | Undisputed | Undisputed |
| 28. On July 25, 2022, Defendant provided Plaintiff with a document titled "Taylor Thomson Digital Asset Overview" to provide an overview of Plaintiff's cryptocurrency assets. (Richardson Depo. Tr. 88:5-11.) | Disputed in part | |
| 29. Defendant did not disclose the wallet address persistence1nxvw4rjuv7fpdj l5aa427sx88c84vy28u5akfe in the document titled "Taylor Thomson Digital Asset Overview." (Richardson Depo. Ex. 3; Richardson Depo. Tr. 91:7-11.) | Disputed in part | Plaintiff's characterization is misleading. By July 2022, to the best of my recollection, the wallet Plaintiff references likely no longer held any assets. Any tokens that had previously been associated with that wallet had already been merged or transferred into Plaintiff's other cryptocurrency wallets as part of ongoing |

- 10 -

| | | portfolio management. There were no hidden assets, and no financial relevance by the time Plaintiff demanded it. Plaintiff never realized any profit from those tokens. Plaintiff's suggestion that this reflects concealment is inaccurate and unsupported | |
|---|---|---|---|
| 30. On March 25, 2022, Leigh Wang, informed Defendant that he would be taking over the administration of Plaintiff's crypto assets. (Richardson Depo. Ex. 6.) | Disputed | Disputed. Leigh's email said only that he would "take over physical custody of the wallets." It did not instruct Defendant to stop trading, did not outline a transition, and was never followed up on. Plaintiff herself admitted during her Nov 7 Deposition that she continued directing trades in April 2022, confirming she still expected Plaintiff to manage positions. | |
| 31. Defendant did not have free reign to trade Plaintiff's assets after she was informed Wang was taking over administration of Plaintiff's crypto assets. (Richardson Depo. Tr. 122:12-16.) | Disputed | Disputed. At no time was Defendant ever directed to stop trading, Plaintiff continued giving Defendant trading instructions after March 25. All trades Defendant made were done in good faith | |

DEFENDANT/COUNTERCLAIMANT'S STATEMENT OF UNCONTROVERTED FACTS AND GENUINE DISPUTES
(No. 2:23-cv-04669-MEMF-MAR)

| | | | |
|---|---|---|---|
| | | based on market conditions and her understanding of Plaintiff's directives. Claim that defendant lacked authority is contradicted by Plaintiff's own testimony. | |
| 32. After March 25, 2022, Defendant made additional trades, including futures trades. (Richardson Depo. Tr. 118:13-20.) | Disputed | Disputed as framed. I continued managing positions after March 25 because no one ever instructed me to stop, and Plaintiff continued communicating trading preferences and objectives. All trades post–March 25 were undertaken in good faith to protect Plaintiff's assets during extreme market volatility and consistent with her ongoing directives and long-standing investment strategy. | |
| 33. Defendant did not receive Plaintiff's permission to conduct trades after March 25, 2022. (Richardson Depo. Tr. 118:21-119:9.) | Disputed | Disputed. Plaintiff never revoked my authority, never instructed me to stop trading, and continued giving me trading directions in April 2022. No written, verbal, or practical restriction was ever communicated. All trades I made were undertaken with the understanding that I was still responsible for managing the | |

- 12 -

| | | | |
|---|---|---|---|
| | | portfolio, especially given Plaintiff's ongoing communications and expectations. | |
| 34. On April 14, 2022, Defendant told Aggarwal that she was "trying to get as much done as I can before I have to pass the baton," that because "I know the 1% is there, best to take advantage ;)," and gave Persistence a "gift" of staking 6 million ATOM and 2 million ETH, "while I still can give." (Richardson Depo. Tr. 129:23-130:14; Richardson Depo. Ex. 123 at 21-22.) | Disputed | Disputed as framed. The quoted message was not an admission of unauthorized trading; it reflected my ongoing good-faith efforts to manage the portfolio during extreme market volatility and in anticipation of an eventual transition that had not yet occurred. No one had instructed me to stop trading, and Plaintiff continued communicating preferences about strategy into April 2022. The message is being taken out of context and does not support Plaintiff's characterization. Plaintiff confirmed on record that she authorized the trade mentioned here in her Deposition on Nov 7 2025. | |
| 35. The market subsequently crashed causing significant losses to Plaintiff's assets that Defendant managed. (Richardson Depo. Tr. 131:9-10.) | | Disputed as framed. The losses resulted from a global cryptocurrency market crash, not from any misconduct by Defendant. The crash affected virtually every major asset class across the industry. Plaintiff's losses were | |

