

FILED
CLERK, U.S. DISTRICT COURT
12/10/2025
CENTRAL DISTRICT OF CALIFORNIA
BY ___gsa___ DEPUTY
DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

Ashley Richardson
25399 Markham Ln,
Corral De Tierra, CA 93908
(310) 490-2476 |
ashrichardson@mac.com

IN PRO PER
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAYLOR THOMSON, | Case No.: 2:23-cv-04669-MEMF-MAR |
|        Plaintiff and Counterclaim Defendant | |
| vs. | DECLARATION OF ASHLEY RICHARDSON IN SUPPORT OF DEFENDANT/COUNTERCLAIMANT ASHLEY RICHARDSON'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGEMENT |
| ASHLEY RICHARDSON, | |
|        Defendant and Counterclaim Plaintiff | |

## <u>DECLARATION OF ASHLEY RICHARDSON</u>

I, Ashley Richardson, declare as follows:

1. I am the defendant and counterclaimant in this action and am proceeding without counsel. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently thereto.

**No Local Rule 7-3 Meet-and-Confer Occurred: Basis to Strike or Deny Plaintiff's MSJ Under the Court's Standing Order**

2. At no time prior to the filing of Plaintiff's Motion for Summary Judgment did Plaintiff's counsel request a real-time meet-and-confer conference (by telephone, Zoom, or otherwise) to discuss the contemplated motion, the issues to be raised, the governing law,

the evidence, or any potential resolution, as required by Local Rule 7-3 and Judge Frimpong's Civil Standing Order.

3. The only communication I received from Plaintiff's counsel regarding the Motion for Summary Judgment before it was filed was an email sent on November 6, 2025, at approximately 11:31 p.m. Pacific Time, attaching a completed draft of Plaintiff's opening brief and stating: "Please find attached our portions of our Motion for Summary Judgment. Please return your portions within 14 days." That email did not propose any meet-and-confer call, did not raise specific issues for discussion, and did not mention Local Rule 7-3.

4. On October 28, 2025, I spent over seven (7) hours with the Plaintiff's counsel, in person, in their San Francisco offices during the course of my deposition. At least four (4) members of Plaintiff's counsel were present throughout the day. There was ample opportunity for Plaintiff's counsel to advise me about their intended Motion for Summary Judgment or to attempt to meet and confer or find an appropriate time to do so at a later date/time. Instead, Plaintiff's counsel did nothing. They were totally silent. In addition to the time we spent on record, I had casual conversations with Josh Yim, Esq. (counsel for Plaintiff) about where he lived in Los Angeles, as well as casual conversations in an elevator with Todd Harrison, Esq. about the drive time from my home to San Francisco, including discussing the area where I lived. These conversations provided ample opportunity for a meaningful discussion or at the very least an attempt to schedule a meet and confer for something as serious as an MSJ.

5. Contrary to what counsel alleges, I have always responded as promptly as possible to any meet and confer requests, I have never refused to participate in a meet-and-confer regarding the Motion for Summary Judgment, nor did I tell Plaintiff's counsel that any attempt to confer would be futile. To the contrary, throughout this case I have repeatedly requested meet-and-confer conferences and have made myself available on dates and times proposed by Plaintiff's counsel, including in connection with discovery disputes and Rule 37 issues. Examples of those communications are attached as Exhibits __, __, and __ to this declaration.

6. For example, on July 29 and July 31, 2025, I wrote to Plaintiff's counsel "pursuant to our obligation to meet and confer" regarding Plaintiff's deficient responses to my document requests and asked counsel to provide their "earliest available for a meet and confer, no later than EOD Wednesday July 30th." Counsel did not schedule such a conference and instead accused me of having "no evidence" and "wholly ignor[ing] your discovery obligations." [cite to Ex.C & D]

7. Similarly, in early May 2025, Plaintiff's counsel offered a limited window on May 7 to meet and confer, and I immediately confirmed my availability for a 3:00 p.m. Eastern

DECLARATION OF ASHLEY RICHARDSON IN SUPPORT OF DEFENDANT/COUNTERCLAIMANT ASHLEY RICHARDSON'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGEMENT -                                                                                          2

Time conference and asked counsel to "confirm today's meet and confer at 3pm EST, and the best method to contact." [cite to Ex.G]

8. In September 2025, when counsel circulated a draft Rule 37 joint statement before any Local Rule 37-1 conference, I responded by citing Local Rule 37-2.2, explaining why their draft did not start my seven-day clock, and again stating that I, "remain available and willing to meet and confer in good faith and hope we can find a mutually workable time," then proposing alternative times later that week. [cite to Ex.H]

9. I check my email regularly and am able and willing to participate in real-time meet-and-confer conferences when requested. If Plaintiff's counsel had contacted me to schedule a call or Zoom conference to discuss the contemplated Motion for Summary Judgment, I would have participated in good faith, as I have done on prior occasions.

10. In addition, Plaintiff resisted producing Ms. Thomson for deposition for approximately a year, requiring me to file a motion to compel. Only after the Court granted that motion did Plaintiff finally agree to produce Ms. Thomson, and the earliest date Plaintiff offered was November 7, 2025 – one day after Plaintiff's counsel sent its draft summary judgment papers. As of the date of this declaration, I have not yet received the certified transcript of Ms. Thomson's deposition and therefore cannot fully incorporate her sworn testimony into my opposition to Plaintiff's Motion for Summary Judgment.

11. Plaintiff resisted producing Ms. Thomson for deposition for approximately one year. I repeatedly requested dates beginning in late 2024. Plaintiff refused or ignored those requests, and I was finally forced to file a motion to compel.

12. Only after the Court granted my motion to compel did Plaintiff offer deposition dates, and Plaintiff insisted that the earliest available date for Ms. Thomson's deposition was November 7, 2025. This was one day after Plaintiff emailed its draft summary judgment brief at 11:31 p.m. on November 6.

13. As a result of this delay, it became impossible for me to file my own motion for summary judgment. The Standing Order requires a reserved hearing date, a 63–14–7 schedule, and sufficient time to prepare a factual record. Because Plaintiff delayed Ms. Thomson's deposition until November 7, I could not obtain her testimony or transcript early enough to prepare and file a motion of my own before the motion cut-off.

14. Plaintiff's timing also prevented me from meaningfully opposing Plaintiff's Motion for Summary Judgment. As of the date of this declaration, I still have not received the certified transcript of Ms. Thomson's deposition. Her sworn testimony addresses central factual disputes. Without the transcript, I cannot properly respond to Plaintiff's claimed "undisputed facts" or cite to the record as required.

15. I believe Plaintiff timed Ms. Thomson's deposition to occur as late as possible in the summary judgment period in order to prevent me from using her testimony in either my own motion or in opposition to Plaintiff's. As a self-represented litigant, I am severely

DECLARATION OF ASHLEY RICHARDSON IN SUPPORT OF DEFENDANT/COUNTERCLAIMANT ASHLEY RICHARDSON'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGEMENT -

prejudiced by these tactics.  Furthermore, I do not believe that Plaintiff's counsel's claim of "futility" regarding the meet-and-confer process regarding Plaintiff's Motion For Summary Judgment has merit nor do I believe it is being made in good faith.


**DEFAMATION — SWORN FACTUAL STATEMENTS**
**Taylor did, in fact, make statements accusing me of fraud and theft to third parties**

16. I am aware that in her Motion for Summary Judgment, Taylor Thomson claims that I "cannot identify any specific statement" she made to any third party accusing me of fraud or theft and that my defamation claim is based only on vague speculation. That is not true. I can and do identify specific people, specific topics, and specific statements Taylor made about me to third parties outside this litigation.

17. In or about early 2023, after not hearing from highly regarded Film/TV director Catherine Hardwicke ("Twilight") for roughly a year despite our previously close relationship, I reached out to her directly to ask what had happened. Catherine and I had collaborated on several projects over the years; she had been both a professional contact. In 2012-2013 I worked as a digital media consultant for her Film "Plush", in 2015 we collaborated in depth on a television project titled "Sharp Teeth", in 2016 when I was working as an executive for the film and television company Insurgent Media, I brought Cat in to direct a project we had optioned "Three Little Lies". I relied on Cat as a professional colleague and trusted friend. When we spoke, Catherine told me, in substance, that Taylor had said I had "taken a secret kickback" and that I had essentially stolen from her in connection with the Persistence/XPRT transaction and other cryptocurrency trading. Catherine referenced Taylor's portrayal of me as dishonest with Taylor's money, and as someone who had betrayed Taylor's trust financially.

18. The way Catherine described it, Taylor conveyed that I had acted in a deceptive, self-interested way by taking money for myself without Taylor's knowledge. Catherine communicated that she was deeply disturbed by what Taylor had told her about me and that this was why she had pulled away from me. Prior to Taylor's statements, Catherine and I had a long-standing professional rapport, and there had been no conflict between us. The only new variable was Taylor's accusation that I had committed fraud or theft with Taylor's cryptocurrency.

19. In the period from approximately late 2021 through 2023, I received multiple, separate reports from individuals in my professional network that Taylor was telling people I had "stolen from her," "taken her money," "taken a secret kickback," or otherwise acted dishonestly with her cryptocurrency. These individuals included people in the film and television community, members of our shared social circle, and people connected to the

DECLARATION OF ASHLEY RICHARDSON IN SUPPORT OF DEFENDANT/COUNTERCLAIMANT ASHLEY RICHARDSON'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGEMENT -                                                                                                          4

crypto and tech space. The reports were consistent with one another: that Taylor was telling people I had committed fraud, taken undisclosed money, or mishandled her assets for my own benefit.

20. Some of these individuals were unwilling to become formally involved or be pulled into litigation with a billionaire, but that does not change the fact that they told me, explicitly, that Taylor had described me as having stolen from her, taken a "secret kickback," or committed fraud with her cryptocurrency. These were not vague impressions; they were direct communications to me that Taylor had accused me of criminal conduct.

21. Prior to the filing of this lawsuit, I also learned that Taylor had told mutual acquaintances and members of our social circle that I had "taken her money" and "stolen from her." These people relayed Taylor's statements back to me, and it was clear from their behavior that they believed Taylor's version and now saw me as someone who had betrayed her financially.

22. In all of my years of knowing Taylor and in all of my dealings with her cryptocurrency, I never told anyone, including Taylor or any third party, that I had taken any secret or undisclosed payment from the XPRT purchase or any other transaction, because no such payment was ever received by me. The way Taylor has characterized my conduct—as if I secretly profited behind her back—is false, as more fully explained below.

23. To be absolutely clear: Taylor did make statements to third parties, outside this lawsuit, accusing me of fraud, theft, and taking a secret kickback. Those statements were repeated back to me by people who heard them directly from Taylor, including Catherine Hardwicke. Her assertion in the MSJ that no such publication exists is false.

**Taylor's accusations of fraud, theft, and a "secret kickback" are false**

24. In August of 2021 I helped facilitate Taylor's purchase of XPRT and was the principal contact with Persistence, but I had no authority or discretion with respect to Taylor's decision to invest or the amount she invested. Taylor decided the amount of XPRT to purchase on her own, and she ignored my recommendation that she purchase less because the investment was risky

25. When Taylor decided to purchase XPRT, while the two of us were having dinner at Nobu Malibu in early August of 2021, I proposed to Taylorthat I receive a finder's fee based on her purchase. I also proposed that I would vest the tokens and that the fee would be contingent on her investment being profitable after the one year vesting period. Taylor agreed and was enthusiastic about the idea of me sharing in the success of the investment.

DECLARATION OF ASHLEY RICHARDSON IN SUPPORT OF DEFENDANT/COUNTERCLAIMANT ASHLEY RICHARDSON'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGEMENT -                                                                                                    5

I remember clearly that after that exchange Taylor would say to me that I could buy the dinners once I was rich.

26. As Taylor's XPRT investment grew, I became uncomfortable and let her know that any additional "finders fee" should be used for a philanthropic project. We discussed the possibility of something we were both passionate about, a sanctuary for wild horses that would otherwise be sold for their meat.

27. Taylor's statements that I "stole" from her, "took a secret kickback," or defrauded her in connection with her cryptocurrency are false. I never stole from Taylor, never secretly profited from her investments, and never entered into any arrangement with the intent to deceive or deprive her of money. At no time did I understand or treat those tokens as a personal, secret payment for myself in the way Taylor now implies.

28. At the end of the one year vesting period, in the summer of 2022 after the crypto markets had collapsed, the tokens had lost almost all of their value. At no time were the tokens converted into realized income, and they never used for my personal benefit. They did not result in me receiving usable money. They were not a secretly pocketed "fee" like the MSJ suggests.

29. From the time we began discussing blockchain-based philanthropy and social-impact projects, Taylor and I talked multiple times about the possibility that certain token allocations might be set aside for charitable initiatives, collaborative projects, or future development. Any suggestion that I was secretly hiding assets from her is completely inconsistent with the nature of those conversations and with how I actually behaved.

30. I did not negotiate, demand, or receive any cash, wire transfer, or realized monetary "finder's fee" for myself in connection with this transaction or any other transaction for Taylor. My role was to help implement what Taylor wanted, not to secretly extract personal profit.

31. When I later prepared a summary of Taylor's crypto holdings in July 2022, I did so at her request and under significant time pressure. That summary was not a forensic accounting of every wallet or theoretical token allocation. It was never intended to be a full **audit of all purchases made to date,** and did not reflect every technical aspect of every project. It reflected the categories and assets Taylor asked me to prioritize. It was not an effort to hide anything.

32. At no point did I intentionally or knowingly conceal a real, realized "finder's fee" from Taylor, because I did not receive a secret, realized finder's fee in the first place. Her characterization of this as a hidden kickback is false.

33. Likewise, the generalized allegation that I "stole" from her or "took her money" is false. Any losses that occurred in her portfolio were the result of market conditions, the extreme volatility of cryptocurrency, and aggressive strategies Taylor herself pushed for—not because I misappropriated funds or secretly took money.

**Taylor initiated, approved, and directed many of the trading activities now labeled "unauthorized"**

34. From 2021 through early 2022, Taylor was an active, driving force behind her own cryptocurrency strategy. She was not a passive, uninformed investor. She was extremely involved, watched the markets closely, and constantly pushed for larger positions and more exposure to certain projects.

35. Taylor frequently contacted me at all hours—by text, phone calls, and voice notes—telling me to "buy now," "get in before it moves," or "we need more of this." Many of the trades now described in the MSJ as "unauthorized" were the direct result of Taylor's urgency, instructions, and explicit desire to maximize positions.

36. In numerous conversations, Taylor made it clear that she wanted me to move quickly and to exercise initiative in executing trades where timing was critical. She repeatedly told me that she trusted me to "handle it" and wanted me to act fast so she did not "miss the move."

37. When I raised concerns about risk, position size, or the magnitude of her exposure—especially with respect to Persistence/XPRT and certain other altcoins—Taylor either minimized those concerns or framed my hesitation as a reflection of my "poverty mentality" and lack of vision. She made it emotionally difficult for me to slow things down or refuse.

38. Even after her financial manager, Leigh **Wang**, became more formally involved, Taylor continued reaching out to me directly for insight, updates, and informal assistance. The transition of formal responsibility was not experienced by me as a clean, abrupt cutoff at the time; it evolved while Taylor's expectations of me remained high.

39. I never viewed myself as having independent authority over Taylor's assets in the way a financial professional or fiduciary would. I saw myself as someone who was trying to keep up with Taylor's demands and protect her positions in a chaotic market, while under immense emotional pressure and fear of her reaction.

**My reputation was severely damaged by Taylor's statements**

40. Before Taylor began accusing me of fraud and theft, I had an established, if fragile, career in digital media, development, and consulting. I had a reputation for being creative, resourceful, and trustworthy. I was actively nurturing relationships and projects in film, television, tech, and crypto.

41. After Taylor made defamatory statements about me to people in our shared social and professional circles, my relationships and opportunities collapsed in a way that was sudden, coordinated, and unlike anything I had experienced before.

42. As described above, Catherine Hardwicke—a respected director I had worked with and deeply respected—pulled away from me and later confirmed that Taylor had told her I had taken a secret kickback and essentially stolen from Taylor. That one conversation alone sent a clear signal that Taylor's accusations had reached high-level industry contacts.

