Page 86

1    restaurant in Positano outdoors?

2        A.  Yes.

3            MR. HARRISON:  Just objection to form.

4    Compound.

5            But go ahead.

6    BY MS. RICHARDSON:

7        Q.  Do you remember at that lunch Michelle and I

8    paid for the lunch?

9            MR. HARRISON:  Objection to form.

10           Go ahead and answer.

11           THE WITNESS:  I -- I don't recall that you paid

12   for that specific lunch.  I do know that on the boat

13   trip, as all guests generally -- each guest would at one

14   point pick up a meal, and I do know you picked up a

15   meal.

16   BY MS. RICHARDSON:

17       Q.  Yes.  Were you aware that that meal cost just

18   under $3,000?

19       A.  No.  If you picked it up and you didn't show

20   me, I wouldn't have been aware.

21       Q.  Yeah.  That's true.

22       A.  Yeah.

23           MR. HARRISON:  Excuse me.  You got to stop

24   testifying, Ms. Richardson.  Like, you can ask a

25   question; but you can't testify.



Page 87

1           MS. RICHARDSON:  That's fair.  I understand.

2    I'll -- I'll do a better job of trying to make sure the

3    form is correct.

4    BY MS. RICHARDSON:

5        Q.  During that trip, we visited the South of

6    France and Italy; correct?

7        A.  Yes.

8        Q.  Okay.

9           THE WITNESS:  Sorry.

10           MR. HARRISON:  No.  It's my fault.

11           THE WITNESS:  I'm so sorry.

12           MR. HARRISON:  It -- I'm getting slow.  Just in

13    the future can you -- just a little bit, can you --

14           THE WITNESS:  I'll be slow.

15           MR. HARRISON:  For the rest of us, can you

16    specify time period -- what we're talking about.

17           MS. RICHARDSON:  Sure.

18    BY MS. RICHARDSON:

19        Q.  In the summer -- in July of 2021 do you

20    remember us going on a boat to the South of France and

21    Italy?

22        A.  Yes.

23           MR. HARRISON:  You may answer.

24    BY MS. RICHARDSON:

25        Q.  Great.  I'll -- I'm -- it will get better as we



Page 88

1  go.  This is the fun thing about this, is that you --

2  you get better as you go, hopefully, or else we all --

3  anyway, try to leave the humor out of it.

4          Do you recall inviting me to join a second

5  yacht trip that was going to happen in Croatia

6  immediately following that?

7      A.  Yes.

8      Q.  Do you recall me expressing a desire to go

9  home?

10     A.  I think you -- I think so.  If that's the

11  moment where you wanted to go back to see your father.

12     Q.  No.  That was a different year.

13     A.  Okay.

14     Q.  It's okay.  That was separate.

15     A.  Okay.  That you wanted to go home, I don't

16  recall.  Sorry.

17     Q.  Okay.  That's fine.  You don't have to recall.

18          Were you aware that on that trip -- let me --

19  let me -- I'm not going to go there.

20          Over the years we took several trips together;

21  correct?

22     A.  Correct.

23     Q.  Do you remember on several occasions when you

24  became ill that I stayed to take care of you?

25     A.  I remember on one occasion, sure, because it



Page 89

1  was very memorable.  It was one of the boat trips, and

2  it was -- I had a hangover, which was just miserable.

3  Not something one wants to do on a regular basis.  So

4  yeah.  You were very -- you were very kind.  Very kind.

5      Q.  Do you think that I had any resentment to be

6  taking care of you?

7          MR. HARRISON:  Objection.  Form.  Calls for

8  speculation.

9          MS. RICHARDSON:  That's fair.

10         THE WITNESS:  No.

11  BY MS. RICHARDSON:

12     Q.  Do you remember me staying back with you while

13  everybody else left to go on a day trip?

14     A.  Yes.  Yes, I do.

15         MS. RICHARDSON:  Let's take a ten-minute break

16  so everybody can use the restroom, get something to

17  drink, and then we will circle back for the -- for the

18  next round.  I know food is coming at some point.

19  Everybody's orders are coming, and this will just give

20  us to a minute to refresh.  If food is here, we can

21  bring it in.  Or -- you know, maybe we don't do that on

22  camera.  Or we'll figure -- let me see.

23         THE VIDEOGRAPHER:  Going off the record at

24  12:20.

25             (A recess is taken.)



Page 90

1          THE VIDEOGRAPHER:  We are back on the record at

2     12:38.  This is Media No. 2 in the deposition of

3     Ms. Taylor Thomson.

4     BY MS. RICHARDSON:

5          Q.  Okay.  Ms. Thomson, thank you.  You got a

6     chance to take a break and -- let's resume our

7     conversation and go back a little bit.  Actually, you

8     know, let's keep going forward.

9               So do you remember in April of 2021 us going on

10    a trip to Mexico?

11         A.  Yes.

12         Q.  Do you remember that while we were on that

13    trip, the price of Bitcoin was doing -- hitting an

14    all-time high?  At that moment I think it was around

15    $58,000.

16         A.  I don't -- the timing on that -- I remember

17    when Bitcoin went -- when it went to 58, but I don't

18    remember a time.

19         Q.  Do you remember --

20         A.  I'll take your word for that one.

21         Q.  -- being excited about crypto and Bitcoin

22    during that trip?

23         A.  Yes.

24         Q.  Okay.  At that time do you remember me

25    mentioning to you that I had subscribed to a newsletter



Page 91

1  from Michelle Whitedove?

2      A.  I do not recall whether that was the time.

3  I -- there was a time -- there was a time when you

4  mentioned it.

5      Q.  During the time that Bitcoin started to do

6  better, is it correct that a lot of altcoins in the

7  crypto market were doing exceptionally well,

8  comparatively speaking?

9          MR. HARRISON:  Objection to form.  Calls for

10  speculation.

11  BY MS. RICHARDSON:

12      Q.  Okay.  Do you remember being excited about

13  altcoins around the same time of the Mexico trip?

14      A.  I don't recall it coinciding with the Mexico

15  trip specifically, so --

16      Q.  Let's just say --

17      A.  So --

18      Q.  -- that the spring to early summer of 2021,

19  roughly -- April to --

20      A.  I can't -- I can't -- I can't say I actually

21  remember that timing.

22      Q.  Okay.

23      A.  I remember later in the summer.  I don't

24  remember the earlier part when that was triggered.

25      Q.  Understood.  Do you remember you purchased --



Page 92

1  you began purchasing Ethereum in -- at -- were

2  purchasing Ethereum in May of 2021?

3       Do you remember that?

4  A.  I -- I don't remember the actual dates, but I

5  started buying Ethereum when I was with Anchorage.

6  Q.  And do you remember writing to me about

7  Ethereum?

8       MR. HARRISON:  Objection.  Vague.

9  BY MS. RICHARDSON:

10  Q.  Do you remember having conversations with me

11  about Ethereum on or about May to June of 2021?

12  A.  I could -- I could not speak to the date.  I

13  mean --

14  Q.  Do you remember --

15  A.  I was invested heavily in Bitcoin, and I also

16  had spread out into Ethereum, and so those were -- those

17  were my crypto -- that was my crypto world.

18  Q.  And was Ethereum the first time you purchased a

19  cryptocurrency other than Bitcoin?

20  A.  Yes.

21  Q.  In May and June of 2021, you and I discussed

22  Ethereum and altcoins.

23       Do you remember that?

24  A.  I don't remember the actual date.  You are the

25  one that brought up and -- brought altcoins onto my



Page 93

1  radar.  I do know that.  In terms of the actual day, I

2  couldn't tell you the actual day.

3      Q.  That's fair.

4      A.  Obviously, it was -- it was before I started

5  purchasing.

6      Q.  Do you remember me mentioning that I subscribed

7  to the newsletter of a psychic, Michelle Whitedove?

8      A.  Yes, I remember that.

9      Q.  Do you remember that I subscribed to it not for

10  cryptocurrency?

11     A.  Yes.

12         MR. HARRISON:  Objection.  Calls for

13  speculation.

14         Go ahead and answer, especially since you

15  already have.

16         THE WITNESS:  Sorry.

17  BY MS. RICHARDSON:

18     Q.  How about this.  What do you remember about me

19  saying to you about Michelle Whitedove?

20         MR. HARRISON:  Objection.  Vague.

21         THE WITNESS:  I -- I remember that you said

22  that you were -- you had been reading her newsletter

23  during COVID to see -- because you were interested in

24  people that had predicted COVID.  Then you started

25  paying attention at one point to her altcoins.



Page 94

1    BY MS. RICHARDSON:

2        Q.   At this point, when we had the conversation

3    about altcoins, is it fair to say the market had already

4    had a considerable run-up?

5            MR. HARRISON:   Objection.   Vague.

6    BY MS. RICHARDSON:

7        Q.   In the spring of 2021 the crypto market had

8    increased considerably from where it had been the year

9    previous, in the beginning of COVID in 2020; correct?

10       A.   Correct.

11           MR. HARRISON:   Objection.   Compound.   Vague.

12   BY MS. RICHARDSON:

13       Q.   The -- do you remember me sharing with you that

14   Michelle Whitedove had made predictions early in 2020

15   that did incredibly well?   Let me rephrase that.

16           You have consulted astrologers and psychics in

17   the past; correct?

18           MR. HARRISON:   Objection.   Compound.   Vague.

19   BY MS. RICHARDSON:

20       Q.   You have construct -- you -- have you ever

21   consulted astrologers?

22       A.   Yes.

23       Q.   Have you ever consulted psychics?

24       A.   Several times, but years ago.

25       Q.   Okay.



Page 95

1      A.  Not regularly.  Astrology is something that I
2  follow and I'm interested in.
3      Q.  And you have done a lot of work with Robert
4  Sabella; correct?
5          MR. HARRISON:  Objection.  Vague.
6  BY MS. RICHARDSON:
7      Q.  In 2021 I shared predictions from Michelle's --
8  Whitedove's subscription newsletter with you; correct?
9          MR. HARRISON:  Objection.  Vague.
10  BY MS. RICHARDSON:
11      Q.  In 2021 I shared Michelle Whitedove's altcoin
12  crypto predictions with you.
13          Do you remember that?
14          MR. HARRISON:  You can answer.
15          THE WITNESS:  I don't remember the actual date,
16  but I remember you -- you bringing it up, and at some
17  point I remember you printed -- I think you had showed
18  me a printout.  I think you showed me something in
19  writing once --
20  BY MS. RICHARDSON:
21      Q.  Yes.
22      A.  -- a printout.
23      Q.  At that time I think I also shared with you
24  that her top pick was a coin called Theta.
25          Do you remember that?



Page 96

1       A.   I don't remember Theta --

2       Q.   Okay.

3       A.   -- specifically as her top pick.

4       Q.   That's okay.

5            Michelle Whitedove had identified the coin

6    Theta in early 2022 as being a top performer, and it

7    went on to grow exponentially.  I believe it was

8    something like a thousand x.

9            MR. HARRISON:  Objection.  Compound --

10           MS. RICHARDSON:  Okay.

11           MR. HARRISON:  -- leading.  Calls for

12   speculation.

13   BY MS. RICHARDSON:

14       Q.  Michelle Whitedove predicted in early 2020

15   Theta would do very well and -- and the returns were

16   very large.

17           Do you remember that?

18           MR. HARRISON:  Objection.  Compound.  Leading.

19   BY MS. RICHARDSON:

20       Q.  Okay.  Go ahead and answer.

21       A.  I -- I reread -- I just -- I reread her -- her

22   newsletter because I saw it in the pleadings.

23       Q.  Uh-huh.

24       A.  So I saw that.  I don't specifically at the

25   time remember Theta.  What I really more remember was



Page 97

1    Persistence.

2         Q.  Right.

3         A.  That was one she was thinking was going to be

4    significant.  And having just read the newsletter, I --

5    I -- I know what she said.

6         Q.  Do you remember -- Persistence was a relatively

7    new coin compared to other altcoins in the spring of

8    2021; correct?  That's when it was introduced, in April

9    of 2021?

10         MR. HARRISON:  Objection.  Calls for

11    speculation.  Compound.

12         THE WITNESS:  Do I answer?

13         MR. HARRISON:  If -- to the -- if you can,

14    yeah.

15         THE WITNESS:  Yes.

16    BY MS. RICHARDSON:

17         Q.  In May and June of 2021, I began doing research

18    on cryptocurrency after our Mexico trip.

19         Do you remember that?

20         A.  Yes, I do.

21         THE WITNESS:  Sorry.

22         MR. HARRISON:  That's okay.  That's okay.

23    Just --

24         THE WITNESS:  Sorry.

25         MR. HARRISON:  Wait a beat.  Just wait a beat.



Page 98

1    BY MS. RICHARDSON:

2        Q.  I shared with you the information I gathered

3    through my independent research and also through

4    Michelle Whitedove's predictions.

5            Do you remember that?

6            MR. HARRISON:  Objection.  Compound.  Calls for

7    speculation.  Assumes facts not in evidence.

8    BY MS. RICHARDSON:

9        Q.  Okay.  Let me rephrase the question.  Just go

10   back a second.

11           Do you remember telling me that you followed

12   the advice of a psychic and -- and, as a result, bought

13   quite a bit of gold?

14           MR. HARRISON:  Objection.  Compound.  Vague.

15           MS. RICHARDSON:  You still answer it.

16           MR. HARRISON:  To the extent -- to the extent

17   that you can, go ahead and answer it.

18           THE WITNESS:  I -- I did buy -- I did buy gold

19   at one point, and I do know -- I do know a psychic who

20   was very keen on gold.

21   BY MS. RICHARDSON:

22       Q.  And --

23       A.  So, I mean, it's like it wasn't -- that wasn't

24   my sole decision as to whether to buy gold.  I think

25   there were a lot of things that were -- the world was



Page 99

1    looking a little turbulent to me at that time, and it

2    was an opportune time because the world -- gold then

3    started moving.

4        Q.  Understood.  Now, I shared with you Whitedove's

5    prediction that Persistence XPRT -- she -- she stated in

6    her newsletter that Persistence XPRT was her -- her top

7    pick.  Do you remember that?

8        A.  I --

9        Q.  Yeah.

10           MR. HARRISON:  Go ahead.

11           THE WITNESS:  I remember you shared that with

12   me, yes.

