Page 193

1    me -- I just want to be clear on the record -- to

2    execute all of these purchases, keep a formal

3    accounting, knowing that I had no financial experience,

4    unpaid?

5            MR. HARRISON:  Objection.  Compound.

6            THE WITNESS:  No.  I'm going to clarify.  I

7    expected you to keep an accounting of any of the trades

8    and the transactions that you were doing, and I did not

9    realize the extent of the transactions you were doing.

10   And when you look at what you did after January through

11   to the time we got the wallets back, there were so many

12   unauthorized transactions, it's mind boggling how -- I

13   could never have anticipated that.  You were a friend.

14   You said you were -- decided to do it.  You wanted to be

15   part of this.  It was -- it was -- you know, it was an

16   exciting thing for you.  It was your rabbit hole.  It's

17   just what you were doing all day long.  It wasn't a big

18   deal.  You're thrilled to do it.  Opens opportunities

19   for you.

20           It wouldn't occur me you wouldn't think that

21   you didn't need to keep an accounting.  And had I known

22   that, of course I never would have left things with you;

23   and I certainly wouldn't have had you trading if I

24   thought you were just doing it without keeping an

25   accounting.  I mean, it makes sense now because you



Page 194

1  never were forthright.  You never -- it was very

2  difficult getting anything from you; and when we did, it

3  was woefully inadequate.

4  BY MS. RICHARDSON:

5      Q.  And -- and woefully inadequate based on what?

6      A.  Based on --

7          MR. HARRISON:  Objection.  Vague.

8          THE WITNESS:  There was a lot missing.

9  BY MS. RICHARDSON:

10     Q.  Uh-huh.

11     A.  The finder's fee wasn't even in any of the few

12 ledgers -- the few accounting sheets that you gave us.

13 And according to the crypto experts, the custodians,

14 when they looked at it they -- they were of the opinion

15 it was incredibly inaccurate.  We never knew quite how

16 inaccurate because the finder's fee wasn't even in it.

17     Q.  So I think --

18     A.  That was a separate wallet.

19     Q.  I think we can both agree that it was -- it

20 was -- it was a mess.

21     A.  That's definitive, yes.

22     Q.  Okay.

23     A.  It was an absolute disaster.  "Mess" is a very

24 kind way to put it.

25     Q.  Based on what we just discussed, is it



Page 195

1   reasonable to assume -- let's just keep the money off

2   the table for a moment.  I know, you're getting a glare.

3        A.  It's okay.  No, I'm not, actually.  It's fine.

4        Q.  Okay.  You have established that I was one of

5   your closest friends.  I want to ask you, were you aware

6   that -- that you were certainly one of my closest

7   friends during that time -- prior to that time?

8        A.  Yeah.

9            MR. HARRISON:  Okay.

10           THE WITNESS:  I would have -- I -- I guessed --

11  I supposed so.

12  BY MS. RICHARDSON:

13       Q.  Is it fair to assume that when I realized --

14  how do I put it?

15           Can you understand that it would be -- is it

16  reasonable to assume that the pressure of the trades and

17  the falling market may have had an impact on my work

18  product?

19           MR. HARRISON:  Objection.  Calls for

20  speculation.

21  BY MS. RICHARDSON:

22       Q.  You yourself have said that I became a version

23  of me that you didn't recognize -- correct? -- during

24  this time?

25       A.  Yes.



Page 196

1        Q.  Is it fair to say that I became somewhat

2    reclusive and different after I started doing the crypto

3    trading?

4        A.  In my -- in my recollection, once we hit

5    November, December, January, when I informed you that we

6    wanted the wallets back, then you started to become

7    very, very -- very elusive -- very elusive and -- and

8    your responses were -- were not -- were not that -- were

9    not very adequate and forthcoming.

10       Q.  Were you aware that I was like that with

11   everybody and not just you during that time?

12       A.  No.

13          MR. HARRISON:  Objection.  Calls for

14   speculation.

15          Go ahead.  That's fine.

16          THE WITNESS:  Sorry.  I couldn't have been

17   aware.

18   BY MS. RICHARDSON:

19       Q.  No.  That's fine.

20       A.  I wasn't with you.

21       Q.  Did it ever occur to you that this period of

22   time could have had a psychologically damaging impact on

23   me?

24          MR. HARRISON:  Objection.  Calls for

25   speculation.  Assumes --



Page 197

1           DEPOSITION OFFICER:  I'm sorry?

2           MR. HARRISON:  I'm sorry.  Objection.  Calls

3    for speculation.  Assumes evidence not in the record.

4           I -- I apologize.  I've been speaking low sort

5    of all day.  Have you been able to hear me or --

6           DEPOSITION OFFICER:  As long as everybody's not

7    talking at the same time.

8           MR. HARRISON:  Is there a question?  Can you

9    repeat the question.

10   BY MS. RICHARDSON:

11       Q.  Is it reasonable to assume that these chain of

12   events could have had a significant psychological impact

13   on me?

14           MR. HARRISON:  Objection.  Calls for

15   speculation.  Assumes facts not in evidence.

16   BY MS. RICHARDSON:

17       Q.  You still have to answer.

18       A.  There's a lot of chains of events.  Can you

19   clarify.

20       Q.  Okay.

21       A.  Can you -- can you --

22       Q.  Sure.  Let's go one by one.

23       A.  It's such a long time frame.  Can you bring it

24   down --

25       Q.  You --



Page 198

1          A.   -- narrow it.

2          Q.   -- meant a great deal to me; and at a time when

3     the world had changed and my circle was very small, is

4     it reasonable to assume that losing you and Madeleine

5     would have had a impact on -- on -- on me, in and of

6     itself?

7               MR. HARRISON:  Objection.  Compound question.

8     Calls for speculation.

9               THE WITNESS:  I -- I -- I cannot -- I cannot --

10    I cannot accurately answer that because, obviously, I'm

11    not you; but also, when I look back on all of the --

12    your actions since November on, it -- you also

13    weren't -- you weren't the person that I thought you

14    were.

15    BY MS. RICHARDSON:

16         Q.   Tell me --

17         A.   So --

18         Q.   That's -- that's a good point.

19              So tell me about what those actions were --

20    the -- in your perception.

21              MR. HARRISON:  I'm sorry.  What actions are we

22    talking about?

23              MS. RICHARDSON:  The ones she just referred to.

24    My actions from --

25              THE WITNESS:  I --



Page 199

1          MR. HARRISON:  From November on?

2          MS. RICHARDSON:  Uh-huh.

3          THE WITNESS:  Talking about, like, all --

4    all -- all -- the multiple trades, the ducking and not

5    giving our wallets back, which we were doing a

6    significant amount of trades from the time we started to

7    ask for them.  We got no accounting, no wallets back.

8    This went on until finally -- finally you surrendered

9    them.  And even then, the codes were wrong.

10          There's -- I would have thought the old Ashley

11   would have taken these things hard, but you were not

12   that person from -- to me, your actions -- I hadn't seen

13   you and been exposed to you, but your actions are not

14   actions that I would have characterized as even been

15   remotely like -- like you were the person I knew.  It

16   seemed like it was -- because you weren't the person I

17   knew, you -- you know -- you know, you took a hidden --

18   a hidden kickback, and you never told me.

19          There's -- it wasn't -- you weren't -- I guess

20   I was thrown off base.  So I could not presume how you

21   would have taken, say, losing me as a friend at that

22   time --

23   BY MS. RICHARDSON:

24      Q.  At --

25      A.  -- because you weren't acting like a friend



Page 200

1    from your actions.

2        Q.  Okay.  At any point from November to --

3    November 2021 until we last communicated, did you have a

4    conversation with me about these concerns?

5        A.  The conversation I had was that we wanted to

6    get the wallets back and I needed the numbers and the

7    accounting for my taxes.  In January you gave us

8    something, but the tax season was coming up, and it

9    still went on and on with -- with no accounting, no

10   wallets returned.  It was awkward, and it was clear that

11   this -- that everything was not what I had thought it

12   was.

13       Q.  Did it ever occur to you that I did not realize

14   that I was expected to do the accounting and that I did

15   not have it?

16           MR. HARRISON:  Objection.  Calls for

17   speculation.  Compound question.

18           THE WITNESS:  When you were asked for the

19   accounting and you gave a -- as I would say, a woefully

20   inadequate one finally in January and things were

21   missing, I would have thought, knowing that we wanted

22   the wallets back and I needed them back, that we need an

23   accounting, it would have been the moment to coordinate

24   a hand-over, as Saffery's had wanted, and let people try

25   to get a handle on how much was where and, whoa, how



Page 201

1    much, what price, where it was staked, which coins,

2    rather than just keep trading, keep trading -- even

3    after wallets were returned, still trading.

4    BY MS. RICHARDSON:

5        Q.  Do you --

6        A.  It doesn't -- it doesn't connect.

7        Q.  Do you --

8            MR. HARRISON:  Ms. Richardson, we've been going

9    for about an hour after lunch.  Can we take a break?

10           MS. RICHARDSON:  Can I just finish up this --

11           MR. HARRISON:  Sure.

12           MS. RICHARDSON:  If you -- if you need to -- I

13   feel like we're right -- I just want to ask this one

14   question before I forget.

15   BY MS. RICHARDSON:

16       Q.  Do you remember we went to dinner in -- you

17   might not remember this.  It was the last time we went

18   to dinner.  It was in January of 2022, and I offered to

19   give you the wallets, and you said no.  I'm -- I'm --

20   you were about to travel -- I -- I had -- I had said I

21   could give you the wallets then; and you said, No.  They

22   should stay with you.

23           We discussed that?

24       A.  No.

25       Q.  Okay.



Page 202

1      A.  No.  Because Saffery's wanted the wallets.

2  They wanted an accounting.  They didn't just need the

3  wallets.  They needed passcodes.  And an accounting

4  would have been nice, but at least wallets and codes --

5      Q.  Do you --

6          MR. HARRISON:  You got to get her finish her --

7          MS. RICHARDSON:  Okay.

8          THE WITNESS:  At least wallet codes would have

9  been I think the start for them in a perfect world and

10 an accounting so that they knew what they were looking

11 at and weren't having to play hide and seek with them.

12 BY MS. RICHARDSON:

13     Q.  And you do not remember me saying to you in

14 January of 2022 that I would give you the wallets there?

15         MR. HARRISON:  Asked and answered.

16 BY MS. RICHARDSON:

17     Q.  Okay.

18     A.  Yeah, no, I didn't.  Because I had told you in

19 November we wanted them and you reacted rather strangely

20 to that, which seemed odd to me.  And then it took a

21 very long time -- months -- six months to get the

22 wallets back from you --

23     Q.  Do you --

24     A.  -- with a lot of trading, transactions and --

25 unauthorized transactions in the meantime.



Page 203

1     Q.  Are you aware that from -- the first time I

2   received any request about the physical wallets was in

3   March of 2022, when Lieh reached out to me and that I

4   said I would be happy to give them to you; we probably

5   should spend a week reviewing things because it's very

6   complicated.

7          Were you aware that we had that discussion?

8          MR. HARRISON:  Objection.  Compound.

9   BY MS. RICHARDSON:

10    Q.  Were you aware that reached -- Lieh reached out

11   to me in March of 2022 about the wallets?

12    A.  The actual date, I would have to look up; but I

13   asked -- Lieh knew that I was getting nowhere with you,

14   and Saffery's was getting -- nobody could get any

15   information out of you; and so as the head of the

16   financials, he stepped in to try to see if he could

17   figure it out and retrieve these wallets.

18    Q.  Are you aware that between our dinner and

19   January of 2022 and that email I received from Lieh,

20   nobody reached out to me about the wallets?

21    A.  I'm not aware of that, no.

22    Q.  Okay.  Between the dinner we had in January of

23   2022 and the email I received from Lieh, nobody reached

24   out to me about the wallets.

25          MR. HARRISON:  Is that -- wait.  Wait.  There



Page 204

1  is no question right now.  It's just a statement, so --

2        MS. RICHARDSON:  Yeah, it's a statement; but

3  I'm asking if she's aware of that.

4        MR. HARRISON:  She can't -- she just answered.

5  Asked and answered.

6        THE WITNESS:  No.

7  BY MS. RICHARDSON:

8     Q.  Are you -- are you aware that the communication

9  I did receive was from Jack about providing money for

10 your taxes?

11       MR. HARRISON:  Objection.  I don't even think

12 that states --

13       THE WITNESS:  I need to see it.

14       MR. HARRISON:  -- the email correctly.

15       THE WITNESS:  I need to see it.

16       MS. RICHARDSON:  I'm happy to --

17       THE WITNESS:  I -- I do recall, at one point,

18 like I said, Jack reaching -- everybody was trying to

19 get information for taxes, and I think he -- he was

20 trying to let you know that we needed information

21 because tax season was just around the corner, and you

22 still hadn't given us any information, so they

23 couldn't -- the accountants were -- it's a lot of

24 complicated accounting -- my -- my income tax.  It's not

25 just, like, this -- this was a significant --



Page 205

1    significant amount of stuff to start unwinding.

2    BY MS. RICHARDSON:

3         Q.  Understood.

4         A.  Yeah.

5         Q.  So if you look at the chain of events, we met

6    and I offered to give you those crypto wallets --

7         A.  Which, as you say, I don't recall.

8         Q.  I received several emails from Jacks [phonetic]

9    and -- and basic questions about accounting but also

10   about getting a large amount of money to pay your taxes.

11          The next correspondence I received about the

12   wallets was from Lieh in late March of 2022.  I

13   responded to him immediately, said I would be happy to

14   do that.  I can fly to Toronto, or are you coming here?

15   Because at -- the idea of them moving without a person

16   didn't seem smart.  At that point Lieh said, We'll

17   figure it out.  You know, he -- I could -- we can -- I

18   can pull up the communication, if you would like, but --

19   but there was a -- there was a gap in the time period.

