intimidated or bullied into compliance with misrepresented deadlines and baseless accusations.

Regards,
Ashley Richardson

<image0.jpeg>
<image1.jpeg>

Sent from my iPhone

On Jul 31, 2025, at 3:13 AM, Harrison, Todd <Tdharrison@mwe.com> wrote:

Ms. Richardson - I am on a family vacation and not available for a meet and confer. In addition, as I have stated before, I am not obligated to be at your beck and call and immediately respond to you in less than twenty-four hours, as you suddenly demand below. This is especially true in a case where you have wholly ignored your discovery obligations for almost a year now. For instance, you were served with our Interrogatories on September 12, 2024, and you still have not responded to them in any way, in spite of our subsequent repeated requests. It seems clear that you have not responded because you have no evidence or specifics whatsoever to support your vague counterclaim. You also have not responded to the deficiency letter we sent to you regarding the clear deficiencies in your document production. Answer the interrogatories as you are obligated to do and then I will be happy to have a meet and confer regarding all of the open discovery issues.

Sincerely, Todd Harrison

TODD HARRISON
Partner
McDermott Will & Emery LLP    One Vanderbilt Avenue, New York, NY 10017-3852
Tel +1 212 547 5727 | Mobile +1 917 797 1728 | Email tdharrison@mwe.com
Website | vCard | Twitter | LinkedIn

On Jul 29, 2025, at 4:36 PM, Ashley Richardson <ashrichardson@mac.com> wrote:

[ External Email ]

Dear Todd,

I write pursuant to our obligation to meet and confer regarding Plaintiff Taylor Thomson's July 7, 2025 responses and objections to Defendant's First Set of Requests for Production of Documents.

After reviewing Plaintiff's responses, I must express serious concern over the pattern of blanket objections, evasive language, and refusal to produce clearly relevant materials. Plaintiff appears to be withholding responsive documents critical to the defense and counterclaims—including but not limited to:
   •    Communications between Plaintiff and Defendant concerning the trades and investment agreement (RFP 4–5, 13)
   •    Plaintiff's rationale, due diligence process, and third-party input regarding the investment (RFP 10–12)
   •    Documents related to the Singapore lawsuit and the now-dismissed California protective order (RFP 15–17)
   •    Communications with third parties regarding media inquiries or coverage (RFP 18)

These documents go directly to the heart of the claims and defenses in this case and are not shielded by any valid privilege or overbreadth objection. The attempt to deflect on relevance is especially concerning given Plaintiff's own use of similar materials in public statements and court filings.

I have been making efforts to produce documents, and continue to. To date, Ms. Thomson has produced no documents.

Let me be clear: if Plaintiff continues to refuse production of these materials, I will have no choice but to move to compel and request sanctions for bad faith discovery practices.

Please let me know your earliest available for a meet and confer, no later than EOD Wednesday July 30th.

Sincerely,
Ashley Richardson

****************************************************************************************
This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Our Privacy

Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Our Privacy
Policy explains how we may use your personal information or data and any personal information or data provided or made
available to us. Thank you.
*************************************************************************************************

Please visit http://www.mwe.com/ for more information about our Firm.

# EXHIBIT E

Ashley Richardson
October 28, 2025

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


TAYLOR THOMSON,                )
                              )
            Plaintiff,        )   Case No.:
                              )   2:23-CV-04669-MEMF-MAR
    v.                        )
                              )
PERSISTENCE TECHNOLOGIES      )
BVI Pte Ltd., et al.,         )
                              )
            Defendants.       )
_____)




            VIDEOTAPED DEPOSITION OF ASHLEY RICHARDSON

                    October 28, 2025

                      11:10 a.m.






REPORTED BY:

Tammy Moon, CSR No. 13184, RDR, CRR

Ashley Richardson
October 28, 2025

```
 1    APPEARANCES:

 2    FOR PLAINTIFF TAYLOR THOMSON:

 3    MCDERMOTT WILL & SCHULTE LLP
      BY:  TODD HARRISON, ESQ.
 4    BY:  JOSH YIM, ESQ.
      BY:  JOE EVANS, ESQ. (REMOTE)
 5    One Vanderbilt Avenue
      New York, New York 10017
 6    212.547.5767
      Tdharrison@mwe.com
 7

 8    FOR DEFENDANTS PERSISTENCE TECHNOLOGIES BVI Pte
      Ltd., et al.:
 9
      IN PRO PER
10    BY:  ASHLEY RICHARDSON
      25399 Markham Lane
11    Salinas, California 93908
      Ashrichardson@mac.com
12

13

14    ALSO PRESENT:  TAYLOR THOMSON, PLAINTIFF (REMOTE)

15    CAMPBELL HERBERT, MCDERMOTT WILL & SCHULTE (REMOTE)

16    DIANA FELL-SHARMA, THE VIDEOGRAPHER

17

18

19

20

21

22

23

24

25
```

Ashley Richardson
October 28, 2025

1               INDEX TO EXAMINATION

2               ASHLEY RICHARDSON

3             Tuesday, October 28, 2025

4         Tammy Moon CSR No. 13184, RPR, CRR

5           WITNESS:  ASHLEY RICHARDSON

6

7    EXAMINATION                                    PAGE

8    BY MR. HARRISON                                   7

9    BY MR. EVANS                                     53

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ashley Richardson
October 28, 2025

| | | |
|---|---|---|
| 1 | INDEX TO EXHIBITS | |
| 2 | ASHLEY RICHARDSON | |
| 3 | Tuesday, October 28, 2025 | |
| 4 | Tammy Moon CSR No. 13184, RPR, CRR | |
| 5 | MARKED          DESCRIPTION | PAGE |
| 6 | Exhibit 1       LinkedIn profile | 92 |
| 7 | Exhibit 2       Telegram messages | 92 |
| 8 | Exhibit 3       Roadmap | 92 |
| 9 | Exhibit 4       Publicly available terms and | 108 |
| 10 |                 conditions Binance Global | |
| 11 | Exhibit 5       Binance terms | 114 |
| 12 | Exhibit 6       Email 3.25.2022 | 114 |
| 13 | Exhibit 75      Email | 161 |
| 14 | Exhibit 78      Email exchange between Ashley | 164 |
| 15 |                 Richardson, Taylor Thomson, and | |
| 16 |                 Leigh Wang | |
| 17 | Exhibit 80      Email exchange between Ashley | 163 |
| 18 |                 Richardson, Taylor Thomson, and | |
| 19 |                 Leigh Wang | |
| 20 | Exhibit 88      Email from Ashley Richardson to | 274 |
| 21 |                 Taylor Thomson 3.25 | |
| 22 | Exhibit 124     Text messages | 263 |
| 23 | | |
| 24 | ***Exhibit 5 not available at time of production | |
| 25 | | |

Ashley Richardson
October 28, 2025

```
 1                    INDEX TO EXHIBITS

 2                    ASHLEY RICHARDSON

 3              Tuesday, October 28, 2025

 4         Tammy Moon CSR No. 13184, RPR, CRR
```

```
 5    Exhibit 125   Text messages between Ashley        273

 6                  Richardson and Tushar Aggarwal

 7    Exhibit 136   LinkedIn résumé                      14

 8    Exhibit 139   Photo of Ashley Richardson and      209

 9                  Michele in the Bahamas in 2020

10    Exhibit 140   Photo of Ashley Richardson and      210

11                  Michele in Italy in 2021

12    Exhibit 141   Photo of Ashley Richardson in the   210

13                  Bahamas in 2020

14    Exhibit 142   Photo of Ashley Richardson          211

15                  paddleboarding in July of 2021

16    Exhibit 143   Text messages                       242

17    Exhibit 144   Photo of Ashley Richardson in       209

18                  Italy in 2014

19    Exhibit 145   Photo of Ashley Richardson and      212

20                  Michele in Mexico in 2021

21    Exhibit 146   Photo of Ashley Richardson in       209

22                  Tofino in 2019

23    Exhibit 147   Photo of yacht                      211

24
```

```
      ***Exhibit 136 not available at time of production
25
```

Ashley Richardson
October 28, 2025

1           Tuesday, October 28, 2025, 11:10 a.m.

2           THE VIDEOGRAPHER:  We are on the record at

3    11:10 Pacific Standard Time, on October 28, 2025.

4           Audio and video recording will continue to

5    take place until all parties agree to go off the

6    record.  Please note that microphones are sensitive

7    and may pick up whispers and private conversations.

