Ashley Richardson
October 28, 2025

 1    Taylor and I were very close friends.  We had a
 2    constant communication before things got very
 3    strained and awkward between us.  And so whatever
 4    she was going to have with this new team was not
 5    going to be the same.  And I knew this team,
 6    obviously, was hostile towards the Persistence team.
 7    I could tell.
 8         Q.   Okay.  And you -- when you say "I'm trying
 9    to get as much done as I can before I have to pass
10    the baton" -- "passing the baton," you are referring
11    to Taylor's assets.  And "as much done as I can,"
12    you mean as much training as possible?
13         A.   I don't know.  I don't actually think
14    that's what it was referring to.  I think it was
15    referring to the allocation of Persistence and the
16    liquidity pools and swaps.
17         Q.   So you wanted to put as much of Taylor's
18    assets as possible in those products before you had
19    to give them back?
20         A.   No, that wasn't it at all.  I was -- I was
21    saying, "What is the best yield and opportunity
22    here?"  And it was that simple.  I wasn't -- I
23    wasn't getting -- you -- I feel like the question
24    you are asking makes an assumption.  I believed at
25    this point in Persistence, and I believed, you know,

Ashley Richardson
October 28, 2025

1    in -- in where it was headed.  And this was going to

2    be the end of my determination of what was going to

3    happen with the Persistence assets.  It was going to

4    be --

5         Q.   At this point -- at this point, you have

6    been asked to return the assets.  Isn't that right?

7         A.   I mean, my understanding was to bring

8    the -- the hard wallets to Taylor.

9         Q.   You didn't think that meant return the

10   assets to her and stop making trades?

11        A.   That was never explicitly explained.

12        Q.   So when Leih Wang says, "I'm taking over

13   the administration of Taylor's crypto assets," you

14   thought you still had free rein to trade her assets?

15        A.   I don't think that I thought I still had

16   free rein.  Obviously, I wasn't -- you know, these

17   were large amounts, and they were being allocated in

18   a specific way.  But I -- you asked me a question

19   which was "What were you referring to in this

20   section of text messages?"  And I'm answering your

21   question.  What I was referring to in that section

22   of text messages was her allocation of Persistence

23   and ATOM on those pools.

24        Q.   And -- but you recognize, don't you, this

25   is after you were asked to give the assets back?

Ashley Richardson
October 28, 2025

1          A.   I had a conversation with Taylor, as I just

2     expressed in a previous question, mid-April.  So it

3     would have been at this time.  And Taylor directly

4     knew exactly about this allocation, authorized it in

5     the last exchange I had with her.  In fact, I

6     brought the hard wallets to her address in Malibu.

7     I said, "Do you want to do this?  This is an

8     opportunity."  And she said, "Yes, I want to do it."

9     So I kept two of the wallets.  I went home.  I made

10    the transaction.  I did the setups.  And then

11    Michele later took those remaining two wallets to

12    Esztella at the Santa Monica house.

13         Q.   So your -- your testimony is that despite

14    being told on March 25 that another professional is

15    taking over the administration of her assets,

16    despite being emailed and contacted multiple times

17    to receive the wallets -- and it's like handing the

18    wallets -- you still have the authority to execute

19    these trades for Ms. Thomson?  That's your

20    testimony?

21         A.   I object to the question because you are --

22              (Simultaneous colloquy.)

23         Q.   You can object all you like.  You were

24    asked three times, four times already, return the

25    assets, and you were still making investments.

Ashley Richardson
October 28, 2025

1        All I'm asking you if it's your testimony

2    that these were authorized or if these were after

3    you were asked to return the assets.

4        A.   You are making -- you are assuming facts

5    that are not in evidence.  You are taking a portion

6    of an email out of context for what was generally

7    happening overall and using that as a reason why

8    this shouldn't have happened.  Taylor --

9        Q.   Can you scroll down, please.  There's

10   another chat, 2144.  You write:  "Trying to help you

11   have the best shot."  "You" being Mr. Aggarwal.  "I

12   also think it's good for T."  I assume that's

13   Ms. Thomson.  Do I have that right?  In this

14   context, "you" is Aggarwal, T is Ms. Thomson?

15       A.   Yes.

16       Q.   Okay.  "This was set aside and I know the

17   one percent is there.  Best to take advantage."

18       A.   No.

19       Q.   What's the one percent?

20       A.   Okay.

21       Q.   Is the one percent the finder's fee that

22   you agreed --

23            (Simultaneous colloquy.)

24       A.   In -- in relation to this, I do not know

25   what it referenced, but can I can tell you without a

Ashley Richardson
October 28, 2025

1    shadow of a doubt there was no compensation.  I

2    remember -- I remember -- this is what I remember

3    about this trade.

4         At that moment in time, I felt very badly

5    for Persistence because they were, you know, trying

6    to build this, and I was concerned genuinely that

7    Taylor was taking her assets to Safferys and they

8    were going to just liquidate them.  And I didn't

9    know what that was going to do to Persistence.  And

10   so I said, look, you know, what do you guys have?

11        We were trying -- when we started to invest

12   in Persistence, there's so many things that are not

13   included in this.  There was a genuine energy from

14   Taylor and from me that we wanted them to do well.

15   And they seemed like lovely people.  I had nothing

16   to think otherwise.  I don't believe they ever did

17   anything untoward.  And if they did, I'm not aware

18   of it.  I'm not saying that they didn't.  There may

19   have been --

20        Q.  I'm asking a narrower question.  You said,

21   "I know the one percent is there, so best to take

22   advantage."  Isn't the one percent the finder's fee?

23        A.  No.  I do not know in this -- in this

24   context.  I would have to go back and read it,

25   truly.  I -- I am not saying this to stall time.

Ashley Richardson
October 28, 2025

1    I'm not saying this to do anything other than to say

2    I cannot answer that accurately in a snapshot.  I

3    really can't.

4        Q.   And when you say "best to take advantage,"

5    happy face, that's because you still had control of

6    Ms. Thomson's assets at this time; isn't that right?

7        A.   With all due respect, Mr. Evans, I think I

8    just told you I cannot answer that question

9    accurately.  And so you trying to make me answer it

10   in a certain way is not going to happen.

11       Q.   These -- I didn't write this.  These are

12   your words.

13       A.   Yes.  You didn't -- you -- you put context

14   to something that doesn't exist.  And I'm not --

15   like, I'm saying I need to review the document.  I

16   don't know that that's what it means.  This was a

17   text message exchange that happened four years ago.

18       Q.   If you scroll down it says --

19            (Simultaneous colloquy.)

20       A.   I need to -- I need to say this clearly.

21       Q.   There's not a question pending.  We ask

22   questions.  You answer them.  This is how it works.

23       A.   Mr. Evans, you are asking questions to

24   mischaracterize what actually happened.  And I don't

25   think -- I don't think that that referred to the

Ashley Richardson
October 28, 2025

1    finder's fee is what I'm saying.  What I would like

2    to do is review the document in full and have that

3    chance so that I can answer it accurately.  Because

4    if I was to say that refers to the finder's fee,

5    that would be two things.  One, I have no idea.  And

6    I actually think, truly, there may have been one

7    percent applied to something in the staking pools.

8    That could have been one percent to Taylor.

9         I am not -- I am telling you very, very

10   honestly I need to review that document.  Because

11   you saying isn't it a certain way, I'm saying

12   absolutely not.  There were so many things happening

13   at that time.  There were so many movements of -- of

14   product and materials.  That could have been any

15   number of things.

16   Q.    No.  I'm saying that when you -- when you

17   are sending a message to the person who previously

18   paid you a quote/unquote finder's fee for getting

19   Ms. Thomson involved in the investment, after you

20   had been asked to return the asset, you continue to

21   make investments, and you say, "I know the one

22   percent is there.  Best to take advantage," happy

23   face, I'm asking you whether that's referring to a

24   finder's fee.  It's the same percentage you were

25   paid before.

Ashley Richardson
October 28, 2025

1        A.   That's absolutely not a fair thing to

2    assume.

