Ashley Richardson
October 28, 2025

**written**
  56:5 57:23
  72:6 141:20
  250:1 256:13
**wrong**
  96:17 128:10
  155:11,25
  255:8
**wrote**
  129:2 195:19
  196:13 200:6

———————

**X**

**XPRT**
  53:25 54:4,
  9,14,23
  56:24 57:14
  58:5 59:2,18
  61:12,13
  64:8 68:11
  80:11 86:25
  90:22 95:6,
  17 134:1,2,
  4,6,9 185:16
  268:13
  274:10,11
**Xs**
  262:4

———————

**Y**

**yacht**
  205:3,14
  207:3,4
  209:6,23
  210:2 220:25
  222:12
  232:17 234:7
**yachts**
  207:10 211:8
**yeah**
  17:25 18:1
  19:5 24:10
  31:25 53:6
  60:8 63:24
  81:1,22

87:25 88:12,
14 91:22
96:22 97:4,8
98:11 103:14
104:8,9,15
114:20
119:10,14,19
134:19 139:1
156:11
163:21
165:7,10
168:14
171:12,18
175:13
176:5,7
177:9 178:6
188:2 189:8
198:9 203:17
204:19
205:15
208:16,18
209:3,25
210:1,11
211:12
214:13
218:2,15
219:21
220:6,22
221:3 222:12
223:18
229:12 232:2
245:16
250:10,14
253:5
261:11,21
263:5,23
264:17
267:11
268:2,3,10
269:16,19,25
270:13,17
271:3 272:1
274:12,16
275:4
**year**
  12:19 16:7,
  9,24 18:22
  19:15 20:14,
  16 21:16

22:7 23:4
24:7,10
27:15 35:17
47:8 52:19
60:4 177:11,
18 202:5
204:20
205:7,11
207:16 249:2
252:24 259:7
263:13
266:25
**years**
  12:1,2,14,
  17,25 23:22
  38:25 45:11
  47:9 64:16
  67:11 98:9
  126:17
  138:7,9
  140:4 169:3
  174:14
  193:6,16
  196:8 200:2
  203:12 206:3
  219:6 232:12
  266:24
**yell**
  202:24
**yelled**
  199:14,16
  200:1 202:2,
  14
**yelling**
  201:4,15
**yield**
  121:21
  130:5,8,16
  131:7
**yields**
  118:1
**Yim**
  7:5,17 56:18
  86:19 96:23
  114:11
  119:18,22
  273:10,13,
  22,24 275:2,

6,13,15
**York**
  19:24 29:3
**young**
  20:5
**Youtube**
  20:6 25:5
  108:5

———————

**Z**

**zero**
  238:25
**zhuzhed**
  246:21
**zone**
  150:4
**zoom**
  7:15,16 97:4
  163:14,22
  165:11,16
  171:22
  270:21
**zooming**
  7:7

———————

**è**

**èze**
  211:24

# EXHIBIT F

1
2
3    Ashley Richardson
     25399 Markham Ln,
     Corral De Tierra, CA 93908
     (310) 490-2476 |
     ashrichardson@mac.com

4
5
6    IN PRO PER
7    UNITED STATES DISTRICT COURT
8    CENTRAL DISTRICT OF CALIFORNIA
9
10   TAYLOR THOMSON,                          Case No.: 2:23-cv-04699-MEMF-MAR
11              Plaintiff and Counterclaim
12   Defendant
                                              DENDANT ASHLEY RICHARDSON
13   vs.                                      RESPONSE TO FIRST SET OF
14   ASHLEY RICHARDSON,                       INTERROGATORIES TO PLAINTIFF TAYLOR
                                              THOMSON
15              Defendant and Counterclaim
16   Plaintiff
17
18              RESPONSE TO INTERROGATORIES
19
20
21   **INTERROGATORY # 1**
22   **Identify and state the factual basis and the specific evidence supporting the factual basis for each**
23   **counterclaim that You have asserted or intend to assert in this action.**
     Response to Interrogatory No. 1:
24
25   **Thomson's Defamatory Lies About Richardson**
26   The factual basis for these counterclaims arises from numerous credible and consistent reports over an
27   extended period from individuals across multiple sectors of my life, including the film and television
28   DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF
     TAYLOR THOMSON **-** 1

industry, cryptocurrency and finance sectors, and our formerly close mutual social circle. These individuals have independently relayed that Ms. Thomson has made statements to the effect that I:

- Committed fraud and theft in connection with cryptocurrency,
- Conspired with others, including members of the Persistence team, to defraud her,
- Misrepresented my professional background and never had a legitimate career; and
- Engaged in conduct that directly caused her financial losses.

I am informed and believe, and based thereon allege, that these statements are false, made with malice, and designed to damage my personal and professional reputation.

The supporting evidence includes, but is not limited to:

    1.    Direct Accounts from Multiple Witnesses – I have spoken with numerous individuals who either personally heard these statements or were present in conversations where they were made. Their descriptions have been consistent in content, tone, and detail, despite coming from separate sources in unrelated contexts.

    2.    Corroborating Circumstantial Evidence – Shortly after these statements were reportedly made, I experienced an abrupt and unprecedented collapse in my professional and personal network. Individuals who had previously maintained regular contact ceased all communication, invitations to events stopped, and previously warm relationships became distant or entirely severed. The timing of this shift strongly correlates with the spread of these defamatory allegations.

    3.    Anticipated Discovery Evidence – I have reason to believe that Ms. Thomson's own communications, once produced in discovery will substantiate these claims and confirm the scope, frequency, and audience of the defamatory statements.

I have been informed and thereon believe that the individuals to which she disseminated this information include but are not limited to: Madeleine Thomson, Hazel Williams Carter, Robert Sabella, Shiro Gutzie, Leigh Wang, Jacques Brodeur, Ron Murphy, Kevin Fitzgerald, Rand Rusher, Kameron Combs, Cameron Moulene, Offer Waterman, Loree Rodkin, Jack Kilgore, representatives of Guidepost Solutions, and representatives of Anchorage Digital.

I am intentionally withholding the names of individuals who expressed concern and relayed the disparaging remarks that Ms. Thomson was disseminating at this stage due to the extraordinary wealth, influence, and reach of Ms. Thomson, combined with her present hostility toward me. In my experience

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON - 2

and observation, this combination of extreme resources and current adversarial posture poses a very real personal and professional risk to any individual who might be identified as contradicting her or providing testimony against her. It is not reasonable to expect that ordinary individuals, especially those in industries where her influence is considerable, would voluntarily expose themselves to the potential consequences of doing so without the protection of court-ordered safeguards.

Should the Court determine it appropriate, I am prepared to provide the identities of these witnesses under seal, pursuant to a protective order, or with other guardrails that ensure their safety and protect them from retaliation or undue harm.

I am informed and believe, and based thereon allege, that Ms. Thomson's acts were done intentionally, with conscious disregard for my rights, and with the intent to vex, injure, or cause me emotional and financial harm. This conduct constitutes oppression, fraud, and malice within the meaning of California law, entitling me to exemplary and punitive damages in an amount sufficient to punish and deter such conduct in the future.

The defamatory statements made by Ms. Thomson were unprivileged and specifically intended to injure me with respect to my professional reputation, character, trade, and business. Ms. Thomson knew, or recklessly disregarded, the fact that her false statements would likely cause me significant harm in these areas. Among other things, these statements falsely accused me of illegal criminal conduct, which is libelous on its face and exposes me to hatred, contempt, ridicule, and professional ostracization.

The false statements are reasonably susceptible of a defamatory meaning on their face in that they falsely assert that I engaged in fraudulent conduct, and they have a direct and foreseeable tendency to cause serious and lasting damage to my career, reputation, and standing in the industries in which I have worked. I am informed and believe that these statements were made with actual malice, knowledge of their falsity, or reckless disregard for the truth.

**Thomson's Intentional Infliction of Emotional Distress**

**Claim: Thomson has an extensive and well documented history of defamation and falsely accusing numerous existing and former staff members of theft and extreme negligence, in a way that was reckless and damaging.**

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON - 3

Because Taylor consistently refused to take accountability for problems, large or small, she maintained an ongoing list of grievances. Her treatment of people was polarized, she either loved them or despised them and could turn on them in an instant.

Memorable examples include, but are not limited to:

   •  Raquel – Taylor told friends Raquel had stolen from her simply because Raquel included overtime on her timecards. She also accused her of being deceptive for not disclosing her pregnancy, and repeatedly called her a "cunt," "bitch," and "thief."

   •  Dora – Taylor told everyone Dora was a thief when, to my knowledge, all Dora had done was get sheets laundered at a laundry service. At the time, Dora was the sole housekeeper for two large estates. She was fired.

   •  Ezstella – When Ezstella requested a small raise—because she was so overworked she rarely saw her husband or animals and had begun experiencing panic attacks—Taylor expressed disbelief at her "nerve" and then fired her.

   •  Justin – Initially praised, Justin was later called "useless" and "incompetent," with Taylor claiming he had cost her "millions" because he was "such an idiot."

   •  Jennifer – One of Taylor's longest-serving and most loyal housekeepers, Jennifer was repeatedly called a "drunk" and paid less than many others despite her tenure.

   •  Yas – A trusted nanny who helped raise and clearly adored Madeline. While I will never know the full truth of the accusations Taylor made against her, what I do know is that many were exaggerated or proven false. Taylor never attempted to correct the record. Yas was fired.

   •  Shannon – After Shannon attempted to defend herself by outlining her actual duties in response to being called incompetent, Taylor labeled her a "bitch," "cunt," "liar," and "thief." Shannon was fired.

   •  Leigh – Taylor repeatedly spoke of her disgust for Leigh. She believed he was actually working for her brothers covertly to make sure she did not do anything reckless. Taylor told me repeatedly that Leigh should be fired, that he had cost her hundreds of millions of dollars in opportunity costs, and that he was useless.

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON - 4

This pattern created a pervasive environment of fear, instability, and hostility that extended to me personally. It was clear that anyone—even the most trusted employee—could be suddenly vilified and cast out without recourse. Knowing that Taylor was capable of such severe and public character attacks left me constantly on edge, aware that I could be next. This ongoing climate of unpredictability and verbal abuse was a significant factor in the extreme emotional distress I experienced.

I will be uploading a substantial amount of relevant evidence in the form of screenshots and emails in the coming days to corroborate this information.

**Claim: Thomson has an extensive history of unlawfully wiretapping phones and surveilling staff members with hidden video cameras and microphones without their knowledge or consent.**

This conduct is well-documented in the public record and can be verified by simply searching "Taylor Thomson" and "Anthony Pellicano." I was aware of these reports and, based on my direct observations and conversations with Taylor, it was clear she continued similar surveillance of staff, and likely others, throughout the time I knew her.