- 13 -

| | | | |
|---|---|---|---|
| | | the direct and foreseeable result of the high-risk investment strategy she personally selected and insisted upon, not my actions. Defendant managed the assets in good faith under extremely volatile conditions. | |
| 36. Defendant conducted a significant number of margin trades and leverage trades in an "attempt[] to hedge losses." (Richardson Depo. Tr. 131:22-133:9.) | | Disputed as framed. My testimony was not an admission of wrongdoing or unauthorized activity. Any hedging activity I undertook occurred only because the market was collapsing, and I believed — based on years of Plaintiff's guidance, expectations, and prior directives — that it was my responsibility to try to protect the portfolio at a time when Plaintiff was not communicating clearly or providing alternative instructions. | |
| 37. From 2015 to early 2020, Defendant worked for InsUrgent Media. (Richardson Depo. Tr. 21:18-22:5) | Undisputed | | |

- 14 -

| | | |
|---|---|---|
| 38. Defendant lost her job at InsUrgent after her company closed down due to COVID. (Richardson Depo. Tr. 22:1-2; 176:8-177:10.) | Undisputed | |
| 39. Defendant also started Roof Dog Digital Consulting in 2012. (Richardson Depo. Tr. 21:5-13.) | Undisputed | |
| 40. Defendant testified that her work through Roof Dog Digital Consulting was "very sporadic" and was an "umbrella under which I could do . . . side consulting gigs." (Richardson Depo. Tr. 21:7-13.) | Undisputed | N/A |
| 41. After COVID, Defendant did not work on the development projects she was working on. (Richardson Depo. Tr. 177:15-21.) | Disputed in Part | |
| 42. Defendant testified that "[t]here's no way of knowing" if she had devoted more time to the development projects that they would have become successful or lucrative. | Disputed in Part | |

- 15 -

| | | | |
|---|---|---|---|
| (Richardson Depo. Tr. 179:12-16.) | | | |
| 43. Defendant could not identify a single opportunity, job, or project that she lost due to anything Plaintiff allegedly said. (Richardson Depo. Tr. 188:3-192:17.) | Disputed | This statement is a mischaracterization of deposition testimony taken during a highly stressful moment, in response to a rapid series of questions when overwhelmed, unrepresented by counsel, and experiencing a severe perimenopause flare.<br><br>What Defendant said in the deposition was not an admission that no opportunities were lost; it reflected only that she could not, *in that moment of emotional and cognitive overload*, retrieve the names of specific individuals or projects.<br><br>In reality, Plaintiff's accusations and statements about me being dishonest or having taken "secret kickbacks" circulated within a small and interconnected professional and social community, causing reputational damage that substantially undermined multiple ongoing and potential projects. | |

| | | | |
|---|---|---|---|
| | | Therefore, SUF 43 is disputed, because it misstates the broader reality and the context in which the deposition testimony occurred. | |
| 44. Defendant has not filed income taxes after 2020. (Richardson Depo. Tr. 24:7-10.) | | | |
| 45. Defendant testified that she managed Plaintiff's cryptocurrency voluntarily. (Richardson Depo. Tr. 179:20-24; Richardson Depo. Tr. 278:1-4 ["[Q.] [Y]ou were voluntarily managing Taylor Thomson's cryptocurrency, correct? No one forced you to do it, right? A. Yes."].) | Disputed in Part | Disputed. Defendants involvement was the result of emotional pressure and urgent demands from Plaintiff—not a voluntary assumption of any managerial role. | |
| 46. Defendant testified that she "never wanted to be a paid employee of [Plaintiff's]" and was not Plaintiff's employee even though managing Plaintiff's cryptocurrency was "taking all of [her] time." (Richardson Depo. Tr. 139:17-25.) | Disputed in Part | This is taken out of context. Defendant never agreed to manage Plaintiff's assets. I declined becoming her employee because I feared damage to our relationship and never expected my help to become full-time. This SUF omits essential context. | |