43. At the same time, key relationships in the entertainment and tech communities abruptly shifted. People I had worked with for years in development, digital strategy, and content packaging stopped responding to emails, ceased including me in group texts and project threads, and let previously active projects go completely silent. This included ongoing conversations about potential series development, digital media collaborations, and advisory roles with emerging platforms—the exact type of work I had done for years and relied on for future income. In several instances, people explicitly referenced my "situation with Taylor" or said they had "heard things" about what I had done with her money and "needed to be careful" or "couldn't get in the middle of that." In others, the timing was unmistakable: communications and opportunities that had been warm and active before Ms. Thomson's accusations simply vanished immediately afterwards, in the same tight window when my small COVID-era social and professional circle cut off contact.This included people like director Catherine Hardwicke, with whom I had ongoing creative and professional discussions before Ms. Thomson told her I had taken a 'secret kickback.' After that, our communication and any potential work together ceased completely.

44. Before Ms. Thomson began telling people that I had "stolen from her" or taken a "secret kickback," I was actively developing multiple paid consulting and development projects in the entertainment and tech space. These included work as a creative/development consultant on scripted and unscripted series, digital strategy and audience growth consulting for production companies and creators, and pitch and deck development for early-stage media/tech ventures. Several of these projects were in the low- to mid-six-figure range if they moved forward to production or full engagement. After Ms. Thomson began spreading accusations that I had committed fraud with her money, those same people told me—sometimes directly, sometimes through intermediaries—that they were "concerned," "needed to step back for now," or "couldn't risk being associated with someone being accused of defrauding a wealthy client." As a result, those consulting and development opportunities stalled or disappeared entirely. These reputational injuries did not appear randomly, nor were they explained solely by COVID-19 or general industry

DECLARATION OF ASHLEY RICHARDSON IN SUPPORT OF DEFENDANT/COUNTERCLAIMANT
ASHLEY RICHARDSON'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGEMENT -                                                                                          8

downturns. They were timed with and directly tied to Taylor's accusations. When someone of Taylor's wealth and status tells people that you stole from her, that label sticks.

45. I estimate that I lost hundreds of thousands of dollars in potential income from consulting, development, and collaboration opportunities that either evaporated or were never offered because people believed Taylor's version—that I was a thief who harmed one of the wealthiest women in the world

46. These reputational and financial harms began before the public filings in this case were widely known, which further confirms that Taylor's damaging statements were being circulated privately and informally, not just contained within privileged legal documents.

**The sudden collapse of my social circle was directly tied to Taylor's accusations**

47. During the COVID-19 pandemic and in the years immediately surrounding it, my world became very small. Like most people, I was physically isolated, and my social and emotional life centered almost entirely around a small, tight-knit circle that included Taylor, her daughter Madeleine, Ron Murphy, Catherine Hardwicke, Kevin Fitzgerald, and a few mutual friends. These people were not casual acquaintances; they were my primary community, my support system, and in many ways my surrogate family.

48. Throughout this period, I communicated with members of this circle constantly. I spoke with Madeleine nearly every day by text and voice message. Ron and I exchanged frequent messages that reflected a close friendship and mutual reliance. I intend to submit representative text message threads with Ron Murphy and Madeleine Thomson as exhibits to this declaration, which accurately reflect the emotional closeness and day-to-day nature of these relationships before things changed.

49. [Ron – directly contradicting Taylor's "not a friend" narrative] In her deposition and Motion for Summary Judgment, Taylor attempts to minimize or erase my connection to Ron Murphy by suggesting he was not really my friend. That portrayal is inconsistent with reality. The messages between Ron and me show an ongoing, personal, and emotionally intimate friendship in which we shared plans, worries, and mutual support. He was someone I trusted and relied on—especially during the pandemic when in-person social contact was limited.

50. There was no conflict or falling-out between Ron and me before Taylor's accusations about me began. We had not had any argument, financial dispute, or personal rupture. From my perspective, our friendship was active and intact—until, very abruptly, it was not.

51. [Madeleine – explicit "because of what you did to my mother"] My relationship with Taylor's daughter, Madeleine, was similarly close. For years, we spoke constantly. She

confided in me, and I was deeply involved in her life and emotional world. Our messages reflect that we communicated almost daily and that she saw me as a trusted, stable presence.

52. After the crypto market crash and after Taylor began accusing me of fraud and theft, Madeleine suddenly stopped speaking to me. When I reached out to ask what was happening, Madeleine made it clear—in substance—that she was not speaking to me "because of what [I] did to [her] mother." That statement from Madeleine is significant: she did not say she was stepping back for her own reasons or because of anything I had done directly to her; she explicitly framed it as a reaction to what she believed I had done to Taylor.

53. I never lied to Madeleine about Taylor's finances, never took money from Madeleine, and never betrayed her trust. Her choice to cut me off was plainly driven by the narrative she had received about me from Taylor—that I had somehow harmed or defrauded her mother.

54. [Abrupt, coordinated cut-off across the circle] Around the same time Madeleine stopped speaking to me, Ron Murphy also entirely withdrew. He stopped responding to messages and invitations without explanation, despite our prior closeness. Catherine Hardwicke— with whom I had an ongoing professional and personal relationship—likewise abruptly stopped responding and engaging. Kevin Fitzgerald and other mutual friends also fell silent or distanced themselves.

55. None of these people gave me a neutral, organic explanation, such as a personal conflict between us, a scheduling issue, or a gradual drift. The change was sudden, coordinated, and aligned in time with Taylor's shift from friend to accuser—when she began telling people (as I later learned from Catherine and others) that I had taken a secret kickback, stolen from her, or committed fraud with her cryptocurrency.

56. During this period, there was no other event in my life that could plausibly explain why this entire social circle, almost all of whom were closely tied to Taylor, would simultaneously cut me off. There was no scandal involving me independent of Taylor, no personal attack I had made on them, and no pattern of behavior that would cause all of them, at once, to disappear from my life.

57. [Catherine – direct confirmation of Taylor's statements] As I described in another section of my declaration, when I finally reached out to Catherine Hardwicke after many months of silence, she told me that Taylor had said I had taken a "secret kickback" and had effectively stolen from her in the Persistence/XPRT deal and other crypto activity. That conversation confirmed that Taylor was giving a specific, defamatory narrative about me to at least one key person in this circle.

58. Catherine's explanation was consistent with what I had already begun to observe: people who had been close to me and to Taylor were now treating me as if I had done something deeply wrong with Taylor's money. They were not merely "busy" or drifting away—they were acting as if I had crossed a moral line.

59. [Michele's corroboration + Taylor's pattern] The declaration of Michele Fleury, my partner of nearly fourteen years, independently corroborates what I experienced. Michele states that she "watched [my] social circle evaporate after Taylor began speaking negatively about [me]," and that once Taylor turned on me, "all [my] closest friends followed suit." That is exactly what it felt like from the inside. Michele also describes Taylor's long-standing pattern of turning on people and then speaking poorly about them—friends, staff, romantic partners, and even her daughter's boyfriends—once she decided they had wronged her.

60. Given this documented pattern, the timing of the mass withdrawal, and Catherine's direct report of what Taylor told her, I do not believe it is a coincidence that every member of my core circle connected to Taylor—including her own daughter—cut me off right after Taylor began portraying me as a thief and fraudster.

61. [Impact + reasonable inference] During the pandemic, these were essentially the only people I had. When they all disappeared—without any direct wrongdoing by me toward them—it felt like being exiled from my entire world. I lost not just friends but emotional anchors, creative collaborators, and the small community that had made an extremely isolated time bearable.

62. The impact on my mental and emotional health was severe. I went from feeling embedded in a small but meaningful community to feeling completely shunned and alone. I experienced this as a form of social and professional death—caused not by any independent misconduct on my part, but by Taylor's decision to recast me as someone who had betrayed and defrauded her.

63. Based on (a) the close, documented nature of these relationships before the market crash and Taylor's accusations, (b) the abrupt and simultaneous severance of contact afterward, (c) the explicit statement from Madeleine that she stopped speaking to me "because of what [I] did to [her] mother," (d) Catherine's direct report of Taylor's statements about a "secret kickback" and theft, and (e) Taylor's well-documented pattern of turning on people and then speaking negatively about them, I firmly believe—and submit—that my social circle did not "just evaporate." They withdrew because of what Taylor told them about me.

64. The loss of this circle, in the unique context of the pandemic and my already-fragile circumstances, was a major component of the emotional and reputational harm I suffered as a direct and foreseeable result of Taylor's defamatory statements about me.

**The collapse of my social circle occurred in early 2022 — more than a year before any
lawsuit existed, and aligned directly with Taylor's private accusations of fraud and theft**

65. One of the most critical facts in understanding my injury is timing. My social circle did
    not collapse after the lawsuit was filed in 2023, nor as a result of public allegations. The
    collapse happened rapidly and abruptly in the spring of 2022, more than a year before any
    legal action existed. At that time, nothing about Taylor's accusations had been stated in
    court filings, in the press, or through any public channel. The only way people could have
    believed that I had stolen from her or committed fraud was if Taylor privately told them
    so.

66. My daily communications with Madeleine, my extremely close relationship with Ron
    Murphy, and my consistent professional connection with Catherine Hardwicke—all of
    which were active through late 2021—shifted suddenly and without warning between
    February and May of 2022. This aligns precisely with the period when the market
    crashed, Taylor became angry about her investment losses, and she began making
    statements to others accusing me of wrongdoing.

67. For example, Madeleine, who had spoken to me nearly every day for years, abruptly cut
    contact in 2022. When I reached out to ask what had happened, she made it clear that she
    was distancing herself because of what she believed I had "done to her mother." This
    occurred well over a year before Taylor filed her lawsuit. Her statement directly ties her
    severing contact to the allegations Taylor shared with her privately.

68. Ron Murphy, another close friend, likewise disappeared from my life during this exact
    window. We had no conflict, no falling out, no disagreement. The withdrawal occurred
    *only* after Taylor began framing me as having stolen from her. The timing is
    unmistakable, and I will attach messages from my prior friendship with Ron that
    contradict Taylor's assertion that he was not my friend.

69. Catherine Hardwicke, with whom I had active creative collaboration, also stopped
    communicating during this period. When I later reached out, Catherine confirmed
    that Taylor had told her I had taken a secret kickback and stolen from her. Catherine's
    explanation tied her withdrawal directly to statements Taylor made about me *long before*
    any lawsuit existed or any litigation privilege could apply.

70. These events did not occur in 2023 or 2024. They happened in early 2022, immediately
    after Taylor began privately accusing me of misconduct. Taylor's MSJ attempts to
    characterize my defamation claim as being based solely on statements made "in
    connection with litigation." That is demonstrably false. My reputational collapse occurred
    nearly 18 months before the complaint was filed, and it happened because of

unprivileged, extrajudicial statements made by Taylor to people in our shared social and professional circles.

71. The fact that this mass severance occurred before any public allegation makes it impossible for the cause to have been the lawsuit or any litigation-related statements. There was one common denominator: Taylor's accusations. As someone known for turning on people swiftly and speaking harshly about them afterward, Taylor exercised extraordinary influence over this small social ecosystem. When she turned on me, every person within her orbit followed.

72. In the isolated, emotionally fragile circumstances of the COVID-19 era, losing my entire support system in this way was devastating. These were the people I relied on. They did not drift away gradually. They vanished all at once—after Taylor's accusations but long before any legal claim or privileged statement existed.

73. Based on the timing, the consistency of the reactions, the statement from Madeleine, the confirmation from Catherine, and Michele's direct observations, there is no reasonable explanation for this sudden, coordinated withdrawal except that Taylor told each of these individuals that I had stolen from her or defrauded her. The harm I experienced was the direct, proximate result of those statements.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – SWORN FACTUAL STATEMENTS

### Taylor's extreme and reckless conduct toward me

74. Over the course of more than a decade, Taylor engaged in a pattern of extreme, demeaning, and dehumanizing conduct toward staff, friends, and family members that I personally witnessed and that directly shaped my relationship with her. I watched her routinely accuse employees and trusted aides of "theft," "fraud," "incompetence," or "extreme negligence" over minor issues, scream at them in front of others, and then abruptly terminate them while spreading damaging stories about their character. Examples included housekeepers such as Raquel and Dora, who were labeled "thieves" over routine job-related conduct like submitting overtime or sending sheets to be professionally laundered; a long-time nanny, Yas, who was fired and repeatedly accused of grand theft and drug abuse; and other staff such as Shannon and Justin, who were called "bitch," "cunt," "liar," "useless," and blamed for "costing her millions" simply for following her instructions.

75. I also became aware, through Taylor's own statements and communications, that she had a history of illegal or covert surveillance of staff, including wiretapping phones and using hidden cameras and audio devices to monitor employees without their knowledge or

consent. She bragged about gathering information through undisclosed surveillance and then using it to fire staff or accuse them of wrongdoing while carefully avoiding putting the real reason in writing so she would not expose the illegal methods by which the information was obtained. This reinforced my understanding that Taylor had both the willingness and the tools to destroy people if she decided they had displeased her.

76. By the time Taylor's cryptocurrency demands escalated in 2021, I had already witnessed more than a decade of this pattern: idealize people, use them intensely, then turn on them with extreme hostility, public accusations, and social banishment. Because I had seen her do this repeatedly to staff and friends—including people as close to her as her daughter's boyfriends and our mutual friend Ron Murphy—I understood that if she ever decided to "turn on" me, the consequences to my life, reputation, and mental health would be catastrophic. That awareness was a constant source of fear and hypervigilance for me, and Taylor knew it because I spoke with her many times about how frightening it was to see her talk about others that way.

77. In 2021, Taylor placed me in sole physical custody of cryptocurrency assets worth up to approximately Two Hundred Million ($200,000,000) at the height of the market. These assets were stored in my personal home, not in an institutional or insured custodial environment. I repeatedly told her that this terrified me, and that if anyone became aware that those funds were under my control, I could be in serious physical danger. Her response was not to reduce the risk or move the assets; instead she told me that no one would ever suspect I had that much crypto because I was "so poor," and, in a conversation I will never forget, she smiled and asked me if I **"would be willing to take a bullet"** if armed intruders came to take her crypto. I was so psychologically conditioned and desperate to stay in her good graces that I said "yes," and then tried to explain that my greatest fear was for my partner and our dogs. She looked visibly disappointed that I would hesitate to sacrifice them. That conversation was one of the most disturbing experiences of my life and made it absolutely clear that Taylor regarded my safety—and the safety of the people and animals I loved—as expendable.

78. At Taylor's insistence, I executed a relentless volume of high-risk, high-value cryptocurrency transactions that regularly exceeded $10,000,000 at a time in extremely illiquid, low-cap coins. Because of the size of her orders, I had to place thousands of small-laddered orders, sometimes every twenty minutes for days, in order not to blow out the market. I repeatedly told her I had no formal financial training, was learning in real time, and that I was not a financial advisor. I also told her that the amounts she was pushing into particular coins—especially Persistence—were far too high and that the

risks were extreme. She dismissed my concerns, told me this was just my "poverty mentality," and said that was why I would "always be poor." The combination of huge financial stakes, total lack of institutional infrastructure, and her contemptuous response to my fear created unbearable psychological pressure that she knew I was experiencing and chose to escalate instead of relieving.

79. Taylor used her immense wealth and social power to keep me locked in this role. She made clear she did not want her family or formal advisors fully aware of the scale of her speculative purchases and therefore relied on me as an off-books operator. When her head of investments and her accountant later began demanding detailed records, I was blamed for not having audit-grade spreadsheets for thousands of tiny trades that no one had ever told me I needed to track in that way. At the same time, Taylor continued to disparage her own advisors—calling Leigh useless and accusing him of costing her "hundreds of millions"—so I was acutely aware that if she decided she had "lost" money, she would look for someone to scapegoat. That someone was me.

80. The environment Taylor created around me was one of constant crisis, fear, and emotional volatility. She called and messaged at all hours of the day and night demanding immediate purchases, transfers, or research, often while berating staff or complaining that everyone around her was incompetent or out to take advantage of her. I often worked twenty-hour days solely to keep up with her demands while turning down paid work in the film, television, and marketing industries because I no longer had the time or mental capacity to do anything else. Taylor was fully aware of this; I told her directly that her demands were causing me to lose other employment opportunities, yet she never offered to scale back, compensate me, or move the work to a professional team.

81. When the crypto market crashed in late 2021 and 2022, Taylor's behavior toward me shifted from controlling and demanding to hostile and accusatory. Despite the fact that every major allocation decision had been hers', and despite my repeated warnings about risk, she began to blame me for her losses in the same way I had watched her rewrite history and blame staff for her own choices for more than a decade. She involved her staff and advisors in pressuring me for records I did not have, while withdrawing personally and socially in a way that left me isolated, terrified, and certain that I would be the next person she destroyed to avoid facing her own role in what had happened.