13   BY MS. RICHARDSON:

14       Q.  You expressed interest in buying a number of

15   altcoins at that time.

16           Do you remember that?

17       A.  I remember being -- I remember being -- having

18   my curiosity stoked because I recall you were of the

19   opinion that they were -- they were the next wave and

20   that there -- they were exponentially -- that -- because

21   it was obvious Bitcoin had moved a lot, and you thought

22   that they were the next wave of -- of the crypto world.

23       Q.  Now, this is a good chance for me to kind of

24   pivot for a second.

25           You knew me at that point very well?



Page 100

1          MR. HARRISON:  Objection.  Compound.  Calls for

2    speculation --

3    BY MS. RICHARDSON:

4        Q.  You and I were -- you and I were close friends

5    in 2021; correct?

6          MR. HARRISON:  You can answer, to the extent

7    you can.

8          THE WITNESS:  Yes.  Yes.

9    BY MS. RICHARDSON:

10        Q.  Is it fair to say that you knew more about me

11    than most other people?

12          MR. HARRISON:  Objection.  Calls for

13    speculation.  Vague.

14    BY MS. RICHARDSON:

15        Q.  Would you consider me one of your closest

16    friends at that time?

17        A.  Yes.  I would have considered you one of my

18    closest friends.

19        Q.  Is it safe to say that you knew that I was not

20    a financial professional?

21        A.  Absolutely you weren't -- you -- you were not a

22    financial professional.  You were just someone who was,

23    as you professed, down -- down the rabbit hole, and this

24    was just a world which was -- had actually become your

25    world because that's what you were doing all day long,



Page 101

1    as you said.  I remember you were trading to try -- to

2    actually make a career at the end and make a good --

3    make money.

4         Q.  I think --

5         A.  And as a result, you were -- you seemed really

6    knowledgeable because that's all you did, you said.

7         Q.  Do you remember me being interested in things

8    other than financial potential of crypto, but also

9    blockchain technology?

10        A.  I -- I remember you feeling that it was of --

11   that it had a utility which Bitcoin did not have because

12   Bitcoin was a store of wealth, effectively.

13        Q.  Yeah.

14        A.  And this was the new world with platforms and

15   other -- other crypto directions.

16        Q.  Do you remember me taking the predictions of

17   Whitedove but then using those predictions to do my own

18   research based on the projects she listed?

19        A.  Yes.

20             MR. HARRISON:  Objection -- objection.

21   Compound.

22   BY MS. RICHARDSON:

23        Q.  Do you remember me -- we can break it into two.

24             Do you remember me looking -- taking -- looking

25   at Michelle Whitedove's advice, period?



Page 102

1      A.  Yes.

2      Q.  Do you remember me taking that advice and doing

3  my own research?

4           MR. HARRISON:  Objection.  Vague.  Calls for

5  speculation.

6           MS. RICHARDSON:  You can answer.  You still

7  have to answer, but yes.

8           THE WITNESS:  Do I answer?

9           MR. HARRISON:  Well, you can answer to the best

10 of your -- if you knew what she did, if you can answer

11 that question.

12          THE WITNESS:  From what I -- from what I

13 gathered from you, yes, you were studying extensively

14 crypto and that world because it was -- you were

15 dedicated.

16 BY MS. RICHARDSON:

17     Q.  Now, do you remember -- we had dinners at Nobu

18 when you -- from -- from May to July it was -- it was

19 a -- there was a period of time.

20          Do you remember that?

21          MR. HARRISON:  Objection.  Vague.

22 BY MS. RICHARDSON:

23     Q.  Do you remember us having dinner at Nobu in the

24 summer of 2021?

25     A.  Yes.  The summer of 2021, when I was in Malibu,



Page 103

1    that was the only place I would eat.

2         Q.  Yes.  And do you remember me telling you that I

3    was reaching out to crypto companies to see if I could

4    do some consulting for them as a trade because I didn't

5    have the means to invest?

6              MR. HARRISON:  Objection.  Compound.

7    BY MS. RICHARDSON:

8         Q.  Do you remember me telling you I was reaching

9    out to several crypto companies to consult -- in hopes

10   of consulting?

11        A.  Yes, I do.

12        Q.  Do you remember that one of those crypto

13   companies was Persistence?

14        A.  Yes, I do.

15        Q.  Now --

16             THE WITNESS:  Okay?

17             MR. HARRISON:  That's fine.

18             THE WITNESS:  I believe that was after -- after

19   we were -- after you were speaking to them about my

20   investment.

21             MS. RICHARDSON:  No.  Before.  That's okay.

22             MR. HARRISON:  Objection.  You can't testify.

23             THE WITNESS:  Sorry.  I shouldn't have said

24   that.

25             MR. HARRISON:  You can't really ask her



Page 104

1   questions either except to clarify her question.  Okay?

2           THE WITNESS:  Okay.  Got it.

3   BY MS. RICHARDSON:

4       Q.  When we first -- when I first mentioned

5   Persistence it was in relation to a large number of

6   altcoins that Michelle Whitedove had predicted could be

7   successful.

8           Do you remember that?

9       A.  I -- to a certain extent.  I predominantly -- I

10  predominantly remember your enthusiasm around

11  Persistence, but I do remember there was -- there was

12  definitely a long list, and it was Whitedove's list.

13      Q.  Yes.  And do you remember that my enthusiasm

14  about Persistence was because it had just launched

15  versus the other coins that had had a run-up?

16      A.  Yes.

17      Q.  Okay.  Now, can we both agree that we went on a

18  vacation and were told we were not to speak of crypto?

19      A.  I do recall that, yes.

20      Q.  Okay.  So is it safe to say that we went on

21  that vacation and did not speak of crypto?

22      A.  I -- we went on that vacation.  I don't know

23  whether we spoke of crypto; but we, I'm assuming, did

24  not speak at meals of crypto --

25      Q.  Sorry.



Page 105

1    A.   -- because that was the veto.

2    Q.  Was the veto, yes.  Sorry.

3        You came back from your trip to Europe directly
4    because you were having a medical issue.

5        Do you remember that?

6    A.  Yes.

7    Q.  When you came --

8        MR. HARRISON:  I'm sorry.  Just to clarify,
9    which trip are we talking about now?

10       MS. RICHARDSON:  Sorry.  2021 -- summer of
11   2021, Italy, and then Taylor was coming back from
12   Croatia.  I was already in Los Angeles.

13       THE WITNESS:  Croatia.  It was Croatia.

14   BY MS. RICHARDSON:

15   Q.  Because you were coming back sooner than
16   expected, is it fair to say that your new home was not
17   ready?

18       MR. HARRISON:  Objection to form.  It's vague.

19   BY MS. RICHARDSON:

20   Q.  Okay.  Let's just -- let me just scrap that.
21   It's not important.

22       Can you --

23   A.  Because I don't remember, actually, that it
24   wasn't ready.

25   Q.  That's okay.



Page 106

1          You came back from Croatia to your new home in

2   Santa Monica on Channel Road; correct?

3       A.  I can't say definitively.  If it wasn't ready,

4   I wouldn't have probably come back to it.  I don't

5   remember.

6       Q.  Let me -- let me try this.

7          When you came back from Croatia, your Santa

8   Monica home was just getting ready; and together we went

9   out and bought carpets and other things to furnish the

10  home?

11         MR. HARRISON:  Objection.  Compound.

12  BY MS. RICHARDSON:

13      Q.  When you first came back to Santa Monica, your

14  new home was ready; and because it wasn't furnished

15  yet -- that's still compound.

16         You came back to your home in Santa Monica;

17  correct?

18      A.  Yes.

19      Q.  Do you remember us going out and buying carpets

20  and furniture?

21      A.  Yes.

22      Q.  Do you remember that during that same time you

23  sent a list of altcoins to Robert Sabella to ask his

24  opinion?

25      A.  The exact timing, I do not recall.  I remember



Page 107

1    you asked me to -- you gave me a list that you wanted

2    Robert to -- to look at.  I remember sending him a list

3    of things; and they were, I believe, what you had taken

4    from Whitedove; and you wanted to get his opinion on it.

5        Q.  And do you remember at this time being excited

6    about his prediction -- or his assessment, rather?

7        A.  I don't particularly remember being excited

8    about his assessment --

9        Q.  You don't?

10       A.  -- because it was just his opinion on

11   something.

12       Q.  Understood.  Before he made that opinion you

13   had discussed putting a small investment into

14   Persistence amongst other altcoins.

15           Do you remember that?

16       A.  Yes.  I remember -- I remember before -- before

17   he got the list, Persistence -- Persistence had been a

18   significant discussion all along, it seems to me, over

19   the boat trip as well -- that timing.  Obviously, not at

20   dinners.  I do remember it was, like, before.

21       Q.  Okay.  And do you remember that -- when you

22   talked about investing in Persistence, do you remember

23   me telling you not to invest more than $500,000?

24       A.  No.

25       Q.  You don't remember that?



Page 108

1          A.   No.

2          Q.   You -- then I can assume you don't remember

3    that when I told you -- do you remember telling me that

4    that is why I would always be poor when I suggested you

5    not invest more than $500,000 in Persistence?

6               MR. HARRISON:  Objection.  Vague.  Assumes

7    facts not in evidence.

8               THE WITNESS:  I -- no.

9    BY MS. RICHARDSON:

10         Q.   You don't remember that?

11         A.   No.

12         Q.   Do you remember telling me --

13         A.   That does not sound like anything I'd say.

14         Q.   Other people were present for that

15   conversation.

16              MR. HARRISON:  Objection --

17   BY MS. RICHARDSON:

18         Q.   Okay.  Do you remember shortly after that --

19   well, you don't remember the conversation; so let me --

20   let me rephrase the next question.

21              After Robert Sabella gave a favorable -- do you

22   remember Robert Sabella giving a numerical --

23         A.   Yes.

24         Q.   -- number for a number of different

25   cryptocurrencies?



Page 109

1      A.   Sorry.

2           MR. HARRISON:   You got to let her finish her

3      question.  Don't cut her off.

4           THE WITNESS:   Okay.

5           MR. HARRISON:   Can you repeat the question.

6      BY MS. RICHARDSON:

7      Q.   Do you remember Robert Sabella giving -- rating

8      a number of cryptocurrencies from 1 to 10, 10 being the

9      highest?

10          MR. HARRISON:   Objection.   Vague.

11          THE WITNESS:   Yes.

12     BY MS. RICHARDSON:

13     Q.   Do you remember Robert Sabella giving

14     Persistence a 10-plus rating?

15     A.   I don't recall the actual number he gave it.

16     Q.   After Robert Sabella rated Persistence as a

17     10-plus, you decided you wanted to purchase ten --

18     actually, I -- I -- let me -- sorry.  Let me rephrase

19     that.

20          Do you remember after Robert Sabella made that

21     prediction and -- okay.

22          Robert Sabella made that prediction.  On or

23     about the same time, Michelle Whitedove made a

24     prediction that the altcoin market was about to go up

25     again.  Do you remember that?



Page 110

1              MR. HARRISON:  Objection.  Compound.  Assumes

2    facts not in evidence.

3              THE WITNESS:  I don't -- because I did not read

4    Whitedove's -- Whitedove's publication.  I know you

5    showed me a printout of it once.  So I don't remember --

6    I don't know what she was saying, but I do know that the

7    crypto -- at that point you had been really

8    investigating it and -- and the Persistence was very --

9    was what I recall the thing that you were most

10   enthusiastic about, about its potential and its upside.

11   But I don't know what Whitedove --

12   BY MS. RICHARDSON:

13        Q.   Okay.

14        A.   -- was saying.  And Robert wasn't making a

15   prediction.  He was reading the energetic on the

16   company.

17        Q.   Yes.  Now --

18        A.   Because he's not a psychic, he's an

19   astrologist.

20        Q.   Mike's -- great.

21             When the -- in your experience and based on

22   your knowledge, is it fair to say that the crypto market

23   is very volatile?

24        A.   Yes.

25             THE WITNESS:  Sorry.



Page 111

1          MS. RICHARDSON:  In the -- in your --

2          MR. HARRISON:  Objection.  Calls for

3   speculation.

4          But she already answered, so --

5   BY MS. RICHARDSON:

6      Q.  In your experience -- or in -- to the best of

7   your memory, Bitcoin had gone up considerably in -- in

8   April and May to about fifty -- a high of $58,000 and --

9   this is a fact -- and then shortly after, while we were

10  in Europe, dropped, I believe, to the low thirties.

11         Do you remember that?

12         MR. HARRISON:  Objection.  Compound.  Vague.

13  Assumes facts not in evidence.

14         To the extent you can answer it, can --

15  BY MS. RICHARDSON:

16     Q.  Do you -- let me rephrase it.

17         Do you remember there being a crypto -- a

18  pullback of price -- all prices in the summer of 2021?

19         MR. HARRISON:  Objection.  Vague.

20         MS. RICHARDSON:  You can answer.

21         MR. HARRISON:  Can you clarify.  All prices

22  of --

23  BY MS. RICHARDSON:

24     Q.  Do you remember -- Bitcoin price had a

25  significant pullback in the summer of 2021 and altcoin



Page 112

1    prices even more so.

2            Do you remember that?

3            MR. HARRISON:  Objection.  Calls for

4    speculation.

5            But to the extent you -- you remember or can

6    answer that question, go ahead.

7            THE WITNESS:  Regarding the altcoins, I don't

8    recall exactly what their pullback was; but I can tell

9    you I recall the Bitcoin falling off because it was a

10   Friday when it hit the 58; and I remember saying to you

11   I was going to sell it and you were like, Hang on for

12   the weekend.  You said it's going to go up to -- over

13   the weekend, and then it dumped over the weekend.

14   That's why I remember -- whenever that happened I --

15   BY MS. RICHARDSON:

16       Q.  I think -- you're thinking of the following --

17       A.  Was that later?

18       Q.  Yeah.  Because --

19       A.  Yeah.

20       Q.  Because it went up and then it came down --

21       A.  And then it went up.

22       Q.  -- and then it went up.

23       A.  That was later.

24       Q.  So Michelle Whitedove, during that summer of

25   2021, during a pullback of the overall crypto market,



Page 113

1    said -- at that time there were many people who were

2    crypto enthusiasts on the Internet forecasting the

3    beginning of a bear market.  Michelle Whitedove

4    contradicted that idea and said there's another run

5    coming.  You and I discussed this prediction.