20          Now, the next time -- nobody reached out to me

21   after that about the wallets.  You arrived at my house

22   unannounced in April of 2022.

23          Do you remember that?

24        MR. HARRISON:  Okay.  That was so compound,

25   like, I have forgotten what the beginning of the



Page 206

1    question was.

2            MS. RICHARDSON:  That's fair.

3            MR. HARRISON:  There was so many -- a

4    recitation --

5            MS. RICHARDSON:  There was --

6            MR. HARRISON:  -- of a whole history.  There is

7    no real question there.  There is no way she can answer.

8            MS. RICHARDSON:  I asked her -- and I should

9    have had you say it on the record.  I asked her if she

10   was aware of that timeline.

11           THE WITNESS:  I'm -- I'm -- I want to answer

12   some of your questions --

13   BY MS. RICHARDSON:

14       Q.  Please.  Please.

15       A.  -- as it comes.

16           You're saying that we had this dinner where you

17   offered me the wallets and that was after November.

18   Well, because in November I knew I wanted the wallets

19   and your reaction was definitely off.  If you had had

20   dinner with me and said, I'm going to give you these

21   wallets, I would have taken those wallets.  Wouldn't

22   matter where I'd fly, and they would have gone with me.

23   Someone could have flown to me and gotten them because I

24   knew we needed the wallets wall back.

25           But we also needed the codes -- the correct



Page 207

1    passcodes, not the reversed one you gave when we finally

2    got them.  But that was very important.  And if Lieh --

3    if -- you know, if Lieh reached out to you in March, the

4    wallets should have been returned pretty quickly.  But

5    it seemed -- we took a long time getting them from you.

6          And the reason I showed up to your doorstep is

7    because, if you may recall, that's the time when you

8    were saying you were up in Northern California,

9    specifically, you said you were dealing with the house.

10   And then you were missing phone calls.  You said you

11   were at the hospital with anaphylactic shock.  All the

12   time we could see that you were staying in Venice Beach

13   at your house.

14          Q.  And how was that?

15          A.  Because you had shared your location.  So we

16   could see that you were lying and that when you said you

17   were up in Northern California, we could see you hadn't

18   moved.

19          And so when I got off that plane, I went to

20   your house, if you might recall.  The first thing you

21   said was -- obviously, you were shocked.

22          You said, You wouldn't believe the saga.  I was

23   on my way up north at 2:00 in the morning.  Something

24   happened.  I had to turn around.

25          Because you were sitting in Venice and you



Page 208

1  were -- had written the night before that you were in

2  Salinas; right?

3          So at that point it was -- it was an obvious

4  circus.  And as I said, because of your tracking, we

5  could see that you were blatantly lying to avoid showing

6  up for -- for phone meetings with -- with Saffery and

7  literally, you know, complying.

8      Q.  Right before you came to my house, do you

9  recall that we did have a phone meeting with Saffery?

10     A.  Yeah, we did.

11         And then you said, I have to go now.  I have to

12  start driving out to Northern California.

13         You were, like, immediately going to go to

14  Northern California.  We saw you, like, sitting there.

15  You never left.

16         And then I got off plane the next day, you

17  still -- you hadn't left.  And then I dropped by your

18  house; and then you're like, Oh, I was -- in the middle

19  of the night -- I was up there at 2:00 in the morning.

20  I turned the car around, and I had to come back.

21         Then you said the next day you would bring the

22  wallets over after you did something to them, and that's

23  when I got the wallets.  Not all -- I don't believe I

24  got all.  Did I ever get all?

25     Q.  When you came -- when you came to my house that



Page 209

 1  day -- this is really important -- did you ask for the

 2  wallets?

 3      A.  Yeah.  Yeah.

 4          And you were like, Okay.  Fine.  I'll bring

 5  them over tomorrow.  I don't have them ready now.  I've

 6  got to do something.

 7          And then tomorrow you came over to Santa

 8  Monica.

 9      Q.  Isn't it true that you came over to my house

10  and you actually didn't ask for wallets, you -- you

11  said, Oh my God.  I wanted to see you, and I said,

12  you're here.  I'm bringing the wallets over?

13      A.  Because you knew that we wanted the wallets.  I

14  was also trying to be cool because I was very mindful

15  that you could have just taken off to Tahiti because you

16  had not only the wallets, you had the codes.  You were

17  the only one with the codes.

18      Q.  So you thought that I was going to take off to

19  Tahiti --

20      A.  I wouldn't have known -- I wouldn't have

21  presumed, but what -- I did know that I was having to be

22  very, very cool so I actually did get the wallets

23  because we'd been wanting the wallets for months.

24      Q.  Now --

25      A.  At that point it was -- I don't remember.



Page 210

1   It -- was it April, May, June.  It was a --

2        Q.  It was April.

3        A.  -- long time later.

4        Q.  It was a long time later from when?

5        A.  From when we originally started to try to get

6   the wallets --

7        Q.  Okay.

8        A.  -- and from when I'd originally told you I

9   wanted the wallets back, which was November.

10          MS. RICHARDSON:  So I think this would be a

11  good time for a break that you wanted to have --

12          MR. HARRISON:  Okay.

13          MS. RICHARDSON:  -- and then we'll circle back.

14          THE VIDEOGRAPHER:  Going off the record at

15  3:37.

16              (A recess is taken.)

17          THE VIDEOGRAPHER:  We are back on the record at

18  3:48.  This is Media No. 4 in the deposition of

19  Ms. Taylor Thomson.

20          THE WITNESS:  Okay.

21  BY MS. RICHARDSON:

22       Q.  In March of 2022 I received a series of text

23  messages from your daughter, Madeleine.

24          Were you aware of that text message exchange?

25       A.  I -- I -- I do know that she did send you some



Page 211

1    texts at some point.

2        Q.  And she said in those text messages that she

3    was upset because of what I had done to Mother.

4            Do you know what she would be referring to?

5        A.  I would think that's something you'd have to

6    ask her.

7        Q.  Was I close with Madeleine over the years of

8    our friendship?

9            MR. HARRISON:  It calls for speculation.

10           But you can answer, if you can.

11           THE WITNESS:  You were close to both Madeleine

12   and I.

13   BY MS. RICHARDSON:

14       Q.  And when you used to go away at times for

15   different reasons, if Madeleine had a problem, could you

16   count on me to show up for her?

17       A.  I always felt that I could count on you.  I

18   trusted you.

19       Q.  Do you think that I cared about Madeleine?

20       A.  I -- I think you did.  My -- I mean -- I think

21   you did to a certain extent.  I think there's also --

22   turns out in hindsight there is also some agenda there,

23   but I couldn't presume to say exactly what.  But I just

24   don't think it's exactly what I thought it probably was.

25       Q.  And when you say that it turns out there was



Page 212

1    some agenda there, can you elaborate on -- on what you

2    mean.

3         A.  I mean, I think at the end -- the end -- the

4    last trip you did with her, she -- she started to feel

5    somewhat used by you, so --

6         Q.  And --

7         A.  -- probably just in the fact -- undoubtedly

8    disappointed.

9         Q.  Can you -- can you explain where that

10   disappointment came from.

11        MR. HARRISON:  Objection.  Calls for

12   speculation.

13   BY MS. RICHARDSON:

14        Q.  Okay.  You -- you -- you just spoke to my

15   having an agenda; and that's something that was also

16   spoken to a "Wall Street Journal" about me, that -- that

17   you should have seen signs that I had an agenda all

18   along.

19        Does that sound familiar?

20        MR. HARRISON:  Sorry.  What --

21        THE VIDEOGRAPHER:  Your mic.

22        MR. HARRISON:  Oh, sorry.  I'm sorry.

23        Objection to form.  Vague.  I don't know what

24   you mean by "Does that sound familiar?"

25   ///



Page 213

1   BY MS. RICHARDSON:

2       Q.  You just spoke about I was close to her but now

3   it's clear there's an agenda.  I --

4       A.  I said there might have been.  I said it wasn't

5   definitive, but I said that I cannot tell now -- I said

6   I could not definitively answer now -- equivocally

7   answer.

8       Q.  And why is that?

9       A.  Because your -- all of your actions over the

10  last -- since -- since the beginning of this crypto were

11  not, in my opinion, genuine.

12      Q.  And --

13      A.  There was -- there were things that went on

14  that seemed and are, in my opinion, disingenuous.

15      Q.  Can you elaborate on what those things would

16  have been.

17      A.  The first one that comes to mind would have

18  been the secret commission with the hidden fee.  That

19  was never -- that was never revealed.  The first person

20  I heard that from was Tushar in July 12th, 2022.  That

21  was a long time after that money had been sent to your

22  wallet.  That's truly disingenuous, in my opinion.

23          And the fact that you didn't surrender the

24  wallets, disingenuous.  You wouldn't give us an

25  accounting -- well, you now profess that you were



Page 214

1   incapable.  But what you did give us was inaccurate, and

2   you knew it was inaccurate because you didn't include

3   the finder's fee.

4           And -- and everything that unfolded afterwards.

5   The fact that you would not surrender the wallets and

6   that you started lying to avoid having to even deal with

7   us.  It's -- it all was, to me, disingenuous.  And of

8   course there is an agenda behind all of that.  There

9   was.

10          And you were doing unauthorized trades for

11  months.  You know, after the last authorized trade -- I

12  don't know when it was.  Maybe January.  It was not --

13  you know, a few trades I authorized; and everything else

14  were then -- hundreds of thousands of crazy risky trades

15  that -- that I hadn't authorized.

16          I mean, all of that just seemed not in

17  integrity to me.

18      Q.  Okay.  And --

19      A.  That's a starting point, for sure.

20          And then, of course, then you come down to the

21  tax.  And then if you really want to get down to it, you

22  come down to this litigation with these, you know,

23  ridiculous assertions.  You know, tried to get you to

24  leave Michelle for me; you know, that, like, I defamed

25  you.  Right?  That's -- intentional infliction of



Page 215

1  emotional distress?

2          I mean, all of these things -- this is -- talk

3  about disingenuous.  I mean, how do you think that your

4  texts made me feel?  That's intentional emotional

5  distress.

6      Q.  So text messages that I sent you when I was

7  financially, emotionally, physically, and mentally

8  destitute, begging you to kill me, in your mind was

9  intentional infliction of emotional distress to you?

10     A.  Well, you sent them.  I didn't -- I didn't send

11 them to myself.  I mean, I couldn't take it any other

12 way but personally --

13     Q.  Right.

14     A.  -- and -- and be -- you know, be on edge, be

15 unnerved and, you know, arguably somewhat frightened for

16 not just myself, but also for you and your safety.  I --

17 to me, you wrote them and you sent them.

18     Q.  And did it ever --

19     A.  That's not me inflicting it.  That's you

20 inflicting it.

21     Q.  At any time from 2021 to the time that you

22 received those text messages, did it ever occur to you

23 that what you asked me to do may have had a catastrophic

24 impact on my life and that it may have hurt me quite

25 possibly even more than you?



Page 216

1          MR. HARRISON:  Objection to form.

2          THE WITNESS:  And to clarify, you offered.  You

3    were excited to do this crypto in the beginning, and you

4    were in your element, and you were in your -- in your

5    field because at that point you had really -- you had

6    become, as you fancied yourself, an authority because

7    that's all you did.

8          Your career, your new life force, direction was

9    this -- this altcoins, which was something you were so

10   knowledgeable about.  It's -- you know, I don't -- I

11   don't see that this was, like, that -- ultimately, it

12   didn't work out well, as you can see; but during the

13   process, I don't know when it would have -- it

14   probably -- when it really went sideways was when you

15   were asked to surrender the wallets.  I'm sure at that

16   point it probably was stressful for you because you knew

17   that you'd misappropriated so much money at that point.

18   BY MS. RICHARDSON:

19     Q.  But -- and how was that money misappropriated?

20   Did -- did you perceive that I personally -- because I

21   know that in January -- June of -- let me rephrase this.

22          In June of 2022 I received a letter alleging

23   that I had committed theft to the tune of millions of

24   dollars.  So was that your perception at that point,

25   that I had stolen the money?



Page 217

1          MR. HARRISON:  Objection.  Vague.

2          I'm not sure I understand what the question is

3   or the reference.

4   BY MS. RICHARDSON:

5      Q.  You just said yourself that my actions were

6   untoward.  I am asking for you to explain what that

7   means.

8      A.  I think when --

9          MR. HARRISON:  Asked and answered.

10         She explained it.

11         THE WITNESS:  When you -- under the guise of

12  saying you're going to manage my crypto and then you

13  take it and you start sending it sideways to your own

14  wallets and you start doing unauthorized trading on your

15  own and then you're asked to surrender the wallets and

16  give them back, which was at a point where we could have

17  salvaged some money, but instead you just duck

18  everything and then you keep trading and you do more

19  adventurous and riskier trades and then you just proceed

20  to basically piss everything away.  Pardon my language.

21  Sorry.

22         You basically just gambled away the rest of my

23  crypto.  It was -- what am I meant to think and how am I

24  meant to feel about that when I thought you were one of

25  my best friends?  And I trusted you.  The only mistake



Page 218

1  that I made was trusting you --

2  BY MS. RICHARDSON:

3      Q.  And so --

4      A.  -- as a friend.  I just -- could have never

5  fathomed this situation.

6      Q.  So your interpretation was that there was a

7  series of events where I first defrauded you and then

8  lied to you over a period of time.

9          Is that fair to -- is that a fair assumption?

10         MR. HARRISON:  Objection.  Asked and

11 answered --

12         MS. RICHARDSON:  Okay.

13         MR. HARRISON:  -- characterization.

14 BY MS. RICHARDSON:

15     Q.  So these allegations, Ms. Thomson, you can

16 understand are extremely serious; correct?

17         MR. HARRISON:  Objection.

18         Which allegations are we talking about?

19         MS. RICHARDSON:  I think that -- all of the

20 ones she just laid out, that -- that I was willfully and

21 willingly withholding information, that I lied, that I

22 misappropriated funds, was one of the words she used.