8           This is the video recorded proceedings of

9    Ashley Richardson, taken by counsel for plaintiff,

10   Todd Harrison, in the matter of Taylor Thomson v.

11   Persistence Technologies BVI Pte Ltd., filed in the

12   United States District Court, for the Central

13   District of California.

14           We are located at 415 Mission Street, Suite

15   5600 in San Francisco, California.

16           My name is Diana Fell-Sharma.  I am a

17   videographer on behalf of U.S. Legal Support,

18   located at 16825 North Chase Drive, Suite 900,

19   Houston, Texas 77060.  I am not related to any party

20   in this action nor am I financially interested in

21   the outcome.

22           The court reporter is Tammy Moon, on behalf

23   of U.S. Legal Support.

24           Counsel will state your appearances for the

25   record, after which the court reporter will enter

Ashley Richardson
October 28, 2025

1    the statement for recorded proceedings into the

2    record and swear in the witness.

3             MR. HARRISON:  Hi.  Todd Harrison from

4    McDermott Will and Schulte for the plaintiff.  With

5    me is my associate, Josh Yim.  On video are my

6    colleagues, Joe Evans and Campell Herbert.  Also

7    zooming in by video is the plaintiff Taylor Thomson.

8             THE REPORTER:  This is Tammy Moon,

9    Certified Stenographic Reporter 13184.

10                  ASHLEY RICHARDSON,

11      called as a witness, having been duly sworn,

12                 testified as follows:

13            THE WITNESS:  I do.

14            MR. HARRISON:  Can we just check the folks

15   on the -- can you hear us, folks, on Zoom?  There's

16   no audio for the Zoom.

17            MR. YIM:  Joe is muted right now.

18            MR. HARRISON:  Joe, can you hear us now?

19            THE VIDEOGRAPHER:  He nodded yes.

20            MR. HARRISON:  Can you say something so we

21   can make sure we can hear you.

22            MR. EVANS:  Testing.  Testing.

23            MR. HARRISON:  Got it.  Thank you.

24            (Reporter clarification.)

25     EXAMINATION BY MR. HARRISON, COUNSEL FOR PLAINTIFF

Ashley Richardson
October 28, 2025

1          Q.   Good morning, Ms. Richardson.

2          A.   Good morning.

3          Q.   We are going to start a little late.  It's

4     11:13 now.  I just want to go over some brief ground

5     rules for the deposition, some basic stuff.  It's

6     important for the court reporter that we not talk

7     over each other.  So I'll talk, then you talk.  I'll

8     talk, then you talk.

9               If there's anything about my questions that

10    are unclear, just ask me to clarify them, and I'll

11    clarify them or change the question.  I'm happy to

12    do that.

13              You are appearing pro se in this case,

14    right?

15         A.   That's correct.

16         Q.   And so you have no lawyer here today,

17    correct?

18         A.   That's correct.

19         Q.   Okay.  By choice.  No one stopped -- we

20    haven't stopped your lawyer from coming or anything,

21    right?  You are appearing by choice without a

22    lawyer?

23         A.   That's correct.

24         Q.   Okay.  You do realize that the deposition

25    today is being videotaped and audio recorded, okay?

Ashley Richardson
October 28, 2025

```
 1          A.   I do.
 2          Q.   And you do realize that you are under oath,
 3     so you are obliged to tell the truth?
 4          A.   I do.
 5          Q.   And that if you don't, it could be
 6     considered a crime of perjury, correct?
 7          A.   I understand.
 8          Q.   What's your full legal name?
 9          A.   Ashley Elizabeth Richardson.
10          Q.   Okay.  Have you ever gone by any other
11     names?
12          A.   Not legally.
13          Q.   What's your current permanent address?
14          A.   It is 25399 Markham Lane.  And it's either
15     Corral de Tierra or Salinas.  They both are the
16     same, true.  California 93908.
17          Q.   Okay.  And do you own that home?
18          A.   No.
19          Q.   Who owns that house?
20          A.   The trust.
21          Q.   And who owns the trust?  Who has an
22     interest in the trust?
23          A.   I have an interest in the trust and my
24     sister.
25          Q.   Okay.  So it's 50/50 between the two?
```

Ashley Richardson
October 28, 2025

```
 1        A.   Yes.

 2        Q.   Okay.  Where did you live before that?

 3   What was your residence before that?

 4        A.   My residence before that was 3748 Redwood

 5   Avenue in Los Angeles, California.

 6        Q.   Okay.  And who owned that residence?

 7        A.   I -- myself and my partner, my former

 8   partner.

 9        Q.   Okay.  And is that Michele Fleury --

10        A.   Correct.

11        Q.   -- if I'm pronouncing her name correctly?

12             And did you -- so you had a 50/50 ownership

13   in that house as well?

14        A.   Correct.

15        Q.   Okay.  And did you sell that house?

16        A.   Yes.

17        Q.   Okay.  How much did you guys sell it for?

18   I don't need exact dollar amount, but approximately.

19        A.   It was approximately -- I think the

20   selling -- gosh, I believe it was 1.8 or 1.85.  I

21   think it was 1.8.

22        Q.   And what's the value of the house that you

23   live in now, the residence that you live in now?

24        A.   It's approximately 1.1 with a mortgage.

25        Q.   How big is the mortgage?
```

Ashley Richardson
October 28, 2025

1      A.   I believe it's $500,000, but I don't have

2    access to it, so I could not tell you for sure.

3      Q.   We've corresponded with you using the email

4    address ashrichardson@mac.com; is that right?

5      A.   Yes.

6      Q.   Okay.  And there's -- I think there's one

7    other that we have corresponded with you on.

8           Is there another email address that you

9    have?

10     A.   There was another email address that I had

11   that was a business email address.  That was -- I

12   can't remember it exactly because I don't use it.

13   It was either ashley or

14   ashleyrichardson@cypresspeakproductions.

15     Q.   @cyberspeakproductions?

16     A.   Mm-hmm.  And you guys have a number of

17   emails you use on the emails to me, but none of

18   those are emails I use or active.  I think I may

19   have like -- I don't know where they came from.

20   Probably you guys did a -- I assume -- a search, but

21   they're not active emails that I use.

22     Q.   Okay.  And how long have you had the

23   ashrichardson@mac.com email address?

24     A.   I could not tell you.  I -- it's a long

25   time.

Ashley Richardson
October 28, 2025

1        Q.    Okay.  More than five years?

2        A.    More than five years.

3        Q.    Okay.  Do you still have access to any of

4    the other accounts that you have referenced?  Any

5    other prior email accounts?

6        A.    Do I have access?  I mean, I don't know if

7    it exists still because I'm not in control.  So I

8    could not answer that question.  I apologize.

9        Q.    Okay.  I want to turn quickly to your

10   educational history.

11            Can you just give me your educational

12   history, please, your educational background?

13       A.    Sure.  I graduated from high school in

14   1996.  I went to, for a few years, to a community

15   college and then to UC Berkeley.  And I dropped out

16   of college to move to India.  So I never -- I never

17   completed.  I completed about three years of my

18   college education.

19       Q.    Okay.  What year was that that you dropped

20   out of Berkeley to go to India?

21       A.    I'm not positive, but I believe it was --

22   it was either 1999 or 2000, approximately.  I

23   couldn't tell you with certainty.

24       Q.    And I think you were in India for a number

25   of years; is that correct?

Ashley Richardson
October 28, 2025

1        A.    That's correct.

2        Q.    And what were you doing in India?

3        A.    I was doing, primarily, volunteer work and

4   a lot of meditating and -- and fundraising for an

5   organization.

6        Q.    Okay.  And I take it you were volunteering

7   and meditating and things and not making a

8   significant amount of income; is that correct?

9        A.    I made no income.

10       Q.    Okay.  And when did you come back from

11  India?

12       A.    It would have been -- I -- I visited

13  periodically throughout that time.  Are you -- I

14  guess I want to clarify what the question is asking.

15       Q.    That's a good point.  If anything I ask you

16  is not clear, go ahead and ask me to clarify.

17             When did you -- I guess when did you

18  permanently, if you have a point of time in your

19  mind, when you permanently moved back from India?

20       A.    That would have been the end of 2003.

21       Q.    Okay.

22       A.    I can't remember the exact date.

23       Q.    Can we hand her a copy of the -- of the

24  résumé, please.

25             So we are handing you a copy of what's been

Ashley Richardson
October 28, 2025

1    marked as Exhibit 136.

2              (Exhibit 136 was marked for identification.)

3        Q.   I believe this is your LinkedIn résumé; is

4    that correct?