3        Q.   Okay.  So when you say "I just put on 6

4    million of ATOM," whose ATOM was that?

5        A.   I can only assume that it was Taylor's

6    ATOM.

7        Q.   Okay.  When you say "I only have 2 million

8    ETH but will add," whose ETH was that?

9        A.   Obviously Tushar is aware.  Maybe I phrased

10   it wrong, but it's -- every -- it was always

11   Taylor's.

12       Q.   Okay.  And you said, "It's my gift while I

13   can still give it," happy face.  What do you mean by

14   that?

15       A.   Liquidity on the platform.

16       Q.   It's your gift of Ms. Thomson's assets;

17   isn't that right?

18       A.   No.  No, that's not correct.  You are --

19       Q.   There's 6 million of ATOM.  You just said

20   that was Ms. Thomson's.  The 2 million of ETH, you

21   just said that's Ms. Thomson's.  And then you said,

22   "It's my gift while I can still give it."

23       A.   You are taking what the intended

24   conversation was completely out of context.  If you

25   would like me to contextualize it for you, I'm happy

Ashley Richardson
October 28, 2025

1    to, but that is not correct.

2         Q.    It's right there.  You wrote it.

3         A.    Right.  And if you would like me to give it

4    context, I would be happy to.  You can -- you have

5    done this in the past.  You have taken things out of

6    context and you put them in legal documents that

7    were filed, including the original legal document,

8    that look a certain way, but when you actually

9    scroll back, you see that it's contextualized and

10   has nothing to do with it.

11        Q.    You can take this down.  This is Exhibit 6.

12        A.    Wait.  Let me finish.  Let me finish.  I

13   have a right --

14        Q.    Ms. Richardson, there's not a question

15   pending.

16             (Simultaneous colloquy.)

17             (Reporter admonition.)

18        A.    You just asked a question about something

19   that has context, and I have -- I think that I -- it

20   is within my rights to answer it so that it can be

21   on the record with proper context, and I would like

22   to take that opportunity.

23             This was a staking pool that was on the

24   Terra chain to the best of my memory.  They needed

25   to add liquidity because, to the best of my

Ashley Richardson
October 28, 2025

1    understanding, the liquidity made the whole thing

2    work.  Like, staking pools don't work without the

3    liquidity.

4            In order to -- to obviously make it great

5    for Taylor, they created a very high yield for her

6    staking on there.  So Taylor knew that if her ATOM

7    was parked on this platform, it was going to be

8    creating an additional yield that was -- it was

9    substantial.  It wasn't crazy, but it was very

10   substantial.  And it was a pair.  So it would have

11   been like -- it was like a pair of ATOM/ETH.  That's

12   how the liquidity pool worked.  It required a pair.

13           So the gift was the parking of the assets

14   on the platform.  The upside was substantial for

15   Taylor because by parking it on the platform, she

16   was going to receive the yield.  The -- the gift for

17   Persistence was they were going to receive the

18   liquidity.  Both were winners.  I got nothing out of

19   it, but I was genuinely wanting Taylor to win and I

20   wanted Persistence to win.  They were both really --

21   you know, at the time I still thought Taylor was a

22   great person and, you know, I would love to believe

23   that.  But, at that moment in time, that was the

24   reason for it.

25           And so you don't know that context.  It's

Ashley Richardson
October 28, 2025

1     very confusing.  There's -- there's a lot of subtext

2     that isn't included in that -- in that note, but

3     nothing was given to Tushar.  What -- what was

4     happening was Taylor's assets were being parked on

5     that -- I can't remember the exact word, but it had

6     to do -- it was a liquid staking pool on a Terra

7     chain.  And Taylor was going to receive yield.

8     Tushar was going to receive the liquidity in his

9     pool.  Both were supposed to be winners.  And then

10    the market crashed and everybody lost.

11        Q.   So the 6 million of ATOM and the 2 million

12    of ETH, both those trades were losers, right?

13        A.   Every cryptocurrency that existed was a

14    loser within weeks of that time.  The entire market

15    went off of a cliff.  Nobody was a winner who was in

16    crypto.

17        Q.   You can take this down.

18             When did you stop trading Taylor's assets?

19        A.   I don't know.  I would say it was probably

20    late June of 2022.  Somewhere around that time.

21    Summer of 2022.  I can't say approximately.

22        Q.   Okay.  And during that time, what kind of

23    transactions were you entering into?

24        A.   I mean, I can't -- I can't say

25    specifically.  It was -- it was voluminous.  It

Ashley Richardson
October 28, 2025

```
1   was -- you know, I know that I was attempting to --
2   attempting to hedge losses in a falling market that
3   I was woefully underequipped to do and --
4        Q.   So there are a significant number of margin
5   trades; isn't that right?
6        A.   That may have been correct.
7        Q.   What about leverage trading?  Was there any
8   leverage trading?
9        A.   I am sure there was.
10       Q.   Okay.  What about spot trading?  Any stock?
11       A.   I can't say with certainty.  You know, I --
12   I can't say with certainty on any specific.  It was
13   a very stressful time, but there were -- there were
14   many trades that happened.
15       Q.   And let me ask you this.  In April, you
16   gave the hardware wallets back.  Didn't your
17   communications with Ms. Thomson cease in April or
18   May, and June and July there was very limited
19   communications between you both?  Isn't that right?
20       A.   It was limited because I was dealing with
21   the death of my stepmother and a lot of fallout
22   around our family estate.
23       Q.   Okay.  So during that time, May, June,
24   July, were you discussing leverage trading with
25   Ms. Thomson?
```

Ashley Richardson
October 28, 2025

1          A.   I wasn't discussing it specifically, no.

2          Q.   Were you discussing perp trading with

3     Ms. Thomson?

4          A.   I wasn't discussing it specifically with

5     her, no, but there were many trades that I did that

6     weren't discussed with her directly.

7          Q.   Just give me one second.

8          A.   I just --

9               (Simultaneous colloquy.)

10         Q.   Do you trade cryptocurrency in your

11    personal capacity?

12         A.   I first want to say, in relation to the

13    last section, it's -- I'm happy to go there, but I'm

14    objecting that it's not directly relevant to the

15    lawsuit in question.  The lawsuit in question is

16    about Persistence.  It's about defrauding Taylor.

17    And now we have gone into a different lane that I

18    understand you have every right to discuss, but I

19    just want to put that objection for -- for relevance

20    there.

21         Q.   Your objection is noted.

22              Do you trade cryptocurrency in your

23    personal capacity?

24         A.   I have, yes.

25         Q.   Okay.  When -- when you were talking to

Ashley Richardson
October 28, 2025

1    Ms. Thomson about trading in XPRT, did you yourself

2    trade in XPRT?

3        A.    Yes.

4        Q.    Okay.  When did you trade in XPRT?

5        A.    Unfortunately, I bought the majority of my

6    XPRT when it was -- it was -- I think it was in May,

7    when it was $16.

8            (Reporter clarification.)

9        Q.    Okay.  Did you trade any XPRT prior to

10   Ms. Thomson's investment?

11       A.    A small amount.  And then the majority I

12   did when the price dropped, at the same time as her.

13       Q.    Were there other forms of cryptocurrency

14   that you invested Ms. Thomson's money into?  Did you

15   trade any of those assets yourself too?

16       A.    I mean, we were both trading similar assets

17   because we were using the predictions of Whitedove

18   and Robert Sabella to sort of dictate what we were

19   going to invest in.  So yeah, we were doing the same

20   things.  We were basing it off of the predictions of

21   the psychics.

22       Q.    In any instance, did you trade a particular

23   asset before Ms. Thomson's asset was traded?

24       A.    I can't say with certainty.  There were so

25   many trades that happened.  It's possible, but I --

Ashley Richardson
October 28, 2025

1    I can't say across the board.

2        Q.   Okay.  Were you in any -- any Telegram

3    chats with other traders?

4        A.   I -- I think I put those in my -- in my --

5    my production.