When Taylor terminated staff, she was careful not to disclose specifics in writing or in recorded conversations. However, she often told me that the information leading to their dismissal came from sources she could not admit having information she obtained through hidden video and audio surveillance. She mentioned on multiple occasions information that was gathered through the the cars bing bugged, that as well undetectable hidden cameras throughout her properties, used to tracked her staff's movements and activities closely without their knowledge or consent.

Taylor's daughter, Madeline, told me that Taylor had played her excerpts of audio recordings obtained while Yas was in the car, speaking critically about Madeline. Madeline also described extensive video footage Taylor had of Yas using illegal substances and having parties in the family hot tub, events which occurred after Yas had dropped Madeline off at my home for me to watch her.

In early 2021, Taylor's trusted housekeeper, Dora, was let go after she had the sheets professionally cleaned and pressed at a laundry service instead of doing them herself. Taylor labeled her a "thief" and, according to what she told me, believed Dora was working multiple jobs based on location tracking and

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF
TAYLOR THOMSON - 5

other surveillance. Taylor never disclosed this alleged evidence to Dora because doing so would have revealed the illegal methods by which it was obtained.

**Claim: Thomson has an extensive history of failing to take accountability for her financial or purchase decisions, and as a result falsely blaming former and existing staff for giving her bad financial advice, stealing (including theft of crypto currencies, clothing, and other items), or making mistakes or omissions that she deemed the cause of substantial financial loss and harm.**

Thomson has an extensive and well-documented history of refusing to take accountability for her own financial or purchase decisions. Instead, she routinely shifted blame onto staff both current and former, accusing them of giving her bad financial advice, stealing (including crypto currencies, clothing, and other personal items), or committing mistakes or omissions that she claimed caused her substantial financial loss and harm. This pattern was consistent throughout the thirteen years I knew her.

In December 2017, Taylor became aware of Bitcoin after it was recommended by her then-head of security, Mike Voss. She began investing heavily and repeatedly urged me to do the same. When Bitcoin's price declined rapidly, she openly and repeatedly blamed Mike for his "horrible advice," spoke of him disparagingly, and positioned herself as a victim for having listened to "someone's terrible financial judgment." Mike became the scapegoat for her loss.

Years later, when those same early Bitcoin investments saw astronomical gains during the 2021 market surge, she took full credit for her "brilliant" investment capabilities. Mike's role was never mentioned, acknowledged, or praised again.

This refusal to accept responsibility extended well beyond crypto investments. On numerous occasions, Taylor instructed staff, including Justin and Shannon, to bid on expensive, high-end items at auction, often with little to no notice. If they failed to secure the item, she would immediately berate them as incompetent, worthless, and undeserving of their jobs, often stating they should be fired.

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON - 6

Even when the requested items were successfully purchased, if Taylor later had a change of heart or decided the price was too high, she would again direct her anger at the staff who had followed her instructions, blaming them for "wasting money" and threatening their employment.

One of the most memorable and telling examples occurred on April 16, 2022, the last day I ever saw Taylor. I arrived at her home to walk her through extensive crypto wallets and their attached directions, an important and time-sensitive matter. Instead of focusing on this, Taylor was in the middle of screaming at Justin for losing an auction item. She was so consumed with berating him for his supposed incompetence that she delayed our meeting. When we finally sat down, she spoke of nothing else except how "useless" Justin was and how he should be fired.

This longstanding sequence of scapegoating and verbal abuse created a persistent atmosphere of volatility and hostility, leaving me—and many others—in a constant state of hypervigilance. I knew from experience that anyone, regardless of loyalty or competence, could become the next target of her wrath. This instability and emotional volatility were major contributors to the extreme stress and emotional distress I endured during my time acting at her request.

The pattern of rewriting history to suit her narrative, taking credit for gains, blaming others for losses, was not isolated. It was her default operating mode, and it extended into her dealings with me in ways that were both damaging and deeply destabilizing.

**Claim: Contrary to the claims made in Thomson's lawsuit, it was Thomson that introduced Richarson to crypto investing in December of 2017, at which time Thomson urged Richardson to invest as much money as she could into Bitcoin, which Richardson did. Shortly after this initial purchase the market crashed and Richardson lost the majority of her investment when forced to sell at a substantial loss.**

*See above captioned matter relating to Bitcoin and Mike Voss. Also please refer to the documents produced in discovery.*

In 2017 Taylor urged me to invest in Bitcoin, telling me it was going to double from its number shortly, so I did. I took the small amount available in my savings account and invested a large portion to Bitcoin,

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON - 7

shortly after the market began to collapse. Ultimately I needed the funds so I had to liquidate my investment six months later. I remained out of the crypto market until our trip to Mexico in April of 2021, when Taylor's passion for Bitcoin reignighted my own crypto curiosity.

**Claim: Thomson has a lengthy history spanning overadecade of making extreme demands of Ashley; the most recent demands were in the form of purchasing a number of low cap crypto currencies not widely _available on the open market._**
_SEE INTERROGATORY # 6_

**Claim: Richardson repeatedly made it clear to Taylor in person and in writing that she was not a financial advisor and that any information she provided was research, and not financial advice. At no time did Taylor make a list of expectations or offer to compensate Ashley in any way, despite being well aware that her constant requests and purchases had become an all consuming and full time undertaking for Richardson, so consuming that Richardson told Thomson several times she was concerned that losing other employment opportunities.**

Taylor began leaning heavily on me for cryptocurrency-related input in May 2021. It is well documented that from 2019 onward, the dynamic in our friendship shifted dramatically, with Taylor becoming increasingly cruel and emotionally withholding toward me. This shift began after she propositioned me to leave my long-term partner during a rough period in that relationship, telling me my life would be "so much better" if I chose her. I loved Taylor, but I was not willing to abandon my partner. That refusal marked a distinct turning point in our friendship, and it is well documented, with the most severe deterioration occurring in late 2020 and into early 2021.

By Spring 2021, as the cryptocurrency market surged, Taylor's interest in the space reignited. On a trip to Mexico in April 2021, I mentioned Whitedove, a psychic I knew she admired, and briefly discussed her cryptocurrency predictions. This was the first time in a long while I felt Taylor saw me as someone of value again. She began messaging me about Ethereum, seeking my opinions on the markets, and asking for guidance on specific trades. Taylor was fully aware that I had absolutely zero professional experience in finance or investing. I was learning in real time, on my own, while trying to understand highly complex blockchain concepts and market patterns. I pursued this learning because I believed in the long-term

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF
TAYLOR THOMSON - 8

potential of the technology and was ready to explore new opportunities since the pandemic had effectively stopped the vast majority of productions in Hollywood.

Initially, I was hesitant to share much beyond my basic understanding of Bitcoin and Ethereum charts. When I shared Whitedove's altcoin predictions with Taylor, she became instantly fixated on buying all of them. I explicitly warned her that these were highly volatile assets that could easily go to zero and urged her to invest only small amounts, low six figures at most, which for her was minimal, to mitigate risk. Her immediate response to my objection was both cutting and coercive. She eviscerated me, saying: "That's your poverty mentality, and that's why you will always be poor." It was more than an insult; it was a deliberate challenge to my self-worth, a psychological pressure tactic that felt like a double-dog dare to "man up" and push beyond my own boundaries if I was going to assist her. This incident was witnessed by several individuals.

Despite her condescension, I continued to caution her at every turn. I repeatedly told her, in person and in writing, that I was not a financial advisor, that anything I shared was my own amateur research, and that she should never treat my information as financial advice. These warnings were ignored. Instead, she continued to lean on me daily, sometimes hourly, for guidance. Her constant demands, combined with the volume and volatility of her trades, became an all-consuming, full-time responsibility for me, one I never agreed to take on as employment or contract work, and for which she never offered any form of compensation.

This intense workload required me to turn down multiple marketing consulting engagements and emerging film/television development projects, opportunities I had been cultivating for years, because I no longer had the time or mental capacity to engage in any other professional work. I told her, multiple times, that I was concerned this level of involvement would cause me to lose other employment opportunities. She never offered to scale back her demands or clarify expectations. She knowingly allowed the dynamic to continue, fully aware of the emotional toll it was taking on me.

This was not a benign oversight. It was extreme, reckless disregard for my well-being, a sustained campaign of psychological pressure, manipulation, and exploitation that left me in a constant state of anxiety, exhaustion, and fear.

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON - 9

**Claim: Richardson expressed to Thomson numerous times her concerns relating to Thomson's high volume of purchases and as a result the high level of risk she was assuming. On numerous occasions Richardson begged Thomson to reduce her risk and to purchase smaller amounts, requests that Thomson repeatedly ignored, and went as far to say that this was Richardson's "poverty mentality" and why Richardson "would always be poor".**

*SEE ABOVE CLAIM*

In addition: at some point before the market crashed I realised that I was in a no-win situation. If Taylor's assets went up dramatically (especially Persistence) she would always blame me for not having secured that additional $20,000,000 investment.

I believe, whole heartedly, that if it had, despite all decisions being solely her own, I would still be writing this interrogatory now, instead defending myself for being responsible for her lost opportunity cost.

**Claim: Richardson expressed numerous times the extreme fear she had for her personal safety in relation to holding the physical custody of Thomson's crypto assets in her personal home, Thomson went so far as to suggest that no one would expect Ashley to have so much crypto since Ashley was so poor, Thomson also asked Richardson (with with a smile) if she would "be willing to take a bullet" if she was put in a position of being attacked physically for Taylor's crypto assets.**

Having up to $200 million in cryptocurrency physically stored in my home at the height of the market was the most stress-inducing event of my life. I was acutely aware that if anyone discovered its presence, I could be in grave physical danger. This constant fear led to chronic insomnia, which rapidly began eroding my physical health, mental stability, and overall well-being.

Throughout this period, I repeatedly told Taylor that I was afraid, specifically that I feared someone might find out I had the assets in my possession. Her response was chilling: she assured me that would never happen because, in her exact words, I was "so poor, no one would ever suspect it."

The responsibility, compounded by the fear of the market falling, became all-consuming. I became so paranoid that someone might learn of the assets' location that I completely isolated myself from any contact with the outside world, with the sole exception of Taylor.

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON - 10

By November 2021, Taylor began to abruptly withdraw from our friendship. This was devastating. She was the only person I was interacting with, save my partner, and I now found myself facing the terrifying possibility that someone so wealthy and powerful, who was experiencing substantial losses in a falling market, might be shifting blame onto me.

In January 2022, during what would be our last dinner together in any social or friendly capacity, I expressed my extreme fear for my physical safety. Her reaction demonstrated total disregard for my well-being. She casually asked, "What do you think is going to happen?" I told her that if intelligence existed that could intercept the fact I was holding her assets, highly sophisticated individuals could arrive armed, demand the keys, and that they could not access the cryptocurrency without me.