- 17 -

| | | |
|---|---|---|
| 47. Defendant asserts that a statement to the Wall Street Journal that she "went to the press to get money from [Plaintiff]" was defamatory. (Richardson Depo. Tr. 193:25-194:1.) | Disputed in Part | Defendants defamation claim is based primarily on Plaintiff's own statements to third parties (including the "secret kickback" accusation), that she made to numerous sources, including third parties who spoke to the WSJ on her behalf. |
| 48. The Wall Street Journal article concerning Defendant and Plaintiff does not include a statement from Plaintiff that Defendant went to the press to get money from Plaintiff. (Dkt. 127-4.) | Disputed | The defamatory statements at issue are those Plaintiff made to third parties that spoke to the WSJ on her behalf— including the "secret kickback" allegation — not whether the WSJ printed a direct quote. |
| 49. Defendant testified that she was aware Plaintiff did not give an interview with the Wall Street Journal. (Richardson Depo. Tr. 234:24-235:2.) | Undisputed | Undisputed but irrelevant. The defamatory statements at issue are those Plaintiff made to third parties — including the "secret kickback" allegation — not whether the WSJ printed a direct quote. |
| 50. Defendant admitted that she gave an interview to the Wall Street Journal and provided it with numerous documents and communications. (Richardson Depo. Tr. 194:10-25.) | Undisputed | N/A |

- 18 -

| 51. Defendant testified that in 2012 Plaintiff "screamed and yelled" at her because she "hated" a hotel Defendant booked for Plaintiff's birthday in Palm Springs. (Richardson Depo. Tr. 202:1-24.) | Undisputed | N/A | |
| 52. Defendant testified that Plaintiff "was, by and large, during the course of our friendship, wonderful and sweet and loving." (Richardson Depo. Tr. 202:21-23.) | Disputed as incomplete and misleading | Defendant does not dispute that she used this phrase at her deposition to describe *aspects* of the friendship. However, this statement is incomplete and taken out of context. Defendant has also testified, and will testify at trial, that Plaintiff could "turn on a dime," had a recurring pattern of turning on staff and close associates, accusing them of "theft" or "fraud" when displeased, and that Defendant lived in fear of that dynamic once she was placed in charge of Plaintiff's cryptocurrency. Plaintiff's partial quote does not negate the evidence of later defamatory statements or extreme and outrageous conduct. | |

- 19 -

| | | |
|---|---|---|
| 53. Defendant testified that she always helped Plaintiff out of her own volition. (Richardson Depo. Tr. 203:1-17.) | Disputed | Defendant does not dispute that she testified she helped Plaintiff as a friend and was not physically forced. However, this SUF omits critical context. Defendant also explains that she felt intense pressure due to the extreme financial power imbalance, Plaintiff's history of turning on staff and friends, and the knowledge that if Plaintiff "turned" on her, it would destroy her life. Defendant's "volition" existed in a context of emotional, financial, and relational pressure— not as a freely negotiated, equal relationship. This does not undermine the evidence of Plaintiff's later scapegoating, defamation, and emotional harm. |
| 54. Defendant testified Plaintiff paid for a trip to Italy that Defendant attended in 2013. (Richardson Depo. Tr. 204:16-19.) | Unisputed | Undisputed that Plaintiff paid for certain travel costs on this trip. However, this is immaterial to the defamation and IIED claims. Defendant also paid for her own flights on many occasions, contributed gifts and meals as she was able, and provided |