82. Taylor then escalated her conduct from private blame-shifting to public, reputation-destroying accusations. Beginning in approximately November 2021 and continuing for years before any lawsuit was filed, multiple individuals from our small COVID-era social

circle and professional network separately reported to me that Taylor was telling people I had "stolen from her," "taken a secret kickback," "defrauded" her, "always had a plan," and was a "grifter" and "cunt." Shortly thereafter, long-standing relationships with people like her daughter Madeleine, our close friend Ron Murphy, and director Catherine Hardwicke abruptly ended with no explanation other than that they were no longer speaking to me "because of what [I] did to [their] mother." The timing of this social collapse exactly tracked the period when I am informed and believe Taylor was spreading these accusations—not the later filing of her lawsuit in 2023.

83. Because this all happened during the COVID pandemic, when my world had already shrunk to a very small circle of people, losing that circle overnight was emotionally shattering. These were the people I ate with, spoke to daily, and relied on for community. It is not credible that an entire group of mutual friends—people who had been woven into my life for years—would spontaneously and simultaneously sever all contact absent some precipitating event or narrative. Based on what I was directly told, Taylor's long-standing pattern of turning on people and rewriting history, and the precise alignment in timing, I am informed and believe that this severance of connection was directly caused by Taylor telling them that I had defrauded and stolen from her.

84. After isolating me socially and destroying my reputation in our shared communities, Taylor filed this lawsuit accusing me of fraud and theft and has prosecuted it aggressively while knowing that I could not afford counsel and would be forced to defend myself pro se against a multi-billionaire with unlimited legal and litigation resources. She was aware of my existing health conditions, my financial precarity, and the fact that the legal costs alone could ruin me, yet she proceeded anyway, doubling down on accusations she knew—or at a minimum recklessly disregarded—were false or grossly incomplete. The lawsuit became an extension and amplification of the same pattern of character assassination, scapegoating, and exploitation I had witnessed her direct at others for years, now focused entirely on me.

### The emotional and physical impact on me

85. The cumulative effect of Taylor's conduct—placing me in sole custody of massive volatile assets; subjecting me to constant high-stakes demands; threatening my physical safety; destroying my reputation and social circle; and then filing a public lawsuit accusing me of criminal conduct—caused a profound and cascading collapse of my mental and physical health. In October 2021, at the height of the trading she demanded, I developed sudden, severe insomnia, Postural Orthostatic Tachycardia Syndrome (POTS), and mitral valve prolapse, diagnoses confirmed by specialists at Cedars-Sinai. These

conditions were accompanied by panic attacks, vertigo, near-fainting episodes, heart palpitations, and an inability to rest or recover. Prior to this period, I had never experienced anything like this.

86. At the same time, my pre-existing conditions—including diverticulitis and Ehlers-Danlos Syndrome—flared severely. I required emergency care for diverticulitis in October 2021 and March 2022 and was later hospitalized for a perforated colon in June 2023 and a colon abscess in August 2025. My Ehlers-Danlos symptoms worsened significantly, leaving me in chronic pain and with reduced functional capacity. These physical crises coincided directly with the period of Taylor's most extreme demands, the market collapse, and the escalation of her accusations against me.

87. The psychological impact was even more devastating. By early 2022 I was experiencing clinical depression, severe anxiety, and suicidal thoughts for the first time in my life. I developed Complex Post-Traumatic Stress Disorder (CPTSD) as a result of months and then years of extreme pressure, sleep deprivation, reputational destruction, and the constant threat of being blamed and cast out by someone I knew had the power to ruin people. I became hypervigilant, unable to trust others, emotionally dysregulated, and often paralyzed by fear. At times I could not function in basic daily tasks, let alone pursue a career or earn a living.

88. The lawsuit and the continuation of Taylor's accusations made the emotional distress permanent and inescapable. I have spent countless hours trying to respond to filings I cannot afford a lawyer to handle, while knowing that Taylor's resources appear limitless. I lost my ability to work in the industries where I had built my career, was effectively rendered "radioactive" in certain networks, and now live with the ongoing reality that my name has been associated with fraud and theft by one of the wealthiest women in the world. The stress of this has, at times, driven me to the brink of complete emotional collapse, including a relapse after two years of sobriety when the combined weight of the breakup with my partner, my financial collapse, and Taylor's legal attacks became unbearable.

89. Before Taylor's conduct escalated, I was a confident, creative, highly functional person with a career, a social network, and a clear sense of direction. As a direct and foreseeable result of her actions, I became someone emotionally devastated, chronically overwhelmed, physically compromised, socially exiled, and financially ruined. The change in my life is not subtle or speculative; it is radical, obvious, and has been witnessed by multiple people close to me, including my former partner, Michele. In my

DECLARATION OF ASHLEY RICHARDSON IN SUPPORT OF DEFENDANT/COUNTERCLAIMANT    17
ASHLEY RICHARDSON'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGEMENT -

view, no reasonable person could look at the full pattern of Taylor's conduct and
conclude that this level of harm was anything other than the predictable, indeed
inevitable, outcome of how she chose to treat me.

**Taylor's conduct toward me was extreme, shocking, and caused severe
emotional harm**

90.  Taylor was not just a former client or investor; she was someone I considered a close
     friend for over a decade. I admired her, trusted her, and oriented huge portions of my life
     around being available to her. For someone in that position to suddenly accuse me of
     criminal behavior—knowing those accusations would spread through my small
     professional world—was emotionally devastating.

91.  Taylor used her enormous wealth, status, and influence to reframe me from a loyal friend
     and helper into a "fraudster" and "thief." She did this knowing that people around her
     would believe her, and that I had no comparable resources to defend myself or correct the
     narrative.

92.  The reversal from being included, praised, and trusted to being painted as a criminal and
     shut out of our mutual community was shocking, disorienting, and traumatic. It did not
     feel like an ordinary friendship falling out; it felt like a public execution of my character.

93.  When Taylor filed this lawsuit accusing me of fraud and theft, she knew I had no money
     to hire counsel, that I was already struggling financially and emotionally, and that
     defending myself against her and her legal team would consume my life. She proceeded
     anyway, while simultaneously spreading her version of events to people who mattered to
     my career and sense of belonging.

94.  As a direct result of Taylor's false accusations, I have experienced intense emotional
     suffering: panic attacks, insomnia, depression, severe anxiety, and episodes of suicidal
     ideation. I often woke up with my heart racing, unable to breathe, and terrified of what
     would happen next—financially, legally, and socially.

95.  My relapse on October 12, 2024, after two years of sobriety, was not random. It occurred
     in the context of the relentless pressure of this lawsuit, the collapse of my financial life,
     the breakdown of my relationship, and the feeling that Taylor had completely destroyed

DECLARATION OF ASHLEY RICHARDSON IN SUPPORT OF DEFENDANT/COUNTERCLAIMANT    18
ASHLEY RICHARDSON'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGEMENT -

my reputation and future. I was in overwhelming emotional pain that I directly associate
with Taylor's actions.

**The extreme power imbalance magnified the harm and removed my ability
to protect myself**

96. Taylor is one of the wealthiest women in the world, with immense financial, social, and
legal resources. I am not. That imbalance shaped every aspect of our relationship and the
fallout.

97. During the years I worked with her on cryptocurrency, I felt that I could not safely set
boundaries, slow her down, or disengage, because I believed that if Taylor turned on
me—as she had turned on others—it would destroy my reputation and community.
Unfortunately, that is exactly what occurred.

98. Taylor knew I depended heavily on my reputation and personal relationships to generate
work and income. She also knew I had no safety net, little stability, and fragile mental
health after years of compounded trauma. She nonetheless chose to characterize me as a
thief and fraudster to people whose opinions had enormous weight in my personal and
professional life.

99. When a person with Taylor's level of power, money, and status tells mutual friends,
colleagues, and industry contacts that you stole from her, the harm is not theoretical. It is
immediate and catastrophic. I experienced that firsthand.

**Taylor's statements and conduct foreseeably caused—and did cause—severe
emotional distress**

100.     Accusations of fraud and theft go to the core of a person's integrity. Taylor knew,
or at minimum recklessly disregarded, the likelihood that accusing me of these things
would cause severe emotional distress. She knew that my entire career depended on being
perceived as trustworthy.

101.     Following her accusations, I watched my support network disappear, my career
prospects collapse, and my sense of self shatter. The people who had once seen me as
talented and trustworthy began to treat me as radioactive. That transition was emotionally
excruciating.

102.    I developed chronic anxiety, experienced frequent panic attacks, and struggled with deep depression. There were extended periods where I could not function normally, where even basic tasks felt impossible. I lived with a constant fear that my life was effectively over and that I would never recover my reputation.

103.    These symptoms were not transient or minor. They were severe, long-lasting, and profoundly disruptive to my daily life, relationships, and ability to work.

## CAUSATION & DAMAGES

104.    I lost concrete professional opportunities, creative collaborations, and consulting work because Taylor accused me of fraud and theft. People who had previously expressed interest in working with me either cut off contact, cancelled plans, or quietly moved on after learning of Taylor's allegations.

105.    My career trajectory, which already had been shaken by the pandemic, was effectively obliterated by Taylor's conduct. There is a significant difference between industry-wide disruption and being individually branded as a thief by an ultra-wealthy, highly connected person. The latter is what happened to me.

106.    I suffered severe emotional and psychological harm as a direct result of Taylor's statements and the way she weaponized her resources against me. The panic, insomnia, profound anxiety, relapse, and trauma symptoms I experienced are not abstract—they are the real consequences of what she did.

107.    Taylor's narrative in her Motion for Summary Judgment—that she was simply a generous friend and I alone am responsible for what happened—is incomplete and false. It omits the reality of her accusations, her power, and the devastating impact her conduct has had on my life.

108.    My life, career, mental health, and reputation have been severely and enduringly damaged by Taylor's false statements, by Taylor's abuse (as set forth hereinabove) and by the extreme, outrageous, and malicious way she chose to handle the fallout from her own investment decisions.

Respectfully submitted,
Ashley Richardson, In Pro Per

DECLARATION OF ASHLEY RICHARDSON IN SUPPORT OF DEFENDANT/COUNTERCLAIMANT
ASHLEY RICHARDSON'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGEMENT -                                                                                                    20

Dated December 10, 2025.

_____
ASHLEY RICHARDSON

# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

TAYLOR THOMSON,                    )
                                   )
Plaintiff and Counterclaim         )
Defendant,                         )
                                   )
    vs.                            )   No. 2:23-cv-04669-
                                   )       MEMF-MAR
ASHLEY RICHARDSON,                 )
                                   )
Defendant and Counterclaim         )
Plaintiff.                         )
_____)

        VIDEO-RECORDED DEPOSITION OF TAYLOR THOMSON

        taken at 2029 Century Park East, Suite 1520,

        Los Angeles, California, at 10:31 a.m. Pacific

        Time, Friday, November 7, 2025, before Theresa

        JoAnn Phillips-Blackwell, CSR 12700.



```
                                                        Page 2
 1   APPEARANCES OF COUNSEL:
 2
 3   For Plaintiff:
 4                   TODD HARRISON, ESQ.
                     (Appearing in Person)
 5                   MC DERMOTT WILL & SCHULTE LLP
                     One Vanderbilt Avenue
 6                   New York, New York  10017
                     (212) 547-5400
 7
                     -and-
 8
                     JULIAN ANDRE, ESQ.
 9                   (Appearing in Person)
                     JOSH YIM, ESQ.
10                   (Appearing via Zoom)
                     MC DERMOTT WILL & SCHULTE LLP
11                   2049 Century Park East
                     Suite 3200
12                   Los Angeles, California  90067
                     (310) 551-9335
13                   jandre@mwe.com
14                   -and-
15                   CAMPBELL HERBERT, ESQ.
                     (Appearing via Zoom)
16                   MC DERMOTT WILL & SCHULTE LLP
                     22 Bishopsgate
17                   London, EC2N  4BQ
                     United Kingdom
18
19   For Defendant:
20                   ASHLEY RICHARDSON
                     (Appearing in Person)
21                   IN PRO PER
                     25399 Markham Lane
22                   Corral De Tierra, California  93908
                     (310) 490-2476
23                   ashrichardson@mac.com
24   Also Present:  Keith Farris, videographer
                     Joseph Tafolla
25                   (Both Appearing in Person)
```



```
                                                        Page 3
 1                        I N D E X

 2

 3   DEPONENT              EXAMINED BY              PAGE

 4   Taylor Thomson    Ms. Richardson              9

 5

 6

 7

 8

 9                       EXHIBITS

10

11                  (NONE MARKED)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Page 4

1       (Los Angeles, California; Friday, November 7, 2025,

2              10:31 a.m. Pacific Time)

3

4       THE VIDEOGRAPHER:  Good morning.  We are now on

5    the record.  This begins the video-recorded deposition

6    of Ms. Taylor Thomson in the matter of Taylor Thomson

7    versus Ashley Richardson.  Today's date is November 7th,

8    2025.  The time is 10:31 a.m.  This deposition is being

9    taken at the law firm Boies Schiller at 2029 Century

10   Park East in Los Angeles, California.

11      My name is Keith Farris, the legal videographer

12   and notary, of Magna Legal Services.  The certified

13   court reporter today is Ms. Theresa Phillips-Blackwell

14   of Magna Legal Services.

15      Will all counsel now please introduce

16   yourselves and state whom you represent.

17      MR. HARRISON:  You're first.

18      MS. RICHARDSON:  Yes.  My name is Ashley

19   Richardson.  Good morning.  I am the defendant and

20   counterclaim plaintiff, appearing today in pro per.

21      MR. HARRISON:  Todd Harrison for McDermott Will

22   & Schulte for Ms. Thomson.  With me is my colleague,

23   Julian Andre.  And on Zoom, not present in the room

24   right now is Campbell Herbert, also with McDermott Will

25   & Schulte.  And we may -- oh, actually, Josh Yim,



Page 5

1    another associate, is also on Zoom.

2            THE VIDEOGRAPHER:  Thank you.  Will the court

3    reporter now please swear in the witness.

4            DEPOSITION OFFICER:  Hello, everyone.  My name

5    is Theresa Phillips-Blackwell.  I'm a California

6    certified shorthand reporter, CSR No. 12700.

7            Raise your right hand, please.

8            You do solemnly state that the evidence you

9    shall give in this matter shall be the truth, the whole

10   truth, and nothing but the truth?

11           THE WITNESS:  I swear.

12           DEPOSITION OFFICER:  Thank you.

13           MR. RICHARDSON:  Ashley, I would like to put

14   something on the record.

15           MS. RICHARDSON:  Sure.  Yeah.  Absolutely.

16           MR. HARRISON:  So we sent you an email

17   yesterday about the pending request that we have in for

18   a confidentiality order.  I didn't get a response.

19           Our suggestion, just for the record, was while

20   the -- while we have a motion in for a confidentiality

21   order -- I think you have some sort of request also into

22   the Court for some sort of protective order.  I'm not

23   sure exactly what.  But we have a motion in for a

24   confidentiality order.  It's a standard -- it's based on

25   the standard Central District of California form


MAGNA ▶
LEGAL SERVICES

Page 6

1    confidentiality order.  We think it's going to get

2    entered by the Court at some point.

3         Our suggestion in email yesterday was that

4    we -- both parties agree to follow the confidentiality

5    order until there's a court decision on it, which I

6    anticipate will happen next week.

7         MS. RICHARDSON:  I don't intend to, you know,

8    disseminate the results of the deposition until that

9    happens; and then we can deal with that at that time.  I

10   think, you know, appropriate -- anything that is -- is

11   deemed improper at that -- at that -- at that time would

12   be fine with me.

13        MR. HARRISON:  Okay.  So just so we're clear,

14   our agreement is that the deposition -- the transcript

15   of this deposition will not be disseminated beyond the

16   parties until there is a court decision on the pending

17   confidentiality order --

18        MS. RICHARDSON:  Correct.

19        MR. HARRISON:  -- request?

20        Great.  Thank you very much.

21        MS. RICHARDSON:  Yes.

22        MR. HARRISON:  The other thing is we had sent

23   in a -- we have a pending request for the Court to

24   exclude certain areas of cross-examination at this

25   deposition that the Court has not ruled on yet, and the



Page 7

1    application or the request was to have a informal

2    discovery conference regarding certain categories of

3    questions that we believe are not relevant and are

4    intended to harass and intimidate Ms. Thomson.

5           So the Court hasn't ruled on that one either

6    yet; and even though the Court hasn't ruled on that,

7    we're still here today.  We want to get the deposition

8    in, get the deposition done; but we do -- you know, we

9    have put you on notice that we think that certain

10   categories are not relevant and we will consider to be

11   harassing and intimidating if they get asked or asked in

12   depth in any way.  So I just want to put that on the

13   record.

14           MS. RICHARDSON:  I -- I --

15           MR. HARRISON:  Hopefully, that's not an issue

16   today.

17           MS. RICHARDSON:  I appreciate it.  I think

18   we'll deal with it case by case.  Obviously, there's a

19   disagreement in terms of which elements are -- you

20   consider to be harassing to you and which I consider to

21   be relevant to the case.

22           So I would say again, you know, if the Court

23   deems those improper, they can come off the transcript.

24   And, you know, if things come to that point today and

25   you request Ms. Thomson not to answer, I would say you



Page 8

1   do that at your own peril with the -- knowing that there

2   could be a motion to compel to come back again.  So I --

3   I leave that to you.

4          You know, I don't think that -- I have, you

5   know, despite everything, no intention of harassing or

6   intimidating Ms. Thomson but -- but I also have a case

7   that is separate from the case that she has against me,

8   so they're two different cases, and they both have

9   merits and -- and, you know, I -- I answered all of the

10  questions that you proposed to me in my deposition; and

11  respectfully, I'm hoping we can do the same today as

12  much as possible.

13         And again, you know, if at any point we need to

14  have a break and you want to discuss with me on the

15  side, I'm happy to do that.

16         MR. HARRISON:  Okay.

17         MS. RICHARDSON:  But I just -- I just need to

18  reserve rights to protect my own -- the merits of my own

19  case as we go through this.

20         And, you know, if I do something, you know, at

21  any point that is -- I will say this to you -- improper,

22  just know I'm doing my best.  I'm not an attorney.  I

23  have spent at this point thousands of hours trying to,

24  you know, study how to be one on the side but -- but I

25  will make mistakes, like, almost definitely.