6              Do you remember that?

7              MR. HARRISON:  Objection.  Compound.  Just

8    testifying instead of really asking a question.

9              MS. RICHARDSON:  Okay.  I understand.

10             THE WITNESS:  I don't remember that -- that --

11   that conversation.

12   BY MS. RICHARDSON:

13        Q.  Let me rephrase the question.

14             During a pullback of the cryptocurrency market

15   in the summer of 2021, do you remember me saying that

16   Michelle Whitedove was forecasting another run-up?

17             MR. HARRISON:  Objection.  Assumes facts not in

18   evidence.  It's compound.

19             But to the -- if you understand the question,

20   you can answer it or both of them or whatever it is.

21             THE WITNESS:  And I can't recall.

22   BY MS. RICHARDSON:

23        Q.  That's fine.  That's totally fair if you don't

24   recall.

25             Persistence, at its beginning, started off at a


MAGNA
LEGAL SERVICES

Page 114

1  price of $3 when it went onto the market; and it rapidly

2  rose to $16 with a number other altcoins throughout the

3  month of May.  During the summer pullback we just

4  discussed, it dropped to a price as low $6.

5          Do you remember that?

6          MR. HARRISON:  Sorry.  I was zoned out.  Can

7  you ask the question again.  Sorry.

8  BY MS. RICHARDSON:

9      Q.  Okay.  So wait.  Can I just say something --

10  can I say something, Taylor?  Because this is important.

11     A.  Okay.

12     Q.  You can't -- so every time I ask a question --

13  it's not normal to get an objection for every question.

14  I understand that that's -- okay --

15          MR. HARRISON:  So first of all, there's no

16  speak -- you can't make speeches.  You can't --

17          MS. RICHARDSON:  Okay.

18          MR. HARRISON:  -- talk to my client like that.

19  You can't tell her how to do things.  I mean --

20          MS. RICHARDSON:  I can say -- I can say if --

21          MR. HARRISON:  How can -- how many depositions

22  have you been at?  How can you testify that this is --

23          MS. RICHARDSON:  That's fair.

24          MR. HARRISON:  -- irregular for a deposition?

25          MS. RICHARDSON:  Is it fair for me to say on



Page 115

1  record to the Judge -- is it fair for me to say that if

2  there is not a -- an objection, your client should

3  proceed in answering the question?

4          MR. HARRISON:  If there is not an objection,

5  that's correct.

6          MS. RICHARDSON:  Okay.

7          MR. HARRISON:  But she can turn to me and ask

8  me if -- if she wants to talk to me or consult with me.

9  You can't stop her from doing that.

10          MS. RICHARDSON:  I'm not stopping her.  I'm

11  just saying that --

12          MR. HARRISON:  Can you please rephrase the

13  question because I didn't hear it.

14          MS. RICHARDSON:  What I said was --

15          MR. HARRISON:  Or re-ask the question.  Sorry.

16          MS. RICHARDSON:  Sure.  Do you want to read it

17  back, actually, so I get the exact question because it

18  took me a while to get there.

19              (The record is read by the reporter as

20              follows:

21              "Q.  Persistence, at its beginning, started off

22              at a price of $3 when it went onto the market

23              and it rapidly rose to $16 within a -- with a

24              number other altcoins throughout the month of

25              May.  During the summer pullback we just



Page 116

1          discussed, it dropped to a price as low $6.

2          "Do you remember that?")

3          MR. HARRISON:  So my objection is compound.

4    It's especially -- essentially testifying rather than

5    asking a question.

6          If you understand the compound questions in

7    there, you can try your best to answer them.

8          THE WITNESS:  What I do recall is -- I don't --

9    I don't specifically recall the -- where it moved --

10   surged forward and pulling back.  I do recall later in

11   the summer it had -- it was down to around 6 because

12   that's around the time that -- that I purchased.

13         MS. RICHARDSON:  Correct.  When it was $6 --

14         MR. HARRISON:  I'm sorry.  I just got to

15   object.  You can't tell her whether her answers are

16   correct or not correct.  You just ask the next question.

17         MS. RICHARDSON:  Thank you.  Thank you for

18   letting me know.  I appreciate -- I do -- look, I will

19   be the first to say that there are some things that I

20   really -- it's -- it's a -- this is a skill, and I

21   understand that -- you know, I'm -- there's a lot of

22   pressure.  There's also, you know, the being across from

23   this person who I was very close to that, you know, I'm

24   now suing and she's suing me.

25         So we're doing our best, all things considered.



```
                                                          Page 117
 1   And if I make a mistake, I'm happy for you to let me

 2   know, Mr. Harrison, truly.  But -- but I also just want

 3   to keep the flow of this going so we don't have to do

 4   this again.  That's my hope.  Because, you know, as fun

 5   as this is -- and -- at least it's a story.  Nothing

 6   else.

 7   BY MS. RICHARDSON:

 8        Q.  Okay.  At this point when there was a overall

 9   pullback, you decided to begin making some purchases.

10   At this same -- sorry.  This is compound, so I will stop

11   myself.

12           You decided to make some altcoin purchases;

13   correct?

14           MR. HARRISON:  I'm sorry.  Vague.

15           When are we talking about?

16   BY MS. RICHARDSON:

17        Q.  In the month of August you decided to start

18   purchasing some about altcoins; is that correct?

19           MR. HARRISON:  Sorry.  August 2021, we're

20   talking about?

21           MS. RICHARDSON:  Yes.  Thank you.

22           THE WITNESS:  Yes, that's correct.

23   BY MS. RICHARDSON:

24        Q.  Okay.  And at that time your Bitcoin was stored

25   with Genesis; is that correct?
```



Page 118

1      A.  I -- I -- I didn't -- I didn't know that was

2  with Genesis.  I thought -- I do -- at that time.  I

3  started at Genesis, then it was moved over to Anchorage.

4      Q.  At this --

5      A.  The timing of it, I don't know.  I'd have to go

6  back to my record.

7      Q.  To the best of my memory, at that point,

8  because you shared with me some of the your crypto

9  information, Anchorage was holding your Ethereum and

10  Genesis was still holding your Bitcoin.

11      A.  So that meant --

12          MR. HARRISON:  Objection.  Compound.

13          MS. RICHARDSON:  Okay.  Sorry.

14          MR. HARRISON:  Testifying.

15          MR. ANDRE:  It's not also a question.

16          MS. RICHARDSON:  It's not a question, yeah.

17  It's -- you're right across the board.  That was on me.

18  I'm just trying to give you context.

19  BY MS. RICHARDSON:

20      Q.  In August of 2021 a large number of Bitcoin was

21  moved into a number of Ledger wallets.

22          Do you remember that?

23          MR. HARRISON:  Objection.  Vague.  Compound.

24  BY MS. RICHARDSON:

25      Q.  Let me -- let me go back.



Page 119

1          In August of '21, when you made the decision to

2    buy altcoins, we talked about it a lot.

3          Do you remember that?

4          MR. HARRISON:  Objection.  Vague.  Compound.

5          To the extent you understand the question, you

6    can try and answer.

7          THE WITNESS:  Around the time particularly of

8    the Persistence, we talked -- we definitely talked, and

9    I do recall things being sent to eight wallets.

10   BY MS. RICHARDSON:

11     Q.  So let's rewind the tape even further than that

12   because you may or may not remember this, but we had a

13   discussion -- Anchorage was holding your Ethereum and at

14   that time had a limited capacity to purchase other

15   altcoins; is that correct?

16         MR. HARRISON:  Objection.  Compound.

17         You can answer.

18         THE WITNESS:  Yes.

19   BY MS. RICHARDSON:

20     Q.  Let me rephrase just for the record, make sure

21   the record is clear.

22         Anchorage was holding your Ethereum; yes?

23         MR. HARRISON:  Sorry.  Time period, please.

24   BY MS. RICHARDSON:

25     Q.  In 2021 -- early 2021 Anchorage was holding



Page 120

1  your -- your Ethereum purchases?

2      A.  I would have to check the records, but very --

3  around that window I moved everything over to Anchorage,

4  so Ethereum could have been there first.

5      Q.  Do you remember us going through the list of

6  altcoins that Anchorage was able to purchase and hold at

7  that time?

8          MR. HARRISON:  Objection.  Vague.

9          You can answer.

10         THE WITNESS:  I don't remember us going through

11  the list.  What I do recall is there were not many

12  altcoins that they could support.

13  BY MS. RICHARDSON:

14     Q.  And at that time do you remember us looking to

15  see if there was another Anchorage that existed that

16  could buy those altcoins?

17         MR. HARRISON:  Objection.  Vague.

18         THE WITNESS:  Yes, I do remember.  We were

19  looking to find other alternatives if there -- if there

20  was a place that was also -- would have had to have been

21  insured, like Anchorage is a crypto bank.

22  BY MS. RICHARDSON:

23     Q.  Do you remember one of those -- one of those

24  outlets being -- I'll come back to that later.

25         Do you remember at that time there was not



Page 121

1    another such entity that existed that could execute that

2    purchase that we could find?

3             MR. HARRISON:  Objection.  Compound.  Vague.

4             What time?  You're saying --

5             MS. RICHARDSON:  August of 2021.

6             MR. HARRISON:  You can answer.  Go ahead.

7             THE WITNESS:  Yes.  I do remember there was

8    nothing.  There was nothing.

9    BY MS. RICHARDSON:

10       Q.  Do you remember at that point the best option

11   was to purchase Ledger wallets for you to make those

12   purchases directly?

13            MR. HARRISON:  Objection.  Vague.  Compound.

14   Calls for speculation.

15   BY MS. RICHARDSON:

16       Q.  Do you remember purchasing a number of Ledger

17   wallets to purchase altcoins?

18       A.  Yes.  I --

19            MR. HARRISON:  Objection.  Vague.  Go ahead.

20            THE WITNESS:  Sorry.

21   BY MS. RICHARDSON:

22       Q.  Do you -- you didn't -- okay.

23       A.  Sorry.

24       Q.  Do you remember me trying to teach you how to

25   use a Ledger wallet in your Santa Monica home?



Page 122

1        A.   I -- I don't -- I remember seeing you using

2   one.  I don't remember you trying to teach me because --

3        Q.   There --

4        A.   I just don't remember that exercise.

5        Q.   There was a day in early August where I told

6   you only you can know these keys and so you have to look

7   at the little box and write them down.

8            Do you remember that?

9            MR. HARRISON:  Objection to compound and

10  testifying.

11           But to the extent you can break that down and

12  try and answer it, go ahead.

13           THE WITNESS:  I remember, which I already knew,

14  that you were -- I remember you showing me how the

15  wallets worked and the codes and writing them down.

16  BY MS. RICHARDSON:

17       Q.   At that --

18       A.   I don't recall that that was going to be me

19  custodying them because that's why I was at Anchorage,

20  for the --

21       Q.   I understand.

22       A.   -- the services.

23       Q.   Well, at this point you wanted to buy altcoins

24  that Anchorage could not custody.  So do you remember me

25  trying to teach you how to do this so you could custody



Page 123

1    it yourself?

2             Do you remember that?

3             MR. HARRISON:  Objection to compound and

4    testifying.

5             To the extent you can break that down and

6    answer the question --

7             THE WITNESS:  I don't recall -- sorry.

8             I don't recall you trying to teach me.  I do

9    remember you, like, bringing the wallets and showing how

10   they worked.  Or it was one of your wallets.  I don't

11   know what it was.  But I do remember you going through.

12   BY MS. RICHARDSON:

13        Q.  We purchased wallets for you.  I informed you I

14   did not want any access or information, so we went

15   through an exercise of setting up a wallet in your home.

16             Do you remember that?

17             MR. HARRISON:  Objection.  Asked and

18   answered --

19             MS. RICHARDSON:  Okay.  That's fair.

20             MR. HARRISON:  -- compound.  Vague.

21   BY MS. RICHARDSON:

22        Q.  Do you remember, after we set up the first

23   wallet, I gave it to you and you lost it in the first

24   48 hours?

25        A.  I --



```
                                                       Page 124
 1          MR. HARRISON:  Objection -- wait.  Wait.

 2          Objection.  Compound.  Testifying.

 3          To the extent --

 4          MS. RICHARDSON:  Okay.  That's fair.

 5          MR. HARRISON:  -- you can break down and

 6  answer, go ahead.

 7          THE WITNESS:  I don't remember you giving me a

 8  wallet, and I don't remember losing it.  However, I

 9  wouldn't be --

10  BY MS. RICHARDSON:

11      Q.  Do you remember --

12      A.  That's why I was at Anchorage, because that's

13  not something I would go near --

14      Q.  Let me try --

15      A.  -- manage --

16      Q.  -- to jog your memory one more time.

17          Do you remember finding a wallet in your shoe?

18      A.  No.

19      Q.  Okay.  Do you think -- based on what we just

20  discussed -- I understand you do not remember that --

21  those specific incidences.  There were other people

22  present during that time, which is irrelevant.

23          But during that time, would -- would it make

24  sense that I would have wanted you to learn how to do it

25  at the -- at the beginning?
```



Page 125

1          MR. HARRISON:  Objection.  Compound.  Calls for

2    speculation.

3          MS. RICHARDSON:  Okay.

4          MR. HARRISON:  I don't know that there's a

5    question pending.  Is there -- are you keeping that

6    question or --

7    BY MS. RICHARDSON:

8      Q.  Do you -- let -- let me ask you differently.

9          Do you remember --

10     A.  I don't --

11     Q.  -- on or about this time saying, Okay.  Well,

12   clearly, you're going to keep them, or something to that

13   effect?

14         MR. HARRISON:  Just so I understand, when you

15   say "this time," what time are we talking about?

16         MS. RICHARDSON:  We -- okay.

17         We went through the exercise of trying to have

18   you set up crypto wallets.  I -- okay.  Let me just

19   abandon this ship for a minute.

20         I need to -- I need to.  You're absolutely

21   right.  I need to do a better job with my form on these,

22   and it's -- it's tricky.

23   BY MS. RICHARDSON:

24     Q.  Around August of 2021, when you decided to

25   purchase Persistence, we moved Bitcoin onto eight Ledger



Page 126

1    wallets.