23 BY MS. RICHARDSON:

24     Q.  So those are -- those are -- those are fairly

25 serious allegations.



Page 219

1          Do you agree?

2          MR. HARRISON:  Calls for speculation.

3          But you can --

4          THE WITNESS:  It's speculation, but it's

5    obvious.  They're pretty serious.  Those -- those

6    offenses -- those are the offenses that they are, and

7    that is serious.  In my opinion, that's very serious.  I

8    mean, I don't know if someone else might perceive that

9    as not but --

10   BY MS. RICHARDSON:

11        Q.  And --

12        A.  -- that's pretty serious to me.

13        Q.  And you are aware at this point they are still

14   allegations, are you not?

15        A.  Ah, yes.  Because --

16          MR. HARRISON:  Objection.  Calls for a legal

17   conclusion.

18          I don't really understand your question.

19          MS. RICHARDSON:  It doesn't call for a legal

20   conclusion.

21   BY MS. RICHARDSON:

22        Q.  There's -- these are -- are these -- these are

23   very serious allegations that you are saying about me.

24          And do you know the difference between a

25   allegation and a fact?



Page 220

1          MR. HARRISON:  Objection.  Calls for a legal

2  conclusion --

3          THE WITNESS:  Yes --

4          MR. HARRISON:  -- speculation.

5          THE WITNESS:  -- objection.

6          MR. HARRISON:  I don't really get the point of

7  this.

8  BY MS. RICHARDSON:

9      Q.  Ms. Thomson, can you understand that -- let

10  me -- let me take this a step back.

11          When this was happening did you discuss it with

12  Madeleine?

13          MR. HARRISON:  Objection.  Vague.

14          I don't -- what's "this"?  When you --

15          THE WITNESS:  "This."  What's "this"?

16  BY MS. RICHARDSON:

17      Q.  When -- when you just gave me a series of

18  allegations that included misappropriation of funds, a

19  secret kickback that was not disclosed, and failure to

20  produce accounting; correct?

21      A.  That's pretty well what's in the -- what's in

22  my motion.

23      Q.  Right.

24      A.  That's in our complaint.  Everything is already

25  published in the complaint.



Page 221

1       Q.  Understood.  Prior to that did you discuss

2   these allegations with your daughter, Madeleine?

3           MR. HARRISON:  Prior to -- objection.  Vague.

4   BY MS. RICHARDSON:

5       Q.  Sorry --

6       A.  Prior to the complaint?

7       Q.  Did you -- no.

8           Just in general, have you discussed these

9   allegations with your daughter, Madeleine?

10      A.  My daughter lives with me, and she is in the

11  world where she knew what was going on, and it's

12  everything in the complaint.

13      Q.  So the answer is -- is yes or no?

14      A.  Well, it would be like you discussing something

15  with Michelle when she was living with you.

16      Q.  Right.

17      A.  Pretty obvious.

18      Q.  And --

19      A.  You're going to speak to your partner.  And

20  she's living in my house, and she's not an idiot.

21      Q.  And did you discuss these things with Ron

22  Murphy [phonetic]?

23          MR. HARRISON:  Objection.  Vague.

24  BY MS. RICHARDSON:

25      Q.  Did you discuss --



Page 222

1        A.   Sorry.   Which things --

2        Q.   Yeah.   The allegations against me --

3        A.   -- are you talking the complaint?

4        Q.   Did you discuss the allegations against me with

5    Ron Murphy?

6        A.   Ron Murphy knows what's in the complaint --

7        Q.   Did you discuss --

8        A.   -- which is exactly what I just told you.

9    Everything that I told you is in the complaint, the

10    hidden fee --

11        Q.   Uh-huh.

12        A.   -- the -- the funds being traded

13    unauthorized --

14        Q.   Uh-huh.

15        A.   -- it's all in the complaint --

16        Q.   Uh-huh.   And --

17        A.   -- right?

18            And so yeah, he knows what's in the

19    complaint -- what's in the complaint.   It's public --

20    it's filed.

21        Q.   Right.   And that that complaint was -- and did

22    you -- did you talk to Catherine Hardwicke about the

23    events that took place and the allegations against me?

24        A.   I saw Catherine Hardwicke in London, and your

25    name came up in passing and just wondering -- she hadn't



Page 223

1    seen you.  She hadn't spoken to you because she said she

2    had written to you and you hadn't been responding.  And

3    I said I hadn't seen you in a long time.

4         Q.  And --

5         A.  And so I said we weren't -- we weren't talking,

6    which was pretty obvious, because we weren't --

7         Q.  And did you tell her why?

8         A.  -- because you -- yeah.  I said you -- all I

9    said was you were managing my crypto because I trusted

10   you and -- and I bought a coin, which, unbeknownst to

11   me, you had a secret commission, and hadn't seen you in

12   a long time.  I don't remember when that was but --

13        Q.  And did you discuss these allegations with

14   Kevin Fitzgerald and Rand Rusher?

15        A.  Kevin -- Kevin because you know Kevin from

16   being on a boat, and you also convinced Kevin to invest

17   where I believe Kevin wants money too.

18        Q.  Uh-huh.

19        A.  So he -- he spoke to me about the fact that

20   he'd -- that you'd convinced him to go into this

21   investment and you lost a lot.  So your name came up.

22        Q.  And how -- how did I -- how did I convince

23   Kevin to invest in Persistence?

24        A.  Well, I think you would know that because

25   you're the one that did it.  But we all know -- everyone



Page 224

1    was around -- that you were -- you were trying to -- you

2    were trying to sell it to anybody; right?  You tried to

3    sell it to Ron.  He wisely, of course, did not bite.

4    But K.J. bought some.

5         Q.  And when you say I tried to sell it --

6         A.  You were promoting it.

7         Q.  How was I promoting it?

8         A.  Well, you know very well.  You were speaking of

9    it -- just like you were with me.  You know, that you

10   had an inside track with the company, you knew Tushar,

11   you were go -- doing all these meetings with him and you

12   knew all these things about the company and how

13   wonderful the company was and it's, like -- how it's

14   going to flourish and -- you know, it's -- you were

15   generally enthusiastic, and you were enthusiastic to

16   everybody that was around.  We were on a boat

17   together --

18        Q.  So you're saying --

19        A.  -- right?

20        Q.  -- I was -- I was excited about it; right?

21        A.  Yes.  You were excited about it; so, you

22   know -- K.J. got into it too.  You didn't force him to,

23   but he got in because he was -- he believed -- he

24   believed everything that you said about it --

25        Q.  Did I --



Page 225

1        A.   -- the company.

2        Q.   Did I force you to?

3        A.   No.  Of course you didn't force me to.  I

4   just -- I just, like -- I just listened to your advice,

5   to your -- to your -- to everything you knew about the

6   company and how positive it seemed and how the staking

7   was going to be -- what? -- 35 percent minimum and it

8   could never go down.  The worst that could happen would

9   be that it wouldn't go up.  I mean, there was -- like,

10   it was -- it was very -- it was a very rosy situation.

11        Q.   And I think --

12        A.   Anyone would have been -- anyone would have

13   been piqued about that.

14        Q.   And I think it's fair to say that I was excited

15   about it?

16        A.   You were very excited about it.

17        Q.   And I think it's fair to say that you were

18   excited about it back then?

19        A.   Absolutely.

20        Q.   And I think that you also told a number of

21   friends about it; is that correct?

22        A.   I told friends I'd made an investment in this.

23        Q.   Uh-huh.  And that you were excited about it?

24        A.   Well, it's implicit if you make an investment,

25   you're usually excited about something.



Page 226

1     Q.  Right.  Do you think that maybe that was

2  similar to what I was experiencing when I told you about

3  it?

4          MR. HARRISON:  Objection.  Calls for

5  speculation.

6          THE WITNESS:  Yeah.  I wouldn't be able to

7  presume.  And also, the difference is you took a secret

8  kickback, which, you know, you didn't do with anyone

9  else, obviously.  You were buying -- they were going,

10  buying on the open market.  You know, that was the

11  difference.

12  BY MS. RICHARDSON:

13     Q.  And that secret kickback that you allege that I

14  took -- how do you see it -- how do you see that secret

15  kickback having been realized or benefiting my life, in

16  general?

17          MR. HARRISON:  Objection.  Vague.  Calls for

18  speculation.

19          I don't even know what that means.

20          THE WITNESS:  It's a speculation, yeah.

21  BY MS. RICHARDSON:

22     Q.  Are you aware that I never received any

23  payment, financial benefit, or -- of any kind at any

24  time throughout this process?

25     A.  I don't know what became of -- of the -- the



Page 227

1    hidden finder's fee.  I -- I didn't -- I didn't track

2    what you ended up getting, if you got -- when you got it

3    but -- but it was -- it was meant to happen.  And as you

4    know, they had your wallet number to send it to.  So I

5    think you did, I guess.  You did get it.  Because Tushar

6    sent it to you.  Persistence sent you -- your wallet

7    that you controlled the secret -- the secret commission,

8    the hidden kickback.

9        Q.  So you are -- you are saying that you have no

10   memory of the conversation we had about setting aside a

11   small amount of tokens to be realized after a year with

12   yours, if you were in profit?

13            MR. HARRISON:  Asked and answered.  Objection.

14            THE WITNESS:  The -- no.

15            What I remember very, very distinctly is that

16   we spoke about -- we spoke about -- about the -- the --

17   them offering you a commission.  Wasn't hidden.  You

18   said, They offered me a commission.  I absolutely turned

19   it down.  I told them no.  Just make sure you give

20   Taylor the best price.  That was what you came back and

21   said, the best price --

22   BY MS. RICHARDSON:

23       Q.  Really?

24       A.  -- was $5.

25       Q.  And so just so we're --



Page 228

1    A.   And many months later you mentioned in passing

2    that they happened to offer you, in thanks, in

3    gratitude, a few tokens.  A few tokens.  That was

4    Persistence.  After the deals had happened.  And that

5    seemed fine with me because that wasn't -- that wasn't

6    coming out of my -- that wasn't coming out of my

7    purchase price.  And it also did not affect -- it would

8    not have affected if you -- your objectivity if it had

9    been just a token after the fact as opposed to a payment

10   behind the scenes before -- before I -- I decided to

11   close the deal.

12       Q.   I -- I believe the conversation about the few

13   tokens that you're referring to was in relation to their

14   liquid staking platform that happened later on, once you

15   had your Persistence and it was being liquid staked.

16       A.   The conversation -- I don't know in which

17   tokens that they were giving you.  You just mentioned at

18   dinner once that they had -- oh, by the way, they --

19   they said that they wanted to give me some tokens as a

20   thank you, which of course seemed fine to me because I

21   knew that you negotiated the best price -- or I thought

22   you negotiated the best price for my deal, not that you

23   had already taken a fee that was embedded in the price.

24       Q.   So there was a pretty substantial discount that

25   you received at the time of your purchase in August of



Page 229

1   2021; correct?  You could -- you would agree to that?

2        A.  I don't know what the discount was, but that's

3   not what we're talking about.  We're talking about the

4   secret kickback which took away from the objectivity,

5   which, if I had known, as you know, because you know

6   me -- if I had known that it existed, I wouldn't have

7   done the deal --

8        Q.  Okay.  But --

9        A.  -- and you wouldn't have made the money --

10  whatever you made off what -- that $6 per -- per token.

11       Q.  So are you -- are you aware that I never made

12  any money off of any transaction that happened with your

13  cryptocurrency and --

14           MR. HARRISON:  Objection.  Vague.  Asked and

15  answered.

16           THE WITNESS:  I have -- I have no idea what

17  that --

18  BY MS. RICHARDSON:

19       Q.  Are you -- are you aware that in the course of

20  my helping you with your cryptocurrency, in fact, it was

21  quite the opposite?  I lost all of -- all -- any and all

22  remaining assets and then I was forced to sell my home

23  when you began to threaten legal action against me?

24       A.  Because you --

25           MR. HARRISON:  Objection.  Compound.  Calls for



Page 230

1    speculation.  Calls for evidence that's not in the

2    record --

3    BY MS. RICHARDSON:

4        Q.  You can still --

5            MR. HARRISON:  -- evidence that's not in the

6    record.

7    BY MS. RICHARDSON:

8        Q.  -- answer.

9            Ms. Thomson, when you purchased Persistence you

10   mentioned earlier that I helped negotiate the deal; is

11   that correct?

12       A.  You -- you controlled the entire deal.  You

13   negotiated with Tushar, with Persistence.  You -- you

14   alone.  You negotiated with Dechert.  You negotiated

15   with the deal with Dechert.  Everything, you did; and it

16   was you solely, yes.

17           And so you negotiated the price with -- with

18   Persistence and -- and that's why you also had the

19   opportunity to instruct Tushar to make sure that he

20   didn't put the commission into the contract and instead

21   to leave it out of the contract and to send the

22   commission straight to you.

23           And you didn't tell the lawyers because Dechert

24   never knew.  Because if they'd known, I'm sure they

25   would have put in the contract.  And I suspect that



Page 231

1  Persistence never talked to Dechert because had they

2  done that, Persistence would undoubtedly have told them

3  about the commission and then my lawyers would have --

4  would have brought that to -- would have put in the

5  contract; I would have noticed it and walked away from

6  the deal.

7        All of that you knew because you knew me very

8  well, having been to art fairs, how I take to people

9  doing something behind my back as opposed to, as you

10 say, being an art dealer who is in the business and they

11 sell something, you know there is a profit, as opposed

12 to someone negotiating -- pretending to get me the best

13 price and then you find they went around the corner and

14 said, Okay.  Give me a slice.

15       It's very different.

16    Q.  I agree with you.  I -- I think that that would

17 be incredibly untoward, which -- if it had happened.

18       Let's go back for a moment to the time period

19 when the price and the deal was being done.  Do you

20 recall that during that time period we were together

21 physically almost every day?