5        A.   I have no idea what it is.

6        Q.   You have never seen this before?

7        A.   I -- I wasn't aware that I had a LinkedIn

8    résumé, so --

9        Q.   Well, this is you, correct?

10       A.   That's me, yes.

11       Q.   Okay.

12       A.   I just -- I don't know where you got this

13   from or where -- where it -- where I -- I uploaded

14   it from.

15       Q.   Sure.  So there's two pages.  So go ahead

16   and take a look at it.  Take a look at the second

17   page.

18       A.   Okay.

19       Q.   And so we got it off of LinkedIn.  So do

20   you -- you must have made a LinkedIn profile at some

21   point, correct?

22       A.   I -- I definitely made a LinkedIn profile

23   at some point.

24       Q.   And this LinkedIn in profile that we handed

25   you, which is Plaintiff's Exhibit 136, does that

Ashley Richardson
October 28, 2025

1    accurately describe your employment history?

2         A.    I -- I think it's -- I can't say with

3    certainty that the specifics are accurate.  I

4    believe that this is a snapshot of my employment

5    history, the basics of it.  Those are all positions

6    I have held, yes.

7         Q.    Okay.  And I -- you would have created this

8    LinkedIn -- excuse me.  Withdrawn.

9              You said previously that you did -- you do

10   remember creating a LinkedIn profile résumé, right?

11        A.    I do.  I do.

12        Q.    And it looks like this is it.  Would you

13   agree with me?

14        A.    It is.  And I would say that what is

15   inconsistent, because I didn't even realize it was

16   there, are the areas marked "Present," because I

17   have not been active on LinkedIn in for quite some

18   time, and the "Present" positions are not accurate.

19        Q.    Okay.  So let me run through a little bit

20   of this.

21              Can you just briefly walk me through the

22   jobs that you've had here, starting Irwin Naturals?

23        A.    Sure.  Irwin Naturals was the first job I

24   had when I came back from India.  It was a sales

25   position.  I started off as an inside sales rep and

Ashley Richardson
October 28, 2025

1    became the sales manager within the first six

2    months, because I was the top performer, and then I

3    became the VP of international sales.

4        Q.   And during your time at Irwin Naturals --

5    I'm not asking you to give me a specific dollar

6    figure, but approximately how much were you earning

7    per year?

8        A.   I would say between 60 and 120,000,

9    depending on the year that I was there.

10       Q.   Okay.  And then -- your next job is

11   Essential Living Foods.  Just briefly, what were you

12   doing there?

13       A.   I was overseeing the marketing and also the

14   sales teams, and I was helping with the new brand

15   creation of aligned products that were being taken

16   to market.

17       Q.   Okay.  And how big was that company,

18   Essential Living Foods?

19       A.   I could not tell you the size.  It was --

20   we had distribution throughout Whole Foods and, you

21   know, the national food sector.  So it wasn't mass

22   market, but it was -- it was substantial.

23       Q.   Okay.  And how much, approximately, were

24   you making per year there?

25       A.   I will say it was -- I think between 120

Ashley Richardson
October 28, 2025

1      and 150,000, but I can't tell you with certainty.

2      It's been so long.

3          Q.   Okay.  The next one listed here is

4      Cuculoris Films, from October of 2008 to May 2011,

5      marketing director.  What were you doing there?

6          A.   I was overseeing the -- I was mostly

7      working on new business for a commercial director,

8      and I was traveling to ad agencies and hearing new

9      businesses through clients like Ford Motors and

10     Sunny Delight and other -- other corporate clients.

11         Q.   Okay.  And what approximately were you

12     making at that job?

13         A.   That job, I was not making much.  I took it

14     because I wanted the opportunity to get into a

15     different sector.  And I believe I was making less

16     than 5,000 a month, but I cannot remember the

17     specific.

18         Q.   Okay.  And the next one is EQAL, director

19     of business development.  What was that?  And what

20     were you doing there?  I'm sorry.  Before you get to

21     that, I'll withdraw it.

22             Let me ask you one more question about

23     Cuculoris.  It looks like they're defunct now as far

24     as I can tell.  Is that company out of business?

25         A.   Yeah.  The person who ran the company

Ashley Richardson
October 28, 2025

1    passed away and, yeah, it no longer exists.

2         Q.   Sounds like it was a small company.  Is

3    that correct?

4         A.   I mean, it was -- it was small when we

5    weren't in production.  And when we were in

6    production, we obviously brought on a lot of

7    freelance employees, you know, production specific.

8         Q.   Okay.  The next one EQAL, director of

9    business development.  What were you doing there?

10        A.   EQAL, I was overseeing sales.  It was for a

11   company that was doing early-stage social media

12   marketing.  So primarily they were focused on

13   campaigns.  It was -- it was early days of social.

14   We were actually building social networks for

15   brands.  It was before we -- I think, people

16   realized everybody had to be on a social network.

17   So we would build out a specific social network,

18   like for Kraft or for a number of other brands.  And

19   I worked in -- you know, I worked directly with

20   clients.  Presentations, sales, and talent liaison.

21        Q.   Okay.  And how much, approximately, were

22   you making per year there?

23        A.   That, I took a pay cut for because I wanted

24   to get in the door.  It was just a little less than

25   six figures, but I can't tell you the exact number

Ashley Richardson
October 28, 2025

1    because I don't remember.  I just remember I took a

2    pay cut to do it.

3         Q.   Okay.  It looks like that company is out of

4    business too.  Is that right?

5         A.   Yeah, I think so.

6         Q.   Okay.  The next one is VP of brand

7    integrations, September 2013 to August 2014.

8              What were you doing there?  I'm sorry.  Let

9    me make sure I understand this.  Can you -- if you

10   look at it, is this --

11             (Simultaneous colloquy.)

12        A.   That's under theAudience.  Yes.

13        Q.   Okay.  So you were at theAudience, and it

14   looks like you started out as VP of brand

15   integrations for a year, 2013 to 2014, and then you

16   were an SVP.

17             Can you just describe very briefly what you

18   were doing there?

19        A.   Sure.  I was -- it was a similar type of

20   position.  I was overseeing the sales for primarily

21   the A-level clients.  So I -- I started off working

22   with all of the key accounts, and then I hired and

23   managed salespeople throughout the country.  So we

24   had key markets in New York, Chicago, San Francisco,

25   Los Angeles, and I would fly consistently to those

Ashley Richardson
October 28, 2025

1    markets to meet with clients.

2          We did integrated branded campaigns with

3    social media and celebrity, but we also were on the

4    early phase of the influencer movement.  So we -- we

5    would bring together a lot of young kids who were

6    on -- at the time Vine was popular and YouTube.  And

7    we would sort of cross-populate them to become, you

8    know, more popular --

9          Q.    Okay.

10         A.    -- through, you know, intersections.

11         Q.    And is that company no longer active?

12         A.    That's true.

13         Q.    Okay.  How much were you making,

14    approximately, per year while you were there?

15         A.    I was making between 250 and -- and 400,000

16    a year.

17         Q.    Okay.  And then it looks like you left that

18    to go do Roof Dog Digital Consulting, which you were

19    the owner, it looks like.

20         A.    Roof Dog was -- was more of a side gig for

21    me.  I was starting to do some side consulting

22    projects in the film and television industry,

23    primarily social media.  And so it wasn't full time.

24    It was just my own sort of, you know, side business.

25         Q.    Okay.  And how much did you make doing --

Ashley Richardson
October 28, 2025

```
 1    well, withdrawn.

 2              Are you still doing that?  It says to the

 3    present here.

 4         A.   It's -- I'm not.  That's incorrect.

 5         Q.   How long did you do Roof Dog Digital

 6    Consulting for?

 7         A.   On and off.  I would say -- I could not

 8    tell you specifically, but I began -- I do remember

 9    beginning it around 2012.  And it was very sporadic.

10    It wasn't consistent.

11         Q.   Okay.

12         A.   But it was like a umbrella under which I

13    could do, kind of, side consulting gigs and --

14         Q.   So during the times that you were working

15    through Roof Dog, how much, approximately, were you

16    making per year just on Roof Dog alone?

17         A.   Probably less than 20,000.

18         Q.   Okay.  And then the next thing on here is

19    InsUrgent Media where it says you were a partner

20    from September 2015 to present.

21              Is that accurate?  Are you still there or

22    --

23         A.   No, it's not.

24         Q.   Okay.  When did you stop being --

25              (Simultaneous colloquy.)
```

Ashley Richardson
October 28, 2025

1        A.    We shut down when the pandemic began.

2    Shortly after the pandemic began.

3        Q.    Okay.  So you were there from about 2015 to

4    end of 2019, beginning of 2020?