6        Q.   Okay.  Did you ever talk to anybody else

7    about investments that Ms. Thomson was going to make

8    into particular tokens or projects?

9        A.   I probably did, but I don't remember

10   specifically.

11       Q.   Okay.  Do you know one way or the other

12   whether those people traded in advance of

13   Ms. Thomson's trade?

14       A.   Absolutely not.  Not to my knowledge.

15       Q.   Where did you trade your personal assets?

16       A.   I mean, all over the place.  I, you know --

17   I use many, many exchanges, and I probably won't

18   cover them all because crypto is like very complex.

19   And at that time, before I realized that, you know,

20   overdiversifying is a bad thing, I think I was

21   trying everything I could find.  I was looking at,

22   you know, like everything from SushiSwap to

23   PancakeSwap to, you know, obviously Coinbase.  And

24   the Binance account I -- I opened when Taylor turned

25   me on to Bitcoin in 2017.

Ashley Richardson
October 28, 2025

1       Q.   Give me one second.

2            The centralized exchange accounts, do you

3    have a Binance account?

4       A.   I don't now.  I had a Binance account.

5       Q.   All right.  What about Gate and PrimeXBT?

6    Do you have your own accounts there too?

7       A.   I cannot remember with certainty.  I

8    believe I had a Gate account, and I don't know if I

9    had a PrimeXBT account or not.  I can't recall.

10           MR. EVANS:  Okay.  All right.

11           Todd, my questions are -- are complete.  I

12   think you might have some more.

13           MR. HARRISON:  Okay.

14           MR. EVANS:  Thank you, Ms. Richardson.

15           THE WITNESS:  Thank you.

16           MR. HARRISON:  I have got more questions.

17   Do you want to take a five-minute break, or do you

18   want to keep going?

19           THE WITNESS:  I think we keep going.  What

20   do you want to do?

21           MR. HARRISON:  I'm fine taking a

22   five-minute bathroom break.

23           THE WITNESS:  Okay.  I can do that.

24           THE VIDEOGRAPHER:  We are off the record at

25   2:15.

Ashley Richardson
October 28, 2025

1              (Break taken.)

2              THE VIDEOGRAPHER:  Back on the record at

3      2:22.

4              MR. HARRISON:  Thank you.

5         Q.   Ms. Richardson, I just have a few minor

6      questions.  I just want to go back a little bit to

7      your job history and your education.

8         A.   Okay.

9         Q.   You don't have any education or training in

10     financial management, correct?

11        A.   No.

12        Q.   Okay.  And no -- no education or training

13     in financial advising, right?

14        A.   No.  I'm not a financial adviser.

15        Q.   Okay.  And you -- you don't have any other

16     degrees or certifications that I don't know about,

17     right?  That weren't on --

18        A.   Not that I know of that I can think of.

19        Q.   So no, like, cryptocurrency certifications?

20     There are some out there, cryptocurrencies

21     certifications.

22        A.   Okay.  Not that I'm aware of.

23        Q.   Okay.  And you have never been a licensed

24     security broker-dealer in California, right?

25        A.   No.

Ashley Richardson
October 28, 2025

1          Q.   Okay.  I want to point you to
2     November 2021.
3          A.   Okay.
4          Q.   In November 2021, Ms. Thomson told you that
5     she was going to be moving to London, correct?
6          A.   I think I knew she was going to be moving
7     to London for years.  I mean, that was the plan.
8          Q.   Okay.  May -- you might have known for
9     years, but she -- she was going to actually move and
10    she told you she was going to actually move in
11    November of 2021, I believe, correct?
12         A.   I don't think that there was a definitive
13    this moment.  I think that I knew -- I was aware she
14    was going to move to London for quite some time.  I
15    sat in on calls with her and accountants in August
16    of 2021 about the move.  So, I mean, it wasn't news
17    to me.
18         Q.   Okay.  And why were you sitting in with
19    calls with her accountants about the move in August
20    of 2021?
21         A.   Because she thought that they were ripping
22    her off.
23         Q.   That what?
24         A.   She thought that they were ripping her off.
25         Q.   The accountants?

Ashley Richardson
October 28, 2025

1        A.   Yeah.  She didn't think they were doing a

2   good job, and so she wanted me to listen in.  She

3   had me listen in to all kinds of things.

4        Q.   Okay.  In that August, September, October

5   time period, you raised with Ms. Thomson the idea

6   that you thought that you should get compensated for

7   handling her crypto for her, correct?

8        A.   I -- I think I might want you to rephrase

9   the question because my first response would be I

10  never wanted to be a paid employee of Taylor's, and

11  that was always clear.  So -- so I would say that is

12  one thing that I do know.  I did not want to be paid

13  for the work I was doing, but I also did not ever

14  anticipate that I was going to take on that level of

15  -- of consistent, like, all-encompassing work for

16  her, and that I was losing other opportunities.

17       Q.   Okay.  And you started saying -- I'm going

18  to say "complaining."  I don't necessarily mean it

19  negatively.  But you started complaining that

20  managing Ms. Thomson's cryptocurrency was taking a

21  lot of your time, correct?

22       A.   It was taking all of my time.

23       Q.   Okay.  But you were not her --

24  Ms. Thomson's employee, correct?

25       A.   That is correct.

Ashley Richardson
October 28, 2025

1      Q.   Okay.  And so you didn't have to manage her

2   cryptocurrency, correct?

3      A.   I didn't have to do any of the things I did

4   for Taylor over the years.

5      Q.   Okay.  And you weren't getting paid to

6   manage her cryptocurrency, correct?

7      A.   I wasn't getting paid to manage her

8   cryptocurrency.  I wasn't a fiduciary.  I was

9   helping her do something.  At first I tried to help

10  her do it herself, and then she asked me to do it.

11     Q.   Okay.  And then you had a discussion -- you

12  and Ms. Thomson had a discussion in November of 2021

13  where Ms. Thomson talked to you about moving to

14  London, and she told you that she would take custody

15  of the cryptocurrency back and put it with an

16  official cryptocurrency custodian, correct?

17     A.   I think that miscontextualizes the

18  understanding between us, because it was always the

19  goal to find a custodian that would be able to

20  safely protect the cryptocurrency and keep it

21  staked, and we were working to that end.  So there

22  was never -- there was no surprise with that.

23  Having cryptocurrency in my house was not something

24  I wanted.  It was not safe for me.  It was not good

25  for anybody.  We were trying -- nothing existed at

Ashley Richardson
October 28, 2025

1    that time.  So the goal was find something that

2    exists or create it.  And we have talked about that

3    a lot.  Like, what could be built to safeguard her

4    assets.  And I was very excited that there could be

5    something, but I was concerned that she would lose

6    the ability to keep her assets staked.

7        Q.   Okay.  So -- but she told you in November

8    of 2021 that she was going to take custody of her

9    cryptocurrency back and put it with a professional

10   cryptocurrency custodian, correct?

11       A.   I don't remember an exact date.  That was

12   always the understanding of what was going to

13   happen.

14       Q.   Okay.  Then why did it -- why did you not

15   return her cryptocurrency for another eight or nine

16   months?

17       A.   There was nowhere for it to go.  That was

18   the only reason.

19       Q.   Well, there are -- there's multiple

20   correspondence, written communications, between you

21   and Ms. Thomson over the next six or seven or eight

22   months where Ms. Thomson is asking you repeatedly to

23   talk to her accountants and give them an accounting

24   of the cryptocurrency and to return the

25   cryptocurrency, correct?

Ashley Richardson
October 28, 2025

1      A.   So I'm going to object on the compound

2   nature of that question.  And if you would like me

3   to answer it in parts, I would be happy to.

4      Q.   Go ahead.

5      A.   But the way you structured it, it's just

6   too much for me to remember and answer adequately.

7   And I would love to answer each of those things

8   independently.

9      Q.   Go ahead.

10      A.   Can you ask me specifics?  Because you

11   asked me about five questions in that question.

12      Q.   In the six or -- in the six to eight months

13   following November of 2021, Ms. Thomson repeatedly

14   asked you to get on the phone with her accountants

15   and give them an accounting of the crypto, correct?