Her next question is something I will never forget: with a smile, she asked if I "would be willing to take a bullet" in that scenario. By this point, I was so psychologically conditioned and damaged by the dynamic between us that I am horrified to admit I said yes. I then added that I wasn't sure I could handle it if they went for my dogs or Michele first. In response, Taylor gave me a look of extreme disappointment, as though my hesitation to sacrifice them diminished my worth to her.

This moment was witnessed by another individual and is forever etched in my memory. It stands as one of the most disturbing examples of her reckless disregard for my safety, humanity, and emotional well-being.

**Claim: Despite never having any formal agreement with Richardson for services or outlined expectations of any kind, Thomson turned violently against Richardson and began accusing her of negligence followed by a number of Thomson's staff members making demands for information Richardson did not have and was unaware she needed to track. This created extreme stress for Ashley who suffered a severe mental and physical breakdown as a result.**

In August 2021, Taylor directed me to purchase the cryptocurrency Persistence using Bitcoin she had transferred to individual ledger wallets. By September 2021, she was insisting that $60,000,000 be

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON - 11

allocated entirely to Persistence. She repeated this demand multiple times. At my urging, I finally convinced her to diversify into other projects.

We had no agreement, formal or otherwise, regarding services, responsibilities, or expectations. I did not want to, nor did I expect to, execute purchases on her behalf. At the time, there was no third-party institution available to purchase the extremely low-market-cap cryptocurrencies Taylor was requesting. Despite this, she expected me to take the $20,000,000 remaining from her Persistence purchases and begin acquiring a series of altcoins based solely on the predictions of her psychic, Robert Sabella.

These purchases were constant. Taylor quickly exhausted the remaining $20,000,000 and then instructed me to transfer Ethereum and Atom from her Anchorage accounts to fund further buys. The pace became relentless. At the same time, I was under immense stress from holding such large amounts of volatile assets. I was also conducting constant research into insured custodial options that could securely store the tokens, knowing the risk of holding them personally.

Taylor explicitly stated she did not want her financial advisors or her family to be aware of the scope of her purchases. This was the reason she had me executing them for her. In a sudden shift, and despite frequently disparaging him, she brought her head of investments, Leigh, into the trading process. Although his involvement was initially a relief, Taylor's demeanor toward me turned cold and hostile. Leigh began demanding account records, something we had never discussed or agreed upon.

To the best of my ability, I attempted to create spreadsheets. However, I had not been tracking each individual trade. The sheer volume of transactions made this impossible: there were thousands, due to the extremely low market caps of the coins and the size of Taylor's purchases. To avoid drastically moving the price, I often laddered in small buy orders, sometimes every twenty minutes for days on end.

The situation escalated further when Taylor's head of accounting, Jacques, informed me that he would need $20,000 to pay Taylor's tax bill. This request was profoundly shocking. Not only was I alarmed that anyone would approach me for funds, but it also indicated that Taylor had no readily available source of

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF
TAYLOR THOMSON - 12

cash to meet basic obligations. This, combined with the volatile market and the mounting pressure for records I did not have, created extreme fear that I would be blamed for any losses.

The cumulative effect of this sustained pressure, combined with Taylor's sudden hostility, impossible demands, and the high stakes involved, caused me extreme mental and physical stress. I ultimately suffered a severe mental and physical breakdown as a direct result.

**Claim: Thomson's extreme reckless disregard for the probability that her actions and the pressure placed on Richardson would cause Richardson severe emotional distress.**

These items include, but are not limited to: placing me in sole custody of nearly $200,000,000 in cryptocurrency without any formal training, contractual safeguards, or security measures; directing me to execute transactions exceeding $10,000,000 at a time in extremely low-cap coins where her purchases would directly and significantly move the market price; calling me with incessant, urgent demands at all hours of the day and night to purchase various coins or to transfer large holdings from Anchorage in order to facilitate NFT purchases; and demanding that I quickly understand, purchase, and liquid stake OHM, then showing extreme displeasure when the transaction was not executed at the speed she desired.

At times, I was working 20-hour days under relentless pressure, with Thomson demonstrating complete disregard for the extraordinary time, mental strain, and risk involved in these transactions. These actions were taken with knowledge of my lack of formal training in these high-risk transactions, my existing health conditions, and the extreme volatility of the assets involved, yet she continued to place demands that any reasonable person would recognize as likely to cause serious emotional harm.

Her conduct, taken as a whole, reflects extreme and reckless disregard for the high probability that her actions and the sustained pressure she placed upon me would result in severe emotional distress.

**Claim: Ashley suffered and continues to suffer severe emotional and physical distress, continuous panic attacks, insomnia, and crippling depression as a direct result of Thomson's outrageous conduct.**
<u>*SEE INTEROGATORY #4*</u>

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON - 13

**INTERROGATORY # 2**

**State all facts Concerning Your relationship with Persistence including, but not limited to, all payments, transfers of fiat or Cryptocurrency, or financial benefits Persistence, or anyone in any way affiliated with Persistence, and/or Tushar Aggarwal made to You, and the actions You undertook or promised to undertake in exchange for those payments or financial benefits.**

Response to Interrogatory No. 2:

I first became aware of Persistence through a newsletter authored by Michele Whitedove, who expressed a positive opinion on the project's potential. This prompted me to monitor its development. After conducting my own research, I observed that the team was aiming to build substantive blockchain applications, such as Comdex (focused on commodity funding) and other platforms relevant to liquid staking.

In June 2021, I initiated outreach to the project's founders to explore whether there might be an opportunity for me to assist with marketing, social media, or branded content. On June 21, 2021, I spoke with Tushar Aggarwal for the first time. This was an informational conversation about the project's plans, trajectory, and existing marketing efforts. A follow-up conversation with their head of marketing took place, where we discussed their general social media and branding approach. I offered suggestions for potential improvements, and we agreed to speak again.

Shortly thereafter, I left for Europe with Taylor, and communications paused until early August 2021. After returning, Taylor expressed that she wanted to move her funds from Bitcoin into various altcoins, including Persistence. At her request, I contacted Tushar Aggarwal to inquire about the possibility of an OTC purchase. These communications are fully documented in my production.

From there, I facilitated certain communications and logistical steps relating to the purchases Taylor decided to make, as she was unwilling or unable to handle them directly. During this time, she was aware that my personal finances had been impacted by the pandemic. She mentioned that she might help me financially if needed, but instead I suggested the idea of earmarking a small allocation of tokens—vested

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON **- 14**

on the same schedule as hers, under her full control, and only to be realized if the investment proved profitable. She agreed without hesitation.

I mentioned this idea to Tushar, and he indicated such an allocation could be recorded in the vesting schedule. At all times, the understanding was that these tokens remained under Taylor's control and would only be transferred to me if she chose to do so after vesting.

I had no contractual, employment, partnership, or any other financial relationship with Persistence or any affiliated person or entity. I received no payment, salary, commission, or profit from Persistence. Any tokens associated with this arrangement remained in wallets under Taylor's control, and I never personally realized any profit from them.

**INTERROGATORY # 3**

**State all facts Concerning Your allegations that Plaintiff made statements to individuals that Richardson had committed fraud and theft of Cryptocurrency as alleged in paragraphs 3 through 5 of Your First Amended Counterclaim (ECF 58) including, but not limited to, the identities of the individuals Plaintiff made statements to, the contents of the statements, and the date and time of those statements.**

Response to Interrogatory No. 2:

Defendant is informed and believes, and based thereon alleges, that Plaintiff made statements to multiple individuals in the film and television industry, the cryptocurrency and financial sectors, and within the parties' shared social circles — including long-standing mutual friends and acquaintances — falsely accusing Defendant of fraud and theft with respect to cryptocurrency.

The contents of these statements, as reported to Defendant by individuals who were either present for or subsequently informed of the conversations, included but were not limited to assertions that Defendant:

- "defrauded" Plaintiff,
- "stole" from Plaintiff,
- "misrepresented" her capabilities and history,
- was "working with others" to deliberately cause Plaintiff's financial loss, and
- had engaged in "illegal" conduct for personal gain,

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON - 15

- "is a grifter, who always had a plan"
- "is a total cunt"

Defendant is further informed and believes that Plaintiff went so far as to call into question whether Defendant ever had a legitimate career, implying that Defendant's entire professional history was fabricated or overstated, and suggesting that "signs" of dishonesty were present all along but unrecognized by Plaintiff.

The individuals who have conveyed this information to Defendant are not identified here because they have expressed, directly and unequivocally, that they fear personal and professional retaliation if they were to be publicly named in connection with this matter. Plaintiff's extreme wealth and influence, estimated in the billions of dollars, combined with her known litigiousness and anger toward Defendant, has created a chilling effect that makes it unreasonable to expect these individuals to come forward absent court-ordered protections.

Defendant will make these witnesses and their statements available under seal, through deposition upon issuance of an appropriate protective order, or pursuant to other measures the Court deems necessary to safeguard them from reprisal. Defendant also intends to seek, through discovery, further documentation of Plaintiff's communications, including but not limited to text messages, emails, and social media exchanges, which are reasonably believed to exist and are expected to corroborate these reports.

The direct consequence of Plaintiff's statements has been the collapse of Defendant's professional reputation, the severing of long-standing personal and industry relationships, and the loss of career and income opportunities. Defendant is informed and believes, and based thereon alleges, that Plaintiff made these statements maliciously, knowing them to be false, or with reckless disregard for the truth, and that they were intended to cause maximum damage to Defendant's reputation, livelihood, and standing in the community.

**INTERROGATORY # 4**
**State all facts Concerning all injuries to Your "professional reputation, character and business" You allege in paragraph 6 of Your First Amended Counterclaim (ECF 58) including, but not**

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF
TAYLOR THOMSON - 16

**limited to, any specific employment or other professional opportunities You lost as a result of Plaintiff's alleged actions.**

Response to Interrogatory No. 4:

Defendant is informed and believes, and based thereon alleges, that as a direct and foreseeable result of Plaintiff's false and malicious statements — including accusations of fraud, theft, and professional dishonesty — Defendant's professional reputation, character, and business have suffered catastrophic and ongoing injury.

Immediately following the dissemination of Plaintiff's statements, Defendant experienced a marked and unprecedented severing of industry relationships across multiple sectors, including the entertainment industry, cryptocurrency and financial markets, and overlapping personal-professional networks. Individuals and companies who had previously engaged with Defendant on a regular basis — and in some cases had active projects or pending negotiations with her — abruptly ceased communications.

Opportunities lost include, but are not limited to:

•       Marketing and consulting engagements in the cryptocurrency and blockchain sectors that had been previously discussed and were expected to proceed;

•       A developing collaborative project within the film and television industry that was in early negotiation stages;

•       Referrals and introductions from long-standing mutual friends and colleagues that had historically led to lucrative professional engagements;

•       Additional emerging opportunities that could not mature because Defendant's reputation had been suddenly and severely discredited in overlapping communities where word-of-mouth credibility is critical.