- 20 -

| | | |
|---|---|---|
| | | substantial non-monetary contributions (logistical, creative, and emotional support). Plaintiff was a billionaire with vastly greater resources; covering trip expenses did not give her a license to later accuse Defendant of "fraud," "theft," or taking a "secret kickback," or to isolate her socially when the market crashed. |
| 55.  Defendant testified that Plaintiff paid for a trip to Italy that Defendant attended in 2014. (Richardson Depo. Tr. 206:20-207:22.) | Undisputed | Undisputed that Plaintiff paid for certain expenses on this trip. This does not negate the later defamatory statements or the extreme emotional harm caused when Plaintiff turned on Defendant. The generosity on some trips coexisted with a dynamic where Plaintiff held all the financial power and later weaponized accusations of theft and fraud against Defendant. |
| 56. Defendant testified that Plaintiff paid for a trip to Coachella that Defendant attended in 2016. (Richardson Depo. Tr. 206:3-7.) | Disputed in Part | Defendant arranged artist passes and tickets to neon carnival at Plaintiffs requests. Defendant did not want to attend the festival but Plaintiff needed a driver. This was not a free trip. |

- 21 -

| | | | |
|---|---|---|---|
| 57. Defendant testified that Plaintiff paid for a trip to Jamaica that Defendant attended in 2017. (Richardson Depo. Tr. 207:23-25.) | Undisputed | Undisputed but irrelevant. | |
| 58. Defendant testified that Plaintiff paid for a trip to the Bahamas that Defendant attended in 2020. (Richardson Depo. Tr. 209:2-4.) | Undisputed | Undisputed but irrelevant. | |
| 59. Defendant testified that Plaintiff paid for a trip to Italy that Defendant attended in 2020. (Richardson Depo. Tr. 209:5-7.) | Disputed | There was no trip to Italy in 2020 that Defendant was a part of. | |
| 60. Defendant testified that Plaintiff paid for a trip to Mexico that Defendant attended in 2021. (Richardson Depo. Tr. 212:2-6.) | Undisputed | Undisputed but irrelevant. | |
| 61. Defendant testified that Plaintiff paid for a trip to France that Defendant attended in 2021. (Richardson Depo Tr. 211:19-25.) | Undisputed | Undisputed but irrelevant. | |

- 22 -

| | | | |
|---|---|---|---|
| 62. Defendant testified that Plaintiff occasionally asked her to review business proposals that she received. (Richardson Depo. Tr. 217:12-218:6.) | Disputed | My occasional review of business proposals cannot be understood in isolation; these requests occurred in the context of a long-standing dynamic in which I felt significant pressure to comply with Plaintiff's wishes because of her volatility and history of turning on people. My participation was not evidence of free choice but of a pattern of expectation and coercive emotional pressure. | |
| 63. Defendant reviewed a business proposal from a company called CutShelf, meeting with them at a hotel for a few hours and engaging in follow-up correspondence. (Richardson Depo Tr. 218:7-18.) | Disputed | Although I met with CutShelf, this is another example of Plaintiff assigning me tasks that felt obligatory due to the power imbalance and consequences of disappointing her. It cannot be characterized as freely-chosen or without emotional pressure. | |
| 64. About 12 years ago, Defendant reviewed a business plan from a social media platform called REX. (Richardson Depo. Tr. 219:4-19.) | Disputed | This was one of many favors I performed under a dynamic where declining Plaintiff's requests often resulted in withdrawal or punishment. These examples do not reflect consent but accumulated pressure. | |

DEFENDANT/COUNTERCLAIMANT'S STATEMENT OF UNCONTROVERTED FACTS AND GENUINE DISPUTES
(No. 2:23-cv-04669-MEMF-MAR)