```
                                                    Page 9
 1            So, you know, I'm -- I am -- I'm happy to -- to

 2   do what is needed to -- to, you know, do the best --

 3   best of my ability.  I have no interest in harassing or

 4   intimidating you.  I -- I just want to go to the truth.

 5            So that being said, this is an awkward life

 6   moment that neither of us ever thought we would have.

 7            THE WITNESS:  No.

 8

 9                        EXAMINATION

10

11   BY MS. RICHARDSON:

12       Q.  Here we are.

13       A.  Okay.

14       Q.  Okay.  So, Ms. Thomson --

15       A.  I look at the camera.

16       Q.  That's okay.

17            Would you please state your full name for the

18   record.

19       A.  Taylor Lynne Thomson.

20       Q.  And we swore in the witness already, so we've

21   done that.  Thank you for being here today.  I know that

22   this is not an easy thing to do, having just done it

23   myself; and I just want to make sure you know you're

24   under oath --

25       A.  Yes.
```



Page 10

1          Q.   -- and so all the questions that you're -- are

2     asked to you under oath require you to be completely

3     truthful to the best of your ability.

4          A.   Understand.

5          Q.   Okay.  Great.

6               And then I just want to say -- this is a tricky

7     one -- sometimes you might head nod, and for the

8     record --

9          A.   I'll be verbal.

10         Q.   Great.  That's it.

11              Will you please let me know if you don't

12    understand a question as we go?

13         A.   (No audible response.)

14         Q.   Thank you.

15              And, Ms. Thomson, if you need to take a break

16    at any time --

17         A.   Okay.

18         Q.   -- you just let me know.

19         A.   Thank you.

20         Q.   Okay.  So that's a yes, you -- you will?

21         A.   I got it.

22         Q.   Okay.  And the only thing I'm going to ask is

23    that if you want to take a break, you wait until after

24    you finish answering the question so if there's a

25    pending question, you wait until it's over and then you



Page 11

1    can --

2        A.  Right.

3        Q.  -- take a break at any time.  Okay.  Great.

4            MR. HARRISON:  Can I just say, unless you have

5    a question about a privilege issue.

6            THE WITNESS:  Okay.

7            MS. RICHARDSON:  That's a good point.  Thank

8    you.

9    BY MS. RICHARDSON:

10       Q.  There are snacks.  I -- they're kind of

11   organicish; and then there is regular bad snacks; and

12   there's water and there's coffee; so if you need

13   anything, feel free.

14           Okay.  So we'll start with, have you ever taken

15   a deposition before?

16       A.  Yes.

17       Q.  You have.  Okay.

18           Do you want to tell me what instances where you

19   had to take a deposition -- what those cases were and

20   approximately when.

21       A.  The first one was over -- it was about 25 years

22   ago.

23       Q.  Okay.

24       A.  It was -- it was a family court hearing, so --

25       Q.  In Canada?



Page 12

1     A.  In Canada.

2     Q.  Okay.

3     A.  And that -- was several depositions there in

4  the same -- same few cases.  And then I -- I don't

5  believe -- I should remember.  I was in the high courts

6  of England, but I don't believe there was a deposition

7  that I recall.  There was testimony, but I think it was

8  straight to testimony.  I'm sure -- I think I remember,

9  but right.

10    Q.  Yeah.

11    A.  So really just 25 years ago or so --

12 approximately.  It was 2002.

13    Q.  And that was a family estate matter?

14    A.  No.  It was my daughter.

15    Q.  Oh.  Oh, right.

16    A.  Yeah.  It was over my daughter.

17    Q.  God, is she 25?

18    A.  Yeah.  It was over my daughter.  So that was --

19 that was actually 2002 through 2005.  So there were a

20 few in there.  Since then, nothing.

21    Q.  Okay.  No other depositions?

22    A.  No.

23    Q.  Okay.  Excellent.

24    A.  Not that I recall.

25    Q.  No.



Page 13

1       A.   I -- I imagine I would recall.

2       Q.   And not in the United States, I assume?

3       A.   No.

4       Q.   And I probably --

5       A.   Never.

6       Q.   I would think they might be similar, but I

7  don't know for sure.

8            So that being said, did you prepare for today's

9  deposition?

10      A.   Yes.

11      Q.   Okay.

12      A.   Yeah.

13      Q.   And how did you prepare?

14      A.   Well, I read the material as much as -- much of

15  the material.  I read much of the material, and then

16  I -- I talked to my lawyers.  And I pretty well read the

17  material, and I talked to my lawyers.

18      Q.   Did you talk to anybody other than your lawyers

19  about the deposition?

20      A.   No.

21      Q.   No.  Okay.

22      A.   No.

23      Q.   Now, are there any other names that you've gone

24  by in the past?

25      A.   Originally, in my youth I was born Lesley Lynne



Page 14

1  Thomson.  But I never use Lesley, and I didn't like it,

2  so I changed to Taylor.  So it's Taylor Lynne now.

3      Q.  Got it.

4      A.  So just felt more appropriate.

5      Q.  No other aliases --

6      A.  No.

7      Q.  -- or names that you went by?

8      A.  No.

9      Q.  And where were you born?

10     A.  Toronto, Canada.

11     Q.  Okay.  And did you grow up in Toronto?

12     A.  Predominantly, yes.

13     Q.  Now, could you please state -- let's see --

14  your -- so you said predominantly Toronto.

15         Where else did you live before you were 18?

16     A.  Before I was 18 I lived -- we -- I lived in

17  London.

18     Q.  You did.  Okay.

19         For more than a year?

20     A.  About two and a half years.

21     Q.  Got it.

22         So you started spending time London in your

23  youth and --

24     A.  At 17.  At 17 I was in the States at

25  university.



Page 15

1    Q.  I'm going to ask you what your educational

2  background is.

3    A.  My educational.  I was at university.  I did

4  two and a half years there and studied languages, and

5  then I went to the American Repertory Theater for a

6  year.  And then beyond that, I was just -- I've been

7  given an honorary doctorate, so...

8    Q.  That's amazing.  Was that recent?

9    A.  That was about 15, 20 years ago.

10    Q.  Okay.

11    A.  Yeah.

12    Q.  I was not aware of that.

13       And what was the doctorate in?

14    A.  Brigham Young.

15       It was -- it was NSCAD, the -- the Nova Scotia

16  Academy of Art.

17    Q.  Okay.  Now, you -- you went to -- did you say

18  to Brigham -- Brigham Young?

19    A.  Brigham Young.

20    Q.  Yeah.  Okay.

21       And how long did you attend Brigham Young?

22    A.  I was there two and a half years.

23    Q.  Two and a -- you were there for two and a half

24  years?

25    A.  Yeah.



Page 16

```
 1      Q.  Okay.  Great.

 2          And did you -- you did not complete your degree

 3  at BYU?

 4      A.  No.

 5      Q.  Okay.  Which we have in common.

 6      A.  It's an odd place if you're non-Mormon.

 7      Q.  Yeah.  I can imagine.

 8      A.  For four years it's a --

 9      Q.  And what were you studying?

10      A.  Languages.

11      Q.  Okay.  And can you tell me, where is your

12  primary residence currently?

13      A.  London.  London, England.

14      Q.  Okay.  And do you live there full-time?

15      A.  Yes.

16      Q.  What about the rest of the year?  Do you live

17  anywhere else?

18      A.  I don't live anywhere else.  I just travel.

19      Q.  Travel.

20      A.  I just travel to my other homes.  And on

21  holiday sometimes, but I don't live anywhere.

22      Q.  And -- and -- and where are those other homes?

23      A.  I have -- I have one in L.A.

24      Q.  Uh-huh.

25      A.  And I don't have any in Canada anymore.  No.
```



Page 17

1        Q.  You don't have -- did you sell those

2    properties?

3        A.  Uh-huh.

4        Q.  Wow.

5        A.  Yeah.  Yeah.

6        Q.  Okay.  So you don't have any homes in Canada?

7        A.  No.  No.  No.  Because I'm a full British

8    resident now.  Yeah.  Lifestyle choice.

9        Q.  Can I do something a little off book for a

10   minute?

11       A.  Yeah.

12           MR. HARRISON:  We'll see.  I mean...

13           MS. RICHARDSON:  This is totally not at all

14   what I was planning on doing, but I'm just going to put

15   this out there before we go.  Do you want to sidebar for

16   five minutes, the two of us, before we continue this

17   deposition?  I don't know -- I'm just putting it out

18   there.  We don't have to.

19           MR. HARRISON:  If you want to -- why don't we

20   talk first.  We'll take a break, we'll go off the

21   record, and you and I can talk, if you'd like to discuss

22   it.

23           THE WITNESS:  Sure.  Don't know quite what

24   we're discussing.

25           MR. HARRISON:  I don't either, but let's do it.



Page 18

1           MS. RICHARDSON:  We'll take a quick break.

2           THE VIDEOGRAPHER:  Going off the record at

3    10:45.

4               (A recess is taken.)

5           THE VIDEOGRAPHER:  We are back on the record at

6    11:07.

7    BY MS. RICHARDSON:

8       Q.  Okay.  Taylor, we were just talking about the

9    homes that you owned; and I want to go back to that for

10   a moment.  You mentioned that you own one home in

11   Los Angeles.  Previously, you owned several.  So I'm --

12   I'm curious what those homes are, and then -- and then

13   we can go through the sale of the other homes.

14          MR. HARRISON:  Objection to form.  Compound.

15   And honestly, I don't see the relevance in --

16          MS. RICHARDSON:  Understood.  Objection heard.

17   BY MS. RICHARDSON:

18      Q.  So the current home you own now in Los Angeles

19   is located where?

20      A.  On Channel Road.

21      Q.  Channel Road.

22          Do you have any homes in Malibu, California?

23      A.  I do, but I don't -- I don't own that.  I just

24   have -- I have a part of it.

25      Q.  Understood.  Who owns that home with you?



Page 19

1    A.  That's owned in -- that's owned in a trust.

2    Q.  In the trust.  Okay.

3    A.  Yeah.

4    Q.  And who is a beneficiary of the trust?

5        THE WITNESS:  Is this relevant?

6        MR. HARRISON:  Objection to this.  Like, what

7    is the relevance to this case?  This -- this, in our

8    view, falls under that intimidating, harassment.  If you

9    just wanted to know --

10       MS. RICHARDSON:  Understood.

11       MR. HARRISON:  -- that we haven't accepted your

12   offer, you now want to dive into her personal finances,

13   which have nothing do with this case --

14       MS. RICHARDSON:  Objection.  Objection heard --

15       MR. HARRISON:  Okay.

16       MS. RICHARDSON:  -- Counsel, and -- and noted.

17       MR. HARRISON:  My suggestion -- because I'm

18   going to cut this deposition off at some point if this

19   is all you're going to ask.  My suggestion would be that

20   --

21       MS. RICHARDSON:  I'm just starting.

22       MR. HARRISON:  -- you would withdraw the

23   question; that you ask relevant, proper questions that

24   get to the heart of the matters in this case; and if you

25   want to re-ask these questions at the end, we'll object


MAGNA
LEGAL SERVICES

Page 20

1    then, you can make your record, we will make our record.

2         MS. RICHARDSON:  With all due respect, Counsel,

3    noted.  And in my deposition I answered the questions

4    that were asked that to me were irrelevant and -- and --

5    and I respectfully would request that unless it's a

6    privileged question, that your client do the same, to

7    the best of her ability.

8         MR. HARRISON:  I'm just telling you, as we

9    warned you previously in letters and in our request to

10   the Court, at some point if you're just going to try and

11   get at personal and financial information that is not

12   relevant to this case, we're going to terminate the

13   deposition.

14        MS. RICHARDSON:  It is any -- anything I'm

15   asking is directly relevant to the case.  But duly

16   noted, and thank you.

17        MR. HARRISON:  It clearly is not.  And again,

18   my suggestion is you ask relevant questions that

19   actually deal with the matter in the case and if you --

20   as a compromise, we'll sit here and answer all those

21   questions.  If you want to re-ask these other questions

22   at the end of the deposition and we will make our

23   objections to them then, and then we'll terminate the

24   deposition so that you can get your relevant questions

25   in, I'm happy to do that.



Page 21

1          MS. RICHARDSON:  With all due respect, Counsel,

2     I would like to have a chance to continue with the

3     deposition rather than hear your reasons.  They are --

4     they are noted, and you will have your chance to remove

5     anything from the record that is deemed improper.  So --

6     so I'm going to continue.

7     BY MS. RICHARDSON:

8          Q.  So which countries do you currently maintain a

9     residence?  You mentioned that sold your homes in

10    Canada, that you have homes in the United Kingdom?

11         A.  In the United Kingdom.

12         Q.  Okay.  And how many homes in the United

13    Kingdom?

14         A.  I have -- I have two homes that I'm a

15    beneficiary of.  I don't own them.  I don't own them

16    outright.

17         Q.  You don't own the homes outright?

18         A.  Uh-huh.

19         Q.  And is one of those homes in -- in Mayfair?

20         MR. HARRISON:  We're not going to get into

21    the -- that's an objection.  It's an improper question.

22    We're not getting into the specific addresses of her

23    properties.  There's local rules, I understand, that

24    does not allow that.

25         MS. RICHARDSON:  I don't believe that I asked



Page 22

1    for an address, Counsel.

2            MR. HARRISON:  You asked for a location.

3            THE WITNESS:  A location.

4            MS. RICHARDSON:  It's a general location.

5            MR. HARRISON:  It's too specific.

6            THE WITNESS:  Too specific.

7            MR. HARRISON:  The rules don't allow it, as I

8    understand it.

9            MS. RICHARDSON:  If -- are -- are you telling

10    your client not to answer the question?

11            MR. HARRISON:  I'm telling you that it's an

12    improper question under the local rules that you

13    shouldn't be asking.

14            MS. RICHARDSON:  I understand, and I -- I

15    believe that's -- that's actually untrue.  You -- you

16    asked for my specific address; and, you know, that

17    seemed to be totally proper; so I'm asking for a general

18    area.

19    BY MS. RICHARDSON:

20        Q.  So once again, tell me about the homes that you

21    have in the United Kingdom.

22        A.  My issue with disclosing that information is

23    that I still have a recollection that's very strong of

24    your text messages which I considered very violent.  We

25    now have security.  And residences I find is something



Page 23

1  that feels like an inappropriate subject under the

2  circumstances.

3      Q.  Well, you know what?  That's an interesting

4  pivot.  Do you -- would you like to go and talk about

5  that out of the gate and then we can go back to the

6  background information?

7          MR. HARRISON:  Objection to form.

8          THE WITNESS:  Up to you.

9          MR. HARRISON:  Argumentative.

10  BY MS. RICHARDSON:

11      Q.  Understood.  Understood.  Why don't we table

12  this and we'll come back to it in a little bit.  Okay?

13          Can you tell me which countries you hold

14  citizenship and where you hold lawful permanent

15  long-term residency.

16      A.  I'm a Canadian citizen.

17      Q.  Okay.

18      A.  And I'm a British domicile.

19      Q.  British domicile.  And --

20      A.  British nondom.  I'm a British nondom, which

21  makes me -- I'm a British resident.  I'm a British

22  resident, Canadian -- and a Canadian citizen.

23      Q.  And are there any other countries where you

24  maintain residency or spend at least 30 days a year?

25          MR. HARRISON:  Objection.  Form.  Compound



Page 24

1    question.  Also improper.

2    BY MS. RICHARDSON:

3        Q.  Are there any other countries where you

4    maintain residency?

5        A.  No.

6            MR. HARRISON:  I'm going to object to the last

7    question as vague as well.

8            MS. RICHARDSON:  Understood.

9    BY MS. RICHARDSON:

10       Q.  Do you spend more than six months a year at

11   your primary residence?

12           MR. HARRISON:  Objection to form.  Vague.

13           MS. RICHARDSON:  It's pretty specific.

14   BY MS. RICHARDSON:

15       Q.  You still need to answer the question,

16   Ms. Thomson.

17       A.  I don't know the exact days where I live.  My

18   primary residence is in -- is in England --

19       Q.  Okay.  And --

20       A.  -- and I spend significant time there.

21       Q.  How many days a year would you say you spend in

22   the United States, approximately?

23           MR. HARRISON:  Objection to form.

24   BY MS. RICHARDSON:

25       Q.  Do you spend a substantial amount of time in



Page 25

1   the United States every year?

2          MR. HARRISON:  Objection.  Vague.

3   BY MS. RICHARDSON:

4      Q.  Do you spend time in the United States?

5      A.  Yes.

6          MR. HARRISON:  Objection.  Vague.

7          THE WITNESS:  From time to time.

8   BY MS. RICHARDSON:

9      Q.  Ms. Thomson, as of today, how many residential

10  properties do you or your trust own, in total?

11         MR. HARRISON:  Objection to the form of the

12  question.  Calls for a legal conclusion.  It's

13  completely improper also.

14         MS. RICHARDSON:  Understood.

15         But you still have to answer --

16         MR. HARRISON:  Can you tell me what the

17  relevance is of delving into her personal finances in

18  her real estate.  What's the relevance to this case,

19  which is a fraud case, and your claims --

20         MS. RICHARDSON:  There are -- there are --

21  there are two claims --

22         MR. HARRISON:  Your claims are defamation and

23  intentional infliction of emotional distress.  What does

24  her finance -- personal financial history and real

25  estate and residencies have to do with that?  The answer



Page 26

1   is nothing; and you, in this case, have a long

2   history --

3           MS. RICHARDSON:  Mr. Harrison --

4           MR. HARRISON:  -- of trying to --

5           MS. RICHARDSON:  Mr. -- I'm going to object --

6           MR. HARRISON:  I'm going to make my record.

7           -- of trying to intimidate my client by

8   threatening to release what you believe to be salacious

9   information to the press.  It's very clear that you're

10  trying to do that again in this deposition.  You haven't

11  asked her a single question that is relevant to the

12  topics at hand.

13          MS. RICHARDSON:  Thank you -- thank you --

14          MR. HARRISON:  So I'm suggesting you do because

15  at some point --

16          MS. RICHARDSON:  Thank you, Mr. Harrison.

17          MR. HARRISON:  -- you're making a record that

18  you're asking completely inappropriate questions, and

19  we're going to terminate the deposition at some point.

20          MS. RICHARDSON:  You know, if -- you are making

21  a record of your objections --

22          MR. HARRISON:  That's right.

23          MS. RICHARDSON:  -- before I get a chance to

24  ask the questions, I'm happy to let the Judge weigh on

25  those objections.



Page 27

1          MR. HARRISON:  We are too.

2          MS. RICHARDSON:  Okay?  So thank you for the

3    objections.

4          Again, Ms. Thomson, you do need to answer the

5    question.  The objection is on the record.

6          MR. HARRISON:  What's the question?

7          MS. RICHARDSON:  The question was how many

8    residential properties you and the trust own, in total.

9          MR. HARRISON:  If you know.

10         THE WITNESS:  I don't know.  I don't know the

11   answer.

12         MS. RICHARDSON:  You don't know how many homes

13   you own.  Okay.

14         MR. HARRISON:  Objection.  Argumentative.

15         That's not a question, so objection to form in

16   many different ways.

17   BY MS. RICHARDSON:

18      Q.  Ms. Thomson, can you tell me if you are

19   currently employed by any company or in a salary

20   position.

21         MR. HARRISON:  Objection.  Compound.

22   BY MS. RICHARDSON:

23      Q.  Ms. Thomson, can you tell me if you are

24   currently employed.

25      A.  No.



Page 28

1    Q.  Can you state the year of your last salaried

2  employment, if any.

3         MR. HARRISON:  Objection.  Vague.

4         THE WITNESS:  It would have been before my

5  daughter was born.

6  BY MS. RICHARDSON:

7    Q.  So --

8    A.  Twenty-five -- over twenty-five years ago.

9    Q.  Okay.  Thank you.

10        Can you please identify your primary source of

11  income.

12        MR. HARRISON:  Objection.  Vague.

13        MS. RICHARDSON:  Noted.

14        MR. HARRISON:  Also completely improper.

15        MS. RICHARDSON:  You still have to answer.

16        MR. HARRISON:  Well, to the extent you can

17  answer.  To the extent you can answer.

18        THE WITNESS:  It's -- it's --

19        MR. HARRISON:  If you don't know, you don't

20  know.

21        THE WITNESS:  Investment -- it would be

22  investments and dividends.

23  BY MS. RICHARDSON:

24    Q.  Understood.  And what was your total income for

25  2024?



Page 29