2           Do you remember that?

3           MR. HARRISON:  Objection.  Compound.

4           You can answer, if you can.

5           THE WITNESS:  I remember the Bitcoin -- Bitcoin

6    was transferred to eight wallets, yes.

7    BY MS. RICHARDSON:

8       Q.  Do you remember why it was transferred to eight

9    wallets instead of one?

10      A.  Your -- you said that it was for security

11   reasons, to keep -- because it's -- not that you want to

12   lose one wallet --

13      Q.  No.

14      A.  -- but it was a lot -- it would have been a lot

15   to have on one wallet.

16      Q.  And do you remember that when you decided to

17   buy Persistence, we reached out to them directly about

18   something called an OTC purchase, which is

19   over-the-counter?

20          MR. HARRISON:  Well, objection to testifying.

21   Objection to compound.

22          To the extent you can break it down --

23   BY MS. RICHARDSON:

24      Q.  Did you reach out to -- did you purchase

25   Persistence through a method which is called OTC?



Page 127

1          MR. HARRISON:  What time period was that?

2          MS. RICHARDSON:  In August of 2021.

3          THE WITNESS:  Persistence -- my Persistence was

4    purchased by you negotiating with the company to do --

5    you know, to do a purchase from them so as not to just

6    destroy the stock value -- the coin value.  So it went

7    right through directly to Persistence and from

8    Persistence.

9    BY MS. RICHARDSON:

10      Q.  And it's fair to say that we -- you did not

11   purchase Persistence on the open market on an exchange,

12   but a direct purchase with the Persistence founders?

13          MR. HARRISON:  Objection to form.  Compound.

14          But to the extent you can answer it, go ahead.

15          THE WITNESS:  Yes.  I remember it was a direct

16   purchase, not through the -- not through the stock

17   market.

18   BY MS. RICHARDSON:

19      Q.  Do you remember me having concerns, when they

20   sent over a purchase agreement, that it should be

21   reviewed?

22          MR. HARRISON:  Objection.  Vague.

23          To the extent you understand the question, you

24   can answer.

25          THE WITNESS:  I don't recall that, no.



Page 128

1  BY MS. RICHARDSON:

2      Q.  Persistence sent over a rather lengthy purchase

3  agreement at that time.

4          Do you remember that?

5          MR. HARRISON:  Objection to the form of the

6  question.  Testifying.

7          But go ahead, if you can answer.

8          THE WITNESS:  No.

9          MR. HARRISON:  Go ahead, if you -- you can

10  answer.

11          THE WITNESS:  I don't remember -- I don't

12  remember them sending over a long, lengthy purchase

13  agreement.  But for the record, it's very obvious with

14  any purchase like that, it would have to have been

15  reviewed, especially by a lawyer.

16  BY MS. RICHARDSON:

17      Q.  At the time do you remember wanting to sign it

18  without having it reviewed?

19      A.  No.

20      Q.  At the time do you remember me saying to you,

21  You can't sign this unless a lawyer looks at it?

22          MR. HARRISON:  Objection.

23          THE WITNESS:  I don't remember you saying that,

24  but that's a given.  Every -- everything I do that's a

25  large -- significant financial transaction like that is



Page 129

1  always, like, reviewed by a lawyer.

2  BY MS. RICHARDSON:

3      Q.  Do you remember me reaching out to lawyers not

4  skilled in cryptocurrency that said they would not

5  review the contract because it dealt with

6  cryptocurrency?

7          MR. HARRISON:  Objection.  Calls for

8  speculation, I believe, to the extent I understand the

9  question.

10         THE WITNESS:  No.  But what I remember is

11  you -- you found -- you got a crypto special -- a crypto

12  lawyer.

13  BY MS. RICHARDSON:

14     Q.  Do you know how I did that?

15     A.  I don't recall how you did it.  I'm assuming

16  you would have asked references.

17     Q.  Google.

18         MR. HARRISON:  Ms. Richardson, you can't

19  testify.  If you have another question, you can ask the

20  question.  You can't testify.

21  BY MS. RICHARDSON:

22     Q.  That contract was reviewed by an attorney that

23  you hired prior to you signing it; correct?

24     A.  Yes.  I believe that was Dechert, was it?

25     Q.  I believe so.



Page 130

1          You were made aware of -- you had already been

2     in the crypto market for some time at this point with

3     Bitcoin.

4          MR. HARRISON:  Objection.  Vague.

5     BY MS. RICHARDSON:

6          Q.  Okay.  There was a portion of that agreement

7     that specified the risk of cryptocurrency.

8          Do you remember that?

9          A.  I would need to look at the agreement again,

10    but I --

11         Q.  Okay.

12         A.  -- think that would make sense.

13         Q.  At the time you purchased Persistence, which

14    you were doing with Bitcoin, the Bitcoin and Persistence

15    prices were rising -- beginning to rise.

16         Do you remember that?

17         A.  Yes.

18         Q.  At the time you purchased Persistence, it was

19    $6; but you were receiving a discount.

20         Do you remember that?

21         MR. HARRISON:  Objection.  Compound.

22    Testifying.  Assumes facts not in evidence.

23         But if you remember that or if you can answer

24    the question, break it down, you can answer.

25         THE WITNESS:  I don't recall it was exactly at



Page 131

1    $6, but I -- I do recall that they -- that they

2    discount -- that they -- they gave a discount to the

3    market of $5 -- $5 for -- for our token.

4    BY MS. RICHARDSON:

5         Q.  And who negotiated the discount for you?

6         A.  You did.  You negotiated everything.

7         Q.  Do you remember, when you first decided to

8    purchase Persistence, at that time your investment was

9    to be less than $10 million, that I was having some

10   financial trouble?

11            MR. HARRISON:  Objection --

12            MS. RICHARDSON:  Okay.

13            MR. HARRISON:  -- vague.  Compound.

14            Go ahead.

15   BY MS. RICHARDSON:

16        Q.  Do you -- in August of 2021 you and I went to

17   dinner quite a bit; correct?

18            MR. HARRISON:  Objection.  Vague.

19            But you can answer, if you can.

20            THE WITNESS:  Correct.  If I -- if I were in

21   L.A., which I believe I was.

22   BY MS. RICHARDSON:

23        Q.  And on one of those dinners, I asked you if it

24   would be okay if I kept aside a small portion of the

25   purchase that would only go to me if it saw value.



Page 132

1          Do you remember that?

2          MR. HARRISON:  Objection.  Compound.  Vague.

3          To the extent you understand the question and

4    can answer it, go ahead.

5          THE WITNESS:  I don't.  I don't remember that,

6    no.

7    BY MS. RICHARDSON:

8      Q.  Okay.  I think I'm clear on that, by the way.

9          At that time your investment was set to be

10   relatively low, less than 10 million, compared to where

11   it ended up, high by most people's standards.

12         At the time we had the conversation over

13   dinner, you were going to invest less than $10 million;

14   but you ended up investing more than that, did you not?

15         MR. HARRISON:  Objection.  Compound.

16         To the extent you understand --

17         MS. RICHARDSON:  You're right -- you're totally

18   right on the compound part.

19   BY MS. RICHARDSON:

20     Q.  Just after you signed the contract for your

21   purchase of Persistence, the price went up

22   substantially.  I believe it went up from $6 to $8

23   before we did the first set of transfers.

24         Do you remember that?

25         MR. HARRISON:  Objection.  Compound.  Vague.



Page 133

1  Assumes facts not in evidence.

2          To the extent you can break it down and try to

3  answer, you can do that.

4          THE WITNESS:  I don't -- at the time I don't

5  specifically remember that it went up, but it would make

6  sense that I went up because I had purchased a

7  significant amount of the tokens.

8  BY MS. RICHARDSON:

9      Q.  Were you aware --

10     A.  It would follow.  It would follow.

11     Q.  Would -- were you aware that the structure of

12  your purchase, because it was such a large amount, was

13  done so that it would not impact the price point?

14         MR. HARRISON:  Objection.  Compound.  Assumes

15  facts not in evidence.  Calls for speculation.

16         To the extent you understand, you can answer.

17  Go ahead.

18         THE WITNESS:  I was aware -- I was aware -- I

19  was aware that I was going directly to -- we were going

20  through Persistence directly and not on the market so as

21  not to create volatility and -- and -- and damage to the

22  value of the shares and alternate -- and falsely

23  alternate -- alter things.

24  BY MS. RICHARDSON:

25     Q.  Now, this is important.



```
                                                    Page 134
 1          Were you aware that the same week of those

 2   purchases, before they took place, the coin was listed

 3   on a relatively large crypto exchange called Huobi?

 4          MR. HARRISON:  Objection.  Assumes facts not in

 5   evidence.  Compound.

 6          To the extent you understand it and can break

 7   it down and answer it, go ahead.

 8          THE WITNESS:  No, I wasn't aware.  I don't

 9   recall that name.

10   BY MS. RICHARDSON:

11     Q.  And were you aware that when this coin launched

12   on this public chain, it dramatically increased the

13   price?

14          MR. HARRISON:  Sorry.  Vague.

15          When you say "this coin," which coin are you

16   talking about?

17          MS. RICHARDSON:  Persistence.  When Persistence

18   was launched on Huobi, that gave it an immediate price

19   jump.

20          MR. HARRISON:  Objection.  Compound.  Assumes

21   facts not in evidence.

22          To the extent you understand question, you can

23   answer.

24          THE WITNESS:  I don't -- I don't recall Huobi,

25   and I don't recall.
```



Page 135

```
1   BY MS. RICHARDSON:

2       Q.  Okay.  That's fine.

3           I -- now, as the price continued to rise, you

4   expressed interest to buy more Persistence.  Do you

5   remember that?

6           MR. HARRISON:  Objection.  Assumes facts not in

7   evidence.  Asks for -- calls for speculation.

8           To the extent you understand it, you can --

9   BY MS. RICHARDSON:

10      Q.  In late August and September you expressed an

11  interest to buy more Persistence; correct?

12      A.  Yes.  It seems to me -- I thought it was almost

13  simultaneous to the first -- the first tranche but --

14      Q.  Now, was this because the price was increasing?

15          MR. HARRISON:  Objection.  Vague.

16          THE WITNESS:  It would be because I would have

17  been -- understood that this was a significant -- this

18  was a significant company that was going to have

19  traction down the road and be something serious in

20  the -- in the altcoin space.

21  BY MS. RICHARDSON:

22      Q.  Understood.  But it wasn't because the price

23  was increasing simultaneously?

24      A.  I mean, the price increasing simultaneously

25  would have had a bearing on any decision as well.
```



Page 136

1       Q.  Okay.

2       A.  I think the overall decision -- the overarching

3  one was the -- was the value of the -- the actual

4  intrinsic value of the coin with the company and what

5  they were -- what they were all about, what -- the

6  direction they were going.

7       Q.  And do you remember that on or about the same

8  time, I encouraged you to diversify your purchases to

9  coins other than Persistence?

10          MR. HARRISON:  Objection.  Vague.

11          To the extent you can -- you understand, you

12  can answer.

13          THE WITNESS:  Yes.  I understood you suggested

14  other coins as well.

15  BY MS. RICHARDSON:

16      Q.  Do you remember what I said to you about

17  diversifying your purchases?

18      A.  I don't remember what you said but -- which is

19  obvious, that it's -- it's always good to have a

20  diversified portfolio.

21      Q.  Do you remember me ever expressing fear that

22  you were putting too much money into Persistence?

23      A.  I don't recall.

24      Q.  Do you remember repeatedly asking me, after you

25  had committed to purchase -- okay.



Page 137

1          You purchase -- you committed to purchase

2     $40 million of Persistence; is that correct?

3          A.  Yes, that's correct.

4          Q.  Do you remember on or about that time you

5     wanting an additional $20 million of Persistence?

6               MR. HARRISON:  Objection.  Vague.

7               But you can answer, to the extent --

8     BY MS. RICHARDSON:

9          Q.  Bringing your total to 60 million?

10         A.  I think I -- if I -- if I thought that, that

11    would have been a thought for -- for a moment maybe; but

12    obviously, it's not something I settled on as a

13    serious -- a serious thing.

14         Q.  You -- you don't recall --

15         A.  I don't actually recall thinking I would be

16    buying 60.

17         Q.  You don't recall that?

18         A.  Forty seemed -- forty was a good -- was a

19    serious position in the company.

20         Q.  You don't recall asking me numerous times if we

21    could get the extra 20 Persistence?

22              MR. HARRISON:  Objection to form.

23    BY MS. RICHARDSON:

24         Q.  You don't recall, after we -- you committing to

25    $40 million of Persistence, you repeatedly asking me to



Page 138

1    procure you an additional 20?

2        A.  No.

3        Q.  Do you remember me saying that it was not a

4    good idea and trying to tell you to buy something else

5    because your stake in Persistence was high?

6            MR. HARRISON:  Objection.  Asked and answered.

7    And compound.

8            MS. RICHARDSON:  Okay.

9            THE WITNESS:  Since I --

10           MR. HARRISON:  I don't know if she is going to

11   withdraw the question, rephrase it, or what she's going

12   to do; so give her a chance.

13   BY MS. RICHARDSON:

14       Q.  You repeatedly asked me to buy you an

15   additional $20 million of Persistence.

16           Do you remember that?

17           MR. HARRISON:  Objection.  Asked and answered.

18           MS. RICHARDSON:  Okay.  That's fine.  That's my

19   rephrase, for the record.

20   BY MS. RICHARDSON:

21       Q.  Do you remember me expressing extreme concern

22   and telling you not to purchase an additional 20,000 --

23   $20 million of Persistence?

24           MR. HARRISON:  Objection.  Asked and answered.

25           THE WITNESS:  Because I don't recall ever



Page 139

1  thinking I wanted to buy another 20 and have it 60,

2  obviously, no, I would not recall you having a concern.

3  BY MS. RICHARDSON:

4      Q.  Okay.  During the same time period --

5          MR. HARRISON:  Which time period?

6  BY MS. RICHARDSON:

7      Q.  Summer of 2021 into fall of 2021, you began

8  purchasing a large number of NFTs.

9          Do you remember this?

10     A.  The timing, I don't recall exactly; but I also

11 was collecting NFTs, yes.