22       MR. HARRISON:  So a couple things.  Compound

23 question, over and over again.  Many, multiple parts to

24 that compound question.

25       MS. RICHARDSON:  Let me rephrase it.



Page 232

1          MR. HARRISON:  There is also some testimony in

2    there before the question.

3          MS. RICHARDSON:  Let me -- let me -- let me

4    rephrase the question.  Withdrawn.

5    BY MS. RICHARDSON:

6      Q.  In August of 2021 you were in Los Angeles for

7    the majority of the month.  During that time, do you

8    recall me being at the house with you and us spending

9    almost every day together?

10          MR. HARRISON:  Objection --

11          THE WITNESS:  I don't recall almost every day.

12          MR. HARRISON:  Before you answer -- objection

13    to compound.  Part of it was just testimony.

14          But go ahead.

15    BY MS. RICHARDSON:

16      Q.  Do you recall --

17      A.  I do not -- I do not recall the -- the

18    frequency.  I know you were around, you were at the

19    house.  You even in those days had, I believe, the code

20    to get in and let yourself in.  That was before we

21    changed the codes.

22      Q.  Are -- are you aware that the only time I went

23    to your Santa Monica home when you were not at the house

24    was by your instruction to check on Raquel's being there

25    and doing work?



Page 233

1      A.   I'm not aware when I was not in the house.  I'm

2  aware when we were in the house --

3      Q.   Okay.

4      A.   -- that you used to just show up unannounced --

5      Q.   I --

6      A.   -- quite regularly.

7      Q.   Oh, okay.

8      A.   It just --

9      Q.   Are you aware --

10     A.   -- was what it was.

11     Q.   -- that during the transactions with

12  Persistence, at every stage I was communicating with you

13  the terms and that I suggested you hire an attorney so

14  that you were protected?

15     A.   I recall distinctly that you did negotiate the

16  terms, which is why we ended up with you negotiating

17  with Tushar and putting your 6-cent commission into --

18  not into the contract and not into writing and directly

19  instructing him to just send it to you and that you also

20  didn't tell the lawyers, which I would have thought you

21  would have want to have something that significant -- if

22  you were standing to make almost a million dollars out

23  of a deal, I would have thought -- especially if you

24  thought I was such a difficult person with anybody who

25  was involved in financial transaction, you would



Page 234

1    definitely wanted to have that in writing somewhere,

2    especially obviously in the contract, have the lawyers

3    put it in.

4         Q.   Ms. Thomson, can I ask you a question?

5              Do you know the difference between a realized

6    and an unrealized gain?

7         A.   Not with the -- that's not what's at issue

8    here.  The issue is, was there a hidden kickback and a

9    secret commission --

10        Q.   Ms. Thomson --

11        A.   -- or not?

12        Q.   -- you are here in a court-ordered deposition,

13   and I'm asking you a question --

14        A.   Of course I know the difference.

15        Q.   Do you know difference between --

16             MR. HARRISON:  Objection.  Argumentative.

17             She's been asking and answering all of your

18   questions.

19   BY MS. RICHARDSON:

20        Q.   Do you understand the difference between a

21   realized and an unrealized gain?

22        A.   Yes.

23        Q.   Do you understand a conditional agreement?

24        A.   Yes.

25        Q.   Do you understand that the money that was



Page 235

1    transferred to the wallets during that purchase were all

2    in my custody?

3         A.  Yes.  But all those wallets I knew about.

4    We -- I had no visibility into your personal wallet,

5    which is where the kickback was sent to.

6         Q.  Do you remember -- you -- you -- Ms. Thomson,

7    are you aware that there was, in fact, no secret

8    kickback at any time?

9         A.  No.

10             MR. HARRISON:  Objection.  Asked and answered.

11             THE WITNESS:  Asked and answered.

12   BY MS. RICHARDSON:

13        Q.  Ms. Thomson --

14        A.  Pretty well explained that one.

15        Q.  When --

16        A.  If it were, you -- would have been in writing

17   somewhere.  There's nowhere where this is in writing.

18        Q.  That is because --

19        A.  You said I sat -- I went to a dinner alone with

20   no witnesses and you told me there's -- they've decided

21   to give me -- they want to give me this; but then you

22   still thought it was necessary, of course, to tell

23   Persistence to make sure they kept it out of the

24   contract.

25        Q.  Do you have proof that I realized gains?



Page 236

1          MR. HARRISON:  Objection --

2          THE WITNESS:  That's not what I'm talking

3    about.

4          MR. HARRISON:  -- asked and answered.

5    BY MS. RICHARDSON:

6      Q.  No.  Do you -- I'm asking you a question.

7          You have made very serious allegations about

8    me; so I want to ask, do you know for a fact that I

9    realized a profit from your Persistence transaction?

10     A.  You've misunderstood.  We're speaking about a

11   secret hidden fee, kickback.  It's -- we're not speaking

12   about whether it was realized or not.

13     Q.  And --

14     A.  Two different things completely.

15     Q.  And is it your --

16     A.  I have no idea what you did realize.  I know

17   some things did go your way.  I don't have the

18   accounting in front of me.

19     Q.  And is it your --

20     A.  I don't know exactly what you got --

21     Q.  -- understanding and belief that I was doing

22   that in a way that was untoward and planned on keeping

23   that for myself?

24     A.  Why else would you have it sent to your

25   personal wallet that only you controlled, that nobody --



Page 237

1    that we didn't know about?

2        Q.  I believe I controlled all of the wallets.

3            But, Ms. Thomson, do you remember --

4        A.  And why would you have told Tushar not to

5    just -- not to let me know, not to put it in our

6    contract?

7        Q.  Are you saying that at some point I told Tushar

8    not to let you know about that?

9        A.  Well, you told Tushar not to put it in the

10   contract --

11       Q.  Why do you think that --

12       A.  -- to write the price down as $5.00, not 4.94,

13   and that you would just keep that between the two of

14   you.

15       Q.  Did I -- did I at some point say to Tushar that

16   we would keep it between the two of us?

17       A.  I have to look at the --

18           MR. HARRISON:  Objection.  Asked and answered.

19   Calls for speculation.

20           MS. RICHARDSON:  I'm asking --

21           MR. HARRISON:  Calls for speculation.

22           DEPOSITION OFFICER:  One at a time.

23           MR. HARRISON:  Calls for speculation.

24           THE WITNESS:  I need to see the texts -- the

25   texts between you Tushar.  Will you pull that out?



Page 238

1    BY MS. RICHARDSON:

2        Q.  I -- I think they're somewhere here in this

3    pile, if you would like to look for them.  But that's

4    not what I'm asking you right now.  When we get back to

5    that question, you are welcome to go through it and --

6    and --

7        A.  I don't need to go through that.

8        Q.  I can tell you that that was never said.  I can

9    also tell you that --

10            MR. HARRISON:  Objection.  You can't just

11    testify.

12            MS. RICHARDSON:  I understand.  I --

13            MR. HARRISON:  You can't just testify --

14            DEPOSITION OFFICER:  Okay.  One at a time.

15            MR. HARRISON:  -- deposition.

16    BY MS. RICHARDSON:

17        Q.  I think we would both agree that -- for very

18    different reasons that it was a major oversight that

19    nothing was ever memorialized that could have been

20    perceived as an upside for me; correct?

21            MR. HARRISON:  Objection --

22            MS. RICHARDSON:  Okay.

23            MR. HARRISON:  -- to form.

24    BY MS. RICHARDSON:

25        Q.  Let me -- let me go back for a second and say



Page 239

1    this.  You've already established that you do not

2    remember me having a conversation with you that there

3    could be a conditional upside for this transaction.  And

4    I want to make it clear that when I ask you this, you

5    don't have any memory of -- of there being something

6    that was conditional based on you receiving profit; is

7    that correct?

8           MR. HARRISON:  Objection.  It's --

9           MS. RICHARDSON:  Okay.

10          THE WITNESS:  -- question.

11          MR. HARRISON:  -- many questions there, many

12   parts to that question.  I don't even understand it.

13   BY MS. RICHARDSON:

14      Q.  Ms. Thomson, I -- is it clear to you that I

15   spent a large amount of time helping you with your

16   crypto transactions?

17          MR. HARRISON:  Objection to the question --

18   form of the question.  Vague.

19   BY MS. RICHARDSON:

20      Q.  We've established that for -- for months, if

21   not the better part of a year, I was working full-time

22   custodying, trading, and trying to help you with your

23   cryptocurrency; correct?

24          MR. HARRISON:  Objection to form.  Compound.

25          You can try and answer.



Page 240

1              THE WITNESS:  It was very, very clear --

2    because everything is tracked; it's on the blockchain --

3    that you were -- you were trading and transactioning for

4    an extremely long time.  Once we hit a certain period,

5    whether it was January, February, very early, you

6    weren't transacting for me because you were doing

7    unauthorized trades that were not -- were not instructed

8    by me --

9    BY MS. RICHARDSON:

10        Q.  And --

11        A.  -- at all and would never have been instructed,

12   trades that I wouldn't even have begun to believe

13   either -- to even understand because they were so risky.

14        Q.  And your --

15        A.  So you weren't doing that for me.

16        Q.  Well --

17        A.  Because how could you be doing that for me when

18   you basically were just throwing millions and millions

19   of my dollars away --

20        Q.  Do you --

21        A.  -- repeatedly?

22        Q.  Do you remember us discussing that when the

23   crypto market was going into a negative, that you would

24   want to create a hedge or create some way to offset your

25   losses?



Page 241

1        A.   No.

2        Q.   Okay.  Do you recall at any point in time

3   giving me any concrete guidelines with how to manage

4   your cryptocurrency?

5             MR. HARRISON:  Objection.  Asked and answered.

6             You can try and answer as best you can.

7             THE WITNESS:  Yes.  You were -- you were -- you

8   were meant to purchase certain coins; and from what I

9   understood, you were going to be staking many of those

10  coins and doing what you said you would do with those

11  coins.  That was obvious for some of them, like the ones

12  that we discussed, the ones that you have in texts.

13            But all the -- the adventuresome, risky trades

14  that came months and months later, when you were

15  avoiding responding to us, that was not anything that

16  you were communicating with me, nor that I'd instructed.

17  BY MS. RICHARDSON:

18       Q.   And that understanding you just expressed --

19  was it based on a written understanding that we had?

20       A.   As you know, we don't -- we did not have any

21  specific contract.

22       Q.   Okay.  Now, let's go back for a moment to the

23  conversations you had with -- you were saying -- we left

24  off on Kevin Fitzgerald and Rand Rusher, Catherine

25  Hardwicke.  Are you aware that Catherine and I have



Page 242

1  worked together in the past --

2      A.  No.

3      Q.  -- on multiple projects?

4      A.  No.

5      Q.  Okay.  Are you aware of the impact these

6  allegations would have on our shared friend circle?

7          MR. HARRISON:  Objection.  Vague.  Objection.

8  Calls for speculation.

9          THE WITNESS:  We don't have a shared circle.

10  BY MS. RICHARDSON:

11      Q.  We don't?

12      A.  The only shared friend we have is Cat -- the

13  only shared friend we have.

14      Q.  Really?

15      A.  I don't know any of your friends.  My friends

16  are my friends.  They're not your friends.  And if you

17  have a problem with the fact that they -- that they

18  don't reach out to you now, they -- since this was all

19  published, a lot of people now know that there was a

20  problem.

21      Q.  I think that happened far before it was

22  published.  I think that -- I think that this happened

23  in 2022, and the lawsuit was filed in -- not filed until

24  2023 and -- and during that time period, there was a

25  very strong shift from mutual friends.  We did have



Page 243

1  quite a few mutual --

2      A.  We had no --

3          MR. HARRISON:  Wait.  Wait.  There's no

4  question here, just a long string of testimony from

5  Ms. Richardson.

6          MS. RICHARDSON:  All right.

7          MR. HARRISON:  So if you have a question, pose

8  a question.

9  BY MS. RICHARDSON:

10     Q.  There were several years, Ms. Thomson, where

11  you were not speaking to Ron Murphy, was there not?

12     A.  No.  Ron and I always communicate.  It's just

13  that Ron is extraordinarily busy, and Ron's been doing

14  back to back shooting for a very long time.

15     Q.  There was a period from 2017 to 2020 where I

16  saw Ron multiple times without you and he expressed

17  great sadness at the loss of your friendship.

18          Do you recall that?

19     A.  Makes no sense.  No.  Of course not.

20     Q.  Okay.

21     A.  Have to get Ron to address that.

22     Q.  Yes, we will.

23          Were you aware that in November of 2019 your

24  daughter was having a lot of anxiety and -- do you

25  remember that time period?



Page 244

1        A.   I don't -- I would have to look at a calendar

2   and try to peg exactly when.

3        Q.   There was a time period where you were having

4   to stay with her and you wanted to go to London and so I

5   went to Canada to be with her so that you could go to

6   London.  Do you remember that trip?

7        A.   I vaguely remember something like that.

8        Q.   Okay.  Madeleine had not seen Ron in several

9   years; and because I was in Toronto, I wanted to see

10  Ron; so we saw him together.

11           Are you aware of that?

12       A.   Oh, yeah.  Yeah, Ron told me.

13       Q.   I want to go back again and reiterate the point

14  you made earlier, which is we have no mutual friends.

15           So are you stating that Ron was not my friend?

16       A.   Yes.

17       Q.   And Madeleine was not my friend?

18       A.   She was your friend until she felt betrayed.

19       Q.   And she felt betrayed --

20       A.   But Ron was never your friend.

21       Q.   Ron was never my friend?

22       A.   No.

23           MR. ANDRE:  Thank you.

24  BY MS. RICHARDSON:

25       Q.   And the time I spent with Ron without you --



Page 245

1  how would you explain that?

2         MR. HARRISON:  Objection.  Vague.

3  BY MS. RICHARDSON:

4      Q.  Okay.  Let's -- let's -- let's switch gears for

5  a moment and go back to Beau.