5        A.    No.  It would have been like April of 2020.

6        Q.    Okay.  And how much, approximately, were

7    you making per year there?

8        A.    I was making -- I think a base of 250 and,

9    you know, plus some additional.

10       Q.    Okay.

11       A.    And that's approximate.  I don't want to

12   lock into an absolute because I can't remember the

13   exact number, but it was roughly 250.

14       Q.    Okay.  And then the last one is -- excuse

15   me -- Cypress Peak Productions, where it says you

16   were partner.  And that was from June 2020 to when?

17       A.    I would say it's -- it's very vague.  This

18   was -- so Cypress Peak Productions is my

19   ex-partner's production company.  And during the

20   pandemic, I began to help and -- you know, managing

21   talent.  And we started to try to, you know, get

22   creative in bringing on new business.  So I would

23   say it's hard to quantify what the end date would

24   have been because I always helped, you know, where I

25   could, but it was very limited.  I would say 2020 to

Ashley Richardson
October 28, 2025

1    2021 would have been the majority of, you know, the

2    help I -- I provided.

3         Q.   Okay.  And while you were there,

4    approximately how much were you making per year?

5         A.   I did not make much.  I contributed a lot

6    to the company.  Like I said, it was a -- my partner

7    was a sole proprietor, and I think I made less than

8    six figures.

9         Q.   Okay.

10        A.   But it was full-time.  I took it on as a

11   full-time commitment from, I would say, May 2020 --

12   and this is an approximate -- until about -- until

13   the time -- right about the time I started, you

14   know, helping Taylor with everything.

15        Q.   Okay.  And just briefly, what did Cypress

16   Peak Productions do?

17        A.   Their primary business is photo shoot

18   production and commercial production -- both

19   commercial but, you know, still photos and moving

20   picture.

21        Q.   Okay.  Did you file tax returns for all the

22   years that we talked about here with these different

23   jobs?

24        A.   Not the -- not the latest one.  Not the

25   last -- Cypress Peak.  But the others, yes.

Ashley Richardson
October 28, 2025

```
 1        Q.   Okay.  Why didn't you file tax returns when
 2   you were at Cypress Peak?  You didn't --
 3        A.   It just -- it just didn't help.  Like,
 4   I'm -- I just haven't finished all of my taxes.  I
 5   think most of the Cypress Peak -- 2020 was filed but
 6   not 2021.
 7        Q.   Okay.  So the -- is that -- the last year
 8   that you filed taxes is 2020?
 9        A.   I have not had income since then.  So,
10   yeah, that's correct.  I will file this year, and I
11   will file for those other -- but I haven't been
12   receiving and -- I haven't been making money.
13        Q.   Okay.  And so that's why you didn't file
14   income tax returns for '21 through whenever, is
15   because there was -- there wasn't sufficient income
16   to require you to file a tax return?
17        A.   That's correct.  And also, I just -- it was
18   2022.  It's that, and just life, I think, you know,
19   became a little bit unmanageable.
20        Q.   Is the -- is the IRS aware that you haven't
21   filed taxes?
22        A.   Yes, I have talked to them.  I'm in the
23   process of filing.
24        Q.   Okay.  What -- what'd you do to prepare for
25   your deposition today?
```

Ashley Richardson
October 28, 2025

```
1          A.   I mean, I did a lot of -- I did a lot of
2     TikTok videos.  You'd be surprised.  There's some
3     good stuff on TikTok --
4          Q.   Okay.
5          A.   -- YouTube.  And, you know, I talked to
6     some friends who've been deposed.
7          Q.   Okay.  Any of them lawyers?
8          A.   Any of the lawyers that I spoke to would be
9     lawyers that are my lawyers.  So I would consider
10    that privileged, and I would object to answering
11    that question.
12         Q.   How many lawyers do you have?
13         A.   I have two lawyers and -- actually, that's
14    not true.  Three.
15         Q.   What are the names of your lawyers?
16         A.   You are aware.  Nick Gravante is one.
17         Q.   Okay.
18         A.   And in a -- completely unrelated matters,
19    Leigh Rodriguez.
20         Q.   Okay.  And what unrelated -- so he doesn't
21    represent you in this matter?
22         A.   No, no.
23         Q.   What other matters does he represent you
24    in?
25         A.   Just -- just the estate matters.  He's a --
```

Ashley Richardson
October 28, 2025

```
 1   he's a local Monterey County lawyer.  He's only been

 2   helping me with -- since, I want to say, September

 3   or the end of August.  I can't give you an exact

 4   date, but recent.

 5        Q.   Okay.  And who is the third, I think you

 6   said?

 7        A.   Philip Kaplan.

 8        Q.   Okay.  And who is Philip Kaplan?

 9        A.   He is someone who's represented me in the

10   past, and I did not talk to him about this

11   deposition.  But that would be privileged if I had.

12        Q.   If -- okay.  Maybe.  What did Philip Kaplan

13   represent you on in the past?

14        A.   He represented me on an employment suit

15   against theAudience.

16        Q.   Okay.  And what was the basis for that

17   employment suit?  What was the issue?

18        A.   The issue was I was not paid fairly for

19   a -- when we sold the company.

20        Q.   So when you say "we sold the company,"

21   were -- did you have part ownership in theAudience?

22        A.   No -- well, I had a stake in theAudience.

23        Q.   Okay.  And what was the amount and

24   controversy?  How much were you saying theAudience

25   should have paid you more?
```

Ashley Richardson
October 28, 2025

1        A.   I cannot remember the specifics of that

2    case.  It's been a while, so I -- to have to -- I

3    don't see how it's relevant to this matter.

4        Q.   Well, several ways.  So you've put your

5    finances at issue, right?  You've said that you are

6    destitute now because of the claims that you made.

7        A.   Yes.

8        Q.   So your finances are at issue.  And my next

9    question is did you get deposed in that case?  Have

10   you been deposed previously?

11       A.   No, no.

12       Q.   Have you ever been deposed before?

13       A.   I -- I want to qualify this.  I do not

14   believe I did.  I was -- I was in a small traffic

15   collision.  I cannot tell you the exact year, but it

16   would have been -- it would have been between 2005,

17   I think, and 2007.  I went to an office with

18   lawyers.  And before it started, they looked at

19   pictures, I believe, of the car, and then they ended

20   up not questioning me.  So I don't think that I was

21   sworn in.  I don't -- but I can't remember exactly.

22   I just know I went to -- I think it was to be

23   deposed, and then it stopped out of the gate, and I

24   wasn't questioned.

25       Q.   Okay.  So now back to my original question,

Ashley Richardson
October 28, 2025

```
 1    which is who did you -- so who did you consult with
 2    or talk to about preparing for your deposition
 3    today?
 4         A.   I just answered that question.
 5         Q.   Well, you said you -- we got on a different
 6    track.  You said you had three attorneys.  So now
 7    I'm just going back to the original question.  So if
 8    I'm understanding, then -- so you talked to
 9    Mr. Gravante about the deposition today?
10         A.   I didn't say that.  My --
11              (Simultaneous colloquy.)
12         Q.   Withdrawn.  Let me just ask you the
13    question again.  You can answer --
14         A.   Yes.
15         Q.   -- however you think is correct.  Who did
16    you talk to to prepare for the deposition today?
17         A.   And -- and as I said, asked and answered.
18    I object to that question.  I just told you I talked
19    to several friends who have been deposed in the
20    past.  And as it relates to counsel, that
21    information is privileged.  I did the majority of my
22    deposition prep based off of publicly available
23    materials.
24         Q.   Okay.  So who were the friends that you
25    talked to about your deposition today?
```

Ashley Richardson
October 28, 2025

1          A.    I talked to a woman named Eydie Saleah.

2          Q.    Okay.  And who is she?

3          A.    She is a friend who lives in New York City

4    who was in a major accident once upon a time and was

5    deposed.

6          Q.    Okay.  Who else?

7          A.    I can't tell you with certainty because

8    I'm -- honestly can't think -- I haven't really -- I

9    talked very briefly with my mother about it, who was

10   a paralegal.

11         Q.    Okay.

12         A.    But it was very brief.

13         Q.    So did you talk to any attorneys about your

14   deposition today?