16      A.   I want to say that I would disagree with

17   that.  I -- I want to preface this by saying I was

18   not a fiduciary.  I was not under any kind of term

19   or agreement with Taylor.  I had no understanding

20   that I was supposed to be keeping an accounting of

21   the cryptocurrency.  I was helping her to execute

22   the trades.  And there was never a set of

23   understanding.

24          After the fact, and to the best of my

25   memory it was around the time we are talking about,

Ashley Richardson
October 28, 2025

```
 1    spring, there was a request for accounting that I
 2    did not possess.  Because there were thousands of
 3    purchases that had happened up to that point, and
 4    then after the fact of the purchases being made, I
 5    was asked for an accounting.
 6            So that accounting did not exist because it
 7    was never specified.  It was never requested.  I was
 8    not a fiduciary.  I was just somebody helping her
 9    purchase crypto.  And yes, she made requests, but
10    she was requesting something I did not have.
11        Q.   Right.  But she was requesting an
12    accounting from you for many, many months, correct?
13        A.   I disagree with that.  I believe the first
14    request I received was in -- I can't say with
15    certainty, but it would have been -- I remember it
16    specifically fell around the time that my stepmother
17    passed away, because I was suddenly inundated with
18    dealing with a lot of major issues, and I got sick.
19    And I remember getting accounting requests and
20    thinking I don't have this and also I don't have
21    time right now, like, to deal with this.  So that is
22    the memory that I have of that specifically, but it
23    was -- it's kind of --
24        Q.   But you never told her that, right?  Over
25    the next six months you -- you skipped meetings and
```

Ashley Richardson
October 28, 2025

1    you avoided telling Ms. Thomson that you didn't have

2    the accounting information that she was looking for,

3    correct?

4         A.   I think I -- I did tell her on some level,

5    but you have to understand, this is -- there was no

6    reason for me to have accounting information.  I

7    wasn't doing anything untoward or preventing

8    anything.  I think -- you are -- I believe that you

9    are trying to take this in a direction that says I

10   didn't do something and I was avoiding a fiduciary

11   responsibility.  What I'm saying is I didn't want my

12   friend to be disappointed in me because I didn't do

13   this the whole way, because I didn't even know to.

14        Q.   So -- but I think we are agreeing.  You --

15   I didn't ask you anything about fiduciary

16   responsibilities.  All I said was for several --

17   about six to eight months you did not give

18   Ms. Thomson an accounting --

19        A.   No, no.

20        Q.   -- when she asked for it, correct?

21        A.   Absolutely incorrect.  Six to eight months

22   is absolutely incorrect.

23        Q.   How long -- from the first time that you

24   remember Ms. Thomson asking you for an accounting of

25   her cryptocurrency, how long was it until you

Ashley Richardson
October 28, 2025

1  finally told her that you didn't have the

2  information she was looking for?

3       A.   To the best of my memory, that started

4  after my stepmother passed and after this time

5  period.  So it would have been -- late April of 2022

6  is a guesstimate.  And then there were lawyers at my

7  house in June of 2022.  So what is that?  Two or

8  three months?

9       Q.   Okay.  And so it's your testimony that you

10  don't recall Ms. Thomson ever asking for

11  accounting-related information for the

12  cryptocurrency between November of 2021 and April of

13  2022?

14       A.   Whatever she asked for I gave her an

15  extensive accounting in November to the best of my

16  ability and understanding at the time.  What was

17  asked of me later --

18       Q.   But you've testified repeatedly that you

19  didn't have the information she was looking for.

20       A.   I didn't.  Because what I had was here are

21  the assets where they were that moment.  I didn't

22  have an accounting for how they were purchased.  You

23  have to understand -- okay -- in order to purchase

24  microcaps at these dollar amounts, Taylor would text

25  me in the middle of the night and say I want 10

Ashley Richardson
October 28, 2025

1    million this.  I want 10 million this.  To execute

2    those purchases, when you make large purchases, the

3    price jumps up.  So there had to be thousands of

4    purchases in order to get to that 10 million.  It

5    had to happen over days sometimes.  And if it wasn't

6    finished, she would get very upset.  Like is it

7    done?  Do you have it?  Is it staked?

8            So I would make those purchases over time.

9    A lot of times I was making purchases with Ethereum

10   or ATOM, and they were like a token for a token.

11       Q.   I'm just -- you are not responding to my

12   question at all.

13       A.   No, I am.

14       Q.   So I'm just trying to figure out is your

15   point you did not keep the records that they were

16   looking for?

17       A.   Let me finish what I'm saying.

18       Q.   But you're not answering my question.

19       A.   I am.

20       Q.   It was a totally different question.

21       A.   If you actually let me finish what I'm

22   saying, I'm getting --

23       Q.   Well, if you actually answer my question,

24   I'd be happy to listen.

25       A.   I -- I don't appreciate you -- you cutting

Ashley Richardson
October 28, 2025

```
 1    me off in the middle before I've gotten a chance to
 2    make the point.
 3         Q.   I don't appreciate you not answering my
 4    question.
 5         A.   If you let me finish, I would be answering
 6    your question is what I'm saying.
 7         Q.   Let's see.
 8         A.   Okay.  You can tell me how I do afterwards.
 9    All right.  I'm trying really hard.
10         Q.   I'm not going to do that.  I'm not
11    interested in doing that.  I just want you to answer
12    the question.
13         A.   I -- I cannot answer the question in a way
14    that is fair --
15         Q.   It's a pretty simple question.  Let me
16    rephrase it so we are all clear.
17              You didn't give Ms. Thomson and her
18    accountants the accounting information they're
19    looking for because you hadn't been keeping those
20    types of records, correct?
21         A.   And now I'm going to finish what I was
22    saying previously in order to answer the question,
23    which is, for every single purchase, which was --
24    had to be incrementally done, it never occurred to
25    me -- I was not asked to keep records of anything.
```

Ashley Richardson
October 28, 2025

1    Nobody ever said we need records.  I was making

2    thousands upon thousands of trades to get her to the

3    point.  That was my job as far as I understood it.

4    I didn't know that it was also my job to be an

5    accountant.

6         Q.   But all those trades had gains and losses,

7    right?

8         A.   I have no idea.

9         Q.   You are trading something on the value

10   system for other coins or for U.S. dollars.  There's

11   gains and losses to each trade.  Otherwise why would

12   you make them?

13        A.   She wanted a purchase executed.  I was

14   executing the purchase.  You are stating that I -- I

15   have some unwritten expectation to also be an

16   accountant at the same time.  I'm telling you I did

17   what was asked of me.

18        Q.   But forget about the accountant part for a

19   minute.

20             It's your testimony that you didn't think

21   that Ms. Thomson would expect you to keep records of

22   the trades?

23        A.   None of it ever occurred to me.  I was

24   doing -- I was doing -- it never occurred to me that

25   I would be executing hundreds of millions of dollars

Ashley Richardson
October 28, 2025

1    of purchases in my house, first and foremost, and it

2    never occurred to me that she would continue with

3    such fervor and FOMO.  And -- and I was working so

4    hard, trying to understand how to do it.  It was

5    insanely complicated.  I mean, do you know how scary

6    it is to move millions of dollars on a block chain

7    and not lose it?  It is very stressful.  So I

8    wasn't -- no, it didn't occur to me.  I'm being

9    very, very transparent.  I was so overwhelmed by the

10   pressure of the execution that I wasn't thinking

11   about it.

12          Now, in hindsight, I also was like oh, my

13   God.  And I was afraid that I let her down,

14   genuinely.  I wasn't worried about --

15       Q.  That's why -- maybe understandably from

16   your point of view, but you were avoiding answering

17   her question about the fact that you didn't have the

18   records and the accounting of the trades, right, for

19   many months?

20       A.  I don't think that was the sole reason.  I

21   think it wasn't --

22       Q.  What were the other reasons?

23       A.  You are mischaracterizing the time period.

24   It was a short window of time.  And during that

25   specific window of time my entire life was imploding

Ashley Richardson
October 28, 2025

1    with personal issues.  That was the main reason.