In one case in particular I was told directly that I was "radioactive" because word had gotten out that I had stolen from Taylor, and no one was going to challenge that level of power, even if they knew it was not true and did love me. In many of these cases, the individuals involved did not explicitly state that Plaintiff's statements were the reason for their withdrawal; however, the abrupt timing, coupled with Defendant's informed knowledge of Plaintiff's false statements to mutual contacts, and the complete absence of any other triggering event, leaves no reasonable doubt as to causation.

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF
TAYLOR THOMSON - 17

Because Plaintiff's net worth and influence are widely known, no reasonable person in these industries would willingly align themselves with an individual Plaintiff has publicly accused of fraud and theft, regardless of the truth, without risking their own standing or future opportunities. This chilling effect has rendered Defendant effectively unemployable within certain high-value networks where she previously thrived.

The cumulative damage to Defendant's professional trajectory, public credibility, and income potential is severe and ongoing. Defendant is informed and believes, and based thereon alleges, that this was Plaintiff's intended outcome. Defendant will provide further details of specific opportunities and communications, as well as witness testimony, under seal or pursuant to an appropriate protective order to prevent retaliation.

**<u>INTERROGATORY # 5</u>**

**State all injuries, illnesses, diseases and/or medical conditions incurred by you and for which you seek recovery in this lawsuit, and the date and location that**

**(a) each such alleged illness, injury, disease, or medical condition first manifested itself (b) the date that each such alleged illness, injury, disease, or medical condition was first diagnosed, and (c) the physician that first diagnosed it.**

Response to Interrogatory No. 5:

During the events at issue in this case, I suffered a profound and cascading collapse of both physical and mental health. These injuries and illnesses were either caused outright by/or were significantly and permanently aggravated as a direct result of, the wrongful acts of Plaintiff. The harm has been severe, ongoing, and life-altering, and I am seeking full compensation for the entirety of my losses, including medical expenses, lost earning capacity, and pain and suffering.

Prior to the events at issue, I had not experienced many of the conditions described below, and those that were preexisting were generally stable and manageable. The extreme stress, workload, and pressure created by Plaintiff's conduct, particularly during the height of the cryptocurrency trading in 2021, marked the onset or dramatic worsening of these conditions, triggering a sustained health collapse from which I have not fully recovered.

**Fall 2021: Pivotal Onset of Systemic Breakdown**

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON - 18

In October 2021, at the height of the intense trading activity I undertook at Plaintiff's urging, I began experiencing a cluster of sudden, severe symptoms that marked the beginning of my physical and mental health collapse. This included the abrupt onset of severe, unrelenting insomnia: the first time in my life I had ever experienced a sleep disorder. This insomnia was not mild or occasional; it was a near-complete inability to achieve restorative rest.

The Insomnia acted as an accelerant to all other emerging health issues, both physical and mental. Without adequate sleep, my body was unable to recover from stress, and my mental health began to deteriorate rapidly. In the same month, I was formally diagnosed with Postural Orthostatic Tachycardia Syndrome (POTS) by Dr. Satinder Bhatia, MD at Cedars-Sinai in Los Angeles after experiencing extreme dizziness, vertigo, and near-fainting episodes that made it impossible to function normally.

Just one month later, in November 2021, I was diagnosed with mitral valve prolapse, also by Dr. Bhatia, after developing persistent heart palpitations, chest discomfort, and shortness of breath. During this same period, I was also diagnosed with severe anxiety and insomnia by a treating physician.

These conditions struck while I was performing complex, high-pressure trading activity under constant demands from Plaintiff. They caused immediate and substantial impairment in my ability to work, concentrate, manage daily responsibilities, and maintain stability in my personal life. I had never before been diagnosed with POTS, mitral valve prolapse, or a sleep disorder, and all three emerged within weeks of each other during the most intense phase of Plaintiff's demands.

**Gastrointestinal and Systemic Decline**

My diverticulitis, originally diagnosed in June 2013 by Dr. Alan Stein, MD in Los Angeles, escalated dramatically during this period. In October 2021, I suffered a diverticulitis flare so severe it required emergency medical intervention. Subsequent flares resulted in an ER visit in March 2022, hospitalization for a perforated colon in June 2023, and hospitalization for a colon abscess in August 2025. Persistent inflammation began in fall 2021 and has continued to the present. By late 2021, I was also experiencing symptoms consistent with gastritis, which remain ongoing. These gastrointestinal crises resulted in weeks of downtime, inability to work, and repeated medical costs.

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON - 19

**Pre-existing Conditions Significantly Worsened**

I was diagnosed with Ehlers-Danlos Syndrome (EDS) in May 2019 by Dr. Pourat, MD in Los Angeles. This condition, previously manageable, flared severely during and after October 2021, resulting in increased joint instability, pain, and functional limitations that have further reduced my physical capacity for work and daily life activities.

**Neurological and Mental Health Collapse**

By early 2022, the relentless insomnia, cardiovascular issues, and physical decline had taken a severe toll on my mental health. In January 2022, I experienced the onset of clinical depression for the first time in my life, accompanied by worsening anxiety, frequent heart palpitations, and suicidal thoughts and ideation. These mental health conditions culminated in a catastrophic nervous breakdown, stripping away my ability to function in daily life, maintain work, or manage basic responsibilities.

**Complex PTSD and Lasting Psychological Injury**

As a direct result of Plaintiff's conduct and the prolonged trauma it caused, I developed Complex Post-Traumatic Stress Disorder (CPTSD). Unlike acute PTSD, which follows a single traumatic event, CPTSD results from sustained, repeated trauma, in my case, months of extreme pressure, reputational attacks, financial destabilization, and cascading health crises that compounded daily.

CPTSD now permeates every aspect of my life. I experience persistent hypervigilance, intrusive thoughts, emotional dysregulation, heightened startle responses, and chronic difficulty trusting others. My ability to concentrate, process information under stress, and make decisions has been permanently impaired. These symptoms have not resolved and are expected to continue indefinitely, requiring ongoing therapeutic intervention.

This represents a permanent psychological injury that limits my earning capacity, has profoundly disrupted my personal relationships, and fundamentally alters my daily functioning. It is one of the most significant and enduring consequences of Plaintiff's conduct.

**Additional Harm (2022–Present)**

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON - 20

From 2022 onward, I have experienced severe hair loss, worsening Ehlers-Danlos Syndrome symptoms, ongoing systemic inflammation, and other chronic conditions. In May 2025, I was diagnosed with severe adrenal dysfunction, and in June 2025, with high cholesterol, both of which were new conditions arising after the onset of the events in question. These conditions require ongoing monitoring and will likely require long-term management.

**Impact on Daily Life and Livelihood**

The cumulative effect of these injuries has been catastrophic. I have endured repeated hospitalizations, ER visits, and specialist consultations, with ongoing and in some cases permanent impairments. My physical pain, emotional suffering, and functional limitations have drastically reduced my quality of life. These conditions have directly caused:

- Permanent or long-term loss of earning capacity
- Significant interruption to my professional career and income
- Inability to engage in many activities I previously enjoyed or relied on for daily living
- Ongoing financial strain from medical expenses, treatment, and recovery

**Damages Summary**

Before these events, I was in good health, building my career, and supporting myself independently. As a direct result of Plaintiff's conduct, I have lost my health, my ability to work at my prior capacity, my financial stability, and my quality of life. These injuries are severe, in some cases permanent, and have required repeated hospitalizations and costly ongoing care. I will continue to face significant medical needs, reduced earning capacity, and daily pain and limitation for the rest of my life. The damages I seek reflect the magnitude of these losses and the reality that my life has been permanently and negatively altered; they are properly measured in the millions of dollars.

**Lack of Early Documentation Due to Financial Destitution**

During much of the period when these conditions were at their worst, I was financially destitute and unable to access consistent medical care (as Ms. Thomson was aware, see my text exchange with her in October 2022). While this resulted in some conditions being diagnosed later rather than contemporaneously, the absence of immediate diagnosis does not diminish the severity or the direct causal link between Plaintiff's conduct and my injuries. Where medical documentation exists, it has been or will be produced.

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON - 21

During the period in which I lacked access to consistent medical care, my noticeable physical and mental decline and the subsequent impact it had on my quality of life was evident to, and personally witnessed by, several close friends and family members. I reserve the right to offer supporting affidavits or testimony from these witnesses as the Court deems necessary to further substantiate the ongoing nature and severity of my injuries.

**Confidentiality and Provider Disclosure**

To protect the confidentiality of highly sensitive mental health treatment records, psychiatric providers are not specifically identified in this response. This is done to avoid an overbroad waiver of the psychotherapist-patient privilege and to protect private medical information unrelated to the conditions at issue in this case. Responding Party will make such provider identities and any relevant, non-privileged records available for in-camera review, under seal, or pursuant to an appropriate protective order limiting the scope of disclosure to the conditions placed at issue in this litigation.

**INTERROGATORY # 6**

**State all facts Concerning Your allegation that Plaintiff "has lengthy history spanning over a decade of making extreme demands of Ashley," as alleged in paragraph 18 of Your First Amended Counterclaim (ECF 58) including, but not limited to, the date and time of the demand and the contents of the demand.**

Response to Interrogatory No. 6:

For more than a decade, Plaintiff imposed a relentless stream of personal and professional demands that intruded into nearly every area of my life. These demands were not occasional favors — they were constant, urgent, and carried an implicit expectation of compliance. They consumed my time, drained my resources, and disregarded my own work, health, and personal boundaries.

Many of these tasks were labor-intensive, emotionally taxing, and financially burdensome. None were compensated. Plaintiff's pattern was clear: my skills, availability, and personal goodwill were to be used at her discretion, regardless of cost to me.

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON - 22

Every example below is supported by extensive contemporaneous email and text evidence, produced in the discovery folder labeled "TT Demands."

2010–2022: Meal Preparation and Event Labor

Over a twelve-year span, I was repeatedly tasked with sourcing (and paying for) groceries, specialty ingredients, and preparing full meals for Plaintiff and her daughter, and on many occasions preparing large brunches, dinners, and holiday events for five or more guests, requiring days of labor and planning.

2013–2021: Strategic Review of Business Plans & Market Positioning

Between 2013 and 2018, Plaintiff repeatedly requested that I review and provide detailed feedback on business plans, pitch decks, and marketing strategies for ventures she was considering for investment. These requests were not casual conversations — they required hours of preparation, market research, and detailed analysis that drew on my professional background in branding, strategic positioning, and competitive market analysis.