| | | | |
|---|---|---|---|
| 65. About 10 years ago, Defendant reviewed a business plan for Demian Dressler concerning an animal venture. (Richardson Depo. Tr. 220:2-19.) | Disputed | Again, this task occurred within the broader relational context where I felt unable to decline. Plaintiff's framing of these as small voluntary acts omits the coercive emotional backdrop. | |
| 66. Around 2013, Defendant evaluated an investment opportunity with Rossano Ferretti, a hairstylist who wanted Defendant to put in a good word to Plaintiff. (Richardson Depo. Tr. 220:20-222:6.) | Disputed | I evaluated this opportunity because I believed I was expected to, not because I had the freedom to choose. Plaintiff's history of turning on people for perceived disloyalty made refusal feel unsafe. | |
| 67. Around 2015, Defendant evaluated a business plan from Stitch Labs. (Richardson Depo. Tr. 222:13-17.) | Disputed | Same context: Taylor's requests were treated as obligations. I feared the repercussions of saying no. | |
| 68. Defendant admits that reviewing the business plans for Plaintiff was not an extreme demand. (Richardson Depo. Tr. 223:18-2.) | Disputed | My deposition answer was taken out of context. Whether a task was "extreme" is separate from whether I felt coerced to do it. Even seemingly small requests existed within a relationship dynamic where refusal was not a viable option. The items Plaintiff chose to share in this grid are selective cherry picking and a part of a much larger narrative that is omitted here. | |

DEFENDANT/COUNTERCLAIMANT'S STATEMENT OF UNCONTROVERTED FACTS AND GENUINE DISPUTES
(No. 2:23-cv-04669-MEMF-MAR)

| | | | |
|---|---|---|---|
| 69. Defendant testified that Plaintiff asked her to go to Plaintiff's Malibu house and "see what the state of the house was." (Richardson Depo. Tr. 224:3-11.) | Disputed | I performed this task because I believed it was expected of me and that refusal would have consequences. It was not a favor freely undertaken. | |
| 70. On March 19, 2021, Plaintiff asked Defendant "Would you do me a favour? Would you mind dropping into the malibu house this weekend and tidying up my closet?" (Richardson Depo. Ex. 124 at 1.) | Disputed | This message must be understood within the broader pattern of me feeling obligated to say yes to preserve the relationship and avoid being iced out, prior to March 19 Plaintiff had igored me for months because I said I could not drive her to a hyperbaric appointment after an elective facelift during the height of the pandemic. | |
| 71. Defendant replied: "Happy to do a quick walk through if you want to make sure all is well, just let me know." (Richardson Depo Ex. 124 at 2.) | Disputed | My phrasing does not reflect true voluntariness; it reflects the people-pleasing survival behavior I developed due to Plaintiff's volatility. My outward politeness does not negate the internal pressure. | |

DEFENDANT/COUNTERCLAIMANT'S STATEMENT OF UNCONTROVERTED FACTS AND GENUINE DISPUTES
(No. 2:23-cv-04669-MEMF-MAR)

| | | | |
|---|---|---|---|
| 72. Defendant testified that the Malibu house "was not ready to be shown." (Richardson Depo. Tr. 224:13.) | Disputed | My observation about the condition of the house does not mean the task was voluntary. I believed I had no choice but to help. | |
| 73. Defendant later said: "I'm fully staging the entire house😂 Don't worry - it's gonna be amazing." (Richardson Depo. Ex. 124 at 2.) | Disputed | This statement reflects my compliance, not free will. I was trying to avoid Plaintiff's anger by doing what I believed she expected of me. | |
| 74. Defendant also said later on April 3, 2021 that: "I'll help you weed out your closet anytime! . . . Just let me know - we are so easy and not at all offended." (Richardson Depo. Ex. 124 at 6.) | Disputed | As with other texts, language of helpfulness reflects the relational pressure and fear of abandonment, not a voluntary willingness. | |
| 75. Defendant also testified that she and her partner helped Plaintiff stage a house and take photos for a real estate listing. (Richardson Depo. Tr. 245:20-247:2.) | Disputed | The fact I helped stage the house further illustrates the extent to which Plaintiff expected uncompensated labor from me under pressure, not evidence of autonomy. | |
| 76. Defendant testified that she received packages for Plaintiff's daughter at her home. (Richardson Depo. Tr. 244:16-245:19.) | Disputed | Receiving packages for Plaintiff's daughter was another task I assumed because refusal felt unsafe. It supports my claim of an ongoing pattern of expectation and dependency, not voluntary participation. What is not mentioned | |