```
 1          MR. HARRISON:  Objection.  Vague.  Again, it's
 2    just for purposes of harassment, intimidation --
 3          MS. RICHARDSON:  Absolutely not.
 4          THE WITNESS:  I don't know.  I don't know.
 5          MS. RICHARDSON:  It's very relevant.  You asked
 6    me the same questions during your --
 7          THE WITNESS:  I --
 8          MR. HARRISON:  Well, you put your -- stop.  You
 9    put your finances directly in issue in this case by
10    saying that you had been defamed and that had affected
11    your financial well-being.  You, not anybody else, put
12    your finances into direct relevance to this case.  That
13    is not true of Ms. Thomson's --
14          MS. RICHARDSON:  Thank you.  I understand.
15          MR. HARRISON:  -- claims against you for fraud.
16          MS. RICHARDSON:  Absolutely understood.  This
17    is very relevant.
18          So again --
19          MR. HARRISON:  How?
20          MS. RICHARDSON:  -- you still need to answer
21    the question.
22          MR. HARRISON:  How is it very relevant?
23    Exactly.
24          MS. RICHARDSON:  Your objection is on the
25    record and -- and you are welcome to, you know --
```



Page 30

1           MR. HARRISON:  Well, I'll withdraw my

2     objections if you can make a cogent argument as to how

3     any of this is relevant in any way.

4     BY MS. RICHARDSON:

5        Q.  Ms. Thomson, I'm going to ask you what your

6     income was for 2024.

7        A.  I have no idea.

8        Q.  You have no idea what your income was for '24?

9        A.  No.

10       Q.  Was it greater than $10 million?

11       A.  I don't know.

12       Q.  Okay.  Do you know what your income was for

13    2023?

14       A.  No.

15       Q.  You don't know?

16       A.  No.

17       Q.  Do you know what your income was for 2022?

18       A.  No.

19       Q.  You have no idea how much income you generated?

20       A.  No.

21       Q.  Okay.  And what about for 2021?

22           MR. HARRISON:  Objection to form for the last

23    one.

24           THE WITNESS:  No.

25    ///



Page 31

1   BY MS. RICHARDSON:

2       Q.   Okay.  Let me ask that question again.

3            Do you know how much income you earned in 2021?

4            MR. HARRISON:  Objection.  Vague.

5            THE WITNESS:  No.

6   BY MS. RICHARDSON:

7       Q.   Okay.  And do you know how much income you

8   earned in 2020, approximately?

9       A.   No.

10      Q.   In general, is it safe to say that annually you

11  generate an income greater than $10 million a year?

12           MR. HARRISON:  Objection --

13           THE WITNESS:  I don't know.

14           MR. HARRISON:  -- based on facts not in

15  evidence.

16  BY MS. RICHARDSON:

17      Q.   Now, we're going to move for a minute to -- you

18  collect art; correct?  You're an art collector?

19      A.   Yes.

20      Q.   Can you identify the approximate total insured

21  value of collection last declared to your insurer?

22      A.   No.

23           MR. HARRISON:  Objection.  Compound.  Objection

24  to the form of the question.

25           MS. RICHARDSON:  Can you --



Page 32

1            MR. HARRISON:  Stop.  You got to wait -- if I'm

2    going to make an objection, you got to wait until I'm

3    done with my objection, then you can answer the

4    question, unless it's based on -- the objection is based

5    on privilege.

6            THE WITNESS:  And if you -- if you object,

7    then -- and then I still answer the question unless it's

8    privileged; correct?

9            MR. HARRISON:  Yes.  But wait for me to finish

10   my objection.

11           THE WITNESS:  Okay.

12   BY MS. RICHARDSON:

13       Q.  Can you identify the approximate total value of

14   your collection?

15           MR. HARRISON:  Objection.  Asked and answered.

16   Relevance.

17           THE WITNESS:  No.

18   BY MS. RICHARDSON:

19       Q.  No.

20           You are friends with Jack Kilgore, who is an

21   art dealer; correct?

22           MR. HARRISON:  Objection.  Compound.

23   BY MS. RICHARDSON:

24       Q.  You are friends with Jack Kilgore; correct?

25       A.  Yes.



Page 33

1     Q.  Jack Kilgore is an art collector; correct?  Or

2  art dealer.  I'm sorry.

3     A.  Jack Kilgore used to be an art dealer.

4     Q.  Good for Jack.

5     You are friends with Honor -- Offer Waterman;

6  correct?

7     A.  Yes.

8     Q.  Offer Waterman is or used to be an art dealer;

9  correct?

10     MR. HARRISON:  Objection to form.  Leading.

11     THE WITNESS:  Offer Waterman is an art dealer.

12  BY MS. RICHARDSON:

13     Q.  Great.  And they have introduced you to works

14  of art that you have acquired; correct?

15     MR. HARRISON:  Objection.

16     THE WITNESS:  Yeah.

17  BY MS. RICHARDSON:

18     Q.  Correct?

19     A.  Offer Waterman has sold me works in the past

20  which I acquired from him; but ironically, I don't deal

21  with him anymore because I discovered he was trying to

22  take a secret commission.

23     Q.  Understood.

24     MR. HARRISON:  Objection.  Form.  Not a

25  question.  Statement.



Page 34

1          THE WITNESS:  Sadly.

2    BY MS. RICHARDSON:

3        Q.  You established -- so Offer Waterman and you no

4    longer communicate; correct?

5        A.  No.

6        Q.  And when did you find out about this

7    undisclosed commission from Offer Waterman?  Was it

8    recent -- in the last five years?

9        A.  Yes.

10       Q.  In the last --

11       A.  Yes.

12       Q.  Yes.

13           And was it in the last two years?

14       A.  I don't recall.

15       Q.  Okay.  That's fine.

16           You established residency in the United Kingdom

17   in or about 2022; correct?

18       A.  Yes.

19       Q.  Okay.  Can you identify your stated reasons for

20   establishing UK residency.

21           MR. HARRISON:  Objection to the form of the

22   question.  And again, there's no relevance to this.

23   It's just harassing and intimidating.  So I'm going to

24   let this go on for a while, but at some point we're

25   going to terminate this deposition.



Page 35

1           MS. RICHARDSON:  Again, Ms. Thomson, I just

2    want to -- I want to take a quick moment just to inform

3    you of -- of the rules and -- and -- as I understand

4    them.  They're not always correct.  But this is a

5    court-ordered deposition and -- as was mine, so it means

6    that we have to answer the questions that are asked of

7    us to the best of our ability unless they are

8    privileged.  If there are any questions that the Court

9    deems inappropriate, harassing, problematic, those

10   questions will be removed from the record.

11          I've agreed with your attorneys to have a

12   moment to try to make sure that that material is, you

13   know, kosher because I don't want anything that I say

14   maybe accidentally to end up on the record that could be

15   harmful to anybody.  But at this point ending a

16   deposition early or not answering a question gives me an

17   opportunity to compel another deposition to get those

18   questions answered, which I hope that we do not have to

19   do.

20          MR. HARRISON:  Not if they're meant solely for

21   harassment or intimidation purposes, Ms. Richardson.

22          MS. RICHARDSON:  Respectfully, Mr. Harrison, no

23   questions I have asked have been for intimidation or

24   harassment purposes; and none will be.  So we can -- we

25   can continue with the deposition.



Page 36

1          Again, I'm going to go back to the reason that

2   you established residency in the UK.

3          MR. HARRISON:  So I'm going to direct you not

4   answer that to the extent that it involves privileged

5   information from lawyers who were advising you on your

6   residency issues.

7          THE WITNESS:  It is privileged.

8   BY MS. RICHARDSON:

9      Q.  Why you moved to the United Kingdom was

10  privileged?  Okay.  Understood.

11     A.  It's privileged --

12         MR. HARRISON:  There is no question pending.

13  There was just a statement, which I will -- I guess I'll

14  object to the form now.

15  BY MS. RICHARDSON:

16     Q.  After establishing UK residency did you

17  continue spending time in Canada?

18     A.  No.

19     Q.  No.  Okay.

20         And after establishing UK residency did you

21  immediately liquidate the properties that you owned

22  there?

23         MR. HARRISON:  Objection to form.  Compound.

24  Assumes facts not in evidence.

25         MS. RICHARDSON:  You mentioned --



Page 37