12     Q.  When you began to collect NFTs, is it correct

13 that you also stored them on small Trezor and Ledger

14 wallets?

15         MR. HARRISON:  What was the -- what kind of

16 wallets?

17         MS. RICHARDSON:  Trezor, T-r-e-z-o-r.

18         THE WITNESS:  Trezor.

19 BY MS. RICHARDSON:

20     Q.  Trezor.

21     A.  Yes.

22     Q.  Do you remember when you had your -- I don't

23 know his exact title -- IT professional Karan Dadwal

24 help you to make and hold those NFT purchases?

25         MR. HARRISON:  Objection.  Compound.



Page 140

1          To the extent you understand, you can answer.

2   BY MS. RICHARDSON:

3       Q.  Do you remember having Karan help you with

4   those NFT purchases?

5       A.  Karan was the one who put the monkeys onto the

6   Trezor wallets.

7       Q.  And do you remember when Karan made a mistake

8   and lost the NFTs on the Trezor wallets?

9       A.  Well, to clarify, he didn't -- sorry.

10          MR. HARRISON:  I was going to object to

11  compound and vague.

12          But go ahead, to the extent you can answer.

13          THE WITNESS:  To clarify his terminology, he

14  did not have the proper code to get back into the

15  wallet.  He had not inputted them correctly.

16  BY MS. RICHARDSON:

17      Q.  And --

18      A.  In other words, he couldn't get back into the

19  wallet.

20      Q.  I know.

21          And it's fair to say that he was very upset?

22      A.  Oh, poor Karan.  Yes, of course he was.  Who

23  wouldn't be?  Wasn't --

24          MR. HARRISON:  There's no question pending.

25  Just let her ask her question.  Wait for her.



Page 141

1          THE WITNESS:  Okay.

2    BY MS. RICHARDSON:

3       Q.  During that time period, your daughter and her

4    boyfriend became actively invested in NFTs as well;

5    correct?

6          MR. HARRISON:  Objection.  Vague.  Compound.

7    To the extent you can answer, go ahead.

8          THE WITNESS:  My daughter was also purchasing

9    NFTs.  At what time exactly, I can't say specifically.

10   BY MS. RICHARDSON:

11      Q.  Was her boyfriend also involved in those

12   purchases?

13         MR. HARRISON:  Objection.  Vague.

14   BY MS. RICHARDSON:

15      Q.  Was her -- was Madeleine's boyfriend, Cameron

16   Moulene, actively engaged in the NFT marketplace?

17         MR. HARRISON:  In what time period?

18         MS. RICHARDSON:  During the period of summer

19   and fall of 2021.

20         THE WITNESS:  Yes.  Cameron -- Cameron was

21   collecting NFTs.

22   BY MS. RICHARDSON:

23      Q.  Did he help you with your NFT purchases?

24         MR. HARRISON:  Objection.  Vague.

25         You can answer.



Page 142

1          THE WITNESS:  Yeah.  He -- he handled a few for

2     me, yes.

3     BY MS. RICHARDSON:

4        Q.  Were you aware that he had a financial

5     instruction with -- financial arrangement with your

6     daughter, Madeleine, to purchase these NFTs?

7          MR. HARRISON:  Objection.  Vague.

8          To the extent you understand the question, you

9     can answer.

10         THE WITNESS:  I could not -- I wouldn't have

11     the answer to that question.

12     BY MS. RICHARDSON:

13        Q.  During this time period, I was holding custody

14     of these eight crypto wallets we spoke about earlier in

15     my home.

16         Do you remember this?

17         MR. HARRISON:  During what time period?

18         MS. RICHARDSON:  August 2021 into spring of

19     2022.

20         THE WITNESS:  Yes.  From -- from the -- from

21     the moment everything was in the wallets, you were

22     custodying them.

23     BY MS. RICHARDSON:

24        Q.  And do you remember that during this time

25     period I started to have a lot of anxiety --



Page 143

1          MR. HARRISON:  Objection --

2          MS. RICHARDSON:  Let me rephrase the question.

3   BY MS. RICHARDSON:

4      Q.  Do you remember me expressing anxiety about

5   holding the cryptocurrency in my home?

6      A.  I remember you once mentioned that -- that you

7   were a little worried; and I think we chatted and it's,

8   like, there wasn't going to be really any genuine

9   concern.  If there were, would have just taken it over

10  to my place.

11     Q.  Do you remember saying to me that storing them

12  at my house was the perfect place because no one would

13  expect me to have that much money because I was so poor?

14     A.  No.  I would -- I remember having a discussion

15  that it would not be expected that you would -- that

16  anybody would be sitting on that much -- that much value

17  in their house, period.  That was the point.

18     Q.  Is it fair to say that when Karan lost those

19  NFTs through human error, it caused a lot of stress and

20  anxiety for him?

21          MR. HARRISON:  Objection to form.  Vague.

22          If you can answer -- if you think -- it calls

23  for speculation.

24          But if you think you can answer --

25          THE WITNESS:  Karan was very sweet, and he was



Page 144

1  very worried that he'd lost them.

2  BY MS. RICHARDSON:

3      Q.  I want to fast --

4      A.  He was sad.

5      Q.  I want to fast-forward a little bit based on

6  our -- our history and relationship.

7          Do you think I cared genuinely about your

8  well-being?

9          MR. HARRISON:  Objection.  Calls for

10 speculation.

11         You can answer, if you can.

12         THE WITNESS:  You were one of -- you were one

13 of my closest friends, so it's implicit that you would

14 have cared for my well-being.  One cares for one's

15 friends.

16 BY MS. RICHARDSON:

17     Q.  Do you think that I wanted you to succeed?

18         MR. HARRISON:  Objection.  Calls for

19 speculation.

20         THE WITNESS:  Yes.

21 BY MS. RICHARDSON:

22     Q.  Do you think that when the crypto market began

23 to fall, similarly to Karan, that that would have

24 created a great amount of stress for me personally as a

25 result?



Page 145

1          MR. HARRISON:  Objection.  Vague.  Calls for

2   speculation.

3          What time period are we talking about?

4          MS. RICHARDSON:  We're now talking about

5   December 2021 into 2022.  I would say it was a -- it was

6   a wide range.

7          MR. HARRISON:  What's the question again?

8          MS. RICHARDSON:  If it would have impacted me

9   to see that you were losing money.

10         MR. HARRISON:  Objection.  Vague.  Calls for

11  speculation.

12         If you can -- you can answer it, give it a

13  shot.

14  BY MS. RICHARDSON:

15      Q.  Reasonably --

16      A.  Yeah.  I could not -- I could not presume to --

17  to say how you would have felt.  If it were me, I would

18  have felt badly.

19      Q.  Were you aware that on or about December 21,

20  '21, I stopped sleeping consistently?

21         MR. HARRISON:  Objection.  Calls for

22  speculation.

23         MS. RICHARDSON:  Okay.

24         THE WITNESS:  No, I was not.

25  ///



Page 146

1    BY MS. RICHARDSON:

2        Q.  I helped you with your Persistence purchase in

3    August of 2021 and discussed the possibility of a

4    finder's fee, but at that point we did not discuss me

5    holding the custody of your crypto or helping you with

6    further purchases; is that correct?

7            MR. HARRISON:  Okay.  Objection.

8            MS. RICHARDSON:  Sorry.  That was compound.

9    Yep.  That was --

10           MR. HARRISON:  Multiple -- assumes facts not in

11   evidence.

12           MS. RICHARDSON:  Totally.  Okay.

13           MR. HARRISON:  Asked and answered.

14   BY MS. RICHARDSON:

15       Q.  In August of 2021 we had not discussed me -- at

16   any time me holding the custody of your cryptocurrency;

17   is that correct?

18           MR. HARRISON:  Objection.  Vague.

19           If you think you can answer, go ahead.

20           MS. RICHARDSON:  Let me --

21           THE WITNESS:  I didn't --

22           MS. RICHARDSON:  I'll rephrase it.

23           MR. HARRISON:  Why don't you rephrase --

24           THE WITNESS:  I don't recall when it was --

25   once the crypto -- once Persistence was bought and the



Page 147

1   wallets -- everything was sent to the wallets, my

2   recollection is it was always understood that you would

3   be custodying those wallets.

4   BY MS. RICHARDSON:

5       Q.   Okay.  Let me ask you this.

6            Did we at any time have any formal agreement?

7       A.   No.

8       Q.   Did we at any time -- at any time was I

9   compensated financially for -- for this --

10           MR. HARRISON:  Objection --

11  BY MS. RICHARDSON:

12      Q.   -- for helping you with your cryptocurrency?

13           MR. HARRISON:  Objection.  Vague.

14           Compensated by who?

15           MS. RICHARDSON:  By Taylor.

16  BY MS. RICHARDSON:

17      Q.   Was I -- was I -- was I your representative and

18  did you pay me for the help I was giving you with

19  cryptocurrency?

20           MR. HARRISON:  Objection.  Compound.

21           THE WITNESS:  You were -- you were advising --

22  I did not pay you or you would not have been objective,

23  obviously.  And you were -- you were -- you were my --

24  my consultant.  You were the person that I was -- I was,

25  like, working with, listening to.  And no, there was



Page 148

1   no -- there was no salary.

2           At the time I remember you being excited

3   because of all of the opportunities you felt that you

4   were going to have, like Tushar and Persistence said you

5   could -- you were hoping to be able to work for them and

6   that this would be opening a world for you that wouldn't

7   have happened with just buying a few thousand of coins

8   here and there.

9   BY MS. RICHARDSON:

10      Q.  And it would make sense then, if I had an

11  upside in the coin you were heavily invested over time,

12  that I would be more invested in that; is that correct?

13          MR. HARRISON:  Objection.  Compound.  Calls for

14  speculation.

15          THE WITNESS:  Yeah -- hypothetical.  I

16  couldn't -- I mean --

17          MS. RICHARDSON:  That's fine.  You don't have

18  to answer.

19          THE WITNESS:  I don't --

20          MS. RICHARDSON:  Let me -- let me think --

21          MR. HARRISON:  Don't answer hypotheticals.

22  BY MS. RICHARDSON:

23      Q.  Let me think of a better -- let me think of a

24  better way to phrase it.

25          I expressed to you that the crypto purchases



Page 149

1    became much more time-consuming than I expected.

2              Do you remember that conversation?

3              MR. HARRISON:  Objection -- bless you.

4              THE VIDEOGRAPHER:  Thank you.

5              MR. HARRISON:  Vague.

6              Do you have a time period on this?

7              MS. RICHARDSON:  Yeah.

8    BY MS. RICHARDSON:

9         Q.  On or about, I would say, September of 2021 to

10   November 2021, you continued to make a large number of

11   purchases in altcoins.

12             Do you remember this?

13        A.  Yes.  I remember November very, very clearly,

14   we had lunch at Toscana, which was before Thanksgiving

15   in 2021, where you had a -- you said to me you were

16   feeling that it was an unevil -- uneven relationship,

17   that you weren't being compensated, it was taking far

18   too much of your time and your energy, and you wanted me

19   to loan you a hundred thousand dollars and then you said

20   that you would -- you would make -- a 10 percent

21   commission it would give to me and then you would keep

22   the difference.

23             And at that point I remember saying I didn't

24   want to risk messing up our friendship with -- with

25   finances -- with financials; and also, that's when I



Page 150

1    told you that I was going to be moving to England, which

2    you already knew --

3    BY MS. RICHARDSON:

4        Q.  Uh-huh.

5        A.  -- but that everything would have to be

6    custodied offshore.  It was around November that I told

7    you that they had to go -- everything had to go to a

8    professional crypto bank.

9        Q.  And do you remember me having concerns about

10   that?

11       A.  What --

12           MR. HARRISON:  Objection.  Vague.

13           Concerns about what?

14   BY MS. RICHARDSON:

15       Q.  Sorry.  Do you remember me having concerns

16   about the custody changing?

17           MR. HARRISON:  Objection.  Vague.

18           If you think you under -- if you do understand

19   it somehow, you can answer.

20           THE WITNESS:  I know you reacted very strangely

21   when I said that I was going to need the wallets back

22   because they were going to have to be custodied by a

23   professional custody company.

24   BY MS. RICHARDSON:

25       Q.  Do you have any sense of why I was concerned?



Page 151

1    A.  At the time it --

2         MR. HARRISON:  Objection.  Assumes facts not in

3    evidence.

4         That's not what the testimony was but --

5         THE WITNESS:  At the time it seemed very

6    strange because you had been saying for a while how much

7    work this was for you and how much time it was taking up

8    with your life, which is why I thought in November, when

9    I said, Don't worry.  I'm taking the wallets back.  You

10   will not have to be -- have to be spending all this

11   time, I thought you would be relieved.  But you had just

12   a -- you had a strange reaction.  You kind of --

13   BY MS. RICHARDSON:

14   Q.  Do you -- and -- and you --

15   A.  -- startled and you were thrown off.

16        MR. HARRISON:  Let her finish.

17        MS. RICHARDSON:  Okay.

18        THE WITNESS:  You were just thrown off; and it

19   wasn't the happy reaction I would have thought of

20   someone who was, you know, feeling oppressed by having

21   to manage all these wallets.  I thought you would be

22   happy to be -- to -- to be able to be free of that

23   responsibility.

24   BY MS. RICHARDSON:

25   Q.  And I want you to tell me, because I think that



Page 152

1    there was some conclusions that came to you at this

2    time, what do you think my concern was?

3            MR. HARRISON:  Objection.  Calls for

4    speculation.  I don't know how she would be expected to

5    answer that.

6    BY MS. RICHARDSON:

7        Q.  Okay.

8        A.  I couldn't -- it didn't make any sense to me.

9    It didn't make any sense to me because I knew you were

10   feeling you were putting far too much time into

11   managing --

12       Q.  That's true.

13       A.  -- the crypto and that it was becoming too much

14   of a burden, which is why it was -- I just thought you

15   would be happy when I said I needed the wallets back.

16       Q.  Do you remember me expressing specifically that

17   the concern was related to the staked assets and that

18   they could not just be moved?

19           Do you remember having that conversation?

20           MR. HARRISON:  Objection.  Compound.  Vague.

21           If you think you understand it, you can break

22   it down, go ahead.