6         How did you meet Beau St. Clair?

7      A.  I met Beau -- I don't remember how I met Beau.

8      Q.  Do you remember telling me that you met Beau

9  St. Clair at Dr. Hourani's office?

10     A.  Yeah.  I was going to say, I met him --

11  exactly.  Yeah.

12     Q.  And do you remember what Dr. Hourani told you

13  about Beau?

14     A.  No.  But she -- I have no recollection of what

15  she told me about Beau.  I just remember meeting Beau

16  there and we got along extremely well.

17     Q.  You've told me and several others in the past

18  that Dr. Hourani told you you should meet Beau; she's a

19  really cool lesbian.

20     A.  Beau is not a lesbian.  And no, I don't

21  remember that.  Beau and I met in getting a -- an IV.

22  We were both in the IV room sitting beside each other.

23         This is, like, absolute made-up nonsense.  I

24  would imagine I would have remembered that because Beau

25  became one of my best friends, and Beau was married to



Page 246

1  Lloydie, and Beau was not gay.

2      Q.  I -- I am aware of that, but let's just go back

3  for a minute.

4          That's why it was a funny story, because

5  what -- what happened next was Beau invited you to go to

6  Venice, Italy, didn't she?

7      A.  At some point I did go.  When Lloyd was filming

8  she was going out to visit; and yeah, I went out with

9  Beau to visit Lloydie on the set and basically to hang

10 out with Beau because he was shooting all day.

11     Q.  You have no recollection of telling myself and

12 others multiple times a very -- a story we all found

13 very funny, including Beau, that you went to Venice

14 having no idea that Beau was married?

15     A.  Because -- yes.  Because when I'd met Lloyd

16 before, I thought he was her business partner because

17 they were just very calm and cool together.  They did

18 not read like a married couple.

19     Q.  Isn't it true that you told many of us that you

20 went on that trip believing that it was actually a date?

21     A.  No.

22     Q.  You never said that?

23     A.  That's nonsense.  No.  I went --

24     Q.  You never said that to me or anyone else?

25     A.  -- because I was going with somebody who was



Page 247

1    like a friend because she was -- she was like, Come to

2    Venice.  Why wouldn't I?  To go hang out, have fun in

3    Venice, and be -- see that -- see the film.  It was fun.

4            And I was just surprised that they were

5    married, and I actually felt badly that I -- because

6    Lloyd had not seen Beau for a while, and it meant --

7    when they went to dinners and that I was there.  So I

8    felt like I'd not given them their alone time; but Beau

9    she was like -- she goes, No.  It's fun.  I want to hang

10   out.

11        Q.  Do you --

12        A.  You're making up all this stuff about her --

13        Q.  I'm -- I'm making it up --

14        A.  -- and gay.

15        Q.  Okay.  I think --

16        A.  Just along with your stuff about making passes

17   at you or leaving Michelle, all of that.

18        Q.  Are you aware that there were a number of

19   people that you told that you had a romantic attraction

20   to Beau St. Clair?

21        A.  No.  Beau was one my dearest friends.  I adored

22   Beau --

23        Q.  I -- I --

24        A.  -- as one adores a very good friend.

25        Q.  I am very well aware of that.  And -- and --



Page 248

1   and they are not mutually exclusive.

2       A.  That's not the case.  Beau was a good friend.

3       Q.  Do you remember expressing to me on multiple

4   occasions that you had a physical and romantic

5   attraction to the recording artist LP?

6       A.  No.

7           MR. HARRISON:  Are you serious right now?

8   Like, are you serious --

9           THE WITNESS:  No.

10          MR. HARRISON:  -- with this line of

11  questioning?  You've got to be kidding me.

12          THE WITNESS:  No.

13  BY MS. RICHARDSON:

14      Q.  No?

15      A.  No.

16      Q.  Do you have any recollection of you expressing

17  to me a physical and romantic interest in Jessica

18  Bendinger?

19      A.  No.  In fact, I vaguely recommend -- recollect

20  -- or -- was she the one that you were trying to sell

21  one of her investments --

22      Q.  No.

23      A.  -- that we met at the hotel?

24      Q.  But I do believe --

25      A.  Then I don't know who she is.



Page 249

1      Q.   -- that one of -- one of the

2  mischaracterizations you have been telling people was

3  that that was the case, she was a friend and she had a

4  business and you met her and --

5      A.   Jessica?

6      Q.   Yes.

7      A.   Where did I meet her, and what was her -- I

8  don't even remember her.  Obviously, not that memorable.

9      Q.   Okay.  Let's go for a moment to 2019.  I was

10  having trouble with my relationship; and during that

11  time, we spent more time alone together because it was

12  just the two of us instead of the three of us.

13          Do you remember that?

14          MR. HARRISON:  Objection.

15          THE WITNESS:  I remember when Michelle had an

16  affair on you and you didn't see her as much.  So, I

17  mean, if that -- you were over for dinner, it would

18  be -- at Nobu, it would be without Michelle.

19  BY MS. RICHARDSON:

20      Q.   Do you remember --

21      A.   Because I don't know -- I don't remember how

22  long it took before you took her back.

23      Q.   Do you remember that during that time period we

24  went to The Rolling Stones concert?

25      A.   Uh-huh.  I didn't recall that that's when



Page 250

1   Michelle was out of the -- was out of the picture; but I

2   remember going to The Stones, yes.

3       Q.  Yes.  It was during that time.  It was in

4   August of 2019.

5           And do you remember kissing me on the lips

6   after that concert?

7       A.  No.

8       Q.  You don't?

9       A.  No.

10      Q.  Okay.  Do you remember that because we were

11  drinking I slept over and you wanted me to sleep in your

12  bed and I slept in the guest room?

13          MR. HARRISON:  What -- what -- what's the

14  question?  I don't understand what this line of

15  questioning is about.

16          MS. RICHARDSON:  Let's go back.

17          MR. HARRISON:  -- harassment --

18          MS. RICHARDSON:  This is not harassment.

19          MR. HARRISON:  -- and this -- the question

20  didn't even make sense.

21          MS. RICHARDSON:  In September --

22          MR. ANDRE:  Object -- object to the form of the

23  question as vague --

24          MR. HARRISON:  Yes.

25          MR. ANDRE:  -- compound.  Ambiguous.



Page 251

1          MS. RICHARDSON:  That's fine.

2          MR. HARRISON:  Much better.

3  BY MS. RICHARDSON:

4      Q.  In September of 2019 we took a trip to

5  Victoria, BC.

6          Do you remember that trip?

7      A.  Yes.

8      Q.  Okay.  We arrived -- and I can't remember the

9  name of the hotel, but we stayed in Victoria for the

10  first few days while we looked at houses for Madeleine.

11          Do you remember that?

12      A.  Yeah.

13      Q.  And do you remember that we had a hotel suite

14  with one king bed that we shared?

15      A.  Well, it wasn't very memorable -- the --

16  what -- whether -- what room we were in, et cetera.

17  Didn't occur to me whether -- it's not a recollection

18  whether you had your room, whether I had a room of my

19  own.

20      Q.  But it's -- it's -- you remember that there

21  were multiple occasions where we would share a bed on

22  trips?

23      A.  I don't say multiple.  We shared once on the

24  crossing at Italy because I -- you wanted -- you were

25  going to take another room, and there was no room that



Page 252

1  the point, and I think we were waiting for a guest to

2  leave, and you were going to stay longer.  You were

3  extending your trip, if I recall.  The only way it

4  worked was to, like, have one night crashing in my room.

5      Q.  Actually, I stayed in your room for, I think,

6  five nights because you asked me to stay on and then

7  you --

8      A.  So then we didn't have a room for you.

9      Q.  No.

10         MR. ANDRE:  Wait for her to finish the

11  question, if she's actually asking a question.

12         Ms. Richardson, you are testifying and not

13  asking questions --

14         MS. RICHARDSON:  I understand.

15         MR. ANDRE:  -- oftentimes, so --

16         MS. RICHARDSON:  I will -- I will work on that.

17  I apologize.

18  BY MS. RICHARDSON:

19      Q.  When we went to -- do you remember our trip to

20  Jamaica in 2017?

21      A.  Yes.  Yes.

22      Q.  We stayed in the -- oh, gosh -- the villa on

23  the property -- the -- that belonged to the person who

24  wrote -- the Fleming Villa -- the Fleming Villa; is that

25  correct?



Page 253

1      A.  Yes.

2      Q.  And that property had a main house and two

3  guesthouses on the property.

4          Do you remember that?

5      A.  I remember there was -- there were several

6  accommodations.  There was the -- the master main house,

7  and then there were some other -- other suites.  I don't

8  remember.

9      Q.  And on that trip it was you --

10     A.  I let you share my room.

11     Q.  On that trip it was me and you and then

12  Madeleine and her boyfriend at the time -- correct? --

13  the four of us total?

14     A.  Correct.

15     Q.  And is it correct that we had the entire Ian

16  Fleming Villa for the duration of that stay to

17  ourselves?

18     A.  Yes.

19     Q.  And do you remember that when we arrived at the

20  villa and I went to put my things in the guest room, you

21  told me I couldn't sleep in there?

22     A.  It probably wasn't very good, and I don't know

23  that everything even had air-conditioning.  I don't

24  know, but it wasn't -- it definitely wouldn't have been

25  nice like the master.  Obviously, I was being nice to



Page 254

1    you.  You're a friend.  You're a girlfriend.

2        Q.  And you told me to use that bathroom and keep

3    my clothes in the closet but that I had to sleep with

4    you because you were going to have to spend more money

5    if I slept in the bed?

6            MR. ANDRE:  Objection.  Compound.

7            Again, Ms. Richardson, if you want to ask her

8    questions, but to testify is not --

9    BY MS. RICHARDSON:

10       Q.  Do you remember -- do you remember telling me

11   to keep my clothes in that closet in the middle bedroom?

12       A.  I -- I do remember you had your clothes in

13   another bedroom, and I don't know why.  Probably was

14   in -- because my bed -- the master was actually my room,

15   would have had my clothes in it.

16       Q.  Do you remember --

17       A.  And it was obviously much easier.

18       Q.  Do you remember telling me after we arrived

19   that if I were to sleep in that bed, you would have to

20   pay more money?

21       A.  Ah, I think they were -- they maybe were

22   charging per -- exactly.  Then we would have been taking

23   another -- another accommodation.

24       Q.  So --

25       A.  Yeah.



Page 255

1      Q.  -- I could use that bed --

2      A.  But you could have slept in it, if you wanted.

3  But a -- I had the master.  Much more fun if you -- like

4  with a good girlfriend -- a friend, why wouldn't you

5  want to, like, hang together?  But you had a choice.

6  You could have.  You could have chosen that.  You could

7  have said, I don't want to sleep in your room.

8          But we were good friends.

9      Q.  We were good friends.

10         And when we were in Victoria, BC, in 2019, we

11  were looking at houses with Madeleine; and we were

12  standing outside waiting for Madeleine; and you told me

13  that you thought that I should leave Michelle and how --

14  how great it would be, I could just hang out with you

15  more and we could hang out together and how great -- how

16  much better my life would be.

17         Do you have any recollection of that

18  conversation?

19         MR. ANDRE:  Objection.  Vague.  Compound.

20  Form.

21         THE WITNESS:  I recollect telling you once

22  again -- because it wasn't the first time.  You've been

23  told many times -- because our opinion was we thought

24  were better than her, that you should be leaving

25  Michelle and that you deserve better.  Nothing to do



Page 256

1   with me.  Nothing to do with me.  I don't want to insult

2   your feelings but --

3   BY MS. RICHARDSON:

4        Q.  No.  That's okay.

5        A.  -- not interested.

6        Q.  That's totally --

7        A.  Not interested.  Not my lane.  Not interested.

8        Q.  Not your lane.

9            So you're saying that you have not had romantic

10  attractions to women?

11           MR. HARRISON:  Objection for obvious reasons.

12           MS. RICHARDSON:  Okay.

13           MR. HARRISON:  Just -- but go ahead.  You can

14  answer.  I mean, just -- I don't even know what to say

15  at this point.

16           THE WITNESS:  Because it's a ridiculous

17  question.  It's a ridiculous question.  Of course not.

18  No.  No.

19           I don't know where you're going to go with

20  this.  You've already, like, got -- like, sold something

21  to the press, like --

22  BY MS. RICHARDSON:

23       Q.  I'm -- I'm asking --

24       A.  -- you want to try to get some more, like --

25  some more, like, you know, stories made up, few more



Page 257

1  lies?  Doesn't make them true.

2      Q.  Ms. Thomson, are you aware that I'm certainly

3  not the only person you spoke to about this?  There is

4  multiple --

5          MR. HARRISON:  Objection.  Objection.

6          THE WITNESS:  That's wrong.

7          MR. HARRISON:  Enough.  Enough.  I mean, that's

8  not even a question.  Objection to the form.  You're

9  testifying again and, frankly, just making stuff up.

10          MS. RICHARDSON:  I asked -- I asked --

11          MR. HARRISON:  Let's take a break.  Let's take

12  a break for a few minutes.

13          MS. RICHARDSON:  Okay.  Okay.

14          MR. HARRISON:  This is ridiculous.

15          THE VIDEOGRAPHER:  Going off the record at

16  4:42.

17              (A recess is taken.)

18          THE VIDEOGRAPHER:  We are back on the record at

19  five o'clock.  This is Media No. 5 in the deposition of

20  Ms. Taylor Thomson.

21  BY MS. RICHARDSON:

22      Q.  Okay.  We're going to change lanes for a

23  moment, which I'm sure nobody will be mad at.

24              In November of 2021, while you were in London,

25  you became friends with the founder of the



Page 258

1  cryptocurrency Tezos; correct?

2       A.  She was an acquaintance.  She was -- she and

3  her husband were friends of a friend.  We were

4  acquaintances.