15         A.    I believe that is privileged.

16         Q.    Well, it's not privileged.  I'm not asking

17   you the substance of any communications you had, and

18   I'll never ask you about the substance of any

19   communications you had with any lawyer that is

20   representing you on this case.  But the first step

21   is I'm asking you if you consulted with any lawyers

22   about your deposition today.  I'm not asking you the

23   substance of any potential conversations, just

24   whether you consulted with any lawyers.

25         A.    Yes.

Ashley Richardson
October 28, 2025

```
 1        Q.   Okay.  Which lawyers did you consult with
 2   about your deposition today?
 3        A.   I -- I consulted with -- very briefly with
 4   Nick Gravante.
 5        Q.   Okay.  Any other attorneys?
 6        A.   No.
 7        Q.   Okay.  Did you review documents before
 8   coming to the deposition today?
 9        A.   I -- I attempted to with the time that was
10   available to me, but I've -- I don't think I went
11   through everything.  I went through as much as I
12   could.
13        Q.   Okay.  And you have, it looks like, spent a
14   lot of time on filings in this case, correct?
15        A.   That is correct.
16        Q.   Okay.  And you -- when you made filings in
17   this case, like your answer and your counterclaims
18   and your answers to interrogatories, I assume you
19   were trying to be as accurate as you could be.  Is
20   that right?
21        A.   I -- I hope so.
22        Q.   Okay.  And I assume that you were trying to
23   be as thorough as you could be in your answers,
24   correct?
25        A.   I'm not a lawyer, so I -- I'm doing the
```

Ashley Richardson
October 28, 2025

1    best of my ability through -- through research

2    and -- and through what I can gather.  But -- but I

3    put my best effort forward.

4         Q.   Right.  And it's not really a

5    lawyer-related question.  The question is you tried

6    to be as thorough as possible in the filings that

7    you have made in this case, correct?

8         A.   I -- I guess I'm not understanding what you

9    mean by "thorough" because -- because I don't know,

10   like, what -- what that means.  I mean, I'm sure

11   there's areas where I missed things and where I

12   could have been probably more thorough or I could

13   have done a better job.  But I -- I'm not sure I

14   understand the question.

15        Q.   Well, the question is you tried to be as

16   thorough as you could be, correct?

17        A.   I have a hard time answering this question

18   simply because I feel like it's completely

19   subjective, and there could always be a way that

20   somebody could be more thorough.

21        Q.   But we are not talking about somebody else.

22   We are talking about you when you were putting your

23   answers together and filings together in this case.

24   I assume -- it's really not a trick question.

25        A.   Yeah.

Ashley Richardson
October 28, 2025

```
 1        Q.   I assume you tried to be as thorough as you
 2   could be.  Or did you not try to be as thorough as
 3   you could be?
 4        A.   I put my best effort forward, yes.
 5        Q.   Okay.  And I assume you tried to be as
 6   accurate as -- as you could be in the -- all of the
 7   filings that you have made in this case?
 8        A.   That is correct.  I don't think that I
 9   always -- you know, I think that there was a lot of
10   room for improvement because oftentimes the time
11   constraints or my limited understanding -- but I --
12   I gave it my best.
13        Q.   Okay.  And some of the filings that you
14   have made in this case have been filed under oath,
15   right, and signed by you.  So I assume you
16   understand the importance of filing things under
17   oath, correct?
18        A.   I -- I think I do.
19        Q.   Okay.  And so you understand the importance
20   of being as accurate as possible when you file
21   things, particularly when it's under oath and signed
22   by you, correct?
23        A.   Yes.
24        Q.   Okay.  Let me turn now to -- you have -- I
25   want to talk about your counterclaims for a second.
```

Ashley Richardson
October 28, 2025

1    So you have -- you have propounded two different

2    types of counterclaims, right?  The defamation

3    counterclaim and an intentional infliction of

4    emotional distress, right?

5         A.    That's correct.

6         Q.    Okay.  On the defamation counterclaim, can

7    you please tell us what you allege to be the

8    specific defamatory statements that Ms. Thomson made

9    that have defamed you.

10        A.    I will try to be as thorough as possible,

11   but I want to preface this by saying I -- this is --

12   you know, won't include everything and, you know, to

13   the best of my knowledge and ability and also the

14   pressure of this moment to answer it thoroughly.

15   Top of mind are the allegations, you know, very

16   simply, directly in the lawsuit that were spoken

17   about to people in shared circles -- social circles,

18   professional circles, as alleged.  So that one is

19   very easy to quantify because all of those

20   allegations are documented.

21            And I have already -- I have already given

22   my position that I deny those allegations, for the

23   most part, as being false; that -- further to the

24   allegations that are in the lawsuit themselves, that

25   I'm a grifter, that I defrauded her, that she had no

Ashley Richardson
October 28, 2025

1   understanding of a potential finder's fee, that

2   there were secret kickbacks -- essentially, all of

3   these allegations that I did anything untoward in

4   relation to her investing in Persistence.

5       Q.   Okay.  But those are the allegations that

6   the plaintiff in the case has made against you.

7       A.   Right.

8       Q.   And I understand that you are denying

9   those.  What I'm asking is you have also made

10  allegations back against Ms. Thomson, correct --

11      A.   Yes.

12      Q.   -- for defamation and intentional

13  infliction of emotional distress?

14      A.   Yes.

15      Q.   So for the defamation claim, what are the

16  actual statements that you say that Ms. Thomson made

17  about you that were publicized that were defamatory

18  and defamed you or hurt you in a negative way?  What

19  are the actual statements?

20      A.   Can you clarify if the question is relating

21  to publications specifically or -- because this

22  is -- I feel like it's a compound question, and I

23  want to -- I want to answer it correctly.  And if

24  it's -- if it's --

25      Q.   Sure.  So I'll rephrase it.

Ashley Richardson
October 28, 2025

1          A.    Thank you.

2          Q.    What are the -- what are the statements

3     that you allege that Ms. Thomson made that are

4     defamatory?

5          A.    I can't say with certainty the exact

6     statement.  I can say the substance of the

7     statement, but I -- I don't want to be called to

8     speculate because I wasn't there physically with

9     her.  So I do feel like this is causing for

10    speculation.  Could you maybe rephrase the question

11    in a way that I can answer it without potentially

12    coming -- you know, I don't want to say something --

13    because that's a specific question.

14         Q.    Sure.  I mean, it's pretty clear,

15    Ms. Richardson, and you know it's pretty clear.  And

16    you know you have been trying to avoid answering

17    this question for a year.  So the question is pretty

18    basic.  You allege that Ms. Thomson defamed you by

19    making statements that were defamatory against you

20    and hurt you negatively, correct?

21         A.    Yes, yes, that's correct.

22         Q.    Okay.  What are they?  What are the

23    statements that you allege that Ms. Thomson made?

24         A.    Is there a way to rephrase the question so

25    that it's not specific?  Like, I -- I can give you,

Ashley Richardson
October 28, 2025

```
1    basically, the -- the areas of focus, the -- the

2    meaning.  But are you asking for verbatim

3    statements?  I just want to clarify on the question.

4         Q.   I'm asking for your best understanding or

5    best knowledge --

6         A.   Okay.

7         Q.   -- of what these vaguely alleged defamatory

8    statements are.  It's your burden -- I hope you

9    understand this.  It's your burden when you make an

10   allegation to give supporting evidence for that

11   allegation.

12        A.   Absolutely.

13        Q.   So all we are asking you -- all I'm asking

14   you is what are the statements?

15        A.   I understand.  I'm just trying to make sure

16   that I'm not put in a position where I'm saying

17   something that can be used against me because of a

18   technicality.  So when you say "statements," like --

19   and I don't have something that shows the exact

20   words, if that would be an issue.  So if you -- if

21   you are saying to me that I am answering this

22   question to the best of my understanding, with the

23   knowledge that these are not direct quotes -- is

24   that correct?

25        Q.   I don't know what you know, but I'm asking
```

Ashley Richardson
October 28, 2025

1    you:  What's your best knowledge?  What do you know

2    about any potentially or allegedly defamatory

3    statements?

4         A.   Okay.

5         Q.   That's it.  It's pretty simple.

6         A.   I know that -- I know that Taylor alleges

7    that she knew nothing about there being any kind of

8    finder's fee.  I know that Taylor has alleged

9    that -- and this -- I want to -- I want to preface

10   this by saying this is to the best of my memory and

11   not a complete list -- that I -- that I had ill

12   intentions throughout our friendship; that I was

13   trying to take advantage of my best friend who had

14   cancer; that I did anything untoward throughout the

15   trading process that wasn't trying to help her; that

16   I lied or stole -- was a thief, was a grifter.

17        These are very substantial allegations that

18   imply extreme malice and, you know, like, ill intent

19   from my part.  And -- and to tell people that -- not

20   just this action that happened within this specific

21   time frame but that there was this whole lead-up

22   throughout our friendship of more than a decade

23   is -- is very harmful to me, to my -- to my standing

24   professionally, to my standing in our social

25   circles.  I know that she said -- I know that she

Ashley Richardson
October 28, 2025

1    said that -- sorry.  I just need a second to collect

2    my thoughts.