2         Q.   Okay.  What were the other personal issues?

3         A.   I was extremely ill.  And I inherited a

4    house that was -- disaster zone.  The mortgage

5    hadn't been paid for months.  My stepmother's family

6    had been, you know, keeping things from us.  So I

7    had to go in and kind of run triage on it.  And

8    that -- and then I got very, very sick.  Those were

9    the main issues.

10        This -- this was a small window.  It wasn't

11   -- we are talking about the month of May, really,

12   and -- and not many months.  Because I saw Taylor in

13   April.  Things were above board.  I went to -- you

14   know, I came up north.  And then while I was still

15   up north, within less than a month and a half, you

16   guys sent somebody to the house with allegations.

17        Q.   So -- I'm sorry.  Just to list the things

18   that you were going through.  One was you inherited

19   a house that was a disaster, right?

20        A.   Well, I didn't -- I wasn't -- yes, that was

21   one of the things.

22        Q.   Okay.  And I think -- I'm sorry.  I didn't

23   hear the whole thing.  Your stepmother died, I

24   think, at some point, right?

25        A.   Okay.  The answer to this question is --

Ashley Richardson
October 28, 2025

```
1    you said you avoided her for many months.  My answer
2    is this.  A, it was a short window of time from
3    start to finish.  It was not many months.
4         Q.   What do you think was the period of time in
5    which you did not answer Ms. Thomson's questions
6    about getting the records and an accounting of --
7         A.   To the best of my memory, it was the month
8    of May.
9         Q.   Okay.  Okay.  So -- I'm sorry.  You
10   inherited a house.  And when did your stepmother
11   die?  In April you said?
12        A.   The end of March.  But I didn't find out
13   about it because nobody informed us.
14        Q.   I'm sorry to hear that.
15             And you said you got ill during this period
16   too.  When -- when did you get ill?
17        A.   I got really ill in May.
18        Q.   What did you get ill with?
19        A.   I -- there was extreme mold in the house
20   and so I got really sick with mold toxicity.  It's
21   documented.
22        Q.   How is it documented?
23        A.   It's documented in -- emails and text
24   messages and a doctor's visit.
25        Q.   Okay.  Do you have any medical records
```

Ashley Richardson
October 28, 2025

1   relating to that?

2        A.   I think that's privileged, but you know, I

3   have -- I don't see how it's relevant to the case.

4        Q.   Well, you made it -- I didn't ask you about

5   it.  You brought it up as a reason as to why there

6   was a delay in answering Ms. Thomson's questions

7   about accounting.  You brought it up.  Not me.

8        A.   I think that within context of the realtime

9   period we are talking about and the things that were

10  going on in my life, those were very real.  I'm not

11  saying -- I'm not refuting what you are saying,

12  which was I was avoiding it on some level, because I

13  didn't have it.

14       Q.   Okay.  Do you remember during this period

15  telling Ms. Thomson or her daughter that you had --

16  you couldn't make a meeting with them because you

17  had gone into anaphylactic shock?

18       A.   Well, I was -- I was having anaphylaxis

19  because of the mold.

20       Q.   Okay.  How long did you have those problems

21  related to the mold?

22       A.   I mean, it was acute for, I want to say,

23  weeks.  And -- and then it was bad for months.  It

24  wasn't -- it wasn't like I was -- you know, it

25  wasn't debilitating for months, but it was really

Ashley Richardson
October 28, 2025

1    bad for a few weeks.

2         Q.   Did you ever go to the hospital for it?

3         A.   I did get medical care for it at one point.

4         Q.   What does that mean, "medical care"?

5         A.   Like, I went in because I was worried about

6    -- I can't remember exactly what the -- what the

7    circumstances was, but I was really sick.

8         Q.   Did you ever go to a hospital?

9         A.   I don't think it was a hospital.  I think

10   it was an urgent care, but I can't remember off the

11   top of my head.  I have been to the hospital many

12   times.  I don't know if I went in that window or

13   not.

14        Q.   Okay.  Did you have any other illnesses

15   during this period?  And "during this period," I'm

16   talking about from November of 2021 to June 2022.

17        A.   Are we changing topics now?

18        Q.   No.

19        A.   Well, you were talking about the accounting

20   and that specific time period, and now you just --

21        Q.   All I'm asking you about is illnesses now.

22        A.   Okay.

23        Q.   So did you have any other illnesses between

24   November of 2021 and June of 2022?

25        A.   I had a number of health issues that I

Ashley Richardson
October 28, 2025

1    think were compounded by stress.

2         Q.   Okay.  What were those?

3         A.   Do you want me to discuss both physical and

4    mental or --

5         Q.   Sure.

6         A.   Okay.  I think starting in -- I have to --

7    I have to -- I have to give a broad date range

8    because I can't remember specifics, but I can say in

9    the fall of 2021 I started having very strange heart

10   symptoms and dizziness and vision issues, and I

11   wasn't sleeping normally.  I started having insomnia

12   because I was very afraid about having crypto in the

13   house.  I -- I didn't want to leave the house.  I

14   went away with Madeleine for a week, and I was not

15   comfortable with -- that was the only time I left

16   the house.  And before I did it, I sent like as much

17   crypto as I could to Anchorage because I did not

18   want it in my house.

19        Q.   While you were gone you mean?

20        A.   No.  I wanted it out of -- I did not want

21   to have it.  So I was like -- Taylor wanted me to

22   keep the Bitcoin to transact it with other alt

23   coins.

24             And when I was going to Mexico, I said I'm

25   not comfortable having this asset when it could be

Ashley Richardson
October 28, 2025

1    parked at Anchorage, because Anchorage had the

2    capacity to hold digital assets and insure them, and

3    I didn't have that.  In my house, it was -- you

4    know, it was cryptocurrency that, if anybody found

5    out that was at my house, could have caused me

6    tremendous harm.  And for that reason, I -- I was

7    not able to sleep.  And that kind of compounded some

8    underlying health issues, but it certainly -- I

9    think the stress of, also, the transactions.

10            Every time, especially with Persistence, if

11   you get one thing wrong, the money is gone.  It's

12   not like moving money in the United States from a

13   bank to a bank where it's tracked, and like, you

14   know where it's going.  If you -- if you miss

15   something, the money is gone.  It evaporates.  And

16   this was before the -- this was when the market was

17   going up.  It was the bull run.  So there wasn't --

18   we weren't having any losses due to market crashes,

19   but there was losses because -- sorry.  There

20   weren't losses on my side.

21            But around that time, Karan, who was

22   Taylor's -- Taylor's head of -- I think he was her

23   IT guy, but like a -- I don't know -- a bigger one,

24   because she has a lot of IT.  Taylor entrusted some

25   wallets to him with NFTs.  He did something wrong.

Ashley Richardson
October 28, 2025

```
 1      I can't remember.  He lost a key or if he lost a
 2      password.  And then there was like $10 million just
 3      gone.  And I -- he called me and he was so
 4      terrified.  You know, it was like -- I mean, I felt
 5      so badly for the guy because it wasn't -- obviously
 6      there was no ill intent, but it was a really intense
 7      cautionary tale of how easy it was for things to
 8      just disappear.
 9           Q.   But Karan was Ms. Thomson's employee,
10      right?
11           A.   Yeah.
12           Q.   You weren't her employee, were you?
13           A.   No.
14           Q.   And you weren't getting paid to hold the
15      crypto, were you?
16           A.   No.
17           Q.   So you could have given it back to
18      Ms. Thomson at any time, correct?
19           A.   I tried.  There wasn't --
20           Q.   When did you try to give her the
21      cryptocurrency back?
22           A.   Okay.  This implies that she wasn't
23      actively wanting me to do something with it.  And --
24      and there's two different stories to this.  I think
25      that if you want to go down that path I can give you
```

Ashley Richardson
October 28, 2025

1   context for it.  But I felt responsible to help

2   Taylor do this.  Taylor wanted -- I knew Taylor

3   wanted --

4        Q.   Why?  You weren't her employee.  She wasn't

5   paying you.