My involvement was never part of a formal arrangement, nor did I receive any compensation, commission, or other benefit. I did not source these opportunities for Plaintiff, had no authority over her investment decisions, and was not acting as her financial advisor. Nonetheless, Plaintiff expected me to deliver the caliber of input typically provided by paid consultants or industry experts, as part of a broader pattern of placing high-stakes, high-pressure demands on me in a personal capacity.

Plaintiff occasionally insisted that I attend meetings with company founders or management teams to offer live assessments of their brand presentation and market approach. These meetings could involve ventures with substantial financial stakes and were often scheduled on short notice, without regard for my own professional or personal obligations.

Examples of ventures where Plaintiff required such input included but are not limited to:
- Rossano Ferretti – Sep–Dec 2013

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON - 23

1  • Cut Shelf – Jun 2015

2  • Demien Dressler – Jun 2015

3  • REX – Sep 2015

4  • Stitch Lab – Oct 2015

5  • World Future Council – Feb 2018

6  2015–2019: Recruitment and Personnel Oversight

7

8  I was directed to recruit, vet, and interface and hold interviews with household and business staff,

   sometimes in highly sensitive situations. I became the intermediary when Plaintiff's relationships with

9  some members of her staff deteriorated, often managing fear and conflict in her absence.

10

11

12  2016: Personal Errands for Social Prestige

13  • Apr 2016 – Secured exclusive artist passes to Coachella, arranged access to the private

    Neon Carnival, drove Plaintiff, her daughter Madeleine, and Madeleine's boyfriend, managed all luggage

14  and logistics — a multi-day effort for Plaintiff's social benefit.

15

16

17  2017–2021: Caretaking and Physical Labor

    • Overnighted at Plaintiff's home to supervise Madeleine while Plaintiff was away, as

18  Plaintiff expressed distrust in other staff.

19  • Sep 2018 – Personally rehomed Plaintiff's chickens — sourcing placement, coordinating

20  transport, and physically moving the animals without assistance.

21

22  On several occasions, I took care of Taylor when she was severely ill from excessive alcohol

    consumption. This included, but was not limited to: remaining on yachts to nurse her so others could

23  enjoy their holiday, holding her hair back while she vomited, helping her rehydrate, massaging her feet

24  and arms, making her dry toast, and even organizing a potential medivac with co-captains when

25  symptoms were severe. This occurred on more than three occasions.

26

27  2019–2021: Emotional Labor and Crisis Management

28  DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF
    TAYLOR THOMSON - 24

• Nov 2019 – Traveled with Madeleine to Toronto to manage her severe anxiety so Plaintiff could travel abroad.

• Mar 2020 – Met with Madeleine's ex-boyfriend to retrieve personal belongings and persuade him to sign a non-disparagement agreement for $0, despite Plaintiff being willing to pay $100,000 — a negotiation carrying both emotional strain and reputational risk to me.

Jan 2021: Pandemic Risk and Retaliation

In January 2021, during the height of the COVID-19 pandemic — when hospitals were banning visitors and cancelling all surgeries deemed medically unnecessary — Plaintiff somehow obtained a deep plane facelift, despite risk of COVID exposure. Shortly thereafter, Plaintiff's daughter contacted me in a state of urgency, explaining that all staff had refused to assist her due to the pandemic risk.

This placed me in an extremely difficult position. I had been meticulously limiting my own exposure because of serious underlying health issues, both my own and my partner's. Despite this, Plaintiff's daughter failed to follow up for two days. Then, with less than 24 hours' notice, Plaintiff demanded that I cancel a scheduled production meeting — an important work commitment — and risk COVID exposure by driving her to a hyperbaric chamber appointment.

When I declined solely because of my professional obligations, Plaintiff and her daughter retaliated by cutting off contact and deliberately excluding me from our shared social circle. They told others that my refusal "revealed my true colors."

2021: Home Staging, Purchasing, and Surveillance

• Aug 2021 – Spent multiple days sourcing, purchasing, and transporting carpets, curtains, furniture, and housewares for Plaintiff's Santa Monica home.

• Aug–Oct 2021 – Staged Plaintiff's Bel Air home for showings, ordered flowers, coordinated photography, and paid out-of-pocket for professional photo editing later published in the Wall Street Journal.

• Sep 2021–Nov 2022 – Conducted unannounced checks on staff at Plaintiff's Santa Monica home, as she suspected they were "conning her."

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON - 25

• Sep 2021 – Urgently cleaned and staged Plaintiff's Malibu home for a showing, finding it in disarray (dirty bathrooms, unmade beds, pet mess) and performing the work alone.

2018–2021: De Facto Household Manager

I became the primary contact for multiple staff members, including Raquel and Estella, who feared direct communication with Plaintiff. I fielded their complaints, coordinated logistics, and attempted to mediate in a work environment they described as hostile and untenable.

Nov 2022: Emergency Dog Incident

• Plaintiff's and Madeleine's dogs were flown from Canada for surgery. I declined to house them due to my own dogs, but Plaintiff directed me to assess whether a housekeeper could care for them.

• Days later, at 2:00 AM, Plaintiff's staff arrived at my home demanding immediate veterinary authorization for "Twigs." With no payment available, I provided my personal credit card, incurring over $5,000 in charges — never reimbursed.

• Plaintiff then instructed me to secretly remove the dogs from the housekeeper's home, hand her $2,000 in cash (which I personally provided), and conceal the reason. This was an extraordinary breach of my boundaries, finances, and ethics, executed under immense pressure.

Overall Pattern of Exploitation

From household chores and pet care to high-level business analysis and personal crisis intervention, Plaintiff treated my time, skills, and resources as an inexhaustible, on-demand service. These demands were not sporadic — they were a continuous expectation over many years, leaving me financially uncompensated, emotionally depleted, and repeatedly placed in situations that risked my personal and professional wellbeing.

Over the years, my need for Ms. Thomson's approval created a deeply imbalanced dynamic that kept me saying yes to nearly every demand, no matter the personal cost. This primed me to take on the extreme

risk of moving tens of millions of dollars of crypto currency on her behalf, which ultimately resulted in a catastrophic physical and mental health collapse, an ongoing CPTSD.

All of the above captioned matters are extensively documented, most already produced and available, more will be uploaded in the coming days and weeks.

**INTERROGATORY # 7**
**State all facts Concerning Your allegation that Plaintiff "verbally disparaged" You to "potential employers" including, but not limited to, the date and time of the disparagement, the identities of the individuals Plaintiff made the disparagements to, and the specific contents of the disparagement.**

Response to Interrogatory No. 7:

Defendant is informed and believes, and based thereon alleges, that Plaintiff's false and malicious statements  including, but not limited to, accusations of fraud, theft, conspiracy, and professional dishonesty  were communicated to individuals in overlapping professional and personal networks in the entertainment, cryptocurrency, and financial sectors. These individuals include persons with whom Defendant had previously worked, relied upon for referrals, or maintained professional relationships that had historically led to significant opportunities.

While Plaintiff may not have directly contacted an "employer" in the narrow sense, the industries in which Defendant operates, Hollywood and at the time cryptocurrency,  are tightly interconnected, relationship-driven, and reputation-sensitive. Information, once seeded, travels quickly and often indirectly, such that disparagement to even a single well-connected individual can effectively function as a broad-based reputational takedown.

Defendant is informed and believes, and based thereon alleges, that Plaintiff's communications reached individuals and entities who had the ability to influence, recommend, or hire Defendant for professional work, and that such communications directly and foreseeably resulted in lost opportunities, severed

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON - 27

relationships, and an abrupt collapse in Defendant's ability to secure work in previously accessible high-value networks.

The impact was compounded by Plaintiff's extreme wealth, social reach, and status, which imbued her statements with heightened credibility and caused them to cascade through the very circles in which Defendant's reputation and career had been built. The result was a chilling effect in which no reasonable person in those industries would willingly associate with Defendant after hearing Plaintiff's allegations, regardless of their truth.

Because of the interconnected nature of these industries, the damage was not limited to the direct recipients of Plaintiff's remarks, but radiated outward through their own contacts, many of whom are individuals Defendant has never met. This makes it impractical, and in some cases impossible, to identify every individual who heard or repeated the disparagements. Defendant will, however, identify specific witnesses, conversations, and lost opportunities in more detail under seal or pursuant to a protective order to ensure those witnesses are not subject to retaliation.

**INTERROGATORY # 8**

**State all facts Concerning each of the "primary legal issues to be addressed in the Counterclaim of this matter" listed on Pages 5-8 of the Joint Rule 26(f) Report (ECF 77) including, but not limited to, the date and time of each specific event or conversation, the individuals involved in each event or conversation, and the specific contents of each event or conversation.**

Response to Interrogatory No. 8:

Defendant objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case under Fed. R. Civ. P. 26(b)(1). It impermissibly contains numerous discrete subparts, each of which counts toward the 25-interrogatory limit under Fed. R. Civ. P. 33(a)(1), a limit that Plaintiff has already exceeded. Further, the request substantially duplicates information sought in other interrogatories, rendering it cumulative and harassing.

Subject to and without waiving these objections, Defendant further states that she is currently reviewing and compiling responsive information. Additional time will be required to provide a complete response,

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF
TAYLOR THOMSON - 28

given the extensive nature of the request, her pro se status, and ongoing efforts to locate, review, and produce responsive materials.

**INTERORGATORY # 9**

**State all of Your sources of income from January 2019 to present.**

Response to Interrogatory No. 9:

August 2015 - April 2020: Insurgent Media
March 2020 - June 2021: Limited Marketing and Business Strategy Consulting
June 2020 - July 2021: Cypress Peak Productions
Nov 2022: Sale of Los Angeles Home
2024- Present: Uber Driver
2024 - Present: Lyft Driver
2024 - Present: Instacart Shopper

**INTERROGATORY # 10**

**Identify all places You have stored or transacted with Your Cryptocurrency from 2020 to present including, but not limited to, Digital Wallets by Digital Address, accounts on Cryptocurrency exchanges, hardware wallets, and identifying each Decentralized Exchange or Liquidity Pools and the total assets held in each Liquidity Pool.**

Response to Interrogatory No. 10:

Responding Party objects to this Interrogatory as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. The request seeks information over an extended time period, covering numerous accounts and transactions, many of which were temporary, intermittent, or no longer accessible, and would require extraordinary effort to identify, trace, and quantify with precision. Responding Party further objects to the extent this Interrogatory seeks information that is not presently within her possession, custody, or control, and to the extent it calls for speculation.