- 26 -

| | | | |
|---|---|---|---|
| | | is the volume and size of the packages, for over a month more than 2/3 of my living room consisted of Plaintiff's packages, and it became unreasonable. | |
| 77. Defendant testified that she was free to decline Plaintiff's requests and had done so, including declining to pick Plaintiff up from a hyperbaric session and to join certain trips. (Richardson Depo. Tr. 234:1-12.) | Disputed as incomplete, misleading, and taken out of the full relational context. | Defendant does not dispute that she testified she declined a request on a single occasion. Defendant disputes that this statement means she was "free" in any meaningful sense within the dynamic of her relationship with Plaintiff. This SUF is profoundly misleading because it omits the critical context: the one time Defendant said no, Plaintiff immediately turned on her and iced her out socially, triggering the very harm underlying Defendant's IIED claim. This confirmed the pattern Defendant had long feared — that any perceived disappointment would result in punishment, exclusion, or abandonment. Far from showing freedom, SUF 77 directly supports Defendant's position that she felt compelled to comply with Plaintiff's escalating demands because the consequences of declining were severe, relational, and emotionally devastating. | |

- 27 -

DEFENDANT/COUNTERCLAIMANT'S STATEMENT OF UNCONTROVERTED FACTS AND GENUINE DISPUTES
(No. 2:23-cv-04669-MEMF-MAR)

| | | | |
|---|---|---|---|
| 78. On October 13, 2024, Defendant sent Plaintiff text messages that said "Pleas [sic] settle this shit, or kill me or have me arrested, I'm fucking done." (Richardson Depo. Ex. 137 at 1; Richardson Depo. Tr. 238:19-239:11.) | Disputed as incomplete and misleading. | Defendant does not dispute that she sent the quoted text in a moment of extreme emotional crisis. Defendant disputes the implication that this message occurred in a vacuum or reflected ordinary communication. The statement was sent during a documented alcohol relapse and at a point of total psychological collapse after months of Plaintiff's accusations, social isolation, and escalating legal threats — all of which form the core of Defendant's IIED claim. Plaintiff's SUF omits the surrounding messages where Defendant wrote that Plaintiff had "destroyed" her life, that she was suicidal, and that she could not understand why Plaintiff was treating her this way. The message reflects acute distress *caused by* Plaintiff's conduct, not evidence disproving emotional harm or outrageousness. | |

- 28 -

| 79. Defendant also said: "Send someone over with a fucking gun before I speak to the press. . . . I have the fucking receipts." (Richardson Depo. Ex. 137 at 2; Richardson Depo. Tr. 239:5-11.) | Disputed as incomplete, taken out of context, and misleading | Defendant does not dispute that the quoted message was sent. Defendant disputes that it can be fairly characterized without acknowledging its context: this message was sent during a suicidal breakdown in which Defendant repeatedly begged Plaintiff to "end this," stated she wanted to die, and expressed that Plaintiff had "destroyed" her. Plaintiff selectively quotes only the most shocking fragment while omitting the surrounding statements of despair, desperation, and self-directed harm. Far from negating IIED, the message is itself evidence of the severe emotional distress Plaintiff's conduct caused. | |
| 80. Defendant also said "yOU narcissistic soscopathic [sic] fucking cunt!" (Richardson Depo. Ex. 137 at 2; Richardson Depo. Tr. 241:10-242:11.) | Disputed as incomplete and misleading. | Defendant does not deny this statement was made; she disputes the implication that it reflects her ordinary disposition or the nature of the relationship. Defendant was experiencing a psychological break involving alcohol relapse, panic, and suicidal ideation. | |