```
 1          MR. HARRISON:  -- continuing objection that I
 2  have to the irrelevance.
 3  BY MS. RICHARDSON:
 4      Q.  You mentioned you sold your Canadian homes;
 5  correct?
 6      A.  Yes.  I sold my Canadian homes before I left
 7  Canada.
 8      Q.  Thank you.  Thank you for that.
 9          MR. HARRISON:  Objection to form.
10  BY MS. RICHARDSON:
11      Q.  Between -- between 2020 and 2025 -- let me
12  rephrase the question.
13          You count the days that you spend in the United
14  States; correct?
15          MR. HARRISON:  Objection to form and relevance.
16  And just to be clear for the record, when I'm objecting
17  to relevance what I'm saying is that I believe these --
18  we believe these questions to be solely for purposes of
19  harassment.  So just so --
20          MS. RICHARDSON:  You made that very -- you made
21  that very clear.
22          MR. HARRISON:  -- it's clear on the record.
23          MS. RICHARDSON:  Yeah.  I'm just going to
24  assume that with every question that you object to from
25  here on out.
```



Page 38

1          THE WITNESS:  Yes, I count my days here.

2  BY MS. RICHARDSON:

3      Q.  Understood.

4      A.  America has rules.  They have -- they have

5  rules of how much time, if you're -- because I'm not an

6  American --

7      Q.  Understood.

8      A.  -- that you can spend in the States.

9      Q.  Now, what are those rules?  What happens if you

10  spend more than the allotted number of days?

11      A.  I don't --

12          MR. HARRISON:  Objection.  Calls for

13  speculation.  Calls for a legal conclusion.

14          THE WITNESS:  I don't know what happens.

15  BY MS. RICHARDSON:

16      Q.  Okay.

17      A.  If you spend more than you're allowed to, my

18  understanding is you don't come back -- you're not

19  allowed in the country for years.

20      Q.  Yeah.

21      A.  Yeah.

22      Q.  And that's -- especially now, I'm sure.

23      A.  Yeah.  People -- that's fine.  One counts days

24  because one does not want to be outside with the days in

25  America.



Page 39

1    Q.  Now, is there also a scenario where if you

2    overstayed those days, you would have tax implications?

3        MR. HARRISON:  Objection.  Calls for a legal

4    conclusion.  Calls for speculation.  It's not a proper

5    question.

6    BY MS. RICHARDSON:

7    Q.  From -- you mentioned, when we talked earlier

8    about your education history, you did not graduate from

9    BYU but you got an honorary degree; correct?

10   A.  Yes.

11   Q.  From 2016 to 2018 were you enrolled as a

12   student in the United States?

13       MR. HARRISON:  Objection to form.

14       THE WITNESS:  No.

15   BY MS. RICHARDSON:

16   Q.  No, you were not.

17       From twenty --

18   A.  Oh, I did a Berlitz, music -- Berlitz,

19   French --

20   Q.  Okay.

21   A.  -- class, yeah --

22   Q.  And --

23   A.  -- course.

24   Q.  And how long was that course?

25   A.  I don't recall.  I don't -- I don't recall.



Page 40

1       Q.  And what were you studying?

2       A.  I was brushing up on my French.

3       Q.  Understood.  And you mentioned that you were in

4   the United States under nondom status; is that correct?

5           MR. HARRISON:  Objection --

6           THE WITNESS:  No.

7           MR. HARRISON:  -- to form.  Assumes facts not

8   in evidence.

9           THE WITNESS:  In the United States -- in

10   England.

11   BY MS. RICHARDSON:

12       Q.  I'm sorry.  I'm sorry.

13       A.  England -- England nondom.

14       Q.  Yes.  Okay.

15           And at any point did you consider or apply for

16   residency in the UAE, Dubai, United Emirates?

17           MR. HARRISON:  Objection -- objection to form.

18   Calls for a legal conclusion.

19           What is the relevance of this?  How is this in

20   any way relevant to this case?

21           MS. RICHARDSON:  Understood.

22           THE WITNESS:  I mean, I can answer the

23   question.  It's random.

24           MR. HARRISON:  I agree.

25           THE WITNESS:  I'll just answer.



Page 41

1            MR. HARRISON:  Okay.

2            THE WITNESS:  No.

3   BY MS. RICHARDSON:

4       Q.  Is that a no?

5       A.  Yeah, it's a no.

6       Q.  Okay.  So at present the only countries where

7   you are a citizen is Canada; correct?

8       A.  Yes.

9       Q.  Understood.  Now, I'm going to move for a

10  moment to -- to your family.

11           You are a member of the Thomson family;

12  correct?

13      A.  Yes.

14      Q.  And the Thomson family is one of the wealthiest

15  families in Canada; correct?

16           MR. HARRISON:  Objection to form.

17           THE WITNESS:  Yes.

18  BY MS. RICHARDSON:

19      Q.  Is your family's wealth managed through the

20  Woodbridge Company that controls Thomson Reuters?

21           MR. HARRISON:  Objection.  Objection to form.

22  Assumes facts not in evidence.  Same relevance objection

23  as well.

24           THE WITNESS:  I wouldn't know the answer to

25  that question.



Page 42

1    BY MS. RICHARDSON:

2        Q.  Okay.  But -- let me try to rephrase it.

3            Is your wealth managed by Woodbridge, the --

4        A.  No.

5            MR. HARRISON:  Object -- sorry.

6            THE WITNESS:  Sorry.

7            MR. HARRISON:  Objection to form.

8            MS. RICHARDSON:  Let's -- let's pivot from that

9    for a second.

10           MR. HARRISON:  Vague.

11   BY MS. RICHARDSON:

12       Q.  Control of the family line in your family is

13   structured to pass through men only; is that correct?

14           MR. HARRISON:  Objection to form.  Assumes

15   facts not in evidence.  Vague.

16   BY MS. RICHARDSON:

17       Q.  Okay.  You have described yourself as being

18   locked out of meaningful control of your financial

19   future from your brothers; correct?

20           MR. HARRISON:  Objection.  Compound.  Leading.

21   Vague.

22           THE WITNESS:  No.

23   BY MS. RICHARDSON:

24       Q.  Have your brothers made it harder for you than

25   other members of the family to have control over your



Page 43

1  finances?

2          MR. HARRISON:  Objection.  Same harassment and

3  intimidation objection, by the way.

4          MS. RICHARDSON:  Thank you.  Noted.

5  BY MS. RICHARDSON:

6      Q.  You do have to answer that one.

7      A.  No, they haven't.

8      Q.  They have not made it harder for you to have

9  control?

10     A.  They have not.

11     Q.  Okay.

12     A.  I have trustees.

13     Q.  You have trustees.

14     A.  Nothing to do with my brothers.

15     Q.  Do you have full control and access to your

16  finances at all times?

17     A.  We have trustees --

18         MR. HARRISON:  Objection -- objection to form.

19  Objection to, again --

20         THE WITNESS:  It depends.  There's different --

21  there are -- if -- if you're talking my personal income,

22  of course.

23  BY MS. RICHARDSON:

24     Q.  Right.

25     A.  Personal income, yes.



Page 44

1      Q.  And is your personal income generated from the

2  dividends, or is that independent?

3      A.  It's from various things.

4      Q.  In 2020 you drafted an email to your brothers

5  complaining that a branch of the family was -- that your

6  branch of the family was completely locked out of

7  stewarding our financial future wealth.

8          Do you remember saying that?

9          MR. HARRISON:  Objection to form.  Compound.

10  Also miss -- misstates the -- misstates evidence and

11  refers to facts not in evidence at all.

12          THE WITNESS:  I drafted -- I drafted an email

13  to the boys because I had a -- because I had a notion

14  that it would be -- it would be -- it would be better to

15  not have to deal through trustees.

16  BY MS. RICHARDSON:

17      Q.  You also stated that you've always been one for

18  riskier investments?

19          MR. HARRISON:  Objection to form.  Vague.

20  BY MS. RICHARDSON:

21      Q.  Did you not?

22      A.  Yes.

23      Q.  Okay.

24      A.  I never sent that letter, by the way.

25      Q.  Understood.  You also wrote, "Restrictive



Page 45

1    compliance put in place in 2020 completely removed any

2    opportunity of me stewarding meaningful investments."

3          Do you remember saying that?

4          MR. HARRISON:  Objection to form.  Assumes

5    facts not in evidence.  Vague.

6          THE WITNESS:  And -- and it's not -- and

7    it's -- and it needs further explanation because I'm not

8    speaking of my personal wealth.

9    BY MS. RICHARDSON:

10        Q.  Understood.

11        A.  I'm speaking of trust wealth.

12        Q.  Okay.  Okay.  That's an important distinction.

13        A.  Yeah.

14        Q.  Isn't it true that these restrictions prevented

15   you from accessing the family investment funds directly

16   from approximately 2020 onward?

17         MR. HARRISON:  Objection to form.  Compound.

18   Assumes facts not in evidence.  And the same harassment,

19   intimidation.

20         THE WITNESS:  Yeah.

21         MR. ANDRE:  Also --

22         THE WITNESS:  It's incorrect.  No.

23   BY MS. RICHARDSON:

24        Q.  Were there restrictions that were not

25   previously in place from 2020 onwards?



Page 46

1           MR. HARRISON:  I'm going to object to the form

2      as vague.  I'm also going to direct you, to the extent

3      that it requires you to violate privilege, to the extent

4      that you got legal advice --

5           THE WITNESS:  Exactly.

6           MR. HARRISON:  -- regarding the trust or

7      whatever -- your finances --

8           THE WITNESS:  Exactly.

9           MR. HARRISON:  -- that you should not answer.

10    BY MS. RICHARDSON:

11         Q.  Let's -- let me try a different question.

12    Let's -- let's move for something else.

13              When you began purchasing cryptocurrency, that

14    was independent of --

15         A.  That was mine personally.

16         Q.  That was your personal --

17              MR. HARRISON:  Let her finish the question

18    before you answer the question.

19              THE WITNESS:  Sorry.

20    BY MS. RICHARDSON:

21         Q.  Has your brother David expressed concern about

22    the handling of your money?

23              MR. HARRISON:  Objection.  Vague.

24    BY MS. RICHARDSON:

25         Q.  Has your brother David expressed concern about



Page 47

1    your access to your funds?

2              MR. HARRISON:  Objection.  Vague.

3              THE WITNESS:  No.

4              MR. HARRISON:  Also -- got to wait till I

5    finish.

6    BY MS. RICHARDSON:

7        Q.  You have referred to limitations placed on you

8    as discriminatory; correct?

9              MR. HARRISON:  Objection.  Vague.  Assumes

10   facts not in evidence.  Leading.

11             THE WITNESS:  Yes.

12   BY MS. RICHARDSON:

13       Q.  Thank you.

14             You have acknowledged yourself that you have

15   historically preferred high-risk, high-reward

16   investments; correct?

17             MR. HARRISON:  Objection --

18             THE WITNESS:  It's all relative.

19             MR. HARRISON:  -- compound in nature.

20             THE WITNESS:  That's just relative.

21   BY MS. RICHARDSON:

22       Q.  Can you tell me about -- your grandfather

23   created the Thomson company; correct?

24       A.  Yes.

25       Q.  And can you tell me what that company was at



Page 48

1    the outset.

2            MR. HARRISON:  Objection to form.  Vague.

3    BY MS. RICHARDSON:

4        Q.  Your grandfather --

5        A.  Media company.

6        Q.  Thank you.

7            At one point your grandfather had a joint

8    venture with -- with John Paul Getty; correct?

9        A.  Correct.

10       Q.  And that venture was, would you say, on the

11   riskier side of investments?  Correct?

12           MR. HARRISON:  Objection.  Vague.  Calls for

13   speculation.  Calls for a legal conclusion.  To the

14   extent that it involves privilege somehow, I'm directing

15   you not to answer it.

16   BY MS. RICHARDSON:

17       Q.  Ms. Thomson, what did -- what was the business

18   venture your grandfather entered into with John Paul

19   Getty?

20           MR. HARRISON:  Objection.  Vague.

21           We are -- we're in agreement -- right? -- that

22   I have a continuing objection on the record from you,

23   Ms. Richardson --

24           MS. RICHARDSON:  I -- I am well aware.  Thank

25   you.



Page 49

1          MR. HARRISON:  -- completely irrelevant and

2   intended solely for intimidation and harassment?  We

3   have an agreement; right?  You're not going to say later

4   on that I wasn't objecting to these questions even if I

5   don't verbally --

6          MS. RICHARDSON:  I think you're making it very

7   clear, Todd.  Thank you.

8          MR. HARRISON:  -- object for each question?

9          MS. RICHARDSON:  Yes.  Thank you.

10          THE WITNESS:  North Sea oil.

11          DEPOSITION OFFICER:  I'm sorry?

12          THE WITNESS:  North Sea oil.

13   BY MS. RICHARDSON:

14      Q.  This investment had a substantial -- created a

15   substantial windfall for your family; correct?

16          MR. HARRISON:  Objection.  Vague.  Calls for

17   speculation.

18          THE WITNESS:  That -- it was a successful

19   venture.

20   BY MS. RICHARDSON:

21      Q.  You considered yourself more like your

22   grandfather than your brothers; correct?

23          MR. HARRISON:  Objection.  Vague.

24   BY MS. RICHARDSON:

25      Q.  You -- as it relates to the investments you



Page 50

1  made, you saw your grandfather's visionary capability to

2  be something aspirational; correct?

3      A.  Correct.

4      Q.  Did that belief motivate some of your

5  investment decisions?

6          MR. HARRISON:  Objection.  Vague.  To the

7  extent it calls for -- let me -- let me --

8          MS. RICHARDSON:  Do you -- do you --

9          MR. HARRISON:  Everybody, let me just finish.

10          To the extent that it calls for any sort of

11  privileged communication, like advice that you got from

12  lawyers, I would direct you not to answer.

13  BY MS. RICHARDSON:

14      Q.  Ms. Thomson, do you remember telling me that

15  you saw crypto as being an opportunity similar to your

16  grandfather -- grandfather's oil investment?

17      A.  I don't remember that exact analogy, how -- or

18  I was -- my initial investment in crypto was very early

19  days, as was his investment in the oil.

20      Q.  Understood.

21      A.  And it was very intuitive and instinct.

22      Q.  Let's take a moment, actually.  That's a

23  good -- are you doing okay?

24      A.  (No audible response.)

25      Q.  Very good.



Page 51

1           I'm going to move for a moment and ask you when

2     you first learned about Bitcoin, approximately.

3           A.  When it was $8,000.

4           Q.  Would that be about 2017?

5           A.  I don't know the exact date, but it was when --

6     when it was 8,000.

7           Q.  Okay.

8           A.  It's before it started moving up.

9           Q.  And who introduced you to Bitcoin?

10          A.  A gentleman that -- that -- that was a

11    consultant that was very -- himself very involved in

12    the -- in the space.

13          Q.  And -- and what was his name?

14          A.  His name was Mike Foss.

15          Q.  Okay.  And can you describe the role that Mike

16    Foss's services provided for you.

17          A.  Mike was providing security.

18          Q.  He was providing security.

19          Did he provide security for you in -- in all

20    your homes worldwide or -- or --

21          A.  Just L.A.

22          Q.  He -- he provided security in Los Angeles.

23          Do you recall discussing Bitcoin with me when

24    you purchased it?

25          MR. HARRISON:  Objection.  Vague.



Page 52

1   BY MS. RICHARDSON:

2       Q.   Do you recall --

3       A.   No.

4       Q.   -- discussing Bitcoin with me?

5            MR. HARRISON:   Objection.   Vague.

6            THE WITNESS:   Not when I purchased.

7   BY MS. RICHARDSON:

8       Q.   Okay.

9       A.   Not -- not in those early days.

10      Q.   You don't remember having those conversations

11  with me?

12           MR. HARRISON:   Objection.   Vague.

13  Argumentative.

14  BY MS. RICHARDSON:

15      Q.   On or about 2017 do you remember encouraging me

16  to buy Bitcoin?

17           MR. HARRISON:   Objection.   Leading --

18           THE WITNESS:   No.

19           MR. HARRISON:   -- vague.

20           THE WITNESS:   I don't remember.

21           MR. HARRISON:   You really got to wait until

22  I --

23           THE WITNESS:   I'm so sorry.

24           MR. HARRISON:   -- finish talking before you

25  talk.



Page 53

1    BY MS. RICHARDSON:

2        Q.  You don't have any memory of -- of telling me

3    that I should buy as much Bitcoin as I could?

4            MR. HARRISON:  Objection.  Vague.

5    Argumentative.

6            THE WITNESS:  I would not have presumed to know

7    how much money you had because Bitcoin even then was

8    a -- 12,000 a coin.  It wasn't -- it wasn't inexpensive,

9    which is, my recollection, why you went into altcoins,

10   because they were very affordable and they made sense.

11   BY MS. RICHARDSON:

12       Q.  That makes sense.

13           At the time you told me about Bitcoin, it was,

14   I believe, December of 2017 and -- and I purchased

15   Bitcoin when it was, I think, $17,000.

16           Do you remember being excited about Bitcoin at

17   that point?

18       A.  Well, I remember being excited --

19           MR. HARRISON:  Just objection.  Compound

20   question.  Asked and answered.  And vague.

21           Go ahead.

22   BY MS. RICHARDSON:

23       Q.  Do you remember in 2017 being excited about

24   Bitcoin going up and talking about it?

25       A.  I don't remember the exact year; but I do



Page 54

1  remember very quickly after I invested, it -- it was

2  moving.

3      Q.  Understood.

4      A.  It was a very volatile, interesting time to be

5  in Bitcoin.

6      Q.  And were you aware that because of your

7  encouragement, I purchased a large amount of Bitcoin at

8  that time?

9          MR. HARRISON:  Objection.  Vague.  Leading.

10  Assumes facts not in evidence --

11          THE WITNESS:  No.

12          MR. HARRISON:  -- and argumentative.  Just --

13  excuse me.

14          Ms. Thomson, please wait to answer the question

15  until I am finished --

16          THE WITNESS:  Sorry.

17          MR. HARRISON:  -- speaking.  Thank you.

18  BY MS. RICHARDSON:

19      Q.  Do you --

20      A.  Can I clarify that?

21      Q.  Sure.  Absolutely.

22      A.  I would not have presumed, because your -- my

23  financial situation is different from yours, that you

24  would mimic in any way any of the investments I was

25  doing if -- unless you felt that the risk was something



Page 55

1   that you didn't have to think twice about, and I

2   couldn't imagine that being the case.  It was -- you

3   were mindful.

4       Q.  Yeah.  Well, I didn't have a -- you know, a lot

5   of funds.

6       A.  Yeah.

7           MR. HARRISON:  Objection to form.  Statement,

8   not a question.

9           MS. RICHARDSON:  You're absolutely right.

10  BY MS. RICHARDSON:

11      Q.  Shortly after that point when Bitcoin hit, I

12  think, $17,000, it dropped substantially.

13          Do you remember that?

14      A.  I do remember Bitcoin dropped.

15      Q.  Yes.  After Bitcoin dropped do you remember

16  telling me and others that you were upset with Mike for

17  suggesting the investment?

18          MR. HARRISON:  Objection.  Vague.  Compound.

19          You can answer.

20          THE WITNESS:  No.

21  BY MS. RICHARDSON:

22      Q.  At the time do you recall me saying that I also

23  lost quite a bit of money?

24      A.  No.

25      Q.  And you understand that because I had limited



Page 56

1    means, the losses would have been more significant?

2            MR. HARRISON:  Objection.  Prejudicial.

3    Leading.  Vague.  Unsupported by facts in evidence.

4            THE WITNESS:  Should I --

5            MS. RICHARDSON:  You under --

6            MR. HARRISON:  You can answer now, yeah.

7            THE WITNESS:  Yeah.

8            MR. HARRISON:  If you can.  To the extent you

9    can.

10            THE WITNESS:  Sorry.  Do you mind asking again?

11   BY MS. RICHARDSON:

12       Q.  Yes.  Absolutely.

13            Did you understand that my losses were

14   significant to -- based on my financial circumstances?

15            MR. HARRISON:  Objection.  Vague.  Assumes

16   facts not in evidence.

17            Go ahead.  You can --

18   BY MS. RICHARDSON:

19       Q.  Okay.  Let me -- let me rephrase the question.

20            Based on my financial circumstances, a Bitcoin

21   drop would have been significant for me; correct?

22            MR. HARRISON:  Objection.  Vague.

23   Speculative --

24            MS. RICHARDSON:  Okay.

25            MR. HARRISON:  -- based on facts not in



Page 57

1  evidence.

2          MS. RICHARDSON:  You can still answer.

3          MR. HARRISON:  You can answer, to the extent

4  that you can answer.

5          THE WITNESS:  I would have -- that -- I had --

6  I just said that the fact is that it wouldn't have

7  occurred to me that you would be, in your position at

8  that time or any time, making an investment that you

9  couldn't afford to lose; and I knew I was in a very

10  different financial position.

11  BY MS. RICHARDSON:

12      Q.  Under --

13      A.  I'm really sorry if you lost money going into

14  it but --

15      Q.  That's okay.

16          Did --

17      A.  And I, of course -- that's -- that's why I just

18  said that I would never presume it, because I know -- I

19  knew and know that you would not have been able, you

20  know, to comfortably tolerate a significant loss.  It

21  would be meaningful.

22      Q.  But is it fair to assume that my decision to

23  make a Bitcoin purchase was my own financial decision?

24          MR. HARRISON:  Objection.  Calls for

25  speculation.  Facts not in evidence.



Page 58

1          THE WITNESS:  I don't even recall you buying

2    it, so --

3    BY MS. RICHARDSON:

4        Q.  Understood.  So if you don't recall me buying

5    it, I'm going to ask you --

6        A.  Then you -- you would have been making your own

7    decision.

8        Q.  If I --

9          MR. HARRISON:  Can you -- you got to let her

10   get her question out first before you answer it.

11          THE WITNESS:  Okay.  Sorry.

12   BY MS. RICHARDSON:

13       Q.  You do not remember me buying it, we've just

14   established; correct?

15       A.  Yes.

16       Q.  I think it's safe for me to assume, then, you

17   don't remember me blaming you for the loss; correct?

18          MR. HARRISON:  Objection.  Assumes facts not in

19   evidence.  Vague.

20   BY MS. RICHARDSON:

21       Q.  I never blamed you for that loss, did I?

22       A.  I don't remember.  I don't remember you buying

23   it.  I don't remember a scenario with you.  I remember

24   you with the altcoins later as your big stake thing.

25       Q.  You have -- you have no memory of me ever



Page 59

1  accusing you of causing my losses?

2        MR. HARRISON:  Objection.  Calls for

3  speculation.  Asked and answered.  Vague.

4        THE WITNESS:  I didn't realize you had losses.

5        MS. RICHARDSON:  Exactly.  Okay.  Thank you.

6        MR. HARRISON:  Objection to form.  Just a

7  statement, not a question.

8  BY MS. RICHARDSON:

9     Q.  Mike Foss was your head of security --

10  correct? -- for Los Angeles?

11     A.  Yes.

12     Q.  Thank you.

13        As head of security, was Mike responsible for

14  gathering information about your daughter's former

15  nanny?

16        MR. HARRISON:  Objection.  What could this

17  possibly have to do with this lawsuit that you have been

18  allowed by the Court to conduct a deposition on?

19        MS. RICHARDSON:  Thank you.  Your objection is

20  noted.

21        MR. HARRISON:  Okay.  So just to be clear, it's

22  the same irrelevance and harassing and intimidating line

23  of questioning.

24  BY MS. RICHARDSON:

25     Q.  You still have to answer the question.



Page 60

1          A.   Mike handled the security of our residence.

2          Q.   Okay.  Was information that Mike obtained used

3     towards a nanny's termination?

4               MR. HARRISON:  Objection.  Assumes facts not in

5     evidence.  Vague.  And my same standing objection to

6     harassment, intimidation.

7               MS. RICHARDSON:  Thank you.

8               THE WITNESS:  There were many reasons the nanny

9     was -- was -- was fired.  The main, ultimate reason was

10    we found her stealing --

11    BY MS. RICHARDSON:

12         Q.   How did you --

13         A.   -- from us.

14         Q.   And how did you find that out?

15         A.   Because she had items of ours in her room.