23           THE WITNESS:  I do.  I remember -- I remember

24   having the -- the conversation around the staked --

25   while it seems to me that because everything was locked



Page 153

1    over at Persistence or something, there was a technical

2    reason why that would not -- why that would have been

3    inopportune to move them over to England.  And in -- I

4    don't recall your concern about the staking; but it

5    would make common sense, just like Anchorage couldn't

6    stake.

7    BY MS. RICHARDSON:

8        Q.  Do you remember me telling you specifically

9    that it would be a breach in the term of your purchase

10   agreement?

11            MR. HARRISON:  Objection.  Vague.

12            That what would be a breach?

13            MS. RICHARDSON:  Moving them off of the staked

14   wallets.

15            MR. HARRISON:  Which coins are we talking

16   about?

17            MS. RICHARDSON:  Persistence now specifically.

18            THE WITNESS:  I recall -- I recall that

19   conversation because it was -- the conclusion was, at

20   least in my -- from my recollection, that Tushar would

21   have to give a go-ahead for it and accommodate it

22   because it was a technicality that had to happen before

23   the British -- British tax year, before -- before

24   April 5th.

25   ///



Page 154

1  BY MS. RICHARDSON:

2      Q.  Were you aware that when you purchased

3  Persistence, Tushar had extreme reservation about the

4  size of purchase you wanted to make?

5      A.  Yes.  You told me.

6      Q.  Do you know why he would have had reservations

7  about the size of the purchase that you wanted to make?

8      A.  Because he --

9          MR. HARRISON:  Objection.  Calls for

10  speculation.

11          If you know, you can answer.

12          THE WITNESS:  My understanding was that he was

13  concerned that someone that would control that much --

14  have as many tokens as that could do something

15  nefarious --

16  BY MS. RICHARDSON:

17      Q.  Now --

18      A.  -- to his -- to his token -- someone with an

19  ill agenda.

20      Q.  Is it fair to say that when you purchased

21  Persistence it was still something that would be

22  considered, in crypto terminology, a micro-cap or a

23  cryptocurrency with a very small overall market cap?

24          MR. HARRISON:  Objection.  Compound.  Calls for

25  speculation.



Page 155

1          If you think you understand it, you can answer.

2          THE WITNESS:  I was aware that it was a small

3    coin, but this was -- this was your area of all the --

4    you know, the -- you know, the understanding in the --

5    you know, the knowledge on everything.  But it was

6    common sense that it was a small company, small coin.

7          MS. RICHARDSON:  Were you --

8          MR. HARRISON:  I'm going to need a bathroom

9    break relatively soon --

10          MS. RICHARDSON:  Totally fine.  Let me just

11   finish this one point and then we can go because we're

12   -- this -- I just want to get to the end of -- if that's

13   okay, and -- is five minutes okay?

14          MR. HARRISON:  Yeah, that's fine.

15          MR. ANDRE:  Can we do --

16          MS. RICHARDSON:  We'll do a lunch break.

17          MR. ANDRE:  Finish your question, we'll go off

18   the record.

19   BY MS. RICHARDSON:

20     Q.  Okay.  Were you aware that unstaking such a

21   large amount in -- in a transfer could dramatically

22   alter the price of Persistence?

23          MR. HARRISON:  Objection.  Vague.

24          What time are we talking about?  What time --

25          MS. RICHARDSON:  This is in -- I believe it was



Page 156

1    November of 2022.

2    BY MS. RICHARDSON:

3       Q.  The reason the contract was signed and the

4    assets were committed to be staked was to not move the

5    price substantially.

6            Were you aware of that?

7       A.  Yeah.  Well, I -- I -- my understanding was

8    that everything was being left over with -- with

9    Persistence so they had sort of more control of it.  And

10   the staking, the idea was that it would be compounding

11   my returns and the -- and one was -- I was meant to be

12   getting greater returns from staking versus not staking

13   it.  The whole point -- it seemed to me much of the

14   point of the whole thing was not staking it.

15   BY MS. RICHARDSON:

16      Q.  But you were not aware that if you were to

17   unstake a very large amount at one time, it could

18   dramatically impact the price?

19      A.  No.

20      Q.  And you were not aware that at that time when I

21   expressed concern, it was that it could dramatically

22   impact the price and also that you would be in breach of

23   your agreement?

24           MR. HARRISON:  Objection.  Compound.

25   ///



Page 157

1  BY MS. RICHARDSON:

2      Q.  You were not aware --

3          MR. HARRISON:  Calls for a legal conclusion.

4          You can answer.

5  BY MS. RICHARDSON:

6      Q.  -- that my concern may have been that this

7  could have a catastrophic impact on not only the coin,

8  but on your investment?

9          MR. HARRISON:  Objection.  Compound.  Calls for

10  speculation.

11  BY MS. RICHARDSON:

12          MS. RICHARDSON:  That's fair.

13          THE WITNESS:  And no, I wasn't aware.

14          MS. RICHARDSON:  Okay.  Why don't we take a

15  lunch break.

16          THE VIDEOGRAPHER:  Going off the record at

17  1:57.

18              (A lunch recess is taken.)

19          THE VIDEOGRAPHER:  We are back on the record at

20  1:31 -- sorry -- 2:31.  This is Media No. 3 in the

21  deposition of Ms. Taylor Thomson.

22  BY MS. RICHARDSON:

23      Q.  Okay.  Hi.

24      A.  Hi.

25      Q.  I will circle back just for a minute where we



Page 158

1    left off, and then we're going to -- oh, and my

2    microphone -- and then we're going to pivot.

3         So we were just talking about when you made a

4    decision to move the custody of your crypto and what

5    that could mean.  I want to go back a little bit because

6    you mentioned that you thought it would be good for me

7    because it would take a lot off my plate; correct?

8         A.  Yes.

9         MR. HARRISON:  Objection.

10        When are we talking about?  What are we talking

11   about?

12        MS. RICHARDSON:  Just say --

13        THE WITNESS:  Moving and --

14        MR. HARRISON:  The statement she just made,

15   like, in the deposition?

16        MS. RICHARDSON:  Yes.

17        MR. HARRISON:  The one where we -- before --

18        MS. RICHARDSON:  On the record, yes.  Yes.

19   Sorry.  Yes.  Not the -- no.  No.  Not referring to

20   this.

21        THE WITNESS:  Moving the Persistence --

22   BY MS. RICHARDSON:

23        Q.  Yes.

24        A.  -- over to Saffery's.

25        Q.  Yes.  So --



Page 159

1          THE VIDEOGRAPHER:  Could we have your mic --

2    BY MS. RICHARDSON:

3      Q.  Do you remember a few months prior to this I

4    told you I definitely can't keep this in my home, it's

5    not safe, but especially so if it were to go up

6    substantially -- that was the bigger fear, if it were to

7    keep going up?

8      A.  I don't remember that.

9      Q.  That's okay.

10          MR. HARRISON:  Objection.  Compound.  Vague.

11    BY MS. RICHARDSON:

12      Q.  That's fair.

13          You had a large of amount of crypto assets on

14    those eight Ledger wallets in 2021; is that correct?

15      A.  Yes.

16      Q.  Do you recall -- the -- the crypto that was on

17    those wallets, at that point in time Anchorage did not

18    have the capacity to custody those coins; is that

19    correct?

20      A.  That's correct.  That's why I had the wallets.

21    I'm --

22      Q.  Do you -- do you remember me reaching out to --

23    do you remember when we realized that Anchorage was

24    using the Ledger vault system to custody your crypto?

25          Do you remember us ever having that



Page 160

1    conversation?

2        A.  Vaguely familiar.  That they were using --

3    wait.  That Anchorage was using crypto wallets -- was

4    using wallets to store my crypto at Anchorage?

5        Q.  They were using something similar to a larger

6    version of a wallet.  It was a version of a Ledger.

7        A.  Okay.  Rings a bell.

8            MR. HARRISON:  I'm sorry.  Is there a

9    question --

10           MS. RICHARDSON:  Yes.  I'm getting there.

11           MR. HARRISON:  -- or is there a statement?

12   BY MS. RICHARDSON:

13       Q.  Sorry.  I'm trying to give some -- some

14   groundwork that -- Ledger vault had the capacity to be

15   insured because it had multi-sig authorization required

16   to access the funds.

17           Does that ring a bell?

18       A.  Okay.  Anchorage -- I remember.  Anchorage

19   had -- are you -- maybe I'm not getting this right.

20       Q.  It's all right.

21       A.  Anchorage had the three -- three-person

22   authentication.

23           That's different, or that's the same?

24       Q.  That's different than a regular Ledger wallet,

25   yes.



Page 161

1    A.  Right.  And that was to do the trades there.

2    Q.  And can you see how the multi-signature

3  protects the crypto more than if just, say, one person

4  has a wallet?

5        MR. HARRISON:  Objection.  Vague.  Calls for

6  speculation.

7  BY MS. RICHARDSON:

8    Q.  Okay.  Anchorage offered, at the time,

9  insurance on your cryptocurrency; is that correct?

10    A.  That is correct, yes.

11    Q.  Do you remember us wanting to create a similar

12  structure for your other altcoins so that they could be

13  insured?

14    A.  Yes.  I remember us wanting to find

15  professional Ledgers and more industrial Ledgers, and I

16  don't recall whether they were going to be insured, but

17  they -- my recollection is that they were going to be

18  more -- more serious -- more substantial and, therefore,

19  probably safer.

20    Q.  Around this time do you remember that I reached

21  out directly to the Ledger foundation and started having

22  conversations with them about the cost of having a

23  Ledger vault for you separate from Anchorage?

24    A.  I remember you reaching out -- I thought it was

25  to the company and -- to the company that made the



Page 162

1   Ledger -- the professional Ledger vault to see if we

2   could get a Ledger vault.  I do not recall that it --

3   because they were -- I just -- that's -- that's what I

4   remember.

5       Q.  Do you recall me telling you after I had that

6   conversation that they would be willing to, based on the

7   size of your investment, build the capacity within the

8   Ledger vault to stake your assets and still have it be

9   insurable?

10      A.  Was this --

11          MR. HARRISON:  Objection.  Compound.  Vague.

12          MS. RICHARDSON:  Okay.  That's fair.

13  BY MS. RICHARDSON:

14      Q.  Do you remember me talking to the Ledger folks

15  about creating a structure that would hold all of your

16  crypto assets, including NFTs and small-cap altcoins?

17      A.  I remember the -- that was the -- that was the

18  agenda.  I don't remember you actually speaking -- I

19  remember you -- you were looking -- you were looking

20  into them and that was the idea to keep them safe but

21  still able to be stakes -- staked.

22      Q.  And do you remember that we ran a cost analysis

23  and it was clear that it would actually save you a

24  considerable amount of money to build your own vault

25  that was insurable than to keep it -- your crypto



Page 163

1    custodied at Anchorage?

2            MR. HARRISON:  Objection.  Compound.

3            MS. RICHARDSON:  Okay.  That's fair.

4    BY MS. RICHARDSON:

5        Q.  Do you remember us -- okay.

6            Do you remember that you were paying Anchorage

7    a fee to custody your assets?  You paid Anchorage a fee

8    to custody your assets -- correct? -- a percentage?

9        A.  That sounds -- since -- I'm so sorry.

10       Q.  It's okay.

11       A.  Because I remember the first one was -- at

12   Genesis didn't charge anything.  I don't remember if and

13   what Anchorage charged.

14       Q.  That's okay.

15       A.  I know I was getting nothing when it was at

16   Genesis, but they also weren't insured.  I -- I'd have

17   to go back and look at the -- the contract, but I'll

18   take your word for it.

19       Q.  Anchorage had a limited capacity in relation to

20   the coins that they can could custody at that time.

21           Do you remember that?

22       A.  Yes, I remember that.

23       Q.  And when I spoke to -- when it became clear

24   that Ledger vault was the same as what Anchorage was

25   using -- yeah -- we ran a cost analysis of which would



Page 164

1    be more favorable to you.

2              Do you have any memory of that?

3        A.   Vague.  And it -- vague.  And it would make

4    sense.  It would follow.

5        Q.   What seemed at the time favorable for you and

6    Persistence was that if you were to build this type of a

7    vault, it would allow people to purchase the coin in

8    large numbers and keep it insured.

9              Do you remember that?

10             MR. HARRISON:  Objection.  Compound.  Calls for

11   speculation.

12             THE WITNESS:  I -- I don't remember that, but I

13   think I might be -- what I remember, I -- is -- I think

14   my understanding of what you're saying is -- maybe I'm

15   confusing this --

16   BY MS. RICHARDSON:

17       Q.   That's okay.

18       A.   -- was a node.

19       Q.   That's separate.

20       A.   A node -- that's separate.  So -- so I don't --

21   I don't -- sorry.  I don't remember specifically.

22       Q.   It's fair to say, though, regardless, this was

23   an active conversation that never materialized; correct?

24             MR. HARRISON:  Objection.  Vague --

25   ///



Page 165

1  BY MS. RICHARDSON:

2      Q.  Okay.  Do you remember that these conversations

3  were ongoing at the time you made a decision to move

4  your assets to Saffery's?

5          MR. HARRISON:  Objection.  Vague.

6          What -- when you say "these conversations,"

7  what --

8  BY MS. RICHARDSON:

9      Q.  Do you remember that the conversations with

10  Ledger vault -- is it fair to say that I was very

11  concerned that your crypto was secure?

12          MR. HARRISON:  Objection.  Calls for

13  speculation.

14          MS. RICHARDSON:  Okay.  That's fair.  Let's

15  just -- let me just pivot for a second, and we'll come

16  back to that.  Let's -- let's table it for a minute, and

17  we'll -- we'll jump to a different topic.  We'll come

18  back.

19  BY MS. RICHARDSON:

20      Q.  We are going to move -- fast-forward and we

21  will go back to this period of time, which is a hard

22  period of time for both of us to discuss, I think.

23          Okay.  You and I stopped communicating at the

24  beginning of June of 2022; is that correct?

25          MR. HARRISON:  Objection.  Vague.



Page 166

1          You can answer, if you can.

2    BY MS. RICHARDSON:

3      Q.   The last time I received communication --

4    direct communication from you was in June of 2022.