5       Q.  And did she introduce you to Saffery's?

6       A.  I don't believe so.

7       Q.  I remember --

8       A.  I can't remember.

9       Q.  -- around that time --

10      A.  I don't remember.

11      Q.  -- you were wanting -- we both -- you and I had

12  talked several times during that time.  Ironically, I

13  had said I was concerned about your accounting; and you

14  had asked me to try to find you an accountant.

15          Do you remember that?

16          MR. HARRISON:  Objection.  Testifying.

17  BY MS. RICHARDSON:

18      Q.  Do you remember asking me --

19          MR. HARRISON:  Compound multiple times --

20  BY MS. RICHARDSON:

21      Q.  Do you remember asking me in the fall of 2021

22  to help you to find an accountant who understood

23  cryptocurrency?

24      A.  I don't recall the exact time, but I do

25  remember having a conversation with you where I wanted



Page 259

1   to find a crypto accountant.

2        Q.  And do you remember that one of the challenges

3   was that it had to be someone who understood the

4   Canadian -- who understood the Canadian tax system?

5        A.  I don't recall that fact.

6        Q.  Okay.  Do you recall that when you were in

7   England you had a meeting set with a firm who was going

8   to potentially help you with your cryptocurrency?

9            MR. ANDRE:  Objection.  Vague.

10           THE WITNESS:  Yeah.  I don't recall.

11  BY MS. RICHARDSON:

12       Q.  Let me ask you this.

13           When was your first meeting with Saffery?

14       A.  I don't recall.

15       Q.  Okay.  You hired Guidepost Solutions to help

16  you understand and recover lost cryptocurrency.

17           When did you hire Guidepost Solutions?

18           MR. HARRISON:  Objection to the form of the

19  question.  Compound.  Testifying.

20           But you can try and answer.

21           THE WITNESS:  I don't -- I don't recall.

22  BY MS. RICHARDSON:

23       Q.  Did you recall --

24       A.  I don't recall.

25       Q.  Did you hire Guidepost Solutions prior to 2022?



Page 260

```
 1        A.   I -- I don't recall exactly.  I don't --
 2        Q.   Did Guidepost Solutions help you with the lost
 3   NFTs?
 4        A.   I think --
 5             MR. HARRISON:  With what?  I'm sorry?
 6             MS. RICHARDSON:  The lost NFTs, the Trezor
 7   wallet.
 8             THE WITNESS:  I -- I don't remember them
 9   helping with that.
10   BY MS. RICHARDSON:
11        Q.   Okay.  But when I received a demand letter from
12   your attorneys in June of 2022, Guidepost Solutions at
13   that point had been retained; correct?
14        A.   Around that time, I believe.
15        Q.   Okay.  And approximately how much would you say
16   you have paid Guidepost Solutions?
17             MR. HARRISON:  Objection.
18             THE WITNESS:  I mean, I can answer it easily
19   but --
20   BY MS. RICHARDSON:
21        Q.   Yeah.
22        A.   I don't know.
23             MR. HARRISON:  Do you know?  Okay.
24             THE WITNESS:  I don't know.  I --
25   ///
```



Page 261

1   BY MS. RICHARDSON:

2        Q.  Have you paid them more than a million dollars?

3            MR. HARRISON:  Objection.

4            THE WITNESS:  I don't know.

5   BY MS. RICHARDSON:

6        Q.  Have you paid them more than $5 million?

7            MR. HARRISON:  Objection.  That's privileged

8   information, so I'm directing you not to answer.

9            MS. RICHARDSON:  It's -- it's not privileged

10  information.

11           MR. HARRISON:  It is privileged information.

12           MS. RICHARDSON:  Are you -- you're telling the

13  client not to answer that question --

14           MR. HARRISON:  Yes.

15           MS. RICHARDSON:  -- so we're clear on the

16  record?

17           MR. HARRISON:  Yep.

18           MS. RICHARDSON:  Okay.  I want to reserve

19  rights to compel that information.

20           THE WITNESS:  And I can answer it easy, if you

21  want.

22           MR. HARRISON:  Go ahead.

23           THE WITNESS:  I don't remember.  I don't know.

24  BY MS. RICHARDSON:

25       Q.  Okay.



Page 262

1      A.   No idea.

2      Q.   Were you aware that Guidepost communicated with

3  a number of my family members on your behalf?

4           MR. HARRISON:   Objection.

5           So those are privileged communications with

6  Guidepost Solutions; so to the extent that the answer

7  would require you to reveal privileged communications

8  between yourself and Guidepost, for instance, about what

9  Guidepost did, then I'm instructing you not to answer

10 that.

11          MS. RICHARDSON:   Can you explain the privilege

12 basis for Guidepost.

13          MR. HARRISON:   Sure.   That's privileged.   It's

14 a privileged --

15          MS. RICHARDSON:   Based on --

16          MR. HARRISON:   -- relationship.

17          MS. RICHARDSON:   Based on -- on what?

18          MR. ANDRE:   Ms. Richardson, Guidepost has been

19 operating at the direction of counsel and, therefore, is

20 covered by our attorney-client privilege.

21          MS. RICHARDSON:   Okay.   That's what I needed to

22 hear.   Thank you.

23 BY MS. RICHARDSON:

24     Q.   So did -- did -- Ms. Thomson, was Guidepost

25 retained by you directly or by your counsel?



Page 263

1          MR. HARRISON:  Objection.

2          But you can -- you can answer, if you know.

3          THE WITNESS:  I don't believe I retained them

4    myself directly.

5    BY MS. RICHARDSON:

6       Q.  But you don't remember; correct?

7          MR. ANDRE:  Objection.  Asked and answered.

8          MR. HARRISON:  Asked and answered.

9    BY MS. RICHARDSON:

10      Q.  Are you aware that representatives from

11   Guidepost went to the homes of my family members?

12         MR. HARRISON:  Objection to the extent that it

13   call -- would require you to reveal privileged

14   information, for instance, your communications with any

15   personnel from Guidepost or from the law firm of

16   McDermott Will & Emery, upon which you may have based

17   any information or knowledge, then I'm directing you not

18   to answer.  If you can answer without revealing

19   privileged information, then you can go ahead and try

20   and answer.

21   BY MS. RICHARDSON:

22      Q.  Are you aware of any communications between

23   yourself and your firm with my half-sister, Jennifer

24   [phonetic] Richardson?

25         MR. HARRISON:  I'm sorry.  Her firm?  Is that



Page 264

1    what you said?

2            MS. RICHARDSON:  I'm sorry.  Not firm.

3    Representatives.

4            MR. HARRISON:  I'm sorry.  Can you just repeat

5    the question or have it read back.

6    BY MS. RICHARDSON:

7        Q.  Yes.  Are you aware of communications or

8    dealings with my half-sister, Jennifer Richardson,

9    between yourself directly or any representatives?

10           MR. HARRISON:  Okay.  So it's the same

11   objection based on privileged information.

12           If the -- if your answer would require you to

13   reveal privileged information, for instance,

14   communications you had with anyone from Guidepost or

15   anyone from McDermott in which you learned any

16   information that would -- that would be part of your

17   answer, then I'm directing you not to answer on the

18   basis of privilege.  If you can answer it without

19   revealing any privileged communications, then you could

20   try your best to answer it.

21   BY MS. RICHARDSON:

22       Q.  It was printed in a magazine article that

23   representatives from Guidepost Solutions went to the

24   home of my mother and my stepsister.

25           Did you read that?



Page 265

1      A.  No.

2      Q.  No.

3          Guidepost Solutions has been retained to create

4  a number of expert reports; is that correct?

5          MR. HARRISON:  Objection.  Assumes facts not in

6  evidence.

7          I don't believe that's correct but --

8          MR. ANDRE:  To the extent you can answer -- to

9  the extent you can answer without basing your answer on

10  conversations you had with Guidepost or your counsel,

11  you can do so.  Otherwise, we'd instruct you not to

12  answer the question off the basis of the attorney-client

13  privilege.

14  BY MS. RICHARDSON:

15      Q.  So are you choosing not to answer?

16      A.  I can't answer the question.  It's privileged.

17          MS. RICHARDSON:  I just want to state on the

18  record that I reserve rights to compel any information

19  with Guidepost Solutions.

20          THE WITNESS:  Excuse me.

21  BY MS. RICHARDSON:

22      Q.  Do you agree that our current financial

23  situations are very different from one another?

24          MR. HARRISON:  Objection.  Vague.  Calls for

25  speculation.



Page 266

1  BY MS. RICHARDSON:

2      Q.  You still have to answer.

3      A.  I don't -- I don't know your financial

4  situation, so I would hazard to guess that it's

5  probably -- there is some disparity there.

6      Q.  And is it fair to say that you have far more

7  resources than I do in these legal proceedings?

8          MR. HARRISON:  Objection to the form of the

9  question.  Vague.

10         It's a completely improper question but --

11 BY MS. RICHARDSON:

12     Q.  Are you aware -- are you aware that I'm

13 representing myself in this litigation?

14     A.  Yes.

15     Q.  Do you know how many lawyers are working on

16 your behalf currently?

17     A.  I've never counted them exactly, no.

18     Q.  The lawyers that I have dealt with -- and I

19 just want to confirm if you're aware of these lawyers

20 directly -- are Todd Harrison, Julian Andre, Josh Yim,

21 and Joseph Evans, in addition to a number of other

22 associates.  Are -- those are only in the United States.

23         Are you -- are you familiar with -- with those

24 attorneys?

25     A.  Not all of them.



Page 267

1       Q.   Okay.   So I received communications from all

2    those attorneys on your behalf.

3            Are you aware of that?

4       A.   No.

5       Q.   Okay.

6       A.   I'm not --

7            MR. ANDRE:   I -- to the extent you have

8    independent knowledge outside of discussions you've had

9    with us, you could answer the question.   If the question

10   would result -- would require you to disclose

11   confidential communications you had with your attorneys,

12   we'd instruct you not to answer the question on the

13   attorney-client privilege.

14   BY MS. RICHARDSON:

15      Q.   It's fair to say you have a number of attorneys

16   assisting you in this matter; correct?

17            MR. HARRISON:   Objection.   Vague.

18            You can try and answer.

19            THE WITNESS:   There -- I do have a few

20   attorneys, yes.

21   BY MS. RICHARDSON:

22      Q.   And Guidepost Solutions is a security firm that

23   you have also retained to help you -- or that your

24   counsel has retained that has been helping you in the

25   process of this litigation; correct?



Page 268

1          MR. HARRISON:  Again, we're not waiving

2    attorney-client privilege; so if you could answer

3    without violating attorney-client privilege in any way,

4    go ahead and do your best.

5          THE WITNESS:  They've been hired -- the

6    question is, have they been hired in this --

7    BY MS. RICHARDSON:

8      Q.  Uh-huh.  I mean, they're here today, are they

9    not?

10     A.  Yeah.  Guidepost -- Guidepost has been hired.

11     Q.  Right.  Okay.

12          And you also hired a very -- a fairly sizable

13   PR management team to protect your interest; is that

14   correct?

15          MR. HARRISON:  Objection to the compound nature

16   of the question.  Vague.

17   BY MS. RICHARDSON:

18     Q.  You retained the services of a PR company;

19   correct?

20          MR. HARRISON:  Objection.

21          To the extent that you know.  And I'm

22   instructing you that to the extent your answer would

23   invoke --

24          THE WITNESS:  Yeah.

25          MR. HARRISON:  -- attorney-client privilege,



Page 269

1  then I'm directing you not to answer it.  If you could

2  answer it without getting any into conversations you had

3  with McDermott or anyone at the PR firm that's covered

4  by attorney-client privilege, then I'm instructing you

5  not to answer.  But you can answer without impinging on

6  that.

7            THE WITNESS:  Privilege.

8  BY MS. RICHARDSON:

9      Q.  It's -- your PR firm you're alleging is --

10  you're suggesting is privileged information?

11      A.  (No audible response.)

12      Q.  So -- so you are saying you're not going to

13  reveal that you hired a PR firm or who that PR firm is;

14  is that correct?

15            MR. HARRISON:  Objection.  That's a compound

16  question.  Assumes facts not in evidence.

17            That's what she said even in her prior answer.

18  BY MS. RICHARDSON:

19      Q.  Have you retained a PR firm, Ms. Thomson?

20            MR. HARRISON:  Are you asking her in -- in her

21  personal capacity if she's retained a PR firm or --

22            MS. RICHARDSON:  Yes.

23            MR. HARRISON:  -- asking if her lawyers have

24  retained a PR firm?

25            MS. RICHARDSON:  I'm asking in her personal



Page 270

1    capacity.

2          THE WITNESS:  No.

3          MR. HARRISON:  That's okay.  That's fine.

4    BY MS. RICHARDSON:

5      Q.  No.  Are you aware that a PR team has been

6    working on your behalf?

7          MR. HARRISON:  Objection to the "on your

8    behalf."

9          Again, if you can answer without violating

10   attorney-client privilege based on any communications or

11   advice that you've been given from McDermott or the PR

12   firm, then you can try and answer it.

13         THE WITNESS:  No, I can't.  Privilege.

14         MS. RICHARDSON:  Okay.  I reserve the right to

15   compel information about the PR company that was

16   retained on behalf of Taylor Thomson.

17   BY MS. RICHARDSON:

18     Q.  I want to go back for a moment to April of

19   2022, after I saw you at my home and I came to see you

20   in Malibu, which is -- and I came to see you in Malibu.

21         Do you remember this?

22     A.  I didn't recall it was Malibu.  I thought you

23   came to Santa Monica.

24     Q.  It was Malibu.

25     A.  Oh.



Page 271

1        Q.   You were getting ready to go to Coachella, I

2   believe, that day.

3             Does that sound familiar?

4        A.   I'd have to look at a calendar.

5        Q.   I came to your home, and you were on the phone

6   with Justin at the time, and you were upset because he

7   had missed an auction item.