3         Q.   Let me ask you this, Ms. Richardson.  So

4    almost everything you've recounted so far is just

5    regurgitating Ms. Thomson's allegations in this

6    case.  Yes, most of the things you have talked

7    about -- in answers to the same repeated question

8    that I have asked you today, you are just

9    regurgitating what Ms. Thomson's allegations are in

10   the litigation.  Is that what we are talking about?

11   Are you -- do you allege that the allegation that

12   Ms. Thomson makes in the lawsuit are the defamatory

13   statements you are talking about?  Is that -- is

14   that what we are talking --

15        A.   No.

16        Q.   Okay.

17        A.   But that is part of it.

18        Q.   Then what are -- then what are the

19   defamatory statements?  So in order to carry a claim

20   for defamation, you need to say that someone made a

21   specific statement on a relatively specific day.

22   You have to tell the substance of the statement, who

23   the statement was made to, and why it's defamatory.

24        A.   These statements have been going on for

25   years -- continue to -- as well as in the past three

Ashley Richardson
October 28, 2025

```
 1    months -- six months to press outlets; to, you know,

 2    third parties.  So this is not a -- this is not

 3    something that happened in a single time frame.

 4    Defamation is not quantified by a single actual

 5    statement.  My testimony is evidence.  My lived

 6    experience and loss of professional opportunities

 7    and an entire social circle, including the

 8    relationship I had with her daughter, is -- is the

 9    evidence.  And I can go into the specifics that I

10    know.  But to say that --

11        Q.    That's fine.  What specifics do you know?

12    What specific statements do you have information on

13    that Ms. Thomson made to anyone that you allege were

14    defamatory to you?

15        A.    I just told you a couple of big ones.

16        Q.    You didn't tell us any specific statements.

17    You made -- you made general allegations.

18        A.    Okay.

19        Q.    You didn't say any specific statements.

20        A.    Specifically, she said that I took

21    advantage of our friend who had cancer, which is the

22    opposite of the truth.  She also said that I am a

23    grifter.  I don't know how that could be seen as

24    anything other than defamatory.  She said that she

25    should have suspected ill intent from my side all
```

Ashley Richardson
October 28, 2025

```
 1   along; that looking back, there were signs.  And it
 2   is highly relevant that she has accused me of theft
 3   and fraud outside of this lawsuit and disseminated
 4   that information, which I am saying is false.
 5        Q.   Okay.  So let me walk through those.  You
 6   are saying that Ms. Thomson made a statement that
 7   you took advantage of Beau when Beau had cancer?
 8        A.   That's correct.
 9        Q.   Okay.  Who are you alleging that
10   Ms. Thomson made that statement to?
11        A.   Mutual friends of ours.
12        Q.   Okay.  Which mutual friends?
13        A.   I believe Ron Murphy, Kevin -- I can't
14   think of his last name -- Madeleine Thomson, Rand
15   Rusher.  Probably others, including -- but, you
16   know, I'm -- those -- those are the ones that I
17   believe, you know, are the core because that was our
18   shared -- you know, our shared social circle.
19        Q.   Okay.  So you are really just making a list
20   of Taylor Thomson's friends right now, correct?
21        A.   No.
22        Q.   Okay.  Have you talked to Ron Murphy, and
23   did he tell you about any allegedly defamatory
24   statements that Taylor Thomson made to you -- made
25   about you?
```

Ashley Richardson
October 28, 2025

1        A.   I have not talked to him directly, no.

2        Q.   So how do you know as you sit here today

3    that Taylor Thomson made defamatory statements to

4    Ron Murphy about you?

5        A.   Well, I know that because Ron Murphy was

6    one of my closest friends.  And there's no way that

7    he would have cut off all contact if Taylor had not.

8        Q.   Okay.  But Ron Murphy has never told you, I

9    take it, that Taylor Thomson made any defamatory

10   statements to him about you.  Is that correct?

11       A.   Not directly.

12       Q.   How -- how -- did he do it indirectly?

13       A.   No.

14       Q.   Okay.  Okay.  Kevin -- I think it's

15   Fitzgerald, you said -- is the next person?

16       A.   Yes, I believe that's correct.

17       Q.   Okay.  Have you talked to Kevin --

18   withdrawn.

19            Has Kevin Fitzgerald told you that Taylor

20   Thomson made defamatory statements about you to him?

21       A.   No.

22       Q.   Madeleine Thomson.  Has Madeleine Thomson

23   told you that Taylor Thomson made defamatory

24   statements about you to her?

25       A.   Indirectly, yes.

Ashley Richardson
October 28, 2025

1       Q.   How did she do that indirectly?

2       A.   She texted me, in our last text exchange

3   that we had, that she was upset with me because what

4   I had done to mother, and we had a heated exchange

5   where I -- around that.  And that was not anything

6   that came from me and it wasn't anything that came

7   from Madeleine's own understanding so that would

8   have come from Taylor.

9       Q.   It would have come from Taylor.  So you are

10  -- you are guessing that Taylor made a defamatory

11  statement --

12      A.   It had to have come from Taylor.

13      Q.   Why did it have to have come from Taylor?

14      A.   Because I know the structure of those

15  relationships intimately, and there's no other way

16  that Madeleine -- and the intense closeness that I

17  had with Madeleine for over a decade.

18      Q.   Okay.  But just so we are clear, Madeleine

19  Thomson has never told you directly that Taylor

20  Thomson made a defamatory statement about you to

21  Madeleine?

22      A.   I would say indirectly it was -- it was

23  clear that defamatory statements had been made based

24  on the history of our relationship and the way that

25  things took a turn.

Ashley Richardson
October 28, 2025

1      Q.   Okay.  But you are not aware of any

2  specific defamatory statement?  You are sort of

3  guessing from the circumstances; is that correct?

4      A.   I'm aware because they had to do with

5  everything that led up to the lawsuit and the

6  allegations.

7      Q.   I don't even know what that means:  "They

8  had to do with everything."  What does that mean?

9      A.   Can you rephrase the question?

10     Q.   You said that the -- you've said that

11  Madeleine Thomson told you indirectly and you

12  extrapolated or insinuated from the circumstances

13  and your past knowledge of the history of your

14  relationships that Taylor Thomson, you think, must

15  have probably made a defamatory to Madeleine; is

16  that correct?

17     A.   That's not what I said, no.

18     Q.   Well, you agree -- you agree with me that

19  you said you don't know of any defamatory statement

20  that -- any specific defamatory statement that

21  Taylor Thomson made to Madeleine Thomson, correct?

22     A.   Based on -- based on the extreme closeness

23  and the nature of our relationships, I know without

24  a shadow of a doubt that defamatory statements were

25  made about me from Taylor Thomson to Madeleine

Ashley Richardson
October 28, 2025

1    Thomson and that those statements would reveal

2    themselves if the production that I requested was

3    actually produced.

4        Q.   Okay.  So if you know without a shadow of a

5    doubt, what were the statements?

6        A.   The statements include that I defrauded

7    Taylor and it -- we are not talking -- I don't know

8    the specific statements.  That's not how defamation

9    is quantified.  Defamation is quantified by the

10   impact to the individual and the general

11   understanding.

12       Q.   That's not at all what defamation is, to

13   begin with.

14       A.   There are --

15       Q.   Secondly, we are not talking about

16   quantification yet.  I'll get there.

17            We are talking about what the actual

18   defamatory statements are.  You realize I'm not

19   asking about quantification, like how much you think

20   you should get for a defamatory statement.  We are

21   talking about the fact that you don't appear to have

22   any evidence of any defamatory statements of any

23   specific defamatory statements.  That's what I'm

24   trying to get at.

25       A.   I disagree.

Ashley Richardson
October 28, 2025

1    Q.   What you have said about Madeleine is you

2  extrapolated indirectly from a text message that

3  Madeleine sent you; is that correct?

4    A.   No.

5    Q.   Okay.  Then tell me what was the statement

6  that Madeleine Thomson told you that Taylor Thomson

7  made to her that was defamatory about you.