6        A.   That's what I'm going to tell you.

7        Q.   And you have free will, right?

8        A.   She was my friend.

9        Q.   Okay.

10        A.   She was -- I know that you are seeing this

11   in a limited context, and you are a lawyer.

12        Q.   I'm really not.  I think anyone listening

13   to your story would say, if it was making you ill,

14   like you say, and it was causing you so much stress,

15   like you say, and you were not an employee and you

16   weren't getting paid and you had no fiduciary duty

17   and you had no obligation to do -- manage the

18   cryptocurrency, then logically a person in your

19   position would have given it back.

20        A.   No.  Because my history with Taylor, I

21   really felt genuinely like -- first of all, when

22   this trading started, I had no plan, interest, or

23   understanding that I would be doing any of the

24   trading or that I would be holding the custody.

25             I sat with Taylor and I tried to explain to

Ashley Richardson
October 28, 2025

```
 1    her how to set up a ledger wallet.  That was like an
 2    afternoon.  I got the wallets.  I was like okay.  We
 3    are going to set these wallets up.  I --
 4         Q.   Go ahead.
 5         A.   I don't want to see the keys.  I really
 6    wanted nothing to do with it.  So we went through
 7    the exercise.  I showed her how to set up the ledger
 8    wallet.  She --
 9         Q.   I'm sorry, Ms. Richardson.  This is not at
10    all responsive to my question.
11              My point was you had free will and you
12    could have given the crypto back, right?
13         A.   Well, I'm -- I'm telling you -- I'm giving
14    you context for the why.
15         Q.   But the context has nothing to do with --
16    that you are giving has nothing to do with my
17    question.
18         A.   It does.
19         Q.   Did you have free will and the ability to
20    give the cryptocurrency back at any time or not?
21    That's the question.
22         A.   There was nowhere for it to go.  There was
23    nobody who could execute those trades.  There was no
24    third party that was -- at that point.  All of the
25    trades that could go through Anchorage did.
```

Ashley Richardson
October 28, 2025

1      Q.   You don't think Ms. Thomson could have

2   hired someone else?

3      A.   There was nobody.  She didn't want -- you

4   have to understand --

5           (Simultaneous colloquy.)

6      Q.   Let's be clear.  There were plenty of

7   people that were much more qualified than you to

8   manage the cryptocurrency, right?

9      A.   Not at that moment.

10          (Simultaneous colloquy.)

11     Q.   There were professional custodians as well,

12  correct?

13     A.   There were no professional custodians at

14  that -- let me finish my question, please.

15          There were no professional custodians at

16  this time -- because we did extreme research -- that

17  could do those low-caps.  Anchorage did a lot of

18  mid-caps, and what we worked with Anchorage on

19  directly.  I had no dog in that fight.  I was

20  calling Anchorage and saying hey, can you guys hold

21  Persistence?  Can you hold these things?  The goal

22  was to get them into a custodial environment where

23  they were insured and protected always.

24          And up until that point, she was doing

25  rapid-fire purchases.  So those purchases were

Ashley Richardson
October 28, 2025

1    happening through me.  They weren't -- anything that

2    could be purchased through Anchorage was being

3    purchased through Anchorage.  Anything that was

4    being purchased and held at Anchorage was.

5          The only things I were purchasing were

6    extreme low-caps that were not available in a

7    custodial environment.  So things like -- I can't

8    even remember what it was called.  There was one

9    UK-based crypto and it had its own mechanism.  I

10   mean, these were things that were so off the wall,

11   like OHM, and all these things that did not have --

12   I looked.  I asked Tushar.  I mean, if you really

13   want to go through --

14        Q.   The only question on the table is you -- is

15   it really your testimony that you don't think

16   Ms. Thomson could have hired someone more qualified

17   and more competent than you at any moment to handle

18   her cryptocurrency?

19        A.   Yes.

20        Q.   Really?

21        A.   At that moment in time it didn't exist.  We

22   were trying to find somebody.  That is my testimony.

23        Q.   Okay.  I am going to hand you -- or Josh is

24   going to hand you --

25          Do you have another copy of this?

Ashley Richardson
October 28, 2025

1          Sorry.  Let me withdraw that.

2          You testified previously that you don't

3     think you got any requests for an accounting on the

4     cryptocurrency until approximately April or May of

5     2022, correct?

6          A.   I mean -- okay.  Let me rephrase that.

7     There was a snapshot of what assets were, but there

8     weren't like a specific purchase price.  They were

9     two different requests.  There was a request for a

10    snapshot of all the crypto and what the values were,

11    which I provided to the best of my ability, I think,

12    in December.

13         Q.   You don't consider that to be

14    accounting-like information?

15         A.   What was asked of me later was very

16    different.

17              (Exhibit 75 was marked for identification.)

18         Q.   Okay.  Let me just hand you Plaintiff's

19    Exhibit 75.  I'm going to have you take a look at

20    that for a second.

21         A.   Okay.

22         Q.   It's an email chain between you and

23    Ms. Thomson and one of her employees where in

24    November of 2021 -- I'm sorry -- December of 2021

25    you have given them a spreadsheet of the

Ashley Richardson
October 28, 2025

1    cryptocurrency holdings in response to Ms. Thomson's

2    request for accounting-type information about the

3    crypto, correct?

4         A.    Right.  And that was -- that was provided.

5    This is as deep as I could go.  That was what I had

6    access to.

7         Q.    But this is in December of 2021.

8         A.    Yes.

9         Q.    Yes.  So long before April or May

10   Ms. Thomson was asking you for accounting-related

11   information on the crypto, correct?

12        A.    It's very different.

13        Q.    Very different than what?

14        A.    Okay.  This is -- this is a list of assets

15   and their values.  That's -- that's a very easily

16   quantifiable thing.  Later what was being asked was,

17   like, I believed, to the best of my memory, the

18   purchase prices.  And that was all over the map

19   because there were so many exchanges at different

20   prices, because the price was fluctuating.  So that

21   was what I did not have track of.

22              This was a very easy exercise.  Here are

23   the assets.  These are the amounts.  And it took me

24   awhile, I mean, but I put it together.  The other

25   request was incredibly different.

Ashley Richardson
October 28, 2025

1          (Exhibit 80 was marked for identification.)

2      Q.   All right.  I'm going to hand you what's

3   been marked as Plaintiff's Exhibit 80.  This is an

4   email exchange amongst yourself and Ms. Thomson and

5   Leih Wang, who you previously testified was an

6   employee of Ms. Thomson's.

7      A.   Yes.

8      Q.   Where, again, the subject line is "We need

9   to get a handle on the wallets and the staking and

10  understand the portfolios."  They're asking you for

11  information and trying to get you on a phone call in

12  January of 2022, correct?

13     A.   Yes.  And I believe we followed this up

14  with a call with Tushar.  We had a Zoom call with

15  Tushar as a follow-up to this.

16     Q.   I don't believe that's correct in January

17  2022.

18          Do you have any documents or information to

19  indicate that there was a call with Tushar in

20  January of 2022?

21     A.   Absolutely.  Yeah, I have tons of

22  documents.  We had a Zoom call.

23     Q.   Okay.

24     A.   That, I am positive of.  And you can find

25  references to that in the text message exchanges

Ashley Richardson
October 28, 2025

1    with me and Taylor, with me and Leih, and with me

2    and Tushar during that period.

3        Q.   Okay.  Let's see.  And then after -- so

4    what I showed you is December and January, correct,

5    the last two exhibits?

6        A.   Yes.

7        Q.   And then there's -- generally there was a

8    follow-up from Leih Wang and from Taylor Thomson,

9    asking for information over the following months,

10   correct?

11       A.   It was very minimal.  The main

12   communication that I recall during that time period,

13   because it was very minimal -- and we can go back

14   and look at the specifics, and you'll see that there

15   is a gap -- I heard from Jacques Brodeur -- I may be

16   pronouncing that incorrectly -- that they needed

17   money to pay -- they needed $20 million to pay

18   Taylor's taxes.  And I was so floored at the fact

19   that anybody would be coming to me for anything

20   monetary and that Taylor didn't have money to pay

21   her taxes.  So that email I remember.