Without waiving these objections and expressly reserving all rights to supplement this response as additional information becomes available, Responding Party states as follows:

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON - 29

From 2020 to the present, Responding Party has engaged in cryptocurrency transactions using various platforms, exchanges, wallets, and protocols, including but not limited to:

- Coinbase
- Binance
- Gemini
- FTX
- AscendX
- Theta Wallet
- SushiSwap
- Osmosis Zone
- OpenSea
- MetaMask
- Ledger Hardware Wallet
- Theta Wallet

I do not presently own, hold, or possess any cryptocurrency or other digital assets, in any amount, whether domestically or internationally, and has not concealed or transferred any such assets to evade disclosure. Many wallets and accounts listed above were used only temporarily, and I do not have current access to all historic addresses or balances. The process of identifying and tracing each specific digital address, liquidity pool, or decentralized exchange transaction is ongoing, and I will supplement this response in accordance with the California Code of Civil Procedure should additional responsive information become available.

**INTERROGATORY # 11**

**Identify all Telegram or other social media applications or groups You belong to Concerning Cryptocurrency, or in which you have made communications Concerning Cryptocurrency.**

Response to Interrogatory No. 11:

I am not currently an active member of any cryptocurrency-related groups or affiliations on any platform.

In the past, I have subscribed to the following applications and channels:

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON - 30

•      TradingView – Paid subscription to access data and analysis on all financial markets, including cryptocurrency. I used this application solely for research and information purposes. I have never interacted on the platform or created my own charts at any time, past or present.

•      X/Twitter – General account, not tied to any formal cryptocurrency group or affiliation.

- Telegram – Past Subscriptions:
  o PSTAKE Finance
  o Maren Messages

- Discord – Past Subscriptions:
  o The Zoo
  o Persistence One
  o Chart Champions
  o Trading Alpha
  o The Trading Floor
  o Because BitcoinChart Champions
  o Trading Alpha
  o The Trading Floor
  o Because Bitcoin

**INTERROGATORY # 12**

**Identify all Cryptocurrency trades You made for Plaintiff by transaction hash if on a Decentralized Exchange or Liquidity Pool or date and amount if on a Centralized Exchange, and each communication in which Plaintiff authorized or requested those Cryptocurrency trades.**

Response to Interrogatory No. 12:

Objections (specific)

In addition to the General Objections, Responding Party objects that this Interrogatory is not limited in time, is compound, and seeks an exhaustive listing of "all" trades by hash/date/amount plus "each

communication," which is facially disproportionate given the known execution structure of the transactions at issue (i.e., order-splitting across hundreds/thousands of fills to mitigate price impact in low-cap markets). It also seeks identification of records for accounts/wallets owned and controlled by Plaintiff, to which Responding Party no longer has access. The Interrogatory assumes Responding Party "made" trades; Responding Party did not have unilateral authority and any executions occurred, if at all, at Plaintiff's express direction using Plaintiff-owned accounts/wallets or access Plaintiff granted.

Answer (subject to and without waiving objections)

Subject to the foregoing, Responding Party states:

    1.     To the extent any digital-asset purchases were executed, they were executed at Plaintiff's express direction and using Plaintiff-owned and controlled exchange accounts and/or wallets, or access that Plaintiff temporarily granted. Responding Party did not maintain independent custodial accounts for Plaintiff and did not maintain a separate ledger of each individual fill.

    2.     Because the relevant tokens frequently had low market capitalization and liquidity, high-dollar purchases necessarily executed as numerous split orders (often hundreds or thousands of individual fills) to avoid materially moving the market price. As a result, a single intended purchase often corresponds to a large number of discrete transaction hashes (on-chain) or numerous partial fills with time-sliced quantities (centralized exchanges).

3.     Responding Party no longer has access to Plaintiff's exchange accounts, custodial statements, API exports, or on-chain wallet(s) under Plaintiff's control; access was revoked. Accordingly, Responding Party cannot identify each transaction hash, date, and amount beyond what appears in documents already within Responding Party's possession.

4.     The information requested is equally (or more readily) ascertainable from Plaintiff's own records and custodians, including:

•     Plaintiff's centralized-exchange account statements, trade logs, and API exports for the relevant period;

•     Custodial wallet statements and public block-explorer histories for the wallet addresses under Plaintiff's control (e.g., explorers for the relevant networks);

•     Any OTC confirmations, allocation schedules, and vesting records maintained by Plaintiff or the counterparties.

5.     Communications authorizing or requesting transactions. Non-privileged communications in Responding Party's possession reflecting Plaintiff's requests/authorizations (e.g.,

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON - 32

iMessage/Signal/Telegram/email) have been produced or are being produced and may be used to identify the dates and context of Plaintiff's instructions. To the extent additional non-privileged communications are located after a reasonable inquiry, Responding Party will supplement consistent with applicable rules.

6.     Without access to Plaintiff's accounts/wallets, Responding Party cannot, with precision, match each discrete fill or on-chain hash to a specific instruction thread; any such mapping would require Plaintiff's account-level exports and wallet addresses, which are in Plaintiff's possession, custody, and control.

Responding Party reserves all rights and objections, and this answer is made based on information reasonably available at this time.

**INTERROGATORY # 13**

**Identify all Cryptocurrency trades You made for Plaintiff by transaction hash if on a Decentralized Exchange or Liquidity Pool or date and amount if on a Centralized Exchange, and each communication in which Plaintiff authorized or requested those Cryptocurrency trades.**

Response to Interrogatory No. 13:

Objections (specific)

Responding Party objects that Interrogatory No. 13 is duplicative and cumulative of Interrogatory No. 12 and is objectionable for the same reasons set forth there.

Answer

Subject to and without waiving the foregoing objections, Responding Party incorporates by reference the Objections and Answer to Interrogatory No. 12 as though fully set forth here.

**INTERROGATORY # 14**

**State all facts Concerning Your assertion that You and Plaintiff discussed "for a percentage of XPRT tokens to be staked" to serve as a "finder's fee in the form of the XPRT token, that was to be staked for one year and realized only if Thomson saw a profit" as asserted in Your Response to**

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF
TAYLOR THOMSON - 33

**Allegations on Pages 4-5 of the Joint Rule 26(f) Report (ECF 77) including, but not limited to, the date and time of these discussions and the specific contents of the discussions.**

Response to Interrogatory No. 14:

At the time, Plaintiff sought my assistance with the contemplated purchase of XPRT. I understood that assisting her with this purchase would be a significant undertaking, requiring liaison with Persistence regarding sale terms, evaluating potential strategies to maximize returns (including whether to establish and operate a validator node, staking mechanics, and token management), and monitoring both the performance of XPRT and broader cryptocurrency market conditions.

During several days in early August 2021, I devoted substantial time to these efforts. I was hesitant about Taylor investing in Persistence, but also believed it to be a valuable opportunity that had the potential to increase in value. This was the first instance in our friendship where I asked for any form of compensation; prior assistance I provided had been personal in nature. Given the scope of the work and the value of the opportunity, I considered it reasonable to request a small "finder's fee" in the form of a percentage of the XPRT tokens she purchased. I also made the decision to be above board, since it had been clear to myself, Taylor, and others close to her that "friends" had benefited financially from their friendship in the past without disclosure.

Because I did not wish to formalize an employer/employee or contractor relationship with Plaintiff, having observed in prior years how her professional relationships could become strained or adversarial, I proposed that such a finder's fee be informal, structured as a small percentage of the tokens, to remain her property but be notionally set aside and "vest" for one year, payable only if she realized a profit.

I raised this proposal in person at dinner at Nobu Malibu, between August 6 and 14, 2021. We were together constantly that week, and dined at Nobu often. At that point, her intended purchase size was smaller than what it ultimately became. I believed that a percentage of the discount I negotiated for her would be fair compensation. Given our long-standing friendship and my trust in her, I did not believe it necessary to formalize the arrangement in writing. I also understood that ultimate payment would remain at her discretion if the tokens were profitable after one year.

As her investment amount grew, we discussed redirecting any set-aside portion toward charitable purposes, including a wild horse sanctuary (this is documented) and animal welfare causes.

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON - 34

The conversation was awkward given our decade-long friendship and the absence of any prior commercial arrangement between us. Many in Plaintiff's inner circle benefited financially from their association with her; I had never sought or received such benefits before. At the time, Plaintiff appeared to welcome the proposal, noting it aligned our interests and joking that I could pay for dinners once I was rich. I had no reason then to anticipate she might later mischaracterize or weaponize this discussion.

Any suggestion that I acted with Persistence to defraud Plaintiff is false and deeply damaging and hurtful. What I proposed was a modest, conditional finder's fee, a common practice in both cryptocurrency and traditional investment contexts, and one that was openly discussed with her from the outset.

It is unconscionable that Plaintiff now suggests I should have deserved nothing had her XPRT investment yielded a profit, particularly given the substantial time, effort, and expertise I devoted to assisting her. Considering that many of Plaintiff's friends and associates have profited from her wealth for years, similar amounts when transactions happened in minutes, I consciously chose never to do so. Her decision to weaponize my request for fair and proportionate compensation has caused me significant emotional and reputational harm.

**INTERROGATORY # 15**

**State the relevance to this matter of each witness You listed in Your "Anticipated Witnesses" section on Pages 9-10 of the Joint Rule 26(f) Report (ECF 77).**

Response to Interrogatory No. 15:

Respectfully submitted,

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON - 35

1        Ashley Richardson

9        Dated August 11, 2025.

_____

Ashley Richardson

In Pro Per

28  DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF
TAYLOR THOMSON - 36

Ashley Richardson

25399 Markham Ln,

Corral De Tierra, CA 93908

(310) 490-2476 |

ashrichardson@mac.com

IN PRO PER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

TAYLOR THOMSON,                                Case No.: 2:23-cv-04699-MEMF-MAR

        Plaintiff and Counterclaim

Defendant                                      DENDANT ASHLEY RICHARDSON

vs.                                            RESPONSE TO FIRST SET OF

ASHLEY RICHARDSON,                             INTERROGATORIES TO PLAINTIFF TAYLOR

        Defendant and Counterclaim     THOMSON – 12 & 15

Plaintiff

---

### RESPONSE TO INTERROGATORIES 12 & 15

#### INTERROGATORY NO. 12

       Identify all Persons that You consulted with or who otherwise assisted You concerning this matter including, but not limited to, with the preparation of any filings or other materials in this case, responding to discovery requests, or providing strategic input.

#### RESPONSE TO INTERROGATORY NO. 12

   Objections. Defendant objects that this interrogatory is overbroad, vague ("assisted," "strategic input"), seeks information not proportional to the needs of the case, and impermissibly calls for disclosure of privileged communications and attorney work product (including core mental impressions), as well as identities/communications of non-testifying consulting experts protected by Fed. R. Civ. P. 26(b)(4)(D), and communications subject to the common-interest doctrine. Defendant further objects to the extent it seeks the identity

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON – 12 & 15 - 1

of attorneys and doctors consulted and/or the substance of legal or medical advice, and to the extent it seeks disclosure of communications made in confidence for the purpose of obtaining legal or medical advice. Nothing herein should be construed as a waiver of any privilege, protection, or confidentiality.