- 29 -

| | | |
|---|---|---|
| | | Plaintiff's SUF omits the surrounding messages — including expressions of love, confusion, desperation, and pleas for Plaintiff to stop harming her — which reflect the emotional devastation Plaintiff's conduct had caused. A single dysregulated outburst, sent during a breakdown, does not negate a year of emotional trauma nor does it undermine the elements of IIED or defamation. |
| 81. Plaintiff did not respond. (Richardson Depo. Ex. 137.) | Undisputed | N/A |
| 82. Defendant admitted that the text messages she sent Plaintiff on October 13, 2024 were "insanely disturbing." (Richardson Depo. Tr. 237:24-238:1 ["Q. Referencing a gun in there is a violent image, correct? A. It is . . . these text messages are insanely disturbing to me as well."]) | Disputed | Defendant acknowledges her own messages were "insanely disturbing" — because they were sent during a suicidal mental-health collapse triggered by Plaintiff's conduct. Defendant's acknowledgment of how disturbed she was at the time does not support Plaintiff's motion; it reinforces that she was in a state of severe, clinically significant distress, which is an element of IIED. Plaintiff again omits the context of this collapse and the chain of events caused by Plaintiff's |

- 30 -

| | | accusations, abandonment, and litigation threats. | |
|---|---|---|---|
| 83. Plaintiff has never sent any sort of message to Defendant like the type Defendant sent to Plaintiff on October 13, 2024. (Richardson Depo. Tr. 197:4-25.) | Disputed as irrelevant, misleading, and incomplete. | Defendant does not dispute that Plaintiff never sent similarly dysregulated messages. Defendant disputes the implication that this fact has any bearing on the claims at issue. Defendant's messages occurred during an emotional and psychological collapse, while Plaintiff's conduct involved deliberate accusations of fraud, theft, social isolation, and a billion-dollar lawsuit — actions which do not typically produce impulsive text messages but instead inflict deep, long-term psychological harm. The comparison is irrelevant: IIED focuses on the *conduct of the defendant* and its *impact* on the plaintiff, not whether the defendant ever sent | |

DEFENDANT/COUNTERCLAIMANT'S STATEMENT OF UNCONTROVERTED FACTS AND GENUINE DISPUTES
(No. 2:23-cv-04669-MEMF-MAR)

| | | | |
|---|---|---|---|
| | | distressed texts in return. | |
| 84. Plaintiff never told Defendant not to take any potential career opportunities. (Richardson Depo. Tr. 247:11-18.) | Disputed as incomplete and misleading | Defendant did not testify that Plaintiff explicitly told her not to take opportunities; rather, Plaintiff's pattern of conduct — accusations of wrongdoing, social isolation, and abrupt withdrawal of support — created a coercive environment in which Defendant reasonably believed that failing to prioritize Plaintiff or becoming unavailable would result in retaliation or abandonment. Defendant's testimony reflects her understanding of the relational stakes, not the absence of pressure. Moreover, the core of Defendant's damages arises from reputational destruction caused by Plaintiff's defamatory statements, not an explicit prohibition on taking jobs. | |

# CONCLUSIONS OF LAW

| Conclusions of Law | Relevant Facts |
|---|---|
| Defamatory and unprivileged statements were made about Counterclaimant Richardson by Counter-defendant Taylor Thomson to numerous third parties outside of the scope of these proceedings. | Facts: 2, 7-13, 14, 47-49. |
| Defamatory statements made by Counter-defendant Taylor Thomson were false. | Facts: 2, 14, 17-25, 26, 30-35 |
| As a direct and proximate result of the defamatory statements made by Counter- defendant Thomson, Counterclaimant Richardson Sustained Damages. | Facts: 7, 18-25, 29. 43, 78-83 |
| Counterclaimant Richardson can prove that Plaintiff Thomson's conduct was extreme, outrageous, or intended to cause emotional distress. | Facts: 7-13, 14, 52-77, 78-83, 77 |
| Counterclaimant Richardson can prove that she was harmed by Thomson's malicious and outrageous conduct and that she is entitled to punitive damages. | Facts: 7, 14, 17-25, 78-83, 52-77 |

Dated: December 10, 2025        **ASHLEY RICHARDSON**

- 33 -

By: _____

ASHLEY RICHARDSON

In Pro Per

- 34 -

DEFENDANT/COUNTERCLAIMANT'S STATEMENT OF UNCONTROVERTED FACTS AND
GENUINE DISPUTES
(No. 2:23-cv-04669-MEMF-MAR)