16         Q.   Okay.

17         A.   And the housekeeper saw checks that were from

18    secondhand stores, which, when we checked it out, had

19    items of ours in it --

20         Q.   Understood.  Are you aware --

21         A.   -- as well as other things.

22              She was throwing parties in the place when I

23    wasn't -- because I didn't live in L.A. full-time, so

24    there were photographs which was showed to me later of

25    her having parties -- like, the mess after parties,



Page 61

1    champagne bottles everywhere.  You know, sofa was all

2    getting ruined from what she was doing.

3        Q.  And -- and during this time, are you aware that

4    your daughter, Madeleine, informed me that she had

5    listened to audio footage of -- of the nanny saying

6    unfavorable things about her?

7            MR. HARRISON:  Objection.

8            THE WITNESS:  No.

9            MR. HARRISON:  Hearsay.  Calls for speculation.

10   Vague.  And assumes facts not in evidence.  And it's

11   also testifying by the questioner.

12   BY MS. RICHARDSON:

13       Q.  Did you at any time record your employees with

14   video or audio footage that they were unaware of?

15           MR. HARRISON:  Objection.  Vague.  Leading.

16   Assumes facts not in evidence.  Objection specifically

17   to "you" -- to the word "you" recording.

18           THE WITNESS:  No.

19   BY MS. RICHARDSON:

20       Q.  Let me withdraw the question.

21           Was video surveillance something that was

22   common on your properties?

23           MR. HARRISON:  Same objections to just

24   irrelevant questioning into personal issues that have

25   nothing do with --



Page 62

1          MS. RICHARDSON:  Thank you.  Noted, Counsel.

2          MR. HARRISON:  -- this litigation.

3          THE WITNESS:  For security reasons, it's

4    standard protocol that there are cameras.  All staff

5    know in all houses that there are cameras.

6    BY MS. RICHARDSON:

7       Q.  Is it standard protocol to have audio

8    recordings in your vehicles?

9          MR. HARRISON:  Objection.  Assumes facts not in

10   evidence.  Vague.  And calls for a legal conclusion.

11         MR. ANDRE:  Also calls for speculation.

12         THE WITNESS:  No.

13   BY MS. RICHARDSON:

14      Q.  Is it standard practice for you to have audio

15   recording in your vehicles?

16      A.  No.

17      Q.  No.

18         Let's go back for a moment to a time when

19   Madeleine was younger.  You retained attorney Bert

20   Fields in connection with a custody dispute in the early

21   2000s; correct?

22         MR. HARRISON:  Objection.  Leading.

23   Speculative.  Vague.  And the same harassment and

24   intimidation objection.

25         MS. RICHARDSON:  Thank you.



Page 63

1          THE WITNESS:  Do I answer the question?

2          MR. HARRISON:  To the -- if -- if you can, yes,

3    without revealing -- unless there's --

4          MS. RICHARDSON:  This is on public record.

5          MR. HARRISON:  I'm speaking.  Unless there is

6    privileged information that would be part of the answer.

7    So she's asking about hiring attorneys in the two --

8    early 2000s.

9          THE WITNESS:  Well, it's -- it's legal.  It

10   was -- was legal information.

11   BY MS. RICHARDSON:

12      Q.  It's not about -- it's not about information

13   you shared with your attorney.  It's just about if he

14   was your attorney at the time.

15      A.  Yes.  Bert -- I consulted with Bert at that

16   time.

17      Q.  Okay.  And during that period, did Anthony

18   Pellicano perform investigative work pertaining to you?

19         MR. HARRISON:  Objection.  Vague.  Calls for, I

20   suppose, a legal conclusion.  And the same intimidate --

21   intimidation, harassment, completely irrelevant to this

22   case.

23         MR. ANDRE:  And also just, Ms. Richardson, to

24   the extent -- Ms. Thomson, to the extent answering a

25   question would require you to disclose conversations



Page 64

1   you've had with your attorney, you should not answer the

2   questions.  You can only -- only answer the questions to

3   the extent it would not require you to disclose

4   confidential conversations you had with your attorney in

5   connection with that matter.

6          THE WITNESS:  Then it was -- I think he was

7   hired through attorneys.

8          MR. HARRISON:  Then that would call for --

9          MR. ANDRE:  Then that's --

10         MR. HARRISON:  -- privileged information.

11         MS. RICHARDSON:  Okay.

12         MR. HARRISON:  You shouldn't answer that.

13  BY MS. RICHARDSON:

14     Q.  Pamela Miller -- who used to be your nanny;

15  correct?

16     A.  Yes.

17     Q.  Okay.  And Pamela Miller provided statements

18  and testimony to federal authorities in the Pellicano

19  investigation; correct?

20         MR. HARRISON:  Objection.  Calls for

21  speculation.  Legal conclusion.  Completely irrelevant.

22         MS. RICHARDSON:  You have -- it's not

23  privileged.

24         MR. HARRISON:  Unless the -- unless the answer

25  involves privileged information or information you got



Page 65

1    through a lawyer, then you shouldn't answer.

2         MR. ANDRE:  To the -- if you can answer

3    without -- to the extent answering the question would

4    require you to disclose information you learned from

5    your lawyers or in connection with from your lawyers,

6    you should not answer the question.  If you have

7    information you know outside of the scope -- that you

8    obtained outside of the scope of that representation,

9    then you can answer the question.

10         MS. RICHARDSON:  This is not -- this is not

11   privileged.

12         MR. HARRISON:  Objection -- objection.

13         MS. RICHARDSON:  Okay.

14         MR. HARRISON:  You are not our client's

15   attorney, so you are not allowed to give her legal

16   advice --

17         MS. RICHARDSON:  Understood.  Understood --

18         MR. HARRISON:  -- or legal direction.

19         MS. RICHARDSON:  -- Counsel.  Thank you.  I

20   apologize.

21         MR. HARRISON:  I don't think you do understand,

22   so I wanted to make that clear.

23         MS. RICHARDSON:  Okay.

24         THE WITNESS:  Can I clarify.  The question

25   was --



Page 66

1  BY MS. RICHARDSON:

2      Q.  Absolutely.

3      A.  -- did Pamela --

4      Q.  Pamela Miller provided statements and testimony

5  to federal authorities in the Pellicano investigation;

6  correct?

7          MR. HARRISON:  Objection.  Same objections as

8  before.

9          MR. ANDRE:  To the extent you can answer the

10  question without basing your answer on information you

11  learned from your counsel, you can answer.  If the only

12  way you have to answer the question is based on

13  discussion you had with your lawyers, then you cannot

14  answer the question.

15  BY MS. RICHARDSON:

16      Q.  Let me rephrase the question.

17      A.  Okay.

18      Q.  Let me try to rephrase the question.

19          It was widely reported in the news that Pamela

20  Miller provided statements and testimony to the federal

21  authorities in the Pellicano investigation.

22          Are you aware of this?

23      A.  Yes.

24          MR. HARRISON:  Objection.  Compound.  Vague.

25          MS. RICHARDSON:  Okay.  It's okay.



Page 67

1              MR. ANDRE:  Ms. Thomson --

2              THE WITNESS:  I'm so sorry.  I did answer yes.

3    BY MS. RICHARDSON:

4        Q.  In 2008 you filed publicly papers to intervene

5    in the Pellicano criminal case to suppress Pamela

6    Miller's testimony.

7              Do you remember this?

8              MR. HARRISON:  Objection.  Same continuing

9    objection.  Compound question.

10   BY MS. RICHARDSON:

11       Q.  In 2008 --

12       A.  It was privileged.

13       Q.  -- you filed -- no.  It's publicly filed.

14             MR. HARRISON:  Okay.  You cannot testify.

15   Okay?  And you cannot give my client legal advice or

16   direction.  Okay?

17             MS. RICHARDSON:  Understood.

18             MR. HARRISON:  You can ask questions, but you

19   can't do that.

20             MS. RICHARDSON:  That's not legal advice.  I'm

21   clarifying that this is not a privilege matter.  This

22   is -- we're talking about a publicly filed matter --

23             MR. HARRISON:  That calls for a legal -- that

24   calls for a legal conclusion --

25             MS. RICHARDSON:  I am asking --


MAGNA
LEGAL SERVICES

Page 68

1           MR. HARRISON:  -- whether something is

2     privileged or not.

3           MS. RICHARDSON:  I am asking about an event

4     that occurred.  I'm not asking -- asking for anything

5     privileged.  I'm not asking for her to -- to come to a

6     legal conclusion.

7           I'm asking very simply if in 2008 you filed

8     papers to intervene in the Pellicano criminal case to

9     suppress Pamela Miller's testimony.

10          MR. HARRISON:  So objection.  Compound.

11          If you can answer without intruding upon any

12    advice that -- or conversations you may have had with an

13    attorney at the time, then you can answer the question;

14    but if answering the question would involve privileged

15    information relating to any discussions with an

16    attorney --

17          MS. RICHARDSON:  Counsel --

18          MR. HARRISON:  -- at the time, then you

19    can't -- I'm directing you not to answer the question.

20          MS. RICHARDSON:  With all due respect, you're

21    running the clock on -- on a question that I just asked

22    your client about a public filing.  I'm not asking her

23    to give me any privileged information or a legal

24    conclusion.

25          MR. HARRISON:  You're not here to testify,



Page 69

1   Ms. Richardson.  You can ask questions, I can make

2   objections, but you're not here to testify.

3           THE WITNESS:  I cannot answer.  I do not know

4   the answer.

5           MS. RICHARDSON:  You don't -- if you don't

6   remember, that's okay.  You can say "I don't remember."

7           MR. HARRISON:  Objection.  Again, you cannot

8   give my client direction about how she should testify.

9   That's our job.

10          MS. RICHARDSON:  Understood.

11  BY MS. RICHARDSON:

12    Q.  You filed publicly papers to intervene in the

13  Pellicano criminal case to suppress Pamela Miller's

14  testimony in 2008.  In that testimony you asserted that

15  Ms. Miller's testimony would be prejudicial to you.

16          Do you have memory of this?

17          MR. HARRISON:  Objection.  Multiple compound

18  questions.  Calls for speculation.  To the extent it

19  involves any privileged information, I'm directing you

20  not to answer it.  If you can answer it without

21  impinging upon any conversations you had with a lawyer

22  or legal advice that you got in relation to those legal

23  filings, then you can answer the question.

24          THE WITNESS:  I can't answer the question.

25  ///



Page 70

1    BY MS. RICHARDSON:

2       Q.  Okay.  Why can't you answer the question?

3           MR. HARRISON:  Objection.  Argumentative.

4    Asked and answered.

5    BY MS. RICHARDSON:

6       Q.  You don't know?  Okay.

7       A.  Because I don't know.  That was a long time

8    ago, and there was a lot of litigation and things around

9    Pamela.

10      Q.  Okay.  I'm going to table that and go back to

11   it later.

12          For today's questions I just want to establish

13   some -- some understanding of -- of what the words I'm

14   about to use pertain to.  "Claim" means any lawsuit; but

15   it also means an arbitration, an administrative charge,

16   a tribunal complaint, police report, or demand letter

17   that alleged wrongdoing by you or an entity you control.

18   So as I -- as I go through this section, I just want you

19   to know "claim" is not specific to a filed lawsuit; but

20   it kind of, you know, covers that broad spectrum.

21      A.  Can I ask a question?

22      Q.  Sure.

23          MR. HARRISON:  Wait.  Wait.  Wait.  Whoa.

24   Whoa.  Whoa.  Objection that you cannot make a speech,

25   one; you cannot give my client legal direction, two; and



Page 71

1   you cannot make up and enforce your own definitions of

2   different things.

3          You can ask questions, and she can try to the

4   best of her ability, but you can -- you can't do that.

5          MS. RICHARDSON:  Great.  I was trying to make

6   it easier because I just wanted to -- I can go through

7   every time I -- I ask.

8   BY MS. RICHARDSON:

9      Q.  But since 2000 have you been a party to any

10  claim or proceeding that involves your staff?

11         MR. HARRISON:  Objection.  Compound.  Vague.

12  In terms of "claim or proceeding," if the answer would

13  involve any privileged information like where you had a

14  discussion with an attorney or got legal advice from an

15  attorney, then I'm directing you not to answer that

16  question.

17         MS. RICHARDSON:  I'm not asking for anything

18  privileged.  I'm not asking for anything privileged.

19  I'm asking for the claim itself.

20         MR. ANDRE:  And, Ms. Richardson, just to be

21  clear, part of what we're trying to do is make sure that

22  we're advising our client and reminding her not to

23  disclose privileged information; and we're telling her

24  to make sure that if -- make sure that she limits her

25  answer, if possible, to nonprivileged information.  You



Page 72

1 need to allow us to make sure that we provide that --

2          MS. RICHARDSON:  Absolutely.

3          MR. ANDRE:  -- that advice for our client on

4 the record.

5          MS. RICHARDSON:  Okay.  That's -- understood.

6 Thank you.

7          MR. ANDRE:  Thank you.

8          THE WITNESS:  So can you repeat that again.

9 BY MS. RICHARDSON:

10    Q.  Sure.  Since 2000 -- the year 2000 have you

11 been a party to any claim or proceeding in Canada or the

12 United States relating to your staff?

13          MR. HARRISON:  Okay.  So objection to compound.

14 Objection to vague.  Objection -- and I'm directing you

15 again, to the extent that it would impinge upon a legal

16 privilege, for instance, advice that you got from

17 attorney or conversations with attorney -- privileged

18 conversation with attorney --

19          MS. RICHARDSON:  Okay.

20          MR. HARRISON:  -- then I'm directing you not to

21 answer that question.  If you can answer it without

22 relating to privileged information --

23          MS. RICHARDSON:  Counsel --

24          MR. HARRISON:  -- then you can try and answer

25 to the best of your ability.  But I've got my continuing



Page 73

1  objection that this question since 2000 is just

2  harassment and intimidation, not --

3          MS. RICHARDSON:  I'm asking for a history of

4  complaints -- of -- of issues with staff, complaints

5  against you or complaints against them.

6          MR. HARRISON:  Objection.  Form.

7          MS. RICHARDSON:  It's not a -- it's not a

8  complicated question.

9          MR. HARRISON:  Objection to form.  It's

10 argumentative.  It's vague --

11         MS. RICHARDSON:  Okay.  Let me try this again.

12         MR. HARRISON:  -- form of the question.

13 BY MS. RICHARDSON:

14     Q.  Have you ever had a staff member file a

15 complaint against you in any capacity since the year

16 2000?

17         MR. HARRISON:  Objection.  Vague.  My

18 continuing objection to harassment and intimidation.

19         MS. RICHARDSON:  Thank you.  Thank you for

20 acknowledging that.  I heard you.

21         THE WITNESS:  Do I -- I answer?

22         MR. ANDRE:  To the extent you can answer the

23 question without disclosing privileged communications.

24         THE WITNESS:  I mean, Pamela Miller -- Pamela

25 Miller sued -- tried to sue -- I think repeatedly,



Page 74

1   several times, to sue me, I believe.  We kept -- she

2   kept getting shut down because it was all just

3   extortion, but she kept trying.

4   BY MS. RICHARDSON:

5       Q.  Were there any other employees that alleged

6   misconduct over the years?

7           MR. HARRISON:  Objection.  Vague.  Assumes

8   facts not in evidence.  Misleading.  And to the extent

9   that answering that question would involve giving

10  information regarding a legal privilege, like

11  attorney-client privilege --

12          MS. RICHARDSON:  Let me rephrase the question.

13          MR. HARRISON:  Let me -- let me finish.

14          MS. RICHARDSON:  Okay.

15          MR. HARRISON:  -- or legal advice that you got

16  from an attorney, then I'm directing you not to answer.

17          If you can answer without relating to

18  privileged information, then you can try and answer.

19          THE WITNESS:  The -- I don't -- to my

20  knowledge, no other -- no other -- nobody else filed

21  than Pamela.

22          MS. RICHARDSON:  Understood.  So I want to be

23  clear that as I'm asking you these questions, it doesn't

24  relate to a filed lawsuit.  A complaint could be those

25  things I mentioned before.  But let me try and get more



Page 75

1    specific so that there's no doubt.

2         And I want to say for a second on the record,

3    Mr. Harrison, with all due respect, I appreciate you

4    guys protecting your client; but if it -- every time I

5    ask a question you give that same long speech, we are

6    going to go over the seven hours and then I'm going to

7    have to compel for more days.

8         MR. HARRISON:  I would -- you can try and do

9    that, if you want.  It's your right to try and do that,

10   if you want.  I can't imagine that that would be

11   granted --

12        MS. RICHARDSON:  Excellent.  Well, I can't

13   imagine --

14        MR. HARRISON:  -- given all the -- given all

15   the irrelevant questions that you --

16        MS. RICHARDSON:  I think that -- I think that

17   there's a good chance but -- but full stop, let's try --

18   let me try to --

19        MR. HARRISON:  I am just going to object to

20   your direction to my client about the definition of a

21   claim and what it was because it wasn't correct and --

22        MR. ANDRE:  I will note for the record as well,

23   part of the issue here is you are asking questions about

24   legal proceedings; and when you start asking questions

25   about legal proceedings, part of legal proceedings, we



Page 76

1    have to make sure that our -- we're helping our client

2    protect attorney-client privilege.

3              MS. RICHARDSON:  That, I respect.

4              MR. ANDRE:  So -- so -- so we need to do that.

5    Now, if you're asking -- that's -- that is why we are

6    doing this.  And again, it is not -- and keep that in

7    mind, please.

8              MS. RICHARDSON:  I -- you know what I'm going

9    to do?  I'm going to -- I'm going to set this section

10   aside.  We'll come back to it.  And then on a break I

11   will do a little more due diligence just to make sure

12   that I'm asking it in a way that we don't have to stop

13   every time.  Let's pivot for a minute.

14   BY MS. RICHARDSON:

15        Q.  Ms. Thomson, you and I have known each other

16   for more than 14 years; correct?

17        A.  I haven't counted the number.

18        Q.  Approximately.

19        A.  If you say -- if you've done the math, I

20   mean --

21        Q.  Would you say that --

22        A.  -- I'd say yes.

23        Q.  We've known each for a long time?

24        A.  Very long time.

25        Q.  Would you describe our relationship during that



Page 77

1    time as friends?

2        A.  Very much so.

3        Q.  Would you describe that relationship during

4    that time, for the most part, as very close friends?

5        A.  Very close.  Close friends.

6        Q.  You did not retain me under a written contract

7    as staff or consultant; is that correct?

8        A.  Very --

9            MR. HARRISON:  Objection to the form.

10   Compound.  Speculative.

11           But you can answer to the best of your ability.

12           THE WITNESS:  No.  I did not retain you as

13   staff or an employee of any sort.

14   BY MS. RICHARDSON:

15       Q.  Sorry.  Just give me one second.

16       A.  Would you like a break?

17       Q.  No.  Shouldn't be the other way around.

18           Because I have a good memory and also because

19   when I met you I was dating a man, I know that that was

20   approximately in twenty -- 2009 to 2010.

21           Does that sound like it might be about right to

22   you?

23           MR. HARRISON:  Objection to form.  Compound.

24           You can answer the question.

25           THE WITNESS:  Probably approximate -- you would



Page 78

1    know.  I --

2          MS. RICHARDSON:  That's -- that's the -- that's

3    one of the main markers.

4          MR. HARRISON:  I'm sorry.  I apologize.  Can I

5    just have that question read back.  I missed it.

6          (The record is read by the reporter as

7          follows:

8          "Q.  Because I have a good memory and also

9          because when I met you I was dating a man, I

10         know that that was approximately in twenty --

11         2009 to 2010.

12         "Does that sound like it might be about right

13         to you?")

14         MR. HARRISON:  Go ahead.

15   BY MS. RICHARDSON:

16       Q.  Would you say accuracy is important, especially

17   in testimony on record?

18         MR. HARRISON:  Objection.  Calls for

19   speculation.  Vague.

20   BY MS. RICHARDSON:

21       Q.  Do you try to be accurate when you are giving

22   testimony on record?

23       A.  Yes.  Yes, I do.

24       Q.  Can I assume that during the Singapore

25   arbitration you were trying to be accurate when you put



Page 79

1  statements on the record?

2          MR. HARRISON:  Objection.  Vague.  Calls for a

3  legal conclusion.

4  BY MS. RICHARDSON:

5      Q.  Were you as accurate as you could be when you

6  gave statements for -- in testimony related to your case

7  against Persistence in the Singapore arbitration?

8          MR. HARRISON:  Objection.  Same objections.

9          You can answer to the best of your ability.

10          THE WITNESS:  Yes.  Yes.

11  BY MS. RICHARDSON:

12      Q.  Are you aware that in that witness statement

13  you provided you said that we met in 2014?

14          MR. HARRISON:  Objection.  Calls for

15  speculation.

16          You can answer to the best of your --

17          THE WITNESS:  I don't recall.  Sorry.

18  BY MS. RICHARDSON:

19      Q.  You don't recall.

20          But as we sit here today, you agree -- and I

21  understand, it is hard to remember dates sometimes --

22  but that that timeline seems accurate to you, that we

23  would have met -- sorry.  Let me -- let me rephrase the

24  question.

25          Do you remember where we met?



Page 80

1        A.  Yes.  We met at Beau's house by the pool, and

2    you were dating Kevin at the time before you met

3    Michelle.

4        Q.  That's correct.  Yes.

5        A.  And you would remember that timeline --

6        Q.  Yeah.

7        A.  -- probably -- I'm sure better than me.

8        Q.  I mean, depends on the day these days; but

9    yeah.

10       A.  I don't -- do not have the exact date.  I would

11   have to go back and start to look through calendars.

12       Q.  Understand.

13       A.  But I would trust your recollection on this

14   one.

15       Q.  Could you explain what you remember about our

16   friendship from -- during those years.  Let's just say

17   approximately 2010 to 2015.

18            MR. HARRISON:  Objection.  Vague.  Calls for

19   speculation.

20            You can answer to the best of your ability.

21            THE WITNESS:  We -- we were good friends.

22   BY MS. RICHARDSON:

23       Q.  And we spent a lot of time together when you

24   were in Los Angeles; correct?

25       A.  Yes.



Page 81

1      Q.   And I flew to visit you in London.

2           Do you remember that?

3      A.   Yes.

4      Q.   In February of 2014 we went to see our mutual

5   friend, Storm Large, perform in Palm Springs.

6           Do you remember that?

7      A.   Yes.

8      Q.   It was your birthday weekend, wasn't it?

9      A.   Yes.

10     Q.   Do you remember that Storm encouraged us to

11  stay at the Saguaro hotel with her?

12          MR. HARRISON:  Objection.  Vague.  And same

13  intimidating and harassment --

14  BY MS. RICHARDSON:

15     Q.   Do you remember that we stayed --

16          MR. HARRISON:  -- objection -- let me just

17  finish --

18          MS. RICHARDSON:  Okay.

19          MR. HARRISON:  -- that I've made before.

20          I see no relevance to this.

21          You can answer to the best of your ability.

22          THE WITNESS:  I remember we stayed -- we stayed

23  at -- I don't remember the name of it, but I remember we

24  stayed somewhere where -- where you -- where you wanted

25  to stay because Storm was, I believe, there and she was