5          Does that sound about right?

6      A.   Yes.  At -- the last time.  Before that,

7    everything had slowed down over this point, the New

8    Year's through the summer --

9      Q.   Uh-huh.

10     A.   -- in general.  Communication slowed down very

11   much from, it seems to be, January to June/July.  And

12   then I -- it makes sense July would have been the

13   last -- or June of 2022, sometime there around.

14     Q.   Okay.  The last -- when -- basically, I would

15   say that once you hired counsel, that was the end of

16   our -- of your direct communication to me?

17     A.   That sounds logical.

18     Q.   That's the record I show.

19          And now, I reached out to you in October of

20   2022 and sent you several text messages.

21          Do you remember that?

22     A.   If it's the texts, yes.

23     Q.   That --

24     A.   The big ones?  Two --

25     Q.   There was 2022 and 2024.



Page 167

```
 1        A.  Oh, I don't remember the 2022 ones.

 2        Q.  That's okay.

 3            Let's specifically move forward to 2024.  Now,

 4   these are the text messages that I sent to you on

 5   October 12th of twenty twenty -- 2024; correct?

 6        A.  Yes.  Same -- let me see.  Of course they are.

 7        Q.  Yeah.

 8        A.  Yeah, they are.

 9        Q.  I am going to ask you -- when you received

10   these messages was it upsetting?

11        A.  Yes.  Yes, it was.

12        Q.  You and I had known each other closely, we've

13   established, for a long time?

14        A.  Yes.

15        Q.  When we were friends did I ever give you a

16   reason to feel as if I was a physical threat to your

17   safety?

18            MR. HARRISON:  Objection.  Vague.  Calls for

19   speculation.

20            To the extent you think you can answer the

21   question, go ahead.

22            THE WITNESS:  No.  No.

23   BY MS. RICHARDSON:

24        Q.  Did I ever express violence towards other

25   people, that you can remember?
```



Page 168

1       A.  No.

2       Q.  Do you think of me as a violent person?

3           MR. HARRISON:  Objection.  Calls for

4  speculation.

5           You talking about currently?

6  BY MS. RICHARDSON:

7       Q.  Have you ever thought of me as a violent person

8  or -- prior to this time?

9       A.  Prior to those texts, no.

10      Q.  I'm -- I'm going to -- in my deposition we

11  focused on a specific carve-out of these texts, and I

12  want to say -- I know this probably isn't the

13  appropriate forum -- I'm really sorry.

14      A.  Thank you.

15      Q.  There were a number of text messages in this

16  thread that were -- I would say all together it -- it --

17  anyone can read them and agree it's disturbing.  The

18  text message thread began, "Because of you, I have lost

19  everything and you decided to sue the person who had

20  nothing left to lose.  How do you think this ends?  Do

21  me a favor.  Tell your lawyers to respond to my request.

22  I never been more destroyed.  Don't underestimate what

23  that looks like.  I loved you more than anything, and it

24  was purer than the purest.  These were your decisions.

25  And Jesus fucking Christ, they're all documented.  What



Page 169

1   the fuck."

2           Now, from there I moved to asking you to kill

3   me.  From asking you to kill me, I moved back to, "I

4   loved you.  I really fucking did.  I can count on one

5   hand how many people I have loved in my life, and you

6   are one.  Please, please do something good with your

7   life.  Please, please, please.  Don't ever speak to me

8   again; but honor that love with something for someone,

9   please.  Please.  You are good.  You are kind.  I know

10  this.  Please be more than your money.  Never see me or

11  talk to me; but help one animal, one person, one

12  ecosystem.  I don't care.  Please.  I'm sorry.  I'm

13  hurt.  I'm broken.  You broke me.  Mission accomplished.

14  I love you.  I tried" -- it says "I tired," but that's a

15  typo.

16      A.  Yeah.

17      Q.  I -- also tired.

18          "I now have nothing left.  Nothing.  Please,

19  please kill me.  Please.  I beg you, just fucking do it

20  already.  Just kill me.  It's better for you.  It's

21  better for me.  Please.  Just have mercy and get it over

22  with.  Send someone over with a fucking gun before I

23  speak to the press.  Fuck you.  I loved you.  I have the

24  fucking receipts.  You want to destroy me, then just do

25  it already."



Page 170

1          And then some expletives that are awful and at

2    the end a series of about like 20 pleases and I say,

3    "I'm so hard" -- "I tried so hard" -- "I'm so sorry.  I

4    tried so hard.  I tried to fix it.  I was scared.  I

5    tried.  I didn't want to fail you.  I tried with

6    everything I had.  I just wanted you to win.  That's the

7    only truth.  I loved you.  I'm sorry I didn't win."

8          Can you tell me about what you felt when you

9    read those text messages.

10    A.  I felt -- I felt frightened, and I felt

11    unnerved.  I felt sorry for you, and I felt like you

12    were -- it felt to me like -- like you were maybe --

13    like that you were unhinged, and it made me very

14    nervous.

15    Q.  Yeah.

16    A.  It made me very, very nervous because I

17    could -- I felt that you had -- you -- really felt you

18    had nothing to lose; and when someone's got nothing to

19    lose, they've got nothing to lose and it -- they

20    don't -- they don't want -- they -- those are often

21    situations where other people get taken down along the

22    way because they've got nothing to lose and -- and I was

23    concerned.

24    Q.  Did you -- I -- I asked for you to hurt me, and

25    you perceived that as a physical threat to your safety.



Page 171

1          Can you explain to me why that was.

2     A.  Because they were so violent.

3     Q.  Okay.

4     A.  Because they were just so violent and it -- it

5  wasn't like the Ashley that I'd known and because it

6  seemed like you were not -- you were not well.

7     Q.  Yeah.

8     A.  That -- the violent -- the violent undertones

9  and feeling like that you weren't -- you weren't the

10  Ashley I knew and you definitely didn't feel -- seem in

11  good mind to me -- and spirit.

12     Q.  Uh-huh.

13     A.  And -- and then I thought -- and I -- and I

14  also felt threatened because you know how -- how private

15  I am and my family -- I've been all -- my whole life and

16  when you, like, are talking about going to go to the

17  press and bring it on, it just -- it -- it just felt --

18  it felt unnerving.  It felt --

19     Q.  It must have.

20     A.  -- frightening and unnerving, quite honestly.

21  I was -- we were sitting in London; so if I had been

22  sitting in L.A., it would have been a whole different

23  story, you know.  At least I was farther across the

24  pond.

25     Q.  Do you -- are you -- are you aware now that I



Page 172

1  had a relapse on that day?

2          MR. HARRISON:  Objection --

3          MS. RICHARDSON:  Sorry --

4          MR. HARRISON:  -- testifying.

5  BY MS. RICHARDSON:

6      Q.  Are you -- are you aware that when you sent

7  those text messages now that I was under the

8  influence -- heavily under the influence?

9          MR. HARRISON:  Objection as -- calls for

10  speculation --

11          MS. RICHARDSON:  Okay.

12          MR. HARRISON:  -- testifying.

13          THE WITNESS:  Yes.  I know -- I know that's

14  your evidence, and so I -- I can't say for a fact,

15  obviously; but I know that that's -- that's -- that's

16  your evidence, so --

17  BY MS. RICHARDSON:

18      Q.  You -- you stated that this is not the version

19  of me you knew, and I want to know if you had concern at

20  that point for my well-being at all.

21      A.  As I said, I was --

22          MR. HARRISON:  Objection.  Objection.

23  BY MS. RICHARDSON:

24      Q.  Okay.  Do you think that the impact of this

25  process played a role in this breakdown that I had --



Page 173

1          MR. HARRISON:  Objection --

2    BY MS. RICHARDSON:

3      Q.  -- in October of 2024 --

4          MR. HARRISON:  -- calls for speculation.

5          I don't know how you could possibly answer

6    that; but if you think you can answer it, go ahead.

7          THE WITNESS:  I would be presuming, and I would

8    be speculating, but it would be -- it also could be

9    easily a conclusion that one could come to, myself

10   included.

11   BY MS. RICHARDSON:

12     Q.  At least partially.

13     A.  It's stressful.  It's -- it's a lot.

14     Q.  Has this process -- you know, I think -- okay.

15   Let me -- that's just --

16     A.  Yeah.

17     Q.  -- speculative.

18         MR. ANDRE:  Give me one second, please.

19   BY MS. RICHARDSON:

20     Q.  This text message said -- that I sent to you,

21   had I -- had I sent text messages like that to you

22   previously?

23     A.  No.

24     Q.  And -- and after this window of time, did I

25   send you any additional text messages similar to this or



Page 174

1  any text messages at all?

2          MR. HARRISON:  Sorry.  Can I just interrupt one

3  second.

4          MS. RICHARDSON:  Oh, sorry.

5          MR. HARRISON:  Can you just plug that in down

6  there.  I'm about to lose power.  Thank you.

7          Just for the record, Mr. Andre is leaving --

8          MS. RICHARDSON:  We're staying on the record.

9  Yeah.

10          MR. HARRISON:  -- another thing that he's got.

11  He'll come back, hopefully.

12          MR. ANDRE:  Yes.

13          THE WITNESS:  Would it be possible to ask one

14  of them for a chamomile -- a cup of tea -- a chamomile

15  tea?

16          MR. TAFOLLA:  I can make that happen.

17          THE WITNESS:  Could you?  Does anyone want one?

18          MR. HARRISON:  I'm good.

19          THE WITNESS:  That's okay.  Anything.

20  Chamomile -- anything herbal, please.  Thank you.

21  BY MS. RICHARDSON:

22      Q.  So I was saying, did I send you any text

23  messages after this?

24      A.  No.

25      Q.  Is it fair to say that this was an isolated



Page 175

1  incident?

2       A.  Yes.  I'd never received texts like that

3  from -- from you.

4       Q.  And is it correct that these text messages came

5  in a short time period?

6       A.  Yes, it's correct.

7       Q.  Okay.  I want to move for a moment now back to

8  the earlier part of our friendship.

9       A.  Can I also add something?  I knew it was a

10 question -- a few ago --

11          MR. HARRISON:  Sure.

12          THE WITNESS:  -- about whether I was concerned.

13 BY MS. RICHARDSON:

14      Q.  Yeah.  Of course.

15      A.  I was concerned for you.

16      Q.  Do you need to take a break?  Are you okay?

17      A.  I'm okay.  I'm totally fine.

18      Q.  Okay.  Actually, let's just finish this.  I was

19 going to change topics to lighten it, but I think it

20 lightens it anyway.

21      A.  Just do it.

22      Q.  You -- you filed a protective order against me

23 after I sent those text messages, and so did your

24 daughter; correct?

25      A.  Yes.



Page 176

1    Q.  And you filed that protective order in Monterey

2    County; correct?

3    A.  I filed it in California.

4    Q.  Yes.

5    A.  The lawyers filed it; so I'm assuming wherever

6    it was filed, it was filed in California somewhere.

7    Q.  And I filed a response that acknowledged the

8    severity of the text messages but affirmed my history

9    and -- and the circumstances.

10       Do you remember that?

11       MR. HARRISON:  Objection --

12       MS. RICHARDSON:  Okay.

13       MR. HARRISON:  -- to the characterization.

14   BY MS. RICHARDSON:

15   Q.  That restraining order was dismissed; correct?

16   A.  I don't know whether it was dismissed or we let

17   it go because I was living in England.  I can't recall.

18   It was one or the --

19   Q.  I think both are true.

20       You -- sorry.

21   A.  That's okay.

22   Q.  Okay.  I want to talk for a moment about the

23   time period of the market crash where you said I

24   communicated less with you.

25       MR. HARRISON:  Which market crash we talking



Page 177

1  about?

2      MS. RICHARDSON:  2021 -- or sorry.  2022.  The

3  beginning of 2022.

4  BY MS. RICHARDSON:

5      Q.  Do you recall a Zoom meeting that we had with

6  Tushar Agarwal in January of 2022?

7      A.  That was with Lieh; right?

8      Q.  Uh-huh.  Yeah.

9      A.  Yes.

10      Q.  It was in response to Lieh sending me an email

11  saying he wanted to get a handle on the stake tokens.

12          Does that ring a bell?

13      A.  Yes.  Yes.  He was trying to get a handle point

14  on, at that point, all my crypto before -- tax season

15  was fast approaching.

16      Q.  Were you aware -- you have a -- I don't know

17  his exact title -- a accountant or financial accounting

18  representative, Jack --

19      A.  Jack Rodor [phonetic].

20      Q.  What is his title?

21      A.  He was financial consultant.  He wasn't

22  full-time.

23      Q.  Oh, okay.

24      A.  Yeah.  Didn't have a specific title --

25      Q.  Were --



Page 178

1          A.   -- that I recall.

2          Q.   Were you aware that he wrote to me in February

3     of 2022 and said, We need $20 million to pay Taylor's

4     taxes?

5          A.   No.

6          Q.   You weren't aware of that?  I don't think

7     you -- you were not cc'd, so...

8          A.   Yeah.  I mean, because all the financials --

9     the financials and -- the tax people would do the tax,

10    the financial people did the financials, and everything

11    was always complicated.  So it's -- it's definitely not

12    an area I was, you know, in the weeds on.

13         Q.   Around the time that Jack emailed me telling me

14    that he needed money for your taxes, the crypto market

15    was descending because it was -- it was the winter of,

16    you know, 2022.

17              Does that sound about right to you?

18              MR. HARRISON:  Objection.  Compound.

19              MS. RICHARDSON:  Okay.

20              MR. HARRISON:  Assumes facts not in evidence.

21              MS. RICHARDSON:  Understood.  Let me rephrase

22    the question.

23    BY MS. RICHARDSON:

24         Q.   Did you ever communicate to me that I would be

25    responsible for generating or passing income to pay for



Page 179

1  your taxes?

2          MR. HARRISON:  Objection.  Vague.

3          I'm not sure I understand.  What do you mean

4  "passing income"?

5  BY MS. RICHARDSON:

6      Q.  Did you ever communicate to me that I was

7  responsible for --

8      A.  No.

9      Q.  -- holding money for your -- to pay for your

10 taxes?

11     A.  No.  And I can't think how Jack would have

12 thought or presumed or -- thank you.  Thank you so much.

13          Like, it's -- it's kind of -- it's bizarre.

14          Thank you.

15     Q.  Is it reasonable that an email like that might

16 have been disturbing to me?