8             Do you have a memory of that?

9             MR. ANDRE:  Objection.  Vague.  Compound.

10            Also, again, Ms. Richardson, you're testifying.

11   You're not asking questions.

12   BY MS. RICHARDSON:

13       Q.   Do you remember that when I came to your house

14   to give you the wallets, you were on the phone?

15            MR. ANDRE:  Objection.  Vague.

16            THE WITNESS:  No.

17   BY MS. RICHARDSON:

18       Q.   Okay.  Do you remember that when I gave you

19   those wallets, I informed you about a ADAM staking

20   opportunity that Persistence had that had a yield in

21   ADAM on the Terra chain?

22            MR. ANDRE:  Objection.  Vague.  Compound.

23            Again, Ms. Richardson, I'd ask you to ask

24   questions, not try to testify.

25   ///



Page 272

1    BY MS. RICHARDSON:

2        Q.  Do you remember discussing with me --

3        A.  No.

4        Q.  -- Persistence's new partnership with ADAM and

5    Terra during that visit?

6        A.  No.

7        Q.  No.

8            Do you remember directing me to stake a portion

9    of your ADAM with your Ethereum that day?

10       A.  I remember there was one last request to

11   something.

12       Q.  Yeah.

13       A.  That is most likely what it would have been.

14       Q.  And do you remember that because of that

15   request, I kept two of the wallets and executed those

16   trades after that meeting?

17           MR. ANDRE:  Objection.  Vague and compound.

18   BY MS. RICHARDSON:

19       Q.  Do you remember that in order to execute those

20   trades, I had to keep two wallets?

21           MR. ANDRE:  Same objection.  Vague.  Compound.

22   Misstates prior testimony.  Assumes facts.

23   BY MS. RICHARDSON:

24       Q.  I kept two wallets to execute those trades, and

25   Michelle returned them to your Santa Monica home.



Page 273

1          Do you remember that?

2          MR. ANDRE:  Same objections.

3          MS. RICHARDSON:  You -- it's fine.  Objections

4    are noted.

5          THE WITNESS:  They were returned, my

6    understanding; but it was not to me.

7    BY MS. RICHARDSON:

8      Q.  To Esztella?

9      A.  I believe they were returned -- yeah, they were

10   returned.

11     Q.  And also, I didn't return them; so I feel like

12   neither of us can totally answer that correctly.

13     A.  Yeah.  Yeah.

14     Q.  I want to go back for a moment to the

15   accounting portion and helping you find an accountant.

16   I -- sorry.  It's very hard later in the day to get

17   these sentences right, so hats off to you guys for doing

18   this all the time.  It's like you have to take a

19   sentence upside and down and inside out, but it's a

20   skill which I clearly don't have yet.

21          I understand that you have alleged you were not

22   aware of a potential finder's fee.  That's correct?

23          MR. HARRISON:  Objection.  Just testifying

24   again.  I mean --

25          MR. ANDRE:  Form.  Compound.  Vague.



Page 274

1          MS. RICHARDSON:  Oh, God.  This is how we're

2   going to go.  Okay.

3          I'm not going to change it, so you can answer

4   it as is.

5          MR. ANDRE:  If you understand the question.

6          THE WITNESS:  To clarify --

7   BY MS. RICHARDSON:

8      Q.  You've stated --

9      A.  -- I was not aware that there -- that you had

10  taken a finder's fee that was embedded in the $5 token

11  price, no.

12     Q.  And based on that understanding, you believed

13  that it was warranted that I spend my time trading for

14  you without the prospect of other opportunities?

15         MR. HARRISON:  Objection to form.  Calls for

16  speculation.  Assumes facts not in evidence.

17         THE WITNESS:  My understanding was that you

18  were excited do it because you were -- you were excited

19  for opportunities and it also wasn't meant to be a big

20  deal.  You said you were doing it all day long for

21  yourself and so it would not be anything -- you'd be

22  honored and happy to be part of it and that you would --

23  because of, I guess, the size of some of the purchases,

24  that you would -- that it would move you into a sphere

25  where you might have opportunities in that space, which



Page 275

1  is a space I understood you really wanted to be in

2  professionally.

3  BY MS. RICHARDSON:

4      Q.  So -- so your belief is based on the

5  opportunity that I was getting from the experience, it

6  warranted the time spent; correct?

7          MR. HARRISON:  Objection.  Vague.  Misstates

8  her prior testimony.

9  BY MS. RICHARDSON:

10     Q.  Okay.

11     A.  Yeah.

12     Q.  I'm going to -- I'm going to totally go in a

13 different direction for a moment and -- and just kind of

14 move through things rather quickly.

15         You routinely travel by private jet; correct?

16     A.  No.

17     Q.  In the past have you traveled by private jet?

18     A.  On occasion.

19     Q.  Okay.  And you have chartered a number of

20 yachts; is that correct?

21     A.  That is correct.

22     Q.  Okay.  And those yacht charters happened

23 primarily in -- in Europe and the Caribbean; correct?

24     A.  Not only.  But primarily, yes.

25     Q.  Okay.  What other areas did you do yacht



Page 276

1   charters?

2       A.  The North Pole.

3       Q.  Oh, right.

4       A.  North Pole, yeah.  Yeah.

5       Q.  And I want to ask you for a moment if you

6   remember in 2021, when Madeleine was thinking about

7   buying a house, that we started working on a budget

8   spreadsheet for you and for Madeleine.

9       A.  I don't recall.

10          MR. HARRISON:  Wait.  Wait.  Wait.  There is no

11  question.  No question has been posed.

12          MS. RICHARDSON:  If we started working on a

13  budget spreadsheet for you and Madeleine.

14          MR. HARRISON:  That's half of a question.

15  BY MS. RICHARDSON:

16      Q.  Do you have memory --

17      A.  I don't recall --

18      Q.  -- of us creating a spreadsheet?

19      A.  I don't recall us working on a budget.

20      Q.  Okay.  Do you -- you mentioned that you are now

21  a partial owner of a number of properties.

22          Were you previously the sole owner of those

23  properties?

24          MR. HARRISON:  Objection.  Vague.

25          No one knows what you're talking about at this



Page 277

1  point.

2  BY MS. RICHARDSON:

3      Q.  When we talked earlier about the homes that you

4  own, you said that you only own one home in Los Angeles;

5  correct?

6      A.  Yes.

7      Q.  Isn't it also correct that you purchased a home

8  in Malibu in -- on or about twenty -- 2010?

9      A.  Yes.  But it wasn't just -- that wasn't solely

10  me.  That wasn't me personally.

11      Q.  Okay.

12      A.  It wasn't me personally.

13      Q.  Oh, I see.  Okay.

14      A.  Yeah.

15      Q.  And then -- and -- and if it wasn't you

16  personally, does that mean it belongs to you and your

17  daughter?

18          MR. HARRISON:  Objection.  Form.  Vague.

19          MS. RICHARDSON:  Is there --

20          MR. HARRISON:  You can try --

21          THE WITNESS:  Should I answer it?

22          MR. HARRISON:  You can -- I mean, it's a

23  completely irrelevant personal question.

24          THE WITNESS:  Yeah.  It's complicated.  Me

25  myself --



Page 278

1          MR. HARRISON:  You can try to answer it.

2          THE WITNESS:  Myself, my daughter, future

3    generations.  It's --

4    BY MS. RICHARDSON:

5      Q.  It would be your family branch?

6      A.  Yeah, it's just our branch.  Yeah, it's our

7    branch.

8      Q.  And your family branch as of today is --

9    consists of you and your daughter; correct?

10     A.  Correct.

11     Q.  Okay.  And do your you and your daughter share

12   any other homes in Los Angeles?

13         MR. HARRISON:  I'm actually just going to

14   remind you not to answer if the answer that you would

15   give is based on privileged communications that you had

16   with any lawyers that have set up whatever structures

17   we're talking about here.  If -- if -- so --

18         THE WITNESS:  Yeah.

19         MR. HARRISON:  But if you can answer without

20   revealing any privileged information that you got from

21   lawyers about the structures that have been set up, then

22   you can try to answer it, to the best of your ability.

23         THE WITNESS:  Can you ask it again, please.

24   BY MS. RICHARDSON:

25     Q.  Yes.  Do you have other homes in Los Angeles



Page 279

1    that you and your daughter own together?

2            MR. HARRISON:  Same instruction.

3            THE WITNESS:  Yeah.

4    BY MS. RICHARDSON:

5        Q.  I'm not asking --

6        A.  It's privilege --

7        Q.  -- where they are.  I'm saying, do you have

8    other homes that you own in -- in Los Angeles?

9            MR. HARRISON:  Objection.  Vague.

10           MR. ANDRE:  Also calls for a legal conclusion.

11   BY MS. RICHARDSON:

12       Q.  Okay.  Let's try this.

13           Did you purchase a home on Tigertail that you

14   currently own?

15           MR. HARRISON:  Objection -- objection -- same

16   objection.  Vague.  Calls for a legal conclusion.

17           MS. RICHARDSON:  A purchase of a home calls for

18   a legal conclusion?

19           MR. HARRISON:  Yeah.  Again, same instruction

20   that if the answer were to impinge upon any

21   attorney-client privileged communications or information

22   that you have received regarding -- I don't even know --

23   the structure of the house, the structure of ownership

24   of the house --

25           MS. RICHARDSON:  Counsel, are you --



Page 280

1          MR. HARRISON:  I'm not done talking.

2          MS. RICHARDSON:  Okay.

3          MR. HARRISON:  -- regarding the structure of

4    the ownership of the house, then I'm instructing you not

5    to answer on the basis privilege.  If, however, you can

6    somehow answer the question without violating

7    attorney-client privilege, then give it your best shot.

8          THE WITNESS:  Technically -- technically

9    privileged.

10         MS. RICHARDSON:  So I want to make sure that

11   the record is clear that the -- Ms. Thomson and her

12   attorneys are stating that she is not going to answer

13   the questions about her real estate ownership based on

14   privilege, and I'm going to reserve the right to compel

15   that information at a later time.

16         MR. ANDRE:  I'll just respond that you can try

17   to answer [sic] the question in a way that would not

18   require her to disclose privileged information.  You're

19   choosing not to do so.

20         MS. RICHARDSON:  I asked if she owns any

21   additional properties -- if -- okay.  I'm not choosing.

22   Would counsel mind telling me where the privilege is in

23   that question?

24         MR. HARRISON:  We're not here to advise you.

25         MS. RICHARDSON:  Okay.  That's fine.



Page 281

1          MR. HARRISON:  You do whatever you want to do.

2   You know, this is completely irrelevant, which is the

3   point, so --

4          MS. RICHARDSON:  It's actually not.

5          MR. HARRISON:  Okay.

6          MS. RICHARDSON:  There's a number of questions

7   in relation to your personal wealth that you have not

8   answered today, and I want to state for the record that

9   I am reserving rights to compel that information.

10  BY MS. RICHARDSON:

11      Q.  You said that you reached out to Persistence in

12  2022 and at that time you sent text messages to Shiro

13  Gutzie saying that I had lied to you and that I hid the

14  fees.  Do you remember that?

15         MR. ANDRE:  Objection.  Misstates testimony.

16  Compound.

17  BY MS. RICHARDSON:

18      Q.  Do you remember sending text messages to Shiro

19  that alleged that I had lied to you in or about the

20  summer of 2022?

21      A.  Yes.  I didn't -- I didn't use the word "lie."

22  I don't remember what I said.  I basically texted him to

23  say that you had taken a hidden fee, which is also, I

24  assume, a secret kickback.

25      Q.  Do you remember sending an email to a number of



Page 282

1  your accounting and financial representatives where you

2  called me a cunt and a liar in the -- on -- in or about

3  the summer of 2022?

4      A.  I don't recall those emails.  Have to pull them

5  and show them, if you have them.

6      Q.  I believe they were produced for the Singapore

7  arbitration.

8      A.  If they were produced, then they were produced

9  and they exist.

10      MR. HARRISON:  Do you have them here today?

11      MS. RICHARDSON:  I don't have them here today,

12  no.

13      MR. HARRISON:  Okay.  Is it your position now,

14  just so we're clear -- because you complained about the

15  use of information and documents from the Singapore

16  arbitration before, but I take it now your position is

17  it's okay to use those.

18      MS. RICHARDSON:  I complained about the use of

19  the materials obtained from the Singapore arbitration

20  for the purposes of slander in the media, not for the

21  purpose of a deposition.  I believe that -- that counsel

22  used a number of -- of pieces of evidence from the

23  Singapore arbitration in our litigation, which I've

24  never disputed; and what I did dispute was improperly

25  procuring evidence and giving it to a reporter before it



Page 283

1  was on the public record.

2          MR. HARRISON:  I -- go ahead.  If you can --

3  you go first.

4          MR. ANDRE:  I'm trying to understand briefly

5  which -- which reporter or -- actually, never mind.

6  Just continue.

7          MR. HARRISON:  So you think you can use this --

8  the information and documents from the Singapore

9  arbitration but nobody else can?  Is that your position?

10          MS. RICHARDSON:  My position is that

11  information given to the press that was obtained through

12  discovery is an improper use and that it's not a public

13  record.

14          MR. ANDRE:  What's your basis to assert that?

15          MS. RICHARDSON:  My basis to assert improper --

16  it's improper to disseminate information from discovery?

17          MR. ANDRE:  What's your basis to allege that

18  information from the arbitration has been disseminated

19  to the press by -- particularly by -- by -- by someone

20  other than yourself?

21          MS. RICHARDSON:  Well, it was either obtained

22  through -- through discovery purposes of me or it was

23  obtained through discovery purposes of the Singapore

24  arbitration.  I know that the text messages between --

25  this is probably not the -- not the proper forum to be



Page 284

1   having this discussion, I don't think.  But --

2            MR. HARRISON:  Well, it's certainly a simple

3   question.  Like, are you -- do you object to the use of

4   documents and information from the Singapore

5   arbitration?  That's previously as I understood your

6   position, but you're using that stuff --

7            MS. RICHARDSON:  That was never my position.

8            MR. HARRISON:  Okay.  Great.

9            MS. RICHARDSON:  My position was improper use

10  of disseminating information obtained through discovery

11  and giving it to the media.  That was -- that was my

12  position.  It's my position today.  It was always my

13  position.  If you go back and review any issue I had,

14  that was the issue.