8    A.   I can't --

9    Q.   What did Madeleine Thomson tell you?

10   A.   I can't recall.  This was a text message

11  that was sent several years ago.  So I would have to

12  go back and check, but I -- I know that there were

13  several things that were stated.  I -- I can't

14  recall that.

15   Q.   Okay.  Is -- have you produced that text

16  message in this litigation?

17   A.   I can't remember if I did or not.  It was

18  on my list of things to put in the folder, but I was

19  pulling hundreds of -- of text messages and

20  documents.

21   Q.   Okay.  So we have talked about Ron -- you

22  listed Ron, Kevin, Madeleine, Rand Rusher.

23        Has Rand Rusher told you that Taylor

24  Thomson made a specific defamatory statement to him

25  about you?

Ashley Richardson
October 28, 2025

1      A.    I cannot recall.

2      Q.    Okay.  And you said there's probably

3   others, but you don't know that there are any

4   others, correct?

5      A.    I do know that there are others.

6      Q.    Okay.  Who -- who else is there that you

7   allege, to support your allegations in this lawsuit,

8   that Taylor Thomson made a defamatory statement

9   about you?  Who else?

10     A.    I've said repeatedly that, due to the

11   nature of Ms. Thomson's wealth and her retaliatory

12   nature, there are certain people that I'm

13   uncomfortable naming, and that I would consider

14   doing it under seal but with protection.

15         One person specifically who I did a lot of

16   work with and who was a very close mutual friend,

17   although she was much closer with me, and that's

18   Catherine Hardwicke.

19     Q.    Okay.  And what did -- what do you allege

20   that Taylor Thomson said to Catherine Hardwicke that

21   was defamatory to you?  Withdrawn.

22         What -- have you talked to Catherine

23   Hardwicke and has Catherine Hardwicke told you about

24   any specific defamatory statement that Taylor

25   Thomson made to her about you?

Ashley Richardson
October 28, 2025

```
 1        A.    Yes.

 2        Q.    Okay.  What was the statement?

 3        A.    I can't recall the specific statement, but

 4   it involved that I committed fraud and theft.

 5        Q.    Okay.  When did you have this conversation

 6   with Cat Hardwicke?

 7        A.    I can't tell you exactly, but it would have

 8   been about a year ago probably.  Maybe more -- maybe

 9   a little bit more.  Within the last two years.

10        Q.    Was it before or after this litigation

11   started?

12        A.    After.

13        Q.    Okay.  How long after?

14        A.    No, actually -- probably right at the

15   beginning.

16        Q.    What do you mean by "the beginning"?

17   Before the original complaint was filed?

18        A.    I think it was probably before my complaint

19   was filed, but your complaint was filed.

20        Q.    So it was --

21        A.    I can't -- I can't tell you with certainty.

22        Q.    Okay.

23        A.    I don't even want to speculate, because I

24   -- I know the conversation -- the conversation

25   happened after the market crashed.  That, I can tell
```

Ashley Richardson
October 28, 2025

1    you with certainty.

2        Q.   Which -- which market crashes are you

3    talking about?

4        A.   The crypto market crash of 2021 -- 2020 --

5    sorry -- '22.

6        Q.   When -- when in 2022 was that?

7        A.   The market crash?

8        Q.   Mm-hmm.

9        A.   The -- the substantial crash occurred

10   between, I would say, January and May of 2022, but

11   the -- the largest, I think, specific major part of

12   the crash would have been between, I think, March

13   and May.  I would have to look.  I can't tell you

14   with certainty.

15       Q.   Okay.

16       A.   I know that it happened throughout 2022.

17       Q.   And how did you come to that conversation

18   with Cat Hardwicke?

19       A.   I had not heard from her.  She had not been

20   responding to me, which was very unlike her.  We

21   were very close.  And then when I heard from her,

22   she told me that.

23       Q.   How did you hear from her?  If she hadn't

24   been responding, how did you hear from her?

25       A.   I believe that I texted her, and I said I

Ashley Richardson
October 28, 2025

```
1    was having a really hard time.  And I think she felt
2    for me.  And then that was the last time I followed
3    up with her since then and didn't hear from her.
4         Q.   Okay.  And did you talk in person?  On the
5    phone?  How did you talk?
6         A.   It was over the phone.
7         Q.   It was on the phone.  And what was the
8    phone number that you were using to make that call?
9         A.   I can't tell you with certainty, but I
10   think that it would have been my regular phone
11   number.
12        Q.   And what is that?
13        A.   (310)490-2476.
14        Q.   How long have you had that phone number?
15        A.   I've had it for a long time.
16        Q.   Okay.  Do you have any other phone numbers?
17   Any other cell phones?
18        A.   I did briefly.
19        Q.   When was that?
20        A.   It was -- it was during the -- I don't know
21   when it would have been exactly.  So I -- I would
22   say, roughly, I think, between 2022 and '24.
23        Q.   You said you had it briefly, but how long
24   did you have that cell phone for?
25        A.   I don't know exactly.  I would say there
```

Ashley Richardson
October 28, 2025

1   was like a few months.  It was -- it was a second

2   phone number.  Because I had reason to believe that

3   Taylor was listening to my devices, so I got a

4   second phone.

5       Q.   And -- we can come back to that.  Why did

6   you stop -- how long did you use that second phone

7   for?

8       A.   Briefly.

9       Q.   How brief?

10      A.   I don't know.  It would have been months,

11  because I think it was like maybe a few months.  And

12  then I didn't -- you know, I let it lapse.  It was

13  like a -- kind of one of those pay-as-you-go.

14      Q.   Okay.  And what was the phone number on

15  that phone?

16      A.   No idea.

17      Q.   Do you have records of that -- for that

18  phone anywhere?

19      A.   Not that I know of, but I might.

20      Q.   Okay.  We'll send you a follow-up letter

21  after this, but we are going to ask for you to turn

22  your cell phone records over.

23      A.   Okay.

24      Q.   What carrier did you use for these two

25  phones?

Ashley Richardson
October 28, 2025

1      A.   I believe -- I don't -- I didn't handle the

2   phone bill because I was on a family plan, but I

3   think it was Verizon.  I know at one point we were

4   on AT&T.  So it was either/or, like, at each time.

5      Q.   Okay.  So Cat Hardwicke.  And what -- what

6   did Cat Hardwicke -- what do you say that Cat

7   Hardwicke told you specifically about this

8   defamatory statement that you say Taylor Thomson

9   made about you?  What did Cat Hardwicke tell you

10  exactly?

11     A.   I -- I object to the question, because I

12  couldn't tell you anything anybody told me over the

13  phone that long ago exactly.

14     Q.   Okay.  Have you talked to Cat Hardwicke

15  since that conversation?

16     A.   No.

17     Q.   Have you communicated with her at all since

18  that conversation?

19     A.   No.

20     Q.   Okay.  You said there may be others that

21  might know about defamatory statements.  Who -- who

22  else could potentially know about defamatory

23  statements related to this case?

24     A.   Shiro Gutzie, Offer Waterman.

25     Q.   Let me rephrase or ask a different

Ashley Richardson
October 28, 2025

1    question.  It sounds like, again, you are just

2    listing names of people that Taylor Thomson knows

3    and you are assuming that Taylor Thomson made

4    defamatory statements about.  Is that correct?

5         A.    No.

6         Q.    Okay.  So what my question is -- what are

7    the specific defamatory statements that you are

8    alleging in this litigation Taylor Thomson made

9    about you?  So if you have names of people who you

10   are alleging Taylor Thomson made specific defamatory

11   statements to, I'm -- that's my question.  My

12   question is not who are Taylor Thomson's list of

13   friends that you think might have heard something

14   bad.

15        A.    I'm not sure that I understand what it is

16   that you are asking for.

17        Q.    I think you do.  I think you are very clear

18   about what I'm asking for because we have been

19   asking for it for a year leading up to this

20   deposition.  But the question is pretty simple:

21   What specific defamatory statements do you allege

22   that Taylor Thomson made about you?