22           (Exhibit 78 was marked for identification.)

23       Q.   Okay.  And then I'm going to hand you

24   what's been marked as Plaintiff's Exhibit 78.

25           This is an email communication between you

Ashley Richardson
October 28, 2025

1    and Taylor and Leih Wang, again, where Taylor asks

2    you again for an accounting of all and to walk Leih

3    through the logistics, like the staking and the

4    lockdown of Persistence as well as the unlocking

5    schedule, right?

6        A.   Can I -- can I take a look, please?

7        Q.   Yeah.

8        A.   What's the date?

9        Q.   July 29, 2022, right?

10       A.   Yeah.  And then we did.  We go on a -- that

11   was -- we got on the Zoom call with Tushar -- I

12   think we had two separate things scheduled.  I think

13   right after this exchange we scheduled something

14   with Tushar, and either Tushar had to cancel or

15   Taylor had to cancel, and we moved it.  And I want

16   to say that Zoom happened -- I have to go back and

17   look -- the last week of January approximately, but

18   it was that month.

19       Q.   Okay.  Let me switch tracks a little bit

20   here.  Okay?

21       A.   Okay.  But that was -- in relation to this,

22   we did.  We walked through everything.  We brought

23   Leih up to speed.  We spent several hours with

24   Tushar to explain it to him, the liquid staking, all

25   of it.  So this was addressed directly.

Ashley Richardson
October 28, 2025

```
 1         Q.   In November -- approximately November of
 2    2021, you had a conversation with Ron Murphy --
 3         A.   Okay.
 4         Q.   -- about you -- your thought that Taylor
 5    Thomson should buy you -- should buy Beau's house
 6    for you, correct?
 7         A.   That was never directly said.  That was
 8    always my goal, was to get -- buy that house.
 9         Q.   Okay.
10         A.   He knew that.  There was never -- it was
11    never said directly that Taylor should buy the
12    house.
13         Q.   Was it said indirectly?
14         A.   I have no memory of that, but I know from
15    hearing from a reporter that there's an allegation
16    that I was trying to untowardly get Beau's house.
17    That is false.
18         Q.   So is it your testimony that you never
19    suggested to Ron Murphy that you thought that Taylor
20    should buy Beau's house for you?
21         A.   I do not believe -- I remember having a
22    conversation in November with Ron.  And give me a
23    minute, because Ron was a dear friend, so this is a
24    little bit hard to swallow.
25              He was having a hard time with Taylor.
```

Ashley Richardson
October 28, 2025

1    Maybe that was fabricated.  And he called me because

2    he was struggling and was expressing his

3    frustrations with Taylor being kind of MIA from his

4    life.  And I was expressing my frustrations because

5    I was worried about what I was doing for Taylor and

6    not knowing how it was going to go.  I didn't

7    disclose anything to Ron about the structure of what

8    Taylor and I had in place.  I didn't disclose it to

9    anybody.  But I said I'm working full time and I'm

10   losing other opportunities, I think.  I mean, I

11   think that I did express that to him because I was

12   frustrated.  I never thought it was going to take

13   over my life the way it did.

14        And because I was not able to do

15   anything -- and I didn't know that I was ever going

16   to receive any compensation.  Taylor alluded to

17   that.  We had the steps set aside.  I had told her

18   that I wanted to utilize some of the money for

19   creating an animal sanctuary.  We discussed that at

20   length.

21        Q.   Using some of what money?

22        A.   Some of the upside from the Persistence.

23        Q.   So, again, you are nowhere near answering

24   the question that I asked, which was --

25             (Simultaneous colloquy.)

Ashley Richardson
October 28, 2025

```
 1        Q.   -- with Ron Murphy that you've said you
 2   had --
 3        A.   Yes.
 4        Q.   -- you indicated to Ron that you were upset
 5   because you'd been doing a lot of work for Taylor
 6   Thomson, and you thought you should be compensated
 7   in some way, correct?
 8        A.   He said -- he said, "Do you want to" -- I
 9   remember him asking me something to the effect -- I
10   don't know if it was on that call or not, but I've
11   thought about this in hindsight.  He said something
12   to the effect of "You guys are simple.  You guys
13   live a simple life," because we did.  And I said,
14   "Yeah.  But I would really love to buy Beau's
15   house."  And that -- it was not "Taylor should buy
16   it for me."  I always wanted -- I never had any
17   expectation of Taylor buying anything for me, but
18   that was -- a goal line was to get to a place where
19   I could buy that house.  It was a very simple, very
20   understated ranch house on a nice property that is
21   now -- no longer exists because of the fires.
22        Q.   Let me ask again:  Is it your testimony
23   that you did not tell Ron Murphy in that -- in a
24   conversation in November of 2021 in any way that you
25   thought Taylor should buy the house for you?
```

Ashley Richardson
October 28, 2025

1     A.   I have no memory of saying that Taylor

2     should buy the house for me, no, but that is a phone

3     conversation that happened four years ago.  I don't

4     believe I ever would have said or that I ever said

5     Taylor should buy me anything.

6         Q.   Okay.  But you did indicate to Ron in that

7     conversation, as you testified a minute ago, that

8     you had been doing a lot of work on Taylor's crypto

9     and that you felt you should be compensated for

10    that?

11        A.   I think -- what I remember more about that

12    conversation was the toll it was taking on me.  And

13    it's possible that I said something about feeling

14    like I was missing out on other things, but I also

15    remember telling Ron -- because Ron and I both knew

16    that things did not end well for Taylor's employees.

17    And I knew, based on that alone, I did not want to

18    be Taylor's employee.  I valued Taylor.  I valued

19    Taylor tremendously, especially during that time,

20    because my world had gotten very small during COVID.

21    And Taylor was one of a small handful of people that

22    I saw and that I interacted with.  And so --

23        Q.   I'm just -- I'm going to ask the question

24    again because I've asked it several times, and you

25    haven't really answered it:  So is it your testimony

Ashley Richardson
October 28, 2025

1    that in a conversation in or around November of

2    2021, when you told Ron Murphy that you were doing a

3    lot of work for Taylor's crypto -- is it your

4    testimony that you did not say in that conversation

5    that you should be compensated?

6         A.   I'm saying I don't remember saying it.

7         Q.   Okay.

8         A.   I'm telling you what I remember, and I'm

9    saying I don't remember saying that directly.  I

10   think that at that point, I did feel like I should

11   be compensated, yes.

12        Q.   Okay.

13        A.   I was working 80 to 90 hours a week.

14        Q.   Okay.  You mentioned just a second ago -- a

15   few seconds ago -- and you said this before --

16   because you were handling Taylor Thomson's

17   cryptocurrency, you missed out on other

18   opportunities.  What specific opportunities did you

19   miss out on?

20        A.   I mean, there was -- there was a lot of

21   things.  I'll start with the obvious and then go

22   kind of backwards.  When I reached out to

23   Persistence, it was not -- like, it was because I

24   wanted to do, you know, some kind of marketing or

25   some sort of consulting for crypto companies.  I

Ashley Richardson
October 28, 2025

 1    thought, you know, crypto seems like the future.  At

 2    that moment in time, production had stopped.  And so

 3    my job was a, you know, film and television

 4    producer.  Nothing was happening.  I needed to

 5    pivot.

 6         Q.   Just so we can agree on when this was, this

 7    is, I think, approximately April of 2021 when you

 8    first reached out to Mr. Aggarwal at Persistence?

 9         A.   No.  I didn't reach out to Tushar until

10    June, I think.

11         Q.   Okay.  But -- of 2021?

12         A.   It was 2021, yeah.

13         Q.   Okay.  And as you said, one of the reasons

14    you reached out to Mr. Aggarwal was you -- COVID had

15    affected your industry, you weren't working, and you

16    were looking to create other opportunities for

17    yourself, correct?