1.  Subject to and without waiving the foregoing objections, and construing "assisted" in the broadest possible sense, Defendant responds as follows:

    o   Michele Fleury

    o   Lynn Farley

    o   Amala Barnett

    o   Susan Learable

    o   Lindsay Lerable

    o   Charles Lerable

    o   Nick Gravante

    o   Phil Kaplan

    o   Leigh Rodriguez

    o   Jodi Avergun

    o   Michelle Dipolito

    o   Jeffrey Becker

    o   Bhijan Pourat

    o   Richard Hell

    o   Lena Martyak

    o   Georgene Vairo

    o   Joyce Sherry

    o   Kristin Moreley

    o   Kevin Dowling

    o   Angela Cuneo

    o   Natalie Drillings

    o   Emily Witt

    o   Tom Espinosa

    o   Marjorie Lewis

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON – 12 & 15 - 2

1      o   Monique Caulfield

2      o   Toby Barlow

3      o   Jamie Ottelsberg

4      o   Chiyo Maniwa

5      o   Josh Elliott

6      o   Kayvan Sadeghi

7      o   Damon Berry

8      o   Hari Veluri

9      o   Asiya Arif

10         **INTERROGATORY NO. 15**

11             State the relevance to this matter of each witness You listed in Your "Anticipated Witnesses"
12     section on Pages 9-10 of the Joint Rule 26(f) Report (ECF 77).

13
14     **RESPONSE TO INTERROGATORY NO. 15**

15             General Reservation. Identification below means "may call or rely upon" depending on availability, Court
       rulings, and trial strategy, reserving all rights to add, supplement, or amend under Fed. R. Civ. P. 26(e) as needed.
16

17     **1) Taylor Thomson (Plaintiff).**

18     **Role/Relationship: Plaintiff.**

19     **Anticipated testimony and relevance:** Ms. Thomson is the central witness on publication and fault. She can
       identify the specific statements she made about Ms. Richardson, the words used, the dates, and the recipients—
20     including family members, staff, advisors, social acquaintances, and intermediaries involved in communications
       with press. She can authenticate her own emails, texts, and social messages (including sets overlapping with the
21     Singapore arbitration) and explain why and to whom she repeated the statements. She can also explain her
       crypto/NFT decision-making process and the narrative she adopted post-loss, which goes to motive, malice, and
22     causation. This testimony establishes publication, provides the context demonstrating falsity and malice, and ties the
       resulting damages to her conduct.
23

24

25     **2) Lieh Wang (Chief Investment Officer, Plaintiff's family office).**

26     **Role/Relationship:** CIO to Plaintiff.

27     **Anticipated testimony and relevance:** Mr. Wang has direct knowledge of Plaintiff's risk appetite, diligence
       practices, and decision flow on the crypto/NFT purchases. He is expected to testify regarding communications

28     DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF
       TAYLOR THOMSON – 12 & 15 - 3

among Plaintiff, Defendant, and third parties concerning timing and rationale of trades, and to any statements by Plaintiff about Defendant made in his presence or conveyed through him. His testimony rebuts the notion that Defendant "caused" or "induced" purchases and will demonstrate that investment decisions were driven by Plaintiff's own appetite for risk and FOMO. That supports falsity, causation defense, and, where applicable, publication.

**3) Tushar Aggarwal (CEO, Persistence).**

**Role/Relationship:** CEO of a non-party entity tied to relevant transactions/Co-Defendant.

**Anticipated testimony and relevance:** Mr. Aggarwal can map the trade chronology, describe the commercial relationship, and define the scope of Defendant's role versus Plaintiff's independent decisions. He is expected to identify statements Plaintiff made about Defendant in business contexts, and authenticate communications reflecting those statements. His testimony directly rebuts any allegation that there was any fraud, malice, or secret "kickback" that Plaintiff alleges.

**4) Ashley Richardson (Defendant/Counterclaimant).**

**Role/Relationship:** Defendant.

Anticipated testimony and relevance: Ms. Richardson will provide detailed ear- and eyewitness testimony of Plaintiff's statements, the words used, the dates, and the specific recipients across social, professional, and media-adjacent settings. She will outline the timeline and context showing falsity and malice, describe the reputational fallout (lost opportunities, damaged relationships), and offer garden-variety emotional distress testimony. She will authenticate emails, texts, and messages (including Singapore-produced sets reflecting pejoratives directed at her). This goes squarely to publication, falsity, malice, damages, and authentication.

**5) Defendant's Damages Expert (TBD).**

**Role/Relationship:** Potential defense expert.

**Anticipated testimony and relevance:** If designated, will quantify reputational harm and economic impact attributable to the publications, correlate losses to publication timing and audience, and address causation using accepted methodologies. Supports damages and causation.

**6) Independent Mental-Health Expert (TBD, if designated).**

**Role/Relationship:** Non-treating expert.

**Anticipated testimony and relevance:** If designated and permitted, will provide limited opinions on emotional-distress and physical ailment causation/extent based on non-privileged materials. This witness is identified out of caution; Defendant is not placing her treatment at issue and does not waive privilege. Supports damages (optional).

**7) Madeleine Thomson (Plaintiff's daughter).**
DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON – 12 & 15 - 4

**Role/Relationship:** Family member involved with NFT purchases, with in depth understanding of Plaintiff Investment and Psychological history.

**Anticipated testimony and relevance:** Anticipated testimony includes Plaintiff's extreme FOMO around high-risk investments; participation in and awareness of the NFT buys; and statements Plaintiff made about Defendant within family and friend circles, including the narratives used to assign blame after losses. This supports publication, shows motive and malice, and provides context that predates and surrounds the dispute. In addition this witness has extensive knowledge of ongoing illegal wiretapping and surveillance Plaintiff was using against her staff as well as family members, reckless investment history, patterns of addiction that led to erratic decision making and behavior.

**8) Cameron Moulene (then-boyfriend of Plaintiff's daughter).**

**Role/Relationship:** Assisted Plaintiff with NFT purchases/ventures.

**Anticipated testimony and relevance:** Mr. Moulene can describe his operational role in executing purchases and helping structure an NFT venture funded by Plaintiff, his direct observations of Plaintiff's volatility and appetite for risk, and false and damaging statements Plaintiff made about Defendant to him and within their circle. Testimony on financial benefits/commissions provides bias context; testimony on statements establishes severity of defamation and supports motive.

**9) Michele Fleury (Defendant's partner, 2010–2024).**

**Role/Relationship:** Long-term partner of Defendant.

**Anticipated testimony and relevance:** Ms. Fleury will testify to Defendant's in depth personal history with Palintiff, the depth of their friendship, all interactions with Plaintiff that related to crypto currency and purchases, the onset and escalation of Plaintiff's statements, and the concrete impacts on Defendant's reputation and relationships. She will provide lay observations of garden-variety distress (sleep disruption, anxiety, social withdrawal, physical and mental health breakdown) and day-to-day consequences. She also can recount instances where Plaintiff's statements were repeated by third parties. This supports damages.

**10) Robert Sabella (advisor/astrologer to Plaintiff).**

**Role/Relationship:** Trusted advisor consulted by Plaintiff on major decisions.

Anticipated testimony and relevance: Anticipated testimony includes the extent to which Plaintiff sought and followed non-traditional advice for investments, life advice, and false defamatory statements about Defendant made to or in his presence that were in turn repeated to others that caused harm. He can authenticate communications and provide motive/animus context, supporting publication and malice.

**11) Hazel Williams Carter (coach/healer to Plaintiff).**

**Role/Relationship:** Advisor/coach to Plaintiff.

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON – 12 & 15 - 5

**Anticipated testimony and relevance:** Ms. Carter can detail Plaintiff's habit of workshopping personal and investment narratives with advisors, including false and defamatory statements about Defendant shared in that process, some of which were relayed onward. This shows patterns, motive, and provides context for fault.

**12) Julia Gordon (former assistant to Plaintiff).**

**Role/Relationship:** Administrative aide during relevant period.

**Anticipated testimony and relevance:** Ms. Gordon observed Plaintiff's communications practices and will testify about statements concerning Defendant made in the workplace and to third parties. Her testimony sheds light on the working environment as well as Plaintiff's state of mind during the crypto currency purchases, as well as the abuse she personally experienced and Plaintiff's retaliatory conduct. This supports motive, pervasive history of abuse, and credibility assessment.

**13) "Eztella" (former assistant; full name to be supplemented).**

**Role/Relationship:** Former assistant with access to sensitive communications.

**Anticipated testimony and relevance:** Expected to testify about statements Plaintiff made about Defendant to staff and outsiders, the handling of sensitive communications, and related practices. This witness also has firsthand experience with disparagement by Plaintiff, indicating a pattern relevant to malice and credibility. Supports authentication of channels/devices.

**14) Pamela Miller (former nanny to Plaintiff).**

**Role/Relationship:** Former Nanny

**Anticipated testimony and relevance:** Plaintiff's former nanny who was targeted by Plaintiff for aiding in a lawsuit against Plaintiff. As a result plaintiff wiretapped this individual, in addition to having her followed by private investigators, and systematically destroying her life and reputation. This witness also has firsthand experience with disparagement by Plaintiff, indicating a pattern relevant to malice and credibility.

**15) Carl Mellinger (former arborist/service provider).**

**Role/Relationship:** Vendor who previously litigated with Plaintiff.

**Anticipated testimony and relevance:** Mr. Mellinger's experience with Plaintiff in financial disagreements provides context for blame-shifting and refusal to accept responsibility. This supports pattern, motive, and credibility, where applicable.

**16) Mike Voss (former head of security to Plaintiff).**

**Role/Relationship:** Security lead; early contact point for Bitcoin/crypto.

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON – 12 & 15 - 6

**Anticipated testimony and relevance:** Mr. Voss has an in depth awareness of Plaintiff's use of illegal wiretapping and surveiling staff and others. Mr. Voss can place Plaintiff's early awareness of crypto, identify communications among Plaintiff, staff, and third parties about crypto, and recount statements by Plaintiff about Defendant within that environment. He is also positioned to describe how Plaintiff later assigned blame to others for losses. Supports publication, causation rebuttal, and motive.

**17) Karan Dadwani (IT/technology support to Plaintiff).**

**Role/Relationship:** Responsible for devices/accounts and NFT custody/security.

**Anticipated testimony and relevance:** Mr. Dadwani was personally trusted to trade and safeguard tens of millions of dollars of NFT purchases, and was given first-hand knowledge of Plaintiff's insatiable appetite for crypto currency, and the risks that followed due to the nature of the purchases. Mr. Dadwani was personally responsible for the loss of millions of dollars of NFT investments due to a password issue and can speak to the impact of high risk without guardrails placed on people trusted to aid Plaintiff in her crypto currency purchases.

**18) Yasmeen Saleh (former nanny to Plaintiff).**

**Role/Relationship:** Former Nanny

**Anticipated testimony and relevance:** Ms. Saleh has extensive first-hand knowledge of Plaintiff's extensive history of illegally surveilling and wiretapping individuals, reckless investment history, failure to be accountable, alcoholism, erratic behavior, false accusations and extensive patterns of defamation.

**19) Ron Murphy (close friend/former partner of Plaintiff; also known to Defendant).**

**Role/Relationship:** Longtime friend to Plaintiff and Defendant, romantic partner and confidant to Plaintiff.

**Anticipated testimony and relevance:** Mr. Murphy has extensive first-hand experience of Plaintiff's history of illegally surveilling and wiretapping individuals, reckless investments, failure to be accountable, alcoholism, erratic behaviour, false accusations and extensive patterns of defamation. In addition, Mr. Murphy has in depth knowledge of Plaintiff's attitudes toward Defendant predating the crypto events and can recount statements Plaintiff made about Defendant in personal settings. That evidence speaks directly to malice and motive, shows publication in intimate circles, and provides a baseline for credibility assessments. Mr. Murphy also worked in the same industry as Defendant and can speak to the nature of the damage that these accusations would have caused.

**20) Catherine Hardwicke (friend of Defendant; acquaintance of Plaintiff).**

**Role/Relationship:** Social/Professional friend to Defendant and acquaintance to Plaintiff.

**Anticipated testimony and relevance:** Ms. Hardwicke can testify to statements by Plaintiff about Defendant made in social/professional contexts and to Plaintiff's reactions to investment solicitations—context that illuminates how Plaintiff framed Defendant to others in a way that was damaging to her reputation and directly impacted her career. Supports publication and motive.

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF TAYLOR THOMSON – 12 & 15 - 7

**21) David Thomson (Plaintiff's brother).**

**Role/Relationship:** Family member with knowledge of oversight measures.

**Anticipated testimony and relevance:** Expected testimony includes family interventions regarding Plaintiff's finances, which provides context for Plaintiff's accountability narratives. He may also be a recipient of statements about Defendant within family circles. This supports motive, credibility, and, where applicable, publication.

**22) Lynn Farley (friend of Defendant).**

**Role/Relationship:** Long-time friend and observer.

**Anticipated testimony and relevance:** Ms. Farley will describe the real-world effects of Plaintiff's statements on Defendant—reputation among peers, lost relationships/opportunities—and provide lay observations of garden-variety distress. This testimony goes directly to damages and corroborates the breadth of dissemination.

**23) Kameron Combs (associate of Plaintiff and Plaintiff's daughter).**

**Role/Relationship:** In the social during the time of the purchasing orbit around cryptocurrency activity.

**Anticipated testimony and relevance:** Ms. Combs can speak to purchasing activity, false and defamatory statements Plaintiff made about Defendant to peers, and how it impacted their social circle. This evidence establishes harm, informs motive, and aids credibility assessments.

**24) Kevin Fitzgerald (friend of Plaintiff).**

**Role/Relationship:** Social circle.

**Anticipated testimony and relevance:** Mr. Fitzgerald is expected to testify about Plaintiff's romantic attraction towards Defendant and the resulting retaliatory conduct, as well as discussions of crypto and false and defamatory statements about Defendant, and harm caused to Defendant within their shared social circle, offering context for pre-existing animus and the way Plaintiff shared narratives about Defendant with friends. This supports publication, motive, and malice.

**25) Shiro Guzie (friend of Plaintiff).**

**Role/Relationship:** Social circle.

**Anticipated testimony and relevance:** Mr. Guzie can recount false and defamatory statements made by Plaintiff about Defendant and the dispute that were made in social settings, corroborating republication and demonstrating state of mind. This goes to publication and malice.

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF
TAYLOR THOMSON – 12 & 15 - 8

Respectfully submitted,

Ashley Richardson

Dated October 12, 2025.

Ashley Richardson

In Pro Per

DENDANT ASHLEY RICHARDSON RESPONSE TO FIRST SET OF INTERROGATORIES TO PLAINTIFF
TAYLOR THOMSON − 12 & 15 - 9

# EXHIBIT G

**From:** **Ashley Richardson** ashrichardson@mac.com
**Subject:** Re: Objections & Request for Extention
**Date:** 7 May 2025 at 08:51
**To:** Todd Harrison tdharrison@mwe.com
**Cc:** Josh Yim  jyim@mwe.com,  Joseph Evans Jbevans@mwe.com



Dear Todd,

Per your timing request: please confirm today's meet and confer at 3pm EST, and the best method to contact.

Regards,
Ashley

Sent from my iPhone

> On May 7, 2025, at 5:46 AM, Ashley Richardson <ashrichardson@mac.com> wrote:
>
> Todd,
>
> Thank you for your response. I confirm availability for a meet-and-confer today, May 7, 3pm. Eastern.
>
> As noted previously, I preserved my objections based on improper service of Plaintiff's discovery demands, and I documented that I did not consent to email-only service. I am continuing to act in good faith and request a reasonable extension through May 30 to complete my responses due to hardship, logistical limitations, and the volume of materials involved.
>
> Additionally, because the Court previously denied my Motion to Compel Deposition of Ms. Thomson without prejudice for failure to meet and confer, I intend to use this conversation to satisfy that procedural requirement. Please be prepared to provide Plaintiff's availability for deposition so we may avoid unnecessary motion practice.
>
> Please let me know the best number to reach you, or if you have a dial in you would prefer to use.
>
> Best,
> Ashley Richardson
>
>> On May 6, 2025, at 9:29 PM, Harrison, Todd <Tdharrison@mwe.com> wrote:
>>
>> Ms. Richardson -
>>
>> You have had over seven months to review and consider our initial discovery demands which are narrowly tailored to the allegations in our initial Complaint and your Counterclaims, which were filed long ago. Over those seven months, you had a responsibility to review your own records and communications and provide a timely response.  Apparently you have done nothing, and you provide no specifics as to why you have somehow been unable to do so, or why you need more time to undertake these relatively basic tasks. Continually pretending that there was some imagined imperfection in the service of everything that you have clearly received, including the discovery demands, is a patently obvious stall tactic. Accordingly, we fail to see why you are unable to respond to our discovery demands as this information should be readily available to you. We are available for a meet and confer tomorrow between 3 and 5:30 pm Eastern.
>>
>> TODD HARRISON
>> Partner
>> **McDermott Will & Emery LLP**  One Vanderbilt Avenue, New York, NY 10017-3852
>> **Tel** +1 212 547 5727 | **Mobile** +1 917 797 1728 | **Email** tdharrison@mwe.com
>> **Website** | **vCard** | **Twitter** | **LinkedIn**
>>
>>
>>> On May 5, 2025, at 2:39 PM, Ashley Richardson <ashrichardson@mac.com> wrote:
>>>
>>> [ External Email ]
>>> Todd,
>>>
>>> This extension is in no way workable in my current circumstances.

Due to significant ongoing hardship caused by your client's actions—including financial instability, loss of essential equipment, and lack of resources—I am unable to fully and accurately comply with the current timeline. I am requesting a reasonable extension to May 30, 2025 to complete production and responses.

If your client is unwilling to stipulate, please provide your earliest availability for a meet-and-confer to discuss:
1.
Improper service of the original discovery demands;
2.
My intention to file a revised motion to compel deposition testimony.

I remain committed to participating in discovery in good faith and hope we can resolve this without further court involvement.

Best,
Ashley

Sent from my iPhone

On Apr 30, 2025, at 2:01 PM, Yim, Josh <jyim@mwe.com> wrote:

Ashley,

As we have made clear, your failure to timely respond to discovery has waived your objections.  Nevertheless, we are amenable to a 7-day extension, and we can have that argument later.  Accordingly, we expect your "full substantive responses" by May 7, 2025.

Best,
Josh

JOSH YIM
Associate
McDermott Will & Emery LLP  2049 Century Park East, Suite 3200, Los Angeles, CA 90067-3206
Tel +1 310 277 4110  |  Email jyim@mwe.com
Website | vCard | LinkedIn

From: Ashley Richardson <ashrichardson@mac.com>
Sent: Wednesday, April 30, 2025 10:21 AM
To: Harrison, Todd <Tdharrison@mwe.com>
Cc: Yim, Josh <jyim@mwe.com>; Evans, Joseph <Jbevans@mwe.com>
Subject: Objections & Request for Extention

[ External Email ]

Dear Todd,

Please find communication related to objections and request for reasonable extension attached.

Please advise whether Plaintiff is willing to stipulate to a 30-day extension by EOD. If Plaintiff declines to stipulate, or no response is received, I reserve all rights and will seek appropriate relief from the Court.

Best,
Ashley

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Our Privacy Policy explains how we may use your personal information or data and any personal information or data provided or made available to us. Thank you.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Please visit http://www.mwe.com/ for more information about our Firm.

# EXHIBIT H

From: **Ashley Richardson** ashrichardson@mac.com
Subject: **Re: Thomson v. Richardson - Rule 37 Statement**
Date: **Sep 22, 2025 at 12:37:40 PM**
To: Josh Yim jyim@mwe.com
Cc: **Todd Harrison** tdharrison@mwe.com, **Julian Andre**
JAndre@mwe.com, **Joseph Evans** Jbevans@mwe.com

Mr. Yim,

Thank you. I intend to exercise my right to a meet and confer within a reasonable timeline and will be available Wednesday after 2:30PM PST, alternatively my schedule is flexible on Friday September 26.

Please confirm your availability.

Best regards,
Ashley Richardson

Sent from my iPhone

> On Sep 22, 2025, at 12:01 AM, Yim, Josh <jyim@mwe.com> wrote:
>
> Ms. Richardson,
>
> Please find the attached documents. This is a draft of what we intend to submit to the Court and the Rules require that we give you an opportunity to state your position.
>
> Best,
> Josh
>
> **Josh Yim**
> Associate
>
> **T:** +1 310 277 4110 I **F:** +1 310 277 4730
> jyim@mwe.com I LinkedIn
>
> McDermott Will & Schulte LLP I mwe.com

2049 Century Park East, Suite 3200, Los Angeles, CA 90067



*******************************************************************************************************
This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Our Privacy Policy explains how we may use your personal information. Thank you.
*******************************************************************************************************

Please visit http://www.mwe.com/ for more information about our Firm.

**<2025-09-21 Harrison Decl. ISO Motion to Compel.pdf>**

**<Ex. A.pdf>**

**<Ex. B.pdf>**

**<Ex. C.pdf>**

**<Ex. D.pdf>**

**<Ex. E.pdf>**

**<2025-09-21 Rule 37 Joint Statement.docx>**