```
                                                    Page 82
 1   performing.  And so the idea was that we would all be

 2   together.  I believe that -- was Storm in another place?

 3   BY MS. RICHARDSON:

 4        Q.  I think -- no.  Storm wanted us to stay there.

 5   She -- I don't think it was -- any of us decided that.

 6   But Storm did decide --

 7        A.  Because it was -- she was your friend, and I

 8   had just -- I was in England when that was arranged, so

 9   I just flew in.

10        Q.  Do you remember being upset with the

11   accommodations?

12            MR. HARRISON:  Objection.  My same continuing

13   objection.

14            Go ahead.  You can answer.

15            THE WITNESS:  I remember it wasn't an

16   impressive place to have gotten off a 12-hour flight

17   from London and go straight from the airport out there.

18   BY MS. RICHARDSON:

19        Q.  Do you remember --

20        A.  It was -- I remember it was uncomfortable.  It

21   wasn't -- it wasn't a great choice, but that's the

22   choice that -- that was the -- that was the deal.

23        Q.  Do you remember that there was no bell staff

24   present?

25        A.  Yeah.  That would have been the case with that
```



Page 83

1    place.

2         Q.  Do you remember yelling at me to take your

3    bags?

4              MR. HARRISON:  Objection to form.

5              Go ahead.  You can answer.

6              THE WITNESS:  No.

7    BY MS. RICHARDSON:

8         Q.  Do you have any memory that Michelle and I paid

9    for yours and Madeleine's hotel rooms during that stay?

10        A.  Yes.  Because you were treating me for my

11   birthday.

12        Q.  Yeah.  I know this -- I'm just saying on the

13   side, we did not choose that hotel.

14             MR. HARRISON:  Objection.

15             THE WITNESS:  Storm did, I remember.  I

16   remember it was driven by Storm performing there, and

17   that's why we were there.

18             MR. HARRISON:  Just going to object to the form

19   for the record, obviously --

20             MS. RICHARDSON:  I know.  That was -- that

21   was -- I totally get it.  That was -- that was a bad --

22   bad Ashley.

23   BY MS. RICHARDSON:

24        Q.  When -- when we dined out did I typically offer

25   to split the bill?



Page 84

1          MR. HARRISON:  Objection.  Vague.

2          Go ahead.

3    BY MS. RICHARDSON:

4      Q.  Do you remember me --

5      A.  Back then, I don't remember.

6      Q.  Okay.

7      A.  I don't --

8      Q.  That's all right.

9      A.  I don't remember.

10     Q.  That's okay.  You cannot remember.  That's

11   totally acceptable.  That's an answer, so it's fine.

12   You're not going to -- who's going to remember

13   everything from back then?

14          Now, do you remember especially I would say

15   from 2010 to 2016, when Beau was alive, that I would

16   cook meals for all of us?

17          MR. HARRISON:  Objection to form.  Compound.

18   BY MS. RICHARDSON:

19     Q.  Do you remember me cooking meals in your home?

20     A.  There were very few.  Very few.  I remember you

21   were up at Beau's house every weekend and you were

22   always up there cooking.

23     Q.  That's also true.

24          There was a period of time where -- I'll leave

25   that off for now.



Page 85

1          Before you visited my home for the first

2    time -- let me rephrase this question.

3          Do you remember coming to my home for the first

4    time?

5          A.  I don't remember exactly when it was.

6          Q.  Okay.  That's --

7          A.  Yeah.

8          Q.  You didn't visit my home often; is that

9    correct?

10         A.  Not that often, no.

11         Q.  Okay.  Do you have a memory of visiting my

12   home -- do you have a memory of us going to dinner after

13   you visited my home where you told me I could not pay

14   for the meal because I was poor?

15         A.  No.

16             MR. HARRISON:  Objection.

17   BY MS. RICHARDSON:

18         Q.  Okay.

19         A.  I answered that "no"; right?

20         Q.  Yeah.  You don't remember?  That --

21             MR. HARRISON:  Objection.  Asked and answered.

22   BY MS. RICHARDSON:

23         Q.  Okay.  During a trip to Italy in 2021, the last

24   trip we took together -- I cannot recall the name of the

25   restaurant, but do you remember us dining at a