17          MR. HARRISON:  Objection.  Calls for

18 speculation on two levels.  There's facts that have not

19 been introduced --

20          MS. RICHARDSON:  Okay.  That's fair.

21          MR. HARRISON:  -- into evidence.

22 BY MS. RICHARDSON:

23     Q.  If you had received an email like that, would

24 it have been upsetting to you?

25          MR. HARRISON:  Objection.  Calls for



Page 180

1   speculation.

2            MS. RICHARDSON:  That's fine.

3            THE WITNESS:  Should I answer?

4            MS. RICHARDSON:  Yes.

5            MR. HARRISON:  I don't know how you could, but

6   if you -- if you can --

7            THE WITNESS:  It's a hypothetical.

8   BY MS. RICHARDSON:

9        Q.  So let's -- let me rephrase it.  Let me

10  rephrase it.

11       A.  I --

12       Q.  Let's -- let -- withdrawn.  You were not aware

13  of that.  That's fine.  We'll leave it at that.

14       A.  I was not aware of that; and to answer, I would

15  have thought, yes, you probably -- if you believed that

16  was your responsibility, you probably would have been

17  upset.  And if I were in your position and I received

18  that, I'd be wondering what the heck was going on and I

19  would be confused.

20       Q.  There was a period -- when we made the

21  Persistence transaction, that was a fairly

22  straightforward transaction.

23            Would you agree?

24       A.  Yes.

25       Q.  There was a contract, and it was very clear the



Page 181

1    amount that was purchased for the amount in Bitcoin?

2         MR. HARRISON:  Objection.

3         MS. RICHARDSON:  Sorry.

4    BY MS. RICHARDSON:

5      Q.  The accounting on the Bitcoin -- or sorry -- on

6    the Persistence purchase was very clear; correct?

7      A.  As I --

8         MR. HARRISON:  Objection.

9         Go ahead.  You can try and answer.

10        THE WITNESS:  Well, my -- don't know whether

11   this the answer to the accounting on it, but my

12   understanding was we literally took the value that --

13   that -- the Persistence -- the Persistence value of $5

14   and the number of shares -- or the number -- or the

15   money -- we actually took, yeah, the -- the price of $5,

16   and it was going to be 40 -- or 20, two tranches, the

17   point is, and just divide it by the current price of

18   Bitcoin that we pegged the day.  Right.

19   BY MS. RICHARDSON:

20      Q.  So that was the benefit of having an

21   over-the-counter purchase?

22      A.  Locked-in price.

23      Q.  Now --

24      A.  Sorry.

25      Q.  -- when it came time to purchase the other



Page 182

1  altcoins, were you aware that every altcoin that you

2  wished to purchase I attempted to purchase over the

3  counter so we could have a similar arrangement?

4        MR. HARRISON:  Objection.  Compound.

5        THE WITNESS:  No, I wasn't aware of that.

6  BY MS. RICHARDSON:

7     Q.  I want to be clear.

8        Were you aware that when I reached out to these

9  crypto companies, I was not looking for staking or a

10 discount?  I just wanted a set price to purchase so that

11 you could have a clean accounting?

12       MR. HARRISON:  Objection.  Vague.

13       I don't understand.

14       MS. RICHARDSON:  Okay.  That's fine.  Let me --

15 let me rephrase it -- I'm going to go at it a different

16 way.

17 BY MS. RICHARDSON:

18    Q.  It is -- just so that -- I just want to put

19 this on the record.

20       Aside from the fact that I'm not a lawyer, I

21 think we can agree that cryptocurrency is very complex;

22 so I'm going to do my best to try to frame these

23 questions in a way that is clear.

24    A.  Yeah.

25    Q.  But because there are so many moving parts, it



Page 183

1  makes it hard I think even for the most seasoned

2  professional to understand -- I can say that for myself,

3  and I feel like I have a pretty good grasp on it.  I

4  apologize if I'm not clear to both of you, but we are --

5  we are now in this territory that is -- is -- is vague

6  on a good day, so I will do my best.

7       A.  Uh-huh.

8       Q.  There were a number of small-cap coins in the

9  fall that you wanted to purchase, and is it fair to say

10  those amounts exceeded -- the total purchases exceeded

11  $1 million when I -- when I was making those purchases?

12          Is it fair to say there were a number of

13  purchases that were approximately $10 million purchases?

14          MR. HARRISON:  I'm sorry.  What time period,

15  and how many?

16          MS. RICHARDSON:  We're talking about -- we're

17  talking about September through December of 2021.

18          MR. HARRISON:  And are you -- are you asking

19  her how many $10 million-plus purchases there were?

20          MS. RICHARDSON:  No.  No.

21  BY MS. RICHARDSON:

22       Q.  I'm asking -- I'm asking, do you remember me

23  making -- executing purchases for small-cap coins --

24       A.  Yes.  I remember you purchasing small-cap

25  coins.



Page 184

1      Q.  Okay.  Do you remember me explaining to you

2   that because I was buying them on the open market, while

3   purchasing them it would change the price?

4          MR. HARRISON:  Objection.

5          You can answer, if you know, if you can -- if

6   you can answer that.

7          THE WITNESS:  I don't specifically remember

8   the -- the moment, but I know we had discussions

9   about -- because it's common sense the price would

10  fluctuate if you're buying a small coin on the open

11  market.

12  BY MS. RICHARDSON:

13     Q.  Do you remember me having to purchase

14  incrementally sometimes over days so to not change the

15  price?

16     A.  Yeah -- you can -- sorry.  Sorry.

17          MR. HARRISON:  You can -- I have no objection.

18          You can try and answer it, if you know.

19          THE WITNESS:  I -- I do recall that they

20  were -- that many of them were to be staggered, which is

21  what Genesis and Anchorage used to also do, even, you

22  know.

23  BY MS. RICHARDSON:

24     Q.  And were you aware that some days I would be

25  making hundreds, if not thousands, of purchases



Page 185

1  throughout the day on different -- okay.

2      A.  No, I wasn't.  Because I wasn't there and you

3  were doing them.

4      Q.  Yeah.  Can you -- is it reasonable to assume

5  that that might have been a stressful process in and of

6  itself?

7          MR. HARRISON:  Objection.  Calls for

8  speculation.

9  BY MS. RICHARDSON:

10     Q.  Your limited knowledge of crypto and the -- we

11  discussed earlier the losses that can happen with

12  cryptocurrency --

13     A.  Uh-huh.

14     Q.  -- is it reasonable to assume that the movement

15  of cryptocurrency can be stressful?

16         MR. HARRISON:  Objection.  Vague.

17         Stressful -- the movement of cryptocurrency can

18  be stressful for who?

19  BY MS. RICHARDSON:

20     Q.  The movement of cryptocurrency is high-risk

21  because if you have one number wrong in the blockchain,

22  you could lose your money.  There's no -- there's no

23  recouping lost cryptocurrency, for the most part; is

24  that correct?

25         MR. HARRISON:  Objection.  Calls for



Page 186

1  speculation.  I think legal conclusion.  I'm not sure.

2          But if you think you can answer, give it a

3  shot.

4          THE WITNESS:  That -- hold on.  That that --

5  yeah.  That once one loses cryptocurrency, one can't get

6  it back, basically.

7  BY MS. RICHARDSON:

8      Q.  If you lose --

9      A.  -- on your wallet.  Absolutely.

10     Q.  Okay.  So if a single transaction carries that

11  risk, can you see how hundreds of transactions in --

12  in -- in a short period of time could be exponentially

13  stressful?

14         MR. HARRISON:  Objection.  Calls for

15  speculation.

16         THE WITNESS:  Should I be answering if I just

17  have a guesstimate on it --

18         MR. HARRISON:  It doesn't have anything to do

19  with privilege, so -- the problem is it's a

20  hypothetical.

21         THE WITNESS:  It's hypothetical but --

22         MS. RICHARDSON:  You have to --

23         THE WITNESS:  I would imagine --

24         MR. HARRISON:  -- speculation.

25         But if you can't answer it, you can't answer.



Page 187

1    But if you can, you need to try to answer it.

2           THE WITNESS:  I would say hypothetically it

3    would -- it would follow; it would make sense.

4    BY MS. RICHARDSON:

5       Q.  Okay.  Now, during this time period when these

6    purchases were taking place, did you communicate to me

7    expectations to have a thorough accounting of all of

8    these purchases?

9           MR. HARRISON:  Objection.  Vague.

10   BY MS. RICHARDSON:

11      Q.  At any time did you express to me an

12   expectation to have accounting for these purchases?

13      A.  To clarify, I actually did because you were

14   entrusted with an awful lot of money; and what I didn't

15   understand was how many of these small -- how many

16   trades that were being -- how many transactions were

17   being executed --

18      Q.  Okay.

19      A.  -- which --

20      Q.  Let me ask -- let me ask the question again.

21          Did you ever give me specific -- did you ever

22   communicate to me specific expectations in relation to

23   accounting?

24          MR. HARRISON:  Objection to how it's phrased

25   because that's a different question.  It's not the same



Page 188

1    question.

2            MS. RICHARDSON:  Okay.

3            MR. HARRISON:  To the extent you think you can

4    answer --

5            THE WITNESS:  I -- well, firstly, it was

6    implicit that if you were trading, you would be keeping

7    track.  I wouldn't have thought I'd have to say, Can you

8    please make sure you make -- keep track.

9            But also, I -- I'd given you instructions to

10   keep an accounting because we were going to have to move

11   it over in the first few months of the year to Saffery's

12   and we need accounting.

13           And moreover, the tax people wanted an

14   accounting of it; and you were the only one that was in

15   the position to be doing that.  It was -- we all thought

16   that that's what you were doing when you were buying and

17   selling, that you would keep -- keep a note, you would

18   keep -- you would keep a ledger, an accounting, so that

19   we knew where we were.

20   BY MS. RICHARDSON:

21       Q.  At what point did you express that to me?

22       A.  As a sit-down conversation of the ground rules,

23   I think it was always understood because it seems

24   pretty -- pretty implicit and it seems pretty obvious.

25       Q.  Did -- did we have a sit-down conversation --



Page 189

1     A.  Since we --

2     Q.  -- about ground rules?

3     A.  No.  Because you were trading.  You were happy

4 to be trading and handling the crypto, and part of

5 handling it is also managing and keeping track of the

6 financials.

7     Q.  Based on -- based --

8     A.  Anchorage and Genesis would all have an

9 accounting if I would have needed to know where we were.

10 It wouldn't occur to me that they wouldn't have had the

11 numbers if we said, What do -- what do I have in this?

12 What do I have in that?

13         It's like, Oh, you know, we didn't think we

14 were meant to keep track.

15         Didn't make sense.

16     Q.  That's a great point.

17         And -- and I would say that -- would you agree

18 that there was a pretty substantial difference between

19 me being your friend and helping you trade crypto than,

20 let's just say, a financial institution like Anchorage

21 or Genesis?

22     MR. HARRISON:  Objection.  Vague.

23     THE WITNESS:  Obviously, you were very

24 different in the sense that you were excited to be

25 handling the crypto and you said that you were doing



Page 190

1  this all the time, all day long and this would be no big

2  deal to do it -- that's how you originally walked into

3  this -- and that you would be honored and thrilled to do

4  it because it was down your rabbit hole and you had --

5  you got experience -- more experience doing it.  So --

6  and I had no idea how many trades -- the trades that

7  turned out were happening were just, to me,

8  unfathomable, had zero idea, which is why I never

9  understood when you would say -- Michelle would say it

10  took so long.

11  BY MS. RICHARDSON:

12      Q.  So to be clear -- to be clear, you -- you never

13  expressed that you expected me to have an accounting

14  and -- but you -- you always expected that; is that

15  correct?  You're saying that now?

16          MR. HARRISON:  Objection.  Vague --

17  BY MS. RICHARDSON:

18      Q.  Okay.  Let me -- let me rephrase the question.

19  Let me -- let me step back for a second.

20          During this time period, I was clearly

21  extremely -- let me rephrase this.

22          We have already established earlier in this

23  deposition that I was not a formal fiduciary; is that

24  correct?

25          MR. HARRISON:  Objection to form.



```
                                                     Page 191
 1   BY MS. RICHARDSON:

 2       Q.  We -- there -- there was no written agreement

 3   between us; is that correct?

 4            MR. HARRISON:  Objection to vague.

 5            You can try and answer.

 6            THE WITNESS:  There was no written agreement

 7   for anything.  Not the finder's fee.  There was no

 8   written agreements; right?  So --

 9   BY MS. RICHARDSON:

10       Q.  And during --

11       A.  And it would be unfathomable to think that

12   anyone would give that amount of money to someone to

13   just be spending it on crypto and not keeping an

14   accounting of it.  It's -- it's -- it's

15   incomprehensible, in my mind.  I can't imagine anybody

16   that would think that was acceptable and normal because

17   it would defy logic, especially knowing that there is

18   going to be accounting that's going to be necessary in

19   the next few months for taxes and --

20       Q.  Right.

21       A.  -- and -- and in general.

22       Q.  And it's fair to say that -- you've already

23   agreed, I was not being compensated for any of this work

24   that I was doing for you -- correct? -- financially?

25            MR. HARRISON:  Objection.  Vague.
```



Page 192

1          When you say --

2          MS. RICHARDSON:  Were you -- were you --

3          MR. HARRISON:  -- talking about --

4          THE WITNESS:  Okay.  You weren't my employee.

5    BY MS. RICHARDSON:

6      Q.  I was not your employee.

7          Now, let me ask you this.

8          Are you -- Anchorage and Genesis were paid for

9    their services.  You're aware of that; correct?

10         MR. HARRISON:  Objection.  Asked and answered,

11   I believe.

12   BY MS. RICHARDSON:

13     Q.  We've established that Anchorage and Genesis

14   were paid for services --

15         MR. HARRISON:  Objection.  That's -- misstates

16   her prior testimony, I believe.

17         MS. RICHARDSON:  Okay.

18         THE WITNESS:  Yeah.  We went -- I specifically

19   had a very special deal with generous -- Genesis, and I

20   don't know what Anchorage ended up doing, but their deal

21   was favorable because they wanted me as their client.

22   BY MS. RICHARDSON:

23     Q.  Well, I -- Anchorage was being paid over 1

24   percent to hold your crypto, and they were paid on

25   transactions.  But regardless of that, you expected