15            MR. ANDRE:  So -- okay.

16            MS. RICHARDSON:  That was the issue.

17            MR. HARRISON:  Don't really know exactly what

18  your position is, but let's keep going.

19            MR. ANDRE:  I think we need to move forward.

20            MS. RICHARDSON:  We do need to move forward.

21  BY MS. RICHARDSON:

22     Q.  I want to continue for a moment on this topic

23  of information about me, which was -- obviously, you

24  know, it's a pretty extreme use of words to be using

25  to -- you know, especially in a professional capacity.



Page 285

1          Can you elaborate on who else you might have

2   told at that time.  Because right now we've talked about

3   Shiro Gutzie; we've talked about your financial

4   professionals; and we've also talked a little bit about,

5   you know, Kevin and Rand and certainly Ron, who -- and

6   Madeleine.

7          MR. ANDRE:  Objection.  Vague.  Ambiguous.

8   Compound.  Misstates testimony.  Misstates the record

9   and, frankly, is unintelligible.

10          MS. RICHARDSON:  That's fine.  That's probably

11   fair at this point in the day.

12   BY MS. RICHARDSON:

13     Q.  Do you remember having conversations about me

14   to others?

15          MR. ANDRE:  Objection.  Vague.

16   BY MS. RICHARDSON:

17     Q.  Did you have conversations with me -- did you

18   have conversations about the allegations you have

19   against me with Jack Kilgore?

20          MR. HARRISON:  Still objection.  Vague.

21          MS. RICHARDSON:  And I'm going to keep that

22   one --

23          MR. HARRISON:  You can try to -- you can try to

24   answer it the best of your ability.

25          THE WITNESS:  Anybody that I spoke to would



Page 286

1  have been in context of them asking because it's -- it's

2  now been published.  I mean, it's publicly --

3  BY MS. RICHARDSON:

4       Q.  So are you --

5       A.  -- claimed.

6       Q.  So the text messages, for example, that you

7  sent to Shiro Gutzie were sent in July of 2022.

8       A.  That was, I believe, the day --

9            MR. ANDRE:  Hold on.

10           Objection.  Misstates the testimony.

11           Are you showing her -- are you going to

12  show her that -- you said you didn't have the text

13  messages with you.

14           MS. RICHARDSON:  I am -- I -- let me ask the

15  question.

16           MR. ANDRE:  I'm asking you, do you have the

17  text messages with you --

18           MS. RICHARDSON:  I heard your objection.  I

19  heard your objection.

20           MR. HARRISON:  No.  But he's asking you as part

21  of the objection --

22           MS. RICHARDSON:  I do not, but that's not --

23  that's not relevant.

24           MR. ANDRE:  No.  It actually -- and for the

25  record, it actually is relevant.  You are representing



Page 287

1    what a document says without showing her and giving her

2    an opportunity to review the document.

3           MS. RICHARDSON:  I understand.

4           MR. ANDRE:  And so if you would like her to

5    comment on a particular document, we would request that

6    you show her the document so that she can review it.  If

7    you're not willing to do that, I'm going to object on

8    the basis that it misstates the evidence in this case --

9           MS. RICHARDSON:  Counsel --

10          MR. ANDRE:  -- and is vague and ambiguous.

11   That's what I'm --

12          MS. RICHARDSON:  Counsel, I -- your client has

13   already confirmed that she remembers sending that

14   information to Shiro Gutzie in July of 2022.

15          MR. ANDRE:  I don't believe she actually did

16   that.

17          THE WITNESS:  No, I didn't.

18          MR. ANDRE:  It wasn't a proper question, and we

19   objected to the question at the time, so I'm putting my

20   objection on the record here.  If you would like her to

21   comment on documents, you need to show them to her and

22   she needs to an opportunity to review them.  Otherwise,

23   I will stand on my objection that you're misstating

24   those records because she has not had an opportunity to

25   review them, I do not have an opportunity to review



Page 288

1    them, and Mr. Harrison does not have an opportunity to

2    review them.

3            MS. RICHARDSON:  I am asking you if you are

4    instructing --

5            MR. ANDRE:  I'm not.

6            MS. RICHARDSON:  -- the witness not to answer.

7            MR. ANDRE:  I am not instructing the witness

8    not to answer.

9            MS. RICHARDSON:  Okay.

10           MR. ANDRE:  But I am pointing out that you are

11   asking her about documents you are failing to give her

12   an opportunity to review, and I'm objecting on that

13   basis along with the other bases I've stated on the

14   record.

15           And I apologize for speaking too fast,

16   Ms. Court Reporter.

17           MS. RICHARDSON:  Thank you.

18   BY MS. RICHARDSON:

19       Q.  And it's -- it's all documented now,

20   Ms. Thomson; so I want to remind you, this is not a

21   privileged question; and you are obligated to give an

22   answer.

23       A.  And the question is --

24           MR. HARRISON:  If you can.

25           MS. RICHARDSON:  The question is -- I just said



Page 289

1    the text messages sent to Shiro was July 2022, and you

2    were just about to say something before counsel

3    interrupted.  You said that was just before --

4              MR. ANDRE:  Preserve same objections, please.

5              THE WITNESS:  But --

6              MS. RICHARDSON:  Yes.

7              MR. ANDRE:  Yes.

8              THE WITNESS:  I answer?

9              MR. ANDRE:  To the best -- if you can --

10             THE WITNESS:  To the best of my knowledge -- I

11   don't -- I remember it was July.  It was -- it was

12   pretty swiftly after we found out from Tushar that you

13   were taking a hit -- a secret -- a secret commission or

14   hidden kickback.

15   BY MS. RICHARDSON:

16        Q.  An alleged secret kickback, yes.  I understand.

17   And --

18        A.  That was --

19        Q.  And is that what you were referring to when you

20   said just after?  Okay?

21        A.  Yes.  Yeah.  That's what -- that's what I

22   recall was the gist of it.  Because I was so shocked to

23   find that out.  I was --

24        Q.  Right.

25        A.  Really sideswiped me, so that's why.



Page 290

1    Q.  Okay.  And during this time --

2    A.  I think -- I believe I said -- I think

3  disingenuous --

4    Q.  That sounds --

5    A.  -- or seemed -- for someone taking a secret

6  kickback almost a million dollars and professing all

7  along that they were getting nothing out of it when I

8  did my deal.  That seems disingenuous to me.

9    Q.  Once again, I would like to ask you if you have

10  ever obtained any evidence that I received anything at

11  any time from the transactions that took place.

12      MR. HARRISON:  Objection.  Vague.

13  BY MS. RICHARDSON:

14    Q.  Are you aware that your claims against me at

15  this point are allegations that have yet to be proven?

16      MR. HARRISON:  Objection.  Calls for a legal

17  conclusion.  It's vague.

18      MS. RICHARDSON:  I will stand with the

19  question.

20      THE WITNESS:  The hidden commission is, my

21  understanding, based on the fact that you had -- it was

22  written no -- nowhere.  It did not incorporate -- it was

23  not incorporated into my arrangement.  And so my

24  understanding was that I was given the best price at $5,

25  and it was not the case because 6 cents of that per



Page 291

1   token were -- actually had been arranged to be

2   ultimately controlled by you and in your wallet because

3   they were a commission to you.

4   BY MS. RICHARDSON:

5       Q.  And is it --

6       A.  That, to me, seems like it's a commission.

7       Q.  Is it fair to say if somebody has a potential

8   upside to be realized at the end of a period of time,

9   that commission does not belong to them?

10          MR. ANDRE:  Objection.

11          MR. HARRISON:  Objection.  Vague.  Compound.

12  Calls for, I suppose, a legal conclusion.

13          MS. RICHARDSON:  Understood.

14          MR. ANDRE:  And improper hypothetical.

15  BY MS. RICHARDSON:

16      Q.  Okay.  I'm going to stand with the question.

17          So do you understand the question, or would you

18  like me to rephrase it?

19      A.  My understanding is that you're saying just

20  that it -- you're -- no, actually.  Can you rephrase it.

21      Q.  Sure.  If an individual never realizes or takes

22  a -- personally takes or liquidates funds that were set

23  aside and those funds go back into the -- how do I put

24  this?

25          Do you believe if I never realized any profit



Page 292

1   monetary or otherwise, from this transaction, that I

2   received a, what you call, secret kickback?

3           MR. HARRISON:  Objection.  Compound.

4   Argumentative.  Vague.

5           THE WITNESS:  My understanding is it's very

6   straightforward.  Secret kickback was just that it was

7   not put in writing, it wasn't part of the deal, and your

8   arrangement with Tushar was to specifically withhold it

9   from the contract that I was going to sign and have the

10  proceeds sent directly to you; and that was -- that was

11  the deal.  It's nothing to do with whether it

12  was realized -- it's not -- or not.  It's whether it

13  was -- it was taken.

14  BY MS. RICHARDSON:

15      Q.  And you believe it was taken because -- can you

16  tell me why you believe it was taken.

17      A.  Why you negotiated it?  Because you --

18          MR. HARRISON:  Objection --

19          THE WITNESS:  Because you wanted it.

20          MR. HARRISON:  Just a second.

21          Objection.  Vague.

22          You can go ahead and try and answer.

23          THE WITNESS:  I mean, I -- I -- I'm only -- I

24  mean, I would be guessing.  My assumption is that if

25  you -- that by negotiating a hidden fee or a secret



Page 293

1    commission, it's because that's what you wanted.

2    BY MS. RICHARDSON:

3        Q.  Okay.  We're going to totally switch lanes for

4    a minute and just go through a couple of questions

5    pertaining back to your staff and Mike Foss.

6            In your Malibu home and your Bel Air home, you

7    had relatively extensive video surveillance; is that

8    correct?

9            MR. HARRISON:  Objection.  Compound.  Vague.

10           You can try and answer.

11   BY MS. RICHARDSON:

12       Q.  In your Malibu home you had video surveillance;

13   correct?

14       A.  No.  In the -- in my homes, they all have

15   cameras.  They all have cameras in certain areas, and

16   all staff know.  That's just a fact.

17       Q.  And are there also recording devices?

18       A.  No.

19       Q.  Okay.  And do you remember --

20           MR. HARRISON:  Objection.  Vague to that last

21   question.

22   BY MS. RICHARDSON:

23       Q.  Okay.  In or around early 2021 you terminated

24   Dora's employment.

25           Do you remember that?



Page 294

1          MR. ANDRE:  Objection.  Vague.

2          THE WITNESS:  Dora was one of our past

3    housekeepers.

4    BY MS. RICHARDSON:

5       Q.  And do you remember telling me that you

6    believed she had -- she was working two jobs?

7       A.  She admitted it.  She told us, and it was

8    obvious because she was calling in sick and not showing

9    up for work when I would come back into town, so -- but

10   she admitted it herself.

11      Q.  Do you remember telling me that you couldn't

12   tell her why she was being terminated because you

13   couldn't tell her how you got that information?

14          MR. HARRISON:  Objection --

15          THE WITNESS:  No.

16          MR. HARRISON:  -- vague.

17          Objection.  Vague.

18          And you --

19          THE WITNESS:  And it's also --

20          MR. HARRISON:  Again, this is -- I'm just --

21   Ms. Richardson, we've talked about this many times

22   before and we warned you many times before.  This has

23   nothing to do with this case.  Okay?  And it's just an

24   attempt to harass and intimidate and sounds like make

25   stuff up about my client.  So at some point -- I'm not



Page 295

1   directing her to not answer now, but at some point it's

2   just going to be --

3           MS. RICHARDSON:  I heard -- I heard --

4           THE WITNESS:  I can answer.

5   Ms. Richardson's -- she's confused.

6           She actually let it slip to one of my -- one of

7   my other staff her other job, at which point it made

8   sense because when I came into town, she would work a

9   day or so and then she would call in sick and then she

10  kept calling in sick and she just wasn't coming to work.

11  It's because she had another full-time job.

12  BY MS. RICHARDSON:

13      Q.  Okay.

14      A.  Because I was living out of the country, and so

15  she didn't -- she should have showed up, but she didn't.

16      Q.  And after Dora's termination you hired Raquel

17  to manage your Los Angeles properties; correct?

18      A.  I don't remember if she was the next one, but

19  Raquel did -- did work for me at one point.

20      Q.  Okay.  When you learned that Raquel was

21  pregnant, you were upset about that.

22          Do you remember?

23      A.  I was -- I wouldn't say I was -- I was

24  displeased that she had not disclosed during her

25  interview because it would most likely have possibly had



Page 296

1    a bearing on whether I would hire her as my only

2    full-time employee because she was, as she did, planning

3    on just checking out of work pretty fast.

4         Q.  Right.  And --

5         A.  So if I'd known that, I would have looked for

6    someone who was going to be available more than two

7    months.

8         Q.  And when Raquel came on board, right about that

9    time you had just gotten the new Santa Monica home and

10   were in the process of selling your Bel Air home; is

11   that correct?

12              MR. HARRISON:  Objection.  Compound.

13              THE WITNESS:  I don't remember the actual date.

14   I mean, I don't recall exactly, no.

15   BY MS. RICHARDSON:

16        Q.  And at that time you also had the Malibu

17   property to manage.

18              Would that be reasonable?

19        A.  Yes.  I was primarily in Malibu at that time.

20        Q.  And do you remember that Raquel was

21   hospitalized during this period due to a complication

22   with her pregnancy?

23        A.  At some point during her tenure, she said she

24   went to the hospital and then she had a doctor's note

25   for the rest of her -- rest of her the duration right