23        A.    I would say objection.  Asked and answered.

24   I answered that question previously.

25        Q.    Okay.  Joe, do you want to ask some of the

Ashley Richardson
October 28, 2025

```
 1    crypto-related questions?

 2       EXAMINATION BY MR. EVANS, COUNSEL FOR PLAINTIFF

 3              MR. EVANS:

 4       Q.   Hi, Ms. Richardson.  Good afternoon.  Can

 5    you hear me okay?

 6       A.   Yeah, I can.  Thanks.

 7       Q.   All right.  I'm going to ask some questions

 8    that focus primarily on the crypto activities.  Did

 9    you ever receive any payments from Persistence?

10       A.   I did not receive a payment from

11    Persistence, no -- I mean, well --

12              (Simultaneous colloquy.)

13       A.   Hold on.  Let me rephrase the question.  I

14    don't want to box myself in in a way that you can

15    take later out of context.  So I would say that, as

16    is well documented, there were tokens set aside.

17    There was no monetary payment ever made.  There was

18    an allocated amount of tokens at the time of

19    purchasing that were set aside.  I don't consider

20    that to be a payment because it wasn't realized, and

21    there was no payment in currency of any form.  But

22    there was an allocation of tokens that were set

23    aside.

24       Q.   So when you are talking about "tokens," we

25    are referring to XPRT.  Is that right?
```

Ashley Richardson
October 28, 2025

1       A.    That's correct.

2       Q.    So let's not get hang up on -- let's not

3   get hung up on the word "payment."  But there were

4   XPRT tokens transferred from Persistence to a wallet

5   that you controlled.  Is that right?

6       A.    I wouldn't say that I controlled it.  It

7   was, you know, one of the wallets amongst all the

8   wallets.

9       Q.    At the time you received the XPRT, did

10  anyone else have control of the wallet?

11      A.    Taylor would have had access to it with the

12  keys that were provided to her.

13      Q.    Didn't you have the keys at the time that

14  you received the transfer of the XPRT?

15      A.    I also did, yes.

16      Q.    Okay.  So let's just go through a couple of

17  the -- a couple of the more specific transactions.

18  Persistence paid you for bringing investors to it.

19  Isn't that right?

20      A.    No, that's not correct.

21      Q.    Okay.  And there was a specific percentage

22  of the investment of an investor you introduced that

23  was going to be sent to you in XPRT.  Isn't that

24  right?

25      A.    I -- I object to the question because

Ashley Richardson
October 28, 2025

```
 1    it's -- it's speculative, and it also calls for

 2    facts not in evidence.

 3         Q.   I'm not sure what the objection is.  And to

 4    be clear, Ms. Richardson, at a deposition, you can

 5    only object on the basis of privilege, not on the

 6    basis of the other things that you are referring to,

 7    like speculation, facts not in evidence.  Those are

 8    not valid objections at a deposition.  But let's

 9    just make it simple.

10         A.   Objection to form is a valid objection at a

11    deposition and --

12         Q.   You can object to -- you can object to

13    form, and then you must answer the question.  But

14    let's not get hung up on it.  Let's just get to

15    the -- let's just get to the facts.  So let's pull

16    up the first text message, please, from Tushar to

17    Ashley.  Who is Tushar Aggarwal?

18         A.   I'm sure there are many Tushar Aggarwals.

19    The Tushar Aggarwal in question, I believe, is

20    the -- I don't know what his exact title was, but he

21    was a senior representative at Persistence

22    Technologies.  I can't see the screen, just FYI.

23         Q.   Oh, okay.

24         A.   There's just a really big glare.

25              (Simultaneous colloquy.)
```

Ashley Richardson
October 28, 2025

1            MR. HARRISON:  There's a glare, so I'm
2     going to close the blinds and then --
3            MR. EVANS:  Okay.
4            THE WITNESS:  If you have a -- I don't know
5     if you have a written -- print copy.  That might be
6     better.
7            MR. EVANS:
8       Q.   It's only a couple of lines.  I think we'll
9     just pull it up big.
10           Go to page 16, Campbell, please.
11      A.   You would have to go a lot -- my eyes are
12    not great, so you'd have to go a lot bigger than
13    that.  But if you have a printed copy, that might be
14    better.
15      Q.   Josh, it is tab 125.
16      A.   Thank you.
17      Q.   Page 16, Josh.
18           MR. YIM:  Okay.
19           THE WITNESS:  Okay.  I have a copy.
20           MR. EVANS:
21      Q.   Okay.  Great.  And so I would like to
22    direct your attention to the text under 348.  It
23    says:  "To clarify, per my discussion with her, she
24    will be receiving a rate of five per XPRT.  And the
25    remainder, I believe 1.1 percent, is going as a

Ashley Richardson
October 28, 2025

1    finder's fee to be a separate wallet to be vested

2    with her amount."  Do you see that?

3         A.    I see that, yes.

4         Q.    Okay.  That 1.1 percent finder's fee, that

5    was for you, wasn't it?

6         A.    That was -- that was not quantifiable.

7         Q.    I'm sorry.  Can you repeat yourself.

8         A.    That -- that wasn't -- that was never a --

9    certain that it was going to go to me.

10        Q.    It was never certain that it was going to

11   go to you?  Is that what you said?

12        A.    That's correct.

13        Q.    When Ms. Thomson made her investment,

14   Tushar sent you the XPRT in a separate wallet,

15   didn't he?

16        A.    When Ms. Thomson made the investment, a

17   portion was set aside, correct, that was not -- that

18   was not mine.  It was -- Taylor and I discussed that

19   if she was in profit later, that it was -- it was --

20   I was hoping that it would go to me, but it wasn't a

21   certainty.

22        Q.    Well, in fact, this -- this finder's fee,

23   this 1.1 percent, that wasn't in any of the written

24   contracts between Ms. Thomson and Persistence, was

25   it?

Ashley Richardson
October 28, 2025

1      A.    I -- I don't believe it was, but it was

2   always considered to be Taylor's asset.

3            (Reporter clarification.)

4      Q.    It was sent to a separate wallet, not sent

5   to the same wallet that Taylor had for her XPRT.

6   Isn't that right?

7      A.    No, that's incorrect.  There were many

8   wallets.  So to assume that one wallet is -- is not

9   hers amongst many wallets, I wouldn't agree with

10  that.

11     Q.    You never gave it to her, did you?

12     A.    It was one of -- it was one of the ones

13  that she had the keys with, I believe.

14     Q.    That's not the question.  I said did you

15  ever give it to her?

16     A.    I -- I don't recall if I did or not.  I

17  gave her a number of wallets.

18     Q.    All right.  Let's scroll down to 406.

19  Tushar says:  "You can control the 1.1 percent on

20  your end.  We can make it very clean."  The

21  1.1 percent on your end, that's the finder's fee for

22  you.  Isn't that right?

23     A.    I don't believe that's what it means

24  necessarily.  I think that it's being taken out of

25  context.  I think everything was on, I think, my

Ashley Richardson
October 28, 2025

1    end.  I think --

2         Q.   Well, Taylor bought the tokens, the XPRT,

3    and you were getting paid for bringing Taylor to

4    Persistence.  Isn't that right?

5         A.   No, that's not correct.

6         Q.   It says at 4:06:  "If you give your

7    Persistence address, 1.1 percent of the coins can be

8    directly sent to you."

9         A.   Yes, it says that.

10        Q.   And, in fact, he did send the 1.1 percent

11   directly to you, didn't he?

12        A.   I'm not clear with how to answer the

13   question because you could say that everything that

14   was sent was sent to me because I was holding all of

15   the wallets and --

16        Q.   Well, there was a -- there was a contract

17   in which Taylor would receive a significant amount

18   of XPRT, and silent from the contract was the

19   1.1 percent that you were sent on the side to your

20   own personal wallet.  Isn't that right?

21        A.   No, I wouldn't say it was my own personal

22   wallet.  I think that this -- this question that you

23   are asking absent the context is misleading,

24   which --

25        Q.   Well, what's the context?

Ashley Richardson
October 28, 2025

1       A.   The context being what I have -- what I

2   have said multiple times, which was this was an

3   amount that was set aside.  It was to be realized

4   after the vesting period, which was a year, if she

5   was in profit.  It wasn't --

6       Q.   What's a finder's fee?

7       A.   What's a finder's fee?

8       Q.   Yeah.

9       A.   My understanding was that it kind of went

10  both ways, but I don't have a clear concept of

11  exactly what the meaning of "finder's fee" is.  It

12  was something that happened, to be clear, after the

13  fact of the purchase.  It didn't happen before the

14  purchase.

15      Q.   No, I'm just asking what a finder's fee is.

16  What is a finder's fee?

17      A.   I can tell you my limited definition based

18  on my limited knowledge because I don't feel like

19  I'm an expert in this area to answer the question.

20  But what I would -- so I would caveat it with I'm

21  not sure that this is the accurate answer.  But my

22  understanding of what a finder's fee would be is

23  if -- it's kind of, like, similar to if somebody

24  brought -- you know, introduced someone to a

25  project.  It goes both ways, really.