18         A.   That's correct, yeah.

19         Q.   Okay.  And -- but Mr. Aggarwal wasn't

20    really interested in having you do marketing for

21    him, right?

22         A.   He seemed to be.  He -- I had a Zoom with

23    his marketing team.  I was going to put together a

24    structure, and we were going to go from there.  That

25    was going to be the focus, I thought.  But then I

Ashley Richardson
October 28, 2025

```
 1    was -- I didn't -- I had a call with Tushar for the
 2    first time right before I went with Taylor to
 3    Europe.  So I think it was -- it was, like, the end
 4    of June.  And then I went with Taylor to Europe in
 5    July, approximately.  And when I got back from
 6    Europe, I said, "Hey, I'm finally getting back.  We
 7    can have that marketing call."
 8            I can't remember exactly, but I think that
 9    I had a follow-up call with the marketing team.  We
10    started talking about their brand identity.  And
11    then right after that, Taylor came back.  And then
12    it moved to me helping Taylor, and then there are --
13    it is documented, if you go through the text
14    messages you have -- I think the ones I sent to
15    you -- I can't remember which person it was.  Maybe
16    Abhitej or one of them.  I can't remember which one
17    did the marketing -- where I was apologizing that I
18    didn't have time to focus on it because I was
19    consumed with all of the other stuff.
20            And I said, "But hopefully we'll get back
21    to that."  So that was -- that was an opportunity.
22    There was another cryptocurrency company that
23    reached out to me at that time about being their
24    head of marketing.
25        Q.   Who was that?
```

Ashley Richardson
October 28, 2025

1          A.    I am totally blanking on the name.  I can

2     look it up for you.  It -- I have email chains.  It

3     was, I believe, in the Cosmos chain.  And I think it

4     was -- I don't know if it was -- I can't remember if

5     it was a token or an exchange, but I think it was an

6     exchange.  And I also had the work that I was doing

7     for Michele's company, which I suddenly stopped.

8     And up until that point, I was doing a good chunk of

9     work of bringing in new business and also

10    representing artists.  And I couldn't do that

11    anymore.  There were also --

12         Q.    What time period are you talking about?

13         A.    We are talking about -- now we are talking

14    about -- starting in August, 2021, onward, I did not

15    have the resource of time available.  And -- and I

16    was happy to do it because I was -- I legitimately

17    thought there would be a longer-term upside from

18    both the experience I was gaining.  And, you know, I

19    thought -- I thought, stupidly, Taylor and I were

20    going to build something together and do something

21    with it.  You know, she was my friend.

22         Q.    Okay.  Let me unpack some of that.  So it's

23    all -- you are saying that in August of 2021 is when

24    you started getting really busy with Taylor's

25    cryptocurrency, and you had to start turning down

Ashley Richardson
October 28, 2025

1    other opportunities.  Is that right?

2         A.    Yes.

3         Q.    Okay.  And the one -- you said -- you've

4    talked about, I think, two opportunities.  One is

5    with a company whose name you don't remember, right?

6         A.    Well, you didn't let me finish, but --

7         Q.    I actually did let you make a long-winded

8    answer and finish.  So --

9         A.    I didn't --

10        Q.    And you yourself said you don't remember

11   the name of the company.  I'm just repeating what

12   you said.

13        A.    It was either -- it was, like -- this was

14   four years ago.  It was -- it was -- they reached

15   out to me.  I mean, I can go back and look.  I

16   don't -- it was -- I can't remember everything.

17   I -- I will be -- how about this.  How about I email

18   you by tomorrow with the name just so you have it?

19        Q.    Great.

20        A.    And we can put it on record.

21        Q.    We are going to follow up with a letter

22   asking you to produce a lot of stuff --

23        A.    That's fine.

24        Q.    -- that hasn't been produced.  So -- so

25   that's one opportunity.  You were going to be

Ashley Richardson
October 28, 2025

```
 1    marketing director for them?  Is that what you said?

 2         A.   Marketing director.  And then there was --

 3    there were other --

 4         Q.   Wait, wait.  Let's take it one at a time.

 5         A.   Sure.

 6         Q.   Did they make you an offer of employment?

 7         A.   No, but I did not have the ability.

 8         Q.   And when were you talking to them?

 9         A.   I think that would have been September.

10         Q.   Okay.  And did you tell -- if you -- did you

11    you tell them that you didn't have time to -- to

12    work with them?

13         A.   Yeah.

14         Q.   Okay.

15         A.   I believe.  To the best of my memory.

16         Q.   Okay.

17         A.   I can't say with certainty, but it was -- I

18    didn't have time.

19         Q.   What other -- what other specific

20    opportunities did you turn down?

21         A.   Well, I had a slate of projects that I

22    carried over from COVID on the development side.

23    There were several documentaries and scripted

24    features that I abandoned because I didn't have the

25    time for them anymore.
```

Ashley Richardson
October 28, 2025

1          Q.    Okay.  What were the development projects?

2          A.    I mean, there was -- I can send you the

3     slate.

4          Q.    Yes.  Do you have a list or something --

5          A.    Yeah.

6          Q.    -- with all the development projects?

7          A.    Yeah.

8          Q.    Okay.  And what -- were you doing that with

9     a company, or what were you doing?

10         A.    Well, I was a part of a company that closed

11    at the beginning of COVID.  And so those projects

12    were still under my kind of banner to move forward,

13    if I was able.  And there was a lot of opportunity

14    there once the production sort of began to resume.

15    To be fair, it -- the industry in general has

16    suffered because of strikes and other things, but

17    that was my -- that was my world.  And I had

18    invested a lot of time and energy in development.

19    And, you know, then I left them because I didn't

20    have the time to --

21         Q.    Okay.  COVID hit in the very beginning of

22    2020, correct?

23         A.    Mm-hmm.

24         Q.    Okay.  And it affected that industry

25    enormously, right?

Ashley Richardson
October 28, 2025

1          A.   Yes.

2          Q.   As you said many times, it basically shut

3     down the industry, and it shut down the company you

4     were working for, correct?

5          A.   Yes.

6          Q.   The very beginning of 2020?

7          A.   Well, not the beginning, but, like, April.

8          Q.   Well, March is when everything shut down.

9          A.   Yeah.

10         Q.   March of 2020, correct?   Okay.   And you

11    didn't start managing Taylor's crypto for a year and

12    a half after that, correct?

13         A.   No.   I worked -- I told you I worked with

14    Michele and Cypress Peak.

15         Q.   Okay.   So what work did you do on these --

16    this slate of development projects between the

17    beginning of 2020 -- whatever it was -- February or

18    March 2020 and the time a year and a half later that

19    you started working on Taylor's crypto?

20         A.   The development projects during that time,

21    I didn't do that much work on.   But you're always in

22    development.   It's constant.   You are -- you are

23    researching.   You are resourcing.   You're -- you

24    know, it's -- the biggest thing that couldn't happen

25    was in-person networking, which I was used to doing

Ashley Richardson
October 28, 2025

```
 1    up until that point.  So it wasn't as, you know --
 2    people kind of just abandoned that sector for a
 3    while.  I mean, I built a van.
 4         Q.   That's my -- that's my point.  That's my
 5    point.
 6         A.   Yeah.
 7         Q.   So there wasn't really any development work
 8    going on between March of 2020 and mid to late 2021,
 9    correct?
10         A.   Correct.  But it was starting to pick up
11    again right around the time I started helping Taylor
12    is my point.
13         Q.   And was there any specific offers or --
14    anything more about these development projects?  Did
15    people -- did anyone specific approach you and say,
16    "We should revitalize that project" or "I would like
17    to have a contract with you about developing that
18    thing" or "I would like to invest some money in
19    that"?  Anything specific?
20         A.   I know that there were a number of
21    projects -- one with an actress and friend of mine
22    Lina Esco that she was developing.  I had a book
23    option for my friend Toby Barlow.  I mean, there was
24    a few projects that came to me, and I did not
25    have -- I did not have the time.  So like anything